UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADIDAS AMERICA, INC., an
Oregon corporation;
and ADIDAS AG, a foreign entity,

                Plaintiffs,

        v.                          21 Civ. 5615 (JSR)

THOM BROWNE, INC., a Delaware
corporation,

                Defendant.

------------------------------x
                                    New York, N.Y.
                                    January 4, 2023
                                    9:55 a.m.

Before:

                    HON. JED S. RAKOFF,

                                    District Judge
                                    –and a Jury–


                        APPEARANCES

KILPATRICK TOWNSEND & STOCKTON LLP
        Attorneys for Plaintiffs
BY:  R. CHARLES HENN, JR.
        H. FORREST FLEMMING III

WOLF GREENFIELD & SACKS, PC
        Attorneys for Defendant
BY:  ROBERT MALDONADO
        HARLEY LEWIN
        BRYAN CONLEY
        TONIA SAYOUR

ALSO PRESENT:
NITA GRAY, adidas paralegal
MICHAEL PUSTERLA, Thom Browne paralegal

1        (Trial continued; jury not present)

2        THE COURT:  Juror No. 3 called in and said that

3   although she tested negative for Covid, she was feeling very

4   weak, very fatigued, and all sorts of issues, so I excused her.

5   Any objection?

6        MR. HENN:  Not from us, your Honor.

7        MR. MALDONADO:  No objection, your Honor.

8        THE COURT:  That is why we have nine jurors even,

9   though we only need six.

10       (Jury present)

11       THE COURT:  Good morning, ladies and gentlemen.  Thank

12  you for your promptness.  The reason there was a little delay

13  is that Juror No. 3 called in and although she tested negative

14  for Covid, she had what sounded to me like flu-like symptoms.

15  She had fatigue, respiratory issues and so forth.  So counsel

16  and I decided to excuse her and continue without her.

17       So, former Juror No. 4, congratulations, you're No. 3

18  now, et cetera, et cetera.

19       So let's continue.

20   CHRISTOPHER GORDON MURPHY, resumed.

21  DIRECT EXAMINATION CONTINUED

22  BY MR. HENN:

23  Q.  Mr. Murphy, when we wrapped up yesterday, you were talking

24  to us about unsolicited media.  Can you tell us why unsolicited

25  media is tracked by adidas?

1   A.  Sure.  Unsolicited media gives us a good idea if the work

2   that we are doing is working.  That means that people,

3   auditors, publishers, writers are talking about us because of

4   the popularity of our brand, of our products.

5   Q.  We will next pull up Exhibit 37.  Will you tell the jury

6   what's contained in this compilation?

7   A.  This is a compilation of unsolicited media articles.

8   Q.  If we go to page 4, can you identify the source of this

9   article?

10  A.  Sure.  This is *The New York Times*.

11  Q.  Nita, if you will blow up the second paragraph in the

12  article.

13          Mr. Murphy, will you just read for the jury the last

14  sentence from this article.

15  A.  Sure.  "Another popular choice is the Trophy leather belt

16  by adidas, with the company's trademark three stripe logo made

17  into a metal buckle.

18  Q.  Thank you.  Let's go to page 6.  What is the source of this

19  article?

20  A.  This is *Glamour*.

21  Q.  Go to the third paragraph, please, Nita.

22          Would you read what's written there in the first

23  sentence, please?

24  A.  Sure. "Wang's line includes T-shirts, sweatshirts and

25  hoodies with an upside down graphic appliqué and a group of

1  tricots and shorts with a monogram print with an inside-out

2  stitching of adidas iconic three stripes."

3  Q.  Go to page 12.  What is the source of this article?

4  A.  This is *Footwear News*.

5  Q.  What is *Footwear News*?

6  A.  *Footwear News* is an industry publication -- industry

7  meaning within the footwear industry -- often read by folks in

8  the industry and anyone who is interested in footwear and shoe

9  design.

10 Q.  Nita, if you will please pull up the last paragraph on this

11 page.

12        Mr. Murphy, will you just read the last that paragraph

13 you see blown up there?

14 A.  Sure. "So when adidas recruits athletes these days, James

15 Harden, Kristaps Porzingis and Lionel Messi are among those to

16 don the brand's signature three stripes."

17 Q.  Go to page 32.  What is the source of this article?

18 A.  This is *Sports Illustrated*.

19 Q.  If we pull up the second paragraph, Nita, the one at the

20 bottom of the page.

21        Mr. Murphy, if you will read that sentence please?

22 A.  Sure.  "The two-tone colorway makes the new Nemeziz boots

23 look incredible.  The dark blue and turquoise trim is set off

24 by the striking and unmistakable adidas stripes in sharp

25 yellow."

1   Q.  Thank you, Mr. Murphy.

2           Nita, you can take that exhibit down.

3           Shifting away a little bit from advertising and

4   marketing, Mr. Murphy, I'd like to talk about consumers to whom

5   you target the marketing efforts.  Does adidas have a targeting

6   in mind when you do your marketing?

7   A.  As I mentioned a little bit earlier, there is a desire for

8   us to reach as many people as possible.  We are a large brand.

9   We want as many people to purchase.  In general, we market and

10  target everyone.  There are instances where we do target

11  specific consumer groups.  For instance, with soccer

12  advertising, we tend to focus on soccer players.  With running

13  advertising, we tend to focus on runners, as examples.

14  Q.  Let's take a look at some of that targeted advertising.  If

15  we can pull up Exhibit 39.

16          Just identify for the jury what's contained in the

17  collection of documents marked as Exhibit 39?

18  A.  Sure.  This is a set of examples from social media and

19  otherwise where we are using targeted advertising specifically

20  around key categories like soccer, running, basketball,

21  football as examples.

22  Q.  Exhibit 39 is the soccer collection, right?

23  A.  Correct.

24  Q.  Go to page 4.  Can you describe for us the marketing we see

25  on this page?

1    A.   Sure.  This is a football ad featuring Zinedine Zidane, a

2    popular French soccer player.  This ad was targeted to football

3    players, soccer players.

4    Q.   Go over to page 5.  Nita, if you'll blow that up for us.

5         Can you describe this piece of marketing material?

6    A.   Sure.  This is a soccer ad as well featuring David Beckham

7    focused on new boots, new apparel and a new ball for the World

8    Cup.

9    Q.   And page 7.  Describe this one, please?

10   A.   Sure.  This is an ad targeting soccer players with our new

11   Predator football boot.

12   Q.   In connection with your targeted soccer marketing, how does

13   the company, if at all, use the Three-Stripe Mark?

14   A.   In all of our ads, we make sure the Three-Stripe Mark is

15   ever present.  In this ad is one example, and you'll see it

16   across the -- down sleeve of all of the players featured.  You

17   will also see it within the Predator soccer boot, which I

18   mentioned.  You'll see it within the box, the sport performance

19   box holding the Predator shoes, and then again the logo in the

20   upper right-hand corner, you'll also see the three stripes

21   there.

22   Q.   Thank you, Nita.  You can take that one down.  Let's pull

23   up Exhibit 40.

24        Mr. Murphy, can you tell us what is contained?

25        THE COURT:  I'm sorry, counsel, I need to have you

1   come to the sidebar for this one.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the sidebar)

2        THE COURT:  So we have now spent more than three hours

3   with this witnesses going over something that, if I remember

4   the opening statements of defense counsel, was not seriously in

5   dispute.  So it's a waste of time.

6        MR. HENN:  Your Honor, the issue we have is that they

7   have an expert who they are going to call in their case who

8   will challenge whether the Three-Stripe Mark is famous and --

9        THE COURT:  Is that right?

10        MR. CONLEY:  Particularly as to horizontal stripes,

11   not the vertical stripes, as we said in the opening.  The

12   common law marks in particular.

13        MR. HENN:  That's the issue we have.

14        THE COURT:  If defense counsel insists on going down

15   that track, then I will allow plaintiff to continue.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2    Q.  Mr. Murphy, would you please describe for the jury what's

3    contained in the collection marked as Exhibit 40?

4    A.  Yes.  This is a basketball ad featuring John Wall and

5    adidas new Crazy Quick basketball shoe.  This would be targeted

6    to basketball players.

7    Q.  Talk to us about how the Three-Stripe Mark is incorporated

8    into your basketball specific marketing.

9    A.  Sure.  In this particular example, you can see the

10   Three-Stripe Mark coming down across the shoes.  This is on

11   Instagram and our handle so you also see our logo being

12   utilized as well.

13   Q.  Pull up Exhibit 41.  Tell us what is contained in Exhibit

14   41.

15   A.  Sure.  This is an older soccer advertisement -- running

16   advertisement, pardon me, *Track and Field*.  You can see our

17   founder, Adi Dassler, below.  This would be targeted towards

18   track and field athletes.

19   Q.  Go to page 2 of Exhibit 41.  Can you identify this, please?

20   A.  Sure.  This is an ad featuring Grete Waitz, one of the more

21   famous marathon runners.  She actually ran and won the New York

22   Marathon multiple times.  This would be targeted to runners.

23   Q.  We go to page 3.  Nita, if you will zoom in at the top

24   there so Mr. Murphy can see that, and the jury.

25          What do we have here?

1   A.  This is our adidas running Instagram handle, and it

2   contains content, advertisement, products that is designed and

3   created specifically for runners.

4   Q.  Finally, page 14.  Nita, zoom in at the top.  Thank you.

5        Mr. Murphy, what do we have on page 14 of Exhibit 41?

6   A.  This is our adidas running You Tube page, similarly

7   featuring content, video specifically, motion content designed

8   for runners.

9   Q.  When you say motion content, what do you mean?

10  A.  Video mostly.

11  Q.  We can take Exhibit 41 down.

12       Mr. Murphy, in the course of your work, do you have

13  occasion to learn what consumers think about the adidas brand?

14  A.  Yes, all the time.

15  Q.  And how do you go about learning that information?

16  A.  A number of ways.  Within my organization, we do have a

17  data analytics team that provides regular information regarding

18  campaigns that we've launched around products or around brand

19  campaigns to tell us how consumers are viewing that:  Is it

20  positively?  Is it viewed negatively?  Any other sentiment type

21  like that.  We also have a larger consumer insights group which

22  does not sit within my organization that provides regular

23  information around consumer trends, around how consumers feel

24  about us, using both quantitative and qualitative means.

25  Q.  Can you just tell us what you mean by quantitative and

1   qualitative means?

2   A.  Sure.  They will do focus groups, regular focus groups.

3   They will run surveys.  They will scrape social media

4   environments.  They will use tools that track conversation on

5   social medial and across the internet.

6   Q.  Did they conduct all of that research inhouse?

7   A.  No.  We use a variety of external agency partners.

8   Q.  How are those agency partners selected?

9   A.  It's done through that consumer insight group.  They work

10  closely in the process of selecting the best option.

11  Q.  Has the consumer insights group been doing that research

12  during your time at adidas?

13  A.  Yes, they have.

14  Q.  Are you provided regularly with the reports from the

15  insights group?

16  A.  Yes, I am.

17  Q.  Mr. Murphy, how would you describe the adidas brand?

18  A.  First and foremost, the adidas brand is the brand known as

19  the brand with the three stripes.

20          Secondarily, we are thought of as a very authentic

21  brand.  We've been around longer than pretty much everybody.  I

22  mentioned our being founder of the 1940s.  In the U.S. in the

23  1950s.  And that's both in sport and style.

24          As we saw yesterday too with Run D.M.C., we've been

25  part of street and lifestyle street culture for a long time as

1  well.  So authenticity in sport and culture is very much who we

2  are.  We also have tremendous credibility, both in sport and in

3  style.  Some of the best athletes in the world in all sports

4  wear our product and perform incredibly well in those products,

5  and that gives you great credibility.  People want to buy your

6  shoes.  And now on the style side as well, when you think about

7  some of the partners that we work with, Beyonce to Pharrell,

8  we have great credibility there as well.

9         THE COURT:  I'm not sure what you mean by credibility,

10  but since there was no objection to what seems to me to be

11  otherwise objectionable testimony, I will let it stand.

12         Go ahead, counsel.

13  A.  And then also inclusivity.  We work very hard to be thought

14  of as an inclusive brand, a brand that is for everybody.  And

15  then sustainability, we work very hard to be thought of as a

16  brand that is stainable.

17  Q.  Has adidas done market research to try and measure these

18  brand attributes you just went through?

19  A.  Yes.

20  Q.  Let's pull up Exhibit 42, please.  Can you identify for the

21  jury what is contained in Exhibit 42?

22  A.  Yes.  This is research done by one of our partners,

23  Hall & Partners.  They are an outside research agency that we

24  worked with for a number of years.  This is a research report

25  from Quarter 1, 2017.

1   Q.  Can we go to page 2?  And, Nita, zoom in on this?  Thank

2   you.

3           Mr. Murphy, will you describe the methodology that was

4   used in this research?

5   A.  Yes.  In this particular one, there was a number of both

6   focus groups and surveys done for this one, done with different

7   types of audiences:  So a large broad audience, a style

8   audience or a group that is more likely to be connected to

9   style, a varsity audience which is high school sports, so

10  varsity sport players.  And then focused in three key cities:

11  New York, LA and Chicago.  And then really looking at a number

12  of key specific sports:  Runners, football, soccer players and

13  basketball players typically, and that one aged 14 to 25.

14  Q.  Go over to page 13.

15          THE COURT:  I'm sorry, counsel come to the sidebar

16  again.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1        (At the sidebar)

2        THE COURT:  So the more I think about it, the more

3   troubled I am by the testimony I interrupted a few minutes ago.

4   I accepted as business records certain exhibits, some of which

5   you're getting to right now, on the representation that this

6   witness was not being called as an expert, and clearly he

7   couldn't be called an expert because there was no expert

8   report.  He was never offered as an expert.

9        Nevertheless, he offered the opinion, and it couldn't

10  be anything other than that, that this was -- the adidas brand

11  was "credible," which no matter how you define that, it has to

12  be an opinion that only an expert could give.

13       Now, I would have struck it, but defense counsel, who

14  either for strategic reasons or because he prefers the potted

15  plant approach to litigation, made no objection, and he was

16  clearly on warning about this issue.  So I let it stand because

17  there was no objection.

18       But if I hear it again, I'm going to object

19  *sua sponte*.  So I don't want any more opinions from this

20  witness.  Got it?

21       MR. HENN:  I do.  And, your Honor, just so you're

22  aware, the research we're now going through will identify the

23  research that shows these data of credibility.  So he wasn't --

24  the intent was not to offer an opinion.

25       THE COURT:  He gave us his opinion.  He did not give

1    us "this is what the research shows."  Moreover, what is meant

2    by credibility?

3              MR. HENN:  Well, he's going to talk about it when he

4    reports these data.  But I'll make sure he doesn't offer

5    opinion as best I can.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     Q.  Mr. Murphy, will you explain to the jury what the research

3     in Exhibit 42 shows?

4     A.  Sure.  If you look in the upper right-hand corner, there's

5     a heart with the acronym NPS.  That stands for Net Promoter

6     Score.  And net promoter score is a way in which you measure:

7     Is a consumer likely to recommend your brand and your products

8     to their friends?  You can see that's kind of the question

9     that's in the lower right-hand side as well.

10         We track that regularly.  It's a way to determine are

11    we successful in our marketing.  If someone is recommending

12    your product, they likely like it.  If they're recommending

13    your brand, they likely like your brand.

14         And we track that regularly, especially the change in

15    NPS over time, both for us individually as a brand as well as

16    compared to some of our competitors, like Nike and Under Armour

17    as you can see on the slide.

18         And this one shows that from basically spring 2015

19    until spring 2017, adidas has seen significant growth in our

20    net promoter score over that time, including in comparison with

21    two of our competitors, Nike and Under Armour.

22    Q.  Go over to page 20.  Nita, blow this up, please.

23         Again, Mr. Murphy, if you will just explain the

24    results of the research reflected on page 20.

25    A.  Yes.  In the methodology, I noted that we looked at both a

1    style consumer, a main sample, as well as a varsity consumer or

2    a sport consumer.  This shows similarly NPS across each of

3    those segments.  It also looks at language utilized by those

4    consumers to describe our brand, and if that's changed over

5    time, because we do this regularly.

6         And you can see with something like authenticity as

7    one example that across all of those sports and across style,

8    that we've seen a growth from Q4 2016 to Q1 2017 in consumers'

9    perception of adidas as an authentic brand, both in sports --

10   multiple sports --

11        THE COURT:  What do you mean authentic?

12        THE WITNESS:  Say that again, sir?

13        THE COURT:  What do you mean by authentic?

14        THE WITNESS:  Authentic meaning, you know,

15   authenticity typically being referred to as do we have the

16   longevity in the space.  Am I authentic to the environment?

17   Meaning, I'm not new.  I've been here for a long time.  I've

18   been around.  People see us as someone who's been in this space

19   both sport and style for a considerably long period of time.

20        THE COURT:  All right.

21   Q.  Go over to page 21.  Nita, if you could blow this one up,

22   please.  Can you describe the results that are reflected in

23   that circular graphic to the left?

24   A.  Sure.  We call that a spider chart.  We use it a lot.  It

25   looks like a spider web, which is why we call it a spider

1    chart.  If you see all the words that are around each of the

2    large circle, those are questions that we ask of consumers

3    about our brand.  In other words, do you think of adidas as

4    courageous?  Do you think of adidas as passionate?  Do you

5    think of adidas as energetic?  And consumers answer questions

6    related to that on our brand as well as related to competitors.

7    You can see Nike and Under Armour are both on there as well.

8    Adidas is represented by the white line, Under Armour by the

9    green line, and Nike by the red line.

10   Q.  With regard to the white line, what are we to do with that

11   circle in terms of understanding what the research show?

12   A.  So we look at --

13              MR. CONLEY:  Objection, your Honor.

14              THE COURT:  Well, at least on my screen it's

15   completely illegible.  My ophthalmologist prescribes reading

16   glasses, but even with reading glasses, I can't make out most

17   of what's there.

18              Sustained.

19   Q.  I note that the white line has pointy parts to it.  What do

20   the pointy parts refer to?

21              MR. CONLEY:  Objection, your Honor.  Leading.

22              THE COURT:  Sustained.

23   Q.  What did the research show with regard to the spider chart?

24              MR. CONLEY:  Objection, your Honor.  The document

25   speaks for itself.

1     THE COURT:  I don't think so.  In fact, I distinctly

2  think it does not.  Overruled.

3  A.  When we look at this chart, we look for areas where that

4  white line has a spike, and that indicates that consumers more

5  frequently use those words when describing our brand.

6     For example, you'll see the spike on the word classic.

7  You'll see a spike on the word energetic.  You'll see a spike

8  on the words worn by stars and celebrities.  You'll see a spike

9  on the word for collaborative.  You'll see spikes for things

10  like good for both sports and fashion style.  So things like

11  that we look for those spikes to give us an indication of the

12  ways that consumers most likely view our brand.

13     MR. CONLEY:  Your Honor, I move to strike the answer.

14     THE COURT:  No, I think that that is within the limits

15  of the Court's previous rulings, but keep those rulings in

16  mind, counsel.

17     MR. HENN:  Will do, your Honor.

18  BY MR. HENN:

19  Q.  Let's take down Exhibit 42.  Pull up Exhibit 43.

20     Mr. Murphy, will you identify the research reflected

21  in Exhibit 43?

22  A.  Yes.  This is another report by the same partner,

23  Hall & Partners, the agency we use for research like this.

24  This is from Quarter 3, 2015.

25  Q.  And if we look at page 39.  If we can just pull up the U.S.

1    portion, Nita, and the words on the left.

2           Mr. Murphy, will you explain what research reflected

3    in Exhibit 43 shows in this chart?

4    A.   Yes.  In this particular case, this was a research project

5    done across multiple markets, including the U.S.; hence, the

6    U.S. flag on the top, and terminology utilized by consumers who

7    were surveyed in terms of the words they would use to describe

8    our brand.  You can see that creativity and innovation,

9    authenticity and design competence were all high in the green.

10   That means good.  That means there's been a significant change

11   season over season in consumers' perception around those three

12   areas.

13          THE COURT:  I am sorry, but we need to have one more

14   sidebar.  Apologize to the jury.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So have all the exhibits so far been among

3     those exhibits whose numbers were read into the record

4     yesterday as received on consent?

5          MR. HENN:  Yes, your Honor.

6          THE COURT:  So defense counsel has waived any and all

7     objections to those exhibits.  That doesn't mean you can't

8     object, as you just did, to his interpretation of the exhibits,

9     but I think the interpretation was within the limit.

10         But I do want to note for the record that had defense

11    counsel not consented to the admission of all of these

12    exhibits, I would have had serious questions about their

13    admissibility.  We took up the one and only exhibit that

14    defense counsel previously did object to, which was an

15    objection to referring to it on the opening statement, and it

16    was that chart that was arguably not fully legible, but I was

17    assured then with respect to that exhibit by plaintiff's

18    counsel that all the witness was going to say is here are the

19    questions that were put to the consumers and here's the

20    arithmetic total of the answers they gave.

21         Now, we're getting well beyond anything even remotely

22    close to that, but, as I say, it seems to me many objections

23    that might have been made have all been waived by defense

24    counsel agreeing to the admissibility of those documents.  And

25    when you agree to the admissibility, the document is received

1    for all purposes.  But, nevertheless, I want to note for the

2    record my concern about this.

3              MR. HENN:  Thank you, your Honor.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Go ahead, counsel.

3    BY MR. HENN:

4    Q.  Go to page 44 of Exhibit 43.

5          Mr. Murphy, will you just describe what the research

6    showed?

7    A.  Yes.  In this example, it's another way we're measuring the

8    way that consumers talk about our brand.  We look at the

9    terminology related to youthful and fun, passionate and

10   classic.  This shows that it says on the top:  Classic remains

11   a core perception with little fluctuation.  In this case, from

12   early 2014 until late 2015.

13   Q.  Thank you, Mr. Murphy.

14         Let's pull up Exhibit 44.

15         Would you identify what we have in Exhibit 44?

16   A.  Sure.  This is a performance, a brand performance update a

17   research project done on how our brand is performing.  It says

18   HY1, that's half year one, so first half of 2019.

19   Q.  Let's go to page 5.

20         First, in the lower left, can you identify for the

21   jury who did the research here?

22   A.  Yes, this is from a company called Brand Watch, which is

23   another third-party agency that we utilize to conduct research

24   for us about our brand.

25   Q.  What did their research show that is reflected on page 5?

1    A.   In this case, you'll see adidas is the gray bar on this.

2    So anywhere that you see that gray color, that's representative

3    of adidas.  You can see the other brands that were also looked

4    at across the top and the connected color associated there.  In

5    this case, you'll see the two that adidas are highlighted the

6    most are through sport involvement on the far right, as well as

7    authenticity and purpose, meaning that consumers more than most

8    other brands thought of adidas as being involved in sports as

9    well as being authentic and purposeful.

10             MR. CONLEY:  Move to strike the last part of his

11   answer.  Starting with "meaning that".

12             THE COURT:  Let me hear that last part.

13             (Read back)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                THE COURT:  Yes.  Let me hear that re-read, that last

2      part of the answer.

3                (Reporter read)

4                Purposeful?

5                THE WITNESS:  Do you want me to restate that?

6                THE COURT:  No.  What do you mean by that?

7                THE WITNESS:  I should say more purpose driven.

8                THE COURT:  I see.

9                All right.  Overruled.

10     BY MR. HENN:

11     Q.  Let's pull this one down and go to Exhibit 45.

12                Can you describe the research contained in Exhibit 45?

13     A.  Yes.  This is research project done in June of 2021

14     connected to our brand performance.

15     Q.  This references the name Kantar under adidas on the cover.

16                Who is Kantar?

17     A.  Kantar is another agency we work with to conduct brand

18     research.

19     Q.  Go over to page 31.

20                MR. HENN:  Nita, maybe zoom in on the content.

21                There we go.  It's a little bigger.

22     Q.  Can you describe the results of Kantar's research reflected

23     on Exhibit 31, please?

24     A.  Yes.  This is another spider chart that we looked at

25     before.  We look at these very regularly to see the spikes that

1    I mentioned previously change.  In this particular case, you

2    can see adidas is the black line, Nike is the line green line,

3    and we look for those spikes overall.

4            Again, you can see the ones where we tend to see

5    spikes for our brand or consumers associate our brand with

6    things like best quality footwear and clothing, authentic.

7    Again, traditional, other places you see on there are creative,

8    is a brand I love, best quality footwear and clothing.

9            These are examples.

10   Q.  Go to page 39.

11           Before we get into the results, can you just explain

12   the sort of funneling-shaped bar across the top of this chart?

13   A.  Yes.  When we look at brand research, we ask questions.

14   I'm curious to see how we're performing across the full sales

15   and marketing funnel.  Sales and marketing funnel basically

16   goes from somewhere aware of me as a brand all the way down to

17   would they consider buying me as a brand, do they actually

18   purchase my products, and would they recommend my products to

19   their friends.  That is the full funnel, from awareness all the

20   way through to making a recommendation.

21   Q.  And under the category of brand strength, can you explain

22   what the research showed?

23   A.  Yes.  Asking consumers across all parts of the funnel –

24   those who are aware, those who consider, those who purchase,

25   those who recommend – what are the things they say about us as

1    a brand most frequently.

2            And those things are, in this case, helps me feel

3    comfortable with best functioning gear, offers best quality

4    footwear and clothing, offers good value for money.

5    Q.  And with regard to the next section where it says style

6    credibility, what does that refer to in the context of this

7    research?

8    A.  Sure.  That also, as I mentioned before, we care very much

9    about being a credible brand within this space, both style and

10   in sport.  We look at ways consumers speak about us as relates

11   to both style and sportability.

12   Q.  So what did the research show about style credibility?

13   A.  Style credibility, the thing that consumers most frequently

14   call out is that adidas helps you fit in with your group of

15   peers, adidas helps you feel part of something bigger, and

16   adidas gives me access to the coolest styles.

17   Q.  What about with regard to sport credibility?

18   A.  For sport credibility, consumers noted adidas helps you

19   stay motivated to do sports, helps you feel like you belong

20   when playing sports, and helps you be your best at sports and

21   fitness.

22   Q.  Thank you.

23           Let's go to Exhibit 46.  Can you identify the research

24   contained in Exhibit 46?

25   A.  Yes.  This is more consumer and industry research from

1    December 20, 2019.

2    Q.  Go over to page three.  There's a lot of words on this

3    slide, but can you describe the methodology that was employed

4    in this research?

5    A.  Yes.  Both quantitative and qualitative research.  The

6    quantitative, you'll note that this was done in multiple

7    geographies in the U.S.  They surveyed 3,505 consumers, both

8    men and women, between the ages of 15 and 64 who have bought

9    sports products, apparel, or footwear in the last 12 months.

10   Q.  Let's go over to page 64.

11              MR. HENN:  Nita, just grab the U.S. column on the left

12   and down to, say, handball.

13   Q.  Mr. Murphy, would you explain what the research showed with

14   regard to the U.S. market?

15              MR. CONLEY:  Objection, your Honor.

16              THE COURT:  Sustained.  Irrelevant.

17   Q.  All right.  Let's take that one down.

18              Let's go to Exhibit 47.  Can you identify what's

19   obtained in Exhibit 47?

20   A.  Yes.  These are consumer and brand insights tied to the

21   originals category, so the lifestyle piece of our business,

22   from February 18, 2021.

23   Q.  Go to page four.  Will you describe the methodology that

24   was employed in this research?

25   A.  Yes.

1              MR. CONLEY:  Objection, your Honor.

2              MR. HENN:  Your Honor, if I may approach or at

3      sidebar?

4              THE COURT:  All right.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (At the sidebar)

2      THE COURT:  Now I need lead counsel.

3      Remind me what you said in your opening was not in

4  dispute.

5      MR. MALDONADO:  I said we don't dispute that they had

6  valuable rights in the three vertical stripes.

7      THE COURT:  Are you disputing that theirs is a famous

8  mark?

9      MR. MALDONADO:  We dispute -- we do not dispute that

10  vertical stripes are associated with adidas, or well-known or

11  associated with adidas.  But they have other iterations we do

12  dispute, they have used a lot less often and for a lot less

13  time, including their horizontal stripes, the new classics

14  collections, various other iterations that are not well-known.

15  And we do dispute those.

16      And these studies, your Honor, do not relate to three

17  stripes, so we --

18      THE COURT:  That was the take of the objection that

19  your colleague made and that's why I sustained the objection a

20  minute ago.

21      First of all, none of this speaks to the difference

22  between the horizontal and the vertical and the mid points in

23  between.

24      MR. HENN:  If I may?

25      THE COURT:  I'm also ignorant that I also associate

1    stripes with military sergeants and lieutenants.  But more to

2    the point, now we're even getting beyond stuff showing that the

3    mark is famous.

4         MR. HENN:  That's correct, your Honor.

5         THE COURT:  And we're showing that it is credible,

6    that it is authentic.  I'm waiting for the one that he

7    mentioned that is passionate.  I guess people who wear adidas

8    must have a heightened romantic life.

9         So anyway, go ahead.

10        MR. HENN:  Your Honor, this research goes directly to

11   dilution.  The whole notion of dilution under trademark law is

12   that when someone comes out and uses a design that is similar,

13   it weakens the brand associations of the senior user.

14        So before we can have our expert talk about how those

15   are weakened --

16        THE COURT:  OK.

17        MR. HENN:  -- we have to put in all the evidence what

18   the brand currently stands for.

19        THE COURT:  While all defense counsel are here, I

20   pointed out to your colleague at the last sidebar, there was no

21   objection to any of these exhibits.

22        MR. MALDONADO:  Yes.

23        THE COURT:  Therefore, they are received for all

24   purposes.  That's what "received without objection" means, so

25   as long as it had any connection to any issue in this case, it

1    will be allowed.

2           And what do you say to the point just made that it

3    goes to dilution?

4           MR. MALDONADO:  I would say that these reports do not

5    measure anything with regards to the Three-Stripe Mark.  They

6    talk about the adidas brand in general, which includes the word

7    mark, and it includes the Trefoil, it includes the badge of

8    sport.  All these marks that are not at issue in this case.

9    It's not research that is focused on the Three-Stripe Mark.

10          THE COURT:  But the evidence of this witness up to now

11   has been to emphasize how universal the three stripes are in

12   their presentation to the public.

13          Now there can be cross-examination about that, but

14   there is a reasonable inference a juror could raise and,

15   therefore, this becomes relevant on dilution.  I will allow it.

16          Now plaintiff's counsel told me yesterday, and it was

17   a non-binding ballpark, that having already gone well over an

18   hour with the witness at the time, that he had about two hours

19   more.  He went one hour with this witness yesterday, and in

20   15 or more, precisely 17 minutes, he will have gone two hours,

21   another hour today, for a total of two hours.

22          I'm going to make a ruling that you must complete this

23   witness in what would be two and a quarter hours, which is by

24   11:15, when we will give the jury their midmorning break.

25          That's a binding ruling.

1           MR. MALDONADO:  Thank you, your Honor.

2              (Continued next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. HENN:

3    Q.  Mr. Murphy, would you explain the methodology used in the

4    Exhibit 47?

5    A.  Sure.  There is three ways they went about doing the

6    research.  They did 43 vertical interviews, they scraped the

7    internet looking across Google and social media channels for

8    data, and they conducted about 8,500 interviews.

9    Q.  Go over to page eight.

10             Can you explain what the research showed?

11   A.  In essence, this shows that we are unique in our ability to

12   be looked at and thought of as both a brand that is good for

13   sports and a brand that is good for lifestyle and that is a

14   unique proposition for us in that we are credible in both.

15             MR. CONLEY:  Your Honor, I move to strike the

16   testimony as to expert testimony.

17             THE COURT:  I think it goes beyond what the exhibit

18   itself shows.  The exhibit does speak for itself, as was

19   previously noted.

20             Sustained.

21   BY MR. HENN:

22   Q.  Let me ask it this way, Mr. Murphy.  In the center of the

23   chart on this page, there are boxes around heritage, three

24   stripes, and openness.

25             Can you explain what the research showed with regard

1    to those three?

2    A.   Yes.  Those are words used by the consumers across all

3    three methodologies that reference how consumers view us from

4    both sport and lifestyle.  In both sport and lifestyle, we have

5    heritage, been around for a very long time in both sport and

6    lifestyle, we are known for our three stripes, and we are open.

7    Again, we're an inclusive brand for everyone.

8              THE COURT:  I'm sorry.  What do you say "open" means?

9              THE WITNESS:  Openness means that we are open to

10   everyone.  We're not inclusive, we are -- I'm sorry.  We are

11   not exclusive, we are inclusive.

12             THE COURT:  So that doesn't relate to the three

13   stripes, that relates to how adidas in general is regarded?

14             THE WITNESS:  Correct.

15             THE COURT:  On that basis, the jury will disregard the

16   testimony with regard to openness.

17             MR. CONLEY:  Your Honor, if we can move to strike the

18   testimony where Mr. Murphy testified "we are known for"?

19             THE COURT:  No.  I'll allow it.

20   BY MR. HENN:

21   Q.   We can take this exhibit down.

22             Let's pull up Exhibit 49.  Exhibit 49, Mr. Murphy, can

23   you identify and describe what is contained in this?

24   A.   Yes.  This is research done for our global BKO, which

25   stands for brand kickoff, of March 2022.

1   Q.  If we look at page two, over on the left-hand side under

2   number four, can you identify what the research concluded?

3   A.  Yes.  In that research, it notes that adidas retains its

4   relative strength in heritage in sports.  We continue to be

5   seen as, in this case at this time when this was done, a brand

6   that is known for its heritage in the world of sports.

7          MR. CONLEY:  Your Honor, I would move to strike

8   everything after "we continue to be seen as."

9          THE COURT:  No.  I think that's within the limits of

10  what this exhibit and the prior exhibits could be summarized as

11  arbitrarily showing.

12         Overruled.

13  BY MR. HENN:

14  Q.  Let's pull up Exhibit 50, please.

15         Can you identify the research contained in Exhibit 50?

16  A.  Yes.  This is perception and positioning of adidas and

17  Reebok in the context of key competitors, a research project.

18  Q.  Who conducted the research?

19  A.  This was done by Icon Added Value, another third-party

20  partner.

21  Q.  Go to page 27.

22         Can you just read for the jury what questions were

23  asked of the participants in this study?

24  A.  Yes.  Participants were asked to please describe the

25  picture in your mind of the brand XY, that means everything

1   that comes to your mind.

2   Q.   XY would have been replaced with what?

3   A.   Replaced with adidas or Reebok.

4   Q.   Got it.

5            Continue.

6   A.   Aside from the various products made by XY, adidas or

7   Reebok, please describe the picture you have in your mind of

8   the brand XY, adidas Reebok, when trying to describe someone

9   you will mention the things that most distinctively define

10  them.

11           For example, when thinking of characters, the black

12  ears, white gloves, red trousers, being funny and friendly are

13  the typical characteristics of Mickey Mouse.  The red cape with

14  the S on his chest and that he is strong and saves the world

15  are typical characteristics of Superman.

16           And what about XY, adidas Reebok, what do you think

17  are the typical characteristic of the brand adidas Reebok?

18           When comparing adidas Reebok with other brands, what

19  makes it different?

20           What is special about adidas Reebok compared to other

21  brands?

22           MR. HENN:  If we turn to the next page, page 28.

23           If you'll zoom in on the section of this that just has

24  the results below the big black bar.

25           A little more down, please.  Capture the whole

1    section.

2           MR. CONLEY:  Your Honor, I would object at least to

3    this being shown to the jury.

4           THE COURT:  Well, this one was one that I ruled on

5    previously.  And so your objection is preserved but the

6    objection is overruled.

7    BY MR. HENN:

8    Q.  Mr. Murphy, under logo lettering it says three stripes and

9    stripes.

10          What is the number under adidas?

11   A.  That is 65.

12   Q.  And does that mean 65 people or 65 percent, or what does

13   that 65 mean directly?

14   A.  65 percent of the people who went through this process

15   noted that when thinking about adidas, they thought of three

16   stripes.

17   Q.  You mentioned earlier XY was replaced with either adidas or

18   Reebok.

19          Was it asked with regard to the other brands as well?

20   A.  Yes.  Nike, Puma, and New Balance were also asked of the

21   respondents.

22   Q.  And under Nike, what was the percentage that mentioned the

23   swoosh?

24   A.  20 percent of respondents noted when closing their eyes and

25   thinking of Nike, they thought of the swoosh.

1    Q.  Thank you.  You can take this down.

2          I want to shift gears and talk about adidas'

3    collaborations with other brands and designers.  From a brand

4    marketing perspective, why did adidas do those collaborations?

5    A.  When we talk about our desire to be authentic and credible,

6    it's important that we work with other people across sport and

7    lifestyle that also have that authenticity and credibility.

8    Q.  Can you give some examples of some of the earlier

9    collaborations that adidas did?

10   A.  Yes.  Some of the earlier ones that we did and continue to

11   do would be our collaboration with famous Japanese designer

12   Yohji Yamamoto.  That's our Y-3 line of product.

13         We have also worked with Stella McCartney for a number

14   of years to create both sport and lifestyle products.

15         Those are two of our longest standing collaboration.

16   Q.  You mentioned Y-3.

17         What does that name refer to?

18   A.  The Y represents Yohji Yamamoto.  The 3 represents the

19   three stripes.

20   Q.  What are some of the more recent collaborations that adidas

21   has engaged in?

22   A.  More recent ones would be our collaboration with Gucci, we

23   have done collaborations recently with Grace Wales Bonner, we

24   have collaborations with Pharrell Williams, we have done

25   collaborations with Beyonce, we have done collaborations with

1    Alexander Wang, we have done collaborations with Jeremy Scott.

2              We have quite a few.

3    Q.  Let's pull up Exhibit 51.

4              Can you just identify what we have in Exhibit 51?

5    A.  Yes.  This is a print advertisement for our Y-3 line or

6    collaboration with Yohji Yamamoto.

7    Q.  How would the Three-Stripe Mark used in the Y-3 marketing?

8    A.  On the left side, you can see the Three-Stripe Mark running

9    on the inside of the jacket, so on the inside of the arm and

10   the inside of the sleeve.  And then on the right-hand side you

11   can see the Three-Stripe Mark running down the length of the

12   pants.

13   Q.  If we can pull up Exhibit 52.  This is another collection

14   of materials.

15             What is contained in the collection marked as

16   Exhibit 52?

17   A.  This is an exhibit done with Danielle Cathari.  This is an

18   example of the products we created in collaboration with her.

19   Q.  Who is Danielle Cathari?

20   A.  She is a famous designer.

21   Q.  Look over to page two.

22             What is being marketed here?

23   A.  This is an example of the Alexander Wang product from the

24   collaboration done with him.

25   Q.  With regard, let's to page four.

1        What is this?

2   A.   This is an example of a collaboration we did with Prada.

3   It showcases the ways in which the product -- it's a print ad

4   we did for that collaboration .

5   Q.   Go to page 29, and just at the top, maybe grab that.

6        Mr. Murphy, what do we have here?

7   A.   This is an example of an Instagram ad we did showcasing the

8   product that we created in partnership with Gucci.

9   Q.   Did you also promote some of your collaborations using

10  video?

11  A.   Yes, we did.  Yes.

12  Q.   Let's play Exhibit 53 with the sound, Nita.

13       When we're done, I'll ask you to explain what this

14  was.

15       (Video played)

16       Thank you.

17       Mr. Murphy, what was Exhibit 53?

18  A.   That's a video that we created in partnership with Prada to

19  promote the collaborative product effort, both the handbag and

20  the superstar that we collaborated on.  That was a video that

21  we pushed out and put advertising dollars behind, mostly on

22  YouTube and on social media.

23  Q.   We talked about media attention with regard to the

24  Three-Stripe Mark.

25       Did the collaborations also get unsolicited media

1    attention?

2    A.  Yes, they do.

3    Q.  Let's pull up Exhibit 381, please.

4         This is another collection of materials.  What is

5    contained in the collection marked as Exhibit 381?

6    A.  Unsolicited media around adidas and some of our

7    collaborations.

8    Q.  Thank you.  We can take down Exhibit 381.

9         Let's pull up Exhibit 55.

10        Have you seen Exhibit 55 before?

11   A.  Yes, I have.

12   Q.  And you've reviewed the products contained in Exhibit 55?

13   A.  Yes, I have.

14   Q.  What is in Exhibit 55?

15        And we'll have Nita flip through this as you're

16   speaking.

17   A.  Sure.  This is related to adidas' complaint against Thom

18   Browne, specifically for utilizing the stripe being on the

19   sleeves of athletic wear, tights, running product.

20   Q.  What is the common feature of all of the products contained

21   in Exhibit 55?

22   A.  The striping on the products, on both the shirts, the

23   pants, the tights, the running shorts, the athletic wear.

24   Q.  Is it your understanding that Exhibit 55 contains the

25   products that adidas specifically accuses with regard to the

1    four bars design?

2    A.   That's correct.

3    Q.   Go to Exhibit 56.

4         Can you explain, as we flip through Exhibit 56, what

5    is contained in 56?

6    A.   This is contained here is the complaint by adidas around

7    Thom Browne's use of the Grosgrain, or the red, white, and blue

8    striping that is on their athletic apparel, athleisure apparel,

9    and on their running and training footwear.

10        MR. HENN:  Nita, go to pages three.

11   Q.   At the top there where it says shorts only, what does that

12   mean?

13   A.   In that particular case, that means that the complaint is

14   connected to that particular piece, the shorts.

15   Q.   As opposed to around the cuff?

16   A.   Correct.

17        MR. HENN:  Nita, you can take that down.

18   Q.   Mr. Murphy, as a marketing professional at adidas in charge

19   of brand marketing, what is your reaction to Thom Browne's use

20   of the stripe designs in Exhibits 55 and 56?

21   A.   Um, it's frustrating, a little disappointing.  I've been

22   with the brand for 17 years, so I'm very much committed and

23   dedicated to the brand and spend 60-plus hours of my week

24   working to drive awareness of the brand and the Three-Stripe

25   Mark, to drive awareness of our brand and desire for our brand.

1    And it's -- it's tough when other brands utilize striping in a

2    comparable way and comparable product, and in some cases play

3    off of the work that we're putting so much effort energy and

4    dollars behind.

5         I think it is, also, we work really hard to connect

6    adidas to being an authentic and credible sport and lifestyle

7    brand.  We work hard to be thought of as an inclusive brand, a

8    sustainable brand.  And when other brands put comparable

9    striping on similar products and have different brand messaging

10   or different ways that they communicate their brand, it takes

11   away some of the uniqueness of my brand, which we work so hard

12   for over many, many, many, many, many years.  And I think it

13   causes confusion for the consumer.

14   Q.  Fair enough.

15        MR. CONLEY:  Move to strike the answer as opinion.

16        THE COURT:  No.  The time to have made that objection

17   was when the question was put, which clearly called for an

18   opinion, and instead you chose to be silent and allow the

19   witness to go on at some length.  And to ask the jury at this

20   point to disregard it would be difficult, at best, for even the

21   most conscientious juror.

22        So in my view, the failure to make the objection at

23   the time the question was made is a waiver.

24        MR. HENN:  I pass the witness, your Honor.

25        THE COURT:  All right.  Ladies and gentlemen, that

1    concludes the direct testimony of this witness, so we will give

2    you your midmorning break at this time.  We'll take a 15-minute

3    break and then have the cross-examination.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You can step down.  We'll see you in

3    15 minutes.

4          Please be seated.

5          The last I checked, the system of law in court is an

6    adversary system premised on the notion that the parties,

7    through their respective lawyers, will decide what they want to

8    object to, what they want to concede, what posture they want to

9    take.  And while in extreme cases this and other courts will

10   intervene and, *sua sponte*, when we have as we have here

11   experienced, sophisticated counsel, the court is very reluctant

12   to intervene.

13         The question last put was so blatantly a request for

14   an opinion that, as it was put I thought to myself, gee, I

15   wonder why defense does not object.  I thought maybe that's a

16   strategy they have.  Some lawyers feel it's best not to object

17   frequently.  Maybe it's because some of what he is saying is

18   irrelevant to the defense.  I was just speculating, but it was

19   self-evident that that question called for an opinion.

20         So if an improper question is put and you don't object

21   when it's put, don't look for me for relieve afterwards.

22         I'll see you in ten minutes.

23         (Recess)

24         Cross-examination.

25         Excuse me.  Hold on.  We've received a note from

1    juror No. 1.  Does adidas have a registered trademark on color

2    patterns?

3            Ladies and gentlemen, thank you, by the way, for your

4    question.  Every question you may have will be answered, I am

5    confident, by the end of the case.  So rather than, you know,

6    bear out with the suspense, but everything will be answered by

7    the end of the case.

8            If, at the end of the case and the case is yours for

9    deliberation, if there is some question you then have that

10   hasn't been answered or you don't remember whether it was

11   answered or not, then you can send us a note and we'll get you

12   the answer, if it was answered.

13           But until then, it's just better to hold off because,

14   as I think I mentioned to you several times previously, the

15   evidence comes in one little bit at a time and it will be a

16   while before everything is in.

17           Which is not to say it wasn't an excellent question.

18   Thank you for it.

19           MR. CONLEY:  We have a cross binder.  Would your Honor

20   like a hard copy of the binder?

21           THE COURT:  Oh, yes.  OK.  Thank you.

22   CROSS-EXAMINATION

23   BY MR. CONLEY:

24   Q.  Good afternoon, Mr. Murphy.

25   A.  Hello.

1   Q.  You looked at a lot of adidas products during your direct

2   examination, correct?

3   A.  Correct.

4   Q.  Product after product told the jury to see adidas'

5   Three-Stripe Mark and adidas' logos, correct?

6   A.  Correct.

7   Q.  It's your testimony adidas' Three-Stripe Mark is, in fact,

8   in adidas' logos?

9   A.  Three-Stripe Mark is in the logos, yes.

10  Q.  And you testified yesterday about adidas' badge of sport

11  logo?

12  A.  Correct.

13  Q.  As well as the Trefoil?

14  A.  Yes.

15  Q.  If we can show the witness document marked DTX 12.

16          Can you see, Mr. Murphy?

17  A.  Yes, I do.

18  Q.  You recognize this document, right?

19  A.  I believe so, yes.

20  Q.  This is an adidas design document related to branding?

21  A.  Correct.

22          MR. CONLEY:  Your Honor, I would move to admit DTX 12.

23          MR. HENN:  No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit DTX 12 received in evidence)

1              MR. CONLEY:  May I publish to the jury?

2              THE COURT:  Please.

3    Q.  Now, DTX 12, this brand direction --

4              THE COURT:  Just for all counsel, once an exhibit has

5    been received, you don't have to ask me whether you can publish

6    it.  You're free to publish to the jury.

7              MR. CONLEY:  Thank you, your Honor.

8    BY MR. CONLEY:

9    Q.  So DTX 12 was created by a group within adidas called brand

10   design, correct?

11   A.  Yes.

12   Q.  Brand design is a global organization that's responsible

13   for the design of adidas' brand work, correct?

14   A.  Correct.

15   Q.  Now, the brand design group is responsible for setting

16   guidelines related to that brand design work, correct?

17   A.  Yes, correct.

18   Q.  And DTX 12, this document was provided to the marketing

19   groups that you oversee, correct?

20   A.  Correct.

21   Q.  If we could turn to page 127 of DTX 12.

22              This is a slide called branding/logos overview,

23   correct?

24   A.  Yes.

25   Q.  On the left we see adidas' logo.  That's the badge of

1   sport, right?

2   A.  Yes.

3   Q.  The badge of sport is typically used with product connected

4   to sport usage, right?

5   A.  Say it again.  The one on the left?

6   Q.  Yes.

7   A.  Yes, correct.

8   Q.  That is footwear and apparel and accessories connected to

9   various sports?

10  A.  Yes.

11  Q.  And the badge of sport logo at adidas is also referred to

12  as the performance logo?

13  A.  Yes.

14  Q.  And to be sure, the badge of sport is a separate adidas

15  trademark, correct?

16  A.  No.  It includes the three-stripe trademark, but it is a

17  logo.

18  Q.  If we could have -- if you could show Mr. Murphy tab C,

19  document Bates number ADITB0211361.

20          Mr. Murphy, do you see the document on your screen?

21  A.  I do.

22  Q.  Do you recognize that that is a trademark registration for

23  the badge of sport, correct?

24  A.  That's what it says, yes.

25  Q.  In fact, if we could have that on the screen and then pull

1     up Mr. Murphy's demonstrative Exhibit 1.

2             Now, we saw in your demonstrative Exhibit 1, that is

3     what you showed us as the badge of sport logo, correct?

4     A.  Correct.

5     Q.  And that matches what we see in the trademark registration?

6             THE COURT:  I'm sorry.  Are both of these already in

7     evidence?

8             MR. CONLEY:  I'm sorry.  The one on the right, your

9     Honor, is a demonstrative that Mr. Murphy used yesterday.  I'm

10    not seeking to admit that.

11            THE COURT:  Right.  But is the trademark in evidence?

12            MR. CONLEY:  The document is not.  That was used to

13    refresh his recollection.

14            THE COURT:  All right.  This is only being shown to

15    him?

16            MR. CONLEY:  Correct.

17            THE COURT:  You don't want to have the jury see it?

18            MR. CONLEY:  I was just making a note, your Honor.

19            THE COURT:  Would you like to offer it?

20            MR. CONLEY:  We would seek to admit what is labeled

21    as Murphy Exhibit 10, the document bearing Bates number

22    ADITB0211361.

23            THE COURT:  We need to give that some sort of defense

24    number, but you can do that at the next break.

25            Any objection?

1              MR. HENN:  No objection, your Honor.

2              THE COURT:  Received.

3              (Defendant's Exhibit DTX 920 received in evidence)

4              So now this can be shown to the jury.

5              MR. CONLEY:  Thank you.

6    BY MR. CONLEY:

7    Q.  You would agree, Mr. Murphy, that it is adidas' mission to

8    be the best sports brand in the world, right?

9    A.  Correct.

10   Q.  That's been adidas' mission for as long as you've been with

11   the organization?

12   A.  Correct.

13   Q.  Athletes are a target audience of consumers for adidas,

14   right?

15   A.  They are.

16   Q.  Now, if we could pull back up DTX 12.

17              Next to the badge of sport is adidas' Trefoil logo,

18   right?

19   A.  Correct.

20   Q.  And the Trefoil logo is typically utilized for product that

21   is used for off-sport or out-of-sport, right?

22   A.  Lifestyle, correct.

23   Q.  So in addition to lifestyle, athleisure, nonsport products?

24   A.  Yes.

25   Q.  The Trefoil is used to delineate a different type of

1   product that is not a performance product?

2   A.   Correct.

3   Q.   Trefoil is used on adidas' originals line, correct?

4   A.   It is, yes.

5   Q.   And these are products that aren't used for sport, but have

6   a sports styling to it?

7   A.   Yes.  Usually they come from or are rooted in sport.

8   Q.   And to be sure, the Trefoil is a separate adidas trademark,

9   correct?

10  A.   It is a separate adidas logo of the badge of sport.

11  Q.   If we can pull up tab E, which is ADITB0211360.

12       Do you recognize this, Mr. Murphy, as an adidas

13  registration for the Trefoil?

14  A.   Yes.

15       MR. CONLEY:  I move to admit the exhibit, your Honor.

16       MR. HENN:  Your Honor, it's not on their exhibit list

17  and this is not a proper impeachment.  It doesn't appear to be

18  appropriate to come in since it's not on the exhibit list.

19       THE COURT:  I'm sorry.  Are you objecting?

20       MR. HENN:  I am objecting.

21       THE COURT:  Yes.  The objection is?

22       MR. HENN:  Not on the list.

23       THE COURT:  That it wasn't on their exhibit list, but

24  as you point out, it doesn't have to be on their exhibit list

25  if it's being used for impeachment.

1              MR. HENN:  Correct.

2              THE COURT:  And I think, given the previous answer, it

3      is being used for impeachment, so it is received.

4              (Defendant's Exhibit DTX 921 received in evidence)

5              Again, defense counsel, you need to make sure that all

6      these exhibits get defense numbers, because when we send out

7      the exhibits to the jury - which we will do, by the way, at the

8      end of the case - we will get all the exhibits and there will

9      be an index.  And the only way you can find what you need is by

10     going to the index, so we'll need to have it.

11             MR. CONLEY:  Yes.  For the record, your Honor, the

12     badge of sport trademark registration will be DTX 920 and the

13     Trefoil will be DTX 921.

14             THE COURT:  Very good.

15     BY MR. CONLEY:

16     Q.  Mr. Murphy, you're familiar with Thom Browne's products

17     that are accused of infringement, right?

18     A.  Yes.

19     Q.  And, in fact, just moments ago we looked through the entire

20     list of accused products?

21     A.  Yes.

22     Q.  You would agree that Thom Browne's accused products have a

23     sports styling to it?

24     A.  They do, yes.

25     Q.  Now, you're aware of the Thom Browne designs that are

1  accused of infringement, right?

2  A.  Is that different than the product?

3  Q.  Well, the designs on the products?

4  A.  Yes.

5  Q.  You're not aware of any Thom Browne products that feature

6  the word adidas, correct?

7  A.  I am not aware of any Thom Browne product that features

8  adidas, no.

9  Q.  Now, if we can look back at DTX 12.

10         We see there the badge of sport, right?

11  A.  Yes.

12  Q.  You're not aware of any Thom Browne products that feature

13  the badge of sport logo as we see is it in DTX 12, correct?

14  A.  I am not.

15  Q.  You're also not aware of any Thom Browne products that

16  feature the Trefoil logo as we see in DTX 12, correct?

17  A.  I am not.

18  Q.  This case is all about stripes, right?

19         THE COURT:  Sustained.

20  Q.  In this case you understand that adidas asserts that

21  Thom Browne infringes on what we call the Three-Stripe Mark,

22  correct?

23  A.  Correct.

24  Q.  And according to you, there is only one Three-Stripe Mark,

25  is that right?

1  A.   That is our trademark is the Three-Stripe Mark, three

2  parallel stripes, yes.

3  Q.   By that, you mean that adidas has one trademark for three

4  stripes?

5  A.   Correct.

6  Q.   Just so we're all clear, when we refer to --

7           THE COURT:  I'm sorry.  I apologize again to the jury.

8  Counsel needs to come to sidebar.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  This issue which has been raised now a

3    couple times, but I think was mostly raised when the case was

4    originally before Judge Nathan, who has since been demoted the

5    Second Circuit, is it plaintiff's position that they are suing

6    on a specific registered trademark?

7          MR. HENN:  Yes, and that registered trademark is the

8    Three-Stripe Mark.

9          THE COURT:  The first one we saw a minute ago?

10         MR. HENN:  No.  So I think you're misunderstanding.

11   The statute talks about a registered mark.  So does it infringe

12   a registered mark.  The key is, is the mark registered -- you

13   don't sue on individual registrations like you infringe

14   registration number 752 the way you would in a patent case.

15         The trademark statute is different, and so the issue

16   here is there is one Three-Stripe Mark, and then it's governed

17   by 20-something registrations in different iterations,

18   different placements, all those things.  But it's all one

19   registered mark.

20         MR. MALDONADO:  Could I?

21         MR. HENN:  I have a whole bench brief on this, which

22   we're happy to provide and probably file.

23         MR. MALDONADO:  If I can respond to that?

24         THE COURT:  Please.

25         MR. MALDONADO:  I would disagree with that.

1    They did -- in fact, Mr. Henn says that their one mark

2    is subject to 20 registrations.  They did, in fact, identify a

3    subset of those registrations which are, in fact, being

4    asserted in this case.  So it's not just one mark.  There's

5    certain registrations they're asserting, others they are not,

6    including, as you know, the badge of sport and the Trefoil,

7    which they say are also their Three-Stripe Mark.

8         You do, in fact, sue for infringement of a trademark

9    registration, as your Honor I'm sure has had many trademark

10   cases.

11        THE COURT:  Yes.  This may be different.  I don't

12   know.  But last I recall, you have to have registered your

13   trademark if you're going to bring an action for infringement

14   under the Lanham Act.

15        MR. HENN:  That's correct.

16        THE COURT:  So it's the registered trademark that

17   triggers the subject matter jurisdiction; yes?

18        MR. HENN:  Yes, except I think where you're getting a

19   little turned around is that there --

20        THE COURT:  No.  The right word is confused.

21        MR. HENN:  You can have one mark.  For example, there

22   is a Southern District of New York case involving the Starbucks

23   mark.  You know the lady that's on all the buildings?

24        THE COURT:  Right.

25        MR. HENN:  Starbucks owns 30 registrations for that

1    Starbucks mark, but it's one mark covered by multiple

2    registrations.  So when a plaintiff brings a claim under

3    Section 32 of the Lanham Act, the question that -- the only

4    question that you have to decide, or the jury has to decide --

5            THE COURT:  Wait a minute.  Just to make sure I

6    understand -- and I don't want to hold up the jury because I

7    think maybe we'll need to see your previous briefing before

8    Judge Nathan on this issue -- if you have 30 registrations of

9    various versions of the Starbuck mark but someone then produces

10   a product with a symbol that is quite similar to the Starbuck

11   mark but is not identical to any of the 30 registered marks,

12   you're saying that is still covered by Lanham Act?

13           MR. HENN:  It is, because it's not a patent case.

14   Where here, the question is, is it confusingly similar to the

15   mark, not to the registration certificate.

16           THE COURT:  I hear what you say, but I think this an

17   interesting issue.  I think I need to have briefing on it, but

18   I don't want to --

19           MR. MALDONADO:  Can I make one comment on the

20   Starbucks?

21           Starbucks, it's a word - Starbucks.  You can have ten

22   registrations for the same word covering different goods and

23   different services.  That is different here because this is a

24   design.  All the designs are different.  If you look at all the

25   registrations, they're not the same.  This is a distinction,

1    and there is infringement of a trademark registration in a

2    registered mark.

3              THE COURT:  So, I mean, for example, I thought the

4    juror had a pretty good question, which is, does the color

5    matter?  I hope someone is going to answer that question.

6              MR. HENN:  We will.  And as Mr. Maldonado knows, the

7    registrations, because they are in black and white, cover any

8    color combination that might be used.

9              THE COURT:  Anyway, at the next break, before we break

10   for lunch I think we should set a briefing schedule on this

11   issue, because I'm not as familiar with it as obviously

12   Judge Nathan was.

13             MR. MALDONADO:  Thank you, your Honor.

14             THE COURT:  Thank you.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. CONLEY:

3     Q.  I think my last question was:  When we use the word mark,

4     you understand that to mean trademark?

5     A.  Yes.

6     Q.  The Three-Stripe Mark, according to you, has three stripes

7     in a variety of ways?

8     A.  Correct.

9     Q.  Now, moments ago we were looking at the badge of sport logo

10    and the Trefoil logo?

11    A.  Yes.

12    Q.  We can agree those are logos?

13    A.  Yes.

14          THE COURT:  What do you mean by logo?

15          THE WITNESS:  What do I mean by logo?

16          THE COURT:  Yes.

17          THE WITNESS:  Logo is the -- the badging that we put

18    on our product and utilize for our marketing.

19          THE COURT:  OK.

20    BY MR. CONLEY:

21    Q.  A logo is what you at adidas use to denote your brand

22    adidas?

23    A.  Yes, which includes the three stripes.

24    Q.  So three stripes are a logo as well?

25    A.  They are included in our logos.

1   Q.  But they are not a separate logo?

2   A.  They are our trademark.

3   Q.  You're not a lawyer, Mr. Murphy, correct?

4   A.  I'm not.

5   Q.  You're not here to tell the jury the difference between a

6   logo and a trademark?

7   A.  I'm not.

8   Q.  Now let's pull up PX 2.  We looked at this yesterday,

9   Mr. Murphy, in your examination.

10          Do you recall that?

11  A.  I do.

12  Q.  And we see a pair -- I'll focus on the pants, if that's all

13  right.  We see we have a pair of adidas track pants.  We see

14  the badge of sport logo, right?

15  A.  Yes.

16  Q.  And that includes the word adidas as part of it, right?

17  A.  Correct.

18  Q.  We also see three stripes running down the side of the

19  pants?

20  A.  Correct.

21  Q.  It's your position that the three stripes running down the

22  side of the pants, that's not a logo?

23  A.  That is not a logo.

24  Q.  Three stripes running down the side of a pant, it's your

25  position that that's a usage of the Three-Stripe Mark?

1  A.  This is a usage of the Three-Stripe Mark, correct.

2  Q.  I want to make sure we understand your testimony.

3        If we could bring up a demonstrative exhibit where we

4  are removed the white stripes.  Pull up DTX 2.

5        The pants that we see in --

6        THE COURT:  Again, is this in evidence?

7        MR. CONLEY:  Just a demonstrative, your Honor.

8        THE COURT:  Well, are you showing it to the jury is my

9  point?

10        MR. CONLEY:  I would like to.

11        THE COURT:  Well, one point is they are having these

12  questions, the jury can't see what you're talking about.

13        MR. CONLEY:  Understood.

14        THE COURT:  Any objection?

15        MR. HENN:  We have no objection.

16        THE COURT:  It's received as a demonstrative.

17        Go ahead.

18  BY MR. CONLEY:

19  Q.  You see here, Mr. Murphy, what we've done is simply remove

20  the white stripes from the articles of clothing?

21  A.  Yes.

22  Q.  And the pants that we see in DTX 2, adidas sells pants with

23  just the badge of sport logo and no three stripes running down

24  the side, correct?

25  A.  That is correct.

1   Q.  Now, the pants that we see on the right in the

2   demonstrative DTX 2, without the three stripes running

3   vertically down the legs, is it your position that those pants

4   still feature adidas' Three-Stripe Mark asserted in this case?

5   A.  Yes, they do.

6   Q.  We can at least agree, though, that the Three-Stripe Mark,

7   as shown in PX 2 on the left, is separate from the badge of

8   sport logo, correct?

9   A.  Explain that a little more, please.

10  Q.  They are two different things?

11  A.  The Three-Stripe Mark is on the side of the pants and on

12  the jacket.  It's also included within the logo.

13  Q.  Right.  My question was simply, you have the three stripes

14  running down the side of the pant, right?

15  A.  Yep.

16  Q.  And there is a badge of sport logo on those pants.

17          Those are two separate things?

18  A.  Correct.

19  Q.  Now in the photo, we also see some sneakers, correct?

20  A.  Yes.

21  Q.  PX 2.  Those also feature adidas' Three-Stripe Mark?

22  A.  Yes, they do.

23  Q.  And those three stripes we see on the shoe, this is

24  separate from adidas' badge of sport logo?

25  A.  Correct.

1    Q.   Separate from the Trefoil logo?

2    A.   Yes.

3    Q.   Now, we heard some testimony earlier about adidas being

4    known as the brand with three stripes, correct?

5    A.   Yes.

6    Q.   According to you, adidas is literally known as the brand

7    with three stripes, right?

8    A.   Yes.

9    Q.   Just so we're clear, the Three-Stripe Mark, according to

10   your testimony, is three stripes, right?

11   A.   Three stripes, correct.

12   Q.   Again, you say adidas utilizes those stripes in a variety

13   of ways?

14   A.   We do.

15   Q.   But it's always three stripes?

16   A.   Always three stripes.

17   Q.   Now, you believe that consumers associate the number of

18   stripes, that is three, with adidas, correct?

19   A.   That's correct.

20   Q.   When you say that adidas is literally known as the brand

21   with three stripes, you believe that literally everybody knows

22   that, correct?

23   A.   I do believe that, yes.

24   Q.   Now, we can agree that adidas isn't known for two stripes,

25   right?

1    A.   Correct.

2    Q.   Adidas isn't known for five stripes or six stripes?

3    A.   Correct.

4    Q.   They are also not known for four stripes?

5    A.   Correct.

6    Q.   And, in fact, adidas doesn't use two stripes, right?

7    A.   We do not.

8    Q.   Adidas doesn't use four stripes?

9    A.   No.

10   Q.   Or five stripes or six stripes?

11   A.   No and no.

12   Q.   It's always three?

13   A.   Correct.

14   Q.   Adidas isn't known as the four-stripe brand, right?

15   A.   We are not.

16   Q.   Or the brand with four stripes?

17   A.   No, we are not.

18   Q.   Adidas isn't known as the brand with four horizontal

19   stripes?

20   A.   No.

21   Q.   Adidas isn't known for any number of stripes other than

22   three?

23   A.   Correct.

24   Q.   Now, you're the senior VP of brand marketing?

25   A.   Yes.

1    Q.  And you think adidas is known for three stripes regardless

2    of orientation, correct?

3    A.  Correct.

4    Q.  But you don't know whether adidas is known for horizontal

5    stripes?

6    A.  I couldn't say if it's horizontal or vertical.  Just three

7    stripes.

8    Q.  Again, according to you, it's adidas' position that they

9    own all rights to three stripes in any configuration, no matter

10   how it's used?

11   A.  Correct.

12   Q.  Now, at last, at the time of the deposition in this case --

13        Do you recall being deposed in this case?

14   A.  I do, yes.

15   Q.  That was over the summer of July of this year; 2022, I

16   should say?

17   A.  Yes.

18   Q.  And during that time you also, I believe, held the role of

19   VP of digital and media, correct?

20   A.  Yes.

21   Q.  Is that still the case?

22   A.  No, it is not.

23   Q.  But at the time, that was a role you were overseeing?

24   A.  I was doing both roles at the time, yes.

25   Q.  In any event, advertising falls within your bailiwick?

1  A.  It does.

2  Q.  And you've shown the jury yesterday a lot of examples of

3  adidas advertising?

4  A.  Yes.

5  Q.  Why don't we look back at one of those.  If we can call up

6  PX 22, please.

7       You testified PX 22 is a collection of adidas print

8  ads?

9  A.  Yes.

10 Q.  That's an exhibit you're familiar with?

11 A.  Yes.

12 Q.  And we can agree that there is plenty of examples in PX 22

13 of three stripes running vertically down sleeves and pant legs,

14 correct?

15 A.  Correct.

16 Q.  We can also agree there is not a single item of adidas

17 apparel in the examples that you provided in PX 22 that

18 features three horizontal stripes around an arm or a pant leg?

19 A.  I don't believe so.

20 Q.  You don't believe that there are?

21 A.  In that exhibit, I don't believe that there are.

22 Q.  If we can call back up PX 28.

23      You testified that PX 28 is a collection of, I think

24 it was, Internet ads and banner placements?

25 A.  Yes.

1    Q.   That's another exhibit you're familiar with?

2    A.   I am.

3    Q.   Now, we can agree that there is plenty of examples in PX 28

4    of three stripes running vertically down sleeves and pant legs,

5    correct?

6    A.   There's a couple, yes.

7    Q.   And as you sit here right now, you can't point the jury to

8    a single advertisement of adidas apparel in PX 28 that features

9    three horizontal stripes running -- three horizontal stripes

10   around an arm or a pant leg?

11   A.   That's correct.

12   Q.   Now, around the time of your deposition - again, that was

13   July of 2022 - you couldn't specifically recall seeing three

14   stripes featured horizontally around an adidas garment in

15   advertising, correct?

16   A.   Correct.

17   Q.   As you sit here today, you can't provide the jury with an

18   estimate about how many advertisements would feature stripes

19   horizontally on a garment, correct?

20   A.   I cannot specifically say that, no.

21   Q.   Now, you and adidas spend a lot of advertising dollars in a

22   lot of mediums, correct?

23   A.   Yes, yes.

24   Q.   In your role, you and adidas work hard to make sure that

25   three stripes show up consistently on the product that you

1    market; that's what you told us yesterday?

2    A.   Correct.

3    Q.   And notwithstanding those efforts, you and adidas don't

4    measure whether the stripes are vertical or horizontal or the

5    orientation in which they are utilized, correct?

6    A.   We do not.

7    Q.   Mr. Murphy, we spent a lot of time yesterday looking at a

8    number of catalogs.

9         Do you recall that?

10   A.   I do.

11   Q.   Catalogs from the '70s, right?

12   A.   Yes.

13   Q.   '80s, '90s?

14   A.   Yes and yes.

15   Q.   Early 2000s?

16   A.   Yes.

17   Q.   Just to be clear, you're not in charge of reviewing

18   catalogs at adidas, correct?

19   A.   I am not.

20   Q.   Catalogs are not marketing?

21   A.   They are not marketing.

22   Q.   You wouldn't consider catalogs to be branding

23   communications?

24   A.   No.

25   Q.   Catalogs are not part of advertising product?

1    A.   They are not.

2    Q.   Catalogs are not part of promoting product?

3    A.   They are not.

4    Q.   Catalogs are used for selling product to retailers, right?

5    A.   Correct.

6    Q.   You agree that selling to consumers is different than

7    selling to a retailer?

8    A.   It is different for the most part.

9    Q.   And for all of those products that you showed us from the

10   '70s, '80s, '90s, early 2000s, you can't tell the jury how many

11   of those products were actually sold, correct?

12   A.   No, I cannot.

13   Q.   You testified that adidas spends a fair amount of money on

14   advertising and marketing its products?

15   A.   Yes.

16   Q.   We looked at a couple spreadsheets yesterday.  We can pull

17   up PX 72.

18          Do you recall this document from your testimony,

19   Mr. Murphy?

20   A.   Yes, I do.

21   Q.   Now, PX 72 does not include any data prior to 2010,

22   correct?

23   A.   Correct.

24   Q.   If we can pull up PX 73.

25          PX 73 was the other spreadsheet you reviewed

1    yesterday?

2    A.  Yes.

3    Q.  Again, this is marketing and advertising dollars spent by

4    adidas?

5    A.  Yes.

6    Q.  Again, PX 73 does not include any data prior to 2012,

7    correct?

8    A.  That's correct.

9    Q.  Now we've already established that adidas uses three

10   stripes down sleeves vertically, right?

11   A.  Yes.

12   Q.  And according to you, adidas also uses three stripes around

13   sleeves as well?

14   A.  Correct.

15   Q.  Now, for all of the money that you say adidas spent on

16   advertising and marketing its products, there is no way for you

17   to tell how much money was spent advertising for products by

18   how the stripes were utilized?

19   A.  There is not, correct.

20   Q.  So you can't tell the jury how much money was spent on

21   advertising for products that featured horizontal stripes

22   around sleeves?

23   A.  I cannot.

24   Q.  Nor could you tell the jury how much money was spent

25   advertising horizontal stripes around shorts or pant legs?

1    A.  I cannot.

2    Q.  You also can't tell the jury how to differentiate between

3    advertisements and marketing spent between products with or

4    without the badge of sport logo?

5    A.  The badge of sport logo, if it's a sport product, it will

6    likely be on every single piece of product we advertise.  It's

7    likely in all of the advertising.

8    Q.  Fair enough.

9        If a product did not feature the three stripes,

10   though, as we looked at in PX 2, running down the side of the

11   pants, you couldn't tell from the marketing spent how to

12   differentiate between the products that had the three stripes

13   running down the side versus ones that did not?

14   A.  Correct.

15   Q.  And, likewise, in terms of the marketing and the

16   advertising spent, there was no way for you to break it out

17   between footwear and apparel?

18   A.  In some cases, yes, but it would be hard to be that really,

19   really specific.

20   Q.  It's mostly mixed together?

21   A.  For the most part, yes.

22   Q.  From about January 2015 to January 2017, you were senior

23   director of managing editor of adidas' U.S. news rooms?

24   A.  Correct.

25   Q.  And you were actually, I think, the first managing editor

1   of a US-based news room for adidas?

2   A.  That is correct.

3   Q.  And the news rooms, at least in the U.S. then, were

4   established around January 2015?

5   A.  I believe so.  A little bit after.

6   Q.  And to the best of your knowledge, you also had foreign-

7   based news rooms too?

8   A.  Yes, correct.

9   Q.  There was one in Tokyo, London, Shanghai?

10  A.  That's correct.

11  Q.  In U.S., there was LA and New York?

12  A.  Started just in Portland, and we expanded to Portland, LA,

13  and New York, yes.

14  Q.  Now, adidas' news room in New York is based out of adidas'

15  office?

16  A.  Yes, correct.

17  Q.  In New York?

18  A.  We have multiple offices.  It's based out of the Hudson

19  Street office.

20  Q.  Sure.  You started at adidas around 2006?

21  A.  Yes.

22  Q.  Adidas has had an office in New York since the time you

23  started?

24  A.  I believe so.

25  Q.  Retail stores as well --

1    A.   Yes.

2    Q.   -- in New York, since the time you started in 2006?

3    A.   Approximately, yes.

4    Q.   Now, in terms of the strategy behind these news rooms,

5    adidas created them to generate content and noise around the

6    adidas brand and its products, mostly on social media?

7    A.   Mostly on social media and editorial or PR public

8    relations.

9    Q.   The news room oversees three areas.  There's social media

10   marketing, right?

11   A.   Yes.

12   Q.   PR?

13   A.   Correct.

14   Q.   And athlete and influencer marketing on social media?

15   A.   Correct.

16   Q.   Social media is focused on adidas' owned channel, so we

17   look at some of that yesterday at adidas, at adidas running?

18   A.   For the most part, and athlete and influencer channels as

19   well.

20   Q.   We saw a lot of that yesterday.  I think you testified that

21   at adidas originals, or at least at the time of the exhibit,

22   had over 35 million followers on Instagram?

23   A.   Correct.

24   Q.   Now, the athlete and influencer marketing on social media

25   is focused on the environment of adidas' athletes or

1    influencers?

2    A.   They are environments, correct.

3    Q.   Influencers includes social media influencers, musicians,

4    and celebrities?

5    A.   And artists as well, yes.

6    Q.   And the news room creates content as well?

7    A.   It does.

8    Q.   So within those three buckets we looked at, adidas-owned

9    channels, they create content, correct?

10   A.   Yes.

11   Q.   Content created for PR?

12   A.   It is.

13   Q.   And the same for the athlete and celebrity influencers?

14   A.   Yes, correct.

15   Q.   Now, athletes are covered by the sports marketing group?

16   A.   For the most part, yes.

17   Q.   And influencers, including musicians and celebrities, are

18   covered by another group called entertainment and influencer

19   marketing?

20   A.   Now called culture marketing, yes.

21   Q.   OK.  Same group, though?

22   A.   Same group.

23   Q.   Now, the news room still exists today?

24   A.   It does, yes.

25   Q.   You still have responsibilities for the news room?

1    A.   Some.   It's a global organization, but they have a dotted

2    line to me.   They sit in our market, yes.

3    Q.   Certainly for the US-based news room?

4    A.   Yes.

5    Q.   Now, you would agree that the groups that you're

6    responsible for at adidas keep track of a lot of information?

7    A.   Yes.   We try.

8    Q.   On a monthly basis you track something that you described

9    earlier called share a voice?

10   A.   Correct.

11   Q.   And those are conversations related to the adidas brand

12   across all social media environments?

13   A.   Yes, correct.

14   Q.   You track share of search?

15   A.   We do also track share of search, yes.

16   Q.   That's on Google, when you type something in a search bar,

17   you track the volume of the searches related to adidas?

18   A.   Correct.

19   Q.   You also track brand awareness on a regular basis?

20   A.   We do, yes.

21   Q.   And then with campaigns, when adidas launches a specific

22   campaign, for example, you'll track its effectiveness as well?

23   A.   Yes, correct.

24            (Continued on next page)

25

N14Qadi3                    Murphy - Cross

1    BY MR. CONLEY:  (Continued)
2    Q.  Part of your job has also been dealing with customer
3    complaints received through social media regarding adidas
4    products?
5    A.  No.  That is not my group.  That's a customer service
6    group.  So when that stuff comes in, we send that to a
7    different organization.
8    Q.  Okay.  So it's your testimony that you've never been
9    responsible for dealing with customer complaints received
10   through social media regarding adidas products?
11   A.  If they come through, they send them on to customer
12   service.
13           MR. CONLEY:  Your Honor, I'd like to impeach the
14   witness.
15           THE COURT:  Go ahead.
16           MR. CONLEY:  May I show?
17           THE COURT:  Yes.
18           MR. CONLEY:  If we could have Tab D.
19   Q.  Do you recall being deposed in the Fashion Nova case?
20   A.  I do, yes.
21   Q.  If we could have Mr. Murphy's November 4, 2021 transcript
22   at 52, lines 11 to 18.
23           THE COURT:  So just before that, I need to explain to
24   the jury what a deposition is.
25           So before any civil case goes to trial, each of the

1   parties is able to take the testimony under oath of any

2   relevant person so that there's no surprises at trial, and if a

3   witness then gives testimony that is arguably different from

4   what he said in his deposition, then you can consider that

5   other testimony, that deposition testimony as testimony given

6   live and you may decide that they really are not inconsistent

7   or you may decide that they are inconsistent, but it's not

8   material, it's not important.

9        Or you may decide that they are inconsistent, and that

10  it bears on the witness's credibility.  And in that case, you

11  can decide that maybe the deposition testimony was more

12  accurate or the testimony in court was more accurate or that

13  you don't know, but you know that they're inconsistent.

14       So the bottom line is you can draw any of many, many

15  possible inferences, but counsel is able to bring to your

16  attention prior deposition testimony that counsel believes is

17  inconsistent with an answer just given.

18       Now, there is a further choice here, which is, as I

19  understand it, this was a deposition given in a different case

20  from this one, but it still was testimony given under oath, so

21  it can still be used for so-called impeachment purposes.

22       Now the practice in introducing this, which you are

23  well on your way to satisfy is, before you show it to the jury,

24  you need to either show it to your adversary or just identify

25  the page and lines.  And if it's from a different case, I think

N14Qadi3                    Murphy - Cross

1    you need to physically show it to them or show it on the screen

2    just to your adversary so if there's any objection, they can

3    make the objection before it's shown to the jury.

4              MR. CONLEY:  Give me one moment.  We have a binder for

5    opposing counsel.  This is on everybody's screen except the

6    jury's.  And your Honor can see it as well.

7              THE COURT:  Yes.

8              MR. CONLEY:  This is the question and answer, your

9    Honor.

10             THE COURT:  Is there an objection?

11             MR. HENN:  It doesn't appear to be proper impeachment,

12   but --

13             THE COURT:  I agree.  Sustained.

14   BY MR. CONLEY:

15   Q.  At the time of your deposition in July of 2022 for this

16   case, you weren't aware of any customer complaints or reviews

17   that mentioned Thom Browne, correct?

18   A.  I was not, no.

19   Q.  At the time of your deposition in this case, you had not

20   seen any reviews or complaints or anything that came through to

21   you where a consumer had indicated to adidas that he or she had

22   been confused between adidas's products and Thom Browne's

23   products?

24   A.  No, I had not.

25   Q.  At the time of your deposition in this case, July 2022, you

1  weren't aware of any market research that adidas has done to

2  determine whether Thom Browne has had any impact on adidas's

3  sales, correct?

4  A.  Correct.

5  Q.  In your current role, sports marketing is something that

6  you handle?

7  A.  Yes, correct.

8  Q.  Adidas has a number of athletes under contract from sports

9  marketing?

10  A.  Yes, we do.

11  Q.  I believe you mentioned yesterday that included both

12  athletes and teams?

13  A.  It does, yes.

14  Q.  I think you mentioned yesterday the U.S. Women's National

15  Soccer Team?

16  A.  They're not under contract with us, no.  That's Nike owned.

17  Q.  Got it.  But individual athletes who play on the women's

18  national team --

19  A.  Yes.

20  Q.  -- are sponsored by adidas?

21  A.  Yes.

22  Q.  That includes Abby Dahlkemper who we looked at yesterday?

23  A.  Correct.

24  Q.  If we actually pull up PX-29 at 53, we looked at this

25  yesterday, right?  This is an image from her social media page?

1    A.  Yes, correct.

2    Q.  I believe you testified that adidas has a contract with

3    Abby Dahlkemper, correct?

4    A.  Yes, correct.

5    Q.  She gets paid by adidas to regularly posts on social media

6    wearing adidas product?

7    A.  That's one of the things we ask her to do, yes.

8    Q.  And we know that adidas monitors her account?

9    A.  We do.

10   Q.  In fact, we see here adidas football making a comment on

11   it.  You see that, right?

12   A.  I do, yes.

13   Q.  Let's pull up PX-39 at 2.  And here again we see another

14   Instagram post from Abby Delkemper of her Instagram account,

15   correct?

16   A.  Yes, correct.

17   Q.  And here we see she tags adidas football in the post?

18   A.  Yes, correct.

19   Q.  Now, another athlete on the U.S. Women's National Team that

20   adidas sponsors is Ashlyn Harris, correct?

21   A.  I believe so.

22   Q.  She just retired from professional soccer in November,

23   right?

24   A.  Yes.

25   Q.  Adidas works closely with Ashlyn Harris as part of its

1   sponsorship?

2   A.  I believe so.  I'm not familiar with all the details with

3   all the athletes.

4   Q.  As an adidas collaborator though, she would post on social

5   media, again, showing adidas products?

6   A.  In some cases, yes.

7   Q.  And she is paid to do that?

8   A.  Yes.  In some contracts they are asked for social medial

9   posts and some are not, and some we leave up to the athlete

10  themselves.

11  Q.  But adidas would follow her social media account?

12  A.  For the most part, yes.

13  Q.  If we could pull up PX-34.  PX-34 is a document you relied

14  on yesterday in your direct testimony to show how adidas uses

15  Three Stripes in its marketing?

16  A.  Correct.

17  Q.  If go to page 2 and actually zoom in on the right there, we

18  see an image that's Ashlyn Harris, correct?

19  A.  Correct.

20  Q.  So in addition to posts she may make on social media, we

21  also see her as part of your advertising campaign in the store?

22  A.  Yes.

23  Q.  You showed us yesterday a number of current and former NBA

24  players that are also adidas athletes, correct?

25  A.  Correct.

1    Q.  Kevin Garnett?

2    A.  Yes.

3    Q.  Damian Lillard?

4    A.  Yes.

5    Q.  James Harden?

6    A.  Correct.

7    Q.  Serge Ibaka is another adidas athlete?

8    A.  Was, yes.

9    Q.  Okay.  Now, incidentally, Lebron James is not an adidas

10   athlete?

11   A.  No, he's not.

12   Q.  He's a Nike athlete?

13   A.  Correct.

14   Q.  Adidas also has a number of influencers under contract

15   through the entertainment and influencer marketing?  I guess

16   that's a different group?

17   A.  It's a different group, but correct, yes.

18   Q.  What's the current title?

19   A.  Culture marketing.

20   Q.  Culture marketing.  So culture marketing has a number of

21   influencers under contract?

22   A.  Correct.

23   Q.  That includes Katy Perry?

24   A.  I don't believe so any more.

25   Q.  But at one time --

1    A.  At one time, yes.

2    Q.  Pharrell?

3    A.  Yes.

4    Q.  And he's still under contract?

5    A.  Yes.

6    Q.  And he still collaborates with adidas?

7    A.  He does, yes.

8    Q.  And Beyonce as well?

9    A.  Correct.

10   Q.  I think we all know who Beyonce is.

11   A.  I hope so, yes.

12   Q.  Now, if we could pull up PX-29.  Yesterday we saw a lot of

13   exhibits related to some of these athletes' social media

14   accounts, correct?

15   A.  Correct.

16   Q.  Now, in PX-29, roughly the first 30 pages or so are

17   screenshots from Lionel Massi's Instagram account?

18   A.  I believe so, yes.

19   Q.  If we go to pages 43 and 44, we see additional adidas

20   athletes here that you were highlighting, correct?

21   A.  Correct.

22   Q.  If go to page 51, here we see another adidas athlete's

23   Instagram account?

24   A.  Correct.

25   Q.  52 is another adidas athlete, and this is their account

1    posting and tagging adidas, correct?

2    A.   Correct.

3    Q.   In fact, this one specifically says paid partnership with

4    adidas football?

5    A.   Correct.

6    Q.   Go to 54.  Again, another example of an adidas athlete

7    posing on her Instagram account?

8    A.   Correct.

9    Q.   Now, for athletes and influencers under contract, adidas

10   looks at their social media posts regularly to see what they're

11   posting?

12   A.   For the most part, yes.

13   Q.   Looking at the content, right?

14   A.   In some cases, yes.  We do our best.  There's a lot.

15   Q.   Understood.  But certainly see if they're meeting their

16   obligations?

17   A.   If they in their contract have a certain number of social

18   media posts.  It's less about the content they're posting; it's

19   more about the number.  So if we ask an athlete in their

20   contract to post ten times a year, yes, we hope that they post

21   ten times a year.

22   Q.   If an adidas athlete or influencer specifically does

23   something that adidas believes is harmful to the brand, in most

24   cases adidas would end that relationship if there were a

25   contract, correct?

1    A.  Correct, for the most part.  There's a lot of dependencies

2    in that statement.

3    Q.  If an adidas athlete or influencer posts him or herself on

4    social media wearing Thom Browne, particularly the products at

5    issue in this case, that would be harmful to the adidas brand?

6    A.  Yes.

7    Q.  In fact, adidas would end their relationship then with that

8    athlete or influencer if there was a contract?

9    A.  When athletes wear competitor brands, which does happen,

10   it's not necessarily an ending of their relationship.  It's

11   depending on what it is.  It may be a notification.  It may be

12   a fine.  It doesn't always result in an ending of a contract,

13   but there usually is some sort of conversation or some

14   repercussion, yes.

15   Q.  In most cases, you would end the relationship if there were

16   a contract?

17   A.  No, the opposite.  In most cases, we wouldn't end the

18   contract.  Again, there's a lot of competitor brands out there.

19   Some athletes do wear competitor brands, and we will let them

20   know, but it's not the case that we typically end the

21   relationship.

22         MR. CONLEY:  Your Honor, I'd like to impeach the

23   witness?

24         THE COURT:  All right.

25         MR. CONLEY:  This is going to be Tab D in the binder.

1   Page 322, line 16 is where the questioning starts, through 323,

2   line 578.

3          MR. HENN:  Again, it's improper impeachment.

4          THE COURT:  Sustained.

5   BY MR. CONLEY:

6   Q.  Now, because you and adidas monitor these social media

7   accounts, you're aware that Ashlyn Harris, for example, has

8   posted herself wearing Thom Browne apparel, correct?

9   A.  I am not aware of that, but if you're saying it is, it's

10  possible, yes.

11  Q.  Let's see if we can refresh your recollection.  If we could

12  show Mr. Murphy Tab H?

13         MR. HENN:  Counsel, what's the exhibit number on this?

14         MR. CONLEY:  It's Tab H in the cross-examination

15  binder.

16         MR. HENN:  Your Honor, it doesn't appear to be on the

17  exhibit list again, and there's no impeachment happening.

18         MR. CONLEY:  This is simply being used to refresh his

19  recollection.

20         THE COURT:  So the question is:  After having looked

21  at this, does that refresh your recollection on what?

22         MR. CONLEY:  As to whether adidas athlete Ashlyn

23  Harris has also posted herself wearing Thom Browne apparel,

24  including the accused products.

25         THE COURT:  Don't describe what's there.  Just tell

1    us, now that you've seen whatever is there, if you have an

2    independent recollection of that.

3            THE WITNESS:  I had not seen it previously, no.

4    Q.  Now, you testified yesterday about adidas's collaboration

5    with Beyonce?

6    A.  Yes.

7    Q.  That's with her apparel line called Ivy Park?

8    A.  Correct.

9    Q.  That's an example of one of adidas's celebrity

10   collaborations?

11   A.  Yes, correct.

12   Q.  Now, you're involved with the marketing -- you're involved

13   with marketing the Beyonce Ivy Park collaboration, correct?

14   A.  Correct.  Partly.  There's a global organization that does

15   the same.

16   Q.  Certainly for the U.S.?

17   A.  Certainly for the U.S.

18   Q.  Now, for celebrity collaborations like with Beyonce, the

19   majority of the marketing itself goes through you?

20   A.  Yes, for the most part.

21   Q.  You review the creative content?

22   A.  With Beyonce, it's a little bit different.  She's very

23   particular about the content created, as you can imagine, so

24   sometimes it doesn't matter what I say.  So I review it, but I

25   don't always have a say in what it looks like.

1   Q.  Understood.  You still see it though?

2   A.  For the most part.  I have teams that look at it more

3   closely than me, but it likely comes across my desk at some

4   point, yes.

5   Q.  Part of the reason you review it is to make sure it's

6   appropriate for the right social media channel?

7   A.  Yes.

8   Q.  Now, if you have concerns about the content of that

9   marketing, if it wasn't consistent with adidas's branding, you

10  would raise those concerns with someone overseeing that

11  business unit, correct?

12  A.  Probably not.  Again, if it's coming through my desk, it's

13  likely been approved by Beyonce, and in that case there's no

14  point in me raising the objection, to be honest.

15          MR. CONLEY:  Your Honor, I'd like to impeach the

16  witness.  This is Tab D, page 98, lines 9 to 13.

17          MR. HENN:  Your Honor, as it has nothing to do with

18  Beyonce, it is improper impeachment again.

19          THE COURT:  I don't think it's inconsistent.

20  Sustained.

21  Q.  You're familiar with Paul Bowyer?

22  A.  I am.

23  Q.  He's a colleague of yours who oversees, among other things,

24  adidas's collaboration with Beyonce and Ivy Park?

25  A.  He's connected to it.  I wouldn't say he overseas it.

1    Q.  Well, if you did have a concern with marketing related to

2    Ivy Park, who would you raise it with?

3    A.  There's a global organization that manages that

4    relationship with her, and that's who I would go to.

5    Q.  If you had a concern with, for example, Ivy Park marketing,

6    you would call Paul Bowyer, correct?

7    A.  He would be someone I would call of a number of people,

8    yep.

9    Q.  Now, yesterday we saw and heard lots about adidas's social

10   media marketing, right?

11   A.  Correct.

12   Q.  I'd like to walk through an example of how that influencer

13   marketing works on social media, in particular Instagram.  Do

14   you have that in mind?

15   A.  Sure.

16   Q.  You're generally familiar with Beyonce's Instagram account?

17   A.  Generally.  I don't spend a ton of time there, but yes,

18   generally.

19   Q.  You showed us an example of that yesterday.  If we could

20   pull up PX-381 at page 248.

21          This is showing an image of one of Beyonce's posts

22   from her Instagram account?

23   A.  Correct.

24   Q.  Now, at least at this time, Beyonce had 264 million

25   followers on Instagram?

1   A.  That is correct.

2   Q.  You would agree her reach as an influencer is pretty

3   extensive?

4   A.  It is significant, yes.

5   Q.  And that includes with respect to posts for Ivy Park

6   products?

7   A.  Correct.

8   Q.  Now, if I'm on the main Instagram page, I can see all of

9   Beyonce's posts on her account?

10  A.  Correct.  Not all of them, but you'll see some of them,

11  yes.

12  Q.  I could scroll through to see the rest, right?

13  A.  Yes.

14  Q.  If I click on one of those posts, let's say, a post that

15  features an Ivy Park product tab, I tap it, it will take me to

16  that specific post?

17  A.  It should, yes.

18  Q.  And if Ivy Park, for example, were tagged, and I tapped on

19  the image, the tag would pop up, correct?

20  A.  Correct.

21  Q.  And if I clicked on that, it would take me to the Ivy Park

22  handle on Instagram?

23  A.  It should or to -- sometimes we tag that to the collection

24  on adidas.com as well, so it will send you to a variety of

25  places.

1   Q.  So it can either send you to adidas.com or to the Ivy Park

2   handle where there would be a link to adidas.com?

3   A.  Correct.

4   Q.  And that's one way that adidas markets on social media with

5   celebrity influencers like Beyonce?

6   A.  Correct.

7           MR. CONLEY:  With your Honor's permission, I would

8   just like to show a demonstrative exhibit.  This is DTX-66.  We

9   are not seeking to admit it at this time, but it just shows

10  what Mr. Murphy just described.

11          MR. HENN:  Just to me, right, your Honor, so I can see

12  if I object?

13          MR. CONLEY:  Yeah, there were no objections to the

14  exhibit on the exhibit list.

15          MR. HENN:  You said this was a demonstrative.

16          MR. CONLEY:  We're using it as a demonstrative.

17          THE COURT:  So it's not being received as evidence.

18  It's just being shown to the jury so that you can reference it

19  in your questions to the witness.

20          MR. CONLEY:  Correct.

21          MR. HENN:  What was the exhibit number?

22          MR. CONLEY:  DTX-66.

23          MR. HENN:  Thank you.  Your Honor, there were written

24  objections made to that exhibit, so before it gets published to

25  the jury, I think we should see it.

1            THE COURT:  Let me see it on my screen.

2            MR. CONLEY:  I might have been confusing that with

3    another one on my sheet.

4            Why don't I show it to the witness and see if he

5    recognizes it as the process that he described.

6            MR. HENN:  So what exhibit number is it?

7            MR. CONLEY:  It's DTX-66.

8            MR. HENN:  That's a video?

9            MR. CONLEY:  It is a video.

10           THE COURT:  Woa.  Come to the sidebar.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So, first, just let's deal with the

3   demonstrative items in general.

4          If in order to help the jury follow particular items

5   for testimony a party wishes to show the jury and the witness a

6   so-called demonstrative, for example, a chart, unless it's

7   objectionable on other grounds, like misleading or something

8   like that, that is allowed, but counsel should understand that

9   it doesn't get received into evidence, and therefore it will

10  not be furnished to the jury when they get all the exhibits at

11  the end of the case.  So I just want to make sure that counsel

12  recognize that.

13         Second, with respect to this particular it item, this

14  is a video?

15         MR. CONLEY:  So this is the nature of social media,

16  all the video does is it shows -- it captures someone scrolling

17  through Beyonce's Instagram account, selecting a post that

18  includes an adidas product, hitting the tag in the post and

19  then being taken to that handle where there's a link to

20  adidas.com.  It's literally just showing what we just

21  described.

22         THE COURT:  Is there any objection to that?

23         MR. HENN:  Our written objection was hearsay because

24  we didn't know how it was going to be used.  If he's just

25  showing how you scroll through these things, we have no

1  objection.

2        THE COURT:  So fine.  Again, it's not received in

3  evidence, in any event.  So then you can show it to the jury.

4  There's no point -- the only time you don't show something to

5  the jury is when it has not yet been received in evidence or

6  subject to objection on some other grounds, but where, as here

7  at the sidebar, there has been a consent to its use for this

8  limited purpose, then you can show it immediately to the jury.

9        (Continued on next page)

1               (In open court)

2    BY MR. CONLEY:

3    Q.  Could you play DTX-66 and then pause at the 15 second mark.

4               So what we've seen so far, Mr. Murphy, is we were on

5    Beyonce's Instagram account, correct?

6    A.  Correct.

7    Q.  We scrolled through to this particular post, correct?

8    A.  Correct.

9    Q.  This is a post that features Beyonce wearing Ivy Park

10   sneakers?

11   A.  I think so.  It's hard to see.

12   Q.  Well, Ivy Park is tagged in the post?

13   A.  Okay.  Then you can make that assumption, yes.

14   Q.  Okay.  Well, if you click on Ivy Park, and you play the

15   rest of the video, and this is the Ivy Park Instagram account?

16   A.  Correct.

17   Q.  And there, there would be a link to adidas.com?

18   A.  Usually, yes, if there's product featured, correct.

19   Q.  Can we finish playing?  And there are product -- excuse

20   me -- a consumer would be taken to the adidas website where

21   they could purchase an adidas Ivy Park product, correct?

22   A.  Correct.

23   Q.  Now, when an adidas Ivy Park product is getting tagged in

24   that manner, that's something that falls within the celebrity

25   marketing umbrella?

1    A.  In this case, because it is Beyonce's environment, that

2    likely falls on her social media team.  We would give them

3    direction or ask for that.  And if it's in the contract for

4    them to do that, they would.  If it's not, it's up to them.

5    Q.  Sure, but in the post consumers are being driven to the Ivy

6    Park handle where they can purchase adidas Ivy Park products.

7    A.  Yes, the Ivy Park handle on Instagram, adidas manages.

8    Beyonce and her social team manage her own.

9    Q.  Adidas would be aware though when they're getting tagged.

10   A.  We should be, yes.  Beyonce does what Beyonce does.  So if

11   she's tagging certain things, sometimes we are aware of it,

12   sometimes we are not.

13   Q.  This is just for you, I'm showing you now a document

14   labeled DTX-72.  Do you recognize this as an image from

15   Beyonce's Instagram post that had the tag to the Ivy Park site,

16   correct?

17   A.  Yes, it looks the same.

18            MR. CONLEY:  Your Honor, I would move to admit DTX-72.

19            MR. HENN:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit DTX-72 received in evidence)

22   Q.  Would you publish that to the jury, please.

23            Now, in this Beyonce Instagram post, she's wearing Ivy

24   Park shoes, correct?

25   A.  Correct.

1  Q.  She's also wearing Thom Browne, correct?

2  A.  I don't know.  I'm not as familiar with the Thom Browne

3  products, so maybe.

4  Q.  I believe you just reviewed dozens of products that

5  featured Thom Browne's Grosgrain signature.  Do you recall

6  that?

7  A.  Yes.

8  Q.  You recognize the Grosgrain in the product, correct?

9  A.  I recognize red, white and blue stripes.

10  Q.  So is it your testimony that you don't understand that to

11  be a Thom Browne product?

12  A.  Like I said, it certainly could be because it has a red,

13  white and blue stripe, but the product I reviewed -- this is a

14  skirt.  I don't know if anyone else can see this, but it's a

15  skirt.  I didn't review a lot of skirts in the stuff that was

16  shared with me.

17  Q.  Are you familiar with a line of apparel called Golf Core?

18  A.  Golf Core, no.

19  Q.  In any event, adidas still has a relationship with Beyonce,

20  correct?

21  A.  Oh, correct, yes.

22  Q.  Nobody from adidas asked her to take this post down?

23  A.  I don't know.  I honestly don't know.  So I don't manage

24  the relationship with Beyonce.  So if someone saw this and said

25  please take this down, it wouldn't be my team.  So I'm not

1    familiar if we did or did not.

2    Q.  You specifically did not raise any concerns about this

3    post, correct?

4    A.  I did not.

5    Q.  Now, adidas has a number of product collaborations with

6    luxury brands, right?

7    A.  Correct.

8    Q.  That includes Gucci and Balenciaga?

9    A.  Correct.

10   Q.  You're also involved in the marketing and advertising of

11   those collaborations, right?

12   A.  Yes, lightly, because they're managed by a global

13   organization.  But, yes, in the U.S. market we help.

14   Q.  I believe you testified yesterday that you spend more money

15   on social media platforms to be seen by more people?

16   A.  Correct.

17   Q.  You aim to make sure that adidas's ads are showing up in

18   someone's Instagram feed, for example?

19   A.  Yes.

20   Q.  Now, when marketing a collaboration product, adidas works

21   closely with the brand that it's collaborating with, correct?

22   A.  For the most part.  Some more closely than others.

23   Q.  That's because the brands may separately sell the

24   collaboration products, right?

25   A.  Yes.  Every collaboration, every partner is very different.

1    Q.  Let's talk about Y-3 for a moment.  You testified today

2    about adidas's collaboration with Japanese fashion designer,

3    Yohji Yamamoto?

4    A.  Correct.

5    Q.  And that collaboration is called Y-3?

6    A.  Yes.

7    Q.  Adidas's Y-3 collaboration started in 2002?

8    A.  I believe so.

9    Q.  It just celebrated a 20-year anniversary?

10   A.  Yes.

11   Q.  And adidas advertises its Y-3 collaboration products?

12   A.  We do.

13   Q.  You're familiar with that advertising?

14   A.  Less so.  Again, it's managed by a global team.  I help

15   with certain parts in the U.S.

16   Q.  Now, with Y-3, adidas also has key launches of either

17   specific products or collections, right?

18   A.  We do, yes.

19   Q.  And for those key launches of either specific products or

20   collections, adidas will increase spending to drive increased

21   visibility, awareness, consideration of the product, right?

22   A.  Yes, correct.

23   Q.  And that's true with respect to other collaborations as

24   well, like Gucci?

25   A.  Correct.

1    Q.  And that would include driving customers wherever they

2    could buy those products?

3    A.  For the -- again, for the most part.  Different

4    partnerships are different.  Gucci is one example.  It sells

5    our product on their environment as well, so you can go to

6    Gucci.com and find the adidas-Gucci collaboration.  You can

7    also find that on the adidas.com.  That isn't the case with

8    every one of our partners.

9    Q.  Is it your testimony that adidas currently sells its Gucci

10   collaboration products on adidas's website?

11   A.  When it's in stock, we sell it through our app, our

12   adidas.com app.

13   Q.  And you mentioned those products can be purchased at

14   Gucci.com?

15   A.  They can as well, correct.  When they're available, I

16   should say.

17   Q.  So let's pull up PX-52 at 29.

18          This is an example of adidas advertising its Gucci

19   collaboration products on social media, correct?

20   A.  Correct.

21   Q.  And you testified that you endeavor to make sure adidas

22   three stripes are featured prominently in its marketing and

23   advertising?

24   A.  Yes, correct.

25   Q.  So you're familiar with the Gucci collaboration products?

1   A.  Again, I don't make the product.  I'm in charge of

2   marketing it.  I don't market all the products, so I'm not as

3   familiar with some of them.  Some, yes.

4   Q.  Well, the products we see in PX-52 that you showed the jury

5   earlier, that's a product you're familiar with?

6   A.  I am, yes.

7   Q.  If we go to page 30, PX-52, here we see another example of

8   adidas advertising its Gucci collaboration products on social

9   media, correct?

10  A.  Correct.

11  Q.  I think we'll see the same at page 31, correct?

12  A.  Correct.

13  Q.  You see that as well at page 32?

14  A.  Correct.

15  Q.  Then we see that again adidas advertising its collaboration

16  with Gucci on page 33?

17  A.  Correct.

18  Q.  And again on page 34.  Pull that up.  Correct?

19  A.  Yes, correct.

20  Q.  And, again, these are all adidas's own social media

21  accounts?

22  A.  Correct.

23  Q.  And certainly, at least for the products we just saw, those

24  are products you're familiar with?

25  A.  I am, yes.

1    Q.  Now, for adidas's collaborations with luxury designers like

2    Gucci, you also advertise in print?

3    A.  We do some, yes.

4    Q.  For print though, you would not go to your usual media

5    partners, right?

6    A.  In some cases.  It depends on what usual media partners

7    means.

8    Q.  Well, you might go to a *Vogue* or more fashion forward

9    publication to market the collaboration products?

10   A.  Correct.

11   Q.  Again, for those collaboration advertisements, adidas works

12   closely with the other brand, for example, Gucci, on those

13   advertisements?

14   A.  Yes, like I said, in some cases, some brands and partners

15   are more collaborative than others.

16   Q.  Well, in the case of Gucci?

17   A.  I didn't manage the back-and-forth with Gucci, so I don't

18   know how collaborative or not it was.  In my instance, I often

19   get handed creative things like that, and they say please get

20   this seen.  And I say, "No problem, I got it."  So earlier when

21   you were asking things like do you raise issues with these

22   things?  Typically, when it comes to the content or creative,

23   I'm not usually raising my hand to say I don't agree with this.

24   I'm usually working hard to make sure it gets seen.

25   Q.  You would certainly have an opportunity to review anything

1    that Gucci says that adidas should market or advertise on

2    adidas's own social media accounts?

3    A.   I would review it.  Whether or not I had a chance to review

4    and give any feedback is very different.  Those are two

5    different things.

6    Q.   So we saw examples of how adidas may advertise its

7    collaboration with Gucci, correct?

8    A.   Correct.

9    Q.   And we know that Gucci sells the products or promotes or

10   advertises the products on their own accounts?

11   A.   They do.

12   Q.   And you're not aware of any instance where adidas would

13   give up complete creative control over marketing that features

14   its brand or product to Gucci, correct?

15   A.   Again, I don't manage the direct relationship with Gucci,

16   so I don't know what's in that contract.

17   Q.   So it's possible?

18   A.   It could be.

19   Q.   Now, earlier we discussed how adidas tracks Share of Voice.

20   A.   Yes.

21   Q.   And that's the conversations related to the adidas brand

22   across social media environments?

23   A.   Yes.  For the most part, yep.

24   Q.   Now, according to you, this past May and June the

25   conversation around Gucci and adidas was quite high?

1   A.  It was quite high, yes.

2   Q.  And the Gucci-adidas collaboration generated a lot of buzz

3   or conversation on social media?

4   A.  It did, yes.

5   Q.  So the Share of Voice -- you say your Share of Voice was

6   high because of that?

7   A.  It was, yes.

8   Q.  Now, this Share of Voice related to the adidas-Gucci

9   collaboration, you say that conversation is mostly around the

10  product?

11  A.  It is mostly around the product, yes.

12  Q.  And the collaboration --

13  A.  I should say it was and is still, yes.

14  Q.  Collaboration products include adidas's logo in a lot of

15  places, right, on footwear and apparel?

16  A.  It does, yes.

17  Q.  Accessories too?

18  A.  Yes.

19  Q.  And that product also contains adidas's three stripes on

20  the apparel and footwear?

21  A.  It does, yes.

22  Q.  Again, not four stripes, but adidas's three stripes?

23  A.  That's correct.

24  Q.  So by that very nature, according to you, if you're talking

25  about adidas, which is mostly around the product, you then say

1   that you're talking about three stripes?

2   A.   Correct, yes.

3   Q.   You're seeing the three stripes, correct?

4   A.   Yes.

5   Q.   And according to you, you're seeing them in an impactful

6   way?

7   A.   Yes.

8   Q.   Now, you believe that the collaboration products feature

9   only adidas's three stripes, correct?

10  A.   Correct.

11  Q.   You know this because you're familiar with the

12  collaboration products?

13  A.   Not all the products, but a good number, yes.

14  Q.   Now, according to you, the Share of Voice that we were just

15  discussing from May and June, that was about adidas and not

16  Gucci?

17  A.   It was about the collaboration, so -- but in order to track

18  that on Share of Voice, adidas has to be used in the

19  terminology, yes.

20  Q.   Right, because you wouldn't just track Gucci?

21  A.   Correct.

22  Q.   Gucci by itself you say generates or would generate a

23  different Share of Voice?

24  A.   Yes.

25  Q.   So you believe that it has to be -- the Share of Voice has

1   to be coupled to adidas?

2   A.   When we track Share of Voice with any collaboration, it has

3   to be connected to our brand, yes.

4   Q.   Now, you're also familiar with the amount of money that

5   adidas spends on the Gucci collaboration?

6   A.   Correct.

7   Q.   How much is that, by the way?

8   A.   I can tell -- from a U.S. perspective, it's in the

9   multimillions of dollars.  It's not hundreds or tens, but it's

10  a lot.  Globally we spend more, but I don't have insight into

11  what we spend globally because this product and this

12  collaboration was not just in this market, in the U.S., it was

13  in quite a few.

14  Q.   But based on your experience and your understanding of how

15  much money is spent on the collaboration, you attribute

16  recognition of the Three-Stripe Mark to that Share of Voice?

17  A.   Yes.

18  Q.   You understand, sir, that Gucci also uses three stripes?

19  A.   They have a logo that has the green-red-green piece, if

20  that's what you're referring to.

21  Q.   But those are three stripes?

22  A.   You can call it that, sure.

23  Q.   Just so we're on the same page, if we take a look at

24  DTX-330, just you first.  If we can scroll through here.  These

25  are products from the initial release of the collaboration, so

1  released around May or June timeframe, right?

2  A.  Looks about right, yes.

3  Q.  You're familiar with these products?

4  A.  I am.

5       MR. CONLEY:  Your Honor, I would move to admit

6  DTX-330.

7       MR. HENN:  No objection.

8       THE COURT:  Received.

9       (Defendant's Exhibit DTX-330 received in evidence)

10 Q.  If we could publish DTX-330 to the jury.  If we could move

11 to page 4.

12      So here we see a pair of pants that are part of the

13 adidas-Gucci collaboration, correct?

14 A.  Correct.

15 Q.  These are flared jogging pants?

16 A.  Correct.

17 Q.  Now, even though we can't see it clearly, we know on the

18 right side of the pants those would feature adidas's Three

19 Stripes?

20 A.  Yes, correct.

21 Q.  And that's adidas Three-Stripe Mark?

22 A.  Yep.

23 Q.  We also see stripes running down the length of the left leg

24 too?

25 A.  Correct.

1  Q.  Right?  That's a green-red-green striping?

2  A.  Correct.

3  Q.  That's what you understand to be Gucci's three stripes?

4  A.  Looks like it, yes.

5  Q.  Just so we're clear, the green-red-green striping, that is

6  not adidas's Three-Stripe Mark?

7  A.  Could be.  It looks like Gucci's, but we use three stripes

8  in other ways, so in this case with a paid partnership or

9  collaboration where we mutually benefit, both of us are using

10  the three stripes.

11  Q.  So it's your testimony that the Gucci green-red-green is

12  adidas's Three-Stripe Mark?

13  A.  I didn't create the product.  It certainly could be.

14  Q.  Just so we're clear, none of the products we looked at

15  during your lengthy testimony yesterday or today showed a

16  green-red-green striping mark, correct?

17  A.  No, I think the closest we had was a green-orange-green on

18  a pair of Top Ten shoes.

19  Q.  Were the stripes smushed together?

20  A.  No.

21  Q.  Like Gucci does it?

22  A.  No, they were parallel and separate from each other.

23  Q.  But it's your testimony that the Gucci stripes, the

24  green-red-green, that that's not Gucci's mark?

25  A.  The green-red-green is Gucci's mark for sure.  They use

1    that quite a bit.  In this particular instance, the designers

2    who collaborated on this could have said wouldn't it be fun if

3    we used three stripes on both sides of the pants.  I don't

4    know. I'm not the collaborator on this.

5    Q.  But we can agree that that's not adidas's stripe mark, the

6    green-red-green?

7    A.  Could be.  We use three stripes in a number of ways:

8    Sometimes smushing the stripes together, sometimes in different

9    patterns.  I'm sure we used green-red-green in the past.

10   Q.  So the stripes could be smushed together and still be the

11   Three-Stripe Mark?

12   A.  Yes, three parallel stripes running together could still be

13   the Three-Stripe Mark.

14   Q.  In any event, you can't testify how long Gucci has been

15   using green-red-green on its products?

16   A.  I can't, no.

17   Q.  Now, if we could look at DTX-41.  This is just for

18   Mr. Murphy first.

19          Mr. Murphy, do you recognize DTX-41?

20   A.  Yes, I do.

21   Q.  This is a screenshot of adidas's website on the Gucci

22   collaboration products?

23   A.  Yes, correct.

24          MR. CONLEY:  Your Honor, I would ask to admit DTX-41.

25          MR. HENN:  No objection.

1          THE COURT:  Received.

2          (Defendant's Exhibit DTX-41 received in evidence)

3    Q.  If we could publish DTX-41 to the jury, I want to focus on

4    the second row, the right-hand jacket there.  That was a jacket

5    we looked at earlier, right, in the adidas's original Instagram

6    post?

7    A.  Yes, correct.

8    Q.  Again, this jacket features three stripes running down one

9    sleeve and then green-red-green running down another sleeve?

10   A.  Correct.

11   Q.  We also see the green-red-green on the jacket cuff as well?

12   A.  Yes, correct.

13   Q.  Just so we're all clear, it's your testimony that that's

14   adidas's Three-Stripe Mark on both sleeves?

15   A.  All I'm saying is it could be.  We have a partnership, a

16   paid partnership, a collaborative partnership with Gucci, and

17   how the designers decided to design this, I don't know.  It

18   could be the Gucci mark.  It could have been the Three-Stripe

19   Mark using Gucci colors.  I don't know how the two designers

20   who created this, likely one from Gucci, one from adidas, came

21   together and made this.

22         THE COURT:  Counsel, do you want me to give the jury

23   their lunch break now so you can review whatever else, rather

24   than our having to wait for --

25         MR. CONLEY:  That would be fine, your Honor.

1            THE COURT:  So, ladies and gentlemen, I will give you

2    your lunch now.  I have a couple of legal issues to discuss

3    with counsel, so we'll resume at 2:00.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  Please be seated.

3            When we come back at 2:00, I will ask defense counsel

4    to give me a binding representation of how much more time you

5    need, but right now give me a ballpark.

6            MR. CONLEY:  It's not long.  I will look over the rest

7    of my outline.  I would say certainly less than 30 minutes.

8    Probably closer to 15.

9            THE COURT:  Then we'll have redirect, and then we'll

10   have the next witness.

11           I'm also grateful that both the questioner and the

12   witness understood the word smush.  I didn't have to call upon

13   my grandmother therefore to define it.

14           Now, with respect to this very interesting and

15   important issue that has now been raised several times about

16   whether it's one mark or several marks, in effect.  I think

17   plaintiff's counsel said he had prepared a brief -- this was in

18   connection with the motion to dismiss?

19           MR. HENN:  Well, we did brief this before at the point

20   of motion to dismiss.  But we also, once we saw the proposed

21   jury instruction and verdict form from the other side, which

22   requires a grid-like comparison of registrations and products,

23   we anticipated we might need to provide you with some authority

24   on why that was wrong, so we prepared a bench brief that we

25   could file or hand up, however you want to handle it.

1          THE COURT:  I think that would be very helpful, but

2     before we get to the schedule for that, so when it was raised

3     before Judge Nathan, did she rule on it?

4          MR. HENN:  So it was originally before the magistrate

5     judge, and there was an R and R, and then it was adopted in

6     form.

7          THE COURT:  I see.  Who was the magistrate judge?

8          MR. MALDONADO:  Lehrburger.

9          MR. HENN:  Lehrburger, thank you.

10          THE COURT:  They're all fungible.

11          And did the magistrate judge rule on it?

12          MR. HENN:  Well, in the context of the motion to

13     dismiss, yes.  He said he adopted our view of the Lanham Act

14     that talks about infringing a mark and said that we had

15     adequately pleaded that we own one mark covered by multiple

16     registration and therefore the motion to dismiss was denied.

17          THE COURT:  Obviously, it was not a final.  It was

18     simply this is what you pleaded, and I will accept it as true

19     for purposes of a motion to dismiss.

20          MR. HENN:  Correct.  Although in order to deem those

21     legally sufficient, he obviously had to know what the law was.

22          THE COURT:  Well, that's true, but what I'm getting at

23     is, it doesn't sound to me like it's a law of the case

24     decision.

25          MR. HENN:  I don't believe it is, your Honor.

1        MR. MALDONADO:  Right.

2        THE COURT:  Very good.

3        So when can you get me your brief?

4        MR. HENN:  It's ready.  The amazing Alex Weatherby.

5        THE COURT:  Nothing like being prepared.  Hand it up.

6   You can hand it to my law clerk.

7        And has defense counsel received a copy?

8        MR. MALDONADO:  We have not, your Honor.

9        MR. HENN:  There's three copies there.

10       THE COURT:  Give them that one, please.

11       Secondly, how long would defense counsel like to put

12  in a response?

13       MR. MALDONADO:  Would Friday be acceptable?

14       THE COURT:  No.  No.  No.  No.  No.  I got to get

15  something you tonight.

16       MR. MALDONADO:  Tonight.

17       THE COURT:  Tonight, but I'll give you till midnight.

18       MR. MALDONADO:  Midnight.

19       THE COURT:  So email me your response at midnight, and

20  then we'll get together at 9:00 tomorrow.  It may be that I'll

21  still need further briefing and there may be other nuances but

22  at least this will give me a head-start on examining the issue.

23  Good.  We'll see you all at 2:00.

24       (Luncheon recess)

25       (Continued on next page)

```
 1                          AFTERNOON SESSION

 2                              2:00 p.m.

 3              (Jury not present)

 4              MR. HENN:  Your Honor, before they come in, should we

 5    deal with quick evidence things?

 6              THE COURT:  First of all, how much longer?

 7              MR. CONLEY:  Hold me at 15.  I expect it to be much

 8    less.

 9              THE COURT:  Great.

10              MR. HENN:  With regard to the next witness, we have a

11    bunch of stipulated admitted evidence.  I thought I would go

12    ahead and read those in.

13              THE COURT:  Well, sure.  You want to put those on the

14    record?

15              MR. HENN:  That would be great.

16              We have agreed to the admission of Exhibits 83 through

17    84, 88 through 91, 93 through 109, 1029 and 1304.

18              THE COURT:  Those are all plaintiff's exhibits?

19              MR. HENN:  All plaintiff's exhibits.

20              One comment about Exhibit 82.  We have agreed with

21    counsel to modify that exhibit to avoid an otherwise hearsay

22    objection.  So we will be replacing the exhibit that was

23    previously exchanged with one that removes the text and is

24    limited to the pictures of the shoes, the name of the shoe, and

25    the year.
```

1           THE COURT:  OK.  Agreed?

2           MR. MALDONADO:  That's agreeable, your Honor.

3           THE COURT:  Very good.

4           (Plaintiff's Exhibits 83 through 84, 88 through 91,

5   93 through 109, 1029 and 1304 received in evidence)

6           Let's bring in the jury.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  Please be seated.

3                Go ahead, counsel.

4      BY MR. CONLEY:

5      Q.  Few more questions for you, Mr. Murphy.

6                We know that Gucci sells its collaboration products

7      with adidas on *gucci.com*, right?

8      A.  Correct.

9      Q.  Adidas sells its products at other places too, like

10     *adidas.com*?

11     A.  *Adidas.com* and confirmed a couple spots, yes.

12     Q.  For adidas only products, do you have that in mind,

13     non-collaboration products?

14     A.  Sure, yes.

15     Q.  Some of the places adidas sells those products would be

16     adidas' own brick-and-mortar stores?

17     A.  Correct.

18     Q.  Dick's Sporting Goods?

19     A.  Yes.

20     Q.  Foot Locker?

21     A.  Yes.

22     Q.  Finish Line?

23     A.  Correct.

24     Q.  JD Sports?

25     A.  Yes.

1    Q.  Kohl's?

2    A.  Yes.

3    Q.  *Amazon.com* as well?

4    A.  Correct.

5    Q.  Do you believe that when someone says, does adidas sell or

6    is known for high-end luxury, most people would say yes,

7    correct?

8    A.  I think a good number of people would say yes, especially

9    based on some of the more recent collaborations we have been

10   doing.

11   Q.  You believe most people would say yes?

12   A.  I think a lot of people would say yes.

13   Q.  Now, that's true even though adidas sells its products at

14   Dick's Sporting Goods, correct?

15   A.  Correct.

16          MR. CONLEY:  No further questions, your Honor.

17          THE COURT:  All right.  Redirect.

18   REDIRECT EXAMINATION

19   BY MR. HENN:

20   Q.  Mr. Murphy, during your cross-examination you were asked

21   about whether adidas tracks its advertising spending

22   specifically with regard to horizontal uses of the three

23   stripes as opposed to diagonal or vertical.

24          Do you recall that?

25   A.  Yes, I do.

1    Q.  Why doesn't adidas track that?

2    A.  It's one mark.  It's three stripes.  We use it in a ton of

3    different ways, as we saw.  We market it in a lot of different

4    ways as well.  We use the three stripes in a variety of ways on

5    product and in marketing, at retail and otherwise.

6            So no, we don't track it.  It's similar if I had this

7    same job for my main competitor Nike, who uses the swoosh right

8    side up, upside down, on the back of the shoe, small, different

9    colors.  If I were in that role, I would also not be tracking

10   the usage of that mark because it's synonymous with Nike, just

11   like three stripes is synonymous with adidas.

12           MR. HENN:  Thank you very much, Mr. Murphy.

13           No further questions, your Honor.

14           THE COURT:  Thank you very much, Mr. Murphy.

15           (Witness excused)

16           Please call your next witness.

17           MR. HENN:  We call Paul Bowyer.

18           Apparently he's in the bathroom, your Honor.  He'll be

19   here in a second.

20           THE COURT:  Some people will do anything to escape

21   testifying.

22           (Pause)

23           Do you want to send someone to fish him out?

24           MR. HENN:  We have someone waiting right outside the

25   door, your Honor.

1              THE COURT:  OK.

2              THE DEPUTY CLERK:  I can see someone coming.

3              THE COURT:  You can use a pole, if necessary.

4              THE DEPUTY CLERK:  Please take the witness stand.

5              THE WITNESS:  Thank you.

6              THE DEPUTY CLERK:  Please remain standing.  Raise your

7      right hand.

8       PAUL BOWYER,

9           called as a witness by the Plaintiffs,

10          having been duly sworn, testified as follows:

11             Please be seated.  State your name and spell it slowly

12     for the record.

13             THE WITNESS:  Paul Bowyer, P-a-u-l B-o-w-y-e-r.

14     DIRECT EXAMINATION

15     BY MR. HENN:

16     Q.  Mr. Bowyer, please introduce yourself to the jury.

17     A.  Hi there.  Welcome.  My name is Paul Bowyer.  If the accent

18     hasn't given it away already, I'm from the U.K.

19             I have a five-year-old boy whose name is Rudy.  I

20     moved to the U.S. in 2006, so I've been here a little while

21     now.  I got citizenship last year, and I will actually be in

22     your seats next week in Oregon, as I've been called for jury

23     duty.  So I did some back-to-back court action.

24             I moved to the U.S. in 2006 to work for Reebok over in

25     Boston.  Spent some time there in various roles, and then moved

1    to Portland, Oregon in 2012.  So I've been in Portland, Oregon

2    for just over ten years now.

3    Q.  What's your current role at adidas?

4    A.  My current role at adidas is vice president of originals,

5    basketball, and part brands, essentially, that is business

6    units.  Just to give you a little bit of context how we

7    architect the brand, we have two benchmarks.  We are the badge

8    of sports, which is performance, and then we have the Trefoil,

9    which is for all of our style products.

10          So what I'm responsible for is the style side of the

11   business.  Originals, just to kind of break that down for you,

12   is a lot of archival products.  Looking back at history, we

13   look at all of the products that have been around for a long

14   time to get inspiration.  And we may bring those back one for

15   one or take inspiration.

16          We have a lot of iconic products in our catalog that

17   have been around for time.  For example, a superstar or Stan

18   Smith that have been evergreen within our collections.  That

19   consists of footwear.

20          MR. MALDONADO:  Your Honor, I would like to object to

21   the rambling nature of the response.

22          THE COURT:  I think we've gotten the basis.

23          What's your current position?

24          THE WITNESS:  My current position is vice president of

25   originals partner brands and basketball.  I think basketball is

1    intuitive.  Partner brands is any collaborations that we do

2    within style.

3    BY MR. HENN:

4    Q.  With regard to the originals products, you were explaining

5    how you bring those back from history.

6              Can you explain how that happens?

7    A.  Yeah.  We have -- obviously, the brand has been around for

8    over 70 years now.  We have a vast archival of products we've

9    been collecting and creating over that time.  Generally we

10   create around 40,000 unique styles per season, so times that by

11   70, we have a lot of products.

12             We actually have, in Herzogenaurach, our headquarters,

13   an archive where we keep one of every style, and that consists

14   of tens of thousands of articles, catalogs, garments that we've

15   referenced typically, to then bring some of those back and

16   contemporize them for today's culture.

17   Q.  Let's pull up Exhibit 80.

18             So Exhibit 80 is a collection of various products.

19   I'm going to ask you to go to page 32, please, Nita.

20             Can you identify what we have on page 32?

21   A.  Yes.  This is one of our superstar track pants.  That sits

22   within our originals apparel line.  You can see from here that

23   you see the iconic and classic three stripes on the side of

24   those pants and the Trefoil logo on the thigh.

25   Q.  I would like to go to page 35.

1          What is that?

2    A.   Firebird is one of our key items within our apparel

3    collection as well.  In this case, it's a women's execution.

4    Again, between that classic branding on the left sleeve and the

5    right sleeve and the Trefoil on the left chest.

6    Q.   Does originals also include footwear?

7    A.   It does as well.  Footwear and apparel, and its men's,

8    women's, and kid's.

9    Q.   Let's look at page 13.

10          Can you identify this for us?

11   A.   Yeah.  This is the Campus 80s, originally named the

12   tournament.  The 80s denotes the time when that product came

13   to bear, and this product has been in our line ever since.

14   Originally it's a shoe worn for sport and now converted more

15   for style.

16   Q.   And if we go to page five.  Describe that.

17   A.   This is one of our superstar styles.  This shoe, again, has

18   been in line for an awful long time, originally designed,

19   actually, as a tennis shoe.  But then it was adopted by

20   basketball players and then hip hop artists, such as Run DMC.

21   You may be familiar with *My Adidas*, so making this superstar

22   iconic.  Now worn for style.

23          This expression shows how we can use different

24   executions of side stripes using the Three-Stripe Mark.

25   Q.   Go to page 18.  If you'll just zoom in on the top there of

1   the product itself.

2           Can you identify this for us?

3   A.  Yeah.  Here we have a pullover style, so just a different

4   cut.  On this style you can see a different execution of the

5   stripes.  You can see them running vertically from the collar

6   across to the sleeve and then horizontally next to the elbow.

7   This has been something that, again, as you look at the

8   archive, we have been doing consistently for many years.

9   Q.  Look over to page nine.

10  A.  Busenitz is one of our skaters.  So we have a really rich

11  history in skates, so we create products specifically for some

12  of our pro skaters, and this is one of those.  You can see the

13  Three-Stripe Mark executed here in blue and red on the side of

14  the shoe.

15  Q.  When you say skate, do you mean ice skates, roller skates,

16  skateboarding?

17  A.  Skateboarding.

18  Q.  Go to page 30.  What do we have here?

19  A.  This is a crew neck sweatshirt just showing the versatility

20  of the color application on the three stripes.  Here, you can

21  see it on the shoulder.  And then the Trefoil executed, we call

22  this the stacked Trefoil, giving really a 3D read and look to

23  that execution.

24  Q.  Thank you.  You can take that down, Nita.

25          Mr. Bowyer, you mentioned that there is an archive in

1    Germany.  I'm going to have Nita play Exhibit 81 for us.  This

2    is a video about the archive.

3            Will you describe for the jury what they are about to

4    see?

5    A.  Yeah.  I mentioned the archive earlier.  In our

6    headquarters in Herzogenaurach, a small town in the center of

7    Germany, is where we store all of the archival products.  It's

8    an immense privilege for anybody that can get the opportunity

9    to travel to Germany to get access to this.  You have to go in

10   a white blazer, white gloves.  It's humidity sealed.  It's

11   really a special opportunity.  We'll bring athletes through

12   there.  Sometimes new employees through there as a really

13   special occasion.

14           This video really celebrates that archive and shows a

15   much wider audience.  We created this video for YouTube

16   channels so people can see our heritage, how the past informs

17   the future in terms of our designs as well.

18           MR. HENN:  Nita, play 81 with sound, please.

19           (Video played)

20           Thank you, Nita.  You can take that down.

21   Q.  Mr. Bowyer, I'm going to show you the cover of Exhibit 82.

22           Can you describe for the jury what's contained in

23   Exhibit 82?

24   A.  Yes.  So we commission Taschen, who is a book producer, to

25   help us really socialize and provide more visibility awareness

1    the archive.  There is emerging consumer who is really kind of

2    fascinated with the history and the rich archive.  They are

3    often looking to tell the story of the brand.

4          So we commissioned this book with Taschen to help tell

5    that story about some of the key products of the future and the

6    history of adidas.

7    Q.  And the products that are depicted in Exhibit 82, do those

8    all come from the archive?

9    A.  Yes, they did.

10   Q.  Let's go over to page 64.  The way I'm going to do this,

11   Mr. Bowyer, is go through several of the images in here.

12         Tell the jury sort of the product that's on the screen

13   and then where it fits in adidas history.

14         OK.  We'll start with the one on page 64.

15   A.  Yeah.  Adidas has a really rich history in running.  Adi

16   Dassler himself was a cobbler.  He was the founder, and there's

17   where the name derived from.  He was Adi Dassler which is

18   adidas.

19         This is one of the first prototypes of a running spike

20   where he actually hammered the nail in by hand to create a best

21   product for the athlete.  We had -- not this shoe specifically,

22   but in the past also, Jesse Owens run in the Olympics back in

23   the day wearing some of early-running spikes.

24   Q.  Go over to 86.  Before you move off of 64, does that shoe

25   have a name?

1    A.   That shoe is the -- I believe that's the Ozweego, initially

2    called the Ozweego.

3    Q.   Would go to page 86.

4    A.   Yeah.

5    Q.   Identify this one.

6    A.   Yeah.  I'm not sure Messi would have won the World Cup in

7    this today.  This is one of the very first soccer boots, soccer

8    cleats.  You can see, obviously, the Three-Stripe Mark on the

9    sides, no cleats on this one on the outsole.  We'll show some

10   of that through the innovation.  A very rich history in soccer.

11   Again, adidas, Germany, that sort of heartland, is central to

12   our activation in soccer.

13   Q.   And the name of this shoe?

14   A.   This is the Samba soccer shoe.  We still use that name

15   today in the collection.

16   Q.   Go to page 114.

17   A.   This is the Chile.  We use this name still in collections

18   in footwear and apparel.

19        This goes to show kind of the evolution of soccer

20   cleats over time.  So in 1960, '61, '62, this is how far back

21   innovation had evolved.  This was the first shoe that actually

22   you could take out the cleats from the bottom and change them

23   so you didn't have to replace the whole boot itself.

24   Q.   Over to page 128.

25   A.   Longstanding partner of ours, Muhammad Ali, lifetime

1    contract, rest in peace.  And this was one of the iconic boxing

2    boots that he wore when he fought.  You can see his signature

3    on the side of that product.

4          So yeah, he was obviously integral in creating fame

5    and awareness for the Three-Stripe Mark in some of those iconic

6    matches that he fought.

7    Q.  Page 144?

8    A.  Dick Fosbury, you may be familiar with the Fosbury flop.

9    It was the first gentleman to actually jump over the high jump

10   backwards, and he was actually wearing this shoe --

11          (Reporter interruption)

12          MR. MALDONADO:  Your Honor, I'll object to the

13   witness's discussion of people that have worn these shoes.

14          THE COURT:  Sustained.

15          MR. HENN:  Your Honor, may I be heard on that on a

16   sidebar, please?

17          THE COURT:  No.  Move on to something else.

18          MR. HENN:  All right.  Let's move to page 162.

19   BY MR. HENN:

20   Q.  Mr. Bowyer, if you'll just tell us what the shoe is and its

21   timeframe.

22   A.  Yes.  This is the first basketball shoes called the

23   pro model from 1972.  This product is actually still in our

24   line today, with some evolution and innovation embedded.  We

25   still have the pro model in the range today.

1    Q.   Does the pro model today still use that blue, red, blue

2    version of the Three-Stripe Mark?

3    A.   We use various color ways on the Three-Stripe Mark.  So it

4    depends on the season, but certainly you can see we have been

5    using that color execution since 1972.

6    Q.   Go to 168.  What is this?

7    A.   This is one of the very early boxing boots, as well worn by

8    one of our other athletes, the guy that makes grills these

9    days.

10   Q.   We'll go to page 171.  If you'll just grab the top.

11   A.   One of our first tennis shoes.  This was for one of the

12   female athletes who is now a huge advocate for female rights,

13   women's rights.

14            MR. MALDONADO:  Your Honor, same objection.

15            MR. HENN:  Your Honor, this is directly relevant to

16   the issue of fame.

17            THE COURT:  I doubt it, but I'll hear you at the

18   sidebar.

19            (Continued on next page)

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Before we even get to the objection that

3     was posed and your response, why isn't all of this simply

4     cumulative and, therefore, a waste of time?

5              MR. HENN:  It's not cumulative because these products

6     are ones that were specifically historically relevant and

7     important in that they were worn by elite athletes over a long

8     period of time.  And we have to prove in this case that the

9     mark was famous prior to Thom Browne's first adoption of the

10    four bars, the Grosgrain.  That's why we're doing up this

11    historic stuff, the reason why the witness should be able to

12    say who wore the shoe.  Otherwise, it would be cumulative, just

13    another picture of this shoe.

14             What makes these shoes important is that they were

15    worn by people like Muhammad Ali, and Billie Jean King, and

16    Artis Gilmore and other famous people on the field, on the

17    court.  So it's directly relevant to how well-known the three

18    stripes were over that long period.

19             MR. MALDONADO:  Well, your Honor, I think the witness

20    is saying more than just naming names of people who wore the

21    shoes and is describing how they became famous in the shoes

22    and, you know, all sorts of other details that are extraneous

23    and irrelevant.

24             Just the name of a celebrity like Beyonce wears, you

25    know, wears adidas Gucci collaboration or whatever, more than

 1    just a name.  It's more of a description that the witness is

 2    giving that's adding importance and that he doesn't have

 3    knowledge of, no personal knowledge of.

 4            THE COURT:  The person who is being inquired about

 5    right now is who?

 6            MR. HENN:  I forget if we're on Billie Jean.  This is

 7    Billie Jean King's --

 8            MR. MALDONADO:  No, it's not Billie Jean.  It's

 9    someone I've never heard of.

10            MR. HENN:  I'll say, the blue one on the screen --

11            THE COURT:  No, the one you just put the question and

12    I sustained the objection to.

13            MR. HENN:  If it's this shoe on the screen now, I'm

14    pretty sure that's Billie Jean King because he was talking

15    about --

16            MR. MALDONADO:  Hang one second.

17            THE COURT:  It's not on my screen.  Excuse me.

18            Go back to the last question put by plaintiff's

19    counsel before we went to the sidebar and read me the question

20    and the answer.

21            (Record read)

22            Assuming it is Billie Jean King, I don't think she was

23    then yet known by name.

24            MR. HENN:  He heard the sustaining of the objection,

25    your Honor.

1          THE COURT:  No.  But what his answer was -- and I have

2    another problem with this, which is he's not paying attention

3    to the specific question asked, and that will get him in deep

4    trouble.  And you may want to just go over and advise -- I'll

5    advise him to answer the question.

6          He started off, he started his answer, as we just

7    heard, by talking about that she is now a great advocate of

8    women's rights.  Now, first, what she is currently has nothing

9    to do with the reason you're introducing it.

10          Second, I think it's fair to say that Billie Jean

11    King's reputation at the relevant time rested largely on the

12    fact that she was a champion female player and had a famous

13    match with --

14          MR. HENN:  A male player.

15          THE COURT:  -- with the fool.  Strike fool.

16          But anyway, I think now that hear your reason.  I will

17    allow this in limited fashion.  I still sustain the objection

18    to the answer that was given.

19          So I think I will allow you to lead in the sense of

20    saying who.

21          MR. HENN:  Who wore this.

22          THE COURT:  Who wore it, period.

23          (Continued on next page)

24

25

1    (In open court)

2    BY MR. HENN:

3    Q.  Mr. Bowyer, with regard to the shoe that we have on the

4    screen here, which is page 171, can you just tell us who wore

5    this shoe?

6    A.  Billie Jean King.

7    Q.  Thank you.

8        If we go over to page 182, what is the shoe depicted

9    there and who was the person who wore it?

10   A.  The issue is the Monza motor sport shoe worn by Mario

11   Andretti in 1977.

12   Q.  Go to page 203.  What is this shoe and who wore it?

13   A.  This is the Atlanta running shoe worn by Greta Waitz.

14   Q.  If we go to page 226, what is this shoe and who wore this

15   shoe?

16   A.  This is the Grand Slam tennis shoe worn by Steffi Graf.

17   Q.  Go to page 232.  What is this shoe and who wore this shoe?

18   A.  This is the accelerated worn my Flo-Jo or Florence

19   Griffith-Joyner.

20   Q.  Page 254.  What is this shoe and who wore this shoe?

21   A.  The Adistar sprint shoe, custom-made for Donovan Bailey.

22   Q.  And can you explain why the Three-Stripe Mark is sort of

23   going horizontally along the shoe, as opposed to between the

24   strings and the sole?

25        MR. MALDONADO:  Objection, foundation.

1    A.   The reason --

2              THE COURT:  When there is an objection, you have to

3    wait.

4              THE WITNESS:  Sorry.

5              THE COURT:  Without giving yes to the answer, do you

6    know from personal knowledge what the answer is?

7              THE WITNESS:  From the archive.

8              THE COURT:  From the archive?

9              THE WITNESS:  Yeah.

10             THE COURT:  And what was the reason you consulted the

11   archive?

12             THE WITNESS:  Because we spend time in the archive

13   reading the books.  That's just part of my job, to understand

14   the history of a product.

15             THE COURT:  All right.  Given that foundation, I'll

16   allow it.

17             MR. HENN:  Go ahead, Mr. Bowyer.

18   A.   So there is still three parallel stripes.  Interestingly,

19   with the starting box for running, the reason that they were

20   applied in this formation is because, that way, you still get

21   the same read of the stripes as if you would when they were on

22   a flat surface.  So runners run on their toes, you still get

23   the same brand read.

24   Q.   Go to page 272.  Can you identify this shoe and who wore

25   it?

1    A.   This is the T-Mac 1 worn by Tracy Mc Grady, basketball

2    shoe.

3    Q.   Page 294.  Identify this one and who wore it.

4    A.   This is the Adizero Adios custom-made for Haile

5    Gebrselassie.

6    Q.   And 404, what is this shoe and who wore this shoe?

7    A.   This is the Superstar 80s shoe specifically made for

8    Run DMC.

9    Q.   If we go to page 424, what is this shoe and who wore this

10   shoe?

11   A.   This is a custom high-top fashion shoe made for Madonna.

12   Q.   Thank you.

13        You mentioned that the archive is one of the sources

14   where you go back and bring forward shoes.

15        I'm going to show you a video now, Exhibit 83, about

16   that.  Can you explain to the jury what they are about to see?

17   A.   Yes.  So you saw a shoe earlier called the Ozweego.  This

18   shoe still is in our collection today, and this video was

19   created quite recently, actually, to show how the product today

20   is inspired by the archive.

21   Q.   Thank you.

22        MR. HENN:  Let's play Exhibit 83 with the sound,

23        (Video played)

24        Thanks, Nita, you can take that down now.

25        Let's pull up Exhibit 104 and let's go to page two.

1    BY MR. HENN:

2    Q.  Can you just describe how this shoe came to be?

3    A.  Yeah.  This shoe is from the Samba collection.  We saw

4    Samba earlier in the archive.  The key insight was the Samba

5    was being worn by fixed gear cyclists.  So we were able to take

6    that insight and add some functional features, such as the

7    cleats on the bottom of the product to that shoe so that it

8    could be worn as a functional cycling shoe, but also on the

9    street.  This product, you can see again the blue, red, and

10   white three-stripe execution on the side.

11   Q.  If we go over to page ten.  Can you identify this shoe for

12   us?

13   A.  Yes.  This shoe is the NMD.  It sits within the originals

14   collection, and this is an example where we take archival

15   reference, but we inject brand new technology.  This shoe

16   specifically features boost technology, which is one of our

17   leading innovations in comfort stories.  So then you can also

18   see on the heel, we call out specifically the brand with the

19   three stripes in French.

20   Q.  You've mentioned the Three-Stripe Mark several times.

21         How do you define the Three-Stripe Mark?

22   A.  I'm not a legal representative on this topic, but my

23   application and understanding is three parallel stripes.

24   Q.  In terms of your job, does it matter whether the stripes

25   are horizontal or vertical or diagonal for it to be the

1    Three-Stripe Mark?

2    A.  No.

3            MR. MALDONADO:  Objection, your Honor.

4            THE COURT:  Sustained.  Not just on the

5    mispronunciation of horizontal.

6            MR. HENN:  Very well, your Honor.

7    Q.  Mr. Bowyer, as you understand it, how many three-stripe

8    marks are there?

9    A.  One.

10   Q.  I would like to go over to Exhibit 98 and have you talk a

11   little bit about how the Three-Stripe Mark is worked on hang

12   tags and packaging for products.

13           If we can go over to page three.  Just describe how

14   the Three-Stripe Mark is used on the hang tags.

15   A.  Yes.  You can see this originals execution applied

16   diagonally across the hang tag.  This item is a tank dress.

17   There is no sleeves, so therefore we apply the Three-Stripe

18   Mark to the side of the ribs, and it's finished with the

19   Trefoil logo front of chest.

20   Q.  Go over to page five.  How does adidas incorporate the

21   Three-Stripe Mark into packaging for shoes?

22   A.  Packaging always incorporates the Three-Stripe Mark.  Here,

23   you can see on the Campus 80s, the shoe we looked at earlier,

24   it's applied on the outside.  It's also on the hang tag on the

25   product and on the product itself.

1    Q.  Thank you.  You can take that down.

2            On product, does adidas ever use the Three-Stripe Mark

3    in a horizontal orientation?

4    A.  Yes.  We've been using the Three-Stripe Mark now for many

5    years, as you saw from the archive.  That gives us the ability

6    to execute it in multiple different ways.

7    Q.  Pull up Exhibit 84.  Before we flip through this exhibit,

8    can you just describe what it is?

9    A.  Yes.  I was asked in my deposition if I knew when we

10   started using horizontal executions of the Three-Stripe Mark.

11   I couldn't name a date, so we went back to some catalogs and

12   where we saw some specific references.

13           Here, you can see that from 1979, we've been using the

14   Three-Stripe Mark horizontally on the sleeve, on waistbands, on

15   chests, on polo shirts, skirts, for example.  So yeah, this is

16   just a representation of how we use the three-stripe marks

17   horizontally on this page.

18   Q.  You don't need to say anything, Mr. Bowyer.

19           MR. HENN:  But Nita, just flip through Exhibit 84, so

20   the jury can see that.

21           (Continued on next page)

22

23

24

25

1    BY MR. HENN:  (Continued)

2    Q.  Shifting gears, Mr. Bowyer, I'd like to discuss where

3    adidas products are offered for sale to you consumers.  So can

4    you just at a high level talk about the different channels

5    through which the products are sold.

6    A.  We sell adidas products almost everywhere.  I mean, there

7    are some places that we choose not to, but the way we look at

8    distribution is almost like a pyramid.  So we have high-end

9    distribution, fashion boutiques, department stores, we have the

10   mall, and then we have sporting goods and then we have more

11   commercial channels, commercial department stores.

12          If I give you some examples.  If you think Kith in New

13   York, could be a department store, Saks, Nieman Marcus,

14   Nordstrom as an example.  Click down, you would think maybe

15   Foot Locker or Finish Line or Champs or Athletic Specialty.

16   And then DSG or some other sporting accounts as well.  And then

17   finally you would probably arrive at Kohls, J.C. Penney, some

18   of those more broader department stores.

19   Q.  How does the online channel fit into that?

20   A.  We have our own online channel, obviously.  We have our --

21   we call them DTC, where we call that direct to consumer.  We

22   also have all of our wholesale partners have the right to sell

23   our products online as well.

24   Q.  Do you also sell through any social media channels?

25   A.  We do.  It's an emerging channel, and if many of you are

1    familiar with Instagram, there are opportunities, for example,

2    in Instagram to be able to click and buy through that channel

3    as you scroll through the feed.

4    Q.  Let's pull up Exhibit 1029, and if you can put the first

5    two pages side by side, I think it will facilitate that.  Thank

6    you, Nita.

7         Mr. Bowyer, can you just explain what Exhibit 1029

8    displays?

9    A.  Yes, this is one of our Instagram posts, and this was one

10   of our collaborations with Jeremy Scott, who is a fashion

11   designer.  In the bottom left of the image, to the left of his

12   foot you can see a little gray circle with it looks like a

13   shopping bag inside that.  If you click on that, or anywhere on

14   the page, it takes you to the image on the right-hand side

15   where you can then go and click through and purchase that

16   product directly through those channels.  So a very quick, very

17   efficient way to be able to access and buy product through

18   social.

19   Q.  You can take that down, Nita.  Thank you.

20        Mr. Bowyer, what are the price points for adidas

21   footwear?

22   A.  There is a cross-point section of price points.  We may

23   start at $50 if it's a Slide, for example.  More recently we

24   just collaborated with Gucci and some of those products went up

25   to $850.

1   Q.   What are the retail price points for adidas apparel?

2   A.   It depends on the item specifically.  A T-shirt could start

3   at $30.   If I use the Gucci example with some of our

4   collaborations, that can go up to $2,000.

5   Q.   Can you give the jury an estimate of total sales in the

6   U.S. of footwear and apparel for adidas?

7   A.   Yeah.   In the last year, it's approximately $4 billion of

8   adidas sales for footwear and apparel only in the U.S.   In

9   addition, there's probably around another billion on top

10  through golf, licensees, and other products that we produce as

11  well.

12  Q.   You mentioned last year.   How does that look over, say,

13  from 2012 to the present?   Is it the same?   Has it increased?

14  A.   The first thing I would say is we are consistently number

15  two or three brand within the sporting goods marketplace.   The

16  U.S. is actually the largest marketplace in the world for

17  sporting goods products.   And that number has grown

18  consistently over time, so we continue to post growth year on

19  year.

20  Q.   Rough breakdown in those numbers between apparel and

21  footwear?

22  A.   We are a footwear-led business predominantly.   Around

23  60 percent of our business is footwear and 40 percent is

24  apparel.

25  Q.   And of those sales, what proportion has the Three-Stripe

1    Mark either on the product or on the packaging or hang tag?

2    A.  All of the products would bear the Three-Stripe Mark.

3    Q.  You mentioned before that you were the business unit

4    director -- well, let me back up.  Prior to your current

5    position -- I think I forgot to ask you this.  Prior to your

6    current position, what were your jobs at adidas?

7    A.  I joined adidas North America in 2012 as the head of the

8    NEO label.  I then moved to the running business unit in 2015.

9    Q.  Can you talk a little bit about the role of adidas's

10   running product in its distribution strategy?

11   A.  Running is a really important category within our industry.

12   It's highly competitive.  It's one of the biggest catalogs

13   within the marketplace, and it's typically where we would

14   launch new innovation.  We spend a huge amount of money on

15   marketing and communication against that innovation.  We have

16   events.  We sponsored the New York Marathon, for example, and

17   we have a lot of athletes in that space.  So it is a really

18   critical category for us to compete in.

19   Q.  Nita, if you'll pull up Exhibit 88.  Go to page 5.

20          Mr. Bowyer, Exhibit 88 is a collection of running

21   products.  We are not going to look at all of them, but if you

22   could just identify the ones that I put to you on the screen.

23   What do we have on page 5?

24   A.  This is the On The Run running tight.  It's a 7/8 tight.

25   You can see the Three-Stripe Mark applied vertically on the

1    thigh of this product.

2    Q.  If we go to page 15.  Maybe zoom in on the picture.

3         What do we have here?

4    A.  This is the Response tee.  This item is consistent in our

5    running collection, and the Three-Stripe Mark is applied on the

6    arm of that T-shirt.

7    Q.  She's also wearing black shorts with three stripes.  Do you

8    know what those products are?

9    A.  I don't know the name of those products.  I just see it's a

10   running short with a Three-Stripe Mark on the side.

11   Q.  If we look at page 23.

12        Identify this, please.

13   A.  This is our running three stripes tight.  You can see the

14   Three-Stripe Mark applied upon the side of the lower leg.

15   Q.  And finally page 27.

16        What is this?

17   A.  The running three stripes PB tee, not named after my

18   initials, unfortunately.  But the Three-Stripe Mark is applied

19   diagonally across the ribs on this product.

20   Q.  You can take that down, Nita.  I want to pull up Exhibit

21   100, and have you describe how the Three-Stripe Mark is

22   incorporated into the product you see on the first page there.

23   A.  Yeah.  We invest an awful lot of money into research and

24   development against all of our running products.  Here you can

25   see the contrast on the calf, whether it could be more

1    compression in that product.  The Three-Stripe Mark is applied

2    horizontally on the front of the shin.

3    Q.  Is that an actual sock or is it part of the compression

4    product?

5    A.  It's part of the compression product.

6    Q.  We turn over to page 14.

7         Just describe how the Three-Stripe Mark is

8    incorporated into these tights.

9    A.  Yeah, this is an applied vertically to the side of the leg.

10   This collection was celebrating Pride, and so --

11        MR. MALDONADO:  Objection, your Honor.

12        THE COURT:  Yes, I take it the objection is to all but

13   the first sentence.

14        MR. MALDONADO:  Correct, your Honor.

15        THE COURT:  Yes.  So the rest will be stricken.

16   Sustained.

17   Q.  Mr. Bowyer, why is the Three-Stripe Mark on this product in

18   three different colors instead of being an all-white symbol?

19   A.  To celebrate Pride month and to give a rainbow look of the

20   Pride symbol.

21   Q.  You mentioned that in your -- you can take that down, Nita.

22   You mentioned that in your current role, you have

23   responsibility for basketball.  Can you describe what your

24   responsibility is there?

25   A.  Yes.  Basketball, again, is a really critical category for

1    this marketplace, as I'm sure you're aware.  It's critical in

2    terms of size.  It's critical because --

3              MR. MALDONADO:  Objection, your Honor.

4              THE COURT:  So the reason you're drawing these

5    objections is you have to listen carefully to the question and

6    only answer the question.

7              But the question put is:  Can you describe what your

8    responsibility is there, not that basketball is a critical

9    category for a marketplace or any of that, okay?

10             THE WITNESS:  Understood.

11             THE COURT:  So the objection is sustained, but the

12   witness now instructed can answer the question.  What your

13   responsibility?

14             THE WITNESS:  I am responsible for the business of

15   the -- our basketball business within North America

16   functionally that consists of product merchandising, so we

17   create the range for North America, pricing, profitability, and

18   then also marketing communications and sports markets.

19   Q.  Now the question I think you were hoping to answer, can you

20   talk about the role of basketball product within adidas'S

21   overall strategy distribution?

22   A.  Yeah, basketball --

23             MR. MALDONADO:  Objection, your Honor.  Relevance

24   grounds.

25             THE COURT:  Overruled.

1    Q.   Go ahead, Mr. Bowyer.

2    A.   Basketball is a critical category for us to be culturally

3    relevant.  It also is very large in terms of size, and the

4    competitive nature of the category relative to the competitors

5    is essential for us to be able to really compete and to win in

6    that marketplace.

7    Q.   Let's take a look at Exhibit 89, which is a collection of

8    basketball products.  If we start with the picture on the front

9    there, can you just describe what that product is and where the

10   Three-Stripe Mark appears?

11   A.   This is the basketball pickup three-quarter pant.  The

12   Three-Stripe Mark is applied to the front shin.

13   Q.   Go over to page 12.  Zoom in on the product, please, Nita.

14        Mr. Bowyer, can you identify this product and point

15   out the Three-Stripe Mark, please?

16   A.   This is a tank top created in partnership with Damian

17   Lillard, one of our signature athletes.  And because it bears

18   no sleeves, we applied the Three-Stripe Mark to the side of the

19   body.  We make that Three-Stripe Mark slightly bolder and

20   bigger so that you still are able to see the Three-Stripe Mark

21   on the screen when he's training.

22   Q.   Go over to page 24 to identify some shoes.  If you'll zoom

23   in, Nita, on the one on the top, for example.

24        Mr. Bowyer, what do we have here?

25   A.   This is a product that we've created with Derek Rose,

1  another one of our signature basketball athletes.  And you can

2  see the Three-Stripe Mark applied on the heel because the

3  construction of the products enables us to place it in

4  different positions accordingly.

5  Q.  Thanks, Nita.  You can take that down.

6         Looking to another sport, can you speak to the role of

7  adidas soccer products in the context of its overall

8  distribution strategy?

9  A.  Soccer is, as you saw from our Archive category that we've

10 been in for many years, we have a rich history here.  We've

11 invested significantly in this category, and we have market

12 leadership within this category based on that heritage and

13 history.  We sponsor the MLS; for example, the New York Red

14 Bulls out here.  We have Lionel Messi, who just won the World

15 Cup.  We made the outfits for the Argentinian team as well, and

16 we sponsor FIFA.  So we invest heavily in this category based

17 on our history and heritage and the importance.

18 Q.  Let's pull up Exhibit 90.  This is a collection of soccer

19 products.  We're going to do the same thing with this.  If you

20 will identify the product on the first page and point out where

21 the Three-Stripe Mark appears.

22 A.  This is a pant made for Bayern Munich, one of our sponsored

23 soccer teams in Germany.  The Three-Stripe Mark is applied

24 diagonally on the thigh.

25 Q.  Go to page 7.  Do the same thing here.

1  A.  This is the Tiro training pants, one of our key franchisers

2  within our soccer collection.  Here you see the Three-Stripe

3  Mark applied on the thigh from the waist to the knee.

4  Q.  Page 16, please.

5      What is this product and identify the Three-Stripe

6  Mark, please?

7  A.  This is the accompanying jacket to the pant, the Tiro

8  training jacket, and the Three-Stripe Mark is applied in

9  classical fashion from the collar to the cuff on the sleeve of

10  this jacket.

11  Q.  Page 13 please, Nita.

12      What do we have here, Mr. Bowyer, and please identify

13  the Three-Stripe Mark.

14  A.  This is a soccer short called the Tastigo 17, and the

15  Three-Stripe Mark is applied on the side of the shorts on both

16  outer sides.

17  Q.  The last one from this exhibit, page 30, can you identify

18  the products on this page?

19  A.  Yes.  You saw Samba has been one of our first soccer shoes

20  in the Archive collection.  That name continues through the

21  collection to today, and Samba is a product that now features

22  it's our indoor soccer shoe, and you can see the Samba

23  Millennium and Classic with the Three-Stripe Mark applied to

24  the side of that shoe.

25  Q.  Thank you.  Let's pull up Exhibit 91.

1          THE COURT:  I think, Counsel, this is probably a good

2    place to give the jury their afternoon break.

3          MR. HENN:  Fair enough.

4          THE COURT:  Ladies and gentlemen, we'll take a 15

5    minute break at this point.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  When we come back, before we start, I want

3     a representation from plaintiff's counsel how much more you

4     have on direct.  Very good.  We'll see you in 15 minutes.

5          (Recess)

6           (Jury not present)

7          MR. HENN:  The answer is I have an hour, but I'm going

8     to do everything I can to finish at 4:30.

9          THE COURT:  That sounds like a good New Year's

10    resolution.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2            THE COURT:  Go ahead, Counsel.

3    BY MR. HENN:

4    Q.  Mr. Bowyer, before the break we were talking about adidas

5    soccer products.  I want to pull up Exhibit 91.  Can you

6    identify what's contained in Exhibit 91?

7    A.  This is a collection of soccer products created in

8    partnership with Lionel Messi, the captain of Argentina, who

9    just won the World Cup.  We have a long-standing relationship

10   with Lionel Messi.  We actually have now a lifetime partnership

11   with him.  And you can see here the Three-Stripe Mark on all of

12   his products in conjunction with the Messi logo --

13           THE COURT:  I need to caution the witness again.

14           The question was:  Can you identify what's contained

15   in Exhibit 91.  It may well be that Mr. Messi is the captain of

16   Argentina who just won the World Cup; it may be that you have a

17   lifetime partnership with him; et cetera, et cetera.  That's

18   not the question that was asked.

19           The question that was asked is:  What is contained in

20   Exhibit 91?  Please answer that question.

21           THE WITNESS:  What's contained in Exhibit 91 is a

22   collection of product created in partnership with Lionel Messi.

23   Q.  Who is Lionel Messi?

24           THE COURT:  Period, that's the answer.

25   Q.  Who is Lionel Messi?

1   A.  Lionel Messi is the captain of Argentina --

2              THE COURT:  We heard this from the previous witness

3   about 14 times when he was busy volunteering.  We don't need to

4   hear it again.

5              MR. HENN:  Very well, your Honor.

6   Q.  Can you describe how the products depicted in 91 are

7   developed?

8   A.  They are developed in conjunction with Lionel Messi in

9   partnership with him.

10  Q.  We've been looking at sport specific products running and

11  soccer.  I want to look at now types of products.  If we can

12  pull up Exhibit 102.  Will you identify what is in 102?

13  A.  This is an insulated hooded jacket bearing the Three-Stripe

14  Mark.

15  Q.  And Exhibit 102 is a multipage exhibit.  Can you just say

16  what is contained in the whole exhibit?

17  A.  Contained in this exhibit is multiple versions of jackets

18  bearing the Three-Stripe Mark.

19  Q.  If we look at Exhibit 101.  Can you identify the products

20  at the top of Exhibit 101?

21  A.  Polo shirts bearing the Three-Stripe Mark.

22  Q.  What is contained in the rest of Exhibit 101?

23  A.  More polo shirts bearing the Three-Stripe Mark in different

24  placements.

25  Q.  If we look at Exhibit 105, and if we go over to page 30,

1    what is contained in Exhibit 105?

2    A.   This is a trail running short bearing the Three-Stripe Mark

3    diagonally on the left thigh.

4    Q.   And that's what we see on this page.  Can you just identify

5    for the jury what's contained in the rest of Exhibit 105?

6    A.   A collection of shorts bearing the Three-Stripe Mark in

7    different placements.

8    Q.   If we can go to Exhibit 106.

9            Can you identify the product on the first page of

10   Exhibit 106?

11   A.   A track jacket bearing the Three-Stripe Mark on the inside

12   of the arm.

13   Q.   What is contained in the rest of Exhibit 106?

14   A.   Multiple track jackets bearing the Three-Stripe Mark across

15   different executions.

16   Q.   Can we pull up Exhibit 99?

17           What do we have on the first page?

18   A.   Basketball track top bearing the Three-Stripe Mark in the

19   classic collar-to-cuff execution.

20   Q.   If we go over to page 13 of Exhibit 99.  Can you identify

21   this product?

22   A.   Mid-layer top bearing the Three-Stripe Mark horizontally on

23   the top of the arm.

24   Q.   If we go to Exhibit 108, can you identify the product being

25   advertised on the top of the first page?

1   A.   It's a women's Essential three-stripe hoodie bearing the

2   Three-Stripe Mark from collar to cuff.

3   Q.   What is contained in the rest of Exhibit 108?

4   A.   Multiple of these, bearing Three-Stripe Mark across

5   different executions.

6   Q.   Let's look at page 12.

7        Can you identify this product, please?

8   A.   This is the sport fleece hoodie bearing the Three-Stripe

9   Mark on the lower arm horizontally.  This is executed in a gray

10  French terry material, which is a signature colorway

11  collection.

12  Q.   Go to page 21, and zoom in on the product, please.

13       What is this product?

14  A.   This is the Adicolor hoodie bearing the Three-Stripe Mark

15  in the white-red-blue colorway.

16  Q.   You can take that down, Nita.  Let's pull up Exhibit 107

17  and go to page 4.  Zoom in on the product, Nita.  Thank you.

18       Mr. Bowyer, what do we have on page 4 of Exhibit 107?

19  A.   The women's Originals cuffed pants bearing the Three-Stripe

20  Mark from hip to ankle, again, in that gray molle fabrication.

21  Q.   What is contained in the rest of Exhibit 107?

22  A.   Multiple track pants bearing the Three-Stripe marks in

23  different placements and executions.

24  Q.   Go to Exhibit 109.

25       Can you identify the product on the first page?

1   A.   This is a three-stripe tee, a Raglan long sleeve T-shirt

2   with contrast sleeves bearing the Three-Stripe Mark from collar

3   to cuff.

4   Q.   Go to page 114.  Can you identify this product?

5   A.   This is the Adicolor 3D trefoil tee bearing the

6   Three-Stripe Mark asymmetrically on one side from collar to the

7   end tip of the sleeve.  On the other, just below the trefoil.

8   Q.   What is contained in the rest of Exhibit 109?

9   A.   Multiple T-shirts bearing the Three-Stripe Mark in

10  different executions.

11  Q.   And Exhibit 103 is next.  We can go to page 4.

12       Can you identify this product for us?

13  A.   This is the Response long sleeve tee from our Running

14  collection.  This is bearing the Three-Stripe Mark from the

15  elbow to the cuff giving a look of the T-shirt worn over a long

16  sleeve jersey.

17  Q.   Page 107 -- excuse me.  Page 7 of 103.  Can you identify

18  this product, please?

19  A.   This is the short sleeve T-shirt that we created for the

20  Boston Marathon in 2022 bearing the Three-Stripe Mark on the

21  sleeve.

22  Q.   If we go to page 13, can you identify the products we see

23  on this page?

24  A.   These are from our women's Running collection called the

25  Response collection, and these are various long sleeve tops, a

1   V-neck, half set and a wind jacket bearing the Three-Stripe

2   Mark horizontally on the sleeves.

3   Q.  Thank you, Nita.  You can take that down.

4        Mr. Bowyer, shifting gears slightly, can you talk

5   about how adidas goes about ensuring the quality of the

6   products it sells?

7   A.  We spend an awful lot of money and have a number of teams

8   and people focused on innovation.  So we develop product as far

9   as 2026, for example, and beyond for the Olympics or the World

10  Cup right now.  So there's a lot investment upfront.  We also

11  have robust quality control teams.  We have rigorous processes

12  for approvals, and we have stringent testing as well to ensure

13  the quality and sustainability that all of our products meets

14  the needs of our athletes.

15  Q.  In terms of geographic area, where does adidas sell the

16  products bearing the Three-Stripe Mark in the U.S.?

17  A.  We sell all across the country.  I gave you some examples

18  of the retail stores that we sell in physically, and you can

19  imagine they span a large cross-section of the country, but in

20  addition, you have obviously social media, and you have

21  eCommerce as well, so the consumer can essentially buy the

22  product anywhere within the U.S. geography.

23  Q.  Does the company ever target specific products to specific

24  parts of the country?

25  A.  Yes, we do.

1    Q.  How?

2    A.  We can target specific retailers within a geography.  We

3    think about climate when we sell product.  So something that's

4    going to work in a cold climate isn't going to work in the

5    southern part of the country.  We consider the consumer

6    demographic.  We also sell products specifically for key

7    cities, such as New York recognizing it's such a cultural

8    epicenter for trends, but also events, so the New York Marathon

9    for example, or Boston Marathon --

10              MR. MALDONADO:  Your Honor, objection.

11              THE COURT:  Well, I think this was responsive to the

12   broad question posed, and there was no objection to the

13   question per se.

14              However, I gather that the gist of what the answer is

15   that you try to target your products to particular local

16   conditions, geographic or otherwise.  Is that fair?

17              THE WITNESS:  Conditions and consumers.

18              THE COURT:  Conditions and pursuits?

19              THE WITNESS:  Consumers.

20              THE COURT:  Consumers.  I'm sorry.  Very good.

21              Put another question.

22   Q.  Let me pull up Exhibit 93 and have you describe for us the

23   products on page 3.  The product on page 3?

24   A.  This is a short sleeve top sold through our flagship store

25   in New York, and this product was customized specifically for

1  New York.  As you can see, it bears New York embroidery on the

2  back of the item.

3  Q.  And then if we go over to page 4, what is this product

4  being held up?

5  A.  This is a tote created to celebrate the anniversary of Stan

6  Smith.  You can see the Stan Smith logo with the Three-Stripe

7  Mark on the tab, and that would also be incorporated within the

8  label on a hand tag, and you can see New York NYC embroidered

9  on the item to celebrate the opening of that store and the

10 anniversary.

11 Q.  We can take that one down.

12        Mr. Bowyer, you were not in the courtroom, so you

13 don't know that the jury has heard some information already

14 about collaborations that adidas has been engaged in, but can

15 you talk about from a product perspective what the role of

16 those collaborations is in your distribution.

17 A.  Yes.  We work with multiple partners to bring creativity

18 and collaboration the best ideas from adidas and the iconic

19 products with the creativity and sensibility together.  Those

20 products would always bear both badges and both brand marks,

21 and really gives us an opportunity to target new consumer and

22 new price points, create some brand image and excitement around

23 those products and then a broader awareness for adidas in doing

24 so.

25 Q.  The jury saw some marketing material about the Y-3

1    collection but hasn't seen much product.  I want to pull up

2    Exhibit 94.  Can you describe for us what we have in Exhibit

3    94?

4    A.  Y-3 refers to our collaboration with Yohji Yamamoto, which

5    has been happening for 20 years now.  This is a track top

6    bearing the Three-Stripe Mark on the left sleeve.  The left

7    chest is the Y-3 logo which the Y resembles Yohji Yamamoto, and

8    3 is the resemblance to the Three-Stripe Mark.  So we combined

9    brands, and we feature both brand marks within that product,

10   and we bring his design sensibility materials to those

11   products.

12   Q.  What is the price for this product, for example?

13   A.  This track top is $420.

14   Q.  Go over to page 10.  Can you just identify what this

15   product is and how the Three-Stripe Mark is used?

16   A.  This is a uniform short.  As you can see more of a blouson

17   kind of fit, and it bears the Three-Stripe Mark just on the

18   left-hand side from the hip to the edge of the bottom of that

19   short on the left-hand side.

20   Q.  Go to page 21, please.

21        Can you identify this product and again talk about

22   where the Three-Stripe Mark appears?

23   A.  This is an oversized short sleeve tee, and the Three-Stripe

24   Mark is placed on the bottom of the front of this item

25   horizontally and on the back vertically, also incorporating the

1    Y-3 logo.

2    Q.  You mentioned that Y-3 has been part of adidas for 20 years

3    or so.  Can you identify some of the more recent

4    collaborations?

5    A.  Yes.  We have many collaborations.  Recently you may have

6    seen a partnership with Gucci, Prada, Wales Bonner, Craig

7    Green, Raf Simons, Alexander Wang in New York, for example, so

8    we have approximately 90 partnerships and collaborations

9    throughout the year, and these will rotate obviously subject to

10   contract throughout that time.

11   Q.  Let's take a look at some of those collaboration products

12   in Exhibit 95.  Just identify the product on the front and how

13   that is a collaboration product?

14   A.  This is a collaboration with Danielle Cathari.  She is

15   synonymous with up-cycling and taking certain pieces and

16   creating a new item.  So in this case we've taken that design

17   language and applied the Three-Stripe Mark in a different

18   placement pattern than we typically would when we just create

19   that for adidas.  That product is co-branded with Danielle's

20   logo and adidas's.

21   Q.  Go over to page 58.  You don't need to walk the jury

22   through everything they can see on the screen, but just

23   generally speak to how the products -- who the collaboration is

24   with here and how those products come to be.

25   A.  So this is a collaboration -- a recent collaboration with

1    Prada, and we co-create that product together.  In this case

2    that product would have been manufactured in Italy.  You can

3    see an elevated price point to resemble the materials and the

4    construction that goes into that, as well as both brand marks

5    featured, so Prada and the Three-Stripe Mark both feature very

6    visibly on this product.

7    Q.  Can you identify the price points of these products?

8    A.  Yes.  They are over a thousand dollars per item.

9    Q.  Go to page 74.

10          Can you identify these products and how they are

11   collaboration product?

12   A.  This is a collaboration we have with Wales Bonner, who is

13   an up-and-coming designer, and the placement of the

14   Three-Stripe Mark is at the bottom of this anorak.

15   Q.  The price of this collaboration product?

16   A.  It's $380, and the Three-Stripe Mark is placed

17   horizontally.

18   Q.  Let's go to page 98.  What do we have on page 98 of Exhibit

19   95?

20   A.  This was a collaboration a little while ago with Alexander

21   Wang from New York.  We had fun launching this outside the Nike

22   store on Mercer Street, and this item is -- as you can see, it

23   has almost like a reversible look to it.  So it's the negative

24   application of the Three-Stripe Mark and working with

25   Alexander, we had some fun with the trefoil logo and turned it

1   upside down.  This product bears both logos:  The adidas logo

2   and the Alexander Wang logo.

3   Q.  Thanks.  You can take that down, Nita.

4         So, when you talked to us earlier about the sort of

5   triangle of distribution, can you help the jury visualize --

6   and maybe we can pull up that demonstrative, Nita.  It's all

7   right.  We don't need it.

8         The triangle you described earlier.  Can you talk

9   about where these collaboration products fit in that triangle?

10  A.  Yeah.  So we use a triangle to very much simplify our

11  distribution strategy.  The top of the triangle is where I

12  mentioned some of those distribution outlets.  Nieman Marcus,

13  Saks, Nordstrom, for example, or Kith.  So typically those

14  collaborations sits at the very top where the consumer is open

15  to a higher price point.  They are typically the cultural

16  pioneers, and they influence the rest of the marketplace.

17  Q.  Why is it from a distribution strategy standpoint important

18  to the brand to be in those places at the top of this pyramid?

19  A.  This pyramid signifies two things on the vertical axis,

20  price typically.  Oftentimes, you have higher prices at the

21  top.  But also it signifies volume.  So typically we do less

22  volume at the very top because there is a supply-and-demand

23  effect here.

24        By doing so, we have a model called hype-to-scale.

25  So, for example, if we launch a collaboration with Gucci on the

1   Gazelle $850, targeted and distributed at the top of that

2   segmentation, that Gazelle product at $80 can also sell at Foot

3   Locker.  So we see the awareness and the energy and the

4   excitement created by Gucci, we can then scale that through the

5   rest of the distribution landscape.

6   Q.  Thank you.  And, Nita, well done finding the pyramid.

7   Thank you.  If we can pull up Exhibit 1304.

8        Can you identify what is contained in Exhibit 1304

9   please?

10  A.  Yes.  This is a very oversimplified expression of our Prada

11  distribution strategy, but this was an internal document that

12  was created to illustrate the stores, the locations, which

13  retailers would stock both brands or be sold by both brands, in

14  which the BTQ stands for boutiques, which is a segment within

15  our distribution channel.

16  Q.  With regard to the ones in the U.S., and maybe we can

17  scroll down a little bit, Nita, within the spreadsheet so that

18  it's more U.S. and online.  Perfect.

19  A.  Specifically for New York, you can see Bergdorf Goodman,

20  DSM, Dover Street Market.  You can see here we have Saks is one

21  of our distribution partners and then Net-A-Porter, Mr. Porter,

22  for online distribution as well.

23  Q.  What is Net-A-Porter, what kind of online retailer is that?

24  A.  Fashion, I would say fashion and luxury distribution

25  predominantly.  They stock brands from fashion and luxury

1  space.

2  Q.  Nita, you can take that down.

3        Mr. Bowyer, shifting gears, I want to talk now about

4  Thom Browne.  Does adidas sell products in stores that also

5  carry Thom Browne products?

6  A.  We do.

7  Q.  Can you give us some examples?

8  A.  Nordstrom, Nieman Marcus, I believe Bloomingdales, in that

9  fashion segmentation.

10  Q.  What about online?

11  A.  Yes, certainly.  Net-A-Porter, Essence in Canada distribute

12  in the U.S. and clothing from the U.K., 65 percent of their

13  business is international, just to name a few.

14  Q.  Let's pull up Exhibit 96.

15        Can you tell us what we see on the first page of

16  Exhibit 96.

17  A.  This is a cross-section of our assortment within Saks Fifth

18  Avenue.  There's some Stella McCartney collaborations in there,

19  and Ivy Park collaborations with Beyonce featured.

20  Q.  Go over to page 18 of this exhibit.  Can you identify what

21  is depicted here?

22  A.  Yes.  This is a small cross-section of the product that we

23  sell with Nordstrom.  Nordstrom is one of our key global

24  distribution partners.  We have strategic plans with this

25  account, and we distribute product from our fashion

1    collaborations, as well as our inline range within Nordstrom.

2    Q.  Go to page 26.  Can you identify this channel of

3    distribution?

4    A.  Yes.  This is a Net-A-Porter, and they here are selling the

5    Wales Bonner Japan leather-trimmed sneaker.

6    Q.  Finally, page 29.

7         What is this distribution channel?  What do we see

8    here?

9    A.  FARFETCH is a global distribution partner, and as you can

10   see, they're stocking a number of adidas products, and

11   typically they would carry our collaborations as well.

12   Q.  Take that down, Nita.

13        Mr. Bowyer, does adidas consider Thom Browne to be a

14   competitor?

15   A.  We do.

16   Q.  Why?

17   A.  There's been a shift in the marketplace where there's a

18   trend for at leisure or leisure, and that means that many

19   fashion brands are starting to create product in the same

20   categories and spaces that we do:  Running products, more

21   casual Lifestyle product, gray molle fabrication product, for

22   example.  As you can see, we have a rich history in this space,

23   but there's a convergence and cross-pollination of brands

24   starting to compete in this space.  So I would say yes, based

25   on we have similar products, we have similar price points, and

1    we sell in very similar points of distribution, and the Thom

2    Browne product bears four stripes, and we have three stripes.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. HENN:

2    Q.  Let's look at some of those products.  Pull up Exhibit 55.

3         Since we've been talking about types of products that

4    adidas sells, as we go through, I'm going to have Nita flip

5    through Exhibit 55.

6         Can you just characterize the products in Exhibit 55

7    and how those compare to the products that adidas sells?

8    A.  Yeah.

9         As we've seen through the adidas collections, you can

10   see a lot of overlap here from compression running tops to

11   running shorts to track jackets to polo shirts to tights or

12   compression pants.  So there is certainly a lot of similar

13   product categories and materials featured within these

14   collections.  You see shorts, which take basketball

15   inspiration, T-shirts, hoodies, sweatshirts, and similar logo

16   placements.

17        There's also some footwear product featured in here.

18   You can see certain footwear styles that have the red, white,

19   and blue stripes on the sides of those products as well.

20   Q.  Speaking of the red, white, and blue, let's jump over to

21   Exhibit 56.  I think this is the exhibit with the red, white,

22   and blue, Mr. Bowyer.

23        Let me just have you do the same exercise with

24   Exhibit 56.  As I flip through, describe these products in

25   relation to what adidas sells.

1   A.  Yes.  These are track pants, swim shorts, regular sleeve

2   T-shirts.  You can see running shoes, court shoes featured

3   here, track pants as well bearing the red, white, and blue

4   stripes.

5   Q.  In terms of the placement of the red, white, and blue

6   stripes on, say, page eight on the shoes, how does that compare

7   to adidas' use of the Three-Stripe Mark on its shoes?

8   A.  Almost identical placement and also almost identical angle

9   of those stripes.

10  Q.  With regard to apparel, say the pants at the top of this

11  page, how does the placement of the red, white, and blue stripe

12  compare to adidas' use of its Three-Stripe Mark?

13  A.  It's almost identical to the placement of our classic

14  Three-Stripe Mark from the waist to the cuff.

15          MR. HENN:  I would like to pull up Exhibit 97.  This

16  is a capture from Thom Browne's website.  If we go to page six.

17  Top right product, Nita, if you'll blow that up with the

18  description.

19  Q.  Mr. Bowyer, would you just identify how Thom Browne

20  identified or described this product to the public on its

21  website?

22  A.  Yes.  This is a track pant.

23  Q.  What is the price?

24  A.  $950.

25  Q.  Does adidas sell track pants?

1    A.  Yes.

2           MR. HENN:  If we go to page eight.  If we can zoom in

3    on the product and the description, Nita.

4    Q.  How did Thom Browne describe this product to the public on

5    its website?

6    A.  Football jersey.

7    Q.  Does adidas also sell football jerseys?

8    A.  Yes.

9           MR. HENN:  If we go to page 11.  Do the same thing

10   with the zoom, Nita, please.

11   Q.  How did Thom Browne describe these shoes to the public on

12   its website?

13   A.  Running shoe.

14   Q.  Does adidas sell running shoes?

15   A.  Yes.

16          MR. HENN:  If we go to page 12.  Same thing with the

17   zoom, please, Nita.  Thank you.

18   Q.  How did Thom Browne identify this product to the public?

19   A.  Ski jacket.

20   Q.  Does adidas also sell ski jackets?

21   A.  Yes.

22   Q.  If we go to page 19.

23          How did Thom Browne describe this product to the

24   public on its website?

25   A.  Compression zip-up jacket.

1    Q.  Does adidas also sell compression zip-up jackets?

2    A.  Yes, we do.

3    Q.  Go to page 22.

4         How did Thom Browne describe this product to the

5    public on its website?

6    A.  Compression tights.

7    Q.  Does adidas also sell compression tights?

8    A.  Yes, we do.

9    Q.  If we go to 28.

10        How did Thom Browne describe this product on its

11   website to the public?

12   A.  Board short.

13   Q.  Does adidas also sell board shorts?

14   A.  Yes, we do.

15   Q.  Go to page 32.

16        How did Thom Browne describe this product to the

17   public on its website?

18   A.  Swim short.

19   Q.  Does adidas also sell swim shorts?

20   A.  Yes, we do.

21   Q.  Go to page 40.

22        How did Thom Browne describe this shoe on its website?

23   A.  A trainer.  Trainer is a common term in Europe for an

24   athletic sneaker.  Typically we would call that a sneaker in

25   the U.S.

1   Q.  Let's go to page 41.

2          How did Thom Browne describe this product to the

3   public on its website?

4   A.  Compression tee.

5   Q.  Does adidas sell compression tees?

6   A.  Yes, we do.

7   Q.  And finally, page 42.

8          How did Thom Browne identify this product on its

9   website to the public?

10  A.  Running shorts.

11  Q.  And does adidas also sell running shorts?

12  A.  Yes, we do.

13  Q.  How much did Thom Browne charge for this pair of shorts?

14  A.  $590.

15         MR. HENN:  Thank you, Mr. Bowyer.  I pass the witness.

16         THE COURT:  Just before counsel begins, to your

17  knowledge, is there any document internal to adidas where they

18  define what they mean by their Three-Stripe Mark?

19         THE WITNESS:  Is that question to me?

20         THE COURT:  Yes.

21         THE WITNESS:  I'm not a legal expert in this, but...

22         THE COURT:  No, no, I'm not asking for law.  I'm just

23  asking.

24         Have you seen anywhere in the documents that you've

25  seen in adidas, during your period of employment there, any

1  document that where the company says, here is what we mean by

2  our Three-Stripe Mark?

3          THE WITNESS:  I've seen branding guideline documents.

4          THE COURT:  I'm sorry.

5          THE WITNESS:  Branding guideline documents.

6          THE COURT:  Branding guidelines.

7          OK.  What do you mean by that?

8          THE WITNESS:  It's a document that's created by our

9  brands design team and our creative team that would suggest

10  this is how you should place products.

11          Now that is not definitive.  There are collaborations

12  that require approvals to be able to apply it differently, but

13  typically that gives you broad direction on how and where you

14  could apply that Three-Stripe Mark.

15          THE COURT:  So if someone, for example, in adidas

16  created a swirling pattern consisting of three stripes, would

17  that be part of your Three-Stripe Mark in your experience, as

18  you understand it?

19          THE WITNESS:  I don't work in design so I couldn't --

20  couldn't say.

21          THE COURT:  I'm sorry.  You couldn't say?

22          THE WITNESS:  No.

23          THE COURT:  OK.  Go ahead, counsel.

24  CROSS-EXAMINATION

25  BY MR. MALDONADO:

1   Q.   Good afternoon, Mr. Bowyer.

2   A.   Hi.  Good afternoon.

3   Q.   Counsel just showed you a whole bunch of products on Thom

4   Browne's website, Exhibit 97.

5            Do you recall that?

6   A.   I do.

7   Q.   And he went through a number of products including a

8   football Jersey.

9            Pull that up.

10           This one, do you remember that?

11  A.   I do.

12  Q.   And I think you testified that adidas sells football

13  jerseys?

14  A.   Yes.  That's my understanding.

15  Q.   And does adidas sell football jerseys to be worn with white

16  dress shirts and ties?

17  A.   We don't -- we don't direct how consumers wear the

18  products.

19  Q.   And does adidas sell football jerseys with pleaded skirts?

20  A.   We do not make a pleaded skirt.

21  Q.   And your counsel walked you through a number of products on

22  this page and asked you if adidas sells those types of

23  products, correct?

24  A.   That's correct.

25  Q.   OK.  It's not your position that Thom Browne cannot sell

1    the same types of products that adidas sells, is it?

2            MR. HENN:  Objection to that question.

3            THE COURT:  I don't know whether his position is

4    relevant, but I take it, I think there's already been testimony

5    that there are numerous competitors in the sportswear area.

6            Go ahead, counsel.

7    A.  Correct.

8    Q.  There are numerous --

9            MR. MALDONADO:  Let me rephrase the question, your

10   Honor.

11   Q.  There are many companies that sell the types of products

12   that you just went through with counsel, correct?

13   A.  There are.

14   Q.  OK.  And you don't have any information as to when Thom

15   Browne began selling any of those products that you just

16   testified about?

17   A.  Um, I couldn't give you a specific date, but I do believe

18   from around -- it came to my attention in 2018.  We had one of

19   our running captains within New York, his name was David Perry,

20   and I believe he worked for Thom Browne at the time.  And so

21   that drew my attention to Thom Browne at that time.

22   Q.  OK.  So you were not aware that Thom Browne has been

23   selling sweatpants since 2009?

24           MR. HENN:  Objection, foundation.

25           THE COURT:  Sustained.

1          Counsel, you can't testify.

2   Q.  Now, you mentioned also you testified as to a number of

3   department stores where the products sell both sell their

4   products, adidas and Thom Browne, correct?

5   A.  Correct.

6   Q.  OK.  And one of those stores that you named was

7   Bloomingdale's, is that correct?

8   A.  Bloomingdale's is within that fashion department store

9   channel.

10  Q.  Are you aware that Thom Browne does not sell any products

11  in Bloomingdale's?

12  A.  I wasn't aware that that specifically wasn't distributed

13  for Thom Browne.

14  Q.  But you mentioned it a store where both products are

15  distributed, right?

16  A.  OK.  I apologize, my mistake.  When we generally --

17          THE COURT:  Ah, ah, ah.

18          THE WITNESS:  Sorry.

19          THE COURT:  You know that adidas distributes to

20  Bloomingdale's, is that right?

21          THE WITNESS:  We have a dynamic distribution strategy,

22  so it can change and devolve over seasons.  Certain times we do

23  sell, sometimes we don't.

24          THE COURT:  I'm just asking a simple question.

25          Do you sometimes sell or distribute your product to or

1    through Bloomingdale's?

2              THE WITNESS:  Yes.

3              THE COURT:  OK.  Whether Bloomingdale's also sells

4    Thom Browne products, you don't know one way or the other,

5    right?

6              THE WITNESS:  That's correct.

7              THE COURT:  All right.

8    BY MR. MALDONADO:

9    Q.  Now, if we could take a look at Exhibit 80.

10             I believe you were asked some questions about that on

11   direct.

12             I'm sorry, Exhibit 90.  This, I believe, is examples

13   of a number of items that adidas sells in the soccer space, is

14   that correct?

15   A.  I believe it's track pants.  This specific one is one

16   created for Bayern Munich.

17   Q.  This collection was soccer-related clothing, I believe, is

18   that correct?

19   A.  That's correct.

20   Q.  And you're the VP of originals, is that correct?

21   A.  That's correct.

22   Q.  And is it true that when adidas, on adidas' clothing within

23   the originals collection, that adidas always uses either the

24   Trefoil or the Badge of Sport along with the Three-Stripe Mark?

25   A.  That's correct.

1    Q.  OK.  And in the images that were shown to you today from

2    this exhibit and those were images one on the first page here,

3    for example, on this image we can't see the Trefoil or the

4    Badge of Sport, correct?

5    A.  Correct.

6    Q.  But the Badge of Sport or Trefoil is on this item of

7    clothing, correct?

8    A.  Correct.  It would be the Badge of Sport on this case.

9    Q.  Would it be on the front of the pants?

10   A.  Typically, but I couldn't confirm.

11   Q.  And if we turn to page seven.  Here, counsel showed you

12   Tiro 17 training pants.

13          Do you see that?

14   A.  I do.

15   Q.  And there's a number of images on the left that could be

16   selected to be shown for this particular product, correct?

17   A.  That's correct.

18   Q.  And the image that was selected and shown here does not

19   show the Trefoil or the Badge of Sport, correct?

20   A.  Correct.

21   Q.  But the Badge of Sport or Trefoil does appear on this

22   product, is that correct?

23   A.  It does.

24   Q.  That would be on the left side of the shorts or pants?

25   A.  Correct, either terminal or contrast.

1   Q.  Turning next to page 13.  And this is a pair of shorts,

2   correct?

3   A.  Correct.

4   Q.  And this is also one of the images that counsel showed you

5   on your direct, correct?

6   A.  That's correct.

7   Q.  And in this image we cannot see the Trefoil or Badge of

8   Sport, correct?

9   A.  That's correct.

10  Q.  Does this item of shorts also contain the Trefoil or Badge

11  of Sport?

12  A.  This would contain the Badge of Sport.

13  Q.  That would be on other part of the shorts that we can't see

14  in on the image?

15  A.  That's correct.

16  Q.  Finally, on page 16.  Here we see the Tiro 19 training

17  jacket, correct?

18  A.  Correct.

19  Q.  And there are a number of views on the left to select from,

20  correct?

21  A.  Correct.

22  Q.  And the image that was selected here, we can't see the

23  Badge of Sport or Trefoil, correct?

24  A.  Correct.

25  Q.  But those, either one or the other, is used on this

1    product, correct?

2    A.  The Badge of Sport would be used in this case.

3    Q.  OK.  Thank you.

4            Now, in Exhibit 80 -- pull up Exhibit 80, page 18.

5            I believe you testified about this pullover --

6    A.  Correct.

7    Q.  -- with horizontal stripes on the sleeves?

8    A.  Correct.

9    Q.  Do you know how long this product has been sold?

10   A.  I do not.

11   Q.  Do you know how many units of this product have been sold?

12   A.  I do not.

13   Q.  Do you know if any units of this product have been sold in?

14   A.  Certainly some would have been sold, as it's on our

15   website.  So I just don't know the quantity.

16   Q.  You don't have any information on sales of this particular

17   product?

18   A.  I do not, I'm afraid.

19   Q.  And there was another -- there was some testimony of yours

20   on direct where we went through a number of shoes that you

21   testified were worn by various famous athletes.

22           Do you remember that testimony?

23   A.  I do.

24   Q.  And you identified the athletes who wore the shoes,

25   correct?

1    A.   Correct.

2    Q.   And you identified the years of the shoes were made, is

3    that correct?

4    A.   Correct.

5    Q.   But you haven't testified about how --

6              Let me rephrase the question.

7              You don't have any information on whether there's been

8    advertising of the use of those shoes by those athletes?

9    A.   By wearing the product, that is advertising.

10   Q.   But you haven't referenced or we haven't seen any evidence

11   of advertising of those shoes on those athletes?

12   A.   Correct, not in my segment.

13   Q.   And you saw those shoes and you know that they were worn by

14   those athletes by visiting the adidas archives, is that

15   correct?

16   A.   That's correct.

17   Q.   Those are the archives in Germany?

18   A.   Correct.

19   Q.   Are those open to the public?

20   A.   Typically not.

21   Q.   OK.  So the public would not have access to that

22   information?

23   A.   Typically not.

24             But we did create the book and the video to showcase

25   the archive and those products, so the book is in the public

1  domain.

2  Q.  Now, you would agree, would you not, that when adidas

3  describes its products to the public, it endeavors to be as

4  accurate as possible?

5  A.  That's correct.

6  Q.  And you would agree that when adidas describes its products

7  to the public, it endeavors to be as truthful as possible?

8  A.  Yes, that's correct.

9  Q.  Now, I would like to show you Defendant's 129.

10          So, Mr. Bowyer, I'm showing you a documents that been

11  marked as Defendant's Exhibit 129.

12          Do you know what this product is?

13  A.  This is the Adicolor Neuclassics hoodie.

14          MR. MALDONADO:  Your Honor, I would like to offer this

15  into evidence.

16          MR. HENN:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 129 received in evidence)

19  BY MR. MALDONADO:

20  Q.  There is the Adicolor Neuclassics hoodie, is that correct?

21  A.  That's correct.

22  Q.  And this is captured from adidas' website, correct?

23  A.  Correct.

24  Q.  And this is a black hoodie with the Trefoil logo in the

25  front, is that correct?

1    A.  That's correct.

2    Q.  And this product also has horizontal sleeves on the left

3    side, is that correct?

4    A.  They look diagonal here, but yeah.

5    Q.  OK.

6    A.  It's on the left sleeve.

7    Q.  How long has adidas been selling this product?

8    A.  I don't recall the exact season that this collection

9    launched.

10   Q.  Do you know what year it was?

11   A.  I believe either 2021 or 2022.

12   Q.  OK.  So very recently, correct?

13   A.  That's correct.

14   Q.  If we zoom in on the product description, please.  I would

15   like you to take a look at this.

16           And the statement on the second sentence reads:  the

17   iconic three stripes aren't where you usually see them –

18   they're wrapped around one sleeve as a modern twist on

19   tradition.

20           Do you see that?

21   A.  I do.

22   Q.  And that's an accurate statement?

23   A.  I think it's open to interpretation.  I think what –– so we

24   have a team, an external team, typically, who copy for our

25   website.  And that is their interpretation of the application.

1    Q.  So does adidas approve of the statements that are made on

2    its website?

3    A.  Yes, we do.  We do check those and approve those through

4    that process.

5    Q.  So this statement was approved by adidas?

6    A.  It was.

7    Q.  OK.  And it's an accurate statement because you said adidas

8    believes in being truthful and accurate?

9    A.  That's correct.

10   Q.  OK.  So I asked you earlier, what's the inspiration --

11          I think you testified previously that the Neuclassics

12   line is inspired by the adidas archives, correct, and products

13   from the past?

14   A.  That's correct.  We saw a number of examples in my

15   testimony predicting the placement of the logo, which is

16   consistent to that Neuclassics collection.

17   Q.  OK.  And you said it was introduced in the last year or

18   two, correct?

19   A.  The Neuclassics collection, yes.

20   Q.  OK.  And adidas produces around how many 10,000 articles of

21   product per season?

22   A.  Around 40,000 per season.

23   Q.  40,000 per season?

24   A.  Yeah.

25   Q.  OK.  And how many of those articles are Neuclassics?

1    A.  I don't recall the range size of that collection.

2    Q.  Besides the Neuclassics collection, are you aware of any

3    other line of clothing from adidas that features horizontal

4    stripes?

5    A.  Just some of the examples that we went through in the

6    testimony.

7    Q.  How long have you been familiar with Thom Browne?

8    A.  From around 2018, I think it was, when I was working --

9    between 2015 and 2018.

10   Q.  And you joined adidas in 2012, is that correct?

11   A.  That's correct.

12   Q.  Now, among the other things you're responsible for is

13   media, PR, and events around originals, is that correct?

14   A.  Originals, partner brands, and basketball, correct.

15   Q.  And in terms of events, adidas presents at major fashion

16   week events, is that correct?

17   A.  We do.

18   Q.  That includes Paris fashion week?

19   A.  Correct.

20   Q.  Does that intersection in Asia?

21   A.  It does.

22   Q.  Does that include New York fashion week?

23   A.  It does.

24   Q.  How about Milan fashion week?

25   A.  I'm not quite sure.  I think it would depend on the season,

1   the collection.

2   Q.  But you have displayed at Milan fashion week in the past,

3   correct?

4   A.  I couldn't testify confidently to say yes.

5   Q.  Can we look at Exhibit 528, Plaintiff 528, please.

6           MR. HENN:  Plaintiff 528?

7           MR. MALDONADO:  Yes.

8           MR. HENN:  OK.

9           MR. MALDONADO:  Is this in evidence?

10          MR. HENN:  Not yet.

11          MR. MALDONADO:  Can I offer this into evidence, your

12  Honor?

13          MR. HENN:  It's our Exhibit, your Honor.  We don't

14  object.

15          THE COURT:  Received.

16          (Plaintiff's Exhibit 528 received in evidence)

17          Counsel, as soon as you finish with this exhibit, we

18  need to excuse the jury for the day.

19          MR. MALDONADO:  OK, your Honor.

20  BY MR. MALDONADO:

21  Q.  Mr. Bowyer, do you see this article here in front of you,

22  Plaintiff's Exhibit 528?

23  A.  I do.

24  Q.  Which says Gucci reveals the adidas collaboration at Milan

25  fashion week show?

1    A.  I see that.

2    Q.  Does that refresh your recollection as to whether adidas

3    participated in the Milan fashion week show?

4    A.  The Gucci collection was led by Gucci, so all activation

5    and events were Gucci led.

6    Q.  Did adidas participate in those events?

7    A.  By proxy of our product, which was created in partnership

8    with Gucci, and co-branded.

9            MR. MALDONADO:  Thank you, your Honor.

10           We'll break now.

11           THE COURT:  So, ladies and gentlemen, we are making

12   good progress, but tomorrow you don't get to come at 9:45.  You

13   have to be here at 9:30.

14           So thank you for your promptness, and we'll see you at

15   9:30 tomorrow.  Have a very good evening.

16           THE WITNESS:  Thank you.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  So I went back and looked at

3   Judge Lehrburger's report and recommendation, which is entitled

4   a report and recommendation to Honorable Alison J. Nathan, but

5   actually Judge Nathan then reassigned the case to me or was

6   reassigned because of her promotion, so I was the one who

7   actually adopted it.

8            But as both counsel recognize, this doesn't decide the

9   issue presently before me because this was a pleading question.

10  Here is what I think is the question before me, and it's

11  prompted by the following language in Judge Lehrburger's report

12  or recommendation at page ten, referring to another case, "The

13  court declines to require adidas to define the scope and

14  boundaries of the mark with more particularity at the 'nascent

15  pleading stage.' The same logic applies here and the court

16  finds no need for a more definite statement let alone

17  dismissal."

18           The first quote was a quote within a quote, so both

19  sentences I just read were from Judge Lehrburger's report.

20           I think the issue is whether, at this stage, in order

21  to ground its claim of infringement of a single mark and

22  diminutions of a single mark, mainly the so-called Three-Stripe

23  Mark, adidas has to define that with greater particularity than

24  it did at the pleading stage.  That's why I asked the witness

25  about whether there is an internal adidas definition.

1        But let me ask counsel who are far more familiar with

2   the sense of discovery.  Is there an adidas internal definition

3   of Three-Stripe Mark?

4        MR. HENN:  There is not a document that says, Here is

5   the Three-Stripe Mark.  But as both of these witnesses

6   testified, and as adidas has consistently testified in every

7   deposition in this case, the mark is defined simply as three

8   parallel stripes, period.  It's three parallel stripes, your

9   Honor.  That's what it is.

10       THE COURT:  So what do you mean by parallel?

11       MR. HENN:  That they are, in fact, parallel to one

12  another.

13       THE COURT:  So as in the example I posed to the

14  witness, supposing someone produces a competitive clothing item

15  and uses as their identifier a three-stripe swirl.

16       Would that be included within Three-Stripe Mark or

17  not?

18       MR. HENN:  I have to answer that by breaking it into

19  two components.  So in every trademark infringement case, there

20  is what the plaintiff owns and then there is what competitors

21  do that are likely to create confusion in the marketplace,

22  hence infringing.

23       THE COURT:  And that's why my question may be

24  irrelevant to the evidence in this case because we don't have

25  any swirls, at least until I go out and create a side business

1      in men's very expensive clothing.

2            But, nevertheless, taking it as a hypothetical, what

3      would be the answer?

4            MR. HENN:  Well, the answer is if someone else did it

5      and it swirls, of course it's not adidas' mark because adidas

6      didn't do it.  That's why I was saying there are two different

7      components here.

8            Now, if adidas were to take three stripes and curve

9      them, as long as they maintain that sort of parallelness along

10     the curve, adidas would say that's three parallel stripes and,

11     thus, is within its mark.

12           I think where you're going with this really is because

13     trademark cases turn on whether consumers are likely to be

14     confused.  This entire issue is based on consumer perception of

15     the mark.  And the question is, do consumers perceive three

16     parallel stripes as one mark or do they me receive it a

17     bazillion different marks.

18           As the witnesses testified and the evidence thus far

19     will continue in this case, consumers see three parallel

20     stripes and associate that with adidas.  They don't say, Oh,

21     that's the three horizontal stripe mark of adidas, and that's

22     the three vertical stripe mark of adidas, or on a shoe, that's

23     the three diagonal mark of adidas.  Consumers don't think like

24     that.  They see it as one mark.

25           So there is a notion in trademark law where you can

1   have a mark that is used in lots of different ways, but it has

2   a common perception by the target audience.  It is deemed to be

3   a single mark for purposes of trademark law.

4           And as we discussed during the sidebar, the statutes

5   and the way the trademark office works is you can own multiple

6   registrations for a single mark and particularly design marks.

7   If you're using that one mark in a bunch of different places,

8   you can separately register in a different place.

9           Here is why you do it.  Not to say we have 42

10  different marks, it's because in counterfeit cases, unlike this

11  one, in counterfeit cases, you can only enforce your rights

12  under the Lanham Act against marks that are substantially

13  identical to the mark as it appears in a registration.

14          THE COURT:  Now I think there are other things that

15  registration does for you related to presumptions, as I recall.

16          MR. HENN:  Of course.

17          THE COURT:  But I'm waiting to see the midnight

18  special from defense counsel.  I'm not totally sure yet that

19  I don't have to give the jury either a definition of the

20  Three-Stripe Mark that is supported by the evidence and that

21  the plaintiff asserts or I may, under your interpretation, the

22  jury would have to determine what the public perceives the mark

23  to be.

24          I'm not totally sure that's an appropriate approach.

25          MR. HENN:  Well, correct.  But what the jury could do,

1    for example, is both of these witnesses on direct were asked,

2    what is the Three-Stripe Mark, and they provided a definition.

3    The jury then can weigh the credibility of that definition

4    versus all the pictures they've seen, the evidence that will

5    come in, in the case.  And they can decide, yes, it is three

6    parallel stripes or they can decide that that's some cockamamie

7    thing that these witnesses threw out and they don't believe the

8    witness, that that is what the mark is.

9          But our witnesses will consistently testify to the

10   jury that that is the mark.

11         THE COURT:  Right.  So you really think your witnesses

12   would say that a swirl of three is what they consider part of

13   the Three-Stripe Mark?

14         MR. HENN:  None of the examples that we have shown the

15   jury yet and none of the examples that are relevant to this

16   case --

17         THE COURT:  Well, that's --

18         MR. HENN:  -- involve swirls.

19         THE COURT:  That may be your best answer.

20         MR. HENN:  I'm glad I thought of it.

21         THE COURT:  But for what it's worth, I would be

22   skeptical that if asked that question, they would all say, yes.

23   It seems to me it's a different beast.

24         MR. HENN:  One way to think about it, I don't know if

25   this is helpful or not.  One of the witnesses, for example --

1    I forget which one, I think it was Mr. Murphy -- he gave the

2    example of the Nike swoosh.  And he said, Nike takes it, blows

3    it up, they move it around on a different product, they flip it

4    upside down and they change the color of the swoosh, no one

5    would come in say, Nike owns 17 different swoosh marks.  It's

6    all the same mark.

7            The only reason that your Honor and others sometimes

8    get caught up is because you think stripes, like that's somehow

9    different, but it's not.  It's the same as the swoosh.  Or if

10   you think of Ralph Lauren's polo pony that used to be this

11   little tiny thing on your shirt, and now he does it in huge

12   things or he has it running down the whole sleeve.  It's still

13   one mark even though it moves around the products and even

14   though the size changes and the color changes.

15           The Three-Stripe Mark is no different than any other

16   design trademark in that regard.

17           THE COURT:  All right.

18           MR. MALDONADO:  Could I just, please?

19           THE COURT:  Yes, of course.

20           MR. MALDONADO:  First of all, in terms of adidas'

21   witnesses, there is no real consistency in how they define the

22   Three-Stripe Mark.  We have heard them define it different

23   ways.  Different witnesses define it different ways.  We heard

24   a witness today define it differently than witnesses that we

25   deposed.

1    So there is no common understanding of what the

2    Three-Stripe Mark means, even among their own witnesses, so we

3    think it does need to be defined so the jury can understand

4    what it is.  We disagree.  I mean, a design mark is different

5    than a word mark.  You have to have a particular expression or

6    description of what your design is.  Adidas cannot go to the

7    trademark office and say, I want to register three stripes.

8    That would not be accepted and that wouldn't be registered.

9    They have to have an image of it, they have to have a

10   description of it, they have to have it in, as you see in the

11   registrations, always on an article of clothing, a shirt,

12   pants.  You know, it has to has some context.  It can't just be

13   three stripes, because stripes are pretty generic.

14        It's like a line.  Lines, stripes, squares, triangles,

15   shapes, you know, these are things that people can't own.  They

16   have to be defined.  You can own it in a certain particular way

17   that's defined, but you can't just say, I own stripes.  I own

18   three stripes.  because there's lot of people that use three

19   stripes as well.  It has to be some definition.

20        THE COURT:  I think a zebra can say he owns stripes.

21   That's, perhaps, not relevant to the analysis.

22        MR. MALDONADO:  In terms of design mark, you do need

23   to have some kind of definition to what the mark is, different

24   from a word.  And they are asserting common law rights here.

25   They have to say what are the common law rights.  They have to

1    show their design, that there is secondary meaning attached to

2    it, and that those common law rights are associated with adidas

3    and they are not associated with other people.

4            That's how they determine --

5            THE COURT:  I have another matter that I have to take

6    now.  I was waiting for the belated attendees for the

7    sentencing to finally appear in my court.  But now, 12 minutes

8    late, they have finally appeared, so we'll proceed with the

9    sentencing.

10           We'll see you all tomorrow at nine o'clock to continue

11   this discussion.

12           MR. HENN:  Thank you, your Honor.

13           MR. MALDONADO:  Thank you, your Honor.

14           (Adjourned to Thursday, January 5, 2023, at 9:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3    CHRISTOPHER GORDON MURPHY

4   Direct By Mr. Henn . . . . . . .163

5   Cross By Mr. Conley  . . . . . .208

6   Redirect By Mr. Henn . . . . . .281

7    PAUL BOWYER

8   Direct By Mr. Henn . . . . . . .283

9   Cross By Mr. Maldonado . . . . .335

10                   PLAINTIFF EXHIBITS

11  Exhibit No.                              Received

12   83 through 84, 88 through . . . . . . . . . . 279

13        91, 93 through 109, 1029 and

14        1304

15   528  . . . . . . . . . . . . . . . . . . . 348

16                   DEFENDANT EXHIBITS

17  Exhibit No.                              Received

18   DTX 12   . . . . . . . . . . . . . . . . . 209

19   DTX 920  . . . . . . . . . . . . . . . . . 213

20   DTX 921  . . . . . . . . . . . . . . . . . 215

21   DTX-72   . . . . . . . . . . . . . . . . . 259

22   DTX-330  . . . . . . . . . . . . . . . . . 270

23   DTX-41   . . . . . . . . . . . . . . . . . 273

24   129  . . . . . . . . . . . . . . . . . . . 344

25