N15sADI1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADIDAS AMERICA, INC., an Oregon corporation;
and ADIDAS AG, a foreign entity,

                    Plaintiffs,

          v.                         21 Civ. 5615 (JSR)

THOM BROWNE, INC., a Delaware corporation,

                    Defendant.

------------------------------x
                                     New York, N.Y.
                                     January 5, 2023
                                     9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                     District Judge
                                     -and a Jury-


                              APPEARANCES

KILPATRICK TOWNSEND & STOCKTON LLP
        Attorneys for Plaintiffs
BY:  R. CHARLES HENN, JR.
        H. FORREST FLEMMING III

WOLF GREENFIELD & SACKS, PC
        Attorneys for Defendant
BY:   ROBERT MALDONADO
        HARLEY LEWIN
        BRYAN CONLEY
        TONIA SAYOUR

ALSO PRESENT:
NITA GRAY, adidas paralegal
MICHAEL PUSTERLA, Thom Browne paralegal

N15sADI1

1          (Trial resumed; jury not present)

2          THE COURT:  I'll ask my courtroom deputy to go see how

3     we're doing on the jury.

4          I will start promptly at 9:30.  Anything that anyone

5     needs to take up with the court?

6          MR. HENN:  We have some agreed admitted exhibits that

7     I thought I would read in at this point.

8          THE COURT:  OK.

9          MR. HENN:  So the witness after Mr. Bowyer will be

10    Mr. Poret, and we have agreed to the admission of Exhibits 551,

11    552, 554 through 557.

12         (Plaintiff's Exhibits 551, 552, 554 through 557

13    received in evidence)

14         THE COURT:  I forgot to ask defense counsel, how much

15    longer are you on cross?

16         MR. MALDONADO:  I think no more than 45 minutes.

17         THE COURT:  Very good.

18         Who else do we have as a witness?

19         MR. HENN:  After Mr. Poret, there will be a very short

20    financial witness named Tom Kahl, and then we have a 30-minute

21    video of the former in-house counsel of adidas, followed by

22    Mr. Becker, the former CEO of Thom Browne, and then probably

23    finish the day with the beginning of Ms. Vanderhoff.

24         THE COURT:  OK.

25         MR. MALDONADO:  Your Honor, may I hand up the binder

1   for this witness now?

2               THE COURT:  Yes.

3               THE DEPUTY CLERK:  We're missing juror No. 1.  He

4   comes from the Bronx.  At 8:40 he texted a fellow juror he

5   would be 15 minutes late because somebody pulled the emergency

6   brake on the D train.

7               THE COURT:  I hope you all heard that.  Classic Bronx

8   story.  Sounds like we will take a 15-minute break in that

9   case.  If he arrives sooner, we'll call you and let you know.

10              THE DEPUTY CLERK:  Absolutely.

11              THE COURT:  You can step down.

12              THE WITNESS:  Thank you.

13              (Recess)

14              THE COURT:  I understand that someone pulled the

15   emergency cord on the train for juror No. 1.  I think that was

16   because someone saw someone wearing an adidas sock on the left

17   foot and a Thom Browne sock on the right foot.

18              But in any event, we are ready to continue.

19              MR. MALDONADO:  Thank you, your Honor.

20    PAUL BOWYER, resumed.

21   CROSS-EXAMINATION

22   BY MR. MALDONADO:

23   Q.  Good morning, Mr. Bowyer.

24   A.  Good morning.

25   Q.  Yesterday you testified about Thom Browne products that are

1   accused of infringement in this action.

2            Do you recall that?

3   A.  I do.

4   Q.  And Mr. Henn showed you two exhibits, one with the four-bar

5   products accused of infringement and one with the Grosgrain

6   products accused of infringement, correct?

7   A.  Correct.

8   Q.  OK.  And as you went through those products, you commented

9   that you saw a lot of similar product categories, correct?

10  A.  That's correct.

11  Q.  And you saw a lot of similar materials, is that correct?

12  A.  That's correct.

13  Q.  OK.  Is it true also that you saw a lot of dissimilar

14  materials?

15  A.  No, I wouldn't say so particularly.  We use extensive

16  materials within our 14 -- we use an extensive amount of

17  materials in our 40,000 articles per season.

18  Q.  Does adidas sell cashmere sweaters?

19  A.  We have in the past, certainly in our collection.  In fact,

20  I believe we have a piece right now.

21  Q.  You have a piece right now in the collection?

22  A.  Cashmere or mohair.

23  Q.  Not in the regular Y-3 adidas collection?

24  A.  I couldn't confirm.

25  Q.  In your nonY-3 adidas collection, do you sell cashmere

1    sweatpants?

2    A.  I couldn't confirm.

3    Q.  But both of those products are accused of infringement in

4    this case, correct?

5    A.  I believe it's -- again, I'm not a lawyer.  I believe it's

6    the actual four stripes and the Grosgrain that's accused.

7    Q.  You do agree that adidas accuses a cashmere sweater of

8    infringement in this case?

9    A.  I'm not sure exactly on which articles are considered.

10          MR. MALDONADO:  Can we pull up Exhibit 55, please, at

11   page 20.  I'm sorry, page 19.

12   Q.  Here on the bottom item there is a cashmere pullover.

13          Do you see that?

14   A.  I do see that.  I think the item is more calling out that

15   it's a hoodie, irrespective of the material.

16   Q.  OK.  That's the product that is accused in this case,

17   correct?

18   A.  Correct.

19   Q.  And on the next page, page 20.  We show at the top here

20   cashmere sweatpants, correct?

21   A.  That's correct.

22   Q.  Is it true, it's true also, isn't it, that adidas sells

23   blazers?

24   A.  I'm trying to think through all of the collections that we

25   have.  I couldn't confirm or refute.  I'm not sure, but it's a

1    probability across our collections.  For example, Y-3, we

2    certainly do experiment with silhouettes.

3    Q.  OK.  Yesterday you testified about fashion shows.

4         Do you recall that testimony?

5    A.  I do.

6    Q.  OK.  And adidas attends fashion shows that are also

7    attended by luxury brands, isn't that true?

8    A.  That's correct.

9    Q.  And you would agree that at a fashion show where adidas and

10   luxury brands attend, it's like a melting pot?

11   A.  Could you describe what you mean by melting pot?

12   Q.  Well, do you recall giving prior testimony where you

13   described the fashion shows as a melting pot?

14   A.  I don't recall off the top of my head.

15        MR. MALDONADO:  OK.  Can your Honor may I impeach the

16   witness?

17        THE COURT:  I don't think so, because the fact that he

18   may have used the term in prior testimony doesn't mean that you

19   don't have to define the term in your question.

20        Now it is true that plaintiff's counsel did not make

21   an objection on grounds of ambiguity, but the witness in effect

22   made that objection.

23        I sustain that objection.

24   BY MR. MALDONADO:

25   Q.  OK.  Sir, you would agree that luxury brands attend the

1   same fashion shows as adidas, is that correct?

2   A.   Yes, I do.

3   Q.   There's a lot of interaction at those shows between the

4   luxury brands and adidas at the shows that you attend?

5   A.   Can you define interaction?

6   Q.   You have discussions about business at fashion shows?

7   A.   Only with our wholesale partners or our athletes, for

8   example, that may attend, or with those partners that we

9   collaborate with, if we were shown collectively at that event.

10  Q.   You've attended fashion shows through your collaboration

11  with Yohji Yamamoto, is that correct?

12  A.   I personally have not attended those shows.

13  Q.   Adidas has attended fashion shows in connection with its

14  collaboration with Yohji Yamamoto, correct?

15  A.   Yes, that's correct.

16  Q.   And that's been since the collaboration began 20 years ago,

17  correct?

18  A.   I'm not sure what date we started showing at fashion shows.

19  I only joined the company in 2012.

20  Q.   Since you've been there, the company has been attending

21  fashion shows with Yohji Yamamoto?

22  A.   I only started in originals in 2018.  That's when it became

23  under my agreement.  Most of those are globally led, in fact,

24  so typically led out of the team in Germany.  So I can't give

25  you an exact date for exactly when we started those shows.

1  Q.  But you've been attending them since you started or you

2  don't recall?

3  A.  With COVID, we obviously had a hiatus.  There was one show

4  in Paris I do recall some of our team attended.

5  Q.  Adidas has also attended fashion shows through the

6  collaboration with Stella McCartney?

7  A.  Correct.

8       Stella is not under my agreement.  Technically it sits

9  within training, so I can't confirm.

10  Q.  Yesterday you testified that adidas and Thom Browne are

11  sold through some of the same department stores.

12       Do you remember that testimony?

13  A.  I do.

14  Q.  OK.  In fact, adidas goes and visits these retailers to

15  view brands of other clothing companies sold in those stores,

16  correct?

17  A.  Correct.

18  Q.  OK.  And adidas does this for all brands without

19  restriction, correct?

20  A.  That's correct.  We often do market travel and go and visit

21  stores as part of our role.

22  Q.  And these locations include Saks?

23  A.  Yes.

24  Q.  OK.  And these locations include Nordstrom?

25  A.  Yes.

1    Q.  And, in fact, you've seen Thom Browne in a number of the

2    retailer shops that you've visited, correct?

3    A.  That's correct.

4    Q.  And you've actually seen Thom Browne products at Saks,

5    correct?

6    A.  I seem to recall seeing products, I believe it was Saks.

7    And as I mentioned in my deposition, you're out doing a lot of

8    retail and it becomes somewhat ubiquitous as to exactly which

9    store you saw which product, but I believe I have seen product

10   in Saks.

11   Q.  You've also seen product at Bergdorf, Thom Browne product?

12   A.  No.  You mentioned yesterday Thom Browne is not sold there.

13   I misquoted in my deposition there.

14   Q.  No, yesterday that was Bloomingdale's that we spoke about.

15   A.  I'm sorry.  Bergdorf Goodman?

16   Q.  Yes, Bergdorf Goodman.

17   A.  Sorry.  Sorry.

18   Q.  You've seen Thom Browne product at --

19   A.  I believe so.  Certainly on the websites.

20   Q.  You've also seen Thom Browne product at Nordstrom's?

21   A.  Correct.

22   Q.  Now, adidas previously had a line of clothing under the

23   SLVR brand, S-L-V-R, is that correct?

24   A.  That's correct.

25   Q.  The SLVR has a retail store in New York, correct?

1   A.   That's correct.

2   Q.   And that store was in SoHo, correct?

3   A.   Correct.

4   Q.   And are you familiar with the Pitti Immagine fashion show

5   in Florence?

6   A.   I'm familiar with the name of the show, yes.  I haven't

7   attended myself.

8   Q.   And are you aware that adidas has attended that show

9   through the SLVR line?

10  A.   Um, I'm not aware.  SLVR ceased quite some time ago, so

11  certainly before my time in the role.

12  Q.   We spoke yesterday about the Y-3 collaboration?

13  A.   Yes.

14  Q.   And adidas has standalone Y-3 stores as well, is that

15  correct?

16  A.   That's correct.

17  Q.   And it has a store here in New York City in the West

18  Village, is that correct?

19  A.   In SoHo, I think, just off Spring Street.

20  Q.   And that store opened around 2008?

21  A.   I'm not sure on the date.  Apology.

22  Q.   Is that store open today?

23  A.   It is.

24  Q.   Now, would you agree that there is overlap between Thom

25  Browne's clothing and adidas' clothing in social media

1   channels?

2   A.  Can you define overlap, or help me to understand

3   specifically?

4   Q.  That consumers can see both Thom Browne clothing and adidas

5   clothing on certain social media channels?

6   A.  Yes.

7   Q.  And adidas follows a lot of these social media channels,

8   correct?

9   A.  I'm not sure.  I don't know exactly.

10          Do you mean, when you say adidas, me?

11  Q.  Not you personally.  The company.

12  A.  Oh.

13  Q.  Or your business.

14  A.  Our handle follows other handles?

15  Q.  Yes.

16  A.  I'm not sure.  I would have to look through who we follow.

17  Q.  Does adidas view products of other fashion companies

18  online?

19  A.  Within my role and my team, yes.

20  Q.  OK.  And you have been working in your present role, you

21  said, as vice president of originals for four years, correct?

22  A.  Yes.

23  Q.  And you've been at adidas since 2012?

24  A.  That's correct.

25  Q.  And so you've been there about a decade now?

1   A.  Correct.

2   Q.  And during the time that you've been here, you haven't seen

3   any quantitative or quantitative data of confusion, actual

4   confusion, between Thom Browne and adidas, correct?

5   A.  Correct.

6   Q.  Now in terms of competition, you believe that anybody who's

7   buying for consumer's wallets, their hearts or their minds is a

8   competitor of adidas, correct?

9   A.  Correct.

10  Q.  And, in fact, under that definition, even Apple would be a

11  competitor of adidas, correct?

12  A.  That's correct.  In the broader context, if they have a

13  finite budget, they can choose whether spending on an Apple

14  device or adidas product.

15  Q.  You view luxury brands as competitors of adidas?

16  A.  That's correct.

17  Q.  You consider Louis Vuitton to be a competitor of adidas?

18  A.  More so in specific product category.

19  Q.  You consider Versace to be a competitor of adidas?

20  A.  Yes.  Again, in specific product categories more directly.

21  Q.  OK.  Let's talk now about the --

22          Let me ask you a question.  You testified that adidas'

23  Three-Stripe Mark consists of three stripes, is that correct?

24  A.  That's correct.

25  Q.  OK.  And those stripes can be in any orientation, correct?

1    A.  Yeah.  I'm not a lawyer and I'm not responsible for brand

2    guidelines, but that's my interpretation of the Three-Stripe

3    Mark; three parallel stripes.

4    Q.  OK.  And I think yesterday you testified about socks that

5    had horizontal stripes?

6    A.  Yes, correct.

7    Q.  But adidas hasn't accused any Thom Browne socks of

8    infringement in this case, correct?

9    A.  I'm not sure.  Again, perhaps.  I'm not certainly sure on

10   which specific items.

11   Q.  Well, yesterday you looked at Exhibit 55 that listed all of

12   the accused products, do you remember that?

13   A.  I do remember that.  I just don't recall if socks were

14   included.

15   Q.  OK.  Want to take a look?

16           MR. MALDONADO:  Want to pull up 55, please.  You can

17   flip through the pages.

18           (Pause)

19   A.  Thank you for refreshing my memory.  I don't see socks in

20   that exhibit.

21   Q.  OK.  Thank you.

22           You testified you've seen, or it is your testimony

23   that -- or don't you agree, rather, that the Three-Stripe Mark

24   can be in a vertical orientation up and down?

25   A.  Correct.

N15sADI1                    Bowyer - Cross

1    Q.  And the Three-Stripe Mark could be in a horizontal

2    orientation side to side?

3    A.  Correct.

4    Q.  And the Three-Stripe Mark can be in a diagonal orientation

5    at an angle?

6    A.  Correct.

7    Q.  And those are all within the Three-Stripe Mark, according

8    to what you believe?

9    A.  Correct.

10   Q.  And then you testified yesterday about a document

11   Plaintiff's Exhibit 84 which was supposedly a timeline of the

12   use of horizontal stripes by adidas.

13          Do you remember that testimony?

14   A.  Um, no.

15          Was it the reference to a catalog?

16          MR. MALDONADO:  Do you want to pull up the exhibit,

17   please.

18   Q.  This Exhibit 84.  Do you recall this?

19   A.  I do recall this.

20   Q.  OK.  Is this a document you created?

21   A.  I did not create it myself, no.

22   Q.  Who created it?

23   A.  I'm not sure.  Somebody, I would assume, within the legal

24   team.

25   Q.  OK.  And I think you believe -- I believe you testified

1    that it was created based upon catalogs that were in the adidas

2    archive in Germany, correct?

3    A.   That's correct.

4    Q.   And you represented that this is a compilation of adidas'

5    use of horizontal stripes throughout time?

6    A.   I wouldn't say it's a timeline.  I think it's some examples

7    from certain moments in time.  It may have preceded this, we

8    just didn't happen to have the catalog.

9    Q.   You say that 1979 is the earliest of an incident you found

10   of horizontal bar use by adidas?

11   A.   That's the earliest within this exhibit that I can see,

12   correct.

13   Q.   Are you aware of any earlier use?

14   A.   I am not myself, no.

15   Q.   And this document here is, I believe it's approximately

16   200 pages.

17        You've seen this document in its entirety, correct?

18   A.   Very quickly skimmed through that document, yes.

19   Q.   OK.  Do you want to --

20        Why don't we flip through and see how many pages.  Why

21   don't we go to the left page, because the pages are numbered on

22   the top.

23        1 through 163, so this document is 163 pages.  Does

24   that sound about right to you?

25   A.   That is correct, yeah.

1    Q.  OK.  And this, as you said, has examples of use of

2    horizontal stripes by adidas, correct?

3    A.  I believe it contained various usage of stripes, not

4    exclusively horizontal.

5    Q.  OK.  So you testified yesterday that adidas makes

6    approximately 40,000 unique styles per season?

7    A.  That's my understanding globally, correct.

8    Q.  So over the last ten years, that's 70 seasons, we're

9    talking over nearly three million different styles?

10   A.  A season -- we have two seasons, spring and fall, so maybe

11   half that.

12   Q.  One and a half million styles?

13   A.  Yeah, correct.

14   Q.  So this document that we're looking at here of 163 pages of

15   horizontal use represents a very minute fraction of the total

16   styles that adidas has put out over the last ten years, would

17   you agree?

18   A.  As a percentage, I would agree.

19   Q.  OK.  Now you mentioned that some of the items, that this is

20   not just horizontal use, correct?

21   A.  That's my recollection.

22   Q.  OK.  So if we look, for example, at page four of this

23   exhibit, we see two items here that are not horizontal use,

24   correct?

25   A.  That's correct.

1    Q.  OK.  If we look at page 12, we see an item here at the top

2    that's not horizontal use, correct?

3    A.  That's correct.

4    Q.  And these stripes are diagonal, right?

5    A.  Correct.

6    Q.  If we move to page 22, at the bottom here we also see

7    stripes that are not horizontal, correct?

8    A.  That's correct.

9    Q.  And let's turn to page 47, please.

10            In the middle row there, do you recognize these

11   images?

12   A.  From this exhibit I do, yes.

13   Q.  Is this the Y-3 collection?

14   A.  I couldn't confirm.  I can't see the Y-3 logo.

15   Q.  OK.

16   A.  I see it on the soccer ball.  That's all I could infer.

17   Q.  But you agree there is no horizontal stripes here?

18   A.  That's correct.

19   Q.  And these are diagonal?

20   A.  Yes, they are.

21   Q.  OK.  Page 145, take a look there.

22            Again, in the middle here we see these are not

23   horizontal stripes?

24   A.  That's correct.

25   Q.  And let's look at page 43.

Again, here, we have stripes that are not horizontal,

correct?

A.   That's correct.

Q.   So you can't tell us sitting here today how many items

adidas has sold over the past, let's say, even five years since

you've been there that has horizontal stripes?

A.   That's correct.  All adidas product bear the Three-Stripe

Mark.  I couldn't tell you exactly how many are horizontal,

vertical, or diagonal.  We don't classify in any of our

systems.

Q.   You don't have any information as to the level of sales

within adidas of apparel bearing horizontal marks?

A.   No.  All adidas product bears the Three-Stripe Mark

irrespective of its application or diagonal, vertical,

horizontal placement.  But we don't have anything in our

systems that denotes which angle that Three-Stripe Mark is

placed.

Q.   You don't have any information about the amount of money

adidas has spent advertising three horizontal stripes?

A.   Any advertising we do promotes and it generates awareness

of the Three-Stripe Mark irrespective of its placement.

Q.   So you don't have any horizontal data on horizontal

advertising, specifically horizontal advertising?

A.   Um, I mean, if you've seen some products, Y-3 products for

example, on run ways or social media, that would be considered

1    advertising in our terms.  I couldn't quantify the dollars that

2    we spend against that.

3              MR. MALDONADO:  Thank you.  I have no further

4    questions.

5              THE COURT:  Redirect.

6              MR. HENN:  None, your Honor.

7              THE COURT:  Thank you very much.  You may step down.

8              (Witness excused)

9              THE WITNESS:  Thank you.

10             THE COURT:  Please call your next witness.

11             MR. HENN:  We call Mr. Hal Poret.

12    HAL PORET,

13         called as a witness by the Plaintiffs,

14         having been duly sworn, testified as follows:

15             THE DEPUTY CLERK:  Please be seated and state your

16    name and spell it for the record.

17             THE WITNESS:  Hal Poret, H-a-l P-o-r-e-t.

18             MR. HENN:  Your Honor, we have a demonstrative exhibit

19    deck that parties have agreed is OK to show the jury.

20             We'll pull up the first slide.

21             THE COURT:  All right.  You should keep in mind,

22    ladies and gentlemen, that demonstratives are a way of helping

23    you follow a witness's testimony, but they themselves are not

24    evidence.  They won't be given to you at the close of the case.

25    They are just an aid to following the witness testimony as it

1    were.

2         Go ahead.

3    DIRECT EXAMINATION

4    BY MR. HENN:

5    Q.  Good morning, Mr. Poret.

6         Would you just introduce yourself?

7    A.  Sure.  My name is Hal Poret.  I do survey research.  I have

8    my own survey research company.  I have a bachelor's and

9    master's degree in mathematics and I have a law degree, a JD,

10   from Harvard.

11        THE COURT:  You can't do any better than that.

12   A.  I, over the course of my career, I've done over 1,000

13   consumer surveys, hundreds of which have been related

14   specifically to trademarks.  I have published several articles

15   on how to conduct trademark surveys, including in the *Trademark*

16   *Reporter*, which is the journal published by the International

17   Trademark Association, and I've also been a speaker on how to

18   design reliable consumer surveys at a number of conferences,

19   including the International Trademark Association and some

20   other intellectual property and legal conferences.

21   Q.  Have you also testified as an expert in other cases?

22   A.  Yes, I have.  I have been accepted as an expert in survey

23   research in other courts and with the U.S. Patent and Trademark

24   office and some other legal entities.

25        MR. HENN:  Nita, would you pull up Exhibit 554,

1   please.

2   Q.  Mr. Poret, can you identify Exhibit 554 for us?

3   A.  Yes.  This is my c.v. summarizing my experience and my

4   publications and presentations.

5   Q.  Is it fair to say that your expertise is in the design and

6   implementation of surveys?

7   A.  Yes.

8           MR. HENN:  Thanks, Nita.  You can take that down and

9   we can return to the deck.

10  Q.  Mr. Poret, what were you asked to do in this case?

11  A.  I was asked to design and conduct a survey to test whether

12  the four-stripe designs and Grosgrain designs on Thom Browne

13  activewear create a likelihood of post-sale confusion with

14  respect to adidas and its Three-Stripe Marks.

15  Q.  What do you mean by post-sale confusion in the context of

16  your survey?

17  A.  Confusion that happens after clothing is sold and already

18  out there.  For instance, you see somebody wearing it on the

19  street or standing in line, things like that.

20          MR. HENN:  Hold on.  My little clicker is not working.

21  There we go.

22  Q.  How did you go about investigating the issue of post-sale

23  confusion in this case?

24  A.  I designed a scientific survey to test whether people who

25  encounter the Thom Browne activewear items in a post-sale

1    situation mistakenly believe that the products are adidas

2    products or that they are affiliated with or approved by

3    adidas.

4    Q.  Was your company paid for the survey work you did in this

5    case?

6    A.  Yes.  The fee for all the survey work was $60,000, which

7    also includes the fees that my company had to pay to the

8    companies that I used as vendors to assist in the survey.

9    Q.  Was your payment of that amount in any way dependent on the

10   outcome of the case or your testimony in the case?

11   A.  No.

12   Q.  Before we go into the detail of the surveys, can you at a

13   high level tell the jury what the results were of the surveys?

14   A.  Sure.  At a high level, the surveys found that there is a

15   significant likelihood of confusion caused by the use of the

16   four stripe and Grosgrain designs on these activewear items.

17   It was nearly 27 percent on average who confused the items with

18   adidas, and that basically was across a number of different

19   items or different variations of clothing and how they were

20   presented.

21   Q.  Would you identify and describe the survey methodology you

22   used to arrive at your conclusions?

23   A.  Sure.  It was a scientific or experimental design that

24   included a test group and a control group, and it used

25   something that is called the Eveready format, which is a method

1    that is well accepted among survey researches as a valid way to

2    test for confusion.

3    Q.  How does the Eveready format work?

4    A.  It gets its name from a case in which the company that made

5    Eveready batteries had a concern about confusion over a case --

6    over Eveready lamps.  And the way it works is that you show the

7    allegedly infringing products and you ask open-ended questions

8    to see if they name the other party on their own.  In this

9    case, adidas.

10         So it has the benefit that you never mention adidas to

11   them in the survey.  You never show them anything for adidas.

12   You just show them the Thom Browne items, and you see if they

13   think of and mention adidas on their own.

14   Q.  You mentioned that you used an experimental design with a

15   test and control.

16         Can you tell us what you meant by that?

17   A.  Sure.  The easiest way to think of it is in connection with

18   things like pharmaceutical trials.  You've probably heard that

19   when people are testing medications, there is a test group that

20   gets the actual medication with the active ingredient in it and

21   there is a control group that gets a placebo or control that

22   removes the active ingredient.

23         And that is how you test for, you know, noise or a

24   false positive rate and see if the result in a test group is

25   greater than the result for the group that gets the placebo.

1          The same phenomenon in consumer surveys.  Surveys can

2     always have noise.  Let's say you're showing people a bunch of

3     activewear items and naming adidas.  How do you know they are

4     naming adidas?  Because of the stripe designs at issue.  Maybe

5     a certain number of people will just guess adidas if you show

6     them any activewear of this style because adidas is a

7     well-known brand that makes clothing like that.

8          So what you do is you show a test group the actual

9     items with the allegedly infringing designs and then you show a

10    control group the same images, but with those designs changed.

11    And that way the control group measures this noise level, which

12    is how many people are going to name adidas even when you show

13    them something without an infringing pattern.  And you can then

14    subtract away that noise to get to a result that reliably has

15    to be caused by the striped pattern's similarity to adidas.

16          MR. HENN:  Nita, pull up Exhibit 555, please.

17    Q.  Mr. Poret, what is in Exhibit 555?

18    A.  This is the questionnaire which has all of the

19    instructions, screening questions, questions-and-answer choices

20    that was used to program the survey.

21    Q.  And if the jury is looking at this later, can you

22    distinguish between what was the question asked at the survey

23    respondent versus what was an instruction for the programmers?

24    A.  Sure.  So, most importantly, this is not a document seen by

25    people taking the survey.  This is a document used to program

1    the survey to appear as it should.

2            In this document, anything that's in bold are just

3    instructions to the programmers, whereas the non-bolded text

4    are things that are intended for the survey respondents to see.

5            MR. HENN:  And if we look at Exhibit 556, Nita, maybe

6    you can zoom in on a little bit of the content there.

7    Q.  Mr. Poret, what is in 556?

8    A.  This is a document showing screenshots of the way that the

9    survey questions actually appeared to consumers in the survey,

10   although each question would have been on its own screen and

11   much larger and easier to see.

12   Q.  So if the jury wanted to know what it looked like to a

13   survey participant, Exhibit 556 is the one?

14   A.  Yes.

15   Q.  All right.  Let's return to the deck, please.

16           So tell me, who were the people who participated in

17   your surveys?

18   A.  There were 2400 people surveyed across all of the groups.

19   They were individuals who are purchasers of the types of

20   apparel that were tested in the survey, which were sweatshirts,

21   sweatpants, and these other items, types of items that were

22   listed here.  There was a balance assortment of males and

23   females and people from all regions of the United States.

24   Q.  You mentioned earlier that the survey was programmed.

25           Was it conducted on a computer, in person?

1              How were people participating in the survey?

2      A.   It was conducted online, so people could take it on a

3      computer or a tablet or mobile phone, however people typically,

4      you know, handle their electronics and interact with things

5      like that.

6      Q.   How did you go about finding the 2400 people to participate

7      in the survey?

8      A.   It used what is the most common method in market research

9      today, which is an online panel.  It's basically a company that

10     recruits and maintains a database of tens of millions of

11     Americans who have given information about themselves and given

12     permission to contact them and invite them to take surveys.

13             So I used a panel from this company called Protege,

14     which is a pretty leading supplier of the sample for surveys.

15     Q.   Talk to the jury about the mechanisms you used --

16             MR. HENN:  Nita, go to the next slide.  I can't get

17     the clicker to do it for me.

18     Q.   Talk to the jury about the mechanism you used to make sure

19     that the people who were taking the survey were legitimate and

20     actual people.

21     A.   Sure.  So the panel itself has some procedures that they

22     use, like things like digital fingerprinting and checking IP

23     addresses to just make sure the same person is not trying to

24     take the survey twice, or that the person who is coming into

25     the survey is actually the person who was invited to take it.

1   And the survey also starts with a CAPTCHA, which is the thing

2   you often see if you're, like, trying to buy tickets online and

3   making you do something to confirm that you're a person and not

4   some computer program.

5          And then within the survey itself, there are a bunch

6   of quantity control questions to make sure people are paying

7   attention, reading the questions and instructions, and

8   answering accurately.

9          So, for instance, one of the beginning questions asks

10  people which social media services have they used, and it has a

11  list of choices which are mostly real.  But there was one fake

12  one called Dusan, and anyone that picks that is excluded from

13  the survey because that catches people who are just clicking

14  every answer choice or not really paying attention.

15         And then in the screening questions it asked people

16  which types of products do they purchase.  There was also

17  another fake or dummy choice, which was Chutil cover or box.

18  Between those there were three different questions that would

19  catch and weed out people who either were just clicking every

20  answer choice or just not paying attention and rushing through

21  the survey.

22  Q.  Did you also ask a final quality question at the end?

23  A.  Yes.  This question, which you can see, this was asked at

24  the very end of the survey, after they had been tested about

25  the clothing, which is another way to catch people who are not

1    paying attention.  It instructed them to select one of these

2    from the list, and they had to follow the instructions in order

3    to be included in the completed survey.

4    Q.  So once one of the people is qualified to take your survey,

5    what happened next?

6    A.  They were then shown a standard set of instructions, like

7    you can see here, which tells people not to consult other

8    websites or materials.  And if they have glasses, they should

9    wear them, and just the standard things that respondents are

10   instructed.

11   Q.  And after they receive those instructions, what happened

12   next?

13   A.  So then each respondent would have been randomly assigned

14   to one of eight groups or really 16 groups.  There were eight

15   different sets of clothing images, and each respondent was

16   assigned to one of those groups depending on what types of

17   products they say they purchase in the screening questions.

18   Q.  So, for example, if someone said they purchased a hoodie

19   sweatshirt for women, they would go where?

20   A.  Yeah.  So if they said that, then they would be eligible to

21   be assigned to the group that was shown a women's hoodie.  So

22   they were always being shown something of the type that they

23   say that they have purchased or would be likely to purchase.

24   Q.  Were the respondents in the survey asked how much they

25   would spend on the types of products?

1    A.   No.

2    Q.   Why not ask that question about price?

3    A.   Because we were not testing confusion at the point of sale,

4    we were testing for post-sale confusion.  We weren't testing if

5    somebody walks into a Thom Browne store and is spending $1,000

6    on an item, are they going to be confused.  We were testing

7    whether someone who sees somebody wearing this clothing outside

8    of that context, like on the street, would be confused.

9    Q.   So after they were randomly assigned to the groups, what

10   happens next?

11   A.   They were given an initial instruction depending on their

12   group.  It either said we're going to show you some images of

13   clothing, or it would say a specific item of clothing, like

14   we're going to show you a hoodie sweatshirt or footwear,

15   depending on what was going to be shown.  The instruction was

16   customized to match that.

17   Q.   And if the respondent was assigned to the footwear group,

18   would the word clothing have been replaced with footwear?

19   A.   Yes.

20   Q.   Or shoes or something?

21   A.   Yeah.  It says for the footwear group.  It said running

22   shoes.

23   Q.   Then what happened next?

24   A.   The respondents were shown the images of the Thom Browne

25   apparel for their group.  They were told to look at them, take

1    their time.  They were also -- they could enlarge them if they

2    wanted to zoom in, or on a mobile device they could pinch to

3    see a larger version if they wanted to.

4    Q.  Let's walk through the images that you showed the people in

5    your test group.

6            If you'll explain for each of these why you selected

7    these images.  First, we have the images for group one.

8    A.  Sure.  So overall I wanted to have a variety of different

9    items from different angles and perspectives, both men's and

10   women's clothing.  Most importantly, I wanted to show the

11   clothing from perspectives that would allow them to see a full

12   and fair view of the clothing, including how the stripes

13   appear.

14           For instance, you can see in these images that by

15   showing these various views, you can see that the stripes are

16   not all the same length or that they don't go all the way

17   across in certain places.  You can also see that the stripes

18   are only on the left side of the garment, not both sides.  You

19   can see on the back of the pants in this image that there is

20   the red, white, and blue flag.  And you can also see on the

21   front of the left image that there is this white label on the

22   clothing.

23   Q.  What about the images you selected in group two, why did

24   you pick these?

25   A.  So this was the image -- in the first group was women's

1   clothing where both items were Thom Browne items, and the

2   second group this was done for an example of women's clothing

3   where the woman is only wearing one item of Thom Browne

4   clothing and the other item is not Thom Browne.

5           But otherwise it's similar and it's the same hoodie

6   and allowing the respondent to see the white tag on the front

7   and the stripes, that the stripes are only on the left side.

8   Q.  You mentioned that they were able to see the white tag on

9   the front.

10          If somebody zoomed in on the image, would they be able

11  to read everything that was on that little tag?

12  A.  No, they could not read what was on the white tag because

13  the survey was trying to simulate a typical post-sale situation

14  and a real -- a real person seeing somebody wearing the Thom

15  Browne clothing in most scenarios would not be able to read

16  what was on that tag, unless they were really unusually close

17  and basically putting their face into somebody else.

18  Q.  Let's look at the images in group three.

19          Tell us why you selected these images.

20  A.  This was another set of women's images to test a different

21  set of examples.  This time was a long-sleeve compression

22  T-shirt and shorts.  Again, this allows the respondent to see

23  the length and proportion of the stripes, including that they

24  are only on the left of the garment, and all the stripes are

25  not always at the same length.  And, again, you can also see,

1    this time, the flag on the middle image both on the shirt and

2    the shorts.  And you can also see on the image to the right

3    this set of four lines on the tag on the front.

4    Q.  What about the images in group four, why did you select

5    these?

6    A.  We also wanted to have some male clothing images and,

7    again, this was -- this was an example of somebody wearing two

8    Thom Browne items, the T-shirt and the sweatpants.  Again, this

9    allowed the viewer to see that the stripes, the length and

10   proportion of the stripes, that they are only on the left.  It

11   allows the viewer to see the red, white, and blue flag tag on

12   the back of the T-shirt and on the sweatpants, and it allows

13   them to see that at the bottom of the sweatpants, there is this

14   white square label on the front.

15   Q.  With regard to group five, why did you select these images?

16   A.  I also wanted to have an example of a male clothing view

17   where it's only one Thom Browne item that they are wearing.

18   This time it's the shorts.  Again, you can see the length and

19   proportion of the stripes, that they are only on the left side,

20   and you can see the flag tag on the back.

21   Q.  How about in group six, why these images?

22   A.  Again, another just variation, different colors, different

23   items, different views, but always letting the respondent see

24   that the stripes are only on one side of the garment, not both,

25   and to get a good sense of the proportions.  Also, again, you

1    can see the red, white, and blue tag on the back of this.

2    Q.  How about group seven, why these?

3    A.  Just another example of somebody wearing just one Thom

4    Browne item, allowing the same views, again, of the white tag

5    that is at the front on the bottom and the flag tag that is on

6    the back and, again, being able to see that the stripes are

7    only on one side.

8    Q.  And finally, group eight?

9    A.  This was to test an example of this Grosgrain striped

10   pattern.

11           MR. HENN:  Nita, pull up exhibit five 52.

12   Q.  Can you tell us what is contained within Exhibit 552,

13   Mr. Poret?

14   A.  Yes.  These are the images that were shown to the various

15   groups and survey in the test group.  Each of the images was

16   viewed one at a time, but this just combines them and shows

17   them all together.

18           MR. HENN:  Thanks, Nita.  Return me to my slide deck.

19   Q.  How long were respondents permitted to look at these images

20   when you were showing them to them?

21   A.  They could view any of the images for as long as they

22   wanted.  They could go back and forth between the images.  They

23   had to view the images for at least 15 seconds to make sure

24   they got a fair view of it, but they could view them as long as

25   they want.

1    Q.  So after a survey respondent sees the image, what happens

2    next in the survey?

3    A.  So they were instructed -- they had to answer to confirm

4    that they could view the images clearly and they had to be

5    available to do that to make sure they could continue with the

6    survey.

7    Q.  You had eight groups.  Why only eight sets of product

8    compilations?

9    A.  Well, eight is quite a lot.  This is a much bigger survey

10   than most, actually, in that it was 2400 people and covering

11   eight different sets of items.  It wouldn't be feasible to do

12   all of the items, or even close to it.  But the idea doing the

13   eight is to cover an assortment of different things between

14   men's and women's, different colors, long and short sleeves,

15   pants and tops, and just the different presentations of the

16   red, white, and blue flag and the label.

17         So the idea is, across all of these, to have some of

18   what a representative sample that could also be applied to

19   other, you know, whatever other items are comparable.

20   Q.  So after they said yes, I could see the images clearly,

21   then what were they asked?

22   A.  Then they were asked these questions that are standard for

23   the Eveready format, which are about the source of the products

24   and any questions about affiliation and sponsorship or

25   approval.

1          MR. HENN:  Nita, will you advance to the next slide,

2     please.

3          Thank you.

4     Q.  Mr. Poret, will you walk through the first set of questions

5     you asked the respondents after they had seen the images?

6     A.  Sure.  So respondents would first be shown that first

7     question on its own screen, but that blank would be filled in

8     by whatever they saw.  It would say whatever company brand you

9     believe makes or puts out the clothing, or if it was just one

10    Thom Browne item, then it would say what that item is, like,

11    the hoodie sweatshirt or the running shoe.

12          And then if the respondents named a company, they were

13    asked what makes you think that the item they were shown is put

14    out, made or put out by the company they named.  So this is

15    going to -- you know, who did they think this item is from.

16    Q.  And then what other questions were they asked?

17    A.  Just one other set of questions going to a different form

18    of confusion.  They were asked if they thought that the item

19    they were shown is affiliated with or sponsored or approved by

20    any other company or brand.  If they said yes, they were asked

21    what other company or brand, and to give their reasons why they

22    think so.

23    Q.  At the time they were asked these questions, who puts it

24    out or do you think it is affiliated or sponsored, were they

25    still able to go back and look at the images?

1    A.  No, not while they were being asked these questions.

2    Q.  Why not let them look at the images while they are

3    answering the questions?

4    A.  The best -- the best practice for finding out what

5    consumers' true impressions are is to give them a fair

6    opportunity to look at the items, but then take them away, out

7    of sight, before asking the questions.  Because that way they

8    can only answer based on the true impressions that they formed

9    while they were looking at the clothing, whereas if you asked

10   them the question and then let them go back and look at the

11   images again, you're risking that they are now just

12   artificially searching for some answer that they hadn't thought

13   of originally on their own.  And you want their true impression

14   that they really formed, like a real -- somebody would in real

15   life, not to have them just go searching for something once

16   they realized what the survey is about.

17   Q.  Was the fact that this was a post-sale confusion, did that

18   influence your decision to take the images away?

19   A.  I would typically do that for either.  The fact it is

20   post-sale also, I mean, that is very appropriate for post-sale

21   confusion.  Because, in general, post-sale confusion means

22   you're seeing somebody out in the real world.  You know, there

23   is no interviewer there to ask you a question and then have you

24   go back and try to look at the clothing again to try to find an

25   answer.

1  Q.  Would you tell the jury what the results were from the test

2  groups?

3  A.  Sure.  So this slide is just summarizing what the results

4  were, the percentage in each group that named adidas when

5  they -- after looking at the Thom Browne clothing.  And as you

6  can see, it ranged from a low of 24.7 percent to a high of

7  50 percent.

8  Q.  If someone said adidas put it out and then they -- then

9  they also said it is affiliated with adidas, did you count that

10  person once or twice in coming up with these numbers?

11  A.  Just once.

12  Q.  You mentioned that respondents were also asked their

13  reasons why they thought it was put out by adidas.

14      Can you talk about what the results were to that

15  question?

16  A.  Yeah, sure.  I mean, those -- so their answers, we call

17  them verbatim answers because these are literally what the

18  respondents typed in verbatim.  It's largely a quality control

19  thing to make sure that people are typing in real, thoughtful

20  answers and not just randomly striking keys.  But they can also

21  tell you something qualitative about the data.

22      For instance, you see that a lot of people referred to

23  the stripes or lines as the reason that they named adidas, and

24  that gives further confirmation that it is the stripes that is

25  causing the connection to adidas.

1    BY MR. HENN:  (Continued)

2    Q.  On the screen here we've got a table that says test group 1

3    adidas makes or puts out the clothing and then verbatim

4    answers.  Can you just explain how to read this table?

5    A.  Sure.  This is just showing a list of the people who named

6    adidas after being questioned about this clothing item, which

7    is the hoodie, sweatshirt, and the compression tights.  And you

8    can see in the left column it shows the respondent's ID number

9    and then it shows what company or brand they named that they

10   thought the clothing was from.  And then the final column shows

11   the reason why they named adidas.  And you can see a lot of

12   these are examples of people who referred to the stripes as the

13   reason for naming adidas.

14   Q.  If we look at the next slide, this is from test group 4.

15   How is this chart different than the one we looked at before?

16   A.  It's the same thing.  It's just for a different group.

17   These are some responses to the clothing items shown here with

18   the male wearing the T-shirt and the sweatpants and reasons

19   people gave for naming adidas in that case.

20   Q.  I noticed in each of these, some of the responses for what

21   makes you think that referenced three stripes or three lines.

22   Do you have an explanation for that given that they were

23   looking at four striped products?

24   A.  Yes, generally people form just an instinctive perception

25   of something that they're seeing.  They're not necessarily

1   counting stripes or scrutinizing all these details.  So

2   somebody just looks at an item and their instinctive reaction

3   is that person is wearing adidas, and then you ask them why

4   they think so, in their minds they may feel they saw three

5   stripes or that's what they're thinking for adidas, so it's

6   just a typical phenomenon that occurs.

7   Q.  Finally, with regard to these verbatims, on your screen now

8   is test group 8.  Can you just identify what these verbatims

9   were from?

10  A.  Sure.  These are some of the verbatims from the group that

11  was asked about this running shoe that you can see here with

12  these stripes, and these also show some of the answers where

13  people were referring to the stripes as the reason for naming

14  adidas.

15  Q.  You mentioned before that there was a test group and a

16  control group.  I want to shift over now and talk about the

17  control group.  Would you just describe what you did in the

18  control group.

19  A.  Sure.  So the idea of the control group is that a different

20  set of respondents is going to take an identical survey but

21  with just one change, which is we're going to remove what is

22  the active ingredient, which is the stripe pattern and replace

23  it with just this one stripe.  And the purpose of this is let's

24  see how many people are going to name adidas for reasons other

25  than the multi-stripe pattern, for instance, that they just

1   think this style of clothing looks like adidas generally.

2   Q.  Why one stripe?  Why not take all the stripes off?

3   A.  Because adidas is not saying that nobody can ever use a

4   stripe on clothing.  Adidas's position is that a one-stripe

5   pattern would not be infringing, so one stripe is a way to

6   still have a stripe on clothing but to alter it so that the

7   look doesn't risk being confusingly similar.

8   Q.  Of the 2,400 respondents that took the surveys in total,

9   how many took the test survey and how many took the control

10  survey?

11  A.  Half took each.  So for each of the eight groups, there

12  were 150 respondents who took the test version and 150 who took

13  the control version.

14  Q.  We see the control images for group 1 on the screen.  I'm

15  going to scroll through the other groups now.  If you'll just

16  identify the control stimulus that you used; in other words,

17  the design that you used in that control group.  So group 2?

18  A.  Sure.  So, again, it's a one-stripe pattern instead of

19  four, and all of the other elements are identical.

20  Q.  For 3?

21  A.  The same thing.  Just the four stripe pattern has been

22  replaced by one, but you can see all of the other elements

23  identically, the red, white and blue tags and the other aspects

24  of it.

25  Q.  What about group 4?

1   A.  Same thing.  One-stripe design instead of the four with all

2   other aspects being identical.

3   Q.  Group 5?

4   A.  Same thing.  One-stripe design instead of four.  You can

5   see the tag on the back and everything else is identical.

6   Q.  Group 6?

7   A.  Same thing for all of the groups.  It it's just an

8   identical item but with a one-stripe pattern replacing the

9   four.

10  Q.  And you did the same with the shoe in group 8?

11  A.  Yes.

12  Q.  Nita, if you'll pull up Exhibit 551, please.

13          Mr. Poret, what's contained in Exhibit 551?

14  A.  This is a collection of the images that were shown to each

15  of the control groups in the survey.

16  Q.  And you mentioned that in the test group people saw the

17  images one at a time.  Was the same true in the control?

18  A.  Yes, everything about the control survey is identical

19  except for the change in the number of the stripes.

20  Q.  Nita, if you go back to the slide deck.

21          So, after survey participants in the control group saw

22  the images, what happened next?

23  A.  They were asked the exact same questions that we went

24  through in terms of the test group.  They were asked who they

25  think makes -- puts out the product, and do they think it's

1   affiliated with or sponsored or approved by anyone else.  So

2   it's the identical survey everything about it.

3   Q.  Just to be clear, if I were to take the survey, I wouldn't

4   take the test and then turn around and take the control.  I

5   would just get one or the other, right?

6   A.  Right.  It's 2,400 different people each who only take one

7   group.

8   Q.  Will you describe for the jury the results of the control

9   groups?

10  A.  Sure.  This shows the percentage who named adidas in each

11  of the control groups where the four stripes had been replaced

12  by one.  And you can see here this -- the rates range from a

13  low 3.3 percent to a high of 20 percent.

14  Q.  You used the term noise before, and it's in this graph.

15  What do you mean by noise in the context of a survey?

16  A.  In this case, it basically means naming adidas for reasons

17  other than the similarity of the stripe patterns.  For

18  instance, I just think, you know, a jacket or sweats like that

19  remind me of adidas generally because they make that style of

20  clothing.  So noise would be any rate of naming adidas for

21  reasons other than the similarity of the multi-stripe pattern.

22  Q.  Nita, if you'll pull up Exhibit 557, please.

23          While she's pulling that up, Mr. Poret, what happens

24  to all of the information that a survey respondent types in in

25  these surveys?  How do you get it?

1   A.  It's all collected in an electronic portal that's hosted by

2   one of the vendors that I've used to program the survey, and

3   then it all is downloaded into an Excel spreadsheet that

4   contains all of the raw data.

5   Q.  Nita, now if you'll pull up Exhibit 557 and click on the

6   tab at the bottom that says "data" in the lower left.  Scroll

7   back to the left so they can see the beginning of the table.

8   Perfect.

9           So, Mr. Poret, what is contained in Exhibit 557?

10  A.  This is the raw data file that contains all of the answers

11  to all of the questions in the survey starting with the

12  screening questions and the age and agenda and then ultimately

13  the answers to the main survey in terms of what people said

14  when they were looking at the clothing.

15  Q.  Nita, if you'll just scroll out to the right slowly.  There

16  are a lot of ones and zeros.  What do those reference?

17  A.  Well, first of all, as you can see, there's a second tab

18  called a data map, and that will tell what every different

19  number means in any column, but what those ones and zeros

20  mostly mean are a yes or a no.

21          For instance, when people were asked which items of

22  clothing have you bought, there will be a column that is for,

23  you know, hoodie sweatshirts; and if there's a one in it, that

24  means they said, "Yes, I buy hoodie sweatshirts."  And if it

25  says zero, then that's probably a no answer.

1    Q.  I want to get over to where they're going to see actual

2    words.  Pause there.

3         So in columns, for example, DF and DH, what are those

4    columns?

5    A.  Well, DF would be the answers to the question who do they

6    think makes or puts out the product.  And DH would then be the

7    reason that the respondent gave for naming whatever company or

8    brand that they did.

9    Q.  Got it.  So, for example, if you go about halfway down what

10   we see on the screen here, the respondent in row 14 who said

11   adidas to the first question, their verbatim is in column DH?

12   A.  Right.  You see DF they named adidas as the source, and

13   when asked why, they typed in "I saw three stripes."

14   Q.  Nita, let's go back to the deck.

15        So, after you calculated all the test percentages and

16   then you calculated all the control percentages, what do you do

17   with those numbers?

18   A.  So, again, the control rate is the percentage who named

19   adidas for reasons other than the multi-stripe design, and we

20   want to weed that out.  So what you do is you take the test

21   group result, and you subtract away the control group result

22   for that group, and what you're left with is the amount of

23   confusion that has to be caused by the multi-stripe pattern

24   being similar to adidas because you've already subtracted out

25   the rate of naming adidas for any other reasons.

1    Q.  I'd like to walk through each group and just have you

2    explain the math that you did for that group.

3    A.  Sure.  So for this group, you see that 37.3 percent named

4    adidas when asked the questions when they were in the test

5    group who saw the four-stripe clothing.  And that went down to

6    11.3 percent in the control group where the four-stripe pattern

7    had been changed to one stripe.  And what that's showing you is

8    that 11.3 percent are going to name adidas in a way that we

9    would consider noise.  It's not confusion caused by the

10   multi-stripe pattern, but if you subtract that away, you're

11   left with 26 percent, and that is the amount of confusion that

12   has to be attributable to the four-stripe pattern being

13   confusingly similar to adidas's stripes.

14   Q.  **And would you do the same in group 2, please?**

15   A.  Yes, so for group 2, you had 45.3 percent named adidas in

16   the test group and only 6.7 in the control group.  So that

17   results, once you subtract out the control, a net of

18   38.6 percent confusion caused by the multi-stripe pattern.

19   Q.  How about in group 3?

20   A.  38 percent in the test group, and then subtracting away the

21   13.3 percent noise rate in the control group for a net of

22   24.7 percent.

23   Q.  And in group 4?

24   A.  We had 38.7 percent name adidas in the test group, and then

25   when subtracting away the 3.3 percent in the control group, you

1    have a net of 35.4 percent.

2    Q.   Group 5?

3    A.   36.7 percent naming adidas in the test group, and then once

4    you subtract away the 5.3 percent who named adidas in the

5    control group, you have a net of 31.4 percent.

6    Q.   Group 6?

7    A.   50 percent naming adidas in the test group minus the

8    20 percent in the control group leaves you with a net of

9    30 percent caused by the multi-stripe pattern.

10   Q.   Group 7?

11   A.   24.7 percent in the test group, and subtracting away

12   9.3 percent from the control group leaves a net of

13   15.4 percent.

14   Q.   And, finally, the shoe group 8?

15   A.   24.7 percent naming adidas in the test group minus the

16   10.7 percent that named adidas in the control yields a net of

17   14 percent.

18   Q.   And then can you just explain to the jury what this summary

19   table shows?

20   A.   Sure.  This just puts together all of the results we just

21   saw and shows the test, the control result, and the net for

22   each group, and it also combines them in an overall line that

23   shows that across all eight groups, the test group result was

24   36.9 percent naming adidas and across all 8 control groups, it

25   was 10 percent.  So the overall net subtracting away the

1    10 percent is 26.9 percent confusion across all the groups

2    caused specifically by the similarity of the multi-stripe

3    design.

4    Q.  Based on the survey you conducted in this case, did you

5    form an opinion concerning likelihood of confusion?

6    A.  Yes, that there is a significant likelihood of post-sale

7    confusion caused by the similarity of the multi-stripe designs

8    to adidas's stripe trademarks.

9              MR. HENN:  Thank you, Mr. Poret.

10             I pass the witness.

11             MS. SAYOUR:  May I approach with a binder for you?

12   CROSS-EXAMINATION

13   BY MS. SAYOUR:

14   Q.  Good morning, Mr. Poret.

15   A.  Good morning.

16   Q.  My name is Tonia Sayour.  And I don't know if you remember

17   me, but I took your deposition in the case.  And it's nice to

18   see you.

19   A.  Yes, I do.  Nice to see you too.

20   Q.  I'd like to start off by going over your representations of

21   adidas.  This isn't the first time you're representing adidas,

22   is it?

23   A.  No.

24   Q.  You've been a testifying expert for adidas in several other

25   lawsuits.  Is that right?

N15Qadi2                    Poret - Cross

1    A.  Yes.

2    Q.  About maybe five different lawsuits including this one.  Is

3    that accurate?

4    A.  I don't know -- that's probably close.  I can think of

5    three others.

6    Q.  So maybe eight total.  Is that right?

7    A.  I don't know if that's right.  I was saying I could think

8    of three others besides this one.

9    Q.  Okay.  So four total?

10   A.  Something in that ballpark, four or five.

11   Q.  But you haven't only been a testifying expert for adidas,

12   correct?

13   A.  Correct, in that I've done other surveys for adidas that

14   were not part of any testimony that I gave.

15   Q.  You've been hired by adidas in context outside of

16   litigation, right?

17   A.  Yes.

18   Q.  What we would call a consulting expert.  Is that fair?

19   A.  Yes.

20   Q.  In addition to being a testifying expert, you have also

21   been a consulting expert for adidas, right?

22   A.  Yes.

23   Q.  So over the years you've worked for adidas many times.

24   Would that be accurate?

25   A.  Yes.

N15Qadi2                    Poret - Cross

1   Q.  I just want to go over a few points to make clear for the

2   jury what you did and didn't do in these surveys.  Is it fair

3   to say that you only conducted a post-sale confusion survey for

4   this case?

5   A.  Yes.

6   Q.  And there are three kinds of confusion, right?  We have

7   initial interest confusion, point-of-sale confusion and

8   post-sale confusion, correct?

9   A.  It is correct that those are three types of confusion I've

10  heard of.

11  Q.  And you're not offering any opinions on initial interest

12  confusion, right?

13  A.  Well, my survey was about post-sale confusion.  It's pretty

14  similar to initial interest confusion in terms of what you're

15  showing, things like where you can't see a visible hang tag or

16  label so there are similarities between those, but the survey

17  was specifically about post-sale confusion.

18          MS. SAYOUR:  Your Honor, I would move to strike that

19  answer in view of the fact that he did not opine on initial

20  interest confusion.

21          THE COURT:  Hold on.

22          Sustained.

23          Your opinions are about post-sale confusion.  Yes?

24          THE WITNESS:  Yes.

25          THE COURT:  Go ahead.

1  BY MS. SAYOUR:

2  Q.  You are not offering any opinions on point-of-sale

3  confusion, right?

4  A.  Right.

5  Q.  And you know that point-of-sale confusion is not being

6  claimed in this case, correct?

7  A.  Yes, that's my understanding.

8  Q.  Now, when we talk about the post-sale environment, would

9  you agree with me that that's when someone sees the products in

10  the real world after they've been purchased?

11  A.  Yes.

12  Q.  So someone walking outside the street of the courthouse,

13  that would be the post-sale environment, wearing the Thom

14  Browne clothes?

15  A.  Sure, that could be an example.

16  Q.  And is another example the products being displayed on

17  social media, right?

18  A.  Yes, that could be an example.

19  Q.  So when we talk about the post-sale environment for the

20  purposes of your report, we're talking about the real world,

21  right, after a sale, or in a social media post?

22  A.  Yes.  I mean, obviously there are countless ways in which

23  things can appear in post sale with people wearing things in

24  the real world or posting pictures, so --

25  Q.  But those are the two ways you identified in your report,

1  correct?

2  A.  It's correct that, yes, seeing people wearing clothing and

3  seeing images in social media are two of the pretty common ways

4  that people can come across images.

5  Q.  Would it be fair to say that in designing a post-sale

6  confusion survey, you would want to get as close to the real

7  world as possible, right?

8  A.  Yes, with the understanding that the real world is very

9  varied, so you're not going to be able to simulate everything

10  about the real world, so, you know, which is why I tried to

11  have an assortment of a number of different scenarios.

12  Q.  And that's because you want to be as realistic as possible.

13  Is that right?

14  A.  Yes.  You want to be as realistic as possible in terms of

15  giving a fair and accurate view of the clothing.  You don't

16  need to be realistic in terms of whatever random things people

17  might be seeing in the background of life.

18  Q.  Now, you showed the jury different photographs that you've

19  used in the first seven groups of the different apparel, right?

20  A.  Yeah.

21  Q.  I believe that was PX-552.  If we can bring that up.  Now,

22  the photos in this exhibit have models wearing certain of Thom

23  Browne's accused products in this case, right?

24  A.  Yes.

25  Q.  And those photos were all featured in the survey that you

1    put together, and that was PX-556, correct?

2    A.  I can't say I remember the exhibit number, but these are

3    all images that we're looking at that were used in the survey.

4    Q.  Mr. Poret, is it your testimony that the photos shown in

5    each of your eight test groups represent the real world?

6    A.  It's my testimony that they represent a variety of

7    reasonably common and typical scenarios in the real world in

8    the sense that they are giving a fair and realistic look at

9    clothing as it might be seen from various realistic

10   perspectives and angles.  Of course it's not attempting to

11   show, you know, trees and signs and other things that might

12   occur in the background, but it's realistic in terms of what

13   the clothing looks like and how it could be seen.

14   Q.  Now, am I correct in saying that you didn't take the photos

15   that were presented in your survey?

16   A.  It's correct that I was not the photographer.  They were

17   taken with me giving direction as to what they should look

18   like.

19   Q.  All the photos presented in your surveys were provided to

20   you by counsel for adidas, correct?

21   A.  I wouldn't say that.  They were transmitted to me through

22   counsel, but I was the one that gave instructions as to how the

23   items should be photographed, so some -- they did help

24   facilitate the process of getting photographs taken.

25   Q.  So the photographs were taken at your direction.  Is that

1    correct?

2    A.  Yes.

3    Q.  Now, correct me if I'm wrong, but you testified that you

4    chose multiple views of the different items of apparel at least

5    in the first seven tests, right?

6    A.  Yes.

7    Q.  And I think there were several reasons you did that, and

8    I'd just like to go through them.  You said you wanted it to

9    appear like they looked like they were moving.  Is that

10   accurate?

11   A.  Not to look like they're moving, but to capture different

12   angles that somebody might see if a person was moving.  For

13   instance, you know, you could see somebody on the street

14   wearing items and at one moment not be able to see what's on

15   the right sleeve, you could only see what's on the left sleeve;

16   but by showing multiple views, I'm intending to capture the

17   idea that you know in the real world if somebody's moving or

18   you're moving, you would then have the opportunity to see

19   apparel from some different angles.

20   Q.  You also wanted to show the length and proportion of the

21   stripes, right?

22   A.  Yes.

23   Q.  And you chose multiple views to allow people to view the

24   Grosgrain flag on the back of the garment.  Is that right?

25   A.  Yes.

1    Q.  And you also chose multiple views to allow people to see

2    the four bars on one side of the garment, correct?

3    A.  Yes.

4    Q.  And those are the reasons that you believe these

5    photographs are representative images of the products in a

6    post-sale environment, right?

7    A.  I believe those are most of the reasons that I mentioned.

8    Q.  Mr. Poret, are you familiar with the adidas website?

9    A.  I've been on it.  Not very recently, but generally I'm

10   familiar with it.

11   Q.  The adidas website allows people to purchase clothing,

12   right?

13   A.  I believe so.

14   Q.  If we can pull up PX-88 which is in evidence and has been

15   identified as an adidas website.  Is this an adidas website

16   image?

17   A.  It looks like it.

18   Q.  Would you agree with me that this adidas website represents

19   a point-of-sale environment?

20   A.  Yes, in that the item can be purchased so it's being

21   offered for sale.

22   Q.  The two pages that are up on the screen from the adidas

23   website have multiple images for a piece of clothing, correct?

24   A.  Yes.

25   Q.  In looking at these pages, would you agree with me that

1   adidas displays clothing from multiple perspectives?

2   A.  Certainly in this instance, yes.  That's fairly common for

3   a point-of-sale scenario as well.

4   Q.  You have three images there of a model wearing the adidas

5   hoodie, right?

6   A.  Yes, I see these.

7   Q.  Mike, if you can focus in on the photo on page 2 where the

8   model is standing forward.

9          Would you agree with me that certain images on this

10  website -- certain images like this one on the website show

11  movement?

12  A.  I would agree this image looks like it's showing some

13  movement.  It looks like the person is leaning in forward or

14  something like that.

15  Q.  And is it fair to say that these multiple views also give a

16  sense of the length and proportion of the adidas stripes?

17  A.  Yeah, it certainly gives some sense of that.

18  Q.  Would you agree that this image, these images also show the

19  length of the stripes running up and down the arm?

20  A.  It looks like it to me.  I'm not completely familiar with

21  all aspects of this garment, but certainly these images show

22  that to some extent.

23  Q.  And the images also show the front and back of the garment,

24  correct?

25  A.  Yes.

1    Q.   And one can also see the Badge of Sport logo on the front

2    of the garment, correct?

3    A.   Yes, I can see that in that image.

4    Q.   Now, if we can display one of the images from Mr. Poret's

5    survey, it would be 552, and we can take the first picture on

6    page 7 and put it next to the image from PX-88 at page 1.

7              Would you also agree that the background colors on

8    your photos are nearly identical to the adidas website?

9    A.   I agree they both have white backgrounds.  It's a pretty

10   standard background for a clothing website, but, yes, they're

11   both essentially white.

12   Q.   When you're looking at these two groups side by side, would

13   you agree that adidas has point-of-sale photos that look like

14   your post-sale photos?

15   A.   There are some similarities and some differences.

16   Q.   Mike, if you go back to PX-88, page 1.

17             The adidas website clearly features the Badge of Sport

18   logo on the top left of PX-88?

19   A.   I see that.

20   Q.   And the website also provides the pricing of the product?

21   A.   Yes.

22   Q.   The Run Icon hoodie is on sale for $53?

23   A.   Yes.

24   Q.   And it is true that when on this website, the user knows

25   that he or she is shopping at www.adidas.com?

1    A.  I would think so, yes.

2    Q.  Mr. Poret, rather than use a white studio background for a

3    still image, you could have shown videos of someone walking

4    down the street in a Thom Browne product in your survey,

5    correct?

6    A.  I agree that that also would be a legitimate way to do a

7    survey.  There are multiple ways that you could show items in a

8    realistic way, and I think both ways would have been valid.

9    Q.  I would like to focus specifically on the image you showed

10   in test group 8, which is the shoe.  Mike, if you could pull up

11   556 and go to page 41, please.

12          Mr. Poret, that image is not a post-sale image, is it?

13   A.  It's realistic of a post-sale image in that it's showing

14   the item outside the point of sale.  Of course it doesn't have

15   an actual ankle in it, but that is not really relevant to the

16   issue of confusion, so it is a valid post-sale image.

17   Q.  Well, earlier we talked about all the different reasons why

18   you captured the images that you captured, the multiple images,

19   right?

20   A.  Yes.

21   Q.  And there's only one image for this shoe, right?

22   A.  Yes, because for this item one image was sufficient to

23   convey what the shoe looks like.

24   Q.  So you can't see the shoe from various perspectives here

25   though, can you?

1   A.  No, there's just the one image.

2   Q.  And you're not getting realistic proportion of the stripes

3   on the other side of the shoe, are you?

4   A.  Well, you can't see the other side of the shoe, but I think

5   seeing somebody walking, it's pretty typical that you would be

6   seeing them -- you would be seeing one side of the shoe, so I

7   think it's pretty realistic for a shoe view.

8   Q.  And you're not seeing the back of the shoe?

9   A.  Right.

10  Q.  In the real world, would you just see an image of the shoe

11  out on the street like this?

12  A.  Again, there's a lot of ways in which any item can be seen

13  in the real world, but I think this is a realistic view.

14  Whether or not it has an actual leg in it doesn't really change

15  whether somebody is going to think the shoe is adidas or not.

16  So it is a realistic view as somebody might see a shoe in the

17  real world notwithstanding that you can't actually see a leg.

18  Q.  Do you know where this image came from?

19  A.  I do not recall sitting here right now.

20  Q.  Do you know that this is an image from Thom Browne's

21  website?

22  A.  That seems likely.

23  Q.  Thom Browne's website is a point of sale, right?

24  A.  The website is a point of sale, but that doesn't mean it

25  doesn't have an image that isn't an appropriate specimen for

1    how something would like outside of the point of sale, so by

2    taking it out of the trappings of the website it becomes a

3    realistic view of something past the point of sale.

4    Q.  Can we pull up PX-56, please.  This has been identified by

5    adidas as the list of Grosgrain accused products.  If you can

6    jump to page 8, please, and enlarge the second entry.

7            The photo of this shoe is the photo that Thom Browne

8    was using on its website to offer the product for sale to its

9    customers.  Is that right?

10   A.  Yes, I believe that is correct.

11   Q.  And if we could put that side by side with PX-556 at 41.

12   This is the same image, right?

13   A.  Yes, I believe that's right.  I believe that's where we got

14   the image from the Thom Browne website.

15   Q.  So you used the image from the Thom Browne website in your

16   survey to test for post-sale confusion, correct?

17   A.  Yes, because Thom Browne is showing a realistic view of its

18   own shoe, and by taking it out of the website and showing it on

19   its own without the name Thom Browne, that makes it letting

20   people see the shoe what it would look like post sale as

21   opposed to what else you see on the website.

22   Q.  Is it your testimony that it is a realistic view when it is

23   not on a person's foot?

24   A.  It's realistic in terms of what the item looks like and

25   what the stripes look like and what the color looks like, so,

1   again, the question that we're testing is whether somebody is

2   likely to think this is an adidas shoe.  Whether or not it has

3   an ankle in the shoe does not affect whether somebody is going

4   to think it's an adidas shoe.  So it is realistic.

5              THE COURT:  Counsel, find a spot in the next few

6   minutes to give the jury their mid morning break.

7              MS. SAYOUR:  How about now, your Honor?

8              THE COURT:  All right.  So, ladies and gentlemen,

9   we'll take a 15 minute break.

10             (Jury not present)

11             THE COURT:  You could step down.  We'll see you in 15

12  minutes.

13             THE WITNESS:  Thank you, your Honor.

14             THE COURT:  This is not binding, but give me a

15  ballpark.  About how much more you have?

16             MS. SAYOUR:  I would say maybe about 15 more minutes.

17             THE COURT:  Very good.  We'll see you in 15 minutes.

18             (Recess)

19             (In open court; jury present)

20             THE COURT:  Counsel.

21             MS. SAYOUR:  Thank you, your Honor.

22  BY MS. SAYOUR:

23  Q.  Mr. Poret, in designing your surveys, you didn't see the

24  actual Thom Browne products in person, correct?

25  A.  Right, not physically.

N15Qadi2                    Poret - Cross

1    Q.  You just looked at the lists of the accused products,

2    right?

3    A.  Or other images.  I looked at images of the products.

4    Q.  So you looked at the lists of accused products or other

5    images online.  Is that right?

6    A.  Yes.

7    Q.  So you created your post-sale confusion surveys without

8    ever looking at the products in person, right?

9    A.  Yes, I didn't look at them physically.

10   Q.  And you showed the Thom Browne label with the name on it in

11   your images because having the Thom Browne label helps dispel

12   confusion.  Is that right?

13   A.  No, I showed what somebody would see in a typical post-sale

14   situation, which would be the ability to see that there is a

15   tag on the clothing but not be able to read it.  So I did what

16   was realistic for most post-sales situations.

17   Q.  Do you recall previously testifying that it's possible that

18   seeing the name on the tag --

19            THE COURT:  Now you have to -- if you're going to read

20   from prior testimony, you have to give the pages and line

21   numbers so that your adversary can have a chance to take a look

22   at it before it's read.

23            MS. SAYOUR:  Sure, your Honor.

24            If we can go to page 159 of the Poret transcript,

25   lines 5 through 9.

1              MR. HENN:  I feel like his -- your Honor, the whole

2      answer should be visible, not just this portion of the

3      sentence.

4              THE COURT:  Let me see it.  Let me get from my law

5      clerk the hard copy.  Just that page.  Here we go.

6              Okay.  I think the full answer should be read, but it

7      will be allowed.

8              MS. SAYOUR:  That's fine.  Your Honor, may we publish

9      the screen so the jury can see it?

10             THE COURT:  Yes, sure.

11     BY MS. SAYOUR:

12     Q.  Mr. Poret, you recall testifying at your deposition in

13     October 2022?

14     A.  Yes.

15     Q.  And were you asked this question:

16     "Q.  In your opinion, having that tag, could that potentially

17     dispel confusion?"

18     A.  Yes.

19     Q.  And your answer at that time was:

20     "A.  Yes, it's possible.  I mean, seeing a name on a tag could

21     have some effect on somebody's perception of source, but my

22     theory of my survey is that the typical post sale situation

23     would not involve seeing the Thom Browne name and that I've

24     measured that there's a substantial amount of confusion in what

25     is going to be a very typical, mostly representative post sale

1    scenario."

2              Do you recall that testimony?

3    A.  Yes.

4    Q.  I'd like to turn to the social media point.  Is it your

5    testimony that the photographs in your survey are

6    representative of how products are displayed in the social

7    media post-sale environment?

8    A.  It's my testimony that they are representative of how some

9    images are displayed.  Obviously people can post images in

10   countless number of ways, and I don't claim that any survey is

11   testing every single way that an image can be posted, but one

12   way that something can appear in social media posts is an image

13   of somebody wearing clothing with little else.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. SAYOUR:

2    Q.  Now, did you use any images from Thom Browne's social media

3    pages?

4    A.  No.

5    Q.  You could have, right?

6    A.  Well, there may have been images.  It would be useful.

7    When I'm talking about social media, I'm not talking about what

8    Thom Browne posts on its social media account, I'm talking

9    about that there is any number of people that might post a

10   picture that has clothing in it or somebody wearing clothing.

11   Q.  Facebook is a common social media platform, right?

12   A.  Yes.

13   Q.  And Instagram would be another one, correct?

14   A.  Yes.

15   Q.  And on either Facebook or Instagram, you understand that

16   people can insert tags of other people or other accounts,

17   right?

18   A.  Yes.

19   Q.  And would you agree with me that that is something that is

20   commonly done?

21   A.  I don't know how to quantify how common it is, but sure,

22   it's common enough that people hashtag things or put various

23   things as part of social media posts.

24        MS. SAYOUR:  If we can pull up PX 191.  We can offer

25   it into evidence because I don't think this is one that is in

1   evidence.

2          MR. HENN:  It's not in evidence, but we have no

3   objection.

4          (Plaintiff's Exhibit 191 received in evidence)

5   BY MS. SAYOUR:

6   Q.  Mr. Poret, is this an example of a Facebook post?

7   A.  Yes.

8   Q.  And this post has a tag on it that says #ThomBrowne.

9          Do you see that?

10  A.  Yes.  It also looks like this is the Thom Browne account

11  posting.

12  Q.  But if this were a Lebron James account and he posted

13  #ThomBrowne, there would be a hashtag on that page, correct?

14         MR. HENN:  Objection.

15         THE COURT:  Sustained.

16  Q.  Would you agree with me that a tag of #ThomBrowne would

17  help people understand that the person is wearing Thom Browne?

18         MR. HENN:  Objection.

19  A.  It might or --

20         THE COURT:  You need to wait until I rule.

21         THE WITNESS:  I'm sorry.

22         THE COURT:  No, I'll allow it.

23         You may answer.

24  A.  It might or it might not.

25  Q.  Well, like the Thom Browne label on the clothing, which

1  could have an effect on someone's perception of source, you

2  don't know one way or the other whether having a Facebook tag

3  could also affect someone's perception of source?

4  A.  No.  I agree with you it's possible that -- it's possible

5  that putting a name on something could affect somebody's

6  perception of source.

7  Q.  You didn't feature any tags in the images of your survey,

8  correct?

9  A.  I did not.  I was testing images like the ones I test in my

10 survey which do not show the name Thom Browne, as that is a

11 very common typical post-sale way to encounter things, as would

12 help seeing anybody announcing the name of the product.

13 Q.  Would you also agree with me that the photographs from your

14 survey don't look like this image from Facebook?

15 A.  Yes.  I agree that you've picked out one that is not

16 typical, and I agree that my survey is not intending to test

17 something like this, which is the actual Thom Browne account,

18 or in this case Lebron James.

19 Q.  We can take that down.  Thank you.  I would like to talk a

20 bit about the accused products.

21        Now, you didn't opine on post-sale confusion for every

22 single Thom Browne product, is that right?

23 A.  Yes, that's right.

24 Q.  I believe you testified you took representative samples,

25 right?

1    A.   I testified that I attempted to do a number of products to

2    get a sense of the results across a variety of products and

3    other -- whatever other products are comparable.

4    Q.   But those representative products, they were limited to the

5    four-bar signature on certain kinds of apparel, right?

6    A.   Yes.  They were certain -- the examples of the types of

7    apparel tested in the survey.

8    Q.   You didn't offer an opinion on likelihood of confusion for

9    Thom Browne's footwear that features the four-bar signature,

10   correct?

11   A.   I -- I'm not offering individual opinions for every single

12   item.  I'm testing types of uses across the items and whatever

13   else the jury would find comparable to it.

14   Q.   If we can pull up PX 55, which is the list of four-stripe

15   accused products in this case.

16            You're familiar with this exhibit, right?

17   A.   Yes.

18   Q.   If we jump to page 54, you are aware that the shoes on this

19   page with the four-bar signature are listed as accused

20   products, correct?

21   A.   Yes.

22   Q.   You didn't test these shoes, did you?

23   A.   I did not test those ones you're showing now.

24   Q.   And if my math is correct -- thank you, you can take that

25   down.

1              If my math is correct, there are 136 different accused

2    products with the four-bar signature in PTX 55 and you tested

3    eight of them, right?

4    A.  Yes, I don't -- I don't know if 136 is the number, but if

5    you counted that, I have no reason to doubt that.

6    Q.  You didn't test polo shirts, did you?

7    A.  No.

8    Q.  You can pull back up PTX 55 and turn to page 37.

9              You didn't test the polo shirt shown there with the

10   four-bar signature on the collar, correct?

11   A.  Correct.

12   Q.  It's listed as an accused product, right?

13   A.  Right.

14   Q.  You also didn't test any cashmere accused products,

15   correct?

16   A.  Correct.

17   Q.  We turn to page 19 of this exhibit.

18             You didn't test the brown cashmere hoodie with the

19   four-bar signature on this page?

20   A.  Correct.

21   Q.  And if we flip to page 20.

22             You also didn't test the cashmere sweatpants with the

23   four-bar signature, correct?

24   A.  Correct.

25   Q.  Sitting here today, you can't particularly testify as to

1    how your survey applies to every single individual item out of

2    the 130-plus items, is that right?

3    A.  I would agree with that.  I can't testify how it applies to

4    each -- every single one of those items.  We would have to be

5    evaluated which items are comparable.

6    Q.  If we talk about the Grosgrain signature products, you

7    didn't offer an opinion on likelihood of confusion for any of

8    Thom Browne's apparel, right?

9    A.  Right.  It was only -- it was the running shoe that had the

10   Grosgrain pattern that I tested.

11   Q.  It was just the running shoe.  So can we pull up PTX 56,

12   please.

13          And this is, again, the list of Grosgrain signature

14   accused products, right, in this lawsuit?

15   A.  Yes.

16   Q.  There are 21 -- if my math is correct, there are 21

17   different accused Grosgrain signature products, is that right?

18   A.  Again, I have no reason to doubt that's the number.

19          MS. SAYOUR:  Mike, if you can just kindly scroll

20   through each page for us.

21   Q.  A pair of pants, shorts, polo shirts, sweatshirts,

22   sweatpants, and shoes.

23          So we have pants, polo shirts, sweatshirts, shorts,

24   and shoes and you only tested the shoes, right?

25   A.  Yes.

1    Q.  And your total net confusion number, that 26.9 percent

2    number that we saw during your testimony, that number is a

3    combination of both the four-bar apparel that you tested and

4    the Grosgrain shoes, correct?

5    A.  Yes, that includes both.

6    Q.  So the two types of products are mixed into that number?

7    A.  In that number, yes.

8    Q.  Now, you testified that you've been involved in lots of

9    trademark cases, correct?

10   A.  Yes.

11   Q.  Over 300, is that accurate?

12   A.  I certainly have done over 300 surveys.  Yes, I would

13   imagine I've been involved in at least that many.

14   Q.  Given your experience, you understand what a fame survey

15   is, right?

16   A.  Yes.

17   Q.  Is that another kind of survey that is used to show that a

18   mark is widely known among the general consuming public?

19   A.  Yes.

20   Q.  And given your many cases, you've conducted surveys on

21   whether marks are famous, right?

22   A.  Yes, I have.

23   Q.  Is it fair to say that you didn't do a survey here on the

24   fame of the Three-Stripe Mark?

25   A.  Yes, you're correct.  I did not.

1    Q.  And if we look at the universe of people for your survey, I

2    think you had those people who purchased sweatshirts, sweat

3    jackets, compression tights, and compression T-shirts running

4    tights and running shoes in the past 12 months, right?

5    A.  Yes, or likely to purchase those in the next 12 months.

6    Q.  Correct.  So the second part of that are people that are

7    likely to purchase those goods in the next 12 months, correct?

8    A.  Yes.

9    Q.  But you don't know the split between the two, right?

10   A.  It's in the data that we looked at before.  I don't know it

11   off the top of my head sitting here right now.

12   Q.  You don't know how many people would be likely to purchase

13   in the next 12 months, for example?

14   A.  I believe it was the vast majority who would be likely to

15   purchase in the next 12 months, but I don't have that number in

16   front of me.

17   Q.  You didn't include any questions in your survey about

18   whether respondents had any opinion about the quality of the

19   products after they observed them, right?

20   A.  That's correct.

21   Q.  And if respondents were able to see the actual products

22   instead of the staged photos, might that affect their response?

23            MR. HENN:  Objection.

24   A.  It depends --

25            THE COURT:  What's the objection?

1          MR. HENN:  Objection, your Honor.  Speculation.

2     Outside the scope.

3          THE COURT:  Sustained.

4     BY MS. SAYOUR:

5     Q.  You didn't ask respondents whether seeing the products

6     would make them more or less likely to buy an adidas product,

7     did you?

8     A.  You're correct.  That question was not part of the survey.

9     Q.  And you didn't ask them whether seeing the products made

10    them think less highly of adidas, right?

11    A.  Right.

12    Q.  And so nothing in your survey indicates that adidas would

13    lose sales of its products to Thom Browne, correct?

14    A.  I don't know the answer to that one way or the other.  That

15    wasn't the intent of the survey, but I can't speak to that.

16         MS. SAYOUR:  Thank you, Mr. Poret.

17         I have no further questions.

18         THE COURT:  Redirect.

19    REDIRECT EXAMINATION

20    BY MR. HENN:

21    Q.  Mr. Poret, why did you choose to have a white background

22    for your photos instead of having trees and birds and fire

23    plugs and benches?

24    A.  It's pretty standard to have a white background just to

25    have the clothing be easier to see, and it's fair to Thom

1    Browne in this case to make sure people actually have a clear

2    view of it.  Meaning the real world, where there is other

3    distractions and other things, it's even more likely somebody

4    would be confused.

5           So it's really the fairest thing to do to show

6    something on a white background, and also that's one of the

7    things that a control group is there for.  The control group is

8    also seeing something on a white background, so even if there

9    was any reason that somebody might name adidas just because

10   something was on a white background, that also would occur in a

11   control group and be subtracted out.

12          So whatever the background is has no scientific affect

13   on the net result when you compare the test in a control group.

14   Q.  You were asked whether you tested a cashmere hoodie and a

15   cashmere sweat pant.

16          Remember that line of questioning?

17   A.  Yes.

18   Q.  You did test a hoodie?

19   A.  Yes.

20   Q.  And you did test a sweat pant?

21   A.  Yes.

22   Q.  In your experience, designing post-sale confusion surveys,

23   can you characterize the likelihood of someone in a post-sale

24   environment walking over and feeling the fabric or asking what

25   it's made of?

1   A.   I mean, the typical assumption for a post-sale analysis is

2   that people are seeing things from distances or angles or in

3   motion, and the typical assumption is you're not really getting

4   so up close to what's likely a stranger to touch or really

5   experience the fabric.

6            MR. HENN:  Thank you, Mr. Poret.

7            Nothing further, your Honor.

8            THE COURT:  Anything else?

9            MS. SAYOUR:  Nothing further.

10           THE COURT:  Thank you very much.  You may step down.

11           THE WITNESS:  Thank you, your Honor.

12           (Witness excused)

13           THE COURT:  Please call your next witness.

14           MR. HENN:  Your Honor, we call Tom Kahl, and we have

15  some agreed admitted exhibits for him.

16           149, 150 and 151.

17           (Plaintiff's Exhibits 149, 150 and 151 received in

18  evidence)

19           THE COURT:  All right.

20           THE DEPUTY CLERK:  Please take the witness stand.

21  Remain standing.

22   TOM KAHL,

23       called as a witness by the Plaintiffs,

24       having been duly sworn, testified as follows:

25           Please be seated.

1             THE WITNESS:  Thank you.

2             THE DEPUTY CLERK:  State your name and spell it slowly

3     for the record.

4             THE WITNESS:  Sure.  Hi.  My name is Tom Kahl.  Last

5     name is spelled K-a-h-l.

6             THE COURT:  Counsel.

7     DIRECT EXAMINATION

8     BY MR. FLEMMING:

9     Q.  Mr. Kahl, why don't you start by just telling the jury a

10    little bit about yourself?

11    A.  I'm a resident of Portland, Oregon.  I have lived there for

12    nearly 20 years now, and for almost the past ten years now,

13    I've been working for adidas.  It's been a few years since I've

14    been in New York, so nice to be back again.

15    Q.  What's your job title at adidas?

16    A.  I'm the senior finance manager for our performance sports

17    business units.

18    Q.  What do you do as senior finance manager at adidas?

19    A.  So I support the leaders of our sport performance business

20    units.  Paul Bowyer earlier today, Paul Bowyer is an example of

21    a unit business leader.  I am their go-to person for finance

22    questions for reporting, scenario planning.  The BUs that I

23    support in particular right now are running, soccer, U.S.

24    sports, and special sports.

25    Q.  You said BUs.  What does that stand for?

1  A.  I'm sorry.  Business units.  A business unit is responsible

2  for creating and bringing products to the marketplace.

3  Q.  Are you familiar in your position with adidas' financial

4  data and how that is tracked?

5  A.  Yes, I'm very familiar with it.  As I mentioned, I produce

6  many sales reports, so very familiar with being able to extract

7  and package that data.

8  Q.  Since this case is about apparel and footwear, I would like

9  to talk to you about some financial data related to those

10  categories.

11          But first, how does adidas track its sales of apparel

12  and footwear?

13  A.  Right.  So all of the apparel and footwear that adidas

14  sells, when those sales transactions happen, the data flows

15  through what we call SAP.  It's an enterprise resource system.

16  Many large companies utilize SAP.  So adidas is just, you know,

17  one that uses that system.

18  Q.  Does each product have its own specific code that you can

19  use to track sales?

20  A.  Yes.  So every product, all the footwear and apparel is

21  assigned what we call an article number.  It's an alphanumeric

22  code, B12345.  So the shoe or whatever piece of apparel,

23  everything would have an individual code.

24  Q.  Is that similar to a SKU or S-K-U?

25  A.  Yes, that would be synonymous with that.  If you've heard

1    SKU or Stock Keeping Unit for something else, I mean, at adidas

2    it's just called an article number.

3    Q.  If you're looking at adidas' article level sales records,

4    how far back are you able to go if you look today?

5    A.  If I were to access our reporting system today, I could

6    pull data going back to 2014.  But I know we have some

7    historical reports that we pulled together, so we can go back a

8    little further than that.  I think we have reports that go back

9    to 2012.

10   Q.  Those symptoms that track those sales, how accurate are

11   your -- is the data in those symptoms?

12   A.  Very accurate.  Everything -- all the data in the system,

13   because we're a public company and we have to report on that

14   and produce annual reports, everything gets audited.  So I know

15   our most recent annual report was audited by KPMG, so I have

16   great confidence in the data that we're pulling.

17   Q.  Is KPMG an accounting firm?

18   A.  Yes.

19   Q.  Mr. Kahl, I think you remember my colleague, Nita Gray,

20   seated right here next to Ms. Vanderhoff.  She is going to be

21   helping us with some exhibits.  We're going to look at four of

22   them today.

23   A.  OK.

24            MR. FLEMMING:  Nita, can you bring up Exhibit 149,

25   please.

1    Q.  Mr. Kahl, what is the spreadsheet that we're looking at

2    here?

3    A.  This is a spreadsheet that shows sales.  In this case it's

4    filtered to show net sales by footwear and apparel articles --

5    excuse me.  In this case it's filtered just to show apparel

6    sales by year for these apparel article.

7    Q.  Where did the data in this spreadsheet come from?

8    A.  So I mentioned earlier all of the sales transaction data

9    sits within SAP.  I would -- a metaphor I would use for this,

10   right, would be if you go to a restaurant, there is all sorts

11   of things they can make.  But if you want to have something

12   specific off of the menu, I place my order with the server.

13         The server in my case is a reporting system called

14   MicroStrategy.  I use it to write a query.  In this case, I

15   would say show me all the apparel and all the footwear, give me

16   the net sales for those by year from 2014 through 2020.  And

17   then I run that query and I can pull the data out and put it

18   into an Excel file like you see here.

19   Q.  I would like for everyone to know how we can actually use

20   and manipulate the spreadsheet.

21         Can you explain to us what the three boxes are there

22   at the top?

23   A.  Sure.  So in Excel, they have a feature called a slicer.

24   A slicer is just a filter that shows you all of the available

25   data, and then if you wanted to see just certain pieces of

1    data, in this case we have clicked on it to show apparel and

2    we've clicked on it to show net sales.  It will filter all the

3    background data and put it into this table so you just view

4    what it is that you have picked in those slicer filters.

5    Q.  Let's look at the metrics box.

6           What's the difference between invoice sales and net

7    sales?

8    A.  Right.  So invoice sales and net sales, all you need to

9    think about there is it just shows you what the final price is

10   that a retailer has paid adidas for an article.  So a net price

11   includes all of the discounts and allowances that we have given

12   on that item.  So when you multiply the number of units you've

13   sold by that net price, that gives you your net sales.  The net

14   sales is the bottom-line sales metric that we report when we

15   report our data.  If you look in the annual report, you would

16   see net sales.

17          MR. FLEMMING:  Nita, can you zoom out just a little

18   bit so we can have all of the columns on our screen.  I think

19   there is two more maybe.

20   Q.  Mr. Kahl, can you please just describe briefly what the

21   different columns are, so columns A, B, and then C through J?

22   A.  Sure, sure.  Just for reference, if you have never used a

23   spreadsheet, columns and spreadsheets all have letters above

24   them and rows.  All are assigned numbers.

25          So what you're looking at here, if I, in a sense, cell

1   A15 -- kind of like we were playing Battleship -- you can see

2   the article, and that just tells you that's the column where

3   all the article numbers are.  And then B15 would be the name of

4   the product, so the model name.  And then in column C through J

5   in row 15, that's the years.  And then you've got a total, the

6   sum total, of all those years in column K15.

7   Q.  Mr. Kahl, does this spreadsheet tell you where the

8   Three-Stripe Mark appears on the particular product?

9   A.  No.  So our systems do not -- there's no attribute in our

10  systems that show you where a Three-Stripe Mark appears.

11  Q.  How could you figure out where the Three-Stripe Mark

12  appears on these particular products?

13  A.  Well, again, it won't tell me by looking at this.  It won't

14  tell me where it appears.  I can always cross-reference the

15  article number that I see in here against sales catalogs that

16  would have images or product, or if I go to our website and go

17  to *adidas.com*, I can cross-reference an article number there

18  and see an image, and then quickly discern where the stripes

19  are on the product.

20          MR. FLEMMING:  Nita, can you please highlight rows six

21  through 25, so just those first ten products.

22  Q.  Mr. Kahl, are you personally familiar with the first ten

23  products that we've just highlighted here?

24  A.  I am familiar with them.  As I mentioned earlier, I work

25  directly with the soccer business unit.  And the first -- the

1   first nine articles that are on there are all soccer product,

2   the Tiro products.

3   Q.  And where does the Three-Stripe Mark appear on these first

4   ten products?

5   A.  Yeah.  So Tiro products have the three stripes running, you

6   know, down the side of the pants.  If it's a jacket, they would

7   have it, you know, running down the sleeves of the jacket.

8   Q.  Can you tell us how to calculate the total sales of just

9   those first ten products from 2014 through 2021?

10  A.  So as I mentioned earlier, column K is the sum total of

11  years 2014 to 2021.  So if you were to add up those totals

12  there, you would be somewhere north of $300 million over the

13  course of 2014 to 2021 just from those ten articles.

14  Q.  So the numbers in rows C through K, those are dollars?

15  A.  Correct, those are dollars.  Net sales dollars.

16          MR. FLEMMING:  Let's bring back up Exhibit 99, which

17  the jury saw yesterday, and let's just look at the first page.

18  Q.  Mr. Kahl, what are we looking at here?

19  A.  So this is a screenshot from the *adidas.com* website.

20  Q.  So earlier you were mentioning that we can use adidas'

21  website and the spreadsheet we were just looking at to

22  calculate sales of specific products.

23          MR. FLEMMING:  Let's scroll down a little bit, please.

24  Keep going.  Zoom in on the text under BB track top.

25  Q.  Mr. Kahl, how could you use this information to calculate

1   sales of this three-stripe track top?

2   A.  OK.  So under the basketball track top name there is a

3   series of bullet points, and the second bullet point there says

4   product code.  You remember earlier I talked about an

5   alphanumeric article number.  That is what you see here,

6   BR2296.

7           If I were to take that article number and then go back

8   to the spreadsheet that we were looking at, I could search for

9   that article number and it will pull up the article, and then I

10  would be able to see the sales history for the article.

11          MR. FLEMMING:  Nita, can we just very quickly do that

12  exercise.

13          Let's go back to Exhibit 149 so we can show the jury

14  and then can you search for BR2296.

15  Q.  Please help us out.

16  A.  You're having -- everyone is going to learn a little Excel

17  here.  Ready?

18          If we go up above row one and to the left of column

19  A., if you click on that little flag with the box, it will

20  highlight the whole sheet.  If you hit control F, now you can

21  search for that.

22  Q.  Is it a very large spreadsheet.

23  A.  There's a lot of data.

24  Q.  Can you remind us about how many products adidas' releases

25  every year?

1    A.  So there is thousands and thousands of articles.

2              MR. FLEMMING:  OK.  I think we're there, Nita.  It is

3    showing us row 9600 at the bottom.  Can we just look at the --

4    Q.  Mr. Kahl, what is the grand total for just that track top

5    BR2296?

6    A.  It is not highlighted.  I'm looking at row 9600 and you can

7    see the basketball track top name and the article number, and

8    the total in column K shows that, over the course of 2017

9    through 2019, we sold $194,387 worth of that article.

10   Q.  I would like to show you another spreadsheet.

11             MR. FLEMMING:  Nita, can you bring up Exhibit 150,

12   please.  Can we also zoom out so we can see everything that's

13   on the sheet.

14   Q.  Mr. Kahl, what are we looking at here?

15   A.  So this is a similar spreadsheet in that it is filtered to

16   show us apparel, net sales.  The only difference here is if you

17   look at that second slicer in the years, the years are

18   different than what we saw before.

19             So in this case, it goes back to 2012, and instead of

20   ending with full year 2021, it goes through the first quarter

21   of 2019.

22   Q.  Just so we don't have to go through that whole exercise

23   again, if we did that exercise for the same product, would that

24   be giving us the same exact grand total?

25   A.  It should be very close to what we saw before.  I mean, of

1    course, we don't have all of 2019, so we don't have Q2 through

2    Q4.  We don't have 2020.  We don't have 2021.  So it's going to

3    be a little bit different than what we saw before.

4    Q.  If there are any discrepancies between a year like 2016

5    between both spreadsheets, like a small discrepancy, how would

6    you explain that?

7    A.  So how I would explain it, we're a European company.  We

8    report our net sales in euros.  When you look at U.S. dollars,

9    the euros have to be converted back.  And, of course, the

10   exchange rate for the dollar and euro can change year to year.

11   Now is a good time to visit Europe.

12          At any rate, if you were to look at, you know, running

13   a report right now versus running a report maybe a year or two

14   ago, the exchange rate could be a little bit different, so the

15   dollars might be slightly different.

16   Q.  Let's bring up one more exhibit, Mr. Kahl.

17          MR. FLEMMING:  Nita, can you show us 151.

18   Q.  Mr. Kahl, what are we looking at here?

19   A.  So what this file shows me, if I look at the column there

20   on the far left, it shows me our net sales in U.S. dollars,

21   again, for footwear and apparel.  And then the sum total of

22   those is our total U.S. net sales.

23          If I go across the columns at the top, I see it

24   reports those for 2012 through 2021, and then sums it up in the

25   column on the far right.

1    Q.  Is this a summary of data from the last two spreadsheets we

2    looked at?

3    A.  So because this doesn't tell me that it's specifically U.S.

4    wholesale, it could also represent our retail and e-commerce

5    business, the business we do directly with consumers and not

6    with wholesalers.  That would be my takeaway, is that it's the

7    business in total.  So in that respect, different than the past

8    two spreadsheets which were just the wholesale business.

9    Q.  If we tally the past two spreadsheets, would there be any

10   double-counting for years that are represented in those

11   spreadsheets?

12   A.  No.

13   Q.  And can you just tell us adidas' total U.S. sales for the

14   footwear category from 2012 through 2021?

15   A.  Right.  So if I look in the far right column, first row,

16   footwear, I see that the total from 2012 through 2021 is almost

17   $20 billion, $19.9 billion.

18   Q.  And what about for apparel?

19   A.  So this would be the next row down.

20         The total was $11.3 billion.

21   Q.  And what's the total of those two numbers?

22   A.  So the sum of the two is over $31 billion.

23         MR. FLEMMING:  Thank you, Mr. Kahl.

24         I'll pass the witness.

25         THE COURT:  Cross-examination.

1    CROSS-EXAMINATION

2    BY MR. CONLEY:

3    Q.  Good afternoon, Mr. Kahl.

4    A.  Good afternoon.

5    Q.  I would actually like to pick up right where you left off.

6    If we can pull up PX 151.

7          Now, I believe you just testified -- stop me if this

8    is wrong -- that includes data that was not in the two

9    spreadsheets that you just showed?

10   A.  So what I testified --

11   Q.  Yes or no first?

12   A.  Yes.

13   Q.  OK.  Did you show the jury that other data, sales data

14   that's not shown in PX 151?

15   A.  No, I did not.

16   Q.  Do you know the difference between the numerical difference

17   between the financials in PX 51 and the sum of the two

18   spreadsheets?

19   A.  Not from memory, no.

20   Q.  If we could actually pull up PX 50.  Or PX 150, I'm sorry.

21   The spreadsheet.

22          OK.  Just to confirm, this sales spreadsheet only

23   includes data from 2012 through Q1 2019, correct?

24   A.  Yes.

25   Q.  So no sales data prior to 2012?

1    A.  That's correct.

2    Q.  If we could pull up PX 149.

3            Similarly, PX 149 includes sales data from 2014

4    through 2021, correct?

5    A.  That's correct.

6    Q.  No sales data prior to 2014, is that right?

7    A.  Correct.

8    Q.  Now, the spreadsheets that we've been looking at, PX 149

9    and PX 150, I believe you testified they include sales of

10   thousands of items of adidas apparel, correct?

11   A.  That's correct.

12   Q.  And footwear as well?

13   A.  Yes.  That's correct.

14   Q.  And I believe you testified that, at least in your

15   reporting system, there is no way to separate out sales of

16   products by how the stripes may be featured on those products?

17   A.  That's correct.  There is not an attribute that shows you

18   how stripes are featured on a product.  You're right.

19   Q.  Right.  There is no attribute to tell you whether the

20   stripes are vertical versus horizontal?

21   A.  That's correct.

22   Q.  Similarly, is there an attribute that could tell you

23   whether an item featured the Trefoil logo versus the Badge of

24   Sport?

25   A.  No, there's not an attribute.

1    Q.  Now to be sure, the sales spreadsheets include products

2    that don't feature stripes running down sleeves or pant legs,

3    correct?

4    A.  There's no attribute that shows me where the stripes are.

5    Because we have thousands of articles in there, I would say

6    that would be correct.

7    Q.  Just to be sure, if we could look at PX 8 which has been

8    admitted.

9            This is one of the adidas catalogs, correct?

10   A.  Yes, it appears to be an adidas catalog.

11   Q.  If we look at page 124.

12           If we focus on the T-shirts on the top there, we don't

13   see any stripes running down those sleeves or across those

14   sleeves, correct?

15   A.  I don't see any stripes running down the sleeves or across

16   the sleeves.

17   Q.  But we do see article numbers or SKUs, correct?

18   A.  Yes.

19   Q.  And those T-shirts would be in your spreadsheet, correct?

20   A.  If they are part of the catalog that you showed me, it says

21   2004 on the cover.  The spreadsheets did not go back that far,

22   so unless those are articles that were carried forward year

23   after year after year, then, you know, then they would be in

24   there.  Then if they are not, if they haven't been carried

25   forward and just in 2004 and not after that, I would not expect

1   to see it in the spreadsheet.

2   Q.  Fair enough.

3        The exhibit was a compilation of catalogs, but why

4   don't we be sure and look at the spreadsheet.  If we can pull

5   up PX 149, and if we look for the article number there, which

6   is M69230.

7        So just to confirm, the T-shirt that we're looking at

8   in PX 8 is, in fact, in your spreadsheets, correct?

9   A.  Yes, I see it.

10  Q.  Now if we continue on page 129 of PX 8, if we focus on the

11  leggings on the bottom half of the screen, again, there is no

12  three stripes running down the sides or horizontally around the

13  legs that we see there, correct?

14  A.  I can't tell on this one because there may be black stripes

15  against a black background.  I mean, it's a little grainy.

16  Q.  Do you think there could be black stripes against a black

17  background?

18  A.  It's conceivable, yes.  I've seen designs like that before.

19  Q.  Sure.  Why don't we pick an even clearer example, though.

20  At least to me that looks like a white front and black back.

21       We can move to page 140.  If we focus on those

22  T-shirts on the top, again, we don't see any vertical stripes

23  running down those sleeves?

24  A.  I do not.

25  Q.  And those T-shirts would be in your spreadsheet, correct?

1    A.  We would have to look.  I don't know the year of the

2    catalog.

3    Q.  Sure.  Why don't we take a look.  We can focus on the first

4    article number, which is S19219.

5              We see it there on your spreadsheet?

6    A.  Yes, I do.

7    Q.  Just take a look at a couple more examples.

8              If we move to page 144 of PX 8 and focus on the

9    Trefoil leggings on the bottom of the screen.

10             Sir, you don't see any three stripes running down the

11   sides of those pants?

12   A.  I don't see three stripes running the length of the pant.

13   I do see three stripes within the Trefoil.

14   Q.  Within the Trefoil logo, correct?

15   A.  Yes.

16   Q.  No stripes separate from the logo, though?

17   A.  I do not see separate stripes in this image.

18   Q.  OK.  And this pair of leggings would also be in your

19   spreadsheet, correct?

20   A.  Again, we would have to look.

21   Q.  Let's do it.  If we can look for M30671.

22             Again, we see these Trefoil leggings reported in your

23   spreadsheet, correct?

24   A.  Yes.

25             MR. FLEMMING:  Objection, foundation.

1              THE COURT:  Overruled.

2              Go ahead.

3    Q.  Mr. Kahl, we've looked at a number of exams of products

4    that don't feature three stripes running vertically or

5    horizontally along the item of the apparel, correct?

6    A.  Yes.

7    Q.  As you testified earlier, if you wanted to know what a

8    product looked like, you could go to the catalog to see it,

9    correct?

10   A.  Catalog would be one source.  I also testified that you

11   could go to our website *adidas.com*.

12   Q.  Right.  Either the catalog or on the website, right?

13   A.  Yes, that's what I said.

14   Q.  If you wanted to see what the article number in your

15   spreadsheet actually looked like, right?

16   A.  Yes, that's what I said, if you looked up the article

17   number and spreadsheet and then cross-referenced a catalog,

18   like we did.

19   Q.  So if someone wanted to try and tally the sales related to

20   apparel that had, say, horizontal stripes around the sleeve or

21   pant legs, they could actually do that, correct?

22   A.  If they wanted to go through thousands of articles, it

23   could be done.

24   Q.  Right.

25              You didn't do that today, right?

1    A.  No.  We're not going to be here that long.

2           MR. CONLEY:  No further questions.

3           THE COURT:  Any redirect?

4           MR. FLEMMING:  Briefly, your Honor.

5           THE COURT:  Go ahead.

6    REDIRECT EXAMINATION

7    BY MR. FLEMMING:

8    Q.  Mr. Kahl, when did you start working for adidas?

9    A.  I started working for adidas in April of 2013, tax day.

10   Q.  And you just looked at a catalog from what year?

11   A.  2004.

12   Q.  Do you have any personal knowledge of whether adidas makes

13   design changes to products that were in 2004 catalogs?

14   A.  No.  I mean, I don't work in a design capacity, so...

15          MR. FLEMMING:  No further questions.

16   A.  It's not something I'm personally familiar with.

17          MR. FLEMMING:  Thank you.

18          No further questions.

19          THE COURT:  Anything else?

20          MR. CONLEY:  Nothing further, your Honor.

21          THE COURT:  Thank you very much.  You may step down.

22          (Witness excused)

23          Please call your next witness.

24          MR. HENN:  Your Honor, next we have testimony from a

25   video deposition, and I can't believe how amazing this is.  The

1   deposition time is 31 minutes and 34 seconds, which means we

2   will finish right at one o'clock.

3           THE COURT:  All right.  If it goes two seconds over, I

4   might allow it.

5           MR. HENN:  Just so the jury can track, we were using

6   deposition numbers in the deposition.  Those now have

7   corresponding plaintiff exhibit numbers.  So if you're tracking

8   that sort of thing, Deposition Exhibit 6 is Plaintiff's

9   Exhibit 174, and Deposition Exhibit 7 is Plaintiff's Exhibit

10  175.

11          The parties have agreed to admit those, your Honor.

12          THE COURT:  All right.  Go ahead.

13          (Plaintiff's Exhibits 174 and 175 received in

14  evidence)

15          I should, before you put it, sometimes witnesses are

16  for one reason or another not available to testify here in

17  person, in which case their depositions can be shown to you,

18  and you should treat that just as if they were here in court.

19  It's the same idea.  They are under oath and so forth.

20          Go ahead.

21          (Video played)

22          MR. HENN:  Your Honor, we need to pause this.

23          We have a monitor that went off the screen.  We are

24  going to back up --

25          THE COURT:  No, we're not, because we need to break

1    for lunch.

2            I think the jury had more than enough to assess her

3    demeanor.  I thought this was going to end by now.

4            MR. HENN:  Well, it's got 46 seconds left.

5            THE COURT:  Let's hear the 46 seconds.

6            That, I'll allow.

7            (Video played)

8            All right.  Ladies and gentlemen, we'll give you your

9    lunch break now.  Since it is three minutes after one, you

10   don't have to be back until three minutes after two.

11           (Jury not present)

12           We'll see you all at three minutes after two.

13           (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

N15Qadi4

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 2:09 p.m. |
| 3 | (Jury not present) |
| 4 | THE COURT:  I've received a note which we've marked as |
| 5 | jury note number 2 from Juror No. 5. |
| 6 | DEPUTY CLERK:  Who is now 4. |
| 7 | THE COURT:  Right. |
| 8 | "Honorable Judge Rakoff:  I am Juror No. 5 in the |
| 9 | trial of adidas America v. Thom Browne.  My mother-in-law |
| 10 | passed away on January 3, 2023.  Her memorial service is |
| 11 | scheduled for Wednesday, January 11, 2023, at 1:30 p.m.  I |
| 12 | would very much like to attend the funeral services and say a |
| 13 | final good-bye.  Please let me know if any accommodations are |
| 14 | possible or if I can be excused from jury duty at this time. |
| 15 | Thank you for your kind consideration.  Signed, Donna Spado." |
| 16 | Now, my own view is that if counsel thinks that we are |
| 17 | moving with sufficient alacrity that we could take a few hours |
| 18 | off to allow her to attend the funeral, it's in Yonkers, so it |
| 19 | might be, in effect, the whole afternoon, but I think that |
| 20 | would be the best solution.  But, of course, you know it's |
| 21 | dependent really on how quickly we move. |
| 22 | So I think what we should say to her now is we will |
| 23 | definitely allow her to go to the funeral, but exactly how |
| 24 | we'll handle it is not yet clear, and so she remains on the |
| 25 | jury. |

1          Any problem with that?

2          MR. HENN:  That's exactly how we would do it, your

3   Honor.

4          MR. MALDONADO:  There is no problem with that, your

5   Honor.

6          THE COURT:  Very good.  So you can convey that to her

7   and bring in the jury.

8          Who is the next witness?

9          MR. HENN:  Mr. Becker.  We should get him on the

10  stand.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Please be seated.  By the way,

3   Juror No. 4, we got your note.  We are going to work it all

4   out, but you made a critical mistake.  You identified yourself

5   as Juror No. 5, whereas now you're Juror No. 4.

6           JUROR:  Yes, I'm was originally 5.

7           MR. HENN:  We call Tom Becker, your Honor.

8    THOMAS BECKER,

9        called as a witness by the Plaintiff,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. HENN:

13          DEPUTY CLERK:  Please be seated.  State your name and

14   spell your last name for the record.

15          THE WITNESS:  First name is Thomas.  Last name is

16   Becker, B-E-C-K-E-R.

17          THE COURT:  Go ahead, counsel.

18          MR. HENN:  Your Honor, to facilitate this examination

19   the parties have agreed to the admission of Plaintiff's

20   Exhibits 175, 258, 259 and 836, as well as Defense Exhibits

21   0060 and 355.

22          THE COURT:  Yes.  I should state for the record where

23   there is this agreement, these exhibits are automatically

24   received, and that includes the ones from before as well.

25          MR. HENN:  Thank you, your Honor.

1              (Plaintiff's Exhibits 175, 258, 259 and 836 received

2      in evidence)

3              (Defendant's Exhibits 0060 and 355 received in

4      evidence)

5      BY MR. HENN:

6      Q.  Mr. Becker, good afternoon.  You were CEO of Thom Browne

7      Inc. between April 2007 and April 2009, correct?

8      A.  That is correct.

9      Q.  In that role you reported directly to Mr. Thom Browne?

10     A.  That's correct.

11     Q.  You were the first CEO that Thom Browne ever hired?

12     A.  To my knowledge, I believe so.

13     Q.  At the time you were CEO of Thom Browne, the company was

14     predominantly selling men's tailored clothing and dress shirts,

15     correct?

16     A.  And wovens, you know, high-end cashmere, as well as shoes.

17     Q.  Sorry?

18     A.  And shoes.

19     Q.  The company was not selling any running shoes at that time?

20     A.  It was not, no.

21     Q.  And no sneakers?

22     A.  No.

23     Q.  At the time you were CEO of Thom Browne, in fact the

24     company did not sell any athletic apparel?

25     A.  Not performance athletic apparel, no.

1    Q.  Sorry.  Could you --

2    A.  No, we did not sell athletic apparel.

3    Q.  At the time Thom Browne didn't even dabble in sportswear

4    either, correct?

5    A.  You mean at athletic apparel?

6    Q.  Yes, sportswear.

7    A.  Yeah.  No.

8    Q.  During the time you were CEO between 2007-2009, there was

9    no strategic discussion about developing a sportswear business,

10   correct?

11   A.  Not that I can recall.  If you mean athletic business, I

12   mean, we had plenty of discussions about diffusing the brand

13   but -- down the road, but not about athletic wear, no.

14   Q.  Is it fair to say that while you were CEO, Thom Browne

15   clothing did not have a sporting feel?

16   A.  I mean, that's a subjective question.  I would say we were

17   not a performance athletic brand.

18   Q.  Do you remember I took your deposition --

19   A.  Yes.

20   Q.  -- earlier this year?

21   A.  Mmm-hmm.

22   Q.  Or, I guess, 2022.  And you told the truth during that

23   deposition?

24           THE COURT:  If it's about sporting feel, you're going

25   to have the same problem we had with the previous witness.

1    It's inherently ambiguous.

2              MR. HENN:  Can I show you the testimony, your Honor,

3    and impeach the witness?

4              THE COURT:  No.

5              MR. HENN:  All right.

6    Q.  At the time you were CEO --

7              THE COURT:  Not unless it relates to something more

8    than sporting feel.

9              MR. HENN:  Those exact words, but --

10             THE COURT:  I know that.  That's the point.  So the

11   fact that someone uses an ambiguous term in a deposition where

12   there was no judge there to say "ambiguous" doesn't mean that

13   the judge who hears it now in court can't say "ambiguous" and I

14   do.

15             MR. HENN:  Fair enough, Judge.

16   Q.  Mr. Becker, at the time you were CEO at Thom Browne, there

17   was just a single retail store of the company here in Tribeca?

18   A.  That's correct.

19   Q.  If we pull up Exhibit 175 at page 2.  Nita, if you will

20   zoom in on the picture, please.  Do you recognize this as a

21   picture of the one store Thom Browne had back when you were

22   CEO?

23   A.  Yeah, I mean -- it looks like this is from before when I

24   was CEO, but it's the same store, yes.

25   Q.  And the jackets we see hanging in the front left of that

N15Qadi4                        Becker - Direct

1    picture, are those examples of the tailored men's clothing that

2    Thom Browne was selling at the time?

3    A.   I mean, yes -- yeah.

4    Q.   Nita, you can take that down.

5         When you were CEO of Thom Browne in May of 2007, you

6    spoke via phone with adidas inhouse lawyer Vanessa Backman,

7    correct?

8    A.   That's correct.

9    Q.   You only had one phone call with Ms. Backman?

10   A.   To the best of my recollection, I believe I only spoke with

11   her once, although I believe I tried to subsequently reach out

12   to her but only one conversation that I can recall clearly.

13   Q.   During the one call in 2007 that you recall clearly,

14   Ms. Backman told you that adidas had seen Thom Browne using

15   three stripes, and that you needed to stop using three stripes,

16   right?

17   A.   Yeah.  She told me that we needed to stop using three

18   stripes.

19   Q.   She also told you that adidas didn't want to have to take

20   legal action against Thom Browne; it just wanted Thom Browne to

21   stop using that design?

22   A.   That is correct.

23   Q.   Ms. Backman never explicitly told you that Thom Browne

24   should change from three to four stripes?

25   A.   Not that I can recall.

1    Q.  And you don't remember her suggesting any alternative

2    number of stripes that would be okay?

3    A.  I don't recall having a discussion about any type of

4    solution, just the problem.

5    Q.  You took notes of that call, correct?

6    A.  I did.

7    Q.  Can we pull up Plaintiff's Exhibit 258.

8            These are your notes regarding that call in 2007 with

9    Ms. Backman, correct?

10   A.  Looks like it, yup.

11   Q.  We see her name in the upper left there, right?

12   A.  That's correct.

13   Q.  And these notes reference "Use up the three stripes."  Do

14   you see that in the third line?

15   A.  I do.

16   Q.  And there's a star that says "images" and that also

17   references three stripes, correct?

18   A.  Yeah, that's what it says.

19   Q.  Your contemporaneous notes of that call make no mention of

20   four stripes, correct?

21   A.  I don't see that on here, no.

22   Q.  And no mention of two stripes?

23   A.  No, just three.

24   Q.  Nita, you can take that down.

25           After you finished your call with Ms. Backman, at some

 1    point later you told Mr. Browne that adidas didn't want him to

 2    use three stripes any more, correct?

 3    A.  Yeah, I think we had -- to the best of my recollection --

 4    again, this was like 15 years ago, so Tom and I talked every

 5    day, we were very close, and so obviously we had lots of things

 6    that we were discussing.  This was definitely something that we

 7    talked about directly.

 8    Q.  And you were not the one that told Mr. Browne to change

 9    from three to four stripes, right?

10    A.  I do not believe that that was the case, no.

11    Q.  In fact, you weren't really involved at all in the decision

12    to go to four stripes?

13    A.  The brand decisions that -- major brand decisions were not

14    under my purview.

15    Q.  Can we pull up Exhibit 259.  Nita, if we could maybe grab

16    the bottom half of the page.

17          These are some other notes from around that time,

18    correct?

19    A.  Yeah, I'm not sure -- I mean, the notebook was from 2007,

20    so it was at some point during 2007.

21    Q.  And there's an open box and a little asterisk and then it

22    reads:  "Adidas put it in writing back to them"?

23    A.  Yep.

24    Q.  You never actually wrote back to Ms. Backman or anyone at

25    adidas, did you?

1   A.  No.  I had no contact information or email contact

2   information for anyone at adidas.  I attempted several times to

3   contact Ms. Backman via phone, but I had no direct email

4   contact to be able to put anything in writing to anyone.

5   Q.  Is it your recollection that there was never anything in

6   writing between adidas and Thom Browne back then?

7   A.  Not that I can recall, no.  Or received via mail or

8   whatever.

9   Q.  It really just boiled down to that one phone call?

10  A.  I believe so.

11  Q.  Nita, you can take that down.

12          Now, at the time you were CEO of Thom Browne, a law

13  firm called Pryor Cashman sent the company a list of all of

14  adidas' Three-Stripe Mark trademark filings.  Do you recall

15  that?

16  A.  Yeah, I recall that.  We discussed this during the

17  deposition.

18  Q.  Can we pull up Plaintiff's Exhibit 836 and go to page 49.

19  Can you zoom just the top third.  Thank you, Nita.

20          Do you recognize this as a May 30, 2007 email from

21  Brad Rose at the Pryor Cashman law firm to you in your role as

22  CEO?

23  A.  I sure do.

24  Q.  And the email states:  "For your information and files, I

25  conducted a rough search of the design marks filed for or owned

1   by adidas.  The rough report is attached.  You will note that

2   adidas owns registrations and applications for a number of

3   three-stripe designs (horizontal, vertical and diagonal) for

4   use on a host of apparel and footwear product.  Just wanted to

5   give you a heads up for your call."

6           Is that correct?

7   A.  That is correct.

8   Q.  If we go back up to page 3, we see the beginning of that

9   lengthy trademark report, do you see that?

10  A.  Yep.

11  Q.  And, Nita, if you'll just scroll through from this page to

12  page 47.  You don't need to zoom in.  Just scroll through the

13  pages.  Thank you, Nita.  You can take that down.

14          Although the law firm sent that collection of

15  trademark registrations, I'm correct that the company never got

16  advice during your time from Pryor Cashman on whether using

17  four stripes would infringe or not infringe adidas's rights?

18  A.  Not that I can recall.

19  Q.  In fact, you never even asked Pryor Cashman for any opinion

20  on whether four stripes would be an infringement?

21  A.  I don't recall whether that question was asked or not.

22  Q.  But to be clear, you never got an opinion in that regard?

23  A.  We didn't get a lot of opinions from Pryor Cashman.

24          MR. HENN:  Thank you, Mr. Becker.

25          I pass the witness.

1               THE COURT:  Cross-examination.

2       CROSS-EXAMINATION

3       BY MR. CONLEY:

4       Q.  Good afternoon, Mr. Becker.

5               Now, we established you were the CEO of Thom Browne

6       for about two years, April 2007 to April 2009?

7       A.  That's correct.

8       Q.  And Mr. Browne personally hired you?

9       A.  He did.

10      Q.  You understood that Mr. Browne's business at that time

11      needed someone to come in and manage the business; it was

12      growing?

13      A.  Yes.

14      Q.  And you reported to Mr. Browne directly, correct?

15      A.  That is correct.

16      Q.  And at the time you were CEO of Thom Browne, you had

17      approximately ten people reporting to you?

18      A.  Yeah, I think the company had -- we had about ten people,

19      something around there.

20      Q.  So about ten people total in the company?

21      A.  Yeah, give or take.

22      Q.  And Mr. Browne drove the design team?

23      A.  That's correct.

24      Q.  And so financed the store in Tribeca at wholesale; that

25      rolled up through you?

A.   That's correct.

Q.   After joining the company, your immediate task was to keep

the business from failing?

A.   That is correct.

Q.   Part of your job was to help find funding for the company?

A.   Yes.

Q.   At the time you joined the company, there were obstacles to

becoming financially stable, correct?

A.   Yes, that's correct.

Q.   And that included significant debt?

A.   Yes.

Q.   Not enough working capital to keep the business running?

A.   Correct.

Q.   You also needed to secure IP assets in the global markets

in which you operated?

A.   That is correct.

Q.   So in 2007 when you were CEO, it was important to you to

resolve any potential dispute with adidas?

A.   It was important to resolve any potential dispute that

would get in the way of a transaction, so yes.

Q.   It would have been critical to resolve that dispute to get

funding?

A.   Absolutely.

Q.   So within about a month or so of starting, you had this

phone call with Ms. Backman at adidas?

1    A.   That's correct.

2    Q.   And you knew at the time she was an inhouse lawyer for

3    adidas?

4    A.   Yeah, I -- she represented herself as representing adidas.

5    Whether she was inhouse or a consultant, I had no idea.

6    Q.   As you discussed on your direct testimony, the nature of

7    your call with Ms. Backman was adidas's concern over Thom

8    Browne's use of three stripes?

9    A.   That is correct.

10   Q.   And her wanting, or her and adidas wanting Thom Browne to

11   stop using the three stripes?

12   A.   Correct.

13   Q.   Now, your recollection is that you didn't need to make the

14   change for your existing inventory or anything that you had in

15   the queue?

16   A.   It's my recollection that we actually discussed that

17   briefly.  I think I mentioned this in my deposition that I

18   recall Vanessa asking something about inventory and explaining

19   to her the calendar of what -- how we did development and the

20   fact that we had inventory in the pipeline and inventory that

21   had already been sold.

22   Q.   So there wouldn't have been any issues with three stripes

23   apparel for products that were made or were in the process of

24   being made?

25   A.   Again, you know, we just -- as far as I can recall, we

discussed that what we had in the queue was okay; just stop

doing it going forward.  That was essentially the nature of the

call that I had with her.

Q.  And that's what Thom Browne agreed to do?

A.  That is subsequently what we did.  We -- I believe the

change was implemented for the spring of 2009 season,

development of which -- because we sold spring and fall.  We

were not a four season business back then.  We were a

collection business that did spring and summer.  So the first

full calendar that we could have affected would have been

spring of 2009 even in 2007.  Because of the way the calendars

work, because of development, we would have sold spring of 2009

in July or August of 2008.  Development would have started in

February or so of 2008, which was, you know, I got a call in

May of '07.  In May of '07 the next market that we would have

had would have been in August, and that line had already been

developed, which would have been fall of '08.  So the first

season that could have been affected would have been spring of

2009.

Q.  And you know that the change was made while you were still

CEO because you have 4-Bar apparel?

A.  Yeah, I have a 4-Bar sweater.  Yep.

Q.  During your time at Thom Browne, as we saw in your direct

testimony, you had a practice of taking notes?

A.  That's correct.

1  Q.  And I think we saw an excerpt from your notebook, correct?

2  A.  Yes, that's correct.

3  Q.  If we could have DTX-60 which was admitted, now this shows

4  the first page of your entire notebook from that time period?

5  A.  The first page I think of the period -- I have the notebook

6  here because you guys had asked me to bring it.  It was on both

7  subpoenas.  This was the first page of the time period that was

8  related to my time with Thom.

9  Q.  If we could turn to page 40 and zoom in on the right-hand

10  side.

11         We looked at this excerpt just a moment ago.  Do you

12  recall that?

13  A.  I do.

14  Q.  And towards the bottom, it appears to say "Y-3 range."  Is

15  that correct?

16  A.  That's what it says, yep, that's correct.

17  Q.  What do you understand Y-3 to refer to?

18  A.  Y-3 was a brand owned by adidas like -- I can't recall the

19  exact context that it was mentioned, whether it was a note that

20  I took or whether it was something that Vanessa had mentioned I

21  can't recall with certainty what the context was for why it was

22  there.

23  Q.  But you understood Y-3 to be a higher end brand of adidas?

24  A.  That's correct.

25  Q.  Now, during your tenure at Thom Browne, the three-stripe

1  design was a signature design for Mr. Browne, correct?

2  A.  It was.  Until the spring of 2009.

3  Q.  Yes.  Including on cardigan sweaters which were a signature

4  item?

5  A.  I would say it was predominantly on the cardigan sweaters.

6  Q.  If we could have DTX-355.  And do you recognize the

7  cardigan in DTX-355?

8  A.  I do.

9  Q.  That shows what was formally used as the three-stripe or

10  three-bar design, correct?

11  A.  Correct.

12  Q.  And that's on the left sleeve only?

13  A.  That's correct.

14  Q.  **And there's another signature design of Thom Browne that we**

15  **see on the cardigan as well, correct?**

16  A.  Mmm-hmm.

17  Q.  What is that?

18  A.  It is the red, white and blue Grosgrain.

19  Q.  And we see that on the placket for the buttons?

20  A.  That's correct.

21  Q.  If we move to page 3 -- I'm sorry -- DTX-355 was admitted.

22  We can publish.  So just briefly --

23         THE COURT:  I'm sorry, is there a question or are you

24  saying it has been admitted.

25         MR. CONLEY:  It was admitted, your Honor.  It was just

1    not being shown to the jury.

2              THE COURT:  Okay.

3    Q.  Briefly, Mr. Becker, this is a cardigan sweater showing the

4    three-bar or three-stripe signature that was used at the time

5    when you were CEO?

6    A.  That's correct, yes.

7    Q.  You had mentioned the Grosgrain signature you see in the

8    middle of the cardigan?

9    A.  That's correct.

10   Q.  If we move to page 3, there we see the Grosgrain by the

11   button closure on the sleeve?

12   A.  Yes.

13   Q.  And Thom Browne was using that Grosgrain signature at the

14   time you started working for the company in 2007?

15   A.  That's correct.

16   Q.  And they were still using the Grosgrain signature by the

17   time you left in April of 2009?

18   A.  Correct.

19   Q.  Now, during your time at Thom Browne, adidas never

20   complained about Thom Browne's use of that Grosgrain signature,

21   correct?

22   A.  Not that I can recall.  The only conversation that I had in

23   '07 was about the three-bar sign or three-stripe design,

24   specifically the three stripes on the sleeve.

25   Q.  I think you said earlier after your May 2007 call with

1    Ms. Backman, you spoke with Mr. Browne about that call,

2    correct?

3    A.   Yes.

4    Q.   So you reported this issue -- strike that.

5           You informed Mr. Browne that adidas wanted Thom Browne

6    to stop using three stripes?

7    A.   I don't know exactly the -- like what was specifically

8    discussed, but we definitely discussed it as something that --

9    I mean, I'm sure we talked about it that day when it came up.

10   We talked every day.

11   Q.   And, again, at that period of time, you were focused on

12   restructuring and recapitalizing the business?

13   A.   That's correct.

14   Q.   At some point thereafter, the company decided to make the

15   change to four bars, correct?

16   A.   Correct.

17   Q.   And that was Mr. Browne's decision?

18   A.   As far as I can recall, it was Thom's decision.

19   Q.   And these stripes, both in the case of the three stripes

20   and now in the four stripes, those were a brand signature?

21   A.   Correct.

22   Q.   And to be sure, that change from three to four stripes,

23   that was made because of adidas, correct?

24   A.   Absolutely.

25   Q.   In fact, Mr. Browne preferred the three stripes?

1   A.  That was my understanding, yes.

2   Q.  But the company was willing to make that change to avoid an

3   IP dispute with adidas?

4   A.  Correct.

5   Q.  Now, I believe you testified that after that decision was

6   made, you did in fact try to follow up with Ms. Backman?

7   A.  Yeah, based on my notes, that's -- if we're going to get to

8   that, you know, I have references where I was trying to get in

9   touch with her.

10  Q.  So you left her messages, and they were never returned?

11  A.  I can't recall if I left messages.  I know I was trying to

12  get in touch with her because I didn't have an email.

13  Q.  And to the best of your recollection, you were trying to

14  get in touch with her to run this idea of four stripes by her?

15  A.  Yeah, to my recollection, I wanted to make sure that we

16  weren't going to have an issue.

17  Q.  There was no way the company could get additional financing

18  if Thom Browne had an outstanding IP dispute with adidas?

19  A.  I would say this was a situation and not an issue because

20  we never received a cease and desist or any notice that this

21  was an issue.  So we kind of internally looked at it as a

22  situation that we wanted to avoid.  Therefore, we took action

23  to remediate the situation before it became an issue.

24  Q.  In other words, you wanted to make sure that the decks were

25  cleared with respect to adidas?

1    A.   That's correct.

2    Q.   And part of that reason was so that you could again become

3    financially stable?

4    A.   Correct.

5            THE COURT:  Just so I'm clear, you are confident that

6    you tried to reach her, but you're not confident whether you

7    left a message or not.

8            THE WITNESS:  I can't recall whether or not I left a

9    message with her.

10           THE COURT:  And if you did leave a message, it

11   wouldn't have been a detailed message about "We're thinking of

12   using four stripes' or something like that; it would be more

13   like "Call me back"?

14           THE WITNESS:  That would generally be my tendency,

15   but, again, I don't have a specific recollection.

16           THE COURT:  So why didn't you send her a letter?

17           THE WITNESS:  I had no contact information for Vanessa

18   Backman other than her phone number.

19           THE COURT:  All right.  Go ahead.

20   BY MR. CONLEY:

21   Q.   And after the change was made, you don't recall hearing

22   from Ms. Backman or adidas again before you left Thom Browne?

23   A.   No.

24   Q.   Now, as Thom Browne's CEO at the time, would you have

25   allowed Thom Browne to change to four bars if you knew that

1  would have been a problem for adidas?

2  A.  No, we had a significant -- we had a portfolio of issues we

3  were dealing with, and we certainly weren't looking for more

4  problems.

5          MR. CONLEY:  No further questions.

6          MR. HENN:  Nothing further from me.  Thank you very

7  much, Mr. Becker.

8          THE COURT:  Thank you very much.  You may step down.

9          (Witness excused)

10         THE COURT:  Please call your next witness.

11         MR. HENN:  Adidas called Sara Vanderhoff.

12   SARA VANDERHOFF,

13      called as a witness by the Plaintiff,

14      having been duly sworn, testified as follows:

15         DEPUTY CLERK:  State your name and spell your last

16  name for the record.

17         THE WITNESS:  Sara Vanderhoff, V-A-N-D-E-R-H-O-F-F.

18  DIRECT EXAMINATION

19  BY MR. FLEMMING:

20  Q.  How do you spell your first name?

21  A.  No H.  S-A-R-A.

22  Q.  Ms. Vanderhoff, will you please introduce yourself to the

23  jury.

24  A.  Hi.  I'm Sara Vanderhoff.  I grew up in Tennessee, which is

25  where I went to college, Vanderbilt University.  I studied in

1    economics, graduated, went straight through to law school at

2    the University of South Carolina and Columbia.  My other

3    full-time job is mom.  I have four kids ages 14, 12, 8 and 5,

4    and I miss them.

5    Q.  Where are they right now?

6    A.  They're at home in Oregon.

7    Q.  Will you briefly tell us about your work history after you

8    left South Carolina?

9    A.  As soon as I graduated from law school, I moved to Atlanta

10   to take a job at Kilpatrick Townsend, your firm.  Actually, it

11   was Kilpatrick Stockton at the time.  I joined the firm's

12   trademark and copyright practice as a junior lawyer.  That's

13   actually how I first got connected with adidas.  My very first

14   assignment as a first-year lawyer was on an adidas matter.  So

15   I worked with Vanessa Backman.  She was our client contact at

16   the time.  And when she left adidas, I applied for her job.  So

17   in 2010, I moved to Portland, Oregon with my husband and then

18   one-year-old son, which is hard to believe, and I have been

19   there ever since.

20   Q.  What's your current title at adidas?

21   A.  My title is associate general counsel.

22   Q.  And what is your main focus?  What is your work focused on?

23   A.  My main focus is trademarks.

24   Q.  Ms. Vanderhoff, why are you testifying here today?

25   A.  I am here to talk about adidas's trademark rights and the

1   Three-Stripe Mark, and to explain -- help explain to the jury

2   why we're asking them to find that Thom Browne infringed and

3   diluted our Three-Stripe Mark.

4   Q.  So you said you work at adidas.  I'd like to know more

5   about the work you did there.  Can you just give me a brief

6   overview of the work you do at adidas?

7   A.  Sure.  It's a lot.  So I'm responsible mostly for

8   trademarks.  I manage a small team of people, and we focus on

9   three main areas.  The first I would call clearance and client

10  counseling.  The second I would call trademark applications and

11  registrations.  And the third trademark enforcement.

12  Q.  Let's just take those one by one.  What do you do when it

13  comes to that first bucket which you called trademark clearance

14  and counseling?

15  A.  So this involves educating and training our business

16  clients at adidas as to what trademarks are, how to use them

17  properly, how to avoid infringing other people's marks by

18  accident.  It also involves actually clearing all of the

19  products, the new products' designs, names, market materials.

20  Anything that we create, we clear from a legal perspective.

21  Q.  Tell us about that second bucket, which was trademark

22  applications and registrations.

23  A.  Sure.  So I oversee trademark -- filing trademark

24  applications for our trademarks in the U.S. and maintaining

25  those registrations.  This involves things like investigating

1    how long we've used a trademark in connection with what product

2    and services we've used it and sometimes collecting specimens

3    of use.

4    Q.   What is that third bucket about trademark enforcement?

5    A.   Trademark enforcement involves monitoring the marketplace.

6    It's my job or my team's job to actively monitor the

7    marketplace for potential infringement or dilution of our

8    marks.  It involves contacting third parties when we have an

9    issue, and also overseeing litigation when we have to file

10   cases.

11   Q.   I'd like to know a little bit more about that first bucket

12   clearance.  In practice, what does the clearance process look

13   like?

14   A.   So, as I mentioned, we are making new things all the time.

15   In all of those things, it's policy at our company that they

16   must be cleared by the legal department.  So an example might

17   be helpful.

18            Let's say a designer wants to put a skeleton design on

19   a shoe.  We would need to clear that to make sure that nobody

20   owned a skeleton trademark in connection with shoes.  So

21   process-wise we would search the United States Patent and

22   Trademark Office to see if anyone already owned a skeleton

23   trademark in connection with shoes.  We'd also do online

24   searches to see if anyone was using a skeleton trademark in

25   connection with shoes.

 1   Q.  What happens if you find that another company owns a

 2   skeleton trademark in your example?

 3   A.  If we find a similar mark or, you know, a risk of

 4   infringement, we generally advise the business against the

 5   particular project.

 6   Q.  Do you ever involve outside law firms in the clearance

 7   process?

 8   A.  I do from time to time, yes.

 9   Q.  What is the benefit of involving an outside law firm in

10   clearance?

11   A.  For big decisions, it's helpful to have someone impartial

12   or objective help us with those decisions.

13   Q.  Is impartiality important in your line of work?

14   A.  It is.  We expect people to respect our intellectual

15   property, and so we definitely try to do the same.  We want to

16   play fair in the marketplace, and so we don't want to

17   accidentally infringe someone else's trademark rights.

18   Q.  Do you do clearance work with adidas's own trademarks?

19   A.  I do.  Part of our legal clearance process also involves

20   making sure that we are using our intellectual property, our

21   trademarks in the right way and in compliance with brand

22   guidelines.

23   Q.  Does that include the Three-Stripe Mark?

24   A.  It does include the Three-Stripe Mark.

25   Q.  Can you give us a definition of the Three-Stripe Mark?

A.   The Three-Stripe Mark is three parallel stripes.  It's our

most valuable trademark.

          MR. FLEMMING:  Nita, could you please bring up Exhibit

86 for the jury.

          Your Honor, some of the exhibits have already been

admitted, and I'd like to just read through them briefly.  This

is one of them.  It has already been stipulated to, exhibits --

          THE COURT:  Well, if anything has already been

stipulated to, you can show it to me and the jury, and it's

received.  If there's anything that has not, you can only show

it to the witness.

          MR. FLEMMING:  Thank you, your Honor.

BY MR. FLEMMING:

Q.   Ms. Vanderhoff, what are we looking at here?

A.   These are our brand ID guidelines for the Originals apparel

business.

Q.   So my first question is, who created these guidelines?

A.   We have a horizontal function, so meaning a business that

goes horizontally across business units.  It's called brand --

global brand design.

Q.   And who uses these guidelines created by global brand

design?

A.   All of our designers in this case because this is apparel

products.

Q.   Did you have any involvement in what's in the brand

1    guidelines we're looking at?

2    A.  I don't remember if I personally did, but someone in the

3    trademark legal team would have reviewed this document before

4    it was active or sent out to designers.

5    Q.  In your role, do you frequently review branding

6    guidelines--

7    A.  Yes.

8    Q.  -- before they're finalized?

9    A.  Yes.

10   Q.  And the branding guidelines we're looking at, these apply

11   to all of adidas's business units, or BU's?

12   A.  These in particular apply to Originals, the Originals side

13   of the business and apparel.

14   Q.  Nita, can we look at page 4, please.

15          Ms. Vanderhoff, looking at the left side of our

16   screen, the statements on that side, what does page 4 say about

17   the function of trademarks?

18   A.  It says that "Trademarks must function as a source

19   identifier, also known as branding."

20   Q.  And then let's look at the middle of the page, those

21   statements in the middle.

22          What does page 4 tell us about the purpose of

23   branding?

24   A.  The purpose of branding and this document, these

25   guidelines, are to keep trademarks recognizable.

1   Q.  What does that mean to you?

2   A.  It means to make sure that our trademarks and our brand are

3   showing up in the marketplace in a consistent way.

4   Q.  Let's turn to page 15, please.  Can you describe for us --

5   looking at that name of this slide, can you describe for us

6   what this branding toolkit is?

7   A.  Yes, these are the branding elements that are available for

8   branding adidas Originals products.  So as you've already heard

9   from some of the other witnesses, the trefoil is reserved for

10  Originals, so that's one of the branding elements, as well as

11  the Three-Stripe trademark is also a branding element for

12  Originals apparel.

13  Q.  Since you mentioned three stripes, can we zoom in on the

14  text beneath the three stripes on the right side of the screen.

15          Ms. Vanderhoff, will you read that text in red for us?

16  A.  "Three stripes are a branding element and not for use as

17  decoration."

18  Q.  Let's back out to see the rest of this page.  I don't see

19  the Badge of Sport on here.  Why is that?

20  A.  These are the brand guidelines for Originals specifically.

21  Q.  Do you have brand guidelines for the Badge of Sport too?

22  A.  We do.

23  Q.  Are they consistent with the guidelines in this document?

24  A.  Yes, they are consistent.  But, for example, the branding

25  toolkit for the performance side of the business would have the

1    Badge of Sport logo as one of the available branding elements,

2    as well as the Three-Stripe trademark.

3    Q.  Let's look at page 26, please.

4           Is this the beginning of the guidelines about

5    three-stripe branding?

6    A.  Yes.

7    Q.  Let's go to page 27 then.

8           So will you please explain this first page of

9    three-stripe guidelines for Originals products?

10   A.  Sure.  So this guideline is explaining the difference

11   between what we call the classic execution of the Three-Stripe

12   Mark and the contemporary execution of the Three-Stripe Mark.

13   Originals designers are allowed to use the classic execution of

14   the Three-Stripe Mark, which go from seam to seam down the

15   sleeve, and the contemporary stripes don't start and stop at a

16   seam, are shorter, and are reserved for the performance side of

17   the business.

18   Q.  When you say designers, who are you talking about?

19   A.  We have product designers all over the world in different

20   countries that are creating product.

21   Q.  So looking at this page, does this mean that designers can

22   never use what's labeled contemporary stripes on Originals

23   clothing?

24   A.  No.  They would be an allowed to use that.  They would just

25   need to get approval.

1   Q.   Approval from who?

2   A.   From legal, so my team and brand identity.

3   Q.   Let's go to page 31, please.

4            I'd like to talk to you about this guideline about

5   hooped stripes, but let me ask you, what do hooped stripes look

6   like?

7   A.   Hooped stripes in this guideline are the Three-Stripe Mark

8   executed like horizontally around the entire sleeve or around

9   pants.

10  Q.   So lets back out so we can see the whole page.

11           Does this guideline authorize any specific types of

12  horizontal stripes?

13  A.   It's permissive in certain approved locations:  Collars,

14  cuffs, socks, waistband, sleeves and pant legs.

15  Q.   Were you reading from the very bottom of the page where it

16  says "approved locations"?

17  A.   I was.

18  Q.   Nita, can you blow that part up on the bottom that says

19  "approved locations" just so we can see it on the screen.  And

20  let's back out for a second.

21           Ms. Vanderhoff, is there a written definition of the

22  Three-Stripe Mark in these 87 pages of guidelines?

23  A.   No, we don't have a definition of a Three-Stripe Mark

24  that's written down in words.  We depict it visually like you

25  see on this page of the exhibit.

1    Q.  Let me ask you about the right side of the exhibit.  Do you

2    see where it says "violations" in red in all caps?

3    A.  Yes.

4    Q.  Why use such strong language in what you've described as

5    guidelines?

6    A.  There's no designers in the room.  Sometimes we just need

7    to get people's attention, and this is a good way to do that.

8    As I mentioned earlier, we have designers all over the world

9    who are creating and designing new products, and this is an

10   efficient way to communicate kind of preapproved ways to use

11   our trademarks.

12   Q.  You mentioned earlier that a designer can get an exception

13   if they go to legal and then also brand identity.  Is that

14   correct?

15   A.  Yes.

16   Q.  How often does that actually happen?

17   A.  It happens all the time.

18   Q.  How do you know?

19   A.  I'm personally involved in those requests, as are several

20   people on my team.

21   Q.  We just talked for a minute about horizontal stripes and

22   those guidelines.  Where does that issue of horizontal stripes

23   fit within adidas's overall branding guidelines?

24   A.  Sure.  So this is one page of -- it's a small portion of

25   even the branding guidelines around the Three-Stripe Mark, but

1    it's also a small piece within the broader guideline document.

2    We have guidelines around the size of the stripes, the

3    proportions, the spacing, the colors, the angles.  We also have

4    guidelines around the logo, so the coloration of the trefoil,

5    where it can be placed, how big it can be, how much space can

6    be around it.  We have guidelines on what fonts we can use on

7    hang tags, how to brand or co-brand a product.  So there's lots

8    of other guidelines and guidance in this document as well.

9    Q.  I'd like to look at an example of another stripe guideline

10   that doesn't have to do with the orientation of the stripes.

11             Nita, can we go to page 78, please.

12             Ms. Vanderhoff, do you see on the left side of the

13   screen about three lines down, it says, "Stripes can vary in

14   color from each other but must maintain equal visibility."

15             Do you see that?

16   A.  Yes.

17   Q.  Going back to what you identified as the purpose of

18   branding at the beginning, what's the reason for a guideline

19   like this?

20   A.  This guideline is meant to ensure that the Three-Stripe

21   Mark is recognizable on our product.  So a good example would

22   be if we executed the Three-Stripe Mark in a red-blue-red

23   coloration on a white shoe, that would be acceptable under the

24   guidelines because the trademark would still be visible.  But

25   if you put that same color execution, for example, on a blue

1    shoe, the middle stripe might be obscured by the background of

2    the shoe color.

3    Q.  Can you look at -- still on the left side of the screen,

4    that red text.  Can you read that out loud, please?

5    A.  It says, "Exceptions need to be approved by legal."

6    Q.  Is that part of the process that you were describing

7    earlier?

8    A.  Yes, it is.

9    Q.  And you would be a part of that process?

10   A.  Yes, I would.

11   Q.  Or your team, rather?

12   A.  Yes.

13   Q.  You mentioned earlier -- Nita, you can take that down.

14   Thank you.

15          Ms. Vanderhoff, you mentioned earlier that you handle

16   adidas trademark applications and registrations.  Has adidas

17   registered the Three-Stripe Mark with the Patent and Trademark

18   Office?

19   A.  Yes, we have many times in several executions.

20   Q.  If someone were interested, how could they find adidas

21   trademark registrations?

22   A.  It's actually really easy and meant to be easy for anyone

23   to go find.  The United States Patent and Trademark Office has

24   a database on their website that's free to use for anyone.  And

25   if you just searched adidas under owner, all of our trademark

1    registrations and applications would populate, including all of

2    our registrations for the Three-Stripe Mark trademark.

3    Q.  I'd like to talk to you about some of those registrations.

4    So, Nita, can we bring up Exhibit 181.  Can you just quickly

5    scroll through this exhibit, please.

6             Ms. Vanderhoff what's in this exhibit?

7    A.  This exhibit shows our trademark registrations in the U.S.

8    for the Three-Stripe Mark on apparel.

9    Q.  Are any of these registrations limited to a particular

10   color or scholar scheme?

11   A.  No, they are not.  They cover any and all color

12   combinations.

13   Q.  Are all of the registrations that we are looking at still

14   owned by adidas?

15   A.  Yes, they are.

16   Q.  Which adidas entity actually owns these registrations?

17   A.  Adidas AG.

18   Q.  So what are the respective roles of adidas AG and the other

19   plaintiff in this case, adidas America, Inc.?

20   A.  Adidas AG is our ultimate parent company that owns all of

21   the subsidiary adidas companies, of which adidas America is

22   one.  Adidas AG licenses the trademarks to all the subs,

23   including adidas America for use here.

24   Q.  Let's talk about some more registrations.  We just talked

25   about the apparel registrations.  Let's bring up Exhibit 183

1    next.  Nita, can you also quickly scroll through this exhibit.

2              Ms. Vanderhoff, what are we looking at here?

3    A.  These are our trademark registrations for the Three-Stripe

4    Mark in the U.S. in connection with footwear.

5    Q.  Let's go back to the second page.  Are any of these

6    registrations limited to a specific color or color scheme?

7    A.  No, they are not.

8    Q.  Are all of the registrations in Exhibit 183 still owned by

9    adidas?

10   A.  Yes.

11   Q.  Nita, can you show just the witness Exhibit 182?

12             MR. LEWIN:  Objection, your Honor.

13             THE COURT:  Well, there hasn't been a question put.

14             MR. LEWIN:  We have no -- well, now we do --

15             THE COURT:  Excuse me?  It has been shown to the

16   witness but no question has been put.  You can't object until a

17   question has been put.

18             MR. LEWIN:  Your Honor, we didn't have anything on the

19   screen.  That's why.  Now we do.

20             MR. FLEMMING:  Actually, I apologize --

21             MR. LEWIN:  Objection is withdrawn.

22             THE COURT:  Thank you very much.  But is it now on

23   your screen?

24             MR. LEWIN:  Yes.

25             MR. FLEMMING:  I apologize, your Honor.  This one had

1    been stipulated so can we publish.

2              THE COURT:  I'm sorry, I misunderstood what defense

3    counsel was objecting to.

4    BY MR. FLEMMING:

5    Q.  Nita, can we publish this to everyone.  I'd like you to

6    show you a few filings related to some of the registrations we

7    just looked at.  This is Exhibit 182.  Nita, can you quickly

8    scroll through this one too.

9              Ms. Vanderhoff, what are the documents in Exhibit 182?

10   A.  These are declarations of incontestability that we filed

11   with the U.S. Patent and Trademark Office for some of our

12   apparel Three-Stripe Mark registrations.

13   Q.  Were the declarations accepted by the Patent and Trademark

14   Office?

15   A.  Yes.

16   Q.  Nita, can you bring up Exhibit 184 next, and also we can

17   quickly scroll through that one.

18             Ms. Vanderhoff, what's in this exhibit?

19   A.  These are declarations of incontestability for some of our

20   trademark registrations for the Three-Stripe Mark in connection

21   with footwear.

22   Q.  And were these also accepted by the Patent and Trademark

23   Office?

24   A.  Yes, they were.

25   Q.  Nita, for this next one, 185, can you show it to the

1    witness and opposing counsel and take a second?

2              THE COURT:  Are you planning to offer any of these?

3              MR. FLEMMING:  I am planning to, but I believe there

4    are objections to them.

5              THE COURT:  When are you planning to do that?  Since

6    you're moving on to another exhibit now, and you've already

7    gone through two, I would have thought that the time to offer

8    it was before you moved on.

9              MR. FLEMMING:  The previous two exhibits were already

10   stipulated by the parties.  That was my mistake in announcing

11   that they weren't.

12             THE COURT:  Have those been shown to the jury?

13             MR. FLEMMING:  The previous two?  Yes, your Honor.

14   This one has not.

15             THE COURT:  I see, because you said show it only to

16   the witness.

17             MR. FLEMMING:  My mistake, your Honor.

18             THE COURT:  Now, which one is this?

19             MR. FLEMMING:  This is exhibit --

20             THE COURT:  Is it in evidence or not in evidence?

21             MR. FLEMMING:  Not in evidence only being shown to the

22   witness currently and it's 185.

23             MR. LEWIN:  We object to this.  We object to

24   admissibility.

25             THE COURT:  The question hasn't been put yet.

1           MR. LEWIN:  We understand that, your Honor.  We had

2     previously voiced an objection to counsel this concerns

3     trademarks not in issue.

4                 (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  So come to the sidebar.

2          (At the sidebar)

3          Didn't you not hear my direction to all counsel that

4    there should be no speaking objections in front of the jury?

5          MR. LEWIN:  I apologize, your Honor.  It's an old

6    habit, and I apologize.

7          THE COURT:  Well, how old are you?

8          MR. LEWIN:  Huh?

9          THE COURT:  How old are you?

10         MR. LEWIN:  78.

11         THE COURT:  So you're a kid, as far as I'm concerned.

12         MR. LEWIN:  Pardon me.  I'm still on the learning

13    curve.  Fair enough.

14         THE COURT:  Now to get to the substance.  What's the

15    relevance if this doesn't relate to a matter in dispute?

16         MR. FLEMMING:  It's specifically the connection

17    between adidas and three stripes.  These are verbal marks that

18    we have registered as the brand with the three stripes and the

19    Three-Stripe Mark.  We are not asserting those marks for all

20    infringement.

21         MR. LEWIN:  That's exactly my point, not being

22    asserted in this litigation.

23         THE COURT:  I'm missing from plaintiff's counsel what

24    you think the relevance is if this doesn't relate to marks that

25    are being asserted in this litigation?

1            MR. FLEMMING:  If adidas is using verbal marks that

2    include the idea of three stripes and they're using that

3    continuously in commerce and that registration --

4            THE COURT:  And, gee, we haven't heard any evidence

5    like that, what, five hours' worth from the first two

6    witnesses.  If that's the purpose, the objection is sustained

7    as cumulative and a waste of time.

8            MR. LEWIN:  Thank you.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. FLEMMING:

3    Q.  Ms. Vanderhoff, I would like to ask you about that third

4    bucket, if you will, of responsibilities that you identified

5    earlier, which was enforcing adidas' trademark rights.

6              Why that does adidas enforce its rights in the

7    Three-Stripe Mark generally?

8    A.  The Three-Stripe Mark is our most valuable trademark, and

9    we have a duty to protect it and it's my job to do that.  We

10   don't want other companies to use similar marks that weaken or

11   blur the uniqueness of it in the minds of consumers.  We also

12   want to protect consumers from confusion.

13   Q.  So you said it's your job to protect the Three-Stripe Mark.

14   I would like to know a little bit more about that process.

15              So how does your team become aware of potential

16   infringers in the first place?

17   A.  It's our job to monitor the marketplace, which we do

18   regularly.  We do this in a variety of ways.

19              One way is through a trademark watch service that we

20   subscribe to.  So anytime someone files a new trademark

21   application in the U.S. that includes stripes, we get notified.

22              Another way is through online monitoring.  We're

23   regularly monitoring the online marketplaces.

24              Another way is about twice a year we send people to

25   physical stores in various cities around the country to look

1   for infringing products or products that dilute our rights.

2   This is mostly in, like, shopping malls or high-traffic areas.

3           The business also sends us leads.  So they, I think as

4   Mr. Bowyer testified, are always out in the market doing either

5   trend research or account visits, and they know to keep an eye

6   out for concerning things.  And when they see those things,

7   they send them to my team.

8           Honestly, I've been doing this job long enough that

9   even my own children send me leads from time to time.

10  Q.  What kinds of things does adidas consider when deciding

11  whether to take action against someone?

12  A.  It really depends.  There is a variety of things that we

13  look at.  We look at how similar the mark is that's being used,

14  we look at what products it's being used on, we look at the

15  company itself, like, are they a reputable company.  We look at

16  where the products with the mark are being sold, is it in

17  similar places to where we sell our products.  We look at how

18  extensive is the use of the mark.  Is it a one-off product of a

19  much larger range, or is it the main logo of a company.

20  Q.  What if adidas decides to take some sort of action, what

21  types of action are available to you?

22  A.  It depends on the situation.  If we decide to take action,

23  that could take several different forms.  Kind of, I guess, the

24  first would be an informal phone call or e-mail from, like, a

25  business to business.  So from a business person at adidas to a

1    business person at the other company.

2           Another thing that could happen is I could send an

3    informal e-mail or phone call to someone at the other company.

4    We could submit an online takedown notice, if the company has

5    an online IP violations reporting process.  We could send a

6    formal cease-and-desist letter.  We could file a formal

7    proceeding in the U.S. Patent and Trademark office or in a

8    federal court like this one.

9    Q.  So about how many potential infringers has your team had to

10   investigate since you've been at the company?

11   A.  In the thousands.

12   Q.  So if adidas does decide to take some action, how do those

13   disputes usually pan out?

14   A.  The good news is that usually we're able to resolve

15   matters --

16           THE COURT:  Counsel, come to sidebar.

17           Better yet, this is going to take a few minutes.  Why

18   don't I give you your midafternoon break and resume in ten

19   minutes.

20           (Continued on next page)

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.

3          We don't need a sidebar now since the jury has been

4     excused.  We'll have this discussion in open court, but the

5     witness can go back to wherever she wants to go for a few

6     minutes.

7          THE WITNESS:  Thank you.

8          THE COURT:  So there was no objection -- there's been

9     no objection so far to any of this testimony.  I'm finding it

10    very hard to see how it is more than tangentially relevant.

11         Would counsel for the plaintiff please explain to me

12    the relevance of how these disputes are usually resolved?

13         MR. FLEMMING:  Yes, your Honor.

14         That is merely a setup for the idea that sometimes

15    they are resolved informally, as happened with Thom Browne many

16    years ago, sometimes they result in a litigation like this one.

17    Sometimes they result informal settlement agreements, informal

18    settlement agreements.

19         THE COURT:  What's the relevance of any of that?

20         MR. FLEMMING:  It really only goes to the issue of

21    laches, and the reason --

22         THE COURT:  No, I don't think it goes to the issue of

23    laches.  That's why, first of all, the only relevance I see to

24    this witness is laches, and I might have thought that you might

25    have cut this down to a five-minute testimony by simply asking

1    the witness:  Why didn't you go after Thom Browne sooner?

2              And then she would have given whatever she is going to

3    say, and in the process of that she could explain, to the

4    extent it was relevant, what their practices are and why they

5    pick those up or don't pick this up or whatever.  And it would

6    have been much more focused on the only issue that I think her

7    testimony even remotely relates to.

8              But since you prefer to give the history of the

9    universe, I'm inclined to *sua sponte* intervene when it's just

10   getting out of hand.

11             I do not see how that last question relates

12   meaningfully to any issue.  And it is also -- if the objection

13   would have made, which it wasn't -- this is, of course, partly

14   your fault but the fact that defense counsel, for undoubtedly

15   good reasons, has chosen to go to sleep through most of the

16   testimony in this case -- but I would have excluded it even if

17   you could arguably make a relevance on a 403.  Because the jury

18   is then getting the impression, Oh, my gosh, they could have

19   settled this and didn't settle this, which is extremely

20   improper, to say the least.  And yet that would have been the

21   clear indication to the jury, in violation of numerous rules of

22   the Federal Rules of Evidence.

23             So during this 15-minute break, I think you ought to

24   streamline your testimony or your questions.

25             All right?

1          MR. FLEMMING:  Yes, your Honor.

2          THE COURT:  Very good.

3          (Recess)

4          MR. HENN:  Your Honor, we want to address an evidence

5    issue before the jury comes in.

6          THE COURT:  Go ahead.

7          MR. HENN:  One of the rulings you made on a motion in

8    limine prior to us beginning the trial, you deferred and said

9    if you get into this, I want to talk to you before you do it.

10          THE COURT:  Yes.

11          MR. HENN:  Our next line of questioning is getting

12   into that.

13          THE COURT:  Tell me about that.

14          MR. HENN:  You may remember from my opening that part

15   of our argument about Thom Browne's willfulness and bad

16   faith --

17          THE COURT:  The opening on that, wasn't that years

18   ago?

19          MR. HENN:  So long ago.

20          -- was about the fact that during the time that

21   Thom Browne both moved into four stripe and then expanded into

22   athletic-wear, there were a ton of lawsuits filed by adidas

23   against a whole host of companies.  You may remember we had

24   slides that we populated with a whole bunch of cases.

25          Opposing counsel had moved in limine to prevent us

1    from talking about the rulings in any of those cases and you

2    said, of course, that's off the table, which is fine.  But

3    before we have this witness identify the fact that we filed a

4    bunch of lawsuits, I wanted to alert you we were going to do

5    that and the reason why, so that we didn't have objections in

6    the middle of that testimony.

7                THE COURT:  All right.  So what's the reason why?

8                MR. HENN:  The reason why is because it goes to the

9    issue of bad faith and willfulness, all cases involving two- or

10   four-stripe uses by other companies, and including some

11   represented by Mr. Lewin himself, who were engaged in

12   litigation with adidas over that same time period.  So anyone

13   getting reasonable advice or trying to make any effort at good

14   faith trademark option would have known that they were stepping

15   right into a lawsuit.  That is sort of the first issue.

16               The second is a very important timing issue.  Adidas

17   prevailed in a case in 2008 that was widely publicized.  It was

18   the largest trademark verdict in history at the time.  It was

19   on the cover of the business section of *The Wall Street*

20   *Journal*, and it was --

21               THE COURT:  The only thing I know about that is that

22   you were the lawyer.

23               MR. HENN:  I was.

24               THE COURT:  And so I figured that would be first thing

25   you would say in your opening statement.

1       But anyway, go ahead.

2           MR. HENN:  The reason -- look, the reason I'm bringing

3   that up is because 2008 is a critical time.  We just heard from

4   Mr. Bowyer and Mr. Poret the fact that 2008 was the time they

5   were designing the four-stripe product.  Critically important

6   for this witness -- not going to say what the verdict number

7   was -- it's important to say we obtained a verdict, widely

8   publicized, because we want to be able to argue to the jury,

9   and should be able to say that that was public information that

10  a jury had, basically that we had pursued two- and four-stripe

11  product and prevailed, and yet they were in the middle of going

12  right into four stripes.

13          THE COURT:  Why don't I hear from defense counsel.

14          MR. LEWIN:  Your Honor, we have several problems with

15  that, obviously.  The first is it prejudices the jury --

16          THE COURT:  I'm having a little trouble hearing you.

17  Just go to the rostrum so the microphone will be right where

18  you are.

19          MR. LEWIN:  I'm too young and don't speak strong

20  enough, your Honor.

21          THE COURT:  Well, you have to remember that New York

22  lawyers are very soft spoken, as everyone knows, so...

23          MR. LEWIN:  I think that was summarized with a word I

24  heard from Chinese counsel in Beijing when she said "pushy."

25          THE COURT:  No, no, no.  That's a word that my in-laws

1    resort to when they are talking with me.

2            Go ahead.

3            MR. LEWIN:  Your Honor, we would object to the

4    admission of any of this information.  I think it prejudices

5    the jury.  It doesn't bear on anything, and they haven't

6    established that we even knew of adidas in that period of time,

7    to the degree that they are talking about.

8            What they are trying to say is, if you read a

9    newspaper, you would have heard that there was a verdict, and

10   then go from that to assuming that you would be sued.

11           If they want to ask somebody something, why don't they

12   ask in the context of the telephone call with Mr. Becker,

13   whether he made that assumption or not, period.

14           THE COURT:  I agree with defense counsel.  I'm going

15   to exclude that.

16           MR. LEWIN:  Thank you, your Honor.

17           MR. HENN:  Your Honor, I know you've made a ruling.

18           THE COURT:  That's all right.  I should have waited to

19   hear what you said in response, so I will reopen the matter.

20           MR. HENN:  Thank you.  Just to make my record.

21           First, they did not object to me referring to all of

22   this in opening, which now creates a significant disadvantage

23   to us because --

24           THE COURT:  No, no, no.  I don't understand that at

25   all.  Many things that are referred to in opening -- which is

not evidence, as I told the jury -- are not followed through,

often for a wide variety of reasons; counts get dropped, issues

get reinterpreted.

        If they were to comment on, in their summation, on

your failure to produce that, I would cut them off, and I will.

The condition, obviously, of ruling in defense favor here is

they can't say anything about your failure to produce that,

even though you mentioned it in your opening.  So that's the

right cure for that.

        MR. HENN:  The second issue, and this is perhaps more

significant because it goes directly to the legal standard that

the Second Circuit has adopted and New York Courts with regard

to our punitives claim.  But willful blindness is the standard

for determining whether someone adopted a trademark in bad

faith.  It could be that they intended to trade on the goodwill

of the plaintiff's mark.

        But the other equally valid basis for a bad faith

adoption is willful blindness, and our whole point in talking

about all of this litigation -- when it's on the front page of

*The Wall Street Journal* and their own lawyer was involved in

one of the cases -- to say then, We had no idea that adidas was

enforcing against four stripes, is the definition of willful

blindness.

        I should be able to argue that to the jury with facts

instead of just standing up and saying they should have known

1    four was bad.

2              THE COURT:  Well, first of all, willful blindness is

3    not the same as reckless.  It requires a conscious decision on

4    their part to blind themselves.  So when Thom Browne or anyone

5    else is on the stand from their side, you can ask him about

6    what efforts did you make, did you check what lawsuits were out

7    there, did you check what was being reported in the press, or

8    something like that.  Questions like that, without referring to

9    any particular lawsuit.

10             Now, what you're saying is you want to go further than

11   that and say, in effect, in the cross-examination, well, hadn't

12   you heard about this lawsuit that was on the front page of

13   the -- and I think the problem with that is, I think the

14   prejudicial -- I think it is a 403 balancing problem.  That is

15   really why I already sustained the objection.

16             It's not that it's totally irrelevant.  It seems that

17   to me, though, that it carries -- you know, it's going to

18   suggest to the jury, Oh, my God, there is this great big

19   lawsuit out there and, my gosh, it was on the front page of

20   *The Wall Street Journal*, and no one can do any better than

21   that, of course, let the record reflect.  And yet you ignored

22   it.  And that, I think, is too prejudicial.

23             MR. HENN:  Respectfully, your Honor, I don't know how

24   I'm supposed to make a willful blindness argument if I can't

25   put in the fact that there was a fact --

1          THE COURT:  You have to make willful blindness in

2    accordance with the Federal Rules of Evidence, and so I'm not

3    particularly moved by the fact that your difficulty is one

4    posed by the law.

5          MR. HENN:  All right, your Honor.

6          THE COURT:  I will say that I was very impressed, when

7    I checked you out, that you even won that lawsuit.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2               THE COURT:  Let's continue.

3   BY MR. FLEMMING:

4   Q.  Ms. Vanderhoff, do you remember on Tuesday during opening

5   statements when Thom Browne's counsel, Mr. Maldonado, referred

6   to adidas as a behemoth that was asleep at the wheel?

7   A.  Yes.

8   Q.  Are you in charge of adidas' trademark activities in the

9   U.S.?

10  A.  Yes, and in Canada.

11  Q.  How big is your team?

12  A.  I have three people on my team.

13  Q.  After adidas has resolved a dispute with a company, does

14  your team continue to check on their websites and stores to

15  make sure that they are not coming up with new ways to

16  infringe?

17  A.  No, usually not.

18  Q.  Does your team of three have the resources to keep

19  following every potential infringer that comes across your

20  desk?

21  A.  No, we do not.

22  Q.  Ms. Vanderhoff, I would love to talk about this lawsuit and

23  how it started.

24          For a little bit of background, how did this dispute

25  between adidas and Thom Browne start?

1   A.  We filed this lawsuit, I believe, in June of last year, but

2   the dispute really started in 2018.

3   Q.  What happened in 2018?

4   A.  Can I provide some context?

5   Q.  If it would be helpful for the jury, I would love for you

6   to provide context.

7   A.  Adidas is a global company.  We have lawyers all over the

8   world, including lawyers in different countries that do what

9   I do but for their markets.  And in early 2018, one of my

10  colleagues in Europe discovered that Thom Browne had filed a

11  trademark application for a stripe design.  That was concerning

12  to her in both Europe and the U.K.  It's what we now know as

13  the Grosgrain --

14              MR. LEWIN:  Objection, your Honor.

15              THE COURT:  Overruled.

16  Q.  Ms. Vanderhoff, you've been --

17              Please, I was just going to refresh where we are in

18  your answer.  Ms. Vanderhoff, you were talking about trademark

19  application.  Please continue your explanation.

20  A.  The trademark applications that were filed in Europe for

21  what we now know as the Grosgrain design of Thom Browne's.

22              My colleague, her name is Donna Kabela, she

23  investigated Thom Browne and -- well, she did a couple of

24  things.  She reached out to the lawyer to express concerns, but

25  then she also investigated the company by looking at their

1    website and seeing how they were using the Grosgrain --

2              MR. LEWIN:  Your Honor, objection, hearsay.

3              THE COURT:  No, I think it falls within an exception,

4    but necessarily we will have a sidebar on this.

5              Let me just focus the jury a little bit.  So the

6    reason we're getting into all this is for two reasons.

7              One, there is a claim from the defense that this

8    lawsuit should have been brought much earlier and that they

9    have been prejudiced by its being brought after a number of

10   years after they started using the four-stripe design.  So the

11   question then is, one of the questions is, was that a

12   reasonable delay or an unreasonable delay.  I think in that

13   context, what the company came to know, as reported to counsel,

14   falls within exception to the hearsay rule, so I will allow it.

15             There is also a question lurking here, which we really

16   haven't discussed and I'm not going to discuss now, about

17   whether either side was operating in bad faith.  You'll hear

18   more from me on that at some later point.  But the immediate

19   focus is what in the law is called laches, which is delay.  You

20   may recall from my preliminary instruction, there is a sentence

21   in there about this, but I don't use the legal term "laches"

22   because why worry about legal terms when we can use plain

23   English.

24             But essentially the claim is that the plaintiffs

25   unreasonably delayed in bringing this lawsuit or otherwise

1    seeking to end the alleged infringement, and that the defense

2    was prejudiced by that.  Of course, you only reach this issue

3    if you find there is infringement, and that's a whole different

4    issue.  If you don't find it is infringement, then you don't

5    have to reach this.

6            But maybe I can move this along.

7            When did you personally first learn of the four stripe

8    problem, for lack of a better word?

9            THE WITNESS:  Sure, your Honor.  I learned of it in

10   2018, May of 2018.

11           THE COURT:  And how did you learn of it?

12           THE WITNESS:  Maybe April.

13           I learned about it from my colleague in Europe, who

14   had --

15           THE COURT:  What you just described?

16           THE WITNESS:  Yes.

17           THE COURT:  OK.  And so that's being received in that

18   context.

19           So what did you do next?

20           THE WITNESS:  I also investigated the website to see

21   how they were -- if they were selling the products into the

22   United States and how they were using the marks.

23           THE COURT:  And then what did you do?

24           THE WITNESS:  And then we reached out to Thom Browne's

25   lawyers to express our concerns with some of the products, the

1  four-stripe products, and Grosgrain products.

2            THE COURT:  OK.  When was that?

3            THE WITNESS:  That was in May of 2018.

4            THE COURT:  Now you had had, your predecessor had had

5  some contact with Thom Browne in, what was it, 2013?

6            THE WITNESS:  I believe it was 2007.

7            THE COURT:  I'm sorry.  You're right.  Absolutely.

8  2007.

9            And you've already explained that adidas makes

10 substantial efforts to protect its trademarks; yes?

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  And sometimes you work things out with the

13 people who you're having a problem with, as happened in 2007,

14 and sometimes you wind upbringing litigation.

15           But in any event, it's a substantial part of what the

16 company does, and more particularly, it's a large part of what

17 you do, correct?

18           THE WITNESS:  That's correct.

19           THE COURT:  OK.  So how come you didn't pick this up

20 sooner?

21           THE WITNESS:  Um, we didn't know about Thom Browne

22 sooner.  They never come up in our market sweeps or monitoring

23 work.

24           THE COURT:  All right.  When you first learned about

25 in the matter that you just indicated and then you reached out

1   to them, and how soon after your first learning this

2   information was that?

3           Give me the chronology in a more precise way.

4           THE WITNESS:  I believe it was about a month or two.

5           THE COURT:  OK.  Go ahead, counsel.

6           MR. FLEMMING:  Thank you, your Honor, for helping me

7   through a lot of questions.

8   BY MR. FLEMMING:

9   Q.  Now that we have that general timeline of when the lawsuit

10  started, I would like to actually talk to you about the accused

11  products in this case.

12          Let's start with the four-stripe design.  Is adidas

13  trying to prevent Thom Browne from using the four-stripe design

14  in any variation or on any product?

15  A.  No.  As you've seen, we're only concerned with the use of

16  the four-stripe design on athletic-style products and apparel

17  and footwear.

18  Q.  Let's look at some of those products.

19          MR. FLEMMING:  Nita, would you please bring up

20  Exhibit 55 and I would like to, instead of scrolling through

21  the whole exhibit, maybe just eight to 13.

22          Let's look at page nine.

23  Q.  Ms. Vanderhoff, did you testify earlier that once you

24  received word from your colleague, you did your own

25  investigation into Thom Browne?

1    A.   Yes.

2    Q.   What did that investigation entail?

3    A.   I reviewed the website.

4    Q.   When you checked Thom Browne's website in 2018, were all of

5    the products in this accused products list on the website at

6    that time?

7    A.   No.   In early 2018, there were approximately ten athletic-

8    style products with the four stripes on it.

9    Q.   About what proportion of Thom Browne's product line is

10   adidas accusing of infringement?

11           MR. LEWIN:   Objection, foundation.

12           MR. FLEMMING:   I can ask foundational questions, your

13   Honor.

14           THE COURT:   Well, do you know the answer to that?

15           THE WITNESS:   I mean, I reviewed the website and I

16   review it often now, given this dispute.   I know the relative

17   size of what is on the website.

18           THE COURT:   Sustained.

19   BY MR. FLEMMING:

20   Q.   Ms. Vanderhoff, I would like to bring up Exhibit 1314.

21   Let's skip to page 89.

22           MR. FLEMMING:   Nita, would you please scroll through

23   to page 96.

24   Q.   Ms. Vanderhoff, what are we looking at here?

25   A.   These are images from Thom Browne's website showing images

1    of their runway collection from 2021 and 2022, I believe.

2    Q.  Is adidas accusing any of the products that we just looked

3    at of infringement?

4    A.  No.

5    Q.  Going back to when you looked at Thom Browne's website in

6    2018, did you testify that you saw a few items of athletic

7    apparel?

8    A.  Yes.

9    Q.  Did that surprise you?

10   A.  It did.  We knew Thom Browne to be a luxury men's fashion

11   designer who made formal wear and business suits and event garb

12   runway looks, but not athletic-wear.

13   Q.  Did Thom Browne continue to offer the same amount of

14   athletic-wear that you saw on the website?

15          MR. LEWIN:  Objection, your Honor, vague.

16          THE COURT:  Sustained.

17   Q.  In May of 2018, was that the only time that you looked at

18   Thom Browne's website?

19   A.  No, I reviewed it several times.

20   Q.  Several times after that?

21   A.  Yes.

22   Q.  Did you continue to see the same amount of athletic apparel

23   in your review?

24   A.  No.  The amount of athletic apparel bearing the four

25   stripes design grew over time.

1    Q.   About what time period are we talking?

2    A.   From 2018 through present.

3    Q.   Was that concerning to you?

4    A.   Yes.

5    Q.   Why?

6    A.   Because we're an athletic apparel company, and that Thom

7    Browne kept increasing the number of styles, athletic styles,

8    with the four-stripe design was concerning to us.  We were

9    concerned that people would be confused.

10             MR. LEWIN:  Objection, your Honor.

11             THE COURT:  Well, I think the objection was waived

12   because when the question was put, why was that concerning to

13   you, there was no objection.  And it's inevitably going to

14   elicit the very answer that was given.

15             Overruled.

16   BY MR. FLEMMING:

17   Q.   Ms. Vanderhoff, other than Thom Browne's website, was there

18   anything else in 2018 factually that gave you a cause for

19   concern?

20   A.   Yes.  There were a few things that indicated to us that

21   Thom Browne was moving into the athletic-wear and sports space.

22             MR. LEWIN:  Again, objection, your Honor.  We don't

23   know what --

24             Pardon me.

25             THE COURT:  Sustained.

1      MR. FLEMMING:  You received earlier --

2      THE COURT:  Just to move it along, maybe -- forgive

3  me, counsel -- do I understand what you're saying is that you

4  had previously not regarded Thom Browne as a material

5  competitor in the areas that you were and adidas was focused

6  on, but now it appeared that they were becoming more of a

7  competitor?

8      THE WITNESS:  Yes.  We first saw a few things in 2018,

9  and since that time, several other things happened that led us

10  to believe they were moving closer and closer into our space.

11      THE COURT:  All right.  Go ahead, counsel.

12      MR. FLEMMING:  Your Honor, I would like the witness to

13  identify those things she just referenced.

14      THE COURT:  I'm not sure, given the answer that she's

15  already given to the court's brilliant questions, I'm not sure

16  that anything more is necessary.  And it would get into, I

17  think, some questions of hearsay, vagueness, best evidence and

18  other things I know you're deeply concerned about.

19      Put another question.

20      MR. FLEMMING:  Can we bring up Exhibit 193.  Scroll

21  through it slowly so that we can look at the products depicted.

22      Let's go back to the first page.

23  BY MR. FLEMMING:

24  Q.  What is in this exhibit that we just looked through?

25  A.  These are pictures of Thom Browne's compression collection

1  that launched in 2020.

2  Q.  Let's bring up Exhibit 196.

3       What are we looking at here, Ms. Vanderhoff?

4  A.  This is a Thom Browne compression apparel product that's

5  being offered for sale at Nordstrom.

6  Q.  Did you say earlier that the collection was in 2020?

7  A.  Yes, I believe so.

8  Q.  How did you become aware of this compression collection?

9  A.  I became aware of it through a *Vogue* article.

10 Q.  Let's quickly look at that article, which is Exhibit 194.

11      Ms. Vanderhoff, is this the article that you are

12 referring to?

13 A.  Yes.

14      MR. FLEMMING:  And, Nita, can you zoom in on the date,

15 which is underneath the author's name.

16 Q.  Ms. Vanderhoff, when did this article come out?

17 A.  On November 26, 2020.

18      MR. FLEMMING:  Let's go to page two and zoom in on the

19 second paragraph.

20 Q.  Ms. Vanderhoff, would you please read this paragraph out

21 loud for us?

22 A.  "You know who else breaks rules?  Thom Browne.  Today, the

23 designer is launching his first active-wear range, a series of

24 compression pieces designed specifically for running.  Inspired

25 by his own jogging regimen -- 'it averages around eight miles a

1  day ' the designer says over a video call -- the compression

2  collection brings sweat-wicking high-performance gear into the

3  Thom Browne universe.  The collection took Browne and his team

4  almost 18 months to perfect, and releases to the world with all

5  the rigor of the Thom Browne suit -- and the added bonus of

6  four-way stretch."

7  Q.  Will you remind me, again, when adidas first objected to

8  Thom Browne's use of the four-stripe design?

9  A.  In May of 2018.

10         MR. FLEMMING:  I would like to bring up plaintiff's

11  Exhibit 190, please.  Actually, 192, please.

12         Can you very quickly scroll through this and let's

13  come back to page two.

14         THE COURT:  Just before you do that, what form did

15  that original objection take?

16         THE WITNESS:  It was a communication, written, I

17  believe, between my outside counsel and Thom Browne's outside

18  counsel.

19         THE COURT:  All right.  Go ahead.

20         MR. FLEMMING:  Let's go to page two, please.

21  Q.  Can you generally tell me what is in this exhibit, please?

22  A.  This is a *GQ* style article announcing or publicizing the

23  partnership between Thom Browne and FC Barcelona.

24  Q.  What year was that?

25  A.  It was in 2018.

1    Q.  Can you just give me the name of the person we're looking

2    at?

3    A.  Leo Messi.

4    Q.  Let's go to page 11, and let's zoom in on that paragraph,

5    please.

6            Ms. Vanderhoff, will you please begin reading out loud

7    where it starts Browne insists?

8            MR. LEWIN:  Objection, your Honor, hearsay.

9            THE COURT:  Well, I had thought -- maybe I

10   misunderstood -- that this exhibit had already been received by

11   stipulation.

12           MR. FLEMMING:  It has, your Honor.

13           THE COURT:  And that it was, as I have repeatedly told

14   counsel for both sides, if it's received by stipulation, it's

15   received for all purposes.

16           So go ahead.

17   BY MR. FLEMMING:

18   Q.  Ms. Vanderhoff, would you please begin reading at "Browne

19   insists?"

20   A.  "Browne insists that his brand will use Zegna's resources

21   when it makes sense to, and continue to operate independently.

22   But expect to see his collection expand even further from core

23   suiting, 'even as we grow, as long as we keep our own unique

24   sensibility, I really feel there is still so much we can add to

25   the collection, as long as we don't compromise quality.' One of

1    the things he says he's been thinking of adding?  Proper

2    athletic-wear.  Might Thom Browne on field kits one day grace

3    the turf of Wembley?"

4              MR. FLEMMING:  Thank you.

5              Let's bring up Exhibit 191, please, and quickly go

6    through that one.  We actually looked at this one earlier with

7    another witness.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. FLEMMING:  (Continued)

2    Q.  Ms. Vanderhoff, what's in Exhibit 191?

3    A.  This Exhibit includes materials around Thom Browne's the

4    Cleveland Cavaliers and Lebron James.

5    Q.  Let's go to page 2.  And what is this article we're looking

6    at?

7    A.  This is an article announcing the partnership between the

8    Cleveland Cavaliers and Thom Browne.

9    Q.  Nita, can you please zoom in on the date which is just

10   below the author's name.

11          Ms. Vanderhoff, what's the date of this article?

12   A.  April 20, 2018.

13   Q.  You can take that down.  Thank you.

14          Ms. Vanderhoff, I have some physical exhibits for you.

15          MR. FLEMMING:  May I approach the witness, your Honor?

16          THE COURT:  Yes.

17   Q.  Ms. Vanderhoff, will you first take out Exhibit 693,

18   please:

19          Nita, can we put Exhibit 694 on the screen.

20          Ms. Vanderhoff, tell me what you're holding in your

21   hand?

22   A.  This is one of Thom Browne's zip-up hoodies.

23          MR. LEWIN:  Your Honor, before testimony starts, can

24   we see this product, please?

25          THE COURT:  Yes.  But if you want to purchase that,

1   you have to do that on your own time.

2   Q.  Ms. Vanderhoff, would you describe it as a hoodie?

3   A.  Yes, the name is Zip-Up Hoodie.

4   Q.  Can we next look at Exhibit 705.  Can we put up on the

5   screen Exhibit 706.

6          Ms. Vanderhoff, what are you holding in your hand?

7   A.  This is one of the Thom Browne compression zip-up jacket

8   with the four-stripes design.

9          THE COURT:  Are these in evidence?

10          MR. FLEMMING:  Yes, your Honor.

11          THE COURT:  Very good.

12  Q.  Next can you please hold up Exhibit 707, and then let's put

13  Exhibit 708 on the screen.

14          Ms. Vanderhoff, what are you holding in your hand?

15  A.  These are a pair of Thom Browne shorts called mid-thigh

16  shorts with the four-stripes design.

17  Q.  Can we start with the shorts actually that you're holding

18  in your hand?  Other than -- looking at just the outside of the

19  shorts, other than the four stripes, do you see any other

20  branding on the product?

21  A.  I see the little red, white and blue flag.

22  Q.  Does that little red, white and blue flag alleviate your

23  concerns?

24  A.  No, it doesn't.

25  Q.  Why not?

1    A.  Because it wouldn't be visible in a variety of contexts

2    depending on the viewer's angle.

3    Q.  Let's look at the jacket next, please, which is Exhibit

4    705.

5         Ms. Vanderhoff, do you see a price tag on that

6    compression jacket?

7    A.  Yes.

8    Q.  What does it say?

9    A.  $1,450.

10   Q.  Does the price of that jacket alleviate your concerns?

11        MR. LEWIN:  Objection, your Honor.

12        THE COURT:  No, I think this was, in effect, raised

13   through examination of prior witnesses, so I will allow it.

14   A.  No, it does not.

15   Q.  And then, finally, can you hold up a hoodie Exhibit 693?

16        Other than the red, white and blue flag and the four

17   stripes, do you see any other branding on the outside of the

18   hoodie?

19   A.  There's a Thom Browne -- there's a square badge at the

20   bottom.

21   Q.  Will you hold it up really high for the jury to see.  And

22   then also can we have on the screen a photo, which is 694.

23        Ms. Vanderhoff, will you please read what's on that

24   badge?

25   A.  It says Thom Browne New York.

1   Q.  Just a yes-or-no question.  Does that badge alleviate your

2   concerns?

3            MR. LEWIN:  Same objection, your Honor.

4            THE COURT:  Same ruling.

5   A.  No, it does not.

6            THE COURT:  Why not?

7            THE WITNESS:  Because that wouldn't be visible in a

8   variety of contexts to a consumer.

9            MR. LEWIN:  Objection, your Honor.

10           THE COURT:  Overruled.

11  Q.  We can put all of those down.

12           Ms. Vanderhoff, have any consumers actually made

13  associations between adidas and Thom Browne?

14           MR. LEWIN:  Objection.  Foundation.

15           THE COURT:  Sustained.

16  Q.  Nita, can we please bring up Exhibit 195.  Can you quickly

17  scroll through pages of this exhibit.

18           Ms. Vanderhoff, what's in Exhibit 195?

19  A.  This exhibit contains social media posts featuring Thom

20  Browne's products where users have posted comments that imply

21  an association with adidas or confusion.

22  Q.  Let's start with page 7, please.  Let's zoom in on that

23  actual post.  And that post continues on the next page, so can

24  we now go to page 8.  Can you zoom in on the top half of that

25  page, please.

1          Ms. Vanderhoff, is there anything concerning in this

2    post to adidas?

3    A.  Yes.

4    Q.  Can you point us to where that is?

5          MR. LEWIN:  Objection, your Honor.  This is hearsay.

6          THE COURT:  It is unquestionably hearsay, but my

7    understanding is this is one of the exhibits that both sides

8    agreed were admissible, and as I told you and repeated outside

9    the presence of the jury many times and now in the presence of

10   the jury, if an exhibit both sides agree comes in, it comes in

11   for all purposes.  So the objection is overruled.

12   Q.  Ms. Vanderhoff, can you point to where you're talking

13   about?

14   A.  I am referring to the user Mattsmithymccullough who

15   commented "adidas four stripe?"

16   Q.  Let's look at page 3.  Let's zoom in on the post.  Is there

17   anything in this post that is concerning to adidas?

18   A.  Again, a user seeing this post Pr1ncegolez comments,

19   "adidas!!!"

20   Q.  You mentioned the word confusion earlier, but can you know

21   this person is actually confused?

22   A.  I'm not this person, so I can't know for certain whether or

23   not they were confused, but this suggests to me that adidas was

24   called to mind.

25          MR. LEWIN:  Objection, your Honor.

1          THE COURT:  All right.  Sustained as to that.

2          I don't want to belabor the record, but I'm also going

3     to note for the record with respect to the earlier magazine

4     article where there was quotations from Mr. Browne, that

5     probably would have come in in any event as a statement of a

6     party adversary, so there was no claim that the reporter had

7     misquoted or anything like that.  It was put in for all

8     purposes, and that this stuff that we're looking at now would

9     also probably come in even despite a more general ruling I've

10    already made because whether it's true or not, the jury could

11    infer from it that at least there was some people who were

12    confused.  But I don't have to reach those alternate holdings

13    because of the main holding I've already made.

14          Go ahead.

15    BY MR. FLEMMING:

16    Q.  Ms. Vanderhoff, let's keep the rest of this very targeted.

17    Let's go to page 1.

18          Is there anything about this post that is concerning

19    to adidas?

20    A.  It concerns us that one of the users, whose name I will not

21    mention to you out loud, is "What will adidas say?"

22          THE COURT:  I am so sorry.  Counsel, come to the

23    sidebar.

24          (Continued on next page)

25

1        (At the sidebar)

2        THE COURT:  So all my rulings the last few minutes

3   have been based on the fact that as plaintiff's counsel

4   represented, these exhibits were all stipulated to.  But my law

5   clerk says that the most recent one was not stipulated to.  It

6   was the subject of a motion in limine, and I allowed it in

7   without prejudice to more specific objections being raised.  So

8   did you get that wrong?

9        MR. FLEMMING:  I understood from our conferrals in

10  advance that we shared the exhibits we were going to put on.

11  We conferred about whether there were any remaining objections,

12  and no remaining objections were identified with respect to the

13  exhibit.

14        THE COURT:  No, that's not my question.  I think it's

15  a simple question.  When this exhibit first came up before the

16  Court, which was at the motion in limine stage, the right to

17  make more specific objections of the kind that were just being

18  made was specifically reserved.  And I did not rule on that.  I

19  ruled on the overall questions presented by the motion in

20  limine.

21        Now, if subsequently independently of that as part of

22  counsel's joint agreement that exhibit X Y Z and so forth are

23  coming in by stipulation, then my rulings stand because then

24  the previous limitation was erased by stipulation.

25        So that's the question.  Was there a subsequent

1    stipulation as to this particular document?

2              MR. HENN:  Well, first before -- the important thing

3    is the basis of the motion in limine, which you denied, was

4    hearsay.  So the objection that was just raised was hearsay,

5    which means it was already covered by the motion in limine

6    ruling.  And I think that's why we are saying when we conferred

7    with them about whether or not this exhibit is coming in --

8              THE COURT:  And that's fair enough, and my ruling is

9    not going to change.  Because for reasons I've already

10   explained, I think this would come in even if there had been no

11   stipulation, but for a little more limited purpose, but I do

12   want to make sure that I was not misled about the

13   representation.  Was there a subsequent stipulation?

14             MR. FLEMMING:  Yes, your Honor, there was.

15             THE COURT:  All right.  Very good.  Thanks a lot.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1            (In open court)

2    BY MR. FLEMMING:

3    Q.  Ms. Vanderhoff, I believe you already read this page.  So

4    let's quickly go to page 2, please.

5            Is there anything in this post that concerned adidas?

6    A.  Yes.

7    Q.  Where is it?

8    A.  It concerned us that a user viewing this post wrote

9    "adidas" and then tagged us in it.

10   Q.  Let's go to page 5.  Is there anything in this post that

11   concerned adidas?

12   A.  Yes.

13   Q.  Where is it?

14   A.  The user fashionloverNYC posted "so#adidas" with some

15   laughing faces.

16   Q.  And then page 4?  Was there anything in this post that was

17   concerning to adidas?

18   A.  Yes.

19   Q.  What is it?

20   A.  One of the users when viewing imagery of the Grosgrain

21   posted "thought it was adidas, sorry" and tagged us.

22   Q.  Thank you, Nita.  You can take that down.

23           Let's talk a little bit more about the Grosgrain and

24   bring up Exhibit 56.  I want to look through, after we look at

25   this page, also pages 6 through 8.

1        What's in this exhibit, Ms. Vanderhoff?

2   A.   These are the Thom Browne products bearing the Grosgrain

3   design that we believe infringe and dilute our adidas

4   trademark.

5   Q.   Did you hear Thom Browne's attorney, Mr. Maldonado, during

6   opening statements refer to the Grosgrain as

7   white-red-white-blue-white?

8   A.   Yes.

9   Q.   And does that description alleviate your concerns?

10  A.   No, it does not.

11  Q.   Let's look at the shoe second from the bottom on this page.

12  Do you see any stripes on the shoe?

13  A.   Yes.

14  Q.   How many?

15  A.   I either see two or three.  Because the shoe is white, I

16  can't tell.

17  Q.   You can take that down.  I want to talk about something

18  else that Thom Browne's attorney said during opening

19  statements, which was about other companies using stripes.  Do

20  you recall that?

21  A.   Yes.

22  Q.   Let's bring up Exhibit 197, please.  Let's look at page 23.

23  What's in Exhibit 197?

24  A.   This Exhibit was produced by Thom Browne to us purporting

25  to show third parties using stripes on apparel.

1    Q.  What did adidas do when it got this collection of

2    documents?

3    A.  We investigated the uses of stripes.

4    Q.  Did adidas take action against any of the companies

5    identified in Exhibit 197?

6              MR. LEWIN:  Objection.  Relevance, your Honor.

7              THE COURT:  No, I think the door was effectively

8    opened by opening statement.  Overruled.

9    A.  I'm sorry, I've lost the question.

10   Q.  Did adidas take action against any of the companies

11   identified in Exhibit 197 after the investigation?

12   A.  We have an open matter with one of the companies in this

13   document already, but we did not take action against anyone

14   else.

15   Q.  Did you review any similar documents from Thom Browne

16   involving third parties using stripes?

17   A.  I did.

18   Q.  Which document was that?

19   A.  I reviewed a document that was prepared by one of Thom

20   Browne's experts that was a collection of screenshots of

21   third-party products.

22   Q.  What did adidas do with those screenshots?

23   A.  We investigated them.  It kept my team busy for quite

24   awhile.

25   Q.  Did adidas decide to take any action against any of those

1    targets after the investigation?

2    A.  No.

3    Q.  Ms. Vanderhoff, why has adidas brought this case all the

4    way to a jury?

5    A.  We need help protecting our trademark rights.

6         MR. FLEMMING:  Thank you.  No further questions.

7         Pass the witness.

8         THE COURT:  Do you want to go five minutes on cross or

9    would you prefer to start tomorrow?

10        MR. LEWIN:  If you don't mind, I'll use those five

11   minutes.

12        THE COURT:  Okay, go ahead.

13   CROSS-EXAMINATION

14   BY MR. LEWIN:

15   Q.  Hi.  I'm Harley Lewin, and as you can see, I'm one of the

16   attorneys for Thom Browne.  And I thought that I would just

17   discuss with you for a minute or two --

18        THE COURT:  Counsel, put some questions.  You only

19   have five minutes.  Put some questions to the witness.

20   Q.  Ms. Vanderhoff, before you joined Thom Browne, where did

21   you work?

22   A.  I didn't join Thom Browne.

23   Q.  Pardon me.  It's late in the day.  As young as I am, I

24   still can't have that kind of memory.

25        Before you joined adidas.

1    A.  I worked at Kilpatrick.

2    Q.  Who did you work for?

3    A.  I worked for the firm.

4    Q.  Who was your supervisor?

5    A.  I had many supervisors as a junior lawyer.  Charlie Henn

6    was one of them.

7    Q.  He was the primary supervisor that you had while you were

8    at Kilpatrick, correct?

9    A.  I wouldn't say primary.  I worked with several partners.

10   Q.  Do you remember testifying that when you joined Kilpatrick,

11   you worked immediately on an adidas case?

12   A.  Yes.

13   Q.  And do you remember the year of that?

14   A.  Yes, 2005.

15   Q.  You worked on most of the adidas cases that came into

16   Kilpatrick from the time you joined to the time you left,

17   correct?

18   A.  I believe I did.  There were a lot of matters.  I wasn't on

19   all of them.

20   Q.  I understand that.  I said most of them.

21        THE COURT:  No.  No.  Counsel, just put questions.

22        MR. LEWIN:  Yes, sir.

23   Q.  During the time that you were working at Kilpatrick, did

24   you have occasion to learn about Thom Browne?

25   A.  I did not.

1  Q.  And it's your testimony, is it not, that you first learned

2  about Thom Browne in 2018, I believe.  Is that correct?

3  A.  That's correct.

4  Q.  And is it also your testimony that you didn't work on any

5  Thom Browne/adidas matters during the time you were at

6  Kilpatrick before 2007?

7  A.  That's right.

8  Q.  And you didn't work on any adidas/Thom Browne matters until

9  2018, correct?

10  A.  That's right.

11  Q.  When you joined -- when you moved over from Kilpatrick to

12  adidas, you took over the role of Vanessa Backman, right?

13  A.  I did.

14  Q.  Did you engage in a transition colloquy with her of any

15  kind?

16  A.  I did not.  She left the company, I believe, in December,

17  and I didn't join until March the following year.

18  Q.  And in the period of time between the time she left and the

19  time that you joined, you had no discussions with her about any

20  pending matters that were being addressed by adidas that you

21  would inherit on landing at adidas?

22  A.  I don't recall any specific meetings.  I don't recall

23  actually meeting with her.

24  Q.  Do you recall what steps you took to learn what was pending

25  at adidas in 2007 -- 2006-2007?

1    A.  Do you mean 2010 when I joined adidas?

2    Q.  2010, I'm talking about when you joined, I'm asking whether

3    you looked back.  Let me put it another way.

4         When you joined adidas, did you take steps to read

5    files on enforcement actions that were pending?

6    A.  Well, yes.  I inherited current matters, yes.

7    Q.  Current matters?

8    A.  Yes.

9    Q.  So those were on your desk, so to speak, when you landed,

10   right?

11   A.  They were.

12   Q.  I believe you testified in deposition that the only person

13   you spoke to adidas about what your responsibilities were at

14   that time were your immediate supervisors.  Is that correct?

15   A.  That's right.

16   Q.  So you didn't reach out to Vanessa Backman and have any

17   discussions with her about any files that were on your desk at

18   that time?

19   A.  No, I didn't.  Her boss, who became my boss, was heavily

20   involved in the work at that time.

21   Q.  And also you brought some knowledge with you when you came

22   across the street, correct?

23   A.  I did.

24   Q.  You worked on a number of those things, correct?

25   A.  Yes.

1   Q.  But none of those was Thom Browne, was it?

2   A.  No.

3   Q.  And you didn't know who Thom Browne was, correct?

4   A.  I did not.

5           MR. LEWIN:  Your Honor, I think we'll pause right

6   here.

7           THE COURT:  That's fine.

8           So, ladies and gentlemen, you saw that door open.

9   That's the cell block.  So I suggest you get out of here while

10  the getting is good.  Anyway, we'll see you at 9:30 tomorrow.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  You may step down.

 3                Please be seated.  Just for the guidance of all

 4      counsel, since this, I'm sorry to say, comes up in virtually

 5      every case sooner or later, counsel who is questioning a

 6      witness is limited to asking questions.  It is not proper, for

 7      example, to say, "That wasn't my question."  It is not proper

 8      to say -- this hasn't happened yet in this case, but --"Would

 9      you please answer my question?"

10                Those are all forms of commenting on the witness's

11      credibility in the sense of arguably being evasive.  That may

12      not be the intent of counsel, I'm not assuming bad faith on the

13      part of counsel, but that is the effect.

14                So, no counsel should ever when questioning a witness

15      do anything but ask questions.

16                All right.  We'll see you all at -- unless someone

17      thinks there's a matter to raise, why don't we say 9:20.  Very

18      good.

19                (Trial continued January 6, 2023 at 9:20 a.m.)

20

21

22

23

24

25
```

1              INDEX OF EXAMINATION

2    Examination of:                        Page

3     PAUL BOWYER

4    Cross By Mr. Maldonado . . . . . . . . . . . 361

5     HAL PORET

6    Direct By Mr. Henn . . . . . . . . . . . . . 378

7    Cross By Ms. Sayour . . . . . . . . . . . . 405

8    Redirect By Mr. Henn . . . . . . . . . . . . 430

9     TOM KAHL

10   Direct By Mr. Flemming . . . . . . . . . . . 433

11   Cross By Mr. Conley . . . . . . . . . . . . 444

12   Redirect By Mr. Flemming . . . . . . . . . . 450

13    THOMAS BECKER

14   Direct By Mr. Henn . . . . . . . . . . . . . 455

15   Cross By Mr. Conley . . . . . . . . . . . . 464

16    SARA VANDERHOFF

17   Direct By Mr. Flemming . . . . . . . . . . . 474

18   Cross By Mr. Lewin . . . . . . . . . . . . . 531

19              PLAINTIFF EXHIBITS

20   Exhibit No.                          Received

21    551, 552, 554 through 557  . . . . . . . . 360

22    191  . . . . . . . . . . . . . . . . . . . 423

23    149, 150 and 151 . . . . . . . . . . . . . 432

24    174 and 175  . . . . . . . . . . . . . . . 451

25    175, 258, 259 and 836  . . . . . . . . . . 456

1                       DEFENDANT EXHIBITS

2     Exhibit No.                              Received

3      0060 and 355  . . . . . . . . . . . . . . . 456

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25