```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ADIDAS AMERICA, INC., an
     Oregon corporation;
 4   and ADIDAS AG, a foreign entity,

 5               Plaintiffs,

 6         v.                              21 Civ. 5615 (JSR)

 7   THOM BROWNE, INC., a Delaware
     corporation,
 8
                 Defendant.
 9
     ------------------------------x
10                                      New York, N.Y.
                                        January 6, 2023
11                                      9:00 a.m.

12   Before:

13                   HON. JED S. RAKOFF,

14                                      District Judge
                         -and a Jury-
15

16                      APPEARANCES

17   KILPATRICK TOWNSEND & STOCKTON LLP
          Attorneys for Plaintiffs
18   BY:  R. CHARLES HENN, JR.
          H. FORREST FLEMMING III
19
     WOLF GREENFIELD & SACKS, PC
20        Attorneys for Defendant
     BY:  ROBERT MALDONADO
21        HARLEY LEWIN
          BRYAN CONLEY
22        TONIA SAYOUR

23   ALSO PRESENT:
     NITA GRAY, adidas paralegal
24   MICHAEL PUSTERLA, Thom Browne paralegal

25
```

1           (Trial continued; jury not present)

2           THE COURT:  Good morning.  Before we talk about the

3     scope of the mark, I want to get a better idea of the schedule.

4           How much longer is defense counsel going to be on

5     cross?

6           MR. LEWIN:  I think perhaps an hour or less but not

7     much more.

8           THE COURT:  Who is the next witness?

9           MR. HENN:  The next witness is Dr. Joachimsthaler.

10          THE COURT:  Is that your last witness?

11          MR. HENN:  I'm sorry?

12          THE COURT:  How many witnesses do you have left?

13          MR. HENN:  We have three.  Dr. Joachimsthaler, Mr.

14    Bill D'Arienzo, and then our damages guy John Plumpe.

15          THE COURT:  Do you expect to finish today?

16          MR. HENN:  We are hoping to finish today.

17          THE COURT:  All right.  Let's turn to defense.  What's

18    your current estimate of how long your case will take?

19          MR. MALDONADO:  I think, your Honor, I would say three

20    to four days.

21          THE COURT:  Yes.  So what I'm concerned about is two

22    things:  The first is the juror who wants to go attend her

23    mother-in-law's funeral.  If worse comes to worse, we'll excuse

24    her and just proceed in her absence, and she won't be part of

25    it, but I'd like to avoid that if I can.

N16Qadi1

1    Now, the case needs to go to the jury, worse case,

2    after summations and charge, by Friday.  I'm hoping to do

3    better than that, but by Friday because next week I'll be

4    teaching a course at the University of Virginia.  I can deal

5    with any notes telephonically or through video.  Another judge

6    can take the verdict if I'm not back, but what I can't pawn off

7    on another judge is giving the charge and all like that.  So we

8    need to be sure that the real final deadline is Friday.

9    Plus we told the jury two weeks, and I don't think

10   they'll be real happy if it goes into the following week.  So

11   my hope is we could have the defense completed by Wednesday.

12   I guess it's Wednesday afternoon that she wants to

13   attend.  We'll play it by ear, but you know now the parameters.

14   DEPUTY CLERK:  Monday, the 16th, the courthouse is

15   closed for Martin Luther King day.

16   THE COURT:  That's true too.  Okay.  Let's turn to

17   the -- I'm finding this an interesting issue.  Nothing turns on

18   it but a few tens of millions of dollars, but anyway let me ask

19   plaintiff's counsel, how do you define your Three-Stripe Mark?

20   MR. HENN:  We define it the same way every witness so

21   far has, which is three parallel stripes.

22   THE COURT:  So, if, for example, someone made a jersey

23   that had three parallel red, white and blue stripes right

24   across the middle going across the entirety of the shirt,

25   you're saying that would be in violation of your mark?

N16Qadi1

1          MR. HENN:  So two things:  First, if adidas made that,

2     it would comply with its guidelines and you saw the guidelines.

3          THE COURT:  I'm talking about someone else.

4          MR. HENN:  Okay.  Well, if someone else did it, the

5     question will be confusing similarity.  So is it done in a way

6     that is confusingly similar.

7          THE COURT:  No, I think what that shows is how

8     excessively vague and overbroad your definition of the mark is.

9     Are you saying the example I put to one witness, supposing it

10    was instead of three marks across the chest, it was a spiral, a

11    red, white and blue spiral in the middle of the jersey, and

12    you're saying that's a violation of your mark?

13         MR. HENN:  Your Honor, this gets back to what I said.

14    There are two buckets of things that you seem to be pushing

15    into one bucket, and I want to make sure because legally they

16    are different.  One is what we claim to own, which is how we

17    use it and what is protectable and what is defined as our mark.

18         The second bucket, which is what you seem to be asking

19    about but in the context of this (indicating), the second

20    bucket by statute is everything --

21         THE COURT:  No.  No.  I understand all of that.  Thank

22    you very much.  And you've told me that 14 times and eventually

23    it did penetrate through.  But you have asked me to instruct

24    the jury that you have a mark called the Three-Stripe Mark,

25    and, therefore, I need to say to the jury what that means.  And

if what you claim it means is any combination of three parallel

stripes on a product that you compete for, then I think that

is, as a matter of law, too vague and overbroad to be a mark

that you can pursue.

MR. HENN:  So, again, your Honor, what we own and what

we would have the jury instructed that we own as the

Three-Stripe Mark has nothing to do with what --

THE COURT:  I don't think you own something that broad

and vague.  That's my point.  And I think contrary to your

cases, which I find overstated, I think you don't own anything

that cannot be defined with greater specificity than you're

giving me now.

The second point, of course, is also relevant.  If

there were three stripes looking exactly like an adidas stripe

on the side of a motorcycle, you're not claiming that's

infringement, but you're not claiming it's an infringement

because you don't make motorcycles, right?

MR. HENN:  Correct, it would not likely be confusingly

similar because consumers seeing it on a motorcycle probably

would not associate it with adidas.

THE COURT:  What about if it's on a motorcycle jacket?

MR. HENN:  If it's on a motorcycle jacket, I believe

consumers would be confused and think, okay, adidas is known

for jackets, they're known for motor sport jackets, and if I

see stripes on that, I'm confused.

1          THE COURT:  I understand that.  That's the second

2     point you're calling the second bucket.

3          MR. HENN:  Right.

4          THE COURT:  But I do not -- and, indeed, I think,

5     frankly, although they haven't been raised, there are antitrust

6     implications to your claim that you own -- as a mark, you own

7     any time three parallel stripes appear on any product that you

8     are involved with.  That cannot be right.

9          MR. HENN:  Your Honor, it's no different than Apple.

10    It's no different than --

11         THE COURT:  It is totally different than Apple.  I was

12    thinking about this.  I think a good analogy in some ways is

13    Chevron.  Chevron has two stripes, but they are always the same

14    color.  They are always the same angle.  They are not the

15    vast -- no one at Chevron, so far as I know in any way -- just

16    assume this -- no one at Chevron claims that they own the mark

17    for all two stripes.  They own a mark for two very specifically

18    placed stripes that are specific colors, specific angles,

19    everything.

20         So that's the problem I'm having with your definition.

21    I thought it was a point made in defense counsel's brief which

22    I thought was pertinent.  Not all your witnesses defined it as

23    three parallel stripes.  One witness said it's the Three-Stripe

24    Mark that, you know, the -- oh yes, a duck is a duck is a duck,

25    as Justice Scalia would say.

N16Qadi1

         MR. HENN:  The first time she was asked, she said

Three-Stripe Mark is a Three-Stripe Mark.  Counsel asked her

again for more specificity, and she specifically said three

parallel stripes.

         THE COURT:  I'm not making any rulings this morning.

I'm not yet convinced that this case can go to the jury saying

that adidas owns as its mark any three parallel stripes that

appears on any item of clothing of a competitor.

         MR. HENN:  The registrations themselves provide adidas

rights in the Three-Stripe Mark on a variety of products.

         THE COURT:  Your adversary is not contesting the

registration.  If you want to say to the jury adidas has 17

registered and here they are, they're in evidence already, and

you can find that they infringe those particular marks, I'm

fine with that.

         MR. HENN:  Let me finish where I was going with my

point.

         THE COURT:  Yes, I'm sorry.

         MR. HENN:  Which is, we have registrations.  The law

is clear that if you own or you are using marks if you want to

refer to them as plural, but if you are using the mark that is

registered in a different way, say, it's depicted in the

registration down the sleeves, and in this case we're saying

when people see horizontal marks, as we saw in the Poret

survey, when they see horizontal stripes, they think adidas.

1    The standard is if there is a continuous or continuing

2   commercial impression, in other words, do consumers -- because

3   they've been exposed to the Three-Stripe Mark in many different

4   ways, do consumers perceive all of those Three-Stripe uses that

5   we are asserting as executions of the single mark.  If they see

6   a common commercial impression between what's registered and

7   what has been used, it's legally the same mark.  There's the

8   *Dial-A-Mattress* Federal Circuit case on that.  So at a minimum,

9   if you were to go down the path that it sounds like you are –

10   THE COURT:  I don't know of any case that governs me,

11  but maybe I'm wrong.

12   MR. HENN:  Granted.  I'm just telling you that's what

13  the Federal Circuit held in *Dial-A-Mattress*.  The language is

14  very clear.

15   THE COURT:  I have respect for the Federal Circuit

16  even though it is the single, most reversed circuit in the

17  Supreme Court in the United States, but go ahead.

18   MR. HENN:  At a minimum, it seems to me the solution

19  to this is not to instruct the jury that there are 47 different

20  Three-Stripe marks.  What the jury should be instructed about

21  is that question of law.  You know, plaintiff asserts it has a

22  mark and it's called a Three-Stripe Mark, and it consists of

23  Three-Stripe.  It's covered by its registration, but also used

24  in other ways.

25   Defendant claims there are a whole bunch of different

N16Qadi1

marks, and you should assess whether the evidence presented
suggests it's one mark or multiple marks.  You should assess
based on the evidence presented do they have a common
commercial --

THE COURT:  That's a possibility, but then of course I
have to tell they have to find to determine whether it is one
mark or several marks.  Part of the problem I have with
defendant's position which is -- I want to hear from them
now -- is I think it is not consistent with good jury practice
to say that they have to find and indicate in their verdict,
oh, it's this mark, registered mark or that registered mark.

My experience over the modest 27 years I've been on
the bench and the 400 trials I've had is that a special verdict
is simply an invitation to confusion.  So I'm very disinclined
to go that route.

But let me hear from defense counsel.

MR. MALDONADO:  Your Honor, good morning.  So we do
believe that the trademark, as you said, should be defined and
there hasn't been consistency among the witness as to what the
Three-Stripe Mark is.  And part of the problem is sending it to
the jury to deliberations without an instruction or definition
is we have had witness after witness after witness over the
last three days talk about the Three-Stripe Mark without
anybody --

THE COURT:  Well, their definition is, as they just

1    reaffirmed, three parallel stripes.  What I'm suggesting

2    favorably to you --

3              MR. MALDONADO:  Yes.

4              THE COURT:  -- is that's immensely overbroad.  I

5    haven't finished reading all the cases you both very kindly

6    provided to me, and I may change my mind, but I don't think

7    that is on its face a valid mark.

8              MR. MALDONADO:  Right.

9              THE COURT:  So then the question is how do you narrow

10   it.  They're saying it doesn't need to be narrowed just to the

11   17 marks that everyone agrees they own.  But also it includes,

12   to use a terrible word, a penumbra or the essence of what you

13   can gather from looking at all of those 17.  That all sounds

14   very nice in the abstract, but it's very hard to put into the

15   concrete is the problem I'm having.

16             MR. MALDONADO:  Right.  And I think that that argument

17   gets into the second bucket that Mr. Henn talked about as to

18   whether there's confusing similarities between their mark and

19   whatever the accused marks are.  In this case, your Honor, the

20   complaint lists more than the 17 registrations that they're

21   currently asserting in this case.  So they've already gone

22   through the exercise or they've gone through registrations, and

23   they've selected the ones that they want to assert in this case

24   against my client's infringing or accused products.  And so

25   they've already determined that not all of their registrations

apply in this case, and they selected the ones that they want

to assert, which is kind of contrary to their notion that they

have one mark, that all registrations cover the same mark

because there's only a subset of registrations that are at

issue in this case.  So if we tie the Three-Stripe Mark to

those registrations that they're asserting, that makes the most

sense in this case rather than having some undefined trademark.

THE COURT:  So assuming I were persuaded to do that --

and, as I said, I'm making no rulings this morning, I'm still

thinking this issue through -- would you have any problem with

the jury, assuming they were instructed as you suggest, that

you have to find that a particular use by the defendant was a

violation of one of those 17 marks, that they have to -- that

they don't have to specify which one they found.  That's the

practical problem that I think it raises, and I will take the

liberty of giving you an example from one of the many examples

I could give.

So I had a copyright case in which copyright liability

had already been determined so all the jury had to determine

was damages.  There were 114 copyright violations.  And I said

to the parties, let's just have the jury give a general

verdict.  And both sides were quite adamant, "No, we need 114

separate verdicts because there is this nuance

as to number one on damages, and there's that nuance as to

number two on damages.  So, of course, always being guided by

1    the wisdom of counsel, I agreed to that.

2         So the jury comes back and they have different amounts

3    for each of the 114.  When you added them up they came to -- by

4    the way, it took forever to take the reading of the verdict

5    because after each one, we had to ask all members of this civil

6    jury -- there were eight in that case -- is that your verdict

7    as to Count One, Count Two and so forth.  It added up to though

8    exactly $300,000.  And everyone had expected a verdict that

9    would be in the low millions just from the nature of the case.

10        So then that was a Friday afternoon.  About 6:00 I get

11   a call from one of the jurors who had just read about the

12   overall edition in the papers, in the media.  And she said,

13   "No.  No.  No.  We agreed to 3 million."  And then I got a call

14   from the foreperson of the jury who said, "I'm getting calls

15   from all the other jurors, we really agreed to 3 million."

16        So I held a hearing on Monday morning with counsel,

17   and individually we voir dired the jurors, and they all said

18   the same thing.

19        When they got in the jury room, they all said, "We're

20   not going to go through 114 separate.  We think overall it's

21   worth 3 million bucks."  And then they turned foolishly to an

22   investment banker and said, "Okay, you whack it up for each of

23   the 114."  And the investment banker used a calculator but put

24   in a wrong decimal place.  And so we got this very strange

25   verdict.  So, you know, not so easy to overturn a verdict, but

1    nevertheless I declared a mistrial, and the parties settled a

2    week later for a million and a half bucks.

3        Now, I give you that long-winded story just to show

4    that you can't expect a jury to be a group of scientists or a

5    group of technologists or whatever.  We have a terrific jury

6    here, but there is only so much we can ask them to do.  So I

7    think I'd be more inclined in your direction if you were

8    agreeable to a general verdict, notwithstanding that they would

9    be in this hypothetical instructed that you have to find for

10   any violation that it was a violation of one or more of the 17

11   registered marks.

12       MR. MALDONADO:  Your Honor, I think that if we're

13   limited to the registrations that are asserted in this case,

14   that we could consider them -- the jury could consider them as

15   a group.  I think our concern is more on the accused products

16   that fall in certain buckets.  There are different types of

17   products that are accused and different groupings of products

18   that are accused.

19       THE COURT:  All right.  Let me go back to plaintiff's

20   counsel.  In terms of this case as opposed to the abstract,

21   does adidas really care whether the jury is told that they own

22   the Three-Stripe Mark in all its beauty and goodness, or that

23   they can collectively find infringement if it infringes any or

24   all of the -- or any one or more of the 17 marks adding, of

25   course, the colors, you know, the marks themselves saying color

1    doesn't matter and stuff like that.

2         MR. HENN:  As to the claim under Section 32 of the

3    Lanham Act, that would be appropriate -- that would be

4    inappropriate, frankly, reversible error under the Section 43

5    claims or the common law claims because those are not tied to

6    registrations.

7         THE COURT:  Well, that's a good point.

8         MR. HENN:  So we would need to address it.  The

9    instruction I proposed earlier gets to that because the idea

10   would be the other marks -- the other iterations of the mark

11   we'd have shown the jury, they could conclude those have the

12   same commercial impression, and therefore even though it's not

13   in a registration certificate, they deem it part of the

14   Three-Stripe Mark and therefore afford it appropriate

15   protection and find that what they have done is confusingly

16   similar.

17        I think on this point, it's worth pointing out that

18   defendants are doing exactly the same thing with the Grosgrain.

19   They've registered it in this little square orientation,

20   DTX-131, which they use back here.  And then when they want to

21   argue that we've delayed or that we were somehow doing

22   something crazy, they say, "Oh, but that's our Grosgrain all

23   the way down the arm, and that's the Grosgrain on the sleeve."

24   They're doing exactly the same thing.  They're essentially

25   saying we have one mark, but we can use it all these different

N16Qadi1

1    ways, and it's covered by the registration by this little

2    square.

3              THE COURT:  It am shocked to hear that owners of marks

4    on either side of the case think that their mark should be

5    broadly interpreted.  What a surprise.

6              MR. HENN:  Exactly.

7              THE COURT:  So, anyway, this has been very helpful.

8    I'm making no rulings today.  I think the time when this will

9    come up will be at the charging conference.  But this has been

10   very helpful.  Let's see if the jury is here.

11             MR. MALDONADO:  Your Honor, could I for the record --

12   we didn't make that argument that he just said.  So just for

13   the record, that's not the argument we've made.

14             MR. HENN:  I know you will control the schedule how

15   you see fit, your Honor, but I wonder if that Wednesday

16   afternoon slot might be an appropriate time for us to do the

17   charge conference.

18             THE COURT:  You read my mind.  That's exactly when I

19   would like to do it if we're at that stage.  Okay.  If not, we

20   can always do it -- and this is not a joke -- I have done it in

21   the evening, and because we have such fantastic court

22   reporters, I've not hesitated to go to midnight where

23   necessary.  So just a threat.

24             Let's get the witness back on the stand.

25

1    (Jury present)

2    THE COURT:  Good morning, ladies and gentlemen.  Thank

3    you as always for your promptness.  I'm glad we're able to get

4    going right away this morning.  This stands in direct contrast

5    to the House of Representatives of the United States, but, in

6    any event, we're ready to proceed.

7    Go ahead, counsel.

8    MR. LEWIN:  Thank you.

9    SARAH VANDERHOFF, resumed.

10   CROSS-EXAMINATION CONTINUED:

11   BY MR. LEWIN:

12   Q.  Ms. Vanderhoff, good morning to you.  I hope you made it in

13   without getting too wet.

14   A.  Good morning.

15   Q.  You testified yesterday that you learned of what the judges

16   call the four-stripe problem in May of 2018, correct?

17   A.  No, I believe I testified that we reached out to Thom

18   Browne's counsel in the U.S. in May of 2018.

19   Q.  All right.  And you learned of the problem earlier than

20   that, correct?

21   A.  Earlier that year, yes.

22   Q.  And under what circumstances did you learn of the

23   four-stripe problem?

24   A.  I learned about it from my colleague in Europe Dana Kabela.

25   Q.  What did she do, send you a note or something?

1    A.  She or someone on her team sent me a note.

2    Q.  And Thom Browne, according to her testimony yesterday and

3    in deposition, didn't come up on your radar screen at all

4    before 2018, correct?

5    A.  That's correct.

6    Q.  And do you remember testifying that you were surprised --

7    yesterday that you were surprised to find that he was doing

8    some athletic gear because you knew he was in or you had known

9    him to be a luxury men's fashion designer who made formalwear.

10   Do you remember that?

11   A.  Yes.

12   Q.  And that implies at least, pardon me -- how did you come to

13   know that Thom Browne was in formalwear as a luxury designer

14   prior to the information that you obtained in 2018 that you

15   were referring to that surprised you?

16   A.  It's hard to say with brands when I personally knew of him

17   in that way.

18   Q.  Do you have some sense of how far in advance you knew Thom

19   Browne was a luxury designer of men's fashions?

20   A.  No.  I think adidas knew them to be that from the earlier

21   2007 dispute.

22   Q.  You said -- you used the plural "we" in answering the

23   question.  "We knew him to be."  Who are you referring to?

24   A.  Adidas.

25   Q.  Adidas.  Do you have anybody in mind at adidas that knew

1    earlier than you're claiming?

2    A.  I'm sorry, I don't understand the question.

3    Q.  Let me rephrase it for you.  Who is it that you had in mind

4    when you said "we"?

5    A.  I guess adidas.  Ms. Backman handled the matter back in

6    2007 with Thom Browne.

7    Q.  And did she ever indicate to you in 2007 that she had an

8    awareness of Thom Browne as a men's fashion designer?

9    A.  I don't -- I don't think so.  I don't recall talking to her

10   about it.

11   Q.  So it wouldn't have been her that you're referring to

12   earlier, could you?

13   A.  Well, when I say "we," I'm referring to adidas, the

14   company.  And so as part of my job, I know the history of this

15   dispute because of this.

16   Q.  Why did you use -- what did you have in mind other than the

17   broad 90,000 employees or something that comprises adidas

18   globally that gave rise to the impression that you had

19   earlier -- that adidas had earlier knowledge?

20           MR. FLEMMING:  Objection, your Honor.  Legal

21   conclusion.

22           THE COURT:  Well, it's not ideally phrased, but I

23   think what he is inquiring about is you had the impression that

24   Thom Browne was limited to men's fashion designs of a certain

25   market, and he wants to know how you got that impression.  And

1    I take it, it's not something you got from Ms. Backman because

2    you didn't discuss this matter with her, right?

3              THE WITNESS:  Correct.

4              THE COURT:  So did you get it just from your general

5    knowledge of the fashion industry or do you have any specific

6    recollection of ever discussing it with anyone at adidas prior

7    to the events of 2018?

8              THE WITNESS:  I didn't discuss it with anyone at

9    adidas prior to 2018, but in the course of this dispute,

10   knowing what happened back in 2007, the product at issue was

11   formalwear.

12             THE COURT:  What you're saying is after the matter

13   arose in 2018, you went back and looked at the internal

14   documents or discussed with people what had happened in 2007.

15   Is that right?

16             THE WITNESS:  That's right.

17             THE COURT:  And that's the source of your belief that

18   adidas knew earlier that Thom Browne was involved in high-level

19   men's fashion.

20             THE WITNESS:  Thank you.  Thank you for helping me get

21   there.

22             THE COURT:  Go ahead, counsel.

23             MR. LEWIN:  Thank you, your Honor.

24   BY MR. LEWIN:

25   Q.  Now, you arrived at adidas in 2018, as I understand your

1  testimony.  Is that correct?

2  A.  That's right.

3  Q.  And your testimony was that you had no discussions with

4  Ms. Backman, your predecessor?

5  A.  That's right.  When I joined the company, I did not speak

6  to Ms. Backman.

7  Q.  Right.  And that there was no transition memo left for you,

8  correct?

9  A.  That's right, there was not.

10  Q.  And that in that same time period, you were not aware of

11  Thom Browne, correct?

12  A.  Correct.

13  Q.  Now, before you moved over to adidas, I think your

14  testimony was that you were an associate; you used the term

15  lowly associate in Kilpatrick Stockton, correct?

16  A.  Correct.

17  Q.  And that you worked at least some of the time with

18  Mr. Henn, correct?

19  A.  Correct.

20  Q.  And that you worked on most of the adidas cases while you

21  were at Kilpatrick Stockton?

22  A.  I worked on many of them.

23  Q.  I think your terminology when you testified earlier was

24  "most."  Is that correct?

25  A.  If I said that, yes.

1  Q.  And you don't recall whether any of those were Thom Browne

2  matters, are correct?

3  A.  No.  I have no recollection of working on a Thom Browne

4  matter.

5            THE COURT:  To put it slightly differently, is it your

6  best recollection that you did not work on a Thom Browne matter

7  during your period as an associate, a well-respected associate,

8  I'm sure, at the firm?

9            THE WITNESS:  That's right.

10            THE COURT:  Okay.

11  Q.  Can I show you PX-0174, please.

12            Do you recognize this document?

13  A.  Yes.

14  Q.  It's a privilege log, right?

15  A.  Right.

16  Q.  And a privilege log is a summary form of recording events

17  that take place that otherwise would be privileged between

18  counsel and client or counsel to counsel pertaining to a

19  matter, correct?

20  A.  Correct.

21  Q.  Now, you weren't always known as -- by your current last

22  name, correct?

23  A.  Correct.

24  Q.  And I think that you had a -- as most of us do, on the

25  women's side, at least -- another name before getting married,

1  correct?

2  A.  Correct.

3  Q.  And what name was that?

4  A.  Maurer.

5  Q.  Now, I'd like to call your attention to line 5 on the

6  privilege log, if I may.  Can you read this and then give me a

7  general description, give the jury a general description?

8          THE COURT:  Is this in evidence?

9          MR. LEWIN:  Yes, sir.

10         THE COURT:  Okay.  Go ahead.

11 Q.  If you might, this is divided only because of the -- if I

12 may, it's one line.  The length of the document requires

13 splitting it up.  If you could, tell us the date first on the

14 left.

15 A.  November 21, 2006.

16 Q.  And the privilege is asserted that's clear, I think.  And

17 can you say who sent it?

18 A.  I did.

19 Q.  And who did it go to?

20 A.  It went to Charlie Henn.

21 Q.  He's the attorney sitting here, right?

22 A.  Right.

23 Q.  And can you say what the subject matter of it was?

24 A.  Potential claims, litigation research, strategy, or

25 analysis in adidas v. Thom Browne.

1    Q.  Correct.  Now, that would indicate that you had at least

2    some conversation with Charlie Henn in 2006, correct?

3    A.  It would.

4    Q.  All right.  Does that refresh your recollection that

5    perhaps you learned about Thom Browne earlier than 2018?

6    A.  It doesn't.  I have no recollection of this email.

7    Q.  And you know it's an email because it says message,

8    correct?

9    A.  Correct.

10   Q.  So you have no recollection on November 21 -- on the events

11   of November 21, 2006?

12   A.  That's right, I don't.

13   Q.  Would you agree with me that the --

14             THE COURT:  I'm sorry.  I apologize profusely.

15             Counsel, come to the sidebar.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Does someone have a copy here in court of

3    the underlying email?

4              MR. HENN:  Not in court.  I'm sure we can track it

5    down.  It's on the log.

6              MR. LEWIN:  It's privileged.

7              THE COURT:  Of course it's privileged.  The reason I'm

8    raising this, there's a possibility that privilege may be

9    waivable in this situation.  I'm not sure.  But I wanted to see

10   the email before I raised this with counsel so if someone will

11   get me the email since the witness is going to be here all the

12   time, we can always recall her if necessary.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. LEWIN:

3    Q.  I'd like to show you PX-175, if I may.  Do you recognize

4    this?

5    A.  I do.

6    Q.  Again, it appears to be an email, correct?

7    A.  Correct.

8    Q.  And it appears to be sent from you -- from Vanessa Backman,

9    pardon me, to Mr. Henn on November 15, 2006, correct?

10   A.  Correct.

11   Q.  It says the subject is Thom Browne, correct?

12   A.  Yes.

13   Q.  Have you seen this before today?

14   A.  I believe so.

15   Q.  Have you seen this before today?

16   A.  I believe I have.

17   Q.  When did you first become aware of this?

18   A.  In the course of this litigation.

19   Q.  Would it be fair to say that you became aware of it when

20   you reviewed the privilege log that you indicated you had

21   reviewed this comes to your attention?

22   A.  I can't say exactly when I saw this document, but it was

23   sometime in the course of this current dispute.

24   Q.  Can we have page 2 of the document up, please.

25              Have you seen this page before today?

1    A.  Yes.

2    Q.  When did you first see this page?

3    A.  Again, it would have been in the course of this litigation.

4    Q.  So you didn't see this page prior to the litigation,

5    correct?

6    A.  I don't have a recollection of seeing this page prior to

7    this dispute, no.

8    Q.  And would you agree with me that this is the article that

9    Vanessa Backman testified started her inquiry into Thom Browne?

10   A.  Yes.

11   Q.  And that was in 2006, right?

12   A.  That's right.

13   Q.  While you were still an associate at Kilpatrick Stockton?

14   A.  That's right, brand new.

15   Q.  Can we go back to 174 please, plaintiff's 174.  Could we

16   look at line 6.

17          Would you agree with me that this line asserts

18   privilege over a communication from Vanessa Backman to Charlie

19   Henn?

20   A.  Yes.

21   Q.  And this was sent 11/21/2006?

22   A.  November 22, 2006.

23   Q.  22, pardon me.  Yes.  And this would appear to be an email,

24   correct?

25   A.  Yes.

1    Q.  And it, again, apparently was involved with potential

2    claims, litigation, research, strategy or analysis in adidas v.

3    Thom Browne.  Do you see that?

4    A.  I do.

5    Q.  And this would represent a second contact from Vanessa

6    Backman to Charlie Henn regarding Thom Browne strategy,

7    correct?

8    A.  I don't know how many times Vanessa contacted Charlie.

9    Q.  I'm not asking that.  If I may be clearer for you.  You

10   just read an email on a privilege log that was dated

11   differently than the one you're looking at.  So I'm asking you

12   that at least there are two times that Vanessa Backman, right,

13   contacted Mr. Henn while you were the associate at Mr. Henn's

14   office engaged in most of the adidas cases, correct?

15   A.  This is a second communication, yes.

16   Q.  All right.  I show you now, please, what's been marked as

17   Plaintiff's 176.  Do you recognize this redacted document?

18   A.  Is this the same one we just looked at?

19   Q.  Frankly, no.

20   A.  So this is -- yes, okay.

21   Q.  If we can flip back for a second to 174 just for a second,

22   line 4.  That's on the 21st of November 2006, right?

23   A.  That's right.

24   Q.  And that had with it a second page document, correct?

25   A.  I'm not sure.  I'd have to look at it again, sorry.  It's

1    hard to remember the redacted.

2    Q.  Let's look at it again then.  Let's look at the email, the

3    redacted email.  Let's look at the second page.  Now, this one

4    will has an ink circle around it, a pen circle, correct?

5    A.  Yes.

6    Q.  And is this something that you've ever seen before this

7    litigation?

8    A.  No, not before this litigation.

9    Q.  You would agree with me, would you not, though that this

10   would appear to be different from the attachment on the earlier

11   email, correct?

12   A.  Correct, it's written on.  It's the same document, but it's

13   written on.

14   Q.  Can we go to PX-176, please.  I'm sorry.  Yes.  Let's go to

15   that second page.

16           Would you agree with me that adidas must have been at

17   least concerned about Thom Browne's three stripes on a sports

18   jacket in 2006, concerned enough to send an email twice to

19   Mr. Henn?

20   A.  Yes, they were concerned.

21   Q.  Can we look at line 5 of 174, please.  We saw this a moment

22   ago.  This is a communication, slightly different, this is

23   going from you, correct?

24   A.  This is the same one we looked at earlier, yes, from me.

25   Q.  Yes, it's going from you to Charlie Henn, right?

1    A.  Right.

2    Q.  Would you agree with me it's on the same date, at least

3    that the email from Vanessa Backman went to Charlie Henn with

4    the second page?

5    A.  Yes.

6    Q.  You would agree with me.

7            And you would also agree with me that the subject

8    matter of your privileged email is litigation, research and

9    some other things against Thom Browne?

10   A.  Yes.

11   Q.  Did you do that research?

12   A.  I'm sure I did.  I don't remember the substance of this

13   message.

14   Q.  Well, during the course of that research, did you discover

15   who Thom Browne was?

16   A.  I am sure I did.

17   Q.  Thank you.

18           Would it be fair to say that it was common practice

19   for Mr. Henn to have you do research to determine the validity

20   of a trademark claim that they might be forwarding?

21           THE COURT:  Sustained.

22   Q.  If we could go back to PX-175, second page, please.  Can we

23   blow up the second column?

24           Would you agree with me that the press article

25   indicated that not only were the goods of Thom Browne being

1    sold at Thom Browne shop but also Bergdorf Goodman, Barneys,

2    Jeffrey, Colette and other upscale retailers?

3    A.  Yes, that's what it says.

4    Q.  Do you recall taking any steps in 2006 or, for that matter,

5    between 2006 and 2018 to visit any of the stores listed, all of

6    whom -- most of whom would appear to have branches in the New

7    York metropolitan area?

8              MR. FLEMMING:  Objection.  Hearsay.

9              THE COURT:  Well, also let me ask the witness because

10   I'm a little unclear.  The sentence that's being highlighted

11   says, "Browne stressed that the menswear for sale in the

12   store" -- meaning his store -- "is not from his runaway

13   collection.  Those looks are sold in Bergdorf Goodman, Barneys,

14   New York, Jeffrey, Colette and other upscale retailers."

15             Do you see that?

16             THE WITNESS:  I do.

17             THE COURT:  So is it your understanding that what

18   Mr. Browne was saying was that his stuff was not being sold in

19   his store?

20             THE WITNESS:  I'm sorry.

21             THE COURT:  At least not the stuff from his runway

22   collection -- excuse me -- not runaway, but runway.

23             THE WITNESS:  Correct.

24             MR. LEWIN:  Your Honor, if I may before she answers, I

25   think she's testified she hasn't seen this before.

1    THE COURT:  I know, but you're questioning her about

2    it and therefore we need to understand, and the jury needs to

3    understand, what's actually being stated in these two

4    sentences.

5    MR. LEWIN:  Fair enough.

6    Q.  Now, you indicated that you've been deposed as a witness

7    for adidas many times, I think was the expression?

8    A.  I have.

9    Q.  And at least twice in this current matter, correct?

10   A.  That's right.

11   Q.  When you were deposed on July 19, you were under oath,

12   correct?

13   A.  That's right.

14   Q.  And you were informed that if you didn't understand a

15   question, you could tell the examining attorney?

16   MR. FLEMMING:  Objection.  Is this impeachment?

17   THE COURT:  Counsel, I don't think we need to go

18   through all of that.  If you want to impeach her, give the page

19   number and lines.

20   MR. LEWIN:  I'll withdraw it, your Honor.

21   THE COURT:  Okay.

22   Q.  Now, I think you indicated that your group at adidas during

23   the time you have been there sent 200 formal demand letters to

24   infringers since 2008.  Is that correct?

25   MR. FLEMMING:  Objection.  Privileged.

1          THE COURT:  How many formal demand letters, if you

2     know, has your group at adidas sent since 2008?

3          MR. FLEMMING:  Objection.  May we have a sidebar your

4     Honor very briefly?

5          THE COURT:  Sure.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  That could not possibly be privileged.

3          MR. FLEMMING:  I apologize.

4          We weren't allowed to present testimony on adidas

5     specific enforcement efforts.

6          THE COURT:  That's not true.  You were allowed to do

7     that.  What I cut you off on was the specific reference to how

8     many cases resulted in verdicts in your favor and things like

9     that.  We got into a discussion about Mr. Henn's great success,

10    but of course he is still aiming for a bar, but the -- there

11    was general discussion about this that was allowed.  Overruled.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  I think the pending question is:  Do you

3   have a knowledge of approximately how many formal letters were

4   sent -- I don't have the exact words in front of me -- but

5   maybe counsel wants to put the question.

6           MR. LEWIN:  I do.

7   Q.  You recall stating in your declaration that your group had

8   sent over more than 200 settlement agreements involving the

9   Three-Stripe Mark since 2008?

10  A.  I'm not sure what declaration you're referring to.

11          THE COURT:  You can show it to her to refresh her

12  recollection if you have it.

13          MR. LEWIN:  Unfortunately, it's loose.

14          THE COURT:  Don't identify what it is.  Just show it

15  to her.

16          MR. LEWIN:  It's a declaration --

17          THE COURT:  No, I said don't identify it.

18          MR. LEWIN:  I'm sorry, I thought you said please

19  identify it.

20          THE COURT:  No.

21          MR. LEWIN:  It's two-sided printing.

22          THE WITNESS:  Oh, double-sided.  Okay.

23          THE COURT:  Let me see.

24          MR. LEWIN:  Thank you, your Honor.

25          (Continued on next page)

BY MR. LIMAN:

Q.  Having seen the document that I just showed you, does it refresh your recollection as to whether or not you've asserted that 20 or more formal demand letters were sent since 2008 regarding the Three-Stripe Mark?

A.  Yes, that's right.

Q.  All right.  Having reviewed the document I just showed you, would it be fair to say that adidas has entered more than 200 settlement agreements in the Three-Stripe Mark since 2008, is that correct?

A.  Yes.

Q.  You've negotiated, in the past decade or so, at least 50 business-to-business resolutions with potential infringers of Three-Stripe Marks, is that correct?

A.  Yes.

Q.  Now you also sent take-down notices to large e-commerce websites, correct?

A.  Yes, we do that.

Q.  All right.  And that you filed more than 90 lawsuits in the United States since 2008, correct?

A.  Yes, we do.

Q.  And you have also filed, I think alleged since 2017 at least, that you filed over 100 proceedings with the U.S. Patent and Trademark office?

A.  That sounds right.

1   Q.  OK.  Which adidas registrations have you filed proceedings

2   on at the Patent and Trademark office, do you recall?

3   A.  I don't recall off the top of my head.

4   Q.  Would you agree with me that this panoply of effort

5   indicates that adidas considers its IP rights tremendously

6   important?

7   A.  Yes, we do.

8   Q.  Would you agree with me if I said that intellectual

9   property is probably the most important asset to a fashion

10  company?

11          MR. FLEMMING:  Objection, foundation.

12          THE COURT:  Sustained.

13  Q.  Now, I think you said as well that your team at least

14  monitors the marketplace to protect your client's IP rights, is

15  that correct?

16  A.  Yes.

17  Q.  In particular regarding trademark, is that correct?

18  A.  That's right.

19  Q.  All right.  And how many members of your team participate

20  in this monitoring effort?

21  A.  Everyone.

22  Q.  And I think, if you can remind me, we're talking about

23  North America United States right now, what do you have on your

24  team, four or five?

25  A.  Currently three and a half.

1  Q.  Three and a half.  I'm not going to ask -- I'm not asking

2  about a half.

3  A.  I'm just sharing literally.

4  Q.  I'm not going near that one.

5        And You've used outside investigators from time to

6  time to do this monitoring, correct?

7  A.  From time to time, correct.

8  Q.  And your employees are considered to stay alert and let you

9  know if they see things on the street that raise an issue for

10  them, is that correct?

11  A.  Yes.

12  Q.  Do you happen to know how many employees you have globally?

13  A.  I don't know that.  Tens of thousands, but I don't know

14  exactly how many.

15  Q.  Do you know happen to know how many employees you have in

16  the United States?

17  A.  I don't know that.

18  Q.  Do you think it's more than 5,000?

19  A.  I think it's -- I mean, I'm totally speculating -- more

20  than five, but probably less than 10,000 is my guess.

21  Q.  Fair enough.

22        And you have fans of the adidas brand, correct?

23  A.  We do.

24  Q.  All right.  Now, when you have -- withdrawn.

25        Your salespeople in the United States, do they sell

1   their accounts by region?

2   A.  Um, I -- I'm not exactly sure how they organize their

3   setup.

4   Q.  Did you ever hear the expression national accounts?

5   A.  Well, there are definitely customers who sell nationally,

6   yes.

7   Q.  OK.  Nordstrom's, Neiman's, those would be national

8   accounts, would you agree?

9   A.  I'm not sure if Neiman's would be.  I know Nordstrom is.

10          THE COURT:  This is not your department, correct?

11          THE WITNESS:  No.

12  Q.  Do you ever receive information from your sales team about

13  possible infringements?

14  A.  Yes, I do.

15  Q.  And aren't those salespeople pretty much knowledgeable

16  about their area that they sell into, correct?

17          THE COURT:  Sustained.

18          MR. LEWIN:  Thank you, your Honor.

19  Q.  Now, adidas also encourages its licensees to report

20  instances of possible infringement, correct?

21  A.  Um, I'm not sure if we encourage them to do that.  Maybe we

22  do.

23          THE COURT:  Do you receive reports from time to time

24  from licensees as to possible infringement?

25          THE WITNESS:  Yes.

1           THE COURT:  All right.

2     Q.  So when you go -- you have testified at one time that,

3     amongst other efforts, adidas monitors the marketplaces doing

4     sweeps, correct?

5     A.  That's right.

6     Q.  What is a sweep?

7     A.  Well, the term sweep has evolved.  A sweep is basically

8     looking at the marketplace, so sending people into certain

9     markets and to go to physical stores to go shopping, and mainly

10    shopping malls or other kind of high-traffic shopping areas.

11    Q.  For example, the infamous Canal Street, right?

12    A.  That would be one, yes.

13    Q.  That would be one for counterfeit goods?

14    A.  For counterfeit goods.

15    Q.  And when you're going into the higher-end department stores

16    doing sweeps or malls doing sweeps, you're looking for

17    everything?

18    A.  We're looking for everything in both kinds of locations.

19    Q.  All right.  You mentioned that a technique of doing market

20    sweeps has increased somewhat.

21          How often do you conduct these?

22    A.  Um, twice a year we physically visit stores.

23    Q.  Do you perform what you call a sweep at the stores if they

24    are larger than just straight in, walk in and see whatever they

25    are selling?

1    A.  Um, what do you mean?

2    Q.  I'll clarify it.

3            If you're going to do a sweep at Nordstrom's, do you

4    do all the floors at Nordstrom's?

5    A.  Yes.

6    Q.  OK.

7    A.  Yes.

8    Q.  Your sweeps aren't random, though, are they?

9    A.  Um, what do you mean by random?

10   Q.  Well, you indicated that you conduct regular sweeps in

11   major cities and you base that on reports received from people

12   in the street.  So I'm just suggesting that you have a goal in

13   mind?

14   A.  Do you want me to tell you, so when we're looking at where

15   to go do market sweeps, I might say, can you go to a shopping

16   mall in Chicago?

17   Q.  Fair enough.

18   A.  Something like that.

19   Q.  All right.  Have you ever received a tip about Thom

20   Browne's product at Nordstrom?

21   A.  Um, no, I have not.

22   Q.  How about Barney's?

23   A.  No.

24   Q.  And in your enforcement efforts, do you search online for

25   potential infringing products?

1    A.  We do search online.

2    Q.  Do you have a dedicated person at adidas that does this

3    work?

4    A.  Again, we kind of all do it.

5    Q.  Do you base it on any underlying information when you

6    conduct a search?

7    A.  Um, no, we're not.  We're just searching, again, kind of

8    places where lots of people shop.

9    Q.  Now, I think you indicated in your testimony that one of

10   the tools that you use is a trademark watch service, is that

11   correct?

12   A.  Yes.

13   Q.  And have you used that since you joined adidas?

14   A.  Yes.

15   Q.  OK.  And I think you also indicated that you instruct the

16   trademark watch service to alert you of trademark filings

17   involving stripes, is that correct?

18   A.  That's right.

19   Q.  And specifically when you say you alert them to filing

20   stripes, what are the parameters that they are instructed by to

21   alert you to?

22          MR. FLEMMING:  Objection, product privilege.

23          THE COURT:  Overruled.

24   A.  I don't know the exact parameters that we ask the trademark

25   service to provide, but it would be -- we would not be looking

1    for stripes applications in, like, the car class of goods, for

2    example.

3    Q.  When you define stripes for your watch service, how do you

4    define them?

5    A.  I don't know exactly how we define that, and it just -- it

6    pulls all of the applications.  We then review them and

7    investigate them.  It's not that we -- you know, it's just a

8    monitoring device.

9    Q.  I understand.  Do you have dedicated person in your team

10   that reviews the watch services?

11   A.  Um, not in my team, but on a comparable team in Amsterdam.

12   Q.  So the watch information doesn't go to you directly, it

13   goes to your team in Amsterdam?

14   A.  Right.

15   Q.  And would that be Dana Kabela?

16   A.  No.

17   Q.  Who would that be?

18   A.  Her name is Maya Rodale.

19   Q.  OK.  And which watch service reports to adidas?

20   A.  It's called Thomson, or Clarivate now, I think.

21   Q.  And they are obligated -- just so the jury is clear, their

22   obligation is to watch trademark applications wherever they are

23   watching then, and if something comes up with stripes, they

24   bring it to your attention, correct?

25        MR. FLEMMING:  Objection, vague.

1           THE COURT:  It's a little vague, but what's your

2   understanding of what they are asked to do?

3           THE WITNESS:  That's what they are asking to do.

4           THE COURT:  OK.

5           MR. LEWIN:  Thank you, your Honor.

6           THE COURT:  Counsel, I'll give you whatever time you

7   need.  It has been 45 minutes.  You estimated a half hour,

8   so...

9           MR. LEWIN:  I thought I had said an hour or less, your

10  Honor, but I may be wrong.

11          THE COURT:  I'm sorry.  You're correct.

12          MR. LEWIN:  I'll see --

13          THE COURT:  I was expressing hope rather than correct

14  recollection.

15          MR. LEWIN:  Thank you, your Honor.

16          It may be a bit longer than that, I'll be as fast as

17  I can.

18          THE COURT:  All right.  Go ahead.

19  BY MR. LEWIN:

20  Q.  Can I show you DTX 131, please.

21          Do you recognize this as a United States trademark

22  registration, correct?

23  A.  I do.

24  Q.  And it is for the Thom Browne Grosgrain ribbon, correct?

25  A.  Yes, I believe that's right.

1    Q.  OK.  And it's in what they call international class 25

2    which includes clothing, correct?

3    A.  Yes.

4    Q.  All right.  And if you look at this with me, can you

5    determine when this trademark application was filed?

6    A.  It was filed November 26, 2012.

7    Q.  All right.  Did this ever come to your attention in 2012?

8    A.  It did not.

9    Q.  It did not.

10         Have you ever become aware of this registration that

11   we're looking at?

12   A.  Again, in the course of this dispute, I became aware of it.

13   Q.  And were you reviewing trademark watch service notices in

14   2012?

15   A.  We were.  Our team was.

16         MR. LEWIN:  Your Honor, we would like to move this in,

17   if we can.  This hasn't been admitted yet.

18         MR. FLEMMING:  No objection.

19         THE COURT:  Received.

20         (Defendant's Exhibit 131 received in evidence)

21         MR. LEWIN:  Can we publish to the jury?

22         THE COURT:  Yes.

23         MR. LEWIN:  All right.  I'm sorry.

24   BY MR. LEWIN:

25   Q.  So this is just to summarize, this is a trademark

1   application in 2012 during the time you were receiving watch

2   notices that you don't recall ever seeing before this

3   litigation; fair statement?

4   A.  We did not receive this in the watch notice, that's right.

5   Q.  Well, that's a different -- let me explore that with you

6   for a moment.  I thought you weren't sure whether you received

7   them, the watch notices, personally reviewed them in 2012?

8   A.  Um, I -- I don't personally receive them, but my colleague

9   does and will send them to me.

10  Q.  OK.  And if I understand what you're saying is, that didn't

11  happen with respect to this particular trademark application,

12  is that correct?

13  A.  Um, we -- this trademark application did not show up on our

14  watch service.

15  Q.  And you know that how?

16  A.  Because when I became aware of this in the course of this

17  dispute, I went back and checked and it wasn't -- you know,

18  they missed it.

19  Q.  Now, you indicated that you spend considerable time and

20  resources monitoring the marketplace, correct?

21  A.  Correct.

22  Q.  All right.  You also indicated, however, that not

23  withstanding what happened in 2007 and 2008, Thom Browne didn't

24  come to your attention until 2018, correct?

25  A.  That's right.

1    Q.  And it didn't come to your attention as a result of any

2    sweep, did it?

3    A.  Um, no, it did not come to my attention that way.

4    Q.  All right.  It didn't come to your attention because of a

5    visit to a retail location?

6    A.  No.

7    Q.  And it didn't come to your attention because of the use of

8    investigators?

9    A.  No, it didn't.

10   Q.  In fact, it came to your attention because somebody picked

11   up a trademark application made by Thom Browne in Europe,

12   correct?

13   A.  That's right.

14   Q.  And it wasn't the four-bar that they picked up, it was an

15   application for the Grosgrain ribbon, correct?

16   A.  Um, correct.

17   Q.  Would it be fair to say that at the time that the

18   information was forwarded to you by your attention in Holland,

19   I think you indicated, that you were not aware of the growth of

20   Thom Browne?

21   A.  Um, the growth?

22   Q.  Yes, sir.  Ma'am, I'm sorry.

23             MR. FLEMMING:  Objection, vague.

24             MR. LEWIN:  I can be more specific if need be, but

25   I'll wait.

1          Your Honor, I'll rephrase.

2     Q.  At the time that you received the information in 2018 that

3     Thom Browne had filed an EU application, you weren't aware of

4     the size of Thom Browne, were you?

5     A.  Um, at the time I received the e-mail from my colleague, I

6     didn't know much about Thom Browne.

7     Q.  Well, you did know he was a high-end fashion company,

8     though?

9     A.  Right.

10    Q.  All right.  Was that the only information, that information

11    regarding an application for the Grosgrain trademark that you

12    received in 2018 from your various sources monitoring the

13    marketplace?

14          MR. FLEMMING:  Objection, vague.

15          MR. LEWIN:  I'm trying to move fast, your Honor.

16    A.  I believe --

17          THE COURT:  So there was an objection.

18          Overruled.  Go ahead.

19          MR. LEWIN:  Thank you.

20    A.  I believe Dana also included information about Thom Browne

21    that she had researched, but I don't recall the specifics.

22    Q.  As a result of this issue, you then looked into Thom

23    Browne's products, correct?

24    A.  I did.

25    Q.  And that was a website review, correct?

1    A.  Um, that's right.

2    Q.  And did you send any investigators down to the store at

3    that time?

4    A.  No.

5    Q.  Did you ask any of the employees of adidas to stop in the

6    store and take a look?

7    A.  No.

8    Q.  Did you even know where the store was located when you were

9    evaluating the website?

10   A.  I'm not sure.

11   Q.  Now, I think you said earlier, in evaluating what to do

12   when this comes to your attention, it is merely a website

13   review, correct?

14   A.  Well, when I'm evaluating a matter, I consider a lot of

15   different things that I can glean from someone's website.

16   Q.  Well, do you consider the products that are being sold?

17   A.  Yes.

18   Q.  On the website that is, to be clear?

19   A.  Yes.

20   Q.  And do you look at how the mark is being used, the stripes

21   in question in this instance, how they are being used?

22   A.  Yes.

23   Q.  All right.  Other than looking at the website, did you take

24   any other steps whatsoever in order to make your decision to

25   refer this to outside counsel?

1  A.  Um, I don't recall the timing of ordering product, but we

2  did order products as well.

3  Q.  OK.  And where did you order those products from?

4  A.  I believe from the website.

5  Q.  I think you heard, since you've been sitting here with all

6  of us, Mr. Henn referred to finding Thom Browne was like

7  finding a needle in a haystack.

8         Did you hear that statement from your counsel?

9  A.  Yes.

10  Q.  But you found him this 2006 and 2007, didn't you?

11  A.  They came to our attention in 2006.

12  Q.  Well, would it be fair to say that in 2018, when it came to

13  your attention again, you knew where he was?

14  A.  Um, adidas knew of Thom Browne, yes.

15  Q.  And you would agree with me that to lump it together, no

16  one was instructed or there is no evidence that adidas visited

17  the multi-brand department stores alleged to be selling Thom

18  Browne products?

19         MR. FLEMMING:  Objection.

20         THE COURT:  Ground?

21         MR. FLEMMING:  He's asking about basis of evidence.

22         THE COURT:  I think the question was a compound

23  question.  The first part was no one was instructed and the

24  second part was there was no evidence.

25         MR. LEWIN:  I can rephrase it, your Honor.

1          THE COURT:  Please.

2          MR. LEWIN:  I'm trying to move quickly.

3          THE COURT:  Yes.  But you can move quickly, but you

4     still have to abide by the rules of evidence.

5          MR. LEWIN:  I understand.  I'm still learning, your

6     Honor.

7     BY MR. LEWIN:

8     Q.   In 2018, did you instruct anybody to visit the multi-brand

9     department stores alleged to be selling Thom Browne products?

10    A.   Um, no, not in connection with this matter.

11         We may have visited department stores in 2018 as part

12    of our regular monitoring efforts, but...

13         MR. LEWIN:  I would move to strike everything after

14    "no."

15         THE COURT:  Granted.

16         MR. LEWIN:  Thank you, your Honor.

17    Q.   Now, I think you testified on your direct that Thom Browne

18    wasn't a threat until they moved or expanding or were found to

19    be expanding into sports wear?

20         Forgive the compound again.

21    A.   I don't know if I said they weren't a threat.  We aren't --

22    they've moved into our product categories by starting to sell

23    athletic-style apparel and footwear.

24    Q.   And what is your impression of when they did that?

25    A.   We became aware of that in 2018.

1    Q.  Would you consider sweatpants in your area of sales?

2    A.  Yes, we sell sweatpants.

3    Q.  And would you consider sweatpants to be athletic garments?

4    A.  Yes.

5    Q.  Nevertheless, adidas was concerned enough in 2006 to write

6    or communicate to Thom Browne his concern over the three bands

7    on a sports jacket, right?

8    A.  That's right.

9    Q.  And is it your position that four bands on a sports jacket

10   is different than three bands on a sport jacket?

11   A.  Yes.

12   Q.  If you knew Thom Browne was selling sweatpants in 2010 with

13   four bars on it, would you have taken action at that time?

14            MR. FLEMMING:  Objection, speculation.

15            THE COURT:  Sustained.

16   Q.  Do you consider the collaboration agreement between Thom

17   Browne and the soccer team FC Barcelona to be moving into your

18   area of sales?

19   A.  Um, what do you mean by sales?

20   Q.  Well, you testified that there was an expansion of Thom

21   Browne -- let me put it this way -- into sports and that that

22   concerned you, correct?

23   A.  That's right.

24   Q.  All right.  So do you consider the collaboration agreement

25   between FC Barcelona, the soccer team, an example of Thom

1   Browne moving into sports?

2   A.  Yes.

3   Q.  Would your answer be the same if I asked you about the

4   collaboration agreement between the Cleveland Cavaliers and

5   Thom Browne?

6   A.  Yes.

7   Q.  And would your answer be the same if I asked you about

8   putting clothing on Lebron James himself?

9   A.  Um, it's -- he's an athlete.  It suggests sports, yes.

10  Q.  So in your view it doesn't matter what the clothes are for,

11  is that correct?

12  A.  Um, no.  My testimony was that it suggested a move into

13  sports, and a lot of those media articles that I had seen

14  referenced the brand was going to be moving into athletic-wear.

15  Q.  But they didn't indicate at all, did they, that they had

16  moved into athletic-wear, correct?

17  A.  Um, I -- at the time of the articles, I don't believe so.

18  Q.  You're not aware, are you, that Thom Browne has put

19  on-field uniforms on sports teams?

20          THE COURT:  Sustained.

21          MR. FLEMMING:  Objection.

22  Q.  Now, you heard testimony throughout this trial about

23  collaboration agreement between adidas and Gucci, correct?

24  A.  Yes.

25  Q.  It's your earlier testimony, I believe, that adidas is not

1    aware of any collaboration product that's ever been marketed or

2    offered for sale without adidas' close oversight, do you

3    remember saying that?

4    A.  I'm not sure if you're saying I did.  I'm sure I did.  I

5    give lots of testimony.

6    Q.  Well, if I represented to you that it's in your

7    declaration, your first declaration --

8            THE COURT:  No, no.  You can show her the declaration.

9            MR. LEWIN:  All right.  She has it up there.

10           Can you turn --

11           THE WITNESS:  You took it back.

12           THE COURT:  You took it right back.

13           MR. LEWIN:  I have it.

14           Sorry.  I'm going to hand you up the document I showed

15   before and ask you to take a look at paragraph 17, if you

16   would.

17   BY MR. LEWIN:

18   Q.  Having had an opportunity to review the document I just

19   showed you, does that refresh your recollection that you stated

20   that adidas was not aware of any collaboration marketed or

21   offered for sale without adidas' close oversight?

22           MR. FLEMMING:  Objection, improper impeachment.  I

23   think the question can be rephrased.

24           THE COURT:  Overruled.

25   A.  Again, I don't remember my exact words.  I think I said

N16sADI2                    Vanderhoff - Cross

1    typically, but it is true that we are closely involved in all

2    of our collaborations.

3    Q.  And that includes presumably the Gucci collaboration,

4    correct?

5    A.  That's right.

6              THE COURT:  The declaration that has been

7    referenced --

8              MR. LEWIN:  Yes, sir.

9              THE COURT:  Excuse me.  This is to the witness.

10             -- is something that you presented on behalf of adidas

11   in this litigation?

12             THE WITNESS:  Yes.

13             THE COURT:  So it's a statement of a party adversary,

14   therefore there is no hearsay exception.  Therefore, if you

15   wish, the declaration can be received into evidence.

16             MR. LEWIN:  Thank you, your Honor.

17             We'll ask that it be admitted.

18             THE COURT:  All right.  Why don't you put a number on

19   it.

20             MR. LEWIN:  I think we had one, don't we?

21             THE COURT:  I think you're up to 900-something.

22             MR. LEWIN:  Probably you know better than I, your

23   Honor.

24             Do you have a number?  922.

25             THE COURT:  922.  Great.  I can't wait for 923.

1        Received.

2             (Defendant's Exhibit 922 received in evidence)

3             MR. LEWIN:  Thank you.

4    BY MR. LEWIN:

5    Q.  Now, I think you testified earlier that adidas, that you do

6    not believe that adidas owns the rights to use any number of

7    stripes on apparel, correct?

8    A.  That's right.

9    Q.  And adidas, in your view, would not own four stripes,

10   correct?

11   A.  That's correct.

12   Q.  And it wouldn't own the five stripes on a Grosgrain

13   signature, would it?

14   A.  Would adidas own?

15   Q.  Correct.

16   A.  No.

17   Q.  That five-color pattern?

18   A.  No, we don't own that.

19   Q.  OK.  And you don't own five or six stripes either, do you?

20   A.  No, we don't.

21   Q.  I believe you've testified that the mark consists of three

22   parallel stripes, correct?

23   A.  That's right.

24   Q.  And is that three parallel stripes in any configuration?

25   A.  Yes.  We own three stripes no matter placement.

1   Q.  So it wouldn't matter if it were a wavy three stripes as

2   long as they were parallel to each other?

3   A.  We don't use wavy three stripes.

4   Q.  Let me ask that question again.

5          Is it your assertion that adidas has rights that would

6   extend -- withdrawn.

7          That adidas has ownership rights of a wavy three-line

8   parallel design?

9   A.  I would need to see what you're talking about because we

10  don't do that.

11  Q.  All right.  How about what I think you called the hoop

12  design, which is the use of the three stripes in a circular

13  motif?

14  A.  Yes.

15  Q.  So it's your assertion that whatever rights you have extend

16  to that format, correct?

17  A.  Yes.

18  Q.  And that would be true with the use of three stripes on the

19  cuffs of a baseball jersey, say?

20  A.  Yes.

21  Q.  So would you agree with me that at least part of the

22  definition of your Three-Stripe Mark is that the marks are

23  separated, the three lines are separated, or bars?

24  A.  Yes, there is space between them.

25  Q.  There is space between them.

1        And sometimes that space is very carefully measured,

2    isn't it?

3    A.  Yes.

4    Q.  Like in the event of a circular hoop design?

5    A.  Um, we have certain dimensions for our stripes -- some of

6    our stripe executions.

7    Q.  That is in the ID brand manual that's been admitted

8    already, correct?

9    A.  That's right.

10   Q.  And if the stripes are being viewed or used -- I want to

11   say the court's term -- squished together, smooshed together,

12   would you consider that a version of --

13       THE COURT:  I don't think that was my term.  I think

14   it was used by the other side.

15       MR. LEWIN:  I know that.

16       THE COURT:  Although I did, outside the presence of

17   the jury, admit that my grandmother also uses the term.  I

18   don't think that's relevant to it.

19       MR. LEWIN:  I stand corrected, your Honor.

20   Q.  Can I show you --

21       MR. LEWIN:  We're almost done, sir.  I think we had

22   the question pending.  I'll ask again.

23   Q.  If the three lines or stripes are together, squished

24   together with no space in between, would that be a version of

25   your trademark, the Three-Stripe Mark?

1  A.  I would have to see it, but we typically have space between

2  the stripes.

3  Q.  Well, imagine the Gucci stripe on the side of sweatpants.

4        You would agree with me that all those colors have no

5  space in between, correct?

6  A.  Correct.  That's Gucci's trademark, not our Three-Stripe

7  Mark.

8  Q.  OK.  And if you saw some other mark in that same form,

9  would you consider that their trademark rather than yours?

10        MR. FLEMMING:  Objection, calls for speculation.

11        THE COURT:  Sustained.

12        MR. LEWIN:  I just would like to ask if we can get PX

13  86 up, these.  Can you turn to page 29.

14  Q.  This has to do, does it not -- withdrawn.

15        Have you seen this page before?

16  A.  Yes.

17  Q.  All right.  And you notice that this indicates, if I'm

18  correct, how far somebody can go off center from vertical, am I

19  correct?

20  A.  This is a guideline for our stripes about the angling, yes

21  and the angles that can be...

22  Q.  Was this document produced by adidas?

23  A.  Yes.

24  Q.  All right.  And have you seen this in the ordinary course

25  of business?

1    A.  Yes.

2    Q.  All right.

3              MR. LEWIN:  Your Honor, we would move this one

4    admitted.  It's not been accepted yet.

5              THE COURT:  Any objection?

6              MR. FLEMMING:  I think it was used on direct and it's

7    already in. but no objection.

8              THE COURT:  OK.  If it's been received, it's in

9    evidence.  But if not, it's now received.

10             MR. LEWIN:  Correct.

11             We're publishing to the jury?

12             Yes.

13   Q.  OK.  On page 29, we're looking at a permitted variation

14   from vertical, correct?

15   A.  Correct.

16   Q.  And does that indicate as well that if you go beyond that,

17   it would be a violation of the instructions contained in this

18   exhibit?

19   A.  It would not comply with the guidance, that's correct.

20   Q.  If we could turn to page --

21             All right.  If you can, would horizontal use of the

22   three-brand mark, as you understand it to be, be a violation of

23   these instructions?

24             MR. FLEMMING:  Objection, vague as to three band.

25             THE COURT:  No, I'll allow it.

1      You may answer.

2  A.  So this is one page of the guidelines, and as we've talked

3  about yesterday, there is another page in this document that

4  specifically permits the horizontal stripes.

5      MR. LEWIN:  Turn to page 37, please, of the same

6  document.

7  Q.  These are violations of proper use of your Three-Stripe

8  Mark, at least from the view of adidas?

9  A.  These are executions that the brand does not -- that the

10  brand doesn't want to see for this time, that's right.

11  Q.  OK.  Are any of these, as you see them, your three-stripe

12  trademark?

13  A.  They all are, yes.

14  Q.  OK.

15  A.  Just because it says violation doesn't mean it doesn't

16  happen or can't be allowed.

17  Q.  Let me call your attention to the shirt, the second shirt

18  in from the left.

19      No, that's three.  Yes, thank you.

20      I just want to be clear that if somebody used three

21  bands like this, you would consider it an infringement of

22  adidas' Three-Stripe Mark?

23      MR. FLEMMING:  Objection, calls for speculation.

24      THE COURT:  Overruled.

25  A.  So this stuff that is not about what's infringing, it's

1    about what our -- what executions of the mark our brand wants

2    to see.  If someone used the three stripes like this, it would

3    be of concern to us and I would investigate it.

4    Q.  Would you consider a possible infringement of your rights,

5    your trademark rights?

6    A.  Yes.

7    Q.  Now, can we turn to -- I'll withdraw that.

8              Can you turn to page 79, please.  Do you recognize

9    this document before today?

10   A.  Yes.

11   Q.  You've seen this particular page before today, correct?

12   A.  Yes.

13   Q.  Can you describe for the jury what this page is saying?

14   A.  Um, this page is saying that the guidance for branding

15   doesn't want to see these types of executions because they want

16   to make sure the brand is recognizable.

17   Q.  And if you look -- let's take the upper right photograph.

18   Can we bring that up.

19             Can you read the line underneath the photo?

20   A.  Equal visibility must be maintained if dissecting stripes.

21             THE COURT:  What does that mean?

22             THE WITNESS:  So I think this means that -- well, this

23   means that when you're using -- when you're executing

24   Three-Stripe Mark in different colors, you need to make sure

25   that they all show up and part of the mark isn't obscured.

1          So putting that color combination on a white shoe

2     obscures the middle stripe, but it could be acceptable on a

3     different color shoe background, for example.

4          MR. LEWIN:  Can we go to PX 56 and pages eight and

5     nine.  Let's go to page eight.

6     BY MR. LEWIN:

7     Q.  Now, you indicated earlier that adidas does not or want

8     anyone to use a three-stripe variation where one of those or

9     more blends into the background, correct?

10    A.  That's right.

11    Q.  And this shoe, would you agree with me, resembles a two-

12    stripe configuration, correct?

13    A.  It could -- I think I said yesterday, I could see two or

14    three.

15    Q.  Well, how do you get to three, ma'am?

16    A.  I believe the context was how Thom Browne defines the

17    Grosgrain, which was white red white blue white.  So I believe

18    there's a white stripe, from the image you can't tell if you

19    can see that because the background of the shoe are not.

20    Q.  Go to PX 195, page one.

21         And you've seen this before today?

22    A.  Yes.

23    Q.  You would agree with me this is a snapshot taken off the

24    Internet, correct?

25    A.  I'm sorry, what?

1  Q.  I said you would agree that this is a snapshot taken off

2  the Internet?

3  A.  Um, it's taken off of, I think, Twitter maybe, or

4  Instagram.  I'm sorry, Instagram.

5  Q.  Instagram is on the Internet, accessible via the Internet,

6  correct?

7  A.  Correct.

8  Q.  Now, would you agree with me looking down dead center

9  underneath the little heart there's a statement October 10,

10  2020, correct?

11  A.  Correct.

12  Q.  And that would indicate to you, would it not, that that was

13  the date that this item was posted on Instagram, correct?

14  A.  Yes, I believe so.

15  Q.  And if you'll look at the bottom of this -- all the way

16  down, thank you -- you'll see a URL.

17          Do you see that?

18  A.  Yes.

19  Q.  And would you agree with me that URL is a URL directly to

20  that image on Instagram?

21  A.  Yes.

22  Q.  So if you look at that URL, can you see what the date is?

23  A.  Yes.

24  Q.  All right.  You can see there where it says capture

25  timestamp, correct?

1    A.  Yes.

2    Q.  So that would indicate to you, would it not, that that is

3    when adidas captured this?

4    A.  Um, I think that that's what this means, that that is when

5    this was captured or visited.

6    Q.  Would you agree with me then that these two dates are

7    roughly 14 months apart, the date of publication and the date

8    it was captured by adidas?

9    A.  Yes.

10   Q.  Can you tell in the span of that 14-month period, can you

11   tell me how many people liked this shot?

12   A.  It says 20,094 likes.

13   Q.  Now, would you agree with me that there are more people

14   that visit a website than indicate they like the website -- I'm

15   sorry -- more people that visit an Instagram posting than

16   indicate that they like the integral posting?

17            MR. FLEMMING:  Objection, speculation.

18            THE COURT:  Also, counsel, now you've gone almost

19   20 minutes over your estimation.

20            MR. LEWIN:  I apologize, your Honor.  I have two more

21   questions.

22            THE COURT:  All right.

23   Q.  We see one comment on that string of comments that mentions

24   adidas, correct?

25   A.  Yes.

1   Q.  You heard testimony about that comment yesterday, didn't

2   you?

3   A.  I think I gave it, yes.

4   Q.  Do you know who the person is that allegedly posted this?

5   A.  No.

6   Q.  Did you take steps to find out who it was?

7   A.  No, I did not.

8   Q.  So it's possible this could have been an adidas employee,

9   correct?

10          MR. FLEMMING:  Objection, speculation.

11          THE COURT:  Sustained.

12  Q.  Let's go to page two of this same exhibit, please.  Can we

13  open that up.

14          You've seen this before today, right?

15  A.  Yes.

16  Q.  You testified on this one, right?

17  A.  Yes.

18  Q.  And would you agree with me that the number of likes are

19  20,094?

20  A.  Yes.

21  Q.  And that the publication date is October 10, 2020?

22  A.  Yes.

23  Q.  All right.  And did you take steps to scroll down and read

24  any further comments that were on this particular posting?

25  A.  I can't remember.  I know I looked at a lot of them.

1   Q.  OK.  So it would be fair to say you and your team reviewed

2   a lot of postings regarding Thom Browne clothes before

3   selecting these for trial?

4   A.  Um, we reviewed, yes, a lot of postings.

5           MR. LEWIN:  I have no further questions, your Honor.

6           THE COURT:  All right.

7           Redirect.

8           MR. LEWIN:  Thank you for the extra time.  I

9   appreciate it.

10  REDIRECT EXAMINATION

11  BY MR. FLEMMING:

12  Q.  Hello again, Ms. Vanderhoff.  I have a few questions.

13          MR. FLEMMING:  Can we start, Nita, with Exhibit 56,

14  page eight, which was one of the last exhibits we just looked

15  at, plaintiff's exhibit.  And page eight.  Thank you.

16  Q.  Do you remember looking at this page just now?

17  A.  Yes.

18          MR. FLEMMING:  Can we zoom in on that first shoe,

19  please, Nita.

20  Q.  Is adidas alleging in this case that this is a proper

21  execution of the Three-Stripe Mark?

22  A.  No.

23  Q.  Is adidas alleging that this is an exact replica of the

24  Three-Stripe Mark?

25  A.  No.

1   Q.   What is adidas alleging in this case about this design?

2   A.   We believe this design was confusingly similar to our

3   Three-Stripe Mark.

4          MR. FLEMMING:   Thank you.  You can take that down.

5          Nita, can we look at Plaintiff's Exhibit 86, please.

6   Q.   How about page 29, do you remember testifying about this

7   page?

8   A.   Yes.

9   Q.   I would like to ask you about that text in red to the left,

10  do not use horizontally.

11         Why use such strong language in red in branding

12  guidelines?

13  A.   I think I talked about this a little bit yesterday, but

14  it's just a way to get people's attention when we have

15  designers sitting all over the world designing products.  So it

16  is meant to catch their attention so that they know, if they

17  want to do something that isn't permissible in this document,

18  they need to get approval.

19         MR. FLEMMING:   Thanks.  Can you zoom out again, Nita.

20  And let's go to the next page.  And the next page.

21  Q.   Ms. Vanderhoff, what types of stripes are specifically

22  authorized on the page we're looking at?

23  A.   This guideline is permissible to horizontal stripes that we

24  call hooped three-stripe execution.  So three stripes executed

25  in a horizontal manner around sleeves and pants, specifically

1  collars, cuffs, socks, waistbands, sleeves, and pant legs.

2         MR. FLEMMING:  Thanks, Nita.  You can take that down.

3  Q.  On cross, did you testify that you didn't send anyone to

4  Nordstrom to look at Thom Browne's products?

5  A.  Yes.

6  Q.  Did you order Thom Browne's products so that you could

7  physically inspect them?

8  A.  Yes.

9         MR. FLEMMING:  Can we bring up Defendant's Exhibit

10 131, please.

11 Q.  Do you remember testifying about this registration?

12 A.  Yes.

13 Q.  Do you remember testifying about the watch notices that

14 they missed it?

15 A.  Yes.

16 Q.  Can you tell us who missed it?

17 A.  Our watch service Thomson, when we asked them about this,

18 they just missed it.

19 Q.  So outside of the watch service, how could adidas have

20 found out about this specific registration?

21 A.  We couldn't have.

22 Q.  Could you have specifically searched for Thom Browne on the

23 PTO website?

24 A.  I could have done that, or I could have searched, I guess,

25 every day's filings every day.

1    MR. FLEMMING:  You can take that down.  Thanks, Nita.

2  Q.  At Kilpatrick, about how many -- the law firm, our law

3  firm -- about how many adidas matters were you involved in?

4  A.  Countless.

5  Q.  Can you name one?

6  A.  Um, any one?

7  Q.  Any one of them?

8  A.  Payless, Target, yeah.

9  Q.  So let's say Payless.

10    About how many e-mails were you copied on in the

11  Payless matter?

12  A.  Probably thousands.

13  Q.  Can you think of any adidas matters that you were actually

14  involved in that you were only copied on a single e-mail?

15  A.  No.

16  Q.  You talked on cross about how adidas resolves its trademark

17  disputes.

18    Do you remember in opening opposing counsel,

19  Mr. Maldonado, describing adidas as a bully?

20  A.  Yes.

21  Q.  How did adidas usually resolve its trademark disputes, if

22  there is a dispute?

23  A.  The vast majority of our cases are resolved -- are resolved

24  before trial.  We very rarely have to file lawsuits and very

25  rarely do they ever go to trial.

1    Q.  Opposing counsel also raised litigations that adidas has

2    filed.

3            How many of those went to trial?

4    A.  Um, since 2001, one.  Only one has gone all the way to

5    trial without resolving beforehand.

6    Q.  And what case was that?

7    A.  That was Payless.

8    Q.  What were --

9            MR. LEWIN:  Objection, your Honor.

10           THE COURT:  There will be limits, but the door was

11   clearly opened to a lot of this on cross, as I'm sure everyone

12   on counsel table was aware.  So that doesn't mean that

13   everything is now fair game, but a lot is.

14           Overruled.

15   Q.  I'll try to ask you a couple of yes-or-no questions.

16           Did that trial go to a verdict?

17   A.  Yes.

18   Q.  What year was that?

19   A.  2008.

20   Q.  Was the verdict publicized at all?

21   A.  Yes.

22   Q.  Can you generally describe the nature of the products at

23   issue in that case?

24           MR. LEWIN:  Objection, your Honor.

25           THE COURT:  Overruled.

1    A.  Payless involved two, three, and four-striped footwear.

2            MR. FLEMMING:  Thank you, your Honor.

3            THE COURT:  Anything else?

4            MR. LEWIN:  Couple of quick ones, your Honor.

5            THE COURT:  Go ahead.

6    RECROSS EXAMINATION

7    BY MR. LEWIN:

8    Q.  The Payless case didn't involve clothes, did it?

9    A.  It involved footwear.

10   Q.  Only footwear, right?

11   A.  Yes.

12           MR. LEWIN:  Now can we have Plaintiff's Exhibit 86,

13   page 29, please.

14   Q.  Do you recall testifying to this a moment ago, right?

15           Your explanation for the statement 'do not use

16   horizontally' is that it was a warning, is that correct?

17   A.  I don't think I used the word 'warning,' but it's meant to

18   get people's attention.

19   Q.  Why?

20   A.  Because these guidelines are meant to, um, ensure that our

21   brand is recognizable across all of our product offerings, and

22   we have so many people in different locations, they need to

23   have some guardrails around what they can do.

24   Q.  Would you agree with me it's telling people not to use this

25   iteration horizontally?

A.  Um, well, the -- this -- yes, it's saying do not use

horizontally.  This is about angling.  And, you know, other

pages in this document allow the same stripes in a horizontal

manner.

          MR. FLEMMING:  Your Honor, I would move to strike the

answer as not responsive.

          THE COURT:  No.  I think given previous answers, that

was reasonably responsive.

          Overruled.

Q.  You testified a moment ago that you had received only one

e-mail concerning the matter of Thom Browne and adidas early

on, correct?

A.  Yes.

Q.  While you were at Kilpatrick, correct?

A.  Yes.

Q.  Is it your testimony that you did nothing in response to

that e-mail?

A.  I didn't receive an e-mail.  I sent an e-mail.

Q.  Right, I'm sorry.

          Is it your testimony that you were not engaged in

anything concerning Thom Browne when you sent that e-mail?

A.  I don't know.  I just don't have any recollection of what

was in the e-mail.  I'm sorry.

Q.  Fair enough.

          You indicated that you -- the vast majority of

1    litigation that you did in your particular area of protecting

2    the mark was settled by settlement agreement prior to trial,

3    correct?

4    A.  Yes.

5    Q.  And is it your view that because of settlement agreements,

6    adidas is not being seen as a bully?

7    A.  Um, I don't know how adidas is being seen.  I don't view us

8    as a bully.  We're very thoughtful in what we do.

9           MR. LEWIN:  No further questions, your Honor.

10          THE COURT:  Anything else?

11          MR. FLEMMING:  None, your Honor.

12          THE COURT:  You may step down.  Thank you very much.

13          (Witness excused)

14          I want to remind the jury that nothing that either

15   counsel said in opening statements is evidence, and whether a

16   company, a person, or entity is a bully or not a bully is

17   completely irrelevant to any issue you have to decide in this

18   case.  What you have to decide is whether there was an

19   infringement or dilution or not.  So I allowed those questions

20   because there was no objection, but I feel compelled to tell

21   you it is completely irrelevant.

22          Time for our morning break.  15 minutes.  Thank you.

23          (Continued on next page)

24

25

1              (Jury not present)

2              THE COURT:  I should add that, in my estimation, the

3    right to bully is solely reserved to the court.

4              All right.  See you in 15 minutes.

5              (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. HENN:  I don't believe we ever formally read the

3    list for the last witness.  Before we move forward, the

4    admitted exhibits were 181 through 184, 1314, Plaintiff's 191

5    through 195, Plaintiff's 197, Plaintiff's 176 and then

6    Plaintiff's 693, 694, 705, 706, 707 and 708.  That also

7    includes the one Mr. Lewin offered on cross.  With the upcoming

8    witness, we have stipulation to Exhibit 283.

9          THE COURT:  Very good.  Let's get the witness on the

10   stand.

11         (Plaintiff's Exhibits 181 through 184, 1314, 191

12   through 195, 197, 176, 693, 694, 705, 706, 707, 708 and 283

13   received in evidence)

14         (Jury present)

15    ERICH JOACHIMSTHALER,

16        called as a witness by the Plaintiff,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. FLEMMING:

20         DEPUTY CLERK:  State your name and spell it slowly for

21   the record.

22         THE WITNESS:  My name is Erich Joachimsthaler.  And I

23   spell it, E-R-I-C-H.  My last name is

24   J-O-A-C-H-I-M-S-T-H-A-L-E-R.

25         THE COURT:  Go ahead, counsel.

1    BY MR. FLEMMING:

2    Q.   Good morning, Dr. Joachimsthaler.

3    A.   Good morning.

4    Q.   If I call you Dr. J occasionally, is that okay?

5    A.   Absolutely.

6    Q.   Dr. Joachimsthaler, will you please introduce yourself to

7    the jury?

8    A.   I'm Erich Joachimsthaler.  I was born originally in

9    Germany.  I am since 2008 American citizen.  I actually was --

10   I became an American citizen around here and maybe even this

11   building.  I am a former professor.  I wrote books.  I'm an

12   author.  And I have a company.  I'm a consultant mostly on

13   brands.  And I live in Chelsea for many years now.  And I have

14   three children.

15   Q.   Dr. J, what is your role in this case?

16   A.    In this case I was asked to opine on the brand of adidas

17   and how three stripes relate to adidas and how -- and the

18   potential harm that -- and the harm that Thom Browne causes to

19   that brand.

20   Q.   I understand you helped prepare a slide show for the jury

21   to follow along with your testimony?

22   A.   Yes.

23   Q.   I'm going to bring up Dr. Joachimsthaler's demonstrative

24   which the parties have agreed can be shown to the jury but just

25   as a demonstrative.  And you remember my colleague Nita Gray.

1    She is going to be helping us with the slides.  Nita can you go

2    to slide 2.

3              Dr. Joachimsthaler, will you give the jury a quick

4    summary of the opinions you're offering in this case?

5    A.   Yes, I opine on adidas and the brand.  I have evaluated the

6    evidence, the empirical evidence in the case, and I analyzed

7    the extent or to what extent adidas is a brand and a strong

8    brand and how three stripes becomes part of that brand, is very

9    close to the brand.

10             And the second part is I analyzed from the point of

11   view of marketing and the part of view of consumer psychology

12   how a brand is harmed like adidas through those actions that

13   are here at issue with Thom Browne.

14   Q.   Since you're here as an expert, I'd love to know more about

15   your background.  Can we go to the next slide.

16             Tell us briefly about your education.

17   A.   Yes.  I studied originally in Germany here at the

18   university of Giessen-Friedberg.  From there I went to

19   Frankfurt.  I studied economics.  I got a scholarship to

20   University of Kansas, and I got stuck there, I should say.  I

21   did a master's degree there, then I did my doctorate there

22   where I studied quantitative methods in marketing and

23   psychology, and then surprise, surprise, I was invited to

24   become a Doctor of Fellow at the Harvard Business School in

25   Boston.

1  Q.  What did you do after you left Harvard professionally?

2  A.  After I left Harvard, I became a professor and, I went

3  through a normal track of various years.  Almost 15 years I did

4  that full time.  And then on the top of it, I also started a

5  few companies, two companies in fact.

6  Q.  And what do you do now?

7  A.  Right now I still -- I have a third company that I started

8  in 1999 here in New York City, and that company is called

9  Vivaldi, and I consult on brands with that company.

10  Q.  About how many employees does Vivaldi have?

11  A.  In the market we are over one thousand people around the

12  world distributed in 258 countries, but the part I founded, my

13  part is about 150 people specializing on brands basically.

14  Q.  Can we go to the next slide.

15          Since you say you specialize in brands, will you

16  please tell us about or name some of your clients since you've

17  been at Vivaldi?

18  A.  They're right here.  Boeing is actually the company I

19  started a long time ago.  American Express a long-time client.

20  Coca-Cola also.  BMW I did a lot of work over the years --

21          MR. LEWIN:  Objection, your Honor.

22          THE COURT:  I think we've had enough.  Let's move on.

23  Q.  All right.  A simple question:  Have you ever worked with

24  any brands in the apparel and footwear industry?

25  A.  Yes.

1    Q.  Let's go to two slides forward.  Thank you.

2          You mentioned earlier that you're an author.  Will you

3    please tell us about your publications?

4    A.  Yes.  I have three major books written.  The first book --

5    they are listed here.

6    Q.  Do you have any publications in peer reviewed journals?

7    A.  Yes.

8    Q.  Can you name any of the publications for us?

9    A.  Yes, of course.  One is called consumer -- *Journal of*

10   *Consumer Research,* which is a consumer psychology journal.

11   Another one is called *Journal of Marketing Research*.  That one

12   is more focused on research and surveys.  *Journal of Marketing*,

13   *California Management Review, Loan Management Review at MIT*,

14   *Harvard Business Review* and onwards.

15   Q.  Have you ever testified as an expert in a trademark case?

16   A.  Yes.

17   Q.  About how many times?

18   A.  Maybe 75 times, around there.

19   Q.  What about at trial, have you ever testified in trial of a

20   trademark case?

21   A.  Yes.

22   Q.  About how many times?

23   A.  About maybe 25 times.

24   Q.  Let's go to the next slide.

25          Are these some of the brands that you've represented

1   in trademark litigations?

2   A.  Yes, these are more recent cases that I've been involved

3   in.

4   Q.  You can take that down, Nita.

5       Dr. Joachimsthaler, will you please summarize your

6   credentials when it comes to consumer psychology?

7   A.  Consumer psychology is a central part of marketing.  You

8   need to understand consumers.  So I trained academically when I

9   was a doctoral student.  I took social psyche classes in the

10  doctoral program, and over the years I have taught consumer

11  psychology.  I've done research.  I've published in major

12  journals in consumer psychology, and it's a central part of

13  everything I do in my work.  My company Vivaldi always starts

14  from understanding consumers deeply and how and why they buy.

15  Q.  Let's bring up Plaintiff's Exhibit 283.  Let's go to the

16  next page.

17      Dr. Joachimsthaler, is this a copy of your CV or

18  résumé?

19  A.  Yes.

20  Q.  Nita, can you scroll through it quickly.

21      Dr. J, if someone wanted to learn more about you, does

22  this provide more background on your work, experience, and your

23  publications and experience?

24  A.  Excuse me?

25  Q.  Does this provide background on your education and work

1  experience and publications?

2  A.  Yes.  Yes.  There's a long list of things.

3  Q.  You can take that down.

4       Dr. Joachimsthaler, let's talk about branding.  So

5  first, what is a brand?  Can you give us a definition, please.

6  A.  Sure.  A brand is -- there is a technical version of that.

7  A brand that is in our world use, a brand is a name and a

8  symbol that identifies a product.  But the brand from my world,

9  a brand is something that is in consumers head.  Brand is not

10  what this gentleman here has a New Balance shoe --

11       MR. LEWIN:  Objection, your Honor.

12       THE WITNESS:  Huh?

13       THE COURT:  Hold on.

14       I think he's answered the question as put.  You can

15  put another question.

16  Q.  Dr. Joachimsthaler, what are the elements of a brand?

17  A.  The elements -- there are two elements of a brand.  One

18  part is called tangible elements and one part is called

19  intangible elements.

20  Q.  What are tangible elements of a brand?

21  A.  Tangible elements are a name or a symbol.  And that's

22  usually in consumers mind.  It's almost like there is a box in

23  consumers mind, a drawer with a name on it, or it's a symbol.

24  That's the tangible element.

25  Q.  What are intangible elements of a brand?

1   A.   Intangible elements of a brand is the way to think about

2   the drawer again, the way everything that is stored in

3   consumers mind, those are intangible elements.  And that could

4   be when I open my drawer and I look at my drawer, that could be

5   an attribute, it could be an experience, that could be -- when

6   I think of Nike, I think of Michael Jordan or I think of Tiger

7   Woods, anything that I store in my memory or that a consumer

8   stores in memory.  Even when I think of if you're old enough, a

9   gesture --

10             MR. LEWIN:  Objection.

11             THE COURT:  When there's an objection, you need to

12   stop.

13             THE WITNESS:  Okay.  Absolutely.

14             THE COURT:  Again, I think he's answered the question.

15   Put another question.

16             MR. FLEMMING:  Thank you, your Honor.

17   Q.   Since you're also here to talk about harm to the adidas

18   brand, I want to ask you a little bit about the business of

19   branding.  Can you briefly tell us why companies care so much

20   about branding?

21   A.   Well, companies care about branding because it's one of the

22   most important assets of a firm.  It determines the value of a

23   company.  Number two, companies care for that because consumers

24   use that drawer in their head the brand when they make purchase

25   decisions or when they search for information online or when

1   they go to a store and they want to decide whether to buy or

2   not or whether to learn more about a brand, they look at what's

3   in the drawer in what we call a brand so --

4   Q.  So we talked about some of the things that businesses

5   really care about when it comes to branding, but this case is

6   about adidas and Thom Browne.  Can you describe your overall

7   opinions on the adidas brand?

8   A.  Well, adidas is a brand that is one of the historically a

9   very, very important brand.  It's one of the all-time great

10  brands.  There is not a survey that would not rank adidas in

11  one of the top hundred brands in the world.

12          MR. LEWIN:  Objection, your Honor.

13          THE COURT:  Sustained.

14  Q.  Nita, can you please bring up slide 8.

15          Dr. J, earlier you talked about tangible and

16  intangible elements of brands.  What are the tangible elements

17  of the adidas brand?

18  A.  The tangible elements here identify as the name adidas and

19  the Three-Stripe Mark.

20  Q.  And based on your research, what are the intangible

21  elements of the adidas brand?

22  A.  The intangible elements are -- there are many, but the most

23  important ones are something about let's call it --

24          MR. LEWIN:  Objection, your Honor.  Foundation.

25          THE COURT:  I haven't heard the answer yet, so you may

1    finish your answer.

2    A.   The intangible elements are sports credibility, something

3    called authenticity, authentic, and inclusivity.

4              THE COURT:  Overruled.

5    Q.   Before we move on to this, can you please give us a brief

6    explanation and maybe an example of what you mean by sports

7    credibility?

8    A.   Sports credibility means that you have been a brand that

9    operates in the world of sports and that that is something you

10   earn over time.  When you work with athletes, you might have

11   developed a shoe or apparel for athletes, even though some

12   non-athletes like myself would wear them.  Sports credibility

13   is about being associated with maybe sport events, with having

14   particular technology and performance, a quality to the product

15   that athletes would use.  It is probably global events

16   sometimes as well.  U.S. in America, NFL, NBA.

17   Q.   Sorry to interrupt you.  I want to get through this list

18   really quickly.  What about authenticity?  Can you give us a

19   definition of authenticity, maybe an example of a brand being

20   authentic?

21   A.   Yes.  So authenticity is really the word is really

22   something about being true to yourself.  So a sports brand that

23   consistently delivers on the performance for athletes, let's

24   say.  A sports brand that is associated with major athletes or

25   with people that are associated with it.  That's what would be

1    authentic.

2    Q.  What do you mean by inclusivity here?

3    A.  Oh, inclusivity is interesting.  Inclusivity or being

4    inclusive is being -- the opposite being exclusive.  A brand

5    that embraces everything, that everybody -- a brand that sort

6    of --

7              MR. LEWIN:  Objection, your Honor.

8              THE COURT:  Counsel come to sidebar.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So we have here a witness, not untypical

3     of many expert witnesses, who feels that he needs to give the

4     history of the universe in response to any given question, and

5     he needs to be more narrow and precise in his responses.  So

6     maybe you want to whisper in his ear just to keep it shorter,

7     but otherwise the questions are fine.  Just the answers go on

8     too long.

9          MR. MALDONADO:  Your Honor may I ask a question?  I

10    thought earlier we shouldn't refer to these witnesses as

11    experts, or is that okay?

12         THE COURT:  No, you can call them experts if you want.

13    You will see in my charge I refer to them as specialized

14    witnesses.  My point is what you shouldn't do, and you haven't

15    done, is ask the Court to accept him as an expert on X, Y or Z,

16    which is the way you had to proceed, but no longer.

17         (Continued on next page)

1          (In open court)

2                THE COURT:  Go ahead.

3    BY MR. FLEMMING:

4    Q.  Nita, can you bring up the next slide please.

5          Dr. Joachimsthaler, I'd like to talk to you about

6    brand equity or strength.  What are some factors that

7    professionals in your industry use to measure the strength of a

8    brand?

9    A.  We use three factors to measure what's in consumers head,

10   and that is in that proverbial drawer, and that is awareness,

11   associations and loyalty.

12   Q.  Since we're here to talk about the adidas brand first, I

13   want to know how adidas performs along those three dimensions.

14   Based on your research, how does adidas perform on the

15   awareness dimension on strength of a brand?

16   A.  Adidas has a very strong awareness.

17   Q.  And what is that opinion based on?

18   A.  I have researched empirical research that was available to

19   me or surveys that was conducted by adidas.  I also researched

20   surveys that are done by firms outside of adidas or independent

21   or third-party marketing research firms, and I did even my own

22   research over the years.

23   Q.  I want to talk about associations next, and really quickly,

24   what do you mean by associations in this context?

25   A.  Yes, associations is a word that is what is linked or

1    associated with a name or symbol in consumers mind and what's

2    in the drawer basically.  Everything that I mentioned earlier

3    are associations, feelings, attributes, perceptions.

4    Q.  What were the three that you mentioned earlier in

5    connection with adidas?

6    A.  There are three of them:  Sports credibility, authenticity

7    and inclusiveness, being inclusive.

8    Q.  I'd like to show you Exhibit 44.

9         Dr. J, did you rely on this study in performing your

10   expert opinions in this case?

11   A.  Yes.

12   Q.  Let's go to page 5.  Page 5 of the last exhibit.  Thank

13   you, Nita.  Can we focus on the I guess right third of this --

14   actually, let's look at this right now.

15        Dr. Joachimsthaler, what does this research tell you

16   about -- what did this research tell you about consumers'

17   associations with adidas?

18   A.  This one, the title here says brand image drivers, so all

19   this association together that's actually called also in

20   layman's terms an image.  What it shows is how strong adidas is

21   on certain attributes, or image drivers they call them, or

22   associations.

23   Q.  And what were the strongest ones in the study?

24   A.  On this study, if you go all the way to the right side.

25   Q.  Let's zoom in on that, Nita.

1   A.  On the right-hand side, yes.  That is what is -- gray is

2   adidas and the other colors are other brands in the business.

3   And it shows that adidas is strongest on authenticity and

4   purpose it says here.

5   Q.  A quick clarification.  It has Reebok in light gray and

6   adidas in dark gray.  Do you see that?

7   A.  Yes.

8   Q.  When we're looking at the larger gray boxes here, is that

9   the adidas?

10  A.  Yes, the larger grays are adidas.  It's sort of all the way

11  on the -- you can't see it right now on this chart.  You see

12  here.  It's a darker gray.  This part, yes.

13  Q.  Can you bring up Exhibit 47, please.

14       Dr. Joachimsthaler, did you rely on this study in

15  forming your expert opinions?

16  A.  Yes.

17  Q.  Let's turn to page 8.  I would like to draw your attention

18  to those three white boxes with red texts in the beginning and

19  ask you what did this study tell you about what consumers

20  associate with adidas?

21  A.  Again, this one also is about the image and the

22  associations, and it says that there are three things primarily

23  associated with adidas:  Heritage, three stripes and openness,

24  might be -- it's another word for inclusiveness.

25  Q.  Nita, can you zoom in on the second bullet point on the

1    bottom.

2            And that be second bullet point says, "Sense of

3    accessibility and inclusivity is an underlying strength of the

4    brand."  Do you see that?

5    A.  Yes.

6    Q.  Did you rely on that in forming your expert opinions about

7    what consumers associate with the adidas brand?

8    A.  Yes.

9    Q.  Let's bring back the PowerPoint presentation you made and

10   look at slide 10 again.

11           Are these the only attributes that you believe that

12   are associated with the adidas brand?

13   A.  No.  There are many more in consumers mind.

14   Q.  Could a brand have too many attributes in consumers' minds?

15   A.  Not necessarily.  Sometimes yes, but the key is that you

16   have some focus on a few.  In my book, I wrote that you need to

17   have -- you should focus on three to five and no more, but

18   there are many more in consumers mind depending on the

19   consumer.

20   Q.  We talked about -- let's bring back up slide 9.  We talked

21   about awareness.  We talked about associations.  We haven't

22   talked about loyalty yet.  What did your research show about

23   how adidas performs on the loyalty dimension of strength, brand

24   strength?

25   A.  Relative to competitors and other brands, adidas is very

1    strong on loyalty.

2    Q.  What are some ways that you can measure loyalty of a brand?

3    A.  Well, the way you will measure loyalty is in one way how

4    much people repeat purchase a brand.  But the other way is to

5    how much a brand will be recommended.  You know, I will

6    recommend this brand to my friends or to others.  So we usually

7    use loyalty in various ways to measure sort of the strengths of

8    affinity on loyalty.

9    Q.  Is there a way that professionals in your field can measure

10   the degree that a brand is going to be recommended by people

11   who purchase their product?

12   A.  Yes, we do surveys.  There are surveys done, yes.

13   Q.  Let's look at Exhibit 45.  Let's go to page 32.

14           Dr. Joachimsthaler, what does this empirical research

15   tell you about loyalty as an attribute of adidas?

16   A.  Well, this is a survey that was conducted recently on the

17   attributes that people associate with adidas.  And what you see

18   here in this chart are the numbers that have -- the attributes

19   that has the highest number for adidas is a brand I recommended

20   or a brand recommended, it says here.

21   Q.  Can you zoom in on that, please, Nita at the top of that

22   graph.

23   A.  So you see it's close to 60 or between 50 and 60 there, and

24   that means that adidas scores extremely high, higher than on

25   many other attributes on this one thing, a brand that I would

1   recommend to somebody else.

2   Q.  Nita, you can take that down.

3           Dr. Joachimsthaler, are you familiar with a net

4   promoter score?

5   A.  Yes.

6   Q.  What is that?

7   A.  A net promoter score is called NPS, net promoter score.  It

8   means the number of people that would recommend a brand to

9   others.

10  Q.  And what is the range for net scores?

11  A.  All brands have today the ranges go from minus 100 to

12  positive 100, so it's a big range.

13  Q.  What does it mean if a brand is in the negative side of the

14  range?

15  A.  If it's in the negative side, so from zero to negative 10,

16  that means people, more consumers leave the brand than actually

17  stay with the brand.  That means they have no loyalty.

18  Q.  So in this loyalty scale for NPS, where would a brand with

19  okay loyalty score?

20  A.  Well, an okay brand would be around maybe 20.  So they have

21  some loyalty, but a number 20 would be a good one, a positive

22  number 20.

23  Q.  What did your research yield with adidas's score?

24  A.  Adidas's score is 46.

25  Q.  Can you put that into context for us?

1   A.   46, it's not as good as Apple, which is higher up there, 70

2   maybe, but it's almost as close as Nike, and it's as good as

3   the best brands you can get.  So most of the brands are at that

4   high level.

5         MR. LEWIN:  Objection, your Honor.

6         THE COURT:  Overruled.

7   Q.   Dr. Joachimsthaler, since you just mentioned Nike, can

8   adidas be a strong brand when Nike is in the same segment?

9   A.   Of course.

10  Q.   How is that?

11  A.   Because I might have a strong association, name and symbol

12  associated with Nike and with adidas, and both of them can be

13  very strong and in many different ways too, just like it is.

14  Q.   We talked a lot about adidas brand and strength.  I'd like

15  to talk to you about the Three-Stripe Mark which we've been

16  hearing a lot about this week.  So where does the Three-Stripe

17  Mark fit into this discussion about the adidas brand?

18  A.   Well, the Three-Stripe Mark is this very important symbol

19  that is outside the drawer of consumers that is associated with

20  the --

21        MR. LEWIN:  Objection, your Honor.  Foundation.

22        THE COURT:  I assume this is in his report?

23        MR. HENN:  It is.

24        THE COURT:  Overruled.

25  Q.   So you were describing the role of the Three-Stripe Mark.

1    Can you finish your thought?

2    A.   It's the symbol three stripes is associated with the adidas

3    name.  It's like what we call synonymous.  It's almost the

4    same.  It's interchangeable.

5         THE COURT:  Are you saying that any time someone sees

6    any three stripes of any kind, they associate it with adidas?

7         THE WITNESS:  Not always, but many times.  My research

8    shows that when they see three stripes, they associate -- and

9    sometimes less than three stripes.

10        THE COURT:  So, for example, in the old days,

11   prisoners in a federal penitentiary would have uniforms with

12   three stripes across the uniform.  You think that would be

13   associated with adidas?

14        THE WITNESS:  So, the way it works, Judge, is that

15   when consumers see three stripes, they go in their head through

16   their eyes, in their head they search for a pattern.  It's an

17   automatic consumer response, memory response, and they search

18   for pattern that matches closely to what they have just seen.

19   They do that because they want to organize information that

20   they see.  And so if there was -- if in those days a consumer

21   or a prisoner has in their head already established the three

22   stripes, and they see the three stripes on the uniform, then

23   they are likely invoking the memory in this drawer that I'm

24   talking about, about adidas.  It's not always like that, but

25   that's how it works.

1          THE COURT:  By the way, when you say that's how it

2     works, are you a psychiatrist?

3          THE WITNESS:  Not a psychiatrist, but I have studied

4     cognitive psychology, so memory research is something I know

5     about.

6          THE COURT:  Isn't it true that many of the premises of

7     cognitive psychology are subject to debate?

8          THE WITNESS:  Well, you know, cognitive psychology

9     started in 1850 around with Ebbinghaus, and the basics of those

10    principles of cognitive psychology are still valid even today,

11    and one of the things is that consumers --

12          THE COURT:  When you say they're still valid --

13          THE WITNESS:  Yeah.

14          THE COURT:  -- what's the error rate?

15          THE WITNESS:  So we cannot -- we never -- this is sort

16    of very important, and I'm glad you asked the question

17    because --

18          THE COURT:  My pleasure.

19          THE WITNESS:  We can never -- we obviously cannot open

20    up a consumer's head and see, but what happens is the error --

21    we get -- over the years, we got better and better and better.

22    For example, 20, 30 years ago and today we ask consumers, when

23    you think of Nike, what comes to your mind?  If you're a golf

24    player, you say Tiger Woods, let's say.  And in the old days,

25    we just could assess the brand like that.

1      Today, the error rate has gone down a lot because my

2   son, for example, studies at Stanford University, and he uses

3   FMRI, which shows when you say Tiger Woods --

4      THE COURT:  Forgive me for interrupting, but so FMRI

5   and cognitive neuroscience, which is a relatively recent

6   development is different, is it not, from the principles you're

7   relying on, which are primarily from an earlier era?

8      THE WITNESS:  Not really.  It's just that the

9   measurements are -- what we do in our world right now in

10  consumer psychology we do FMRI studies.  It's just more

11  expensive.  In the practical world of adidas and Nike and in

12  the business of this, you oftentimes don't have the access to

13  FMRI.  You rely still on the traditional.  But what's important

14  is the FMRI has not invalidated the traditional approaches to

15  measurement.  They have just made it more accurate sometimes.

16  It's almost like validating the research.

17      THE COURT:  Go ahead, counsel.

18  BY MR. FLEMMING:

19  Q.  Dr. Joachimsthaler, did you personally conduct any

20  quantitative research into consumers' associations between the

21  Three-Stripe Mark and the adidas brand?

22  A.  Yes.

23  Q.  Dr. Joachimsthaler, one of the issues in this case is the

24  fame of the Three-Stripe Mark under the trademark dilution

25  statute.  The research you did, was it regarding fame?

1   A.  No.

2   Q.  Please describe the quantitative research that you did.

3   A.  I wanted to know how strongly three stripes is associated

4   with adidas, so I asked over 2,000 consumers.  It's a large

5   sample.  And I presented them with a very neutral shirt with

6   the three stripes on the arm.  And then I asked them, what

7   brand do you -- what name comes to your mind or who put that

8   out?  And then they answer.

9   Q.  I'd like to know, did you follow generally accepted

10  methodology for such research?

11  A.  Yes, as I always do in my research, and I've done for many

12  years now, over 30, I follow sort of the standard principles

13  of --

14          MR. LEWIN:  Objection, your Honor.

15          THE COURT:  Overruled.

16  Q.  Can you name some of the standard principles that you

17  followed with this particular research you conducted?

18  A.  Yes.  One is you need to have a large sample size, a lot of

19  consumers.  Another one is you don't want to ask questions that

20  are leading, that are suggestive.  You want questions that are

21  neutral.  Number three, sometimes people when you ask these

22  kinds of questions, they like to guess rather than really know.

23  And in order to do that, we use something called a control

24  group.  So those kind of things I have done.

25  Q.  And I believe the jury has heard about a control group in a

1    survey in this trial.  In your questions, were you giving the

2    takers multiple choice answers they could choose from?

3    A.  Yeah.  Well, multiple choice would be leading because if I

4    suggest the possible multiple choice, it makes it easier.  I

5    try to make it more conservative and hard.  So I just had a box

6    where people had to actually write in there what do they see,

7    what brand they see.  So it's a little bit more difficult.

8    There was a lot of misspellings of the adidas name.

9    Q.  Earlier you testified that these were generally accepted.

10   How do you know they are generally accepted in the community?

11   A.  Well, for two reasons:  One is there are principles of

12   survey research that I should have been teaching for years in

13   the university.  But on the other side, there are also

14   guidelines for -- I think guidelines that are used in the court

15   of law, federal guidelines by an author called Shari Diamond,

16   actually, from Chicago.

17   Q.  About how many surveys have you conducted in your career?

18   A.  Oh my God, over a hundred.  More than I dare to remember.

19   Q.  I'd like to just, Dr. Joachimsthaler -- can you show him

20   Exhibit 285, please?  Go to the second page.

21        I think I made this difficult by doing a presentation

22   and exhibits.  So I apologize for the delay.

23        Dr. Joachimsthaler, is this the study that we were

24   just talking about that you conducted?

25   A.  It's not on my screen yet.  This is the questionnaire that

1   I used.

2           MR. FLEMMING:  I offer this one into evidence, your

3   Honor.

4           THE COURT:  Is there any objection?

5           MR. LEWIN:  Your Honor, can we see the first page?

6           THE COURT:  This has been furnished to defense counsel

7   previously.  Yes?

8           MR. LEWIN:  I believe so, your Honor.

9           MR. FLEMMING:  But they might not have it in front of

10  them.

11          MR. LEWIN:  Thank you very much.  This is okay, your

12  Honor.  No objection.

13          THE COURT:  Received.

14          (Plaintiff's Exhibit 285 received in evidence)

15  BY MR. FLEMMING:

16  Q.  Dr. Joachimsthaler, can you see it on the screen?

17  A.  Yes.

18  Q.  Can we publish this?

19          THE COURT:  What's the number on this?

20          MR. FLEMMING:  This is Exhibit 285.

21  Q.  Is this be published to everyone?  Great.

22          Dr. Joachimsthaler, just to confirm this is the

23  research that we were just discussing, right?

24  A.  That's right.

25  Q.  I have a question about this page.  The text in red were

1    the test-takers or survey-takers.  Do you see that?

2    A.  No.  Those are just instructions for the researcher.

3    Q.  Let's go to the next page, please.  Just briefly what are

4    these questions we're looking at?

5    A.  These questions are qualifying questions.  We call them

6    sort of educational level:  Where are you working.

7    Q.  Let's look at page 4.  Zoom in a little bit so we can see

8    the products.  I want to see the text a little better.

9         Please explain to the jury what we're looking at on

10   this page.

11   A.  This is phrase of the question order of what we call test

12   group of questions.  This is what I explained earlier when I

13   said, I asked -- I showed people consumers the various four

14   brands in this case.  One of them is the three stripes on the

15   arm, on the sleeve as you see.

16        Then I ask the question here in bold, you see in the

17   middle:  What band do you think makes this long-sleeve shirt?

18   What I mentioned earlier is this open box where people had to

19   write in the name that comes to mind, and that's what this

20   says.

21   Q.  Let's go to the next page.  Can we zoom in?  Thank you.

22        Will you please explain to the jury what's on this

23   page?

24   A.  This is the same one, but so from the 2000 consumers, half

25   of them I showed this page and the other half the other page

1   and in this one I made a slight change to the shirt as you see

2   here.  It's only one stripe.  And I asked the same question.

3   And what's interesting also I should note here is that I used

4   this question here on the bottom.  If the person doesn't know

5   what this is, they can say they don't know the brand.  So I'm

6   not looking for a particular answer.  I actually -- if they

7   don't know it, they can just say, like I mentioned earlier with

8   the question here from the judge, then we just say I don't

9   know.  So that's an important part.  It's a conservative way of

10  measuring how three stripes links together in consumers' minds

11  with the name adidas.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

N16sADI4                    Joachimsthaler

BY MR. FLEMMING:

Q.  The question was otherwise the same to the test group,

right, just different images?

A.  Yes.

Q.  Just one different image?

A.  Just one image that is different, and that is on the left

side here, the one stripe or the three stripes.

Q.  Part of this prompt says there is no right or wrong answer,

if you do not know a certain brand, please also tell us that.

This information is just as important to us as whether or not

you recognize the brand.

          Do you see that?

A.  Yes.

Q.  Why include that in your prompt?

A.  I think it's important that, again, you try to not solicit,

you do not try to lead consumers, they need to know the answer.

That's why there is no right or wrong answer.  They can choose

anything.  It's important.

Q.  Why did you choose -- why did you choose this particular

design for the control, the one stripe?

A.  I used the one stripe because, um, again, this is sort of a

way for us to think about -- this is not part of the case here,

one stripe.  So by using a one stripe, it's kind of an

effective control.  If people guess that that's sort of how I

estimate the degree of guessing that takes place because one

1    stripe could be anything, really.  It can't be adidas.

2              MR. FLEMMING:  You can take that down.  Thank you,

3    Nita.

4              Nita, just show to Dr. Joachimsthaler and the court

5    Exhibit 286.

6              This one is a native Excel file, your Honor, so paper

7    copies aren't readily available.  Let me just show it on the

8    screen.

9              I would like to go ahead and offer it to see if

10   there's an objection.

11             MR. LEWIN:  There's an objection here, your Honor.  We

12   don't see the relevance to this survey.

13             MR. FLEMMING:  Can we approach?

14             THE COURT:  Yes.  Let's have a sidebar.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So what's the relevance?

3          MR. HENN:  Dr. Joachimsthaler's opinions as set forth

4     in his report around harm and dilution are based on the notion

5     that because the Three-Stripe Mark and adidas are so closely

6     linked in a consumer's mind, when they see Thom Browne they

7     make an association, and that weakens the adidas brand.  That's

8     the fundamental basis of this whole opinion.

9          So this is the quantitative survey he conducted to

10    show the consumer's memories, three stripes and adidas are

11    linked so that then he can go talk about the next stages of his

12    opinions, which is his whole opinion in the case, that was in

13    his report and there was no Daubert motion or anything.

14         THE COURT:  But this chart --

15         MR. HENN:  It's just the results.

16         THE COURT:  -- is the results of three stripes versus

17    one stripe.

18         MR. HENN:  Right.

19         So he's explained to the jury that he did that as a

20    control so the three-stripe results were -- I forget what the

21    number was -- say 70 percent of people said adidas when shown

22    three stripes.  He didn't just rely on that.  There might have

23    been guessing and other things.  He did a separate control for

24    one stripe and he subtracted anybody who said adidas in

25    response to one so he could get a clean read on how closely the

1  three stripes are associated with adidas.

2          He explained all that.

3          THE COURT:  I think there can be cross-examination

4  about that.

5          MR. HENN:  Of course.

6          THE COURT:  I think that is admissible.

7          Overruled.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  All right.  What was the number again?

3        MR. FLEMMING:  286, Plaintiff's.

4        THE COURT:  We're only up would 286.

5        MR. FLEMMING:  Skipping a lot.

6        THE COURT:  286 is received.

7        (Plaintiff's Exhibit 286 received in evidence)

8        MR. FLEMMING:  Thank you, your Honor.

9        Can you publish it to everyone, Nita.

10   BY MR. FLEMMING:

11   Q.  Mr. Joachimsthaler, what is the exhibit that we're looking

12   at?

13   A.  That's actually the results from the tabulated results from

14   the survey.

15   Q.  OK.  So before we actually look at the final results, can

16   you tell me which set of results are on the left side of the

17   screen?

18   A.  The left side, as it says here, is the test group, those

19   who have seen the three stripes.  And then the answers is here,

20   you see in the rows the answers that they gave.

21   Q.  Then on the right side of the screen is the control?

22   A.  That's where you see the control, when they just saw the

23   one stripe on shirts.

24   Q.  Let's scroll down a bit and see the total results for the

25   test group.  You can stop right there.

1          Dr. Joachimsthaler, based on your survey, what

2    percentage of the respondents in the test results saw the three

3    stripes and wrote in adidas or some spelling of adidas?

4    A.  So over the 1,000 people, 707 said adidas or some spelling

5    thereof.  It's about 68, almost 70 percent.

6    Q.  And what about the control group, those who saw the one

7    stripe, what percentage said adidas?

8    A.  Those who said adidas is about 168 only out of over 1,000,

9    and it's about 16.1 percent.

10   Q.  Let's bring back up the presentation and we can skip ahead

11   to slide 13.

12          Dr. Joachimsthaler, now that we have the results from

13   the test group and we have the results from the control group.

14          What is the next step in your calculations?

15   A.  So in order to make this conservative, sort of as true as

16   possible, you subtract the guessing from the three stripes

17   group from the control -- the test group.

18          So the guessing sort of is the lowest score, so you

19   subtract it.  You see that here.

20   Q.  Please tell us the results.

21   A.  So you see --

22   Q.  Put everything on the screen.

23   A.  Yeah, thanks.  So we don't have to do math.

24          So it's 68.4 percent, the number from those who have

25   seen the three stripe minus the one stripe test group or

1   control group, and sort of the net, the net result is

2   52.3 percent or over 50 percent associate very closely adidas

3   with three stripes.

4   Q.  So with your background in branding and consumer psychology

5   and all of your research, what conclusions did you draw from

6   the survey?

7   A.  Well, the conclusion here is that this is a relatively high

8   number, mainly that the conclusion is that three stripes is

9   essentially synonymous or the three stripes invokes the adidas

10  name.  That's basically what it says.

11  Q.  Just a couple more questions about these types of surveys.

12          Can you tell us the difference between an aided

13  awareness survey and/or an aided survey and unaided survey?

14  A.  Yes.

15  Q.  Aided is when you give people multiple choice questions.

16  Aided is when you aid them, and what happens then in aided

17  awareness, the scores get very high, 90 percent or something.

18          Unaided is what I did here.  Unaided means I just ask

19  them to put a type and name into the box.  That's cognitively

20  very difficult.  You actually have to retrieve in memory that

21  box or to draw where you have --

22          MR. LEWIN:  Objection, your Honor.

23  A.  -- what you have written on it.

24          THE COURT:  Overruled.

25  A.  And so unaided awareness is oftentimes a very conservative,

1    a lower estimate, and the true read is somewhere in between.

2    So this is a very high number.

3    Q.  Were you surprised by this result?

4            THE COURT:  Sustained.

5    A.  No.

6            THE COURT:  Sustained.

7    Q.  In your research, did you uncover any other evidence

8    suggesting the degree to which consumers associate the

9    Three-Stripe Mark and adidas?

10   A.  Well, we know -- we know for many years that adidas has

11   been associated with three stripes.

12   Q.  Why?

13           MR. LEWIN:  Objection, your Honor.

14           THE COURT:  Yes.

15           The question is:  In your research, did you uncover

16   any other evidence suggesting --

17           THE WITNESS:  Yes.

18           THE COURT:  -- suggesting the degree to which

19   consumers associate the Three-Stripe Mark and adidas?

20           I think that's a yes-or-no question.

21           What's the answer; yes or no?

22           THE WITNESS:  Oh, yes.

23           THE COURT:  OK.  Put another question.

24   BY MR. FLEMMING:

25   Q.  What evidence did your research reveal?

1    A.  The evidence shows, from other empirical research and other

2    survey research, that the three stripes --

3              MR. LEWIN:  Objection, your Honor.

4    A.  -- associated --

5              THE COURT:  I'm sorry.  Ground?

6              MR. LEWIN:  Vague.

7              THE COURT:  Overruled.

8              Go ahead.

9    Q.  I believe we're just trying to get to what other evidence

10   you reviewed said about associations between adidas and the

11   Three-Stripe Mark.

12             If you can just continue.  Thank you.

13   A.  Yes.  There is enormous -- there is a significant amount of

14   empirical survey research that will show the same thing, mainly

15   that the three stripes is associated with adidas.  That's why.

16             MR. LEWIN:  Objection, your Honor.  No foundation.

17             THE COURT:  Overruled.

18   Q.  Thank you, Dr. Joachimsthaler.  I think you've answered

19   this question many times, so I won't belabor the point.

20             Can we bring up slide 14, please.

21             Dr. Joachimsthaler, are you familiar with these two

22   designs that we are looking at now?

23   A.  Yes.

24   Q.  How did these two designs factor into your opinion, if at

25   all, about the association between adidas and the Three-Stripe

1   Mark?

2               MR. LEWIN:  Your Honor, we have to object to the title

3   on this slide.

4               MR. FLEMMING:  There was no objection lodged before

5   when we conferred about this.

6               THE COURT:  Overruled.

7   A.  Um, these are two logos that are used by adidas, and that's

8   another way that adidas uses to identify the products and their

9   assortment of products.

10  Q.  What effect do these logos have on associating adidas as a

11  brand with three stripes?

12  A.  Well, the important part is that these two logos used by

13  adidas also, or is a part of it, the stripes, the three stripes

14  logo.  So it's important that from a branding point of view,

15  that a consumer can recognize three stripes not only through

16  stripes maybe on a leaf, but also through a logo, like a swoosh

17  in a Nike example.

18              MR. LEWIN:  Your Honor, we have to object.  These are

19  not in the case.

20              THE COURT:  Counsel, let's have a sidebar.

21              (Continued on next page)

22

23

24

25

1          (At the sidebar)

2          THE COURT:  First, I already denied the defendant's

3     motion in limine on this.  That doesn't mean that new, more

4     particularized objections can't be made.  But most of the

5     objections I've heard so far seem to take no cognizance of my

6     prior ruling.

7          Second, an expert can, of course, refer to the studies

8     and opinions done by others.  Indeed, that's most of what

9     experts usually rely on.  And as long as it is reflected in his

10    or her expert report, the expert is free to explain to the jury

11    why he used this or what he thought they showed.

12         So I am really totally mystified at some of these

13    objections.  Overruled.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2    BY MR. FLEMMING:

3    Q.  Dr. J, so we can get just one clear answer on this

4    question, I'll just ask it one more time.

5        What affect do these two logos have on consumer's

6    associations between the adidas brand and three stripes?

7    A.  The effect is that these logos reinforce the association

8    between the three stripes and adidas.

9        MR. FLEMMING:  You can take that down, Nita.

10   Q.  Dr. Joachimsthaler, does the fact that the Three-Stripe

11   Mark is composed of stripes, a common design, does that weaken

12   its strength as a visual identifier for the adidas brand?

13   A.  No.

14   Q.  Why not?

15   A.  Um, because it's commonly used.  And when we design symbols

16   all over, we use common -- common lines, many times, for

17   brands.

18   Q.  Based on the materials you reviewed and your education and

19   your experience, what is your expert opinion on the strength of

20   the Three-Stripe Mark as a visual identifier for the adidas

21   brand?

22   A.  Well, in summary, the Three-Stripe Mark is a very, very

23   strong visual identifier of the adidas brand, of its products,

24   yes.

25   Q.  In your opinion, how long has that been the case?

1    A.  Well, it's been many years.  When I was ten years old, my

2    first training suit -- we call them training suits --

3                THE COURT:  Can I go back to --

4                Let me ask you.  If I understood what you're saying,

5    you're saying that if there is one mark that is like an

6    original configuration, a cartoon character that has never been

7    created before or something like that, and then there's another

8    mark which takes something that people see all the time in

9    other contexts, namely stripes, but now there are three

10   stripes, that the fact that the second mark is composed of

11   something that people see every day doesn't make it any less

12   strong than something they only see ever in their life

13   associated with this just one product?

14               THE WITNESS:  Yes, it doesn't make it less strong.

15   What it means --

16               THE COURT:  What's your basis for that?

17               THE WITNESS:  Because -- because, um, consumers, when

18   they -- this is what we call Gestalt.  That is one of the

19   principles.

20               THE COURT:  Yes.  So I studied under Solomon Asch.  I

21   understand Gestalt psychology.  He was the founder in the

22   United States.

23               Go ahead.

24               THE WITNESS:  And it goes back to Ebbinghaus in 1850.

25   And consumers, they don't really count stripes.  What they do

1   is they see a piece of something and make an inference.  They

2   see something in a Gestalt, in a holistic way.  So it doesn't

3   make it less strong.

4           What it means, Judge, is that it makes it a lot harder

5   for you to create that association with adidas.  So if you take

6   common lines, they can be as strong as something very unique

7   that only exists once.  But the common lines are just much

8   harder to build in consumer's mind uniquely with adidas.

9           So that is what my studies showed that adidas, in all

10  these years, actually accomplished this common lines to

11  associate it with adidas, which is good.

12              THE COURT:  Go ahead, counsel.

13              MR. FLEMMING:  Thank you, your Honor.

14  BY MR. FLEMMING:

15  Q.  We were talking about timing and how long.  I know you

16  personally have been familiar with adidas, familiar with adidas

17  for a while.

18          But in a professional respect, how long do you believe

19  that adidas has been associated so strongly with the Three-

20  Stripe Mark?

21  A.  Again, many years.  But at least since 2005.

22  Q.  Why that year specifically?

23  A.  Well, I remember I reviewed a study that actually showed

24  already back then, that's 15, 18 years ago, that adidas is

25  synonymous with three stripes.

1    Q.   Let's bring that up very quickly.

2             MR. FLEMMING:  Nita, that is exhibit 50 and it's

3    already in evidence.  We'll turn to page 28.

4    Q.   Is this the 2005 study you were talking about?

5    A.   Yes.

6    Q.   Please explain to the jury --

7             MR. LEWIN:  Objection.

8    Q.   -- what this shows.

9             THE COURT:  Ground?

10            MR. LEWIN:  I'll withdraw.

11            MR. FLEMMING:  There was no objection.

12            THE COURT:  OK.

13   A.   This one shows that if you see that a bold in the middle

14   there called logo and lettering, it shows that 71 percent

15   associate three stripes -- actually one below, 65 percent --

16   associate the three stripes with adidas.

17   Q.   And that was in 2005?

18   A.   That was in 2005.

19            MR. FLEMMING:  Let's go to the next page, page 29.

20            I think we were just on 28.  Nita, you can take that

21   down.

22   Q.   So we talked a lot about marketing and branding, but you

23   also have an extensive background in consumer psychology.

24            So based on all of your research and background, were

25   you able to form an opinion about how consumers perceive the

1   adidas brand in their own minds?

2   A.  Yes.

3   Q.  Please walk us --

4           MR. FLEMMING:  Let's put up slide 15.

5   Q.  Would you please walk us through how you were able to form

6   your opinion on how consumers perceive adidas in their own

7   minds?

8   A.  This is actually that draw that I mentioned earlier, which

9   has a name and a logo or symbol in front of the draw.  And what

10  you see here is how a consumer -- how the draw actually is

11  organized in consumer's mind and what's in there, thoughts,

12  attributes.  Here on the left side, feelings, experiences.

13          And what is sort of important here is that the memory

14  of a consumer is organized as a network.  So when I think of

15  Nike, I think of Tiger Woods.  When I think of Tiger Woods, I

16  think of Augusta National, golf, things like that.

17          So the network operates -- the memory, it's not like a

18  cluttered draw, it's actually a network.  There are linkages,

19  and this is what we call a memory network.

20  Q.  So, Dr. Joachimsthaler, based on all of your research, were

21  you able to create a similar visual representation of a memory

22  network for the adidas brand?

23  A.  Yes.

24  Q.  Let's look at slide 16.

25          Earlier we talked about tangible elements of a brand.

1   We also talked about intangible elements of a brand.

2           Do you remember that?

3   A.   Yes.

4   Q.   Would you please using this visual tell us where the

5   tangible elements of the adidas brand are?

6   A.   Yeah.  So the tangible elements here are bolded of adidas,

7   and you see that in the middle there, three stripes.  Then you

8   see the networks of intangible elements or associations that

9   are coming around.  That's how that is organized.

10  Q.   I would like to cull out the three at the bottom –

11  authentic inclusive, and sport credibility.

12          Were those the ones we were discussing earlier?

13  A.   Yeah.

14  Q.   Would you please explain why they are where they are in

15  this representation?

16  A.   So what you see here is that you need to look at the

17  linkage.  Number one, how closely they are associated with the

18  name adidas or the bubble.  And authentic is very close to

19  adidas.  Inclusive and sports is close.  Sports credibility

20  goes closely with three stripes.  That is one thing you look

21  at.

22          The other thing you look at, let's say authenticity on

23  the left side.  You look at what are the linkages.  So it goes

24  to sports.  Authentic is something that you earn over time, it

25  is like the heritage.  But authentic also means it's part of

1   being inclusive.  That's the adidas brand.

2          So you look at the linkages and how closely they are

3   connected to each other.

4   Q.  So why would celebrities be off at the top sort of by

5   itself, just really briefly?

6   A.  Well, you see, celebrities is a little bit further away

7   because adidas is associated with celebrities like Beyonce, for

8   example, but I think primary you see the direct link goes to

9   real athletes – Messi, Mohammad Ali, and so forth.

10         And celebrities, of course, is a little bit further

11  distance.  Still connected, but not a direct connection.

12  Q.  Dr. Joachimsthaler, at the beginning of your testimony you

13  also said that you were here to talk about harm to the adidas

14  brand.  I would like to talk about that now.

15         Would you please quickly summarize your expert

16  opinions on the issue of harm?

17  A.  Yes.  So if I identify four, five areas of harm in my

18  report, there are many more that I could analyze with more

19  time.  But I looked at four major areas of harm.

20  Q.  Before we dig into those areas, what are the bases for your

21  opinions on harm?

22  A.  OK.  The basis of the opinion on harm is my own survey, my

23  own empirical research I've done, then the research done by a

24  third party for adidas or by adidas.  But also harm is

25  something that has been studied in my field for many, many

1  years.  Companies are interested, you know, whether they are

2  brand is doing well and what causes harm.  And companies like

3  myself help companies, brands, to work on remedying harm

4  issues.

5  Q.  Did you study harm from a consumer psychology perspective?

6  A.  Yes.

7  Q.  What about from a branding perspective?

8  A.  I studied from both sides, from a consumer psychology

9  perspective, how a network, for example, like this is affected,

10  but also from a marketing perspective; what it means for a

11  business, you know, to attract customers and to retain

12  customers, for example.

13  Q.  Since we have this one on the screen, I would love to start

14  with the consumer psychology aspect of your testimony on how

15  Thom Browne was harming the adidas brand.

16        Can you use this image to explain at a high level some

17  of the consumer psychology principles you applied in this case?

18        THE COURT:  Before you do that, because I'm unclear

19  and the jury may be unclear, this image that's on the screen,

20  this is not a picture of a brain, is it; yes or no.

21        MR. FLEMMING:  That is to you, Dr. Joachimsthaler.

22        THE WITNESS:  Yes, that's a brand.

23        THE COURT:  That's a brain?

24        THE WITNESS:  Brand.

25        THE COURT:  No, brain, b-r-a-i-n.

1          MR. FLEMMING:  Brain.

2          THE WITNESS:  This is how --

3          THE COURT:  No.  Answer that yes or no.

4          THE WITNESS:  This is not a brain.

5          THE COURT:  Thank you.

6          Now, but it purports to show how memory operates

7    within the brain, right?

8          THE WITNESS:  Correct.

9          THE COURT:  And how did you arrive at the spacing

10   between the various ovals on this chart?

11         THE WITNESS:  You look at existing research, like a

12   research where you ask consumers what comes to your mind when

13   you think of adidas, and the spacing is determined -- if they

14   say athletes, then the spacing gets closer to adidas.  If they

15   say -- if celebrities doesn't come up, then I put it further

16   apart.

17         So the closer these -- the closer these bubbles are to

18   the adidas brand, the closer that signifies that consumers say

19   adidas and then they say heritage or authenticity.

20         THE COURT:  All right.  So this is really an

21   arithmetic chart, if I understand what you're just saying.

22   You're saying that, in an answer to your survey, that was an

23   association by the consumers who answered the survey and there

24   was a greater association between three stripes and adidas than

25   there was between celebrities and adidas.

1            THE WITNESS:  Yes, correct.

2            THE COURT:  So what are the numbers?

3            What was the number for celebrities?

4            THE WITNESS:  So the percentage?

5            THE COURT:  Yes.

6            THE WITNESS:  Oh, I wouldn't know anymore.  This is

7     not just on one survey, this is produced from a number of

8     surveys, a number, and so...

9            THE COURT:  All right.

10            THE WITNESS:  Yeah.

11            THE COURT:  Go ahead, counsel.

12     BY MR. FLEMMING:

13     Q.  Dr. Joachimsthaler, what market research by adidas did you

14     review in arriving at this conclusion?

15     A.  No, I would like --

16            THE WITNESS:  Can I still answer something?

17            THE COURT:  Go ahead.

18            THE WITNESS:  Which is a very interesting question,

19     because one way to reflect your thought on number of

20     celebrities is to draw bigger circles or smaller circles.

21     Like, for example, there are -- if there are fewer celebrities

22     associated with adidas, let's say, then maybe the bubble itself

23     should be smaller than for athletes.  I didn't draw it that way

24     because many celebrities actually wear adidas shoes, and so you

25     don't know whether they are sponsored or not sponsored.

1          So there is celebrities.  Athletes generally are

2     associated with adidas.  That's why the bubbles are the same.

3     But I could have reflected your thought of number, the strength

4     of it, not just the linkage, the strength of it through a

5     sizing of the bubble.  It's a very good point.

6          THE COURT:  Thank you.  I don't have any thoughts.

7     I'm a judge.  I just ask questions.

8          Go ahead, counsel.

9     BY MR. FLEMMING:

10    Q.  Dr. Joachimsthaler, does adidas track or does adidas

11    conduct surveys into the attributes that consumers associate

12    with the brand?

13    A.  Yes.

14    Q.  How much research is there that you reviewed?

15    A.  Oh, there is enormous amount of research.  Every

16    three months adidas is doing a study of very similar nature.

17    Q.  So if you could put a number on how many studies you

18    reviewed of that nature, can you give me a ballpark?

19    A.  Oh, maybe two hands full, so over 20.

20    Q.  OK.  So we were talking about walking through some

21    principles of consumer psychology which we are talking a lot

22    about.

23          Can you use this to walk us through some of the

24    specific principles that you're relying on in this case?

25    A.  Yeah.  Well, we mentioned earlier Gestalt.  I think what is

important, which perhaps should be mentioned, is the key to

Gestalt is -- and this is so important for branding -- is that

you don't always see the three stripes.  What you see is a

fragment.  And from that fragment, the brain operates and sees

something holistically, and that invokes then the adidas brand.

You know, like with McDonald's, when you see yellow

and an M and you are hungry, guess what you think about?  I

think of McDonald's, and I think it's automatic.  And the key

to that is that this operates how this operates.  You're not

always consciously thinking about something.

But I know, for example, this gentleman here --

MR. FLEMMING:  Wait.  We don't have to talk about the

people in the room.

THE COURT:  Excuse me.

MR. FLEMMING:  Please continue but without talking

about those of us in the room.

THE COURT:  They are very shy.

A.  Yeah.  I think it's important that you're not always

processing something consciously, like I am reading here then

blue.  Oftentimes the way this operates is memory -- is that

sometimes it's just a fragment.  Maybe you do something else

and you still -- this has an impact on your memory.  It may

remind you of something or you see something while you're doing

something else, and you process it and put that into your draw,

in the right drawing, and make sense out of it in your head.

1  Q.  So we've talked about how consumers look at things

2  holistically and process things consciously and unconsciously,

3  as you said.

4  A.  Yeah.

5  Q.  Let's pause for a second because we're also here to talk

6  about Thom Browne.

7        Did you conduct research into what attributes are

8  associated with the Thom Browne brand?

9  A.  Yes.

10  Q.  What did you do?

11  A.  Well, I didn't have a survey research available, but I did

12  research it.  I went online.  I researched it quite

13  extensively.  It's a good brand to research.  It's 20 years

14  old.  I went on Pinterest, I went on Instagram, I looked on

15  Google.  And I looked on empirical research, survey research,

16  or any other research that I could find to understand Thom

17  Browne.

18  Q.  Did you review any internal Thom Browne documents?

19  A.  No.

20  Q.  Based on your research, were you able to come up with a

21  similar visual for the Thom Browne brand?

22  A.  To the best I could, I tried to do that, yes.

23  Q.  Let's put up the next slide, please.

24        Dr. Joachimsthaler, in your expert opinion, what are

25  the most significant differences between the attributes of the

1  adidas brand and the attributes of the Thom Browne brand?

2  A.  Um, you can see here the Thom Browne brand.  And when you

3  look at this again, try to do this in a holistic way in some

4  ways, it's not perfect, but Thom Browne is about luxury.  It's

5  an American designer.  Thom Browne is about the four stripes.

6  There is some people that know maybe Grosgrain ribbon.

7       Thom Browne is a luxury, but also a fashion.  It's a

8  fashion statement in some ways.  It's about exclusive, being

9  exclusive.  Being luxury.  Being very specific in some ways.  A

10 particular style.  When you research Thom Browne, you learn

11 also that they are theatrical for fashion shows.  You could

12 think about some products associated.  So that's the Thom

13 Browne association.

14      My opinion to your question, that is very different

15 from what you see when you look at adidas.  Thom Browne is

16 exclusive.  Adidas is inclusive.  Thom Browne is luxury.

17 Adidas is for everybody, it's inclusive.  They have a campaign

18 called All In.

19      So if you look holistically, if you just look at them,

20 they are very different brands.  One is a designer, fashion

21 brand, respected, luxury brand.  One is a brand that you and I

22 can buy every few months, if you will.

23 Q.  Dr. J, how did you use principles of consumer psychology to

24 measure how Thom Browne is harming the adidas brand in this

25 case?

1    A.  So the way you look at consumer psychology is that

2    consumers, what they do is when they see, let's say, the

3    four-stripe from Thom Browne, just like you mentioned earlier,

4    the first thing you do, you see four stripes, and then what you

5    do is see only fraction of it.  Then consumers go in their

6    memory and they match what they see in memory.  The way you

7    understand consumer psychology is that that match then takes

8    place.

9    Q.  Can we go to the next slide, please.

10            Please continue.

11   A.  So is there a question?

12   Q.  Yes, how Thom Browne -- I believe you're talking about

13   seeing four stripes.

14            What happens then?

15   A.  Yeah.  So what I've -- from my research, I know when

16   consumers see four stripes or Grosgrain ribbon, what happens is

17   they invoke actually three stripes.  They invoke --

18   Q.  Let me stop you right there, Dr. Joachimsthaler.

19            How do you know or why do you believe that consumers

20   would see four stripes with a Grosgrain and see three stripes

21   and think adidas?

22   A.  Well, I know it because we have available empirical

23   original research, so survey research.

24   Q.  Let's go to the next slide please, and I would like to talk

25   more about this evidence.

1          Dr. Joachimsthaler, when you said we have empirical

2    evidence, were you referring to the Poret study?

3    A.  Yeah.  I think you call it Poret study, perhaps.

4    Q.  And we heard from Hal Poret yesterday.

5          Would you please explain what that research meant to

6    you in your harm analysis?

7    A.  To me, actually, in the way we do it on ordinary business,

8    it showed it matched what you just saw earlier.  Namely, those

9    red lines between Thom Browne, four stripes and Grosgrain

10   ribbon and the adidas three stripe, which means that the survey

11   basically presented -- as you know, they presented Thom Browne

12   product with Thom Browne's four stripes, but consumers actually

13   invoked the adidas brand.  When they went in and patent search

14   in their head, they said, oh, that's a three-stripe.

15         MR. LEWIN:  Objection, your Honor.  The document

16   speaks for itself.

17         THE COURT:  Well, I'll allow it.

18         But did you explore the underlying methodology of this

19   study?

20         THE WITNESS:  Yes.

21         THE COURT:  For example, to what extent did he correct

22   for problems some consumers would have with their vision?

23         THE WITNESS:  Um, there is -- I don't know.  I would

24   have to go into the detailed study, but there is -- the firm

25   that the panel -- it's called a panel firm that Poret and

1   others researchers use.  Typically, in order to qualify for

2   that, they -- um, they have certain dimensions.  One of them is

3   the vision issues, that in order to qualify that you actually

4   are a member of the panel.

5          So I don't know specifically how Mr. Poret looked at

6   it, but typically that is something we, as market researchers,

7   try to sort of control for.

8          THE COURT:  So are you familiar, for example, with a

9   well-known scientific study called My Cousin Vinny?

10          MR. FLEMMING:  The movie.

11          THE WITNESS:  Winnie the Pooh?

12          THE COURT:  No.  This is a movie.  And in the movie

13   the eyewitness, the alleged eyewitness has a vision problem,

14   and the defense counsel goes to the back of the room and holds

15   up two fingers and says to the eyewitness:  How many fingers?

16   The judge then interrupts and says:  Let the record reflect

17   that there were two fingers raised.  The defense lawyer gives

18   him the appropriate look, and the judge says:  Start again.

19   And he then puts up, again, two fingers.  And the witness says

20   four fingers because her vision is poor.

21          So just to state the obvious, wouldn't it be very

22   important to know whether Mr. Poret corrected for vision, so

23   people who were saying they associated four stripes with adidas

24   maybe only saw three?

25          So did you check that out?

1          THE WITNESS:  No.  I would have to research, look at

2     the study again.  This is not my study.

3          THE COURT:  OK.

4          THE WITNESS:  That's a really important point, but the

5     way -- there could be an error such as this.  But my

6     experience, these numbers are so high that, yes, it could

7     affect the results, but still --

8          THE COURT:  You think it would not affect the overall?

9          THE WITNESS:  I wouldn't.  I don't think so.  I think

10    that these numbers are really high numbers in terms of, that's

11    why.

12         THE COURT:  All right.

13         THE WITNESS:  Otherwise, I think this is really --

14    this is really something to look at.  I agree with that.

15    BY MR. FLEMMING:

16    Q.  Dr. Joachimsthaler, what do you make of some of the

17    verbatim answers to the Poret study where respondents answered

18    adidas, and when asked why, they wrote in three stripes?

19    A.  Yeah, that's really interesting.  I think in particular to

20    the conversation we just had, that the memory -- again, this

21    goes to the finding that also I had in my study.  They said,

22    what I see is, I look at --

23         This is crazy.  I look at Thom Browne four stripes, I

24    see adidas.  That's what they say.  When you ask them, Why do

25    you say adidas?  They say, Three stripes.  You know, to the

1    point that you just made, they saw three stripes even though --

2              MR. LEWIN:  Objection, your Honor.

3              THE COURT:  I'll allow it.

4              Go ahead.

5              THE WITNESS:  Even though they saw four stripes.  It's

6    exactly the Vinny example here.  It's powerful.

7              This is, again, it just means that the three stripes

8    is very closely associated with adidas and four stripes invokes

9    adidas.

10   BY MR. FLEMMING:

11   Q.  And did you review some social media posts in your

12   research?

13   A.  Yes.

14   Q.  And is this an example on the right side of the screen?

15   A.  Yes.  You see this quite a number of times.

16   Q.  So when we were talking about seeing four stripes and that

17   triggering adidas and a memory network, how does social media

18   comments like this fit into your analysis?

19   A.  Well, they just are validation to the survey research that

20   I did.  It's basically real-world evidence.

21   Q.  Let's go to the next slide.

22              THE COURT:  Stop.  Stop.  I apologize for

23   interrupting.

24              So the people who actually saw four stripes but

25   reported that they saw three were having, in effect, a kind of

1    illusion or some sort of memory problem or whatever.

2              But that could be caused by any of many possibilities,

3    could it not?

4              THE WITNESS:  Yes, and it's what -- this is what we

5    call cognitive biases, and there are 25 of them.  I can't go

6    into those.  But over the years now, we have established the

7    fact that consumers make mistakes.  They make -- so these are

8    errors or biases.

9              Sometimes you can research them, but there is a number

10   of reasons that why consumers make those mistakes.  We are not

11   perfect computers or information processors.

12             THE COURT:  So once they think they have seen three

13   stripes, even though they've seen four, then they are being

14   asked to associate it with some company.  And they, of course,

15   say adidas, but I'm not sure what that shows.

16             THE WITNESS:  Well, that's the most important point,

17   because when they say -- when they see four and then they

18   associate it with three, and what do they associate with three?

19   Everything that they already have stored in memory.  And then

20   what happens is, what happens is this is what is principally in

21   psychology called activation spreading.

22             That means everything that they've seen about the

23   four-stripe is now getting associated with the three stripes

24   and that memory network.  And over time, that memory network

25   smooshes together, and adidas isn't about adidas anymore.  It's

1   kind of adidas to some people, it's a little bit of Thom

2   Browne.  It's like smooshed together into one thing.

3            THE COURT:  Well, we've already had considerable

4   expertise on the meaning of the word smoosh.

5            Anyway, why don't we continue.

6            THE WITNESS:  OK.

7   BY MR. FLEMMING:

8   Q.  Let's go to the next slide.  Maybe it was the previous.

9   There we go.

10            You just mentioned activation spreading, so I don't

11   want you to repeat your testimony that you just gave.  That was

12   very clear.

13            Can you briefly explain with this visual what

14   activation spreading means?

15   A.  Yeah.  Activation spreading is important because of the

16   network.  Everything connects in some ways, and the first part

17   of this activation spreading to happen is that there needs to

18   be a link between four stripes and three stripes.  And that's

19   what the Poret study basically showed, we just talked about.

20            But what that also means is that over time,

21   immediately and over time the adidas network is no longer

22   separate from the Thom Browne network.  They move slowly

23   together.  They come together.  And that causes a problem for

24   adidas, because suddenly you can't -- you can't be inclusive

25   and then you're also exclusive.  You can't be sportswear

1    credibility and you're also design and luxury and something

2    else.

3              You know, it sort of becomes -- consumers realize,

4    well, I don't know anymore.  Things don't really work together

5    for me.  This is sort of -- this is causing a big problem.

6    Cognitively, that sort of causes a problem for adidas.

7    Q.  Dr. Joachimsthaler, we've talked a lot about harm from a

8    consumer psychology perspective.

9              You also mentioned harm from a branding perspective.

10   Before we get into that, I want to ask if you're familiar with

11   Thom Browne's expert witness, Dr. Joel Steckel?

12   A.  Yes, I am.

13   Q.  Would you please compare his background to yours briefly?

14   A.  Dr. Steckel is a professor --

15             MR. LEWIN:  Objection.

16             THE COURT:  Sustained.

17   Q.  Then let's go ahead and talk about branding.  We actually

18   can wrap up before lunch.

19             From a branding perspective, how --

20             THE COURT:  That's if I can shut up.

21   Q.  From a branding perspective, how is Thom Browne harming

22   adidas?

23   A.  Well, from a branding perspective, as I mentioned just now,

24   it weakens the associations that adidas has.  Sports,

25   inclusive, athleticism, authentic, all of these things.

1   Suddenly you're not that much there.  What it means is that

2   consumers, when they think of one thing, suddenly they focus

3   and consumers get lost.  So it weakens the associations because

4   these things sort of like move together into one thing, into

5   one thing in your head.

6   Q.  So talking about weakening associations, what does that

7   mean practically?

8              What does that mean to the business?

9              How does that affect the bottom line?

10  A.  Well, to the business, what that means is that consumers,

11  what it means is you need to spend a lot more advertising and

12  marketing to communicate what you are, what you stand for, that

13  you are actually an authentic sports brand, let's say.  So it

14  means that your marketing investments really go up.

15             MR. LEWIN:  Objection, your Honor.

16             THE COURT:  Ground?

17             MR. LEWIN:  I'm sorry.  Relevance.

18             THE COURT:  Well --

19             MR. LEWIN:  And foundation.

20             I'm sorry, your Honor.

21             THE COURT:  No, I think the foundation objection is

22  overruled.  I think the relevance, it is irrelevant, but it's a

23  little marginal.

24             I think maybe, if we're going to fulfill your pledge

25  to finish his direct testimony by lunch, we should move on.

1            MR. FLEMMING:  OK.

2      BY MR. FLEMMING:

3      Q.  Dr. Joachimsthaler, you've talked about a couple of harms.

4            Can you identify the additional two concrete harms to

5      the adidas brand that Thom Browne is causing?

6      A.  Basically another one harm is that it makes adidas less

7      distinctive, less differentiated from others.  It's all over

8      the place.  And when it's all over the place, then that affects

9      the sales of adidas products, that affects your liking, the

10     consumer's liking of the product, it affects the loyalty you

11     have to a product.

12           You say, is that still the brand that I really am used

13     to?  No, they are in a different world now.  So it sort of

14     causes a significant impact on the business side.  It affects

15     sales.

16           MR. LEWIN:  Objection, your Honor.

17           MR. FLEMMING:  This goes to harm, your Honor.

18           THE COURT:  Overruled.

19     Q.  Dr. Joachimsthaler, we've talked about weakening brand

20     associations, you've talked about having to spend more to

21     reinforce those, and now you've just talked about how it

22     actually affects purchasing decisions.

23           Can you put a dollar amount on those harms that you

24     have just identified?

25     A.  No.  It is not as easy.

1          MR. LEWIN:  Objection, this is --

2          THE COURT:  Well, the answer is no, so we'll let that

3     stand as the answer.

4          He's not being called to put monetary valuations and

5     he is not purporting to do so, so put another question.

6     Q.  Why can't you quantify it?

7     A.  It's because these things happen, as the judge has said.

8     These things happen in consumers' minds.

9          MR. LEWIN:  Objection, your Honor.

10         THE COURT:  Sustained.

11    Q.  Dr. Joachimsthaler, of the harms that you have identified,

12    how can they actually be prevented?

13    A.  Well, there is only one way to do it, and that is to stop

14    selling Thom Browne products, the alleged products, I think,

15    with four stripes.

16         MR. FLEMMING:  Pass the witness, your Honor.

17         THE COURT:  OK.  Ladies and gentlemen, two things.

18         First, when I ask questions of a witness, it's only to

19    try to clarify things.  You should understand I have absolutely

20    no opinion as to how you should decide this case or how you

21    should view any given witness.  That is entirely your job, not

22    mine.  But second, since it's three minutes before one, I think

23    you deserve a three-minute extra lunch.  We'll resume at two

24    o'clock.  Have a good lunch.

25         (Continued on next page)

1          (Jury not present)

2          THE COURT:  The witness mentioned Shari Diamond.  I

3   take the liberty of mentioning that Dr. Diamond is one of the

4   true giants in the field of cognitive neuroscience and

5   psychology.  I take very great liberty of mentioning to

6   counsel, for whatever purpose it might have a much, much, much

7   less important volume entitled The Judge's Guide to Cognitive

8   Neuroscience, coauthored by Mike Gazzaniga, one of the great

9   giants in the field, and Judge Jed Rakoff.  Just to pass that

10  on.

11         I also can't help but mention that reference was made

12  to Gestalt psychology, which is certainly one of the most

13  important areas of psychology.  And the great American

14  proponent of that was Dr. Solomon Asch, and his famous

15  experiments all dealt with variations on how people viewed

16  three lines.

17         I'm glad to say that adidas did not attack that

18  research as being an infringement of their mark.  But if you

19  ever, just it's really interesting.  He would draw three lines

20  on a blackboard, two of which were identical and one which was

21  clearly not identical.  And then he would ask a group of seven,

22  eight people which of these three are identical.

23         The first five or six, all of whom were, you know,

24  stooges, so to speak, which say -- and they would say two and

25  three, which were the two that are totally different.  And then

1    it got down to the person who was the actual subject.  And in

2    an amazing percentage of cases, like 90 percent, they would

3    yield and say, Oh, I first thought it was one and two, but now

4    I see it's really two and three.  So that was an interesting

5    study.

6             So, Doctor, we'll see you at two o'clock.

7             THE WITNESS:  Thank you very much.

8             THE COURT:  I'll need to know from defense counsel

9    before we start at two o'clock approximately how long you're

10   going to be on cross.

11            MR. LEWIN:  Yes, your Honor.  Thank you.

12            MR. FLEMMING:  Your Honor, after Dr. Joachimsthaler,

13   another expert witness your Honor wanted to hear about before

14   he got on the stand in a response to a Daubert motion.

15            THE COURT:  Oh, yes.

16            Are we going to be going to the midafternoon break

17   with your cross?

18            MR. LEWIN:  Probably.

19            THE COURT:  Yes.

20            All right.  We'll do that at the midafternoon break.

21            THE DEFENDANT:  Your Honor, are we breaking at four

22   today or 4:30?

23            THE COURT:  I'm sorry.  I think at one point I had a

24   matter at four, but I postponed it to 4:30 because I didn't

25   want to miss more of the trial.

1              MR. MALDONADO:  Thank you, your Honor.

2              (Luncheon recess)

1                          AFTERNOON SESSION

2                              2:05 p.m.

3     CROSS-EXAMINATION

4     BY MR. LEWIN:

5               THE COURT:  Please be seated.

6               (Jury present)

7               THE COURT:  You may proceed.

8               MR. LEWIN:  Thank you, your Honor.

9     Q.  Dr. Joachimsthaler, you testified this morning that you

10    have previously testified in a number of trademark cases,

11    correct?

12    A.  Correct.

13    Q.  Have you ever had your -- withdrawn.

14              I assume that in connection with your testimony,

15    you've rendered written reports of the findings that you had in

16    that particular matter?

17    A.  Yes.

18    Q.  And have they always been accepted, sir?

19    A.  Yes.

20    Q.  Do you remember rendering a report in the matter of *Lucky

21    *Brand Dungarees v. Ally Apparel Get Lucky*?

22    A.  Yes.

23    Q.  And is it your testimony that your report was fully

24    accepted in that matter?

25    A.  My report was accepted, yes.

1  Q.  Let me be clear.  Fully accepted, sir?

2  A.  There was some initial research that I did, qualitative

3  research before the quantitative research, and the judge said I

4  should not rely on the initial qualitative I did.  I was just

5  exploring the brand at the time without using it as part of my

6  testimony -- report.

7  Q.  In that report, did not the court find that the probative

8  value of your opinion was minimal?

9  A.  I don't know that.  I hope that's not the case.

10  Q.  You see the exhibit before you, sir?

11  A.  Right, that's from 15 years ago.

12  Q.  Right.  And you recognize this, the title of the case?

13  A.  Yes.

14  Q.  Can we turn to page 2, the lower left side.  Thank you.  I

15  was just going to ask for that.  You see where it says that

16  the --

17            MR. FLEMMING:  Objection.  403.

18            THE COURT:  Sustained.

19            MR. FLEMMING:  And 402.

20            THE COURT:  Sustained.  Take it off.

21            MR. LEWIN:  All right.  Your Honor, if I may just

22  break for a second.  When counsel objects, it would be

23  helpful -- he's facing you and in front of me, if I could ask

24  him to raise his voice.  I can't hear the basis of the

25  objection.

 1            THE COURT:  I agree.

 2            MR. LEWIN:  Thank you.

 3   Q.  Since we're not going to talk about the past, let's talk

 4   about today.  Your opinion, your report did not express any

 5   opinion about trademark dilution, did it?

 6   A.  No.

 7   Q.  And your report did not express what fame was under

 8   trademark law?

 9   A.  Yes, it did not.

10   Q.  And do you find any link between -- do you have any

11   expertise between what would be considered harm to a brand and

12   trademark dilution?

13            MR. FLEMMING:  Objection.  Compound.

14   A.  Again --

15            THE COURT:  Hold on.  There's an objection.

16            I think it's all right.  You started with a different

17   question and then you came to a perfectly proper question.  Why

18   don't you put it again in proper form.

19   Q.  Do you have any expertise with regard to the link between

20   harm to a brand and trademark dilution?

21   A.  Well, trademark dilution is a legal term.  So I know how

22   harm occurs and as I explained earlier how brands get weakened,

23   and so that is my expertise.

24   Q.  Now, you offered an opinion on adidas's market position in

25   the United States in your report, didn't you?

1    A.  Yes.

2    Q.  And you considered it to be dominant in the sportswear

3    market.  Is that correct?

4    A.  Yes.

5    Q.  And you've been paid today to testify for adidas, haven't

6    you?

7    A.  Correct.

8    Q.  And you are also a paid consultant with respect to other

9    work that you do for adidas, correct?

10   A.  No.

11   Q.  Do you render consulting services to adidas?

12   A.  No.

13   Q.  Have you ever?

14   A.  Back in 1995 when adidas had some challenges globally, and

15   I worked on brands -- that's sort of 25 years ago, I helped to

16   clarify the differences between Nike and adidas, but that's a

17   long time ago.

18   Q.  Fair enough.  Since you brought it up though, Nike is

19   considerably larger than adidas, isn't it?

20   A.  In the U.S. Nike is a whole market here.  Adidas is a brand

21   from Europe.  Yeah, it's considerably larger, about double the

22   size, I guess, globally at least.

23   Q.  You made much during your morning testimony of exclusivity

24   versus inclusivity, correct?

25   A.  Yeah, there is some -- that's correct, yes.

1   Q.  Thank you.  And you indicate that adidas is apparently

2   damaged because it is an inclusive brand, and it is damaged

3   when it is associated in some manner with a non-inclusive

4   brand, correct?

5   A.  I didn't understand correctly the point.  I think you --

6   adidas is not damaged because it's an inclusive brand.  Adidas

7   is -- the belief system of adidas, the values of the company

8   and of the brand is about being inclusive.

9   Q.  And you indicated that you would call Nike an exclusive

10  brand or a brand -- withdrawn -- an exclusive brand?

11  A.  Nike, I wrote about a book in 2000 and I compared Nike and

12  adidas back then, and the notion is that Nike is much more an

13  exclusive brand.  You got to be an athlete.  It's about

14  winning.  It's about an aspiration of athleticism.

15  Q.  I take that to mean, sir, that Nike is not interested in

16  selling product to the same athletes that adidas is interested

17  in selling to?

18          MR. FLEMMING:  Objection.  Relevance.

19          THE COURT:  Well, the objection on relevance is

20  overruled.  If the objection was on grounds of speculation,

21  foundation, conceivably hearsay, I might have had to sustain

22  the objection.  But since it's on the ground of relevance, it's

23  overruled, so you may answer the question.

24  A.  Both companies follow what's called a hierarchy of

25  influence model.  You market to serious athletes then to

weekend warriors, but you're also selling to a very large mass

market.  So Nike, like adidas, wants to sell to serious

athletes as much as to based on the sportswear ability and Nike

does it too, but they definitely sell to the -- to everybody.

But the belief system, as I said, the belief system of Nike is,

you know, if you run with Nike, you're an athlete.  It's a

value system.

Q.  I'm sorry, I don't mean to interrupt.  If you weren't done,

please finish.

          And how do you know that Nike's value system is

exclusive?

A.  As I said, as early as the year 2000, I have researched

Nike for my book back then, and I've researched them over the

last 20 years.  So I did not say that they are exclusive.  I

say they have a value system of being more exclusive relative

to adidas.  Adidas has a value system of being inclusive.

Q.  You conducted, I believe your personal survey in this

matter, and you consider what is called a recognition survey.

Is that correct?

A.  I don't think I called it that way, but I did a survey in

this case, specifically for this case, yes.

Q.  And do you recall that you called it original empirical

research?

A.  Yes, that's what I called it.  That's how we call it in the

scientific world, in the academic world.

1   Q.  And you don't recall or you're saying that -- withdrawn.

2           You don't recall indicating that in your view it was a

3   recognition survey?

4   A.  The kind of question that I used is actually a recognition.

5   It's actually a recall survey, not a recognition survey.  So

6   technically it's a different survey.

7   Q.  Would you put up tab A, please.

8           MR. LEWIN:  Your Honor, this is impeachment in

9   transcript.  Page 31:7-15.

10          MR. FLEMMING:  Objection.  Collateral.

11          THE COURT:  Overruled.

12          MR. LEWIN:  Can we publish that to the jury, please.

13  Q.  Now, sir, I represent to you that this is a portion of a

14  transcript of a deposition that you gave in this matter.  And

15  you see where it says:  "How would you describe the surveys in

16  this case?"

17          Would you agree with me your answer was:

18  "A.  Original empirical research?"

19  A.  Yes.

20  Q.  And then question was:  "I believe you referred to it as a

21  recognition study."

22          Your answer was: "So I would say that's a recognition

23  study, an originally owned empirical research survey."

24          Is that correct, sir?

25  A.  Yes, that goes to the earlier testimony on aided versus

1   unaided.  Typically in our world --

2   Q.  Sir, I don't mean to cut you off.  I apologize.

3   A.  But you did.

4           THE COURT:  Yes, but he cut you off because he didn't

5   ask you for an explanation.  He just asked you whether you said

6   what you said in the deposition.  So you can't volunteer, and

7   so he had every right to cut you off.

8           THE WITNESS:  All right.  Thank you.

9   A.  Thank you.

10  Q.  The recognition study did not test for fame, did it?

11  A.  No, it did not test for fame.

12  Q.  Now, for the study that you're relying on, your own study,

13  the empirical study, recognition study, if you'll agree with me

14  for the moment, how did you determine what the population was

15  of the several thousand respondents?

16  A.  I don't know the details any more but we randomly select

17  over 2,000 from a panel of consumers, and we provided a frame

18  of reference, meaning we said we would like to talk to

19  consumers who are sports wearing -- purchasing in the sports

20  category.

21  Q.  So that would be a survey that was not inclusive of the

22  general population?

23  A.  Yeah.  If it would be general, then it would be a fame

24  survey.  I did not do a fame survey.

25  Q.  A very selective one, actually, correct?

1   A.  Yeah, within that.  Yes.

2   Q.  And I believe you also indicated that you relied on a

3   survey which was conducted by Mr. Hal Poret, correct?

4   A.  Correct.

5   Q.  And could you remind us why you included your review of

6   Mr. Poret?

7   A.  Why I --

8   Q.  Why you relied on it, how about that?

9   A.  I relied on Mr. Poret because the survey shows the

10  infringing product from, if I remember the details now --

11  excuse me -- accused products from Thom Browne, and I relied on

12  it, I wanted to know to what extent consumers invoke adidas,

13  adidas's three stripes.

14  Q.  Did you rely on any other studies to indicate to you some

15  measure of consumer response to the adidas stripes?

16  A.  Yes.  There is, as I said earlier, a lot of surveys being

17  conducted that shows the three stripes and how it relates to --

18  Q.  Sir, I just wanted to know if you could tell us a

19  particular survey that you relied on?

20  A.  Earlier in testimony I said there are more than two

21  handfuls, so I don't know that -- and adidas conducts them

22  every three months, so sorry.

23  Q.  And the surveys you're talking about are conducted by

24  adidas, correct?

25  A.  No, they are conducted by third party, third-party

1    providers, yes.

2    Q.  You indicated at one point that you relied on or you

3    incorporated in your opinion a survey from 2005.  Do you

4    remember that?

5    A.  Yes.

6    Q.  Now that survey was commissioned by adidas, was it not?

7    A.  Yes.

8    Q.  In your survey, did you rely on the same methodology that

9    adidas did to conduct its surveys?

10   A.  What do you mean by the same?

11   Q.  Did you hire an outside survey company to conduct this?

12   A.  Well, I hired an outside, a very large survey company to

13   conduct the study, but I analyzed them myself.

14   Q.  Thank you.  And you indicated that that study was between

15   consumers 18 and 64 years of age?

16   A.  Yes.

17   Q.  Correct?  And they had to wear sportswear or buy these

18   items for their household, correct?

19   A.  Yes.

20   Q.  And what was the definition of sportswear that you would

21   apply to that use?

22   A.  I would have to look back at the questionnaire, but I asked

23   the consumers, for me I ask consumers -- I ask consumers

24   whether they qualify, whether they wear or are using certain

25   sportswear.  I don't know the specific question.

1  Q.  I'm sorry, I didn't make myself clear.  Let me see if I can

2  do better.  You used the term sportswear in your survey.

3  A.  Mmm-hmm.

4  Q.  What does sportswear mean to you?

5  A.  You know, I know sportswear from several dimensions.  One

6  dimension is how I use it in the world of business.  In my

7  report I talked about how large sportswear is.  And when I --

8  Q.  Sir, again, I'm sorry, but I am trying to get to a category

9  of --

10         MR. FLEMMING:  Objection, your Honor.

11         THE COURT:  No, I think the answer was not really

12  responsive.  What he wants to know is when you use the term

13  sportswear, what articles are you including in that?

14  A.  Well, it depends on how I -- whether I use a business

15  definition or I use a definition from a brand point of view.  I

16  need to do both in my work.

17         THE COURT:  Did you do both here?

18         THE WITNESS:  Yes.

19         THE COURT:  So what's the difference?

20         THE WITNESS:  So the difference is, as I just said, is

21  that the business definition it's at the beginning of my report

22  where I talk about sportswear and the category of sportswear.

23  That definition is an industry definition.

24         THE COURT:  But what is it?

25         THE WITNESS:  And it defines sportswear as companies

1    that are defined to be operating within the sportswear

2    classifications.  And there is a $250 billion number that says

3    this is companies that operate in sportswear.  That's the

4    business definition.

5           The second definition that I use in my work and that

6    we use as brand experts is we look at what consumers perceive

7    as sportswear.

8    Q.  Can we have tab C, please.  Go to paragraph 123.

9           If you look at the first several lines, if I may,

10   beginning with empirical study.  You see that very first full

11   sentence.  Does that refresh your recollection as to what you

12   intended sportswear to mean?

13   A.  Yes.

14   Q.  In the context of this survey?

15   A.  Yes.

16   Q.  All right.  What does sportswear mean in the context of

17   this survey?

18   A.  Again, I would have to look at the specific question that I

19   asked.  It's in part of my report in my survey where I ask

20   consumers to respond with respect to sportswear.  I can't

21   really know the specific question.

22   Q.  Would it be fair to say, sir, that you indicated that

23   sportswear was an item, was items?

24   A.  Items, that's possible.  Yeah, products.

25   Q.  Did you further define those items in any study that you

1   did related to this case?

2   A.  I did this in my report, yes.  I did an entire industry

3   analysis, and, as I said earlier, I looked at the business

4   definition as it is used by Nike, by adidas and everybody else,

5   and I also defined it from the consumer perspective.

6   Q.  Did you tell the consumers that when you were conducting

7   the survey itself?

8   A.  Again, I don't know any more of the specific question.  I

9   would have to look at the questionnaire.  I don't know it right

10  now, unfortunately.

11  Q.  Now, in the surveys that you offered to support your

12  opinion and that you reviewed, a number of those were conducted

13  or commissioned by adidas, correct?

14  A.  That's correct.

15  Q.  And can you indicate any of the surveys that you relied on

16  that compared adidas to brands other than strong sportswear

17  brands?

18  A.  There are studies where adidas compares themselves to the

19  best of the best from a brand perspective.  I have seen these

20  studies before, and yes, there are studies like that.

21  Q.  Did you rely on those studies in formulating your report?

22  A.  Yes.

23  Q.  So that helped you select the brands that you highlighted

24  in your report in comparison to adidas?

25  A.  No, in my report, I have used sportswear brands.  So I

1    didn't have to rely on reports that goes beyond sportswear.

2    You asked about beyond sportswear.

3    Q.  You indicated that I guess in the first stage there were

4    three stages of consumer processing information that leads to

5    the -- and forgive me, I am not technically adept; way too old

6    to learn -- but that the consumer somehow or other gives rise

7    to the memory and he assigns attributes to that trademark when

8    he sees that trademark or that logo.  Is that correct?

9               MR. FLEMMING:  Objection.  Compound.

10              THE COURT:  Yes.  You can rephrase it.  Break it down.

11   Q.  Would you agree that you used in your report a description

12   as an example consumer recognizing in the first stage that he

13   needs a pair of sweatpants for both gym and office?

14   A.  I didn't get the full question.

15   Q.  I'm sorry.  Would you agree with me that you used as an

16   example of the first stage of this processing where a consumer

17   recognizes he has a certain need for something, and you offered

18   as an example where he wants sweatpants for both the gym and

19   office?

20   A.  Yeah.  I don't know exactly any more that one specific

21   sentence but what you refer to is that consumers have a

22   problem.  They perceive a problem.  That's sort of the

23   beginning of what we call the consumer journey, the process of

24   a consumer to decide.  And I may have used that example.  I

25   don't remember very well, but you could -- yeah, in this day

1   and age you can say a consumer uses -- says I have a problem, I

2   need to go and you decide whether to use sweatpants or not to

3   go to the office.  That exists today.

4   Q.  Assuming that happens, the second stage is where the

5   consumer narrows down and evaluates a number of brands that

6   come to his mind from the various drawers presumably in his

7   brain, correct?

8   A.  Yes.

9   Q.  And he associates those with the attributes of that, what

10  he needs.  He associates those brands with the attributes that

11  his need reflects, correct?

12  A.  Yes.

13  Q.  And you indicated that Nike, Under Armour, adidas, and I

14  think Lululemon were typical of those brands that would come to

15  mind in that process?

16  A.  Well, that's just illustrative.  It could be anything that

17  comes to mind.  For some, that's just in the category of some

18  category that they -- they all offer products that is sometimes

19  wearable for office and sometimes not.

20  Q.  But you did say, sir, did you not that adidas, Nike and

21  Under Armour are in, to use your words, the same category of

22  interest, correct?

23  A.  Adidas, Nike and Under Armour are in the same category of

24  interest.  It's possible that I said that.  It kind of makes

25  sense.  They are part of sportswear.

1    Q.  And those are the brands that you consider comparable to

2    adidas, correct?

3    A.  Yes.

4    Q.  Can I have PX-285, page 4.

5              MR. LEWIN:  This has been admitted already, your

6    Honor.

7              THE COURT:  Yes.

8              MR. LEWIN:  Can we publish that to the jury?

9    Q.  Sir, I'd like to learn a little bit more about what you did

10   with respect to this survey.  This survey was conducted via the

11   internet, correct?

12   A.  Yes.

13   Q.  And you sought to avoid issues by rotating randomly the

14   images that were shown to the consumers, correct?

15   A.  Yes.

16   Q.  Did you ever show those consumers all four of these

17   together?

18   A.  They are shown side by side.

19   Q.  And if you'll agree with me, the second one is Nike?

20   A.  Yes.

21   Q.  Third one is Puma?

22   A.  Yep.

23   Q.  Fourth one is Under Armour.  Correct?

24   A.  Yes.

25   Q.  And those are all leading at athletic brands, correct?

1    A.   Yep.

2    Q.   And the one that you were testing, the product that you

3    were testing on behalf of adidas was in the upper left, a

4    three-stripe, plain white, long-sleeve shirt of some kind?

5    A.   Yes, in this image.

6    Q.   Correct.  And those three stripes are vertical, correct?

7    A.   Yes.

8    Q.   And the consumer was asked what brand, if any, correct?

9    And they were told it was okay not to have a brand, right?

10   A.   Yep.  What brand do you think -- it says what brand do you

11   think, yes.

12   Q.   Makes this long-sleeve shirt, right?  And it was all four

13   of those at the same time then, correct?

14   A.   Yes.

15   Q.   Is there a particular reason in this particular instance

16   that you selected Nike, Puma, and Under Armour as logos?

17   A.   The reason that I chose Nike as an example because the key

18   visual of identifier of Nike is the swoosh.  It's actually

19   famous.  And I did the same thing, same thing with Under

20   Armour.  Typically, in those cases, the logo is the key visual

21   identifier.

22   Q.   Well, you would agree with me, would you not, that when the

23   respondents see Nike, Under Armour and the Puma logo, they are

24   more likely than not to conceive of adidas in what you call a

25   consideration set, correct?

1    A.  I didn't understand that question.

2    Q.  Well, sir, very simple.  When you see Nike, Under Armour

3    and Puma and then are asked what brand some other item is, you

4    have the concept of a consideration set in your report, do you

5    not?

6    A.  I do have the consideration set in my report?  What does

7    that mean?

8    Q.  What do you mean by a consideration set?

9    A.  Consideration set is a consumer in order to evaluate a

10   brand or several brands chooses a subset, which is called a

11   consideration set, and usually uses those three or four

12   brands -- sometimes it's two, sometimes it's six -- to assess

13   which one they will consider for further evaluation in their

14   purchase.

15   Q.  What I'm suggesting to you, sir, is by using those -- Nike,

16   Puma and Under Armour -- that in that consideration set, adidas

17   would come up next.

18   A.  I don't understand the question.  What does it mean next?

19   Q.  I will move on, sir.

20          You only tested consumers that knew sportswear brands,

21   correct?

22   A.  Yes.

23   Q.  You didn't test consumers that knew luxury brands or other

24   brands like Gucci or Prada?

25   A.  I looked at sportswear brands.

1    Q.  You didn't test horizontal stripes, did you?

2    A.  No, these were the images I tested.

3    Q.  And that image that we're talking about is the white shirt

4    with the vertical stripes running down both sides, both

5    sleeves, correct?

6    A.  That's right, that's the stimuli.

7    Q.  And why that particular stimulation?

8    A.  You know, I thought -- I wanted to use a neutral apparel,

9    something that consumers associate with, like a T-shirt.

10   Q.  I'm sorry, sir.  Let me be clearer.  I don't want to have

11   you waste your time or the Court's.  You selected three

12   vertical stripes on both sides of the garment --

13   A.  Yes.

14   Q.  -- to illustrate your -- to achieve your goal of finding

15   out.  Why those stripes in that configuration?

16   A.  Those are the stripes associated with adidas.

17   Q.  Thank you.

18         Have you tested any other stripe configurations to

19   determine whether they are associated with adidas?

20   A.  No.

21   Q.  With respect to the 2005 survey that we talked about, I

22   think the objective, if you recall it -- and if not, I'll pull

23   it up for you -- was to track the brand health of adidas over

24   time with the help of KPIs?

25   A.  Yes.

1    Q.  I thought that might bring about a smile.  Can you explain

2    what a KPI is?

3    A.  I smiled because I assumed the jury goes like, "What the

4    heck?"

5    Q.  Not only the jury, sir.

6    A.  KPI is a -- it's called key performance indicator.  And

7    that's what a KPI is.

8    Q.  Thank you.  You also used this study or relied on this

9    study to generate insights and answers on relevant brand

10   specific questions, didn't you?

11   A.  Yes.  I did not conduct that study, but yes.

12   Q.  The study looked at adidas, Nike, Puma, Reebok, and New

13   Balance, correct?

14   A.  Mmm-hmm, that's possible.

15   Q.  And who selected the brands as the brands to be in this

16   study?

17   A.  I don't remember.  I was not involved in conducting that

18   study.

19   Q.  So you didn't select the brands?

20   A.  No, I did not.

21   Q.  Do you recall that the respondents in that study were 14 to

22   30?

23   A.  Yes.  I don't recall it, but I believe that's the case.

24   It's not unusual that you study that age group.

25   Q.  Well, perhaps I can go a bit further with that.  And if

1   not, I'm happy to show you the document.  But do you recall,

2   sir, that the sample was 50 percent male, 50 percent female?

3   A.  I don't recall, but I would trust that that's correct; it's

4   2005.

5   Q.  And it was divided equally, one-third, one-third, one-third

6   between a range 14 to 17.  Another range 18 to 24.  And a third

7   range 25 to 30.  Do you recall that?

8   A.  Yes.

9   Q.  And one hundred percent of the respondents in order to

10  qualify for the test had to wear sports shoes or sports

11  clothing for sport that they're either doing themselves or in

12  their free time?

13  A.  Mmm-hmm.

14  Q.  And one hundred percent have bought sport shoes in the last

15  six months, correct?

16  A.  Yeah.

17  Q.  This is considerably different, is it not, than the general

18  population?

19  A.  Definitely.  It's not a fame survey.

20  Q.  Thank you.

21        Let's look at -- withdrawn.  You also relied, I think

22  in your report, on a 2023 study?

23  A.  Yeah.

24  Q.  Which actually was conducted apparently in 2021.  Do you

25  recall who conducted that study?

1    A.  No, the words are different.  Now Kantar is one of the

2    companies, large companies, that I think is doing that study,

3    yes.

4    Q.  And let's look at PX-45, if we could.

5            MR. LEWIN:  Your Honor, this was actually, I believe,

6    referred to and admitted this morning.

7            THE COURT:  Okay.

8            MR. LEWIN:  Can we publish to the jury?

9            THE COURT:  Yes.

10   Q.  You discussed this during your direct examination, did you

11   not?

12   A.  Yes.

13   Q.  This is one of the studies you relied on, correct?

14   A.  Correct.

15   Q.  And you talked about aided and unaided, did you not?

16   A.  Yes.

17   Q.  And there was an opinion rendered in that report 57 percent

18   of the people were aware of adidas unaided, correct?

19   A.  Yes.  I don't know exactly.

20   Q.  Well, if we can turn to page 23 of this report.  If you

21   need a moment to refresh your recollection, sir, please take

22   it, but I want -- if you don't, I can move on quickly.

23   A.  Yes.

24   Q.  Thank you.  You see where that red one is on the upper

25   left?

1    A.  Yes, mmm-hmm.

2    Q.  And it says awareness unaided, correct?

3    A.  Yes.

4    Q.  Is it true here that in this case what was being measured

5    was not the stripes alone, but what would be called the

6    mountain logo or any one of a variety of names, but consists of

7    the three lines with the word adidas under it?

8    A.  That is -- yes.

9    Q.  Right?

10   A.  Yep.

11   Q.  Underneath that is the swoosh with nothing under it,

12   correct?

13   A.  Yes.

14   Q.  But they weren't testing stripes here, were they?

15   A.  Well, they tested stripes.  In some ways, stripes are

16   reflected in this particular logo called, the BOS, Badge of

17   Sports.

18   Q.  And that logo says adidas under it, doesn't it?

19   A.  Yes.  Just like with Converse, it says Converse.

20   Q.  Yes, sir.  And the Reebok says Reebok?

21   A.  Mmm-hmm.

22   Q.  So you understand that the Badge of Sports, which is what

23   this is called in some terminology, is not being asserted in

24   this case, right?

25   A.  That is correct.

1    Q.  Do you know whether any configurations of the purported

2    Three-Stripe Mark were tested separately from this particular

3    survey?

4    A.  I don't know.  Adidas has done some studies on the strength

5    of the brand, and I don't know specifically, but it's always

6    been a very important thing, three stripes, and it's sort of a

7    key piece of the brand obviously.  And so I don't know -- I

8    don't know whether -- I haven't conducted any study or I don't

9    know right now as I sit here, but it seems like something that

10   is done typically, so I might be -- typically in our business,

11   we do this kind of --

12   Q.  Sir, if I can move on.  Thank you.  Do you know what the

13   demographics of the respondents were in this study?

14   A.  In this study here?

15   Q.  You do?

16   A.  Yes.  It says on the top left here 14 to 64 year olds.

17   Q.  And you also know the only thing tested in this study was

18   the Badge of Sport, correct?

19   A.  That's how in this report it is identified.  I don't know

20   the underlying questionnaire.  So to the extent this is what

21   the questionnaire reflects, then the answer is yes.

22   Q.  Now, you understand the expression "coming to mind" when

23   doing work in this area?

24   A.  Yes.

25   Q.  What does that mean?

1   A.  Coming to mind is you want -- along this journey process

2   here, awareness, consideration, the black chart, you want the

3   brand to come to mind, to consumers mind as easily as possible,

4   that's the goal.

5   Q.  And would you agree with me that the results of this survey

6   indicate there was a huge gap between Nike and adidas in terms

7   of coming to mind?

8   A.  They are both very high because this is unaided.  Unaided.

9   It's very, very different.

10  Q.  Sir, I'm sorry.  Let me call your attention to that same

11  page on the right side, number one right there.  This is a

12  correct statement, isn't it?  You would agree with this

13  statement?

14  A.  Yeah.  Nike is the American brand here.  Nike is --

15  Q.  Sir, I'm asking only if you agree with the statement.

16  A.  Yes, definitely.

17  Q.  You testified earlier today that the Three-Stripe Mark was

18  strong in the minds of consumers and related strongly to

19  adidas, correct?

20  A.  Yes.

21  Q.  And in your statement, sir, you did not have the

22  opportunity to qualify is the question I'm asking.  Did you

23  include in that statement any results relating to the trefoil

24  or the Badge of Sport?

25  A.  No.

1   Q.  So your conclusion is strictly separate and apart from any

2   of that use, correct?

3   A.  My conclusion and my survey is about the three stripes on

4   the sleeve, that's what I tested.

5   Q.  Fair enough.  So in making that conclusion, you relied on

6   your survey?

7   A.  Yeah.

8   Q.  And did you rely on any other survey conducted by adidas

9   internally that you reviewed?

10  A.  Remember, we looked at, reviewed several studies where

11  people were asked how they relate to three stripes, and they

12  said they would invoke adidas.  Yeah, they're surveys, but

13  they're not specifically designed as I have done it.

14  Q.  Well, wasn't it your testimony, sir, that when consumers

15  hear the phrase Three-Stripe Mark, they think of the trefoil or

16  the Badge of Sports logo?

17  A.  I did not -- I didn't test the hearing part when they hear

18  it.  So I actually presented in my survey, I presented them a

19  visual stimuli.

20  Q.  Well, if we could turn to tab A again of the doctor's

21  transcript in deposition and publish it only to the Court,

22  witness and counsel.  I would call the Court's attention to

23  page 172, lines 19 through 24.

24          MR. FLEMMING:  Objection, your Honor.  A partial

25  answer.

1            THE COURT:  Can I see the rest?  Go back to the

2      previous question.

3            I don't think it bears on the previous answer.

4      Sustained.

5            MR. LEWIN:  Thank you, your Honor.

6      Q.  Would you categorize, sir, from your expert, position or

7      expertise, adidas and Thom Browne as competitors?

8      A.  From the consumers' point of view, which is my sort of

9      point of view, they compete, yes.

10     Q.  And they compete for wallet share?  Wouldn't that be fair

11     to say?

12     A.  For?

13     Q.  What we would call wallet share?  If you don't understand

14     that term, I'll be happy to clarify it.

15     A.  Yes, wallet share would be good.  I would accept that too.

16     Q.  Thank you.  And you --

17           THE COURT:  I'm not sure the jury --

18     Q.  I'm happy to explain that.  Let's ask the witness.  What do

19     you understand the term wallet share to mean?

20     A.  Well, wallet share is, I can decide -- if I'm a consumer, I

21     can decide I buy an adidas shoe or apparel, a sweater.  Or I

22     say, hey, I got some extra money, I'm going to buy something

23     from Thom Browne.  So Thom Browne competes because I have a

24     limited budget.  I have a salary, a monthly income that I get,

25     and I need to choose if I buy something to wear, let's say,

1   like something sweat pants, let's say, I need to choose between

2   one or the other, but I don't buy both.  I don't need both.  So

3   in a way adidas competes with Nike -- sorry -- Thom Browne and

4   Thom Browne competes for my wallet, the share of my wallet.

5   Q.  And that would be true under your definition if I had to

6   make a choice between buying a sweatshirt and earing dinner,

7   wouldn't it?

8   A.  That also competes, at least in my budget.

9   Q.  You understand the term athleisure, sir?

10  A.  Yes.

11  Q.  How do you define athleisure?

12  A.  Athleisure is a new category growing very much now.  I

13  defined it specifically in my report.  Athleisure is sort of

14  sportswear that can be used for everyday wear, even for the

15  office.

16  Q.  In your view, Lululemon, Vans and Athletica are the brands

17  that compete with adidas in the athleisure category, correct?

18  A.  Yes, Lululemon is one the brands in that category.

19  Q.  Do you know happen to know what the adidas market share is

20  in athleisure?

21  A.  No, I don't know it right now.

22  Q.  Do you happen to know what Thom Browne's market share is in

23  athleisure?

24  A.  No, I don't know.

25  Q.  Sir, would you agree with me that in terms of determining

1   competition under your market wallet -- wallet share statement

2   that price becomes a factor in the decision-making process?

3           MR. FLEMMING:  Objection.  Outside the scope.

4           THE COURT:  Overruled.  You may answer.

5   A.  Given the explanation that I gave earlier on the share of

6   wallet, price makes a difference, yes.

7   Q.  Thank you.  And you would agree that Prada, for example, a

8   luxury brand like Prada is not a direct competitor with an

9   athleisure company, correct?

10  A.  Well, it is by my definition.  I can choose a luxury item

11  to purchase or I can choose a more broader, sort of more

12  available inclusive-type brand like adidas.

13  Q.  Have you ever read a study, sir, that places Thom Browne

14  and adidas as competitors?

15  A.  No, I wouldn't expect that.

16  Q.  You ever see any documents in your reviewing of all of the

17  adidas documents where adidas describes Thom Browne as a

18  competitor?

19  A.  No.  No, I don't think so.

20  Q.  Sir, I'm reluctant to get into this, but I will.  During

21  your examination today, you discussed the concept of memory

22  networks activation spreading.  Am I correct?

23  A.  No, it's called activation spreading.  Spreading like

24  diffusing.

25  Q.  Yeah.

1  A.  Spreading.

2  Q.  But you're relating that statement to memory net -- what

3  you call memory networks, correct?

4  A.  Yeah.  I'm not calling it that way.  That's a standard in

5  our field in cognitive science.

6  Q.  I would like to call up demonstrative number 1, page 19

7  please, your demonstrative.

8          You recall seeing this earlier today, correct?

9  A.  I didn't hear the question.

10  Q.  You recall seeing this earlier today?

11  A.  Yes.

12  Q.  Okay.  And the red lines that are dotted to three stripes

13  on the adidas side are connected to the Grosgrain ribbon on the

14  Thom Browne side?

15  A.  Yes.

16  Q.  Why?

17  A.  Because the empirical evidence -- and I think it was

18  referred to as the Poret study -- showed that when they see the

19  four stripes that is also linked, the four stripes within the

20  network of Thom Browne is also linked to Grosgrain ribbon.

21  When they see that, that invokes the three -- three stripes.

22  There is empirical evidence.

23  Q.  You relied on the Poret survey then to make that dotted red

24  line, correct?

25  A.  That's correct.

```
 1   Q.  And is that the same one you made the dotted red line

 2   between four stripes and three stripes?

 3   A.  Yes.

 4   Q.  And was that the same when you made the dotted line between

 5   exclusive and inclusive?

 6   A.  No, that's not in the -- that's not in the Poret study.

 7   Q.  So is there some study that you base this upon?

 8   A.  So, in testimony this morning or this afternoon, I

 9   illustrated that the way a brand is harmed is first -- and this

10   is why we are here -- is first consumers make a connection from

11   the four stripes of Thom Browne and invoke the three stripes.

12   And once that connection is made, activation spreading, and

13   that's why I wanted to explain the psychological principle.

14   Activation spreading takes place because there is that linkage.

15   And, as I said, in testimony that activation spreading takes

16   place not only consciously but also unconsciously.  So we

17   called the word smushing, smushing together.  The red lines

18   here are illustrative of my testimony earlier where I said

19   there is a dissonance, a difference between the Thom Browne

20   exclusive brand perception and the inclusivity brand

21   perceptions of adidas, and that's why I illustrated is the way

22   harm takes place.

23   Q.  Very good.  You have the connection here between Grosgrain

24   ribbon and three stripes, correct?

25   A.  Yes.
```

1    Q.  In this activation spreading process, at least.

2            And you relied on the Poret study to do that, correct?

3    A.  So Poret does not assess the activation spreading.  Poret

4    only assesses whether the activation spreading, the foundation

5    of activation spreading, when four stripes or Grosgrain ribbon

6    or four stripes Thom Browne invokes the three stripes, which is

7    Poret's study established, then activation spreading takes

8    place.  It's not in the study itself, the activation spreading.

9    It's a psychological principle that's proven empirically over

10   and over again.

11   Q.  Thank you, sir.

12           Just to explain a little bit more to me , you have a

13   connection between fashion on the Thom Browne side and sport

14   credibility on the other side?

15   A.  Yes.

16   Q.  And apparently you're saying that, if I understand this

17   right -- and forgive me again, I make no representation I'm an

18   expert in this.  But if I understand you right, an attribute

19   first of fashion is attributable to Thom Browne himself, and

20   then it somehow or other spreads to infect adidas's

21   relationship with sport credibility.  Is that correct?

22   A.  Yes.

23   Q.  If I understand you correctly, that's a -- the concept of

24   sport credibility is tied to the Three-Stripe Mark?

25   A.  That's correct.

1  Q.  And that the fashion of Thom Browne somehow or other

2  diminishes the brain's association with sport credibility and

3  adidas.  Is that correct?

4  A.  Yes.

5  Q.  Thank you.  And you have basically the same lines, I guess,

6  for theatrical fashion shows?

7  A.  Yeah.

8  Q.  Thom Browne's use of theatrical fashion shows affect the

9  sport credibility of adidas.  Is that correct?

10  A.  Yes.

11  Q.  And, well, we'll take one.  Let's try the theatrical

12  fashion shows.  How does that relate to sport credibility?

13  A.  So, if you remember my definition on sport credibility,

14  it's about being authentic to a history.  You create a shoe or

15  an apparel that helps in athletes to perform better.

16  Performance, technology, quality, particular fabric, particular

17  type of fabric, particular type of material, particular type of

18  shoe, and you establish that sport credibility through

19  sponsoring athletes, Messi if you know soccer.  You establish

20  it through putting it on products they wear, sports apparel

21  they wear, you sponsor --

22  Q.  Sir, with respect, my question was how does theatrical

23  fashion show impact sports credibility?

24  A.  So to continue my answer, theatrical fashion shows

25  typically are about expressing the design of Thom Browne,

1    expressing the artistic and luxury position of Thom Browne.

2    And these particular fashion shows aren't usual fashion shows.

3    They're actually known and written up in the trade magazines as

4    theatric.  There is theater to that.  Theater is about art,

5    design, celebrity, about luxury, and that is fine.  That's good

6    for Thom Browne, and this is the right thing to do for Thom

7    Browne.  But that theatrical fashion show is in contrast to be

8    more serving athletes and also anybody who wants to be part of

9    the adidas community, and it sort of contrasts and even in some

10   ways conflicting with sports credibility.

11   Q.  Sir, I know I'm cutting you off, but maybe I could try to

12   rephrase this question.  You see that there's a connection

13   between theatrical fashion shows and sport credibility,

14   correct?

15   A.  Yes.

16   Q.  And there's a second connection between sport credibility

17   and three stripes?

18   A.  Yes.

19             (Continued on next page)

20

21

22

23

24

25

1    BY MR. LEWIN:

2    Q.  Right.

3            So this is, I'm too old to say, Tinkers to Evans to

4    Chance, but this is it a multi-step process in the brain, is it

5    not?

6    A.  It all happens at the same time, you know.

7    Q.  OK.  If a theatrical -- if a fashion show is highly

8    theatrical, does that relate to sports in some way that harms

9    adidas?

10   A.  It depends on the theatrical fashion show.

11   Q.  Thank you.

12           MR. LEWIN:  I know we're probably coming down to the

13   break.  I'll ask one last question and be finished on this

14   segment.

15           THE COURT:  No, no.

16           MR. LEWIN:  All right.  Thank you, your Honor.

17           THE COURT:  You can go ahead for another ten minutes.

18           MR. LEWIN:  OK.  Great.

19   BY MR. LEWIN:

20   Q.  Now, you have the little circle with the word luxury in it,

21   right?

22   A.  Yes.

23   Q.  And you show no direct association between Thom Browne and

24   luxury, is that correct?

25   A.  Yes.

1   Q.  You show a relationship between luxury and American or

2   being American and then to Thom Browne, correct?

3   A.  Yes.

4   Q.  And you show a relationship to the trademark, the Grosgrain

5   ribbon trademark, and then to Thom Browne, correct?

6   A.  Yes.

7   Q.  And you don't show the word luxury on the adidas side?

8   A.  Yes.

9   Q.  Why not?

10  A.  Um, the core of adidas is not about luxury.  I think that's

11  why.

12  Q.  Thank you.

13          Adidas is not a luxury brand, is it, in your view?

14  A.  No.

15  Q.  And are you aware of the collaboration between adidas and

16  Y-3?

17  A.  No.

18  Q.  OK.  And would you agree with us today, with me today, that

19  as of today, adidas is not a luxury brand?

20  A.  Um, so adidas has --

21          Do you call it Y-3?  I think it's Yamamoto.

22  Q.  Yes, that's the brand of Yamamoto.

23  A.  So adidas has a collaboration with Yamamoto which is a

24  luxury brand.

25  Q.  So does that make -- in your view, does that make adidas a

1    luxury brand?

2    A.  No.

3    Q.  OK.  Now I notice that you don't have any celebrity circle

4    up relating to Thom Browne?

5    A.  Yes.

6    Q.  Is it your position that Thom Browne and celebrities are

7    not associated with each other?

8    A.  Um, no, I don't think so.  I think that they are

9    associated, but a lot of celebrities would wear Thom Browne,

10   but I don't -- I could not in my research identify any

11   celebrity -- like Beyonce for adidas, let's say -- that would

12   sort of be, like, closely connected from a consumer's point of

13   view with Thom Browne.

14   Q.  Celebrities that adidas is associated with that you're

15   identifying are sports athletes, are they not?

16   A.  No, not always.

17   Q.  Can you give me an example of one that is not?

18   A.  Beyonce.  She's a singer.

19   Q.  All right.  And are you aware that Thom Browne has

20   collaboration agreements with celebrities?

21   A.  No.  I don't know very much about their collaborations.

22   Q.  All right.  Now, your opinion is that -- let me just --

23            MR. LEWIN:  I've got five more minutes, your Honor,

24   but I'm about to begin another section.  If I may suggest that

25   it would be appropriate to break now?

 1              THE COURT:  All right.  We'll give the jury their

 2     midafternoon break.

 3              We'll see you in 15 minutes.

 4              (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You may step down.

3          Please be seated.  The witness can leave.

4          You can leave.

5          THE WITNESS:  OK.

6          THE COURT:  All right.  So defense counsel had said he

7     would take an hour to an hour and a half.  He hoped to complete

8     by the break, but he didn't guarantee that.  He's taking an

9     hour and ten minutes.  So when we come back, he will have

10    20 minutes, but not 21.

11         MR. LEWIN:  Fair enough, your Honor.

12         THE COURT:  Very good.

13         I'm sorry.  There are issues regarding the next

14    witness that we'll take up now, so please be seated.

15         Someone remind me what those issues are.

16         MR. FLEMMING:  Defense counsel filed a motion, a

17    Daubert motion, for the next expert, who is Dr. D'Arienzo.

18         THE COURT:  Hold on.  Let me get out my notes.

19         All right.  So there were a variety of arguments made

20    in the motion in limine, but the only one that I think gives me

21    pause is that this witness, Mr. D'Arienzo, does not appear to

22    base his testimony, his opinions, on any methodology.

23         He is going to opine, first, that adidas' clothing and

24    Three-Stripe Mark are perceived as fashion statements rather

25    than just functional sportswear.

1          Second, that the line between luxury brands and

2     sportswear has blurred significantly.

3          And third, how adidas' various uses of the three-

4     stripe marks strengthen brand association among consumers.

5          So I'm not quite sure what methodology he used to

6     arrive at those conclusions.  Maybe plaintiff's counsel can

7     elucidate that.

8          MR. FLEMMING:  Starting with the last one, which is

9     the last part of his opinions which address what happens when a

10    brand like adidas uses a mark in the varied ways that the court

11    has been seeing, what that does for a brand that has been using

12    the mark like that for a long time and how it increases

13    engagement with consumers.

14         So he's relying on his 40 years of expertise in

15    branding and luxury branding and his analysis of the

16    marketplace and how adidas and other brands do the same --

17         THE COURT:  No.  I guess clearly this is not being

18    offered as, you know, scientific evidence or anything like

19    that.  But on the other hand, it's not like he's relying on a

20    survey as the other experts have.

21         MR. FLEMMING:  No, your Honor, he's not relying on a

22    survey.

23         THE COURT:  He's just saying I've been around this

24    stuff a long time and here is my thoughts.

25         MR. FLEMMING:  His working with many brands over the

1    years on these exact issues and how to increase touch points

2    with consumers and build equity in a brand and in a mark

3    through creative executions, yes.

4            MR. MALDONADO:  Your Honor, if I may.

5            THE COURT:  Let me hear from defense counsel.

6            MR. MALDONADO:  None of that work he just described

7    from the other brands is disclosed in his report.  He, for this

8    section of his report where he talks about various executions,

9    building consumer engagement, all he does is refer to various

10   brands that have used different variations of their brands over

11   years.  But there is no data or any other reference that shows

12   how that has affected any of those brands.  So he has no

13   empirical support or no other support cited in his report that

14   would support his conclusions.

15           THE COURT:  So we may have to hear briefly from him

16   now outside the presence of the jury, but I guess the point I'm

17   making is this.

18           The Supreme Court has said that the requirements of

19   the Federal Rules of Evidence for experts apply to all experts,

20   obviously, and not just to scientific experts, and that means

21   that while Daubert is not, perhaps, applied with the same

22   demands as it would be in the case of scientific evidence,

23   still there has to be a consistent and reliable methodology.

24           So Rule 702 states, A witness who is qualified as an

25   expert by knowledge, skill, experience, training, or education,

1    may testify in the form of an opinion or otherwise if (a) the

2    expert's scientific, technical, or other specialized knowledge

3    will help the trier of fact to understand the evidence or to

4    determine a fact at issue.

5              And that used to be where it ended.  Then after

6    Daubert it was amended, and now it is also required, The

7    testimony is based on sufficient facts or data, the testimony

8    is the product of reliable principles and methods, and the

9    expert has reliably applied the principles and methods to the

10   facts of the case.

11             So, for example, if there were two experts who had

12   devoted their life to studying baseball and one took the stand

13   and said, The greatest player in the history of baseball was

14   Babe Ruth and the other took the stand and said, No, the

15   greatest player in the history of baseball was Ted Williams,

16   and I will ask the apologies of the ghost of Ty Cobb for this

17   example, but if that was just their sort of opinion from

18   having, you know, immersed themselves, but they didn't have

19   anything more to say.

20             Now by contrast, if those experts could say, well, we

21   think you need to look at batting average and we think you need

22   to look at home runs, you need to look at slugging percentage,

23   etc., etc., etc., then there might be a basis for admitting

24   that.

25             But that doesn't sound like this expert here, so

1     that's your problem.  But let me hear from plaintiff's counsel.

2              MR. FLEMMING:  Your Honor, in this particular case it,

3     of course, does have the experience.  But we don't think it is

4     necessary that he conduct a consumer survey of their specific

5     reactions to other brands who have played around with their

6     marks.  He can measure, he can look and measure press coverage

7     of those iterations, he can look at --

8              THE COURT:  Did he?

9              Did he measure press coverage?

10             MR. FLEMMING:  He looked at it.  I wouldn't say he

11    measured it.

12             THE COURT:  That's a big difference, I think.

13             MR. FLEMMING:  Yes, your Honor.

14             THE COURT:  I'm sorry, I interrupted you.

15             What else?

16             MR. FLEMMING:  I should say analyzed press coverage

17    and analyzed buzz generated by these executions, showing the

18    point that by playing around with a mark creatively increases

19    consumer engagement with that mark and increases their

20    engagement with that brand.

21             We don't believe that --

22             THE COURT:  Let's bring the witness in, please.

23             MR. MALDONADO:  What's that?

24             MR. FLEMMING:  What did you say, your Honor?

25             THE COURT:  I'm sorry, defense counsel wanted to say

1   something.

2           MR. MALDONADO:  I wanted to say our reading of the

3   section of the report, I don't see any explanation of that in

4   there.

5           THE COURT:  I'm sorry?

6           MR. MALDONADO:  I don't see an explanation of what --

7           THE COURT:  If someone would pass me up his report.

8           MR. MALDONADO:  OK.

9           THE COURT:  In hard copy, please.  I know that's

10  putting you to the test, but...

11          Please take the stand.

12          Just state your name.  You can be seated.  State your

13  name for the record.  We'll swear you in later.

14          MR. D'ARIENZO:  William D'Arienzo.

15          THE COURT:  Please be seated.

16          So, Mr. D'Arienzo, in forming your opinions in this

17  case, what methods or principles did you use to arrive at those

18  opinions?

19          MR. D'ARIENZO:  Well, a variety --

20          THE COURT:  Speak into the microphone so the lawyers

21  can hear you as well.

22          MR. D'ARIENZO:  I'm sorry.

23          A variety of primary and secondary research, as well

24  as my own experience in the industry.

25          THE COURT:  So, for example --

1          MR. MALDONADO:  Your Honor, if it helps, start with

2     paragraph --

3          THE COURT:  I'm sorry.

4          MR. MALDONADO:  If it helps, our issue starts with

5     paragraph 68.

6          THE COURT:  Thank you very much.

7          So you say in paragraph 68 of your report, "adidas

8     owns trademark registrations covering certain executions of the

9     Three-Stripe Mark, but adidas also uses its Three-Stripe Mark

10    in many other executions.  From a fashion industry perspective,

11    these additional executions do not create different branding

12    devices, nor do they serve to lessen the recognizability and

13    source identifying function of the Three-Stripe Mark.  To the

14    contrary, they enhance it."

15         Now, this wasn't based on any, for example, consumer

16    survey that did you, was it?

17         MR. D'ARIENZO:  No, but it was based on consumer

18    response from a secondary sources online, such as List, which

19    evaluates consumers in terms of exchanges of information

20    online.

21         THE COURT:  Is that referenced in your report?

22         THE WITNESS:  It's not a direct reference to the List

23    platform.  But to social media measurements, yes.

24         THE COURT:  So then you say in 69, "Fashion brands

25    with high consumer recognition and deep emotional consumer

1     attachment to the brand and its marks and varied

2     configurations, the location, and design elements of their most

3     highly recognizable brand assets, without compromising the

4     clarity of the message and the integrity of the brand, doing so

5     keeps the relationship with consumers from becoming stale and

6     increases the fashion brand's coolness factor."

7              Just for my curiosity, are you an expert in coolness?

8              MR. D'ARIENZO:  Occasionally.

9              THE COURT:  I see.  But more seriously, what was the

10    methodology that you relied on to arrive at what I've just

11    read?

12             MR. D'ARIENZO:  Well, we looked at brands that are in

13    the same fashion space and how they have gone back and created

14    new iterations, new creations of the essential brand identity

15    by slight variations, sometimes even parodies of their own

16    logos.

17             Again, the fashionistas on the web, consumer groups on

18    the web highlight this as a kind of confidence, strength, if

19    you will, and kind of wink at the community that supports the

20    brand.

21             THE COURT:  In your answer just then you said you

22    refer to the reaction of fashionistas and consumers.

23             THE WITNESS:  Yes.

24             THE COURT:  Those are two different groups, are they

25    not?

1             THE WITNESS:  They could be.  They could be

2   complimentary groups.  They are overlapping groups.

3             THE COURT:  I guess I'll ask counsel.

4             What's the relevance, if any, of a fashionista's

5   reaction to any issue in this case?

6             Not that, of course, we aren't all thrilled to hear

7   about fashionistas.

8             MR. FLEMMING:  Your Honor, only to the extent that

9   they publish things that are then consumed by consumers who are

10  relevant people in this case.

11            THE COURT:  To the extent that they publish things

12  that are?

13            MR. FLEMMING:  That are read by consumers, in the

14  press.

15            THE COURT:  Let's go to that.  I'm not unfortunately

16  able to give you an example of a fashionista.  The last one

17  that I had any knowledge of was Jackie Kennedy, but perhaps

18  there have been a few since then.

19            MR. D'ARIENZO:  One or two.

20            THE COURT:  So give me an example of a fashionista.

21            MR. D'ARIENZO:  Let's talk about Rihanna, for example.

22            THE COURT:  About who?

23            MR. D'ARIENZO:  Rihanna.

24            THE COURT:  Who is that?

25            MR. D'ARIENZO:  With all due respect.

1          With all due respect, your Honor, she's a fairly

2     well-known entertainer from the Caribbean Islands who has

3     become an absolute icon in the fashion world with her own

4     collection of cosmetics and fashion from that effort.

5          THE COURT:  So Rihanna says, I saw that change in the

6     adidas advertisement and it gave me a great big chuckle, that

7     was so clever, as I understand is one of your situations you're

8     describing.

9          MR. D'ARIENZO:  Then she goes and gets the T-shirt.

10         THE COURT:  And then she goes and gets the T-shirt.

11    Let's distinguish those two for a minute.

12         MR. D'ARIENZO:  OK.

13         THE COURT:  So when she says the first -- and let's

14    say she says it online or in a television show or whatever,

15    wherever fashionistas --

16         MR. D'ARIENZO:  Congregate nowadays.

17         THE COURT:  Right.

18         What is the basis for your assertion that some

19    consumer says, Ah, if Rihanna thinks that is clever, I should

20    think it is clever, too?

21         MR. D'ARIENZO:  Well, the sense of leadership,

22    fashionista, that is the community that follows the brands and

23    follows her.

24         THE COURT:  I mean, isn't that just sort of, you know,

25    we had some testimony here about some very famous sports

1   figures, Lebron James for example, who adidas advertised.

2           Now, the jury, through their ordinary experience, can

3   assess how someone might react to Lebron James wearing an

4   adidas shirt.  And what if you tell me is so, everyone who is

5   at least ten years younger than me then would be able to assess

6   how an everyday consumer would react to Rihanna wearing an

7   adidas shirt.

8           So I'm not sure what it is that you're adding to that

9   everyday assessment.

10          MR. D'ARIENZO:  The fact that she is a trendsetter,

11  and if she's wearing it, it confirms the fact that no equity

12  has been lost in the conversion of the brand's details and the

13  logo.

14          THE COURT:  I see.  All right.

15          I have to discuss some matters with counsel.  We'll

16  call you back in a very few minutes.

17          MR. D'ARIENZO:  Thank you.  Shall I?

18          THE COURT:  You can step down.

19          MR. D'ARIENZO:  Thank you.

20          THE COURT:  Yes.  My law clerk points out that my

21  ignorance was well on display.  It's Rihanna, as I pronounced

22  it, and I have no doubt that I am one of maybe only four people

23  in the world who have never heard of her.

24          But the question is, most of what he's testifying

25  about, at least as to the extent we just discussed it, you

1   don't need expert testimony.  Everyday consumers can assess

2   what a normal reaction would be to someone wearing an adidas

3   shirt, or if they were a major sports figure or something like

4   that.  He says what he's adding is that it doesn't diminish the

5   strength of the mark.

6           Let me make sure I understand.  Is defense counsel

7   claiming that it diminishes the strength of the mark?

8           MR. MALDONADO:  That's their theory.

9           THE COURT:  I'm sorry?

10          MR. MALDONADO:  That's their theory, that Thom

11  Browne's use of the stripes diminishes the mark.  That's the

12  plaintiff's theory.

13          THE COURT:  No, no, no.  Maybe I'm not hearing you.

14          You want to get closer to a mic.

15          MR. MALDONADO:  Sure.

16          THE COURT:  So clearly we've had testimony that all

17  these famous people wear adidas, and I'm sure they are doing

18  that sheer out of love and not because they are being paid.  In

19  any event, they wear adidas, and plaintiffs have introduced

20  that evidence presumably to show how strong the mark is.

21          Is it your contention that, actually, no, that

22  diminishes the strength of the mark?

23          MR. MALDONADO:  Celebrities wearing the brand?

24          THE COURT:  Yes.

25          MR. MALDONADO:  No, that's not our contention.

1            THE COURT:  What's the relevance of the expert?

2            MR. FLEMMING:  Your Honor, this goes to whether the

3    more maybe outrageous executions of a Three-Stripe Mark dilute

4    consumer's recognition of it.  Whether it just blurs things

5    together and they don't really know what is happening, which I

6    believe is an argument that defense counsel --

7            THE COURT:  I don't think this guy has the expertise

8    to testify about that.  His expertise is not on consumers.  His

9    expertise is on fashionistas, and he has quite correctly

10   exposed my ignorance of that entire field.

11           But I still, and I think the jury still understands

12   the everyday experience of seeing a television or media

13   commercial where some famous person wears a particular item.

14   And then the question is, does that strengthen it, does it

15   weaken it?

16           But he's not really talking to that, other than very

17   indirectly, and he's not basing it on any surveys or anything

18   like that.  I'm tempted to exclude it.

19           MR. FLEMMING:  Your Honor, he did not conduct a survey

20   in this case.  But as part of his work, he has conducted many

21   consumer surveys in the branding area.

22           THE COURT:  Well, that may be, but that's not in his

23   report, as I understand it.

24           MR. FLEMMING:  He references all of his history of

25   conducting surveys.  That is absolutely in his report.

1          THE COURT:  Does he reference it with reflect to any

2     given opinion?

3          The point is, does he say, for example, the two

4     paragraphs we just read, does he say in any part of his report,

5     I arrived at this opinion because of a survey I conducted

6     20 years before or because of a survey by Mr. Jones that I had

7     read or anything like that?

8          I don't think so.

9          MR. FLEMMING:  No, your Honor.

10          If I may, I think the one issue -- it doesn't seem

11     that defense counsel is making a big of a deal now, as maybe

12     previously, about more outrageous executions of the Three-

13     Stripe Mark.

14          But the one thing that we wanted the jury to hear was

15     his testimony about how different executions can still being

16     recognized from a branding device.

17          THE COURT:  Let's find out what defense counsel --

18          Give me an example of what you had in mind, and then

19     we'll hear from defense counsel.

20          An example of what we had in mind, I guess back when

21     this report was originally written was, deposition testimony,

22     is this a Three-Stripe Mark, is this a Three-Stripe Mark, is

23     this a Three-Stripe Mark, choosing some very specialized

24     products where adidas got very playful with the three stripes

25     and not known as a classic execution.

1          I don't believe that defense counsel is making a big

2     of a deal about that anymore.  What Dr. D'Arienzo does talk

3     about --

4              THE COURT:  Let's find out the answer.

5              Is that still in this case?

6              MR. MALDONADO:  I don't believe so, your Honor.

7              THE COURT:  OK.  So that's fine.

8              With that, on that representation, which will be of

9     course enforced, I think we can excuse this witness.

10             All right.  We're going to take no more than a

11    five-minute break.

12             (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Jury present)

2              THE COURT:  We need the witness.  Sorry.

3              Ladies and gentlemen, just so you know, we are sorry

4       for that long break, but it actually was very helpful.  It

5       helped shorten the testimony.  It really was to your benefit,

6       you just didn't know it.

7              All right, counsel.

8       BY MR. LEWIN:

9       Q.  I just want to get the last questions.  I'm on a very tight

10      time limit.

11             You would agree with me, would you not, that --

12             Well, withdrawn.

13             You are aware, are you not, of a collaboration between

14      adidas and Gucci?

15      A.  Yes.

16      Q.  And are you aware that that collaboration has resulted in

17      merchandise bearing both the name Gucci and the name adidas on

18      the same product?

19      A.  Yes, I think so.

20      Q.  All right.  And if I may show you DTX 330.

21             MR. LEWIN:  I believe, your Honor, I believe this is

22      admitted.

23             THE COURT:  Yes.

24             MR. LEWIN:  We can publish, please.

25             Can we zoom in on the right side, please, so we can

1  see that what appears to be a Trefoil.

2  BY MR. LEWIN:

3  Q.  You see the Trefoil on the right side?

4  A.  Yes.

5  Q.  You see the name underneath it?

6  A.  Yes.

7  Q.  What does that name say?

8  A.  Gucci.

9  Q.  Earlier you testified that Trefoil was, I believe,

10  reasonably well known to adidas, correct?

11  A.  Yes.

12  Q.  Would you consider the use by Gucci of this adidas Trefoil

13  to be enhancing the relationship between adidas and its

14  Trefoil?

15  A.  I don't know whether be it enhances the relationship.  I

16  don't know that.

17  Q.  Well, if you were advising adidas, would you tell them to

18  do something like this?

19        MR. FLEMMING:  Objection, speculation.

20        THE COURT:  Sustained.

21  Q.  In your opinion, sir, does not -- withdrawn.

22        Would you agree with me, sir, that the Gucci Trefoil

23  combination here diminishes adidas' brand association?

24  A.  Again, I don't know that.  That would be a speculation,

25  again.

1   Q.  Well, you've testified that their Trefoil is associated

2   with adidas and you've testified that the Trefoil carries the

3   three stripes in it, correct?

4   A.  Yes.

5   Q.  And one of the things that the Trefoil more often than not

6   is it carries the name adidas with it?

7   A.  Correct.

8   Q.  Now it carries the name Gucci --

9   A.  Yes.

10  Q.  -- correct?

11          Do you have a view or opinion of whether that weakens

12  the association between adidas and Gucci?

13  A.  Yes.  As you know from my report and my analysis and my

14  testimony in deposition, there are sometimes when one brand is

15  extremely strong, like Gucci, and there is another brand that's

16  extremely strong, like the adidas.  Sometimes there are ways

17  that these -- there is some collaboration.

18          There is some research usually done, as is also said

19  in my deposition, and then the company makes a decision whether

20  they do it or not.  But the key here is that this is a decision

21  that Gucci and adidas have agreed on.  They are in control of

22  the brand.  It's entirely different in the discussion we had up

23  to now.

24  Q.  But in your view, sir, weren't you of the opinion that this

25  does not enhance the association between adidas and the

1    Trefoil?

2    A.  In my opinion, I'm not in favor of this kind of

3    collaborations.  It is a trend right now in the industry to do

4    so.

5    Q.  Sir, thank you.

6    A.  But it's not my --

7    Q.  Thank you.

8    A.  Yes.

9    Q.  You indicated in earlier testimony, I think in your

10   demonstrative in the case, the word luxury, a concept of luxury

11   is associated with Thom Browne, correct.

12          And that same demonstrative indicated that the word

13   luxury is not associated with or -- I'm sorry -- the attribute

14   luxury was not associated with adidas, correct?

15   A.  Yes.

16   Q.  And you indicated earlier that Nike, in your view, is seen

17   as an exclusive brand?

18   A.  Yes.

19   Q.  And adidas is seen as inclusive, correct?

20   A.  Yes.

21   Q.  And your view is that an association between an exclusive

22   brand and an inclusive brand diminishes the inclusive brand, is

23   that correct?

24   A.  Yes.

25   Q.  All right.  Do you regard Gucci as an inclusive brand?

1    A.  I don't --

2    Q.  Withdrawn.

3    A.  Yes.

4    Q.  Before you start to answer, I apologize for that.

5            Do you regard Gucci as inclusive or exclusive?

6            MR. FLEMMING:  Objection to foundation.

7            THE COURT:  Sustained, but you may be able to lay a

8    foundation.

9    Q.  Well, are you aware of the brand Gucci, sir?

10   A.  I know it as I know many other brands, but I haven't

11   researched it in particular.

12   Q.  I didn't ask that.

13           Are you aware of the products that are sold around the

14   world under the Gucci name?

15   A.  Um, I know vaguely the product, yeah.

16   Q.  Would you consider Gucci to be a luxury brand?

17   A.  Yes.

18           MR. FLEMMING:  Objection, foundation.

19           THE COURT:  Overruled.

20   Q.  You would consider Gucci, based on everything you know,

21   right?

22   A.  Yes.

23   Q.  All right.

24           THE COURT:  The answer was yes?

25           THE WITNESS:  Yes.

1  Q.  Thank you.

2          And luxury brands are exclusive, are they not?

3  A.  Luxury brands are exclusive, but not all exclusive brands

4  are luxury.

5  Q.  Fair enough.

6          But Gucci is a luxury brand that sells at very high

7  prices, correct?

8  A.  Yeah.

9  Q.  And limited distribution, correct?

10 A.  Yes.

11 Q.  Certainly higher prices than comparable products if there

12 were -- withdrawn.

13 A.  True.  But it can be --

14         THE COURT:  No, I think he withdrew that.

15         MR. LEWIN:  Yes.

16 Q.  So the luxury definition that we're applying to Gucci is

17 similar to the luxury definition that we're applying to Thom

18 Browne, correct?

19 A.  No.

20 Q.  No.

21         Gucci has a three-color stripe it uses.  Are you aware

22 of that?

23 A.  No.

24 Q.  OK.

25 A.  Oh, the color.  Yeah, the color bands.

1   Q.  The color band?

2   A.  Yes.

3   Q.  And they use that as a visual brand identifier, correct?

4   A.  Yes.

5   Q.  And what would your opinion be, sir, as to the garment that

6   carried both adidas stripes and Gucci stripes?

7   A.  I already --

8           MR. FLEMMING:  Objection.  Objection, foundation and

9   vague.

10          THE COURT:  Sustained.

11  Q.  Have you ever seen Gucci products?

12  A.  Yes.

13  Q.  Have you ever seen Gucci products with the adidas Trefoil

14  on them?

15  A.  Um, I don't know what their product was that you showed me

16  just now.

17  Q.  OK.  But let me show you DTX 330, fifth page, please.

18          All right.  I'm showing you a photograph blown up of a

19  product which carries green red green stripes, correct?

20  A.  Yes.

21  Q.  And do you recognize those to be Gucci?

22  A.  Yes.

23  Q.  And it also carries the word Gucci --

24  A.  Yes.

25  Q.  -- correct?

1          And it carries a Trefoil with three stripes running

2   across it, correct?

3   A.  Yes.

4   Q.  In your view, does that association enhance the brand value

5   of adidas?

6   A.  You already asked me the question and I answered it

7   already.

8   Q.  Well, do me a favor and answer me again.

9          Does this enhance the brand value of adidas?

10  A.  Again, I don't know.  I have -- there are conditions, as I

11  already testified and I wrote in my deposition.  You asked me

12  already in deposition.

13         THE COURT:  No.  First of all, it's irrelevant what

14  was asked in the deposition because the jury does not have the

15  deposition.

16         THE WITNESS:  OK.

17         So there are situations where two brands are very

18  strong.  One, for an example, is Gucci, very global brand, and

19  there is another brand called adidas.  And they choose to do

20  some collaborations.

21         It's not my favorite.  It's a trend in the industry

22  right now --

23  BY MR. LEWIN:

24  Q.  Excuse me.

25  A.  -- and I don't know -- I don't know yet whether this will

1  be positive or negative.  There is no evidence right now.

2  Q.  So you have no opinion then on this, correct?

3  A.  I usually base my opinion --

4  Q.  Sir, I asked you a question whether you have an opinion or

5  not.  It's a simple yes or no.

6  A.  I don't have an opinion.

7  Q.  Thank you, sir.

8          I ask forgiveness in advance because I'm going to deal

9  with your brain node discussion.

10         If I understand this correctly, if a consumer looks at

11  Thom Browne with four stripes on a pair of trousers, for

12  example, and the attributes of that are very clear in that

13  consumer's mind, correct.  However, however because of kind of

14  an association with adidas in his mind with stripes, he

15  associates the attributes of Thom Browne to adidas, is that

16  correct?

17  A.  Yes.

18  Q.  OK.  And your testimony is that harm to the adidas brand

19  occurs because the pathway from the brain to adidas gets, in my

20  words, cluttered?

21  A.  No.  No, that's not it.

22  Q.  OK.  Can you explain to me then how that harm occurs?

23  A.  OK.  Um, the survey research, the empirical research and

24  survey research, not only in this particular case but also in

25  our field for many years, now shows that -- shows that

1    consumers see a visual identifier -- let's say it's four

2    stripes from Thom Browne, as you suggest.  Sometimes they only

3    see the fraction.  Sometimes they see only for split seconds.

4    Sometimes they actually sit in front of it, like I do right

5    now, in one case.  And then -- then what happens is the

6    consumer, this theory is consumers process in certain

7    psychological principles, cognitive, how memory works.  One is

8    called Gestalt.  That means that they see a fraction and they

9    complete something, oftentimes as we heard earlier, that

10   doesn't even exist.  They just think they see something that

11   they see familiar.

12           If that consumer goes into his memory, that's the

13   process.  In his memory, he's making a search for a pattern.

14   If that consumer knows adidas and is familiar with adidas,

15   which is very likely because a large percentage of consumers do

16   know adidas --

17   Q.  Sir.

18   A.  -- then what happens is, there is a matching of that, and

19   that's the first fundamental way how the brain is then --

20   activation is spreading.  The second principle takes place, and

21   that means that the association, that part of Thom Browne

22   become gradually smooshed up we said, I think --

23   Q.  I got it.

24   A.  -- with those of adidas.

25   Q.  Thank you.

1           You mentioned Gestalt's theory, correct?

2    A.   Yes.

3    Q.   And isn't it true that the dominant theory, this dominant

4    theory which, as you say and as his honor said in a very strong

5    theory, for many years in terms of the area of branding and

6    thinking in that cognitive fashion.

7           Isn't it true under cognitive theory that it's not any

8    individual design element of any product, but rather all of

9    those elements in a product working together that produces an

10   effect on the viewer?

11   A.   That's not correct.  That's exactly --

12   Q.   All right.  Thank you, sir.

13          Can we turn to tab C in the report on paragraph 218

14   and publish it please to everyone but the jury.

15          Now, do you recall this paragraph, sir?

16   A.   Yes.

17   Q.   All right.  And would you agree with me that it says that

18   you wrote in your report, right, it's not any individual design

19   element of any product, but rather the elements working

20   together that produces an effect on the viewer?

21   A.   Yes.

22   Q.   OK.  Thank you.

23          So when a consumer -- to make this a little simpler,

24   it's the overall impact of all of those different elements that

25   produces the effect on the viewer, correct?

A.  It's not -- there are several principles within the Gestalt

theory, and part is true what you say and part is not true.

Consumers choose particular elements, not all of the elements.

They take some of the elements, but then they form -- which is

called closure.  Closure is one of the four, five principles

that fall underneath Gestalt theory.  And closure means that,

even if I show you something like this, consumers actually see

a ring.  Assume this is a ring, even though I showed you a C.

But consumers make the closure.

        There are five, six principles that you apply.

How they process information, not only how they perceive

information and process through the retina, and then goes into

memory.  And second, how they process that in memory given the

other principles we mentioned.

Q.  Sir, would you not agree with me that a person looking at a

Thom Browne product -- let's say a suit that has four bars on

the left -- processes that image using not only the four bars,

but the fit, the finish, what he may know about price, quality,

and otherwise as he looks at that image?

A.  No.

Q.  That's all I'm asking you.

A.  No.

Q.  All right.

A.  That's not how it works.

Q.  OK.

1    A.  As the principles already are defined.

2    Q.  Is it your testimony, sir, that when somebody looks at a

3    Thom Browne product, he is not impacted by the tailoring of the

4    product?

5    A.  That's what I not said.

6    Q.  All right.  Do I understand you, and would you agree, that

7    it has nothing to do with the Grosgrain signature?

8    A.  With?

9    Q.  The Grosgrain signature?

10   A.  I don't know what the question is.

11   Q.  I'll withdraw it.

12   A.  OK.

13   Q.  It's possible, is it not, that a person looking at an

14   old-fashioned adidas track suit, for example, would not only

15   process the stripes, but the fact that it was made of nylon?

16           MR. FLEMMING:  Objection, speculation.

17           THE COURT:  No, I'll allow it.

18   A.  And the question, what was the material you said?

19           MR. LEWIN:  Can you read back the question, please?

20           The material was nylon.

21           THE WITNESS:  Nylon?

22           MR. LEWIN:  Yes.

23           (Record read)

24   A.  If the consumer knows and can see the nylon, yes.

25   Q.  Yes.  Same way that we used to hear them go swish, swish on

1    airplanes, correct?

2    A.  Yes.

3    Q.  Would you agree with me, sir, that the Thom Browne four

4    bands on the left sleeve are quite different visually than the

5    three vertical bars you tested in your empirical study?

6    A.  The Thom Browne?

7    Q.  Four bars.

8    A.  Four bars.

9    Q.  Quite different visually than the three bars running down

10   the sleeve that you tested in the adidas matter?

11                MR. FLEMMING:  Objection, outside the scope and

12   speculation.

13                THE COURT:  Overruled.

14   A.  The four stars from Thom Browne are what I tested on in my

15   survey?

16   Q.  Yes.

17   A.  From a design perspective, if I have the length of time a

18   designer would find differences between that.  But that's not

19   how consumers process information.  Consumers --

20                (Continued on next page)

21

22

23

24

25

1    BY MR. LEWIN:  (Continued)

2    Q.  I didn't ask you that, sir.  Forgive me for interrupting

3    you, but, again, I have limited time, so...

4         You agree the adidas stripes that you tested are

5    vertical, correct?

6    A.  The one --

7    Q.  That you tested.

8    A.  Yes, I did.  Yes.

9    Q.  And the reason that you tested that because that's the one

10   that's associated with adidas.  Isn't that your testimony, sir?

11   A.  Yes.

12        THE COURT:  Counsel, you have two minutes.

13        MR. LEWIN:  I know.  I'm watching it carefully.

14   Q.  Are you aware of any data that indicates that by reason of

15   adidas -- by reason of Thom Browne's use of four bars that

16   somehow adidas has lost market share to Thom Browne?

17   A.  It would be impossible to even think of having data like

18   that.

19   Q.  So the answer would be no?

20   A.  There can't be data.  It is such an abstract concept.  It's

21   almost unrelated to the question of harm here.

22   Q.  Are you aware of any impact on brand loyalty by reason of

23   the use of Thom Browne's use of four bars on adidas?

24   A.  How possibly could I know that the consumer has made a

25   choice of buying a Thom Browne over buying an adidas?  It's

1  just impossible.

2  Q.  Thank you, sir.  Thank you.

3  A.  It's impossible.

4  Q.  Thank you.

5        MR. LEWIN:  No further questions.  I'll pass the

6  witness.

7        THE COURT:  Redirect.

8        MR. FLEMMING:  Thank you, your Honor.

9  REDIRECT EXAMINATION

10  BY MR. FLEMMING:

11        Dr. J, are you here to give an opinion -- an expert

12  opinion on the likelihood of confusion between the parties'

13  products?

14  A.  No.

15  Q.  Let's bring up exhibit -- Plaintiff's Exhibit 285, please.

16  Let's start on page 2.

17        Dr. J, do you recognize what we're looking at?

18  A.  Yes.

19  Q.  What is it?

20  A.  That's the survey I conducted.

21  Q.  The title of the survey at the top, would respondents see

22  that?

23  A.  Yes.

24  Q.  And then if you go down -- let's scroll down a little bit.

25  Go to page 3.  Let's go to question 6.  Do you see that

1   question in which industry do you or members of your household

2   work?

3   A.  Yes.

4   Q.  Do you see the ninth option?

5   A.  Yes.

6   Q.  It's sports and active wear?

7   A.  Yes.

8   Q.  Why did you choose those words here?

9   A.  This was one of the things I did in order to make sure that

10  I really interviewed consumers and not people that are actually

11  working in that industry, you know, like somebody that might

12  work with sports and active wear.

13  Q.  Let's go to page 4.  Let's zoom in on the prompt.  Do you

14  see in the first sentence, it says, "In the following section,

15  we would love to understand which brand of sports/active wear

16  you know"?

17  A.  Yes.

18  Q.  Why did you choose the phrase "sports/active wear"?

19  A.  Because I -- that's the category that's what I wanted to

20  study.

21  Q.  Let's look at the first red text there that's on the

22  screen.  It says, "new screen for each long sleeve shirt,

23  rotate."

24          Would respondents have seen that text?

25  A.  They don't see that, but it's automated.

1    Q.   Who is that text directed to?

2    A.   This is to instructions to the computer, basically.  It's a

3    computer instruction.

4    Q.   So what happened as a result of this instruction?

5    A.   Consumers -- the respondents in the survey, they see one

6    screen at a time.  So they see adidas with three stripes, then

7    it goes away.  As it says, it rotates, then they see something

8    else.  And in order to make sure that adidas doesn't come

9    always the first time, I then sometimes showed Under Armour

10   first, and then I showed Nike sometimes first.  I want to make

11   sure it's not always the first, just to be as objective as

12   possible.

13   Q.   Let's zoom all the way out.  Would consumers have seen --

14   sorry -- would respondents to your survey have seen these

15   products as we see here, all on one page?

16   A.   No, you see them one at a time, and you respond to that

17   question.

18   Q.   You can take that down.  Thank you, Nita.

19           On cross you talked about the adidas collaboration

20   with Gucci, right?

21   A.   Yes.

22   Q.   And you talked about how adidas has some control over the

23   products in those collaborations?

24   A.   Yeah.

25   Q.   What did you mean by control?

1    A.  Companies brands do from time to time certain

2    collaborations.  They choose to do that for many reasons.

3    Control is so important because in the case with Gucci, adidas

4    and Gucci decide we do this together for a period of time, and

5    that's the control you want when you do things with your brand.

6    In the case we discuss here --

7    Q.  I was going to get to that, but I actually sort of summed

8    it up right before.  Does adidas have control of its brand in

9    connection with the Gucci collaboration?

10   A.  That is really the --

11            MR. LEWIN:  Objection.

12            THE COURT:  Hold it.

13            MR. CONLEY:  Sustained.

14   Q.  Based on your research, how much control does adidas have

15   over what Thom Browne does with its own products?

16   A.  No control.

17   Q.  How does that result in harm to adidas?

18   A.  Potential area of huge harm.

19   Q.  Explain what you mean by that.

20   A.  Because we know from the --

21            MR. LEWIN:  Objection, your Honor.  It's not in his

22   report.

23            MR. HENN:  Yes, it is.

24            THE COURT:  I'm not understanding the relevance.  No

25   one contends that adidas has control over Thom Browne, and

1   therefore if Thom Browne has infringed or diluted adidas's

2   mark, they may have liability.  That's what the jury is

3   focusing on.  But no one suggests, that I can recall, that

4   there was an issue of whether or not Thom Browne had any

5   obligation to agree to any control by adidas.

6              Sustained.

7              MR. FLEMMING:  May we briefly approach, your Honor?

8              THE COURT:  All right.

9              MR. FLEMMING:  Thank you.

10             (Continued on next page)

1          (At the sidebar)

2          THE COURT:  Just so we're all on the same page, the

3    redirect will be finished by 4:29, and recross, if any, will be

4    finished by 4:30.

5          Go ahead.

6          MR. FLEMMING:  Last question, your Honor.  The

7    trademark infringement the case law in trademark infringement,

8    it's very clear the loss of control over your own brand that

9    happens in trademark infringement is a serious form of harm,

10   and we all here may know that but the jury needs to hear that.

11         THE COURT:  So if someone took the adidas brand and

12   did X, Y and Z without adidas's permission, that would be a

13   loss of control.  But the issue here is whether what they did

14   with their own brand was such that it led to confusion with

15   adidas's brand.  That is, I think, a totally different

16   question.

17         MR. FLEMMING:  If consumers are confusing or

18   associating the two, then what Thom Browne does, which adidas

19   has no control over, has an impact on adidas's brand.  That's

20   just the connection that's being made.

21         THE COURT:  I see.  That's not how I understood the

22   question.  But I will allow that reformulation of that if you

23   can get this witness to answer in less than 20 minutes.

24         MR. FLEMMING:  I will.  Thank you.

25         (Continued on next page)

1                      (In open court)

2      BY MR. FLEMMING:

3      Q.  Dr. Joachimsthaler, very briefly, since we're at the end of

4      the day, how does adidas having no control over how Thom Browne

5      uses its four-striped design and Grosgrain design, how does

6      that harm adidas?

7      A.  At any time, there's something that can happen with Thom

8      Browne with a brand or they might do a campaign or launch a

9      product that fails, we know that Thom Browne four stripes links

10     up with three stripes in most of memory network and therefore

11     instantly harms adidas.

12               MR. FLEMMING:  Pass the witness, your Honor.

13               THE COURT:  Anything else?  Any recross?

14               MR. LEWIN:  Briefly.  I think I have only two

15     questions.

16     RECROSS EXAMINATION

17     BY MR. LEWIN:

18     Q.  One, you indicated to us originally in testimony that all

19     four images on your survey were shown to a consumer at the same

20     time.  That wasn't correct, was it?

21     A.  No, that was not correct.  It would be impossible to --

22               THE COURT:  The answer is, it wasn't correct.

23     Q.  I think your report on your methodology indicated that it

24     was a rotating sequence, correct?

25     A.  Yes.

1    Q.  And if I understand that right, 75 percent of the time

2    people would see a brand other than adidas first.  Is that

3    correct?

4    A.  Mathematically, if you have four choices, maybe that works

5    out mathematically 75 percent.

6    Q.  And --

7              THE COURT:  You've asked two questions, which is what

8    you said you would ask.  I don't know, I assume you have five

9    fingers.

10             MR. LEWIN:  Well, your Honor, I'm trying to think

11   whether or not I boxed myself in on that one.

12             THE COURT:  You didn't box yourself in.  You created a

13   representation to the Court that the Court is willing to

14   enforce.

15             MR. LEWIN:  Fair enough, your Honor.  I'm done.

16             THE COURT:  That concludes the recross.  Thank you

17   very much.  You may step down.

18             THE WITNESS:  Thank you.

19             (Witness excused)

20             THE COURT:  Ladies and gentlemen, you will be glad to

21   know that despite all of this back-and-forth, we are on

22   schedule.  I am told that the plaintiffs have just one more

23   witness, which we will hear first thing Monday, and then we

24   will go to the defense case, and we're very much in mind also

25   of the special situation for Juror No. 4 a/k/a 5, so we are

1   fine.

2          During the weekend, I don't want you to think at all

3   about this case.  If you see three stripes anywhere, just say

4   three strikes and you're out.

5          So, in all seriousness, remember not to discuss this

6   case with anyone, have a very good weekend, and we'll see you

7   at 9:30 on Monday.

8          (Jury not present)

9          THE COURT:  So my law clerk tells me that not only did

10  I get the original name wrong, but I even got the pronunciation

11  wrong, but if you want to know anything about Jenny Lynn, just

12  ask me.

13         Anyway, I do want to say in all seriousness, once

14  again, I am very grateful to counsel.  There have been moments

15  when we've had ups and downs, but all of counsels' cases are

16  really doing a very excellent and professional job.  The Court

17  is very appreciate of that.  We will see you at -- I don't

18  think we have anything we need to discuss.  The issue we

19  discussed this morning will come up again at charging

20  conference but not before that.  I'm sorry, Yes, sir.

21         MR. CONLEY:  There is, your Honor, some objections to

22  Mr. Plumpe's slides, the adidas expert who will testify Monday.

23         THE COURT:  Why don't we get together at 9:15 on

24  Monday.

25         (Trial continued January 9, 2023 at 9:15 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 SARAH VANDERHOFF

Cross By Mr. Lewin . . . . . . .554

Redirect By Mr. Flemming . . . .604

Recross By Mr. Lewin . . . . . .609

 ERICH JOACHIMSTHALER

Direct By Mr. Flemming . . . . .613

Cross By Mr. Lewin . . . . . . .679

Redirect By Mr. Flemming . . . .747

Recross By Mr. Lewin . . . . . .753

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 181 through 184, 1314, 191  . . . . . . . . . 613

          through 195, 197, 176, 693,

          694, 705, 706, 707, 708 and

          283

 285  . . . . . . . . . . . . . . . . . . . . 637

 286  . . . . . . . . . . . . . . . . . . . . 644

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 131  . . . . . . . . . . . . . . . . . . . . 582

 922  . . . . . . . . . . . . . . . . . . . . 593