UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADIDAS AMERICA, INC., an Oregon corporation;
and ADIDAS AG, a foreign entity,

                    Plaintiffs,

            v.                          21 Civ. 5615 (JSR)

THOM BROWNE, INC., a Delaware corporation,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        January 9, 2023
                                        9:15 a.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge
                                        -and a Jury-


                        APPEARANCES

KILPATRICK TOWNSEND & STOCKTON LLP
        Attorneys for Plaintiffs
BY:  R. CHARLES HENN, JR.
        H. FORREST FLEMMING III

WOLF GREENFIELD & SACKS, PC
        Attorneys for Defendant
BY:   ROBERT MALDONADO
        HARLEY LEWIN
        BRYAN CONLEY
        TONIA SAYOUR

ALSO PRESENT:
NITA GRAY, adidas paralegal
MICHAEL PUSTERLA, Thom Browne paralegal

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  I notice there are some

3     clothing items prominently placed against the wall bearing a

4     four-stripe mark, as to which I express no opinion, but is

5     there any objection to this?

6          MR. HENN:  Yes, your Honor, for two reasons.

7          First, during discovery we asked defendants to produce

8     for inspection any clothing items that we intended to rely on

9     at trial.  There was a day when they allowed us to come and

10    inspect those, and as best I can tell, maybe only one item on

11    that entire rack was actually produced for inspection during

12    discovery pursuant to our request.

13         The second issue is the display itself is both

14    misleading and likely prejudices adidas and will be confusing

15    to the jury because similar to what I just said about what was

16    produced in discovery, I do not believe -- I think there may

17    only be one or two items on that entire rack that are actually

18    accused of infringement, and thus the others are not relevant

19    to anything the jury needs to decide.

20         THE COURT:  So...

21         MR. LEWIN:  Your Honor, good morning.

22         First of all, we invited the plaintiffs to examine

23    these goods yesterday.

24         THE COURT:  Sunday?

25         MR. LEWIN:  Pardon me?

| | |
|---|---|
| 1 | Yes, sir. Yes, sir. Sunday evening and possibly this |
| 2 | morning. |
| 3 | THE COURT: Long after this trial had begun. |
| 4 | MR. LEWIN: Oh, yes. These are demonstratives, sir. |
| 5 | We don't intend to submit them, but we did -- |
| 6 | THE COURT: Which is all the more reason for them not |
| 7 | to be in front of the jury until they are presented to the |
| 8 | jury. |
| 9 | MR. LEWIN: Fair enough, your Honor. |
| 10 | THE COURT: Move them into the witness room right now. |
| 11 | MR. LEWIN: Yes, sir. |
| 12 | May we present them to the witness, though? |
| 13 | THE COURT: We're going to discuss that in a minute. |
| 14 | THE DEPUTY CLERK: We may be able to wheel it right |
| 15 | through to Judge Crotty if he is not sitting. |
| 16 | I may have an easier solution. You may be able to |
| 17 | wheel it right through to Judge Crotty's. |
| 18 | THE COURT: Stop. Do you hear what my courtroom |
| 19 | deputy is saying? |
| 20 | She is saying stop. Just stop for a minute. |
| 21 | Linda, get off the phone. |
| 22 | THE DEPUTY CLERK: I'm waiting for them to confirm to |
| 23 | me that they are not using the courtroom. |
| 24 | THE COURT: No, no. Just put it in the witness room. |
| 25 | THE DEPUTY CLERK: OK. |

1          THE COURT:  You can put it in the witness room.

2          MR. LEWIN:  Put it in the witness room.

3          THE COURT:  Now next, Ms. Vanderhoff, please take the

4     stand.

5          The court reminds you you're still under oath.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  So when Ms. Vanderhoff was on the stand,

8     she was questioned about an e-mail she sent when she was

9     working for the Kilpatrick law firm to Mr. Henn, which was on

10    the privilege log with a sort of generic description, and this

11    was all apropos what she did or did not remember about the

12    earlier 2007 and '8 dispute between adidas and Thom Browne.

13         I asked plaintiff's counsel to send me the actual

14    underlying e-mail, which they did.  Even though I think there

15    is a substantial argument that privilege has been waived with

16    respect to this e-mail, I don't need to reach that because,

17    for immediate purposes, it can be shown to the witness as a

18    document to possibly refresh her recollection and that, of

19    course, can be done even with the privilege document.

20         So I'm showing you the actual e-mail.  Do not read it

21    aloud, but read it to yourself and tell me whether it refreshes

22    your recollection as to what work, if any, you did back in 2008

23    regarding the Thom Browne-adidas dispute.

24         THE WITNESS:  It doesn't refresh my memory.  I

25    obviously worked on this.  This is from Charlie to me, though,

1    so it's not what I did.  But I'm sure I followed his direction

2    and went --

3            THE COURT:  All right.  Let me have this back.

4            So I don't know whether either side wants to pursue

5    the question of waiver.  Of course, plaintiff's counsel could

6    waive privilege just as to this document, since this was the

7    document inquired into that would not constitute a waiver of

8    anything else.

9            Defense counsel could argue that because adidas called

10   this witness and called her in part to examine her as to her

11   lack of knowledge of Thom Browne in most respects, that that

12   was before she took action in 2018, that that arguably is a

13   waiver.

14           And I'll tell you why I pursued this.  The privilege

15   log doesn't really say very much.  It has a big generic listing

16   there, and I think to the extent it is material, which I doubt

17   very much, but to the extent either side thinks it is material,

18   I think the jury would be much better served by seeing the

19   actual e-mail.

20           The e-mail consists of one sentence, but that's as far

21   as I can go without addressing the question of waiver.

22           Let me first ask plaintiff's counsel, do you want to

23   waive privilege as to this e-mail?

24           And I repeat, that does not constitute waiver as to

25   anything else.

1    MR. HENN:  No, we do not want to waive privilege.  And

2    also, to address the court's suggestion that perhaps there has

3    been a waiver, there has not been.  The sum and substance of

4    her testimony on cross was that it was essentially to confirm

5    what was written on the privilege log and thus did not open the

6    door to any further inquiry as to what is the content of the

7    e-mail.

8            THE COURT:  Well --

9            MR. HENN:  Any privileged document --

10           THE COURT:  -- if someone has the reference on the

11   privilege log and wants to read it again to refresh my own

12   recollection, please do so now.

13           MR. MALDONADO:  One second, your Honor.

14           THE COURT:  There it is.

15           So it says the claim on the privilege log is

16   privileged communication between adidas' outside counsel

17   discussing potential claims, litigation research, strategy, or

18   analysis in adidas v. Thom Browne.

19           Now, if I were defense counsel I might want to argue,

20   based on what has been presented to the jury, which includes

21   what I just read, that Ms. Vanderhoff, not withstanding her

22   testimony, if she was involved in discussing potential claims,

23   litigation research, strategy or analysis, how could she not

24   remember much more than she says she remembers about Thom

25   Browne.

1    So I am quite amused at plaintiff's position

2  maintaining the privilege, but go ahead.

3    MR. HENN:  Well, your Honor --

4    THE COURT:  This consists of all of one sentence.

5    MR. HENN:  Fair enough.  I mean, it clearly will

6  prejudice nothing.  It's the reason that it is not material to

7  anything.  The witness testified that, yes, this e-mail would

8  have been sent.  Yes, it would have related to exactly what is

9  described in the subject matter.

10    She admitted that in response to the question:  Well,

11  during the course of that research, did you discover who Thom

12  Browne was?  She answered:  I am sure I did.

13    So there is nothing to be gained by adding an

14  additional document or recalling this witness.  It also doesn't

15  change the timeline in any event because everyone is aware that

16  adidas and Ms. Vanderhoff was aware of Thom Browne as of

17  November 2006.  So that all relates to materiality.

18    As to the privilege issue, your Honor, all privilege

19  documents on the log are presumably relevant.  Otherwise, we

20  wouldn't have to log them.  So the mere fact that there is a

21  document that pertains to the witness' testimony on direct

22  doesn't waive the privilege as to any privileged document that

23  might pertain to that testimony, that isn't sufficient to

24  create a waiver.

25    THE COURT:  Well, I think the question is you, adidas,

N19sADI1

1    called her. It wasn't that she was called by the other side.

2    You called her. You called her to, as I recollect, partly if

3    not wholly on the issue of laches, to show that it wasn't like

4    Thom Browne was right there in everyone's consciousness as the

5    years passed, and it was only when this person in Europe picked

6    up on the new Thom Browne logo that things got moving.

7    And so it was inevitable in calling that that there

8    would be cross-examinations, as there was, as to what she knew

9    earlier. So query whether that doesn't waive the privilege as

10    to an e-mail that she herself sent in 2008 relating to the

11    discussion, according to the privilege log, of potential

12    claims, litigation research, strategy or analysis, that's

13    separate and apart from the fact that one single sentence might

14    put an end to that argument.

15    But that's your strategy call. So let me find out

16    from defense counsel whether you think you want to argue waiver

17    or not.

18    MR. MALDONADO: Your Honor, we're satisfied with the

19    record as it is now.

20    THE COURT: OK. That's great. Everyone is happy and

21    I am glad.

22    By the way, I think I said 2008 a couple times. It

23    was 2006. I was just a kid then, so of course I can't remember

24    back that far.

25    All right. Let's get the witness on the stand.

1          You may step down.

2          (Witness excused)

3          I also remember that there will not be motions made at

4   the end of this witness because there are two witnesses who are

5   going to appear on the defense side who are really joint

6   witnesses, so to speak.

7          So we'll take up any motion practice at after that.

8          THE DEPUTY CLERK:  Shall I bring in the jury?

9          THE COURT:  Please.

10         Of course if the jury gets cold, we have a lot of

11  extra clothing we can bring in.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Please be seated.  Good morning, ladies

3   and gentlemen.  Welcome back to the salt mine.  I hope you all

4   had a great weekend.  We are ready to proceed.

5        Where is the witness?

6        THE DEPUTY CLERK:  The judge is asking for the

7   witness.

8        MR. FLEMMING:  Your Honor, the witness was in security

9   as of 35 minutes ago, and we sent someone down ten minutes ago

10  to check on him.  He may be right outside.

11       THE COURT:  All right.

12       MR. HENN:  Apologies, your Honor.  He is still

13  apparently making his way through security.

14       THE COURT:  Of course counsel should have arranged for

15  him to be here long ago.

16       How long were you planning to be on your direct

17  testimony?

18       MR. FLEMMING:  Less than an hour, your Honor.

19       THE COURT:  How much less than an hour?

20       MR. FLEMMING:  50 minutes.

21       THE COURT:  OK.  We will start the clock right now,

22  and when he's here you'll have whatever time remains in that

23  50 minutes.

24       MR. FLEMMING:  Yes, your Honor.

25       THE COURT:  Always try to move things along.

1    I should mention, ladies and gentlemen, though this

2  will be the last witness called by the plaintiff, some of the

3  witnesses who are being called, when we get to the defense case

4  later this morning, are being called by both sides.  It's of no

5  importance really which side calls a witness.  It's what the

6  witness has to say and what you think about the witnesses that

7  important.

8    Well, I think, ladies and gentlemen, there is no sense

9  of you just sitting there.  Why don't you go back in the jury

10  room, and we will call you as soon as the tardy witness

11  appears.

12    THE DEPUTY CLERK:  Judge, there are approximately 50

13  people in front of him.  I have his name and they pulled up a

14  picture on a phone for me.

15    Shall I go get him?

16    THE COURT:  Yes.

17    THE DEPUTY CLERK:  OK.

18    THE COURT:  You can keep going back to the jury room.

19    (Continued on next page)

20

21

22

23

24

25

1        (Jury not present)

2        THE COURT:  Please be seated.

3        All right.  Let's continue the discussion about those

4    demonstrative exhibits while we're waiting.

5        So the claim was that --

6        MR. LEWIN:  Your Honor.

7        THE COURT:  I'm sorry.  I can see that's not the

8    witness.

9        Now, so the claim is that, at least until yesterday,

10   they had never seen all but one or two of these.

11       MR. LEWIN:  That's correct.

12       THE COURT:  So why not?

13       MR. LEWIN:  Well, we just curated the list yesterday

14   and made that decision as a demonstrative.  I don't believe it

15   needs to be on the list.  When we made the decision, we asked

16   them to come over and made them available to be seen.

17       THE COURT:  And let me ask plaintiff's counsel.

18       MR. LEWIN:  May I also point out --

19       I'm sorry, your Honor.

20       THE COURT:  Go ahead.

21       MR. LEWIN:  May I also point out that one of their

22   expert witnesses, Ms. Vanderhoff, actually put in the look

23   book, testified on the look book, which showed an array of

24   styles of Thom Browne.  And we are trying to indicate to the

25   jury what the Thom Browne product actually looks like rather

1    than photographs, so we gave them --

2              THE COURT:  I think no one is questioning relevance,

3    the question especially as a demonstrative, but let me hear

4    from the plaintiff's counsel.

5              How are you prejudiced?

6              You can go right now.  Apparently you're going to have

7    some time and look at them.  My guess is they will have four

8    stripes.

9              MR. HENN:  Two reasons.

10             First, we specifically requested these in discovery

11   and they were not provided, despite an agreement from defense

12   that they would make available for inspection, anything they

13   were going to use at trial.  So there is a discovery violation

14   that has not been lived up to.

15             But the other issue is one of confusing the jury on

16   the issue.  Those products are not an issue in the case.  I

17   think on that rack there might have been one accused product,

18   maybe a hoodie.  But it's stuff from fashion shows, it's

19   scarves --

20             THE COURT:  Oh, OK.  So there is a relevance question.

21             MR. HENN:  It is relevance and prejudice.

22             THE COURT:  So let me go back to defense counsel.

23             It's one thing to show the clothing that is being

24   accused of infringing.  Why should you be able to show clothing

25   that no one is claiming is infringing?

1      MR. LEWIN:  Well, your Honor, it's a representative

2  sample of what the designer does for a living, what his product

3  is like across the board, and it has been discussed at least a

4  half a dozen times, runway shows, look books, and the like.

5  The runway shows contain some of these garments.  The look book

6  contained virtually all of the garments, save two.

7      To be very clear, your Honor, on the availability of

8  the documents to be exhibited, the plaintiffs asked to see the

9  accused products.  They didn't ask to see anything else.  They

10  didn't ask us.  We made them available when we made the

11  decision.  Everybody has been working late at night, and it's

12  not unusual under these circumstances to have those available

13  as a demonstrative.

14      Yes.  If I may, your Honor, just one more thing.

15      THE COURT:  Go ahead.

16      MR. LEWIN:  There's been much made of the sweatpants

17  and sweatshirts, and those would be part of what we wanted to

18  show the witness and ask him about his quality, what separates

19  these products, but particularly to give the jury an idea of

20  what we're talking about here.  I would be perfectly happy, if

21  need be, and would offer to remove from any display the rather,

22  far-out garments that are not accused.

23      THE COURT:  All right.  So that may be a reasonable

24  compromise.

25      So since we have a few minutes yet, I will, with

1     apologies, ask the belabored persons who wheeled the cart out

2     to wheel it back in for me.

3              MR. HENN:  As soon as they wheel it in, the witness is

4     going to get here.

5              MR. LEWIN:  Well, at least we will have an

6     entertainment section, right.

7              Your Honor, I would mention that these garments are

8     all part of the collection and are visible on the website of

9     Thom Browne, are visible --

10             THE COURT:  I haven't ruled yet whether that is an

11    independently sufficient reason or not, but...

12             MR. LEWIN:  I understand.

13             THE COURT:  Given what you just said, we can at least

14    eliminate some, as I understand it.

15             So now which ones is defense counsel agreeing should

16    be eliminated?

17             MR. LEWIN:  Green, the knitted garment, and the

18    gray-and-white garment.

19             THE COURT:  Why don't we take those off the rack.

20             So now as to the remaining ones, let me ask

21    plaintiff's counsel, why isn't it relevant to show that, even

22    if some of these are not accused, they are sufficiently similar

23    to what is accused to cast in doubt the validity of plaintiff's

24    claim?

25             MR. HENN:  Because there's no authority for that being

1    relevant to one's analysis of confusing similarity.  The

2    analysis of confusing similarity under *Polaroid* and all the

3    cases after that pertains to the products themselves, not to

4    other products that don't infringe.  And then you say, well, is

5    it more or less like the ones that don't infringe?  The jury

6    has only asked, does the product that's presented to you, does

7    that create a likelihood of confusion.  Whether there are

8    things in the universe that also don't infringe is irrelevant.

9             THE COURT:  So if I understand your argument, so if

10   there hypothetically was a manufacturer that made 7 million

11   products with four stripes in the same pattern, and you only

12   attacked as infringing one of those, you say it would be

13   totally irrelevant that you haven't attacked the other

14   6,999,999?

15            MR. HENN:  Correct.

16            THE COURT:  Why?

17            MR. HENN:  Why would it be relevant?  The point before

18   the jury is, does the accused product create a likelihood of

19   confusion.  Is the accused product bearing a similar mark.  Is

20   the accused product a similar good.  Is the accused product in

21   the same channel.

22            Imagine the world in which all of a sudden those other

23   6,999,999 products --

24            THE COURT:  But why doesn't defendant have the

25   argument that the world knows, in my hypothetical the 7 million

1    other products, that this four stripes is identified with this

2    manufacturer and that's why they haven't bothered to go after

3    the other 7 million, but they are going after this one because

4    it's a more direct competitor or whatever, and that shouldn't

5    blind you to the fact that the whole world knows, in my

6    hypothetical, that this four stripes are identified with

7    manufacturer X?

8            MR. HENN:  It is an interesting query, mental

9    exercise, but I can't think of the element of the claim to

10   which that goes.  It doesn't go to similarity of the product.

11   It doesn't go to similarity of the mark.  It doesn't, I mean...

12           THE COURT:  Hang on just one minute.

13           THE DEPUTY CLERK:  Ta-da.

14           THE COURT:  OK.  Let's wheel it back out.

15           We'll continue this at the next break because we want

16   to give all these fine folks, I will hereinafter refer to as

17   the wheeler dealers, lots of exercise.

18           Please take the stand and let's bring in the jury.

19           (Continued on next page)

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  You have 37 minutes.

3            THE DEPUTY CLERK:  Please raise your right hand.

4      JOHN PLUMPE,

5         called as a witness by the Plaintiffs,

6         having been duly sworn, testified as follows:

7            Please be seated.  State your name and spell it slowly

8      for the record.

9            THE WITNESS:  Good morning.  My name is John Plumpe.

10     It's P-l-u-m-p-e.

11           THE COURT:  Counsel.

12     DIRECT EXAMINATION

13     BY MR. FLEMMING:

14     Q.  Welcome, Mr. Plumpe.  Would you please introduce yourself

15     to the jury.

16     A.  Sure.  As I said, my name is John Plumpe.  I'm a managing

17     director with an economic and financial consulting firm in

18     Chicago called Epsilon Economics, where I'm a managing

19     director.

20           I live in the Chicago area with my wife and three

21     children.  My oldest is a freshman at Ohio State and I have a

22     sophomore and freshman in high school.

23     Q.  Mr. Plumpe, what's your role in this case?

24     A.  In this case, I was retained by counsel to adidas to be an

25     expert witness on monetary relief and damages issues.  So I'm

1    not an adidas employee.  I'm not a Thom Browne employee.

2    Instead, I work for a third party and I was retained to provide

3    some calculations and opinions regarding forms of monetary

4    relief and damages that adidas is seeking in this case.

5    Q.  At a high level, what are those opinions on monetary

6    remedies?

7    A.  Well, at a high level the calculations and opinions I

8    expressed are regarding the profits of Thom Browne from selling

9    the accused products that are accused of infringement as well

10   as adidas' damages in the form of what's called a reasonable

11   royalty.

12   Q.  Did you make any assumptions in forming your opinions in

13   this case?

14   A.  Yes, I did, two foundational assumptions.

15          I'm not a legal witness, so I have assumed that there

16   will be a finding of liability on behalf of adidas, for adidas,

17   against Thom Browne.  I have also assumed that there was some

18   harm to adidas in those actions.

19   Q.  Did you prepare a presentation to help the jury follow

20   along with your testimony?

21   A.  Yes, I did.

22   Q.  Let's bring up that presentation as a demonstrative.

23          So this will not be offered.  Let's go to the second

24   page.

25          Can you tell me briefly about your background starting

1    with your education?

2    A.   Sure.  My education is at the bottom of the slide.  I have

3    a bachelor of science degree and a master of science degree

4    from the University of Illinois, and then I have a master of

5    business administration, which is sometimes referred to as an

6    MBA, from the University of Chicago's Booth School of Business.

7    That's my educational background.

8    Q.   Let's go to the next slide.

9              Will you tell us a little bit about your professional

10   background startling with Deloitte?

11   A.   Sure.  When I was working on my MBA, I had a job with

12   Deloitte, which is a big global accounting and consulting firm.

13   I worked in their consulting group and I was based in Murray

14   Hill, New Jersey, where I worked on some high-tech marketing

15   startup projects.

16             From there I moved into the space that I'm in now.

17   This was in 1999.  I started with an intellectual property

18   consulting firm known as Intercap, which was then acquired by a

19   larger, publicly traded economic consulting firm called Charles

20   River Associates.  That was 1999 until about 2017.

21             I worked for that combined entity where I worked on

22   intellectual property economics, finance, valuation, licensing,

23   intellectual property are patents, technology trademarks,

24   copyrights, trade secrets, those sorts of things.

25             In 2017 I moved my practice over to my current firm,

1    Epsilon Economics.  I've been in this area working on

2    intellectual property finance and economics issues since 1999.

3    Q.  Let's go to the next slide.

4              Are you a member of any professional organizations?

5    A.  Yes.  I'm involved in the Intellectual Property Owners

6    Association, where I was chair of the monetary relief working

7    group within the U.S. Trademark Committee.  Then I've been

8    involved in the International Trademark Association, which is

9    often referred to as INTA, for more than 15 years.  And I've

10   had a series of leadership roles that culminated in 2022 as

11   being appointed the cochair of the presidential task force on

12   intellectual property reporting where we look at how trademarks

13   are valued and accounted for and communicated both internally

14   and externally to investors and lenders and the outside world.

15   Q.  Let's go to the next slide.

16             Have you served as an expert witness in a trademark

17   case before?

18   A.  Yes, I have, many times.

19   Q.  Do you do any work outside of your work as an expert

20   witness?

21   A.  Yes.  A significant portion of my practice is for non-

22   litigation-related matters involving intellectual property,

23   often trademarks.  So over the course of my 23-year career,

24   while I have worked on hundreds of litigation matters, I've

25   also worked on hundreds of intellectual property and trademark

1    cases that don't involve litigation, that involves valuing

2    trademarks, trademark licensing, the reporting on the value of

3    trademarks for financial reporting purposes or tax purposes,

4    M and A, those sorts of thing.

5    Q.  Have you worked on projects involving consumer products

6    like footwear and apparel?

7    A.  Yes.  As you might expect, trademarks and brands are very

8    important in consumer products and in apparel and footwear.  So

9    over the course of my career, I've worked on many cases

10   involving consumer products.

11   Q.  Let's go to the next slide.

12           What material did you review in forming your expert

13   opinions in this case?

14   A.  I've put a list up on the slide of the main categories of

15   documents and information that I considered when I was

16   developing my opinions over the past year working on this case.

17   So this simplifies it, but there were thousands and thousands

18   of documents and datasets and Excel files some from adidas and

19   some from Thom Browne.

20           I also read the deposition transcripts of witnesses

21   that testified for adidas and witnesses that testified for

22   Thom Browne, along with the exhibits to their depositions.

23   Exhibits are documents that accompany someone's testimony in a

24   deposition.  I also read expert reports, such as the expert

25   report of Dr. Joachimsthaler, and then I conducted research on

1   my own of publicly available sources of information.

2   Q.  Mr. Plumpe, earlier you testified that you are here to talk

3   about two monetary remedies.

4          Will you remind us what those are again?

5   A.  Sure.  The first is the profits of the defendants, Thom

6   Browne, and the second are reasonable damages to adidas.

7   Q.  Are you here to talk about punitive damages?

8   A.  No.

9   Q.  Let's bring up the next slide.

10         Before we get into how you reached these conclusions,

11  will you give an overview of your calculations of those two

12  monetary remedies that you mentioned?

13  A.  Sure.  I summarized it on this slide here.

14         For the accused products, these are the products that

15  Thom Browne sold that are accused of infringement by adidas for

16  the period from December 16, 2015, through November 30, 2022,

17  so just a couple months ago.  The gross profits earned by Thom

18  Browne were approximately $7,011,961, and adidas' reasonable

19  royalty damages were $867,225.

20  Q.  That date range there at the top, what's the significance

21  of that?

22  A.  It was my understanding, when I reviewed the documents

23  adidas from Thom Browne that we'll talk about today, that that

24  was the date range that Thom Browne provided to adidas during

25  the course of this litigation.  That was the date range that

1    they ran their reports on.

2    Q.  Let's go to the next slide.

3         So starting with profits, can you just give us a basic

4    definition of profits?

5    A.  Sure.  Profits is a relatively straightforward concept that

6    I've shown on this slide here.  It starts with revenues or

7    sales of the products that are at issue.  So we're not talking

8    about total company sales, we're just talking about the sales

9    of the products that are accused of infringement and the amount

10   of money that Thom Browne collected from that.  Then to

11   calculate profits, you subtract the costs that are associated

12   with those sales.

13   Q.  Let's go to the next slide.

14        What are the profits that you calculated in this case?

15   A.  Well, the profits calculation here is an estimate because

16   the cost calculation is an estimate.  We'll get to that in a

17   minute.  But the profits that I was able to calculate based on

18   information available to me was $7,011,961.

19   Q.  OK.  So we need to do revenues minus costs to get to

20   profits.

21        Let's go to the next slide.  Let's start with

22   revenues.

23        How did you go about calculating Thom Browne's

24   revenues of sales of the accused products specifically?

25   A.  Sure.  So like I said, Thom Browne's data to adidas for the

time period that we've been talking about here, that's the

December 2015 to November 22 time period, when Thom Browne

sells the accused products through what's known as three

different channels.  So there is the wholesale channel, there's

the retail channel, and there's the e-commerce channel.

I'll define each of those for you real quick.  So

wholesale, the wholesale channel is like a business-to-business

sale.  So when Thom Browne sells to Nordstrom, that's a

wholesale sale made from one business to another.  That's not a

consumer-level sale.  So that's an example of a wholesale sales

channel when Thom Browne sells to another company that would

then resell it to consumers.

Retail, as you might expect, the retail channel is

through Thom Browne's own stores.  So if you were to go into a

Thom Browne store, buy a Thom Browne item from that Thom Browne

store, that would be a retail sale.  That would be the retail

channel.

Then e-commerce, as you might expect, the e-commerce

channel brings in sales that were made online primarily through

two sources, Thom Browne's website and then Thom Browne uses a

third-party e-commerce called Farfetch.  So the sales to those

two websites primarily make up the e-commerce channel.  Again,

those are considered like retail sales that are made to

consumers.

Q.  Are we talking about global sales here?

1    A.  This is U.S. sales, is my understanding.

2            And so to get to your question, sir, the data provided

3    by Thom Browne to adidas broke their sales up into the three

4    channels.  And so what I did was I looked at that data and I

5    aggregated it.  And you see the numbers on the screen there by

6    channel and in total.

7    Q.  Let's bring up Exhibit 568.

8            Briefly, Mr. Plumpe, what are we looking at here?

9            MR. FLEMMING:  Actually, can you zoom out a little bit

10   and see more columns, Nita.

11   A.  While she's doing that, would it be possible for me to get

12   me bottle of water, please?  These are empty.

13   Q.  Of course.

14           Mr. Plumpe, what are we looking at in this

15   spreadsheet?

16   A.  This is just the tip of the iceberg, if you will.  This is

17   the very beginning of a very large spreadsheet that was one of

18   a few that was produced by Thom Browne that provides details

19   regarding their sales and revenues of the accused products for

20   the various years that I've already talked about.

21           So what each little segment is the item, there's a

22   picture, and then the SKU, which is the stock keeping unit,

23   which is kind of a serial number to identify that product, and

24   then a description, and then sales data by channel by year.

25   Q.  Can you look at column W.

1          What is in column W?

2   A.  Let's see.

3   Q.  What does that WHS stand for?

4   A.  That's the wholesale channel, and that particular column is

5   the quantity, so the unit volumes.  And then if you move over

6   to the right, you see the dollar amounts associated.

7   Q.  So looking at column AC, what does that T stand for?

8   A.  AC RET, that's the retail dollar amount for that particular

9   item in each of the years shown there.

10  Q.  And then see ECOM next to that.  Is that e-commerce?

11  A.  Correct.

12  Q.  Let's bring up Exhibit 569.

13          We can zoom out on this one.

14          Mr. Plumpe, what is the spreadsheet we're looking at

15  here?

16  A.  This spreadsheet is similar to the previous one.  I would

17  like to amend, when we were talking about the previous one,

18  that involved the four-stripe or four-bar products.  This one

19  is involving what I believe is referred to as the Grosgrain

20  products, but it's a similar structure, similar types of

21  information included in it.

22  Q.  Just to summarize, how did you use these last two

23  spreadsheets we looked at in forming your expert opinions?

24  A.  So what we did is we put together a database, took all of

25  this information from both of the files from every product, for

1  every channel, for every year, and we built a database that for

2  each channel you're able to calculate the sales in each year of

3  Thom Browne's accused products, the four-bar products or

4  four-stripe products, as well as the Grosgrain products.  And

5  you can add it all up and that is what I did.

6  Q.  Let's go back to the PowerPoint.

7        This is what happened when you added it all up?

8  A.  Correct.

9  Q.  So now that we have Thom Browne's revenues from sales of

10  the accused products, what is the next step in the calculation?

11        MR. FLEMMING:  You can go to the next slide, Nita.

12  A.  The next step is to subtract costs that are attributable to

13  the sales.

14        THE COURT:  I'm sorry.  Were you offering the

15  spreadsheets?

16        MR. FLEMMING:  Yes, your Honor.  Thank you for

17  reminding me.

18        I would like to offer Exhibits 568 and 569.

19        THE COURT:  Any objection?

20        MR. CONLEY:  No objection, and those are plaintiff's

21  exhibits for the numbers.

22        MR. FLEMMING:  Plaintiff's.

23        THE COURT:  Thank you very much.  Received.

24        (Plaintiff's Exhibits 568 and 569 received in

25  evidence)

1    BY MR. FLEMMING:

2    Q.  Mr. Plumpe, you mentioned costs.

3            What was your assignment from counsel as to which

4    costs you should deduct?

5    A.  I was asked by counsel to consider information that was

6    produced by Thom Browne regarding costs that were directly

7    attributable to the sales of the accused products.

8    Q.  What types of costs are those?

9    A.  Directly attributable costs are those that can be directly

10   identified as being incurred because of the sales of the

11   accused products, and the most common of those is what is known

12   as cost of goods sold, which in the accounting world is

13   abbreviated as COGS, C-O-G-S.  That's the cost to Thom Browne

14   of acquiring the items from the vendors that make the products

15   for Thom Browne.

16   Q.  And earlier you said you estimated costs.

17           Why is it estimated and not actual?

18   A.  Well, my understanding from the documents that were

19   provided to me, as well as from the deposition testimony of

20   Mr. Gajo that I reviewed, was that Thom Browne does not, in its

21   accounting systems, prepare actual costs for any particular

22   SKU, for any particular item.  What Thom Browne instead does is

23   aggregate all of its costs of goods sold as a company level.

24   So you can't directly calculate an actual cost per item, you

25   can only do it at the company level.

1          So what I had to do was, using the best available data

2     to me, was to estimate the COGS of the accused items based on

3     the COGS of the total company as a percent of COGS -- as a

4     percent of the total company sales, and I could explain to you

5     a little bit what that means, if you would like.

6     Q.  Please do.  Sounds slightly complicated to me, please.

7     A.  Sure.  Let's say that a company's sales are $100 and their

8     COGS are $40.  So their COGS as a percent of sales would be

9     40 percent, and then their gross profit, which is the sales

10    minus the COGS, is $60 or 60 percent.

11         So what I had to do in this situation was look at Thom

12    Browne's total U.S. sales and their total company COGS in the

13    U.S. and calculate that percentage, which I did for each year.

14    Q.  What pieces of information did you use to calculate that

15    cost of goods sold as a percentage of Thom Browne's sales?

16    A.  Well, I used two different sources of data from that was

17    produced by Thom Browne in this case.  Thom Browne produced

18    some accounting records and details from some of the older time

19    periods, roughly 2015 through 2018, using one format, and then

20    2019 through 2021 using a different format.  So I used these

21    two different types of reports.  Thom Browne did not produce

22    any cost data for 2022.  I had to make an assumption regarding

23    2022 costs.  For all those reasons, that's why it's an estimate

24    of COGS.

25         MR. FLEMMING:  And let's bring up Exhibit 414,

1    plaintiff's exhibit.

2              I would like to offer this one into evidence as well.

3              MR. CONLEY:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 414 received in evidence)

6              MR. FLEMMING:  Let's go to the tab at the bottom

7    labeled TB standalone.

8              Neta, you'll probably have to scroll across the bottom

9    to see the other tabs.  You can scroll on the far left.

10   There's little arrows.

11             We're all learning so much about Excel during all

12   these cases.  There we are.  P and L standalone, the first gray

13   one, Nita.  There we are.

14   BY MR. FLEMMING:

15   Q.  Mr. Plumpe, what are we looking at here?

16   A.  Could you zoom out just a little bit.  There you go.

17             So this is what's referred to as a P and L, which is

18   an abbreviation for a profit and loss statement.  Profit and

19   loss statement is typically prepared by a company's in-house

20   finance and accounting people to provide a summary of the sales

21   and costs and profitability of a product line or a business

22   unit, or in this case, my understanding is this is for all of

23   Thom Browne, Inc., in the United States.

24             So what the company's internal finance and accounting

25   people did was, for this particular spreadsheet that we're

1    looking at, they prepared a P and L for each year 2014 through

2    2021.

3    Q.  And how did you use this information in calculating Thom

4    Browne's cost of goods sold as a percentage of overall revenue?

5    A.  Well, as we see in a minute, as we compare this to the more

6    recent data files, you'll see this is very high level.  And so

7    for 2015 through 2018, this was the best available data that

8    Thom Browne had provided to adidas regarding its cost of goods

9    sold at the company level.

10          So I used this for 2015 through 2018 to determine COGS

11   as a percent of sales.  And if you look down on row 30, Thom

12   Browne's personnel had already done that calculation for us.

13          So for 2015 through 2018, in that row 30 you see some

14   percentages, and those were the percentages that Thom Browne's

15   finance and accounting report had said were the COGS as a

16   percent of sales for each of those years.

17   Q.  So what did you use for 2019 through 2022?

18   A.  For 2019 through 2021, Thom Browne finance and accounting

19   people produced what's called trial balances, which are much

20   more detailed versions of -- it's not really a P and L because

21   it has to do with their general ledger, where they record all

22   of their accounting transactions.  It does provide a lot more

23   detail regarding the revenues and COGS, through 2019 through

24   2021.  I relied on those files.

25          MR. FLEMMING:  Let's look at those.  Can we bring up

1    Exhibit 918, and I would offer this one as well.

2                THE COURT:  Any objection?

3                MR. CONLEY:  No objection.

4                THE COURT:  Received.

5                (Plaintiff's Exhibit 918 received in evidence)

6    BY MR. FLEMMING:

7    Q.  Let's zoom out a little bit.

8                Mr. Plumpe, what is this spreadsheet?

9    A.  Well, I don't believe this has --

10               Could you zoom in just a little bit?  Thank you.

11               I don't believe this has a year on it.  If my memory

12   serves me correctly, this is Thom Browne's trial balance for

13   2019 for the full year 2019 at the company level.  This is not

14   specific to the accused product.

15   Q.  How did you use this to calculate cost of goods sold for

16   2019?

17   A.  Well, if you look on row 48, it's called total COGS.  If

18   you scroll all the way to the right, you will see what the

19   total COGS were for the company in that year.  It's about

20   $15,485,000.  That was the total cost of goods sold for Thom

21   Browne in the U.S. for all products in 2019.

22               So to calculate COGS as a percent of net sales, I took

23   that COGS from row 48 and I divided it by the number in row 26,

24   which is total income, which is the synonym in this case for

25   the sales.

1          MR. FLEMMING:  Let's look at the next spreadsheet,

2     which is 919, and I offer that one as well.

3          MR. CONLEY:  No objection, your Honor.

4          THE COURT:  Received.

5          (Plaintiff's Exhibit 919 received in evidence)

6     Q.  Now this ones looks a little different.

7          Mr. Plumpe, what does this spreadsheet show us?

8     A.  Again, this does not have a year on it either.  If my

9     memory serves me correctly, this is the trial balance for Thom

10    Browne in the U.S. for the year 2020.

11    Q.  Briefly, how did you use this spreadsheet to calculate

12    costs of goods sold for 2020?

13    A.  Similarly to 2019, I went to total COGS for the company on

14    this spreadsheet, and I divided it by the total net sales for

15    the company.  Again, this is the company, this is not the

16    accused products, this is all products, and I determined the

17    percentage of COGS of net sales.

18         MR. FLEMMING:  And finally, let's look at Exhibit 920,

19    which I also offer.

20         MR. CONLEY:  No objection.

21         THE COURT:  Received.

22         (Plaintiff's Exhibit 920 received in evidence)

23    Q.  Mr. Plumpe, is this the trial balance spreadsheet for 2021?

24    A.  Yes, I believe so, if my memory serves me correctly.

25    Again, this file, this particular page does not have a year on

1    it.  I believe this was the trial balance for 2021.

2    Q.  You treated this one similarly in calculating cost of goods

3    sold for 2021?

4    A.  Correct.

5    Q.  Why did you use one spreadsheet for 2015 through 2018, and

6    then different types of spreadsheets for 2019, 2020, and 2021?

7    A.  Well, this was the best available data that was available

8    to me at the time I prepared my expert report.  For 2015

9    through 2018, as far as I'm aware, there were no trial balances

10   produced by Thom Browne to adidas.  But for 2019 through 2021,

11   they did produce that.  I was relying on the best available

12   data to me at the time I prepared my report.

13   Q.  Let's go back to the slide show, please.  You can go to the

14   next slide.

15          So to sort of wrap up our discussion of costs, after

16   you calculate the overall costs of goods sold as a percentage

17   of total sales for 2015 through 2022, what was the next step in

18   estimating costs for the accused products specifically?

19   A.  Well, once I had the total company COGS as a percent of net

20   sales for each year, it was a matter of applying that -- each

21   of those percentages from each year to the sales of Thom

22   Browne's accused products in each year.

23          So I had that for 2015 through 2021, I did not have

24   that for 2022.  Like I said, Thom Browne, to my knowledge, did

25   not produce cost data for 2022, but there were 11 months of

1    sales.  So I decided to conservatively assume that 2022's COGS

2    as a percent of sales was the same as 2021.  Rather than saying

3    there were no costs, I used 2021's COGS as a percent of sales,

4    and I applied that to the 2022 sales.

5            So I did that math for each year and I added it up,

6    and as a result, the total estimated cost of goods sold for the

7    accused products were $8,643,347.

8            MR. FLEMMING:  Nita, can we bring up the previous

9    exhibit, which was 920.

10   Q.  Mr. Plumpe, do you see that there are several entries

11   underneath cost of goods sold in this spreadsheet?

12   A.  So what we're looking at there, starting at row 11 going

13   down, those are the different subcategories within cost of

14   goods sold.

15           MR. FLEMMING:  Can we scroll down.  You can stop.

16   Q.  Then there are other categories other than costs, other

17   expense categories, and cost of goods sold, correct?

18   A.  Starting in row 37 going down, there is some other income

19   as well as some other expenses.

20   Q.  Why didn't you include these other category in your cost

21   calculations?

22           MR. CONLEY:  Objection, outside the scope.

23           THE COURT:  Overruled.

24           You may answer.

25   A.  Well, as I said towards the start of my testimony, I was

1     asked to consider those costs that the evidence indicated to me

2     at the time were directly attributable to the sales of the

3     accused products.  And based on the documents I had received

4     and the testimony of Thom Browne's witnesses that I had

5     reviewed at the time, the cost of goods sold were the only

6     costs that were clear to me were evidence that were expenses

7     that were directly attributable to the sales.  So that is what

8     I deducted.

9              MR. FLEMMING:  Let's go back to the slide show and

10    then we can go to the next slide.

11    Q.  So, Mr. Plumpe, we've calculated revenues and then you

12    estimated costs.

13             What's the next step in calculating the profits from

14    just sales of the accused products?

15    A.  So you take the sales or the revenues of the accused

16    products, you subtract the costs, and the result is profits.

17    So in this case, that's $7,011.961.

18    Q.  What is the purpose of a profits award in a trademark case?

19             MR. CONLEY:  Objection.

20             THE COURT:  Sustained.

21             MR. FLEMMING:  You can go to the next slide, Nita.

22    Q.  Mr. Plumpe, I would love to shift gears for a second and

23    ask you about the other type of monetary revenue that you're

24    here to talk about, which you say was reasonable royalty.

25             So first, can you just explain to the jury what a

1    royalty is?

2    A.   Sure.  A royalty is like a rent payment.  It's when one

3    party pays to another party an amount that allows the pair,

4    which is the licensee, to use the licensor's property.  So it's

5    similar to like a rent payment in an apartment.

6    Q.   So in this the context of a trademark case, what is a

7    reasonable royalty award?

8    A.   In a trademark case, a reasonable royalty award would be

9    one where a defendant, or you would think of it as a licensee,

10   would pay an amount to the plaintiff, or the trademark owner,

11   so that the defendant or the licensee can use the plaintiff's

12   trademark or can sell products that would therefore not

13   infringe the plaintiff's trademark in exchange for a payment, a

14   royalty payment.

15   Q.   Why did you call that damages earlier?

16   A.   Well, a reasonable royalty can be a proxy for the damage

17   that has been suffered by a plaintiff for any of the reasons

18   that they may have been harmed, such as loss of control of

19   their trademark.

20   Q.   Mr. Plumpe, did adidas and Thom Browne come to an agreement

21   on how to calculate a reasonable royalty in this case?

22   A.   In this case, my understanding is yes.

23   Q.   So let's go to the next slide.

24           How do you go about calculating a reasonable royalty

25   award in a trademark case?

1  A.  Reasonable royalty award this a trademark case is fairly

2  straightforward.  You multiply the royalty rate, which is that

3  payment, that rent payment for use of the trademark, sometimes

4  the sales of the products that are accused of infringement.  So

5  here would be the royalty rate times the sales of Thom Browne's

6  accused products.

7  Q.  Did the parties agree on just one royalty rate in this

8  case?

9  A.  No, they agreed on two different royalty rates because of

10  those different sales channels that I talked to you about

11  earlier.

12  Q.  Let's go to the next slide.

13          So can you explain what we're looking at here, what

14  those two royalty rates apply to.

15  A.  Yes.  These are the two royalty rates that I understand the

16  parties have agreed to in this case that's a reasonable royalty

17  rate for Thom Browne to pay adidas so its products will not

18  infringe would be eight percent of the wholesale sales, but

19  3.1 percent of the retail and e-commerce sales.

20          I'll explain why that is.  So the wholesale sales,

21  those are those business-to-business-sales when Thom Browne

22  sells to Nordstrom.  So Thom Browne, when it sells to

23  Nordstrom, it sells the products at lower prices than when it

24  sells those products at a retailer e-commerce level.

25  Nordstrom, of course, has to mark up those products to sell

1  | them at the retail level --

2  |            MR. CONLEY:  Objection, your Honor.

3  |            THE COURT:  Ground?

4  |            MR. CONLEY:  The witness testified that the royalty

5  | rates are already agreed upon by the parties.

6  |            THE COURT:  Well, I'll leave it to plaintiff's counsel

7  | whether he wants to inquire further on this since he has one

8  | minute left of his direct examination or whether he would

9  | rather go to something else.

10 |            MR. FLEMMING:  Yes, your Honor.

11 | Q.  Let's just go to the next slide so we can talk about, can

12 | you briefly tell the jury how you applied the eight percent

13 | royalty rate on wholesale sales?

14 | A.  Yes.  The eight percent wholesale sale times Thom Browne's

15 | wholesale sales, as you see here, results in reasonable royalty

16 | award on the wholesales sales of $623,528.

17 | Q.  We can go to the next slide.  I think the jury can follow

18 | the math for this one as well, let's just go to the next slide.

19 |            Slide 19, give us a summary of your calculations or a

20 | reasonable royalty award in this case?

21 | A.  So the reasonable royalty total award -- and these are

22 | rounded numbers, as you see there for the time period shown --

23 | would be $867,225.

24 | Q.  And then let's go to the next slide.

25 |            Mr. Plumpe, can you just please summarize your two

N19sADI1                    Plumpe - Cross

1   calculations in this case?

2   A.   Yes.   Thom Browne's profits from the accused products after

3   deducting cost of goods sold is $7,011,961.  And adidas'

4   reasonable royalty damages are $867,225.

5           MR. FLEMMING:  Pass the witness, your Honor.

6           THE COURT:  Cross-examination.

7   CROSS-EXAMINATION

8   BY MR. CONLEY:

9   Q.   Mr. Plumpe, in your direct testimony you stated that you

10  assumed liability, correct?

11  A.   Yes.

12  Q.   So you're not offering any opinions with respect to

13  trademark infringement, right?

14  A.   Correct, I'm not here to offer any liability.

15  Q.   Same with trademark dilution?

16  A.   No liability opinions, correct.

17  Q.   OK.  Now, in addition to assuming liability, you also

18  assumed that there would be harm to adidas, correct?

19  A.   Yes.

20  Q.   In fact, you testified that as to the reasonable royalty,

21  you considered that to be a proxy for damages, correct?

22  A.   Yes, that's my understanding.

23  Q.   So you didn't actually form any opinions as to any actual

24  damages suffered by adidas in this case, correct?

25  A.   Well, the amount of actual damages I have.

1    Q.  Sir, you didn't offer any opinions as to whether adidas has

2    suffered any actual harm in this case, correct?

3    A.  OK.  No, I understand.

4            THE COURT:  Just so the ladies and gentlemen of the

5    jury understand this so we can move along, so this is what is

6    called a damages expert.  He assumes that the plaintiff

7    prevails on infringement and dilution and harm, and then says

8    if those assumptions are true, then the damages are X or Y.  So

9    we all know that.

10           Let's move on.

11           MR. CONLEY:  Thank you.

12   BY MR. CONLEY:

13   Q.  Sir, you testified on direct that you have experienced

14   valuing trademarks?

15   A.  Yes.

16   Q.  You didn't value any of adidas' trademarks in this case,

17   did you?

18   A.  That was outside the scope of what I was asked to do.

19           MR. CONLEY:  No further questions.

20           THE COURT:  Anything else?

21           MR. FLEMMING:  No, your Honor.  Thank you.

22           THE COURT:  Thank you very much.  You may step down.

23           THE WITNESS:  Thank you, your Honor.

24           (Witness excused)

25           THE COURT:  The defense will call their first witness.

1            MR. LEWIN:  Your Honor, we call Thom Browne.

2            THE COURT:  OK.

3            THE DEPUTY CLERK:  Please raise your right hand.

4       THOM BROWNE,

5            called as a witness by the Defendant,

6            having been duly sworn, testified as follows:

7            MR. LEWIN:  Your Honor, before starting I would like

8       to read a list of exhibits that have been...

9            THE COURT:  Go ahead.

10           MR. LEWIN:  Thank you.  We have DTX.  All of them will

11      be DTX unless I specify otherwise.

12           0082, 0089, 0091, 0093, 0102, 0103, if I may, 0104,

13      0105, 0106, 0107, 0108, 0109, 0110, 0112, 0113, 0114, 0115,

14      0127, and then DTX 39, 145, 146, 155, 185, 186, 187, 319, 354,

15      382, 427, 449, 450, 451, 452, 453, 454, 479, 483, 551, 586,

16      793, 873, and for brevity, the following numbers exhibit with

17      08, 0874, 0875, 0876, 0877, 0878, 0879, 0880, 0881, 0882, 0883,

18      0884, 0885, 0886, 0887, 0888, 0889, and then 0890, 0891, 0892,

19      0893, 0894, 0895, and 0896.

20           THE COURT:  Sure that's all?

21           MR. LEWIN:  Your Honor, if you want me to

22      double-check.

23           THE COURT:  Received.

24           (Defendant's Exhibits 0082, 0089, 0091, 0093, 0102,

25      0103, if I may, 0104, 0105, 0106, 0107, 0108, 0109, 0110, 0112,

1  0113, 0114, 0115, 0127, 39, 145, 146, 155, 185, 186, 187, 319,

2  354, 382, 427, 449, 450, 451, 452, 453, 454, 479, 483, 551,

3  586, 793, 873 0874, 0875, 0876, 0877, 0878, 0879, 0880, 0881,

4  0882, 0883, 0884, 0885, 0886, 0887, 0888, 0889, 0890, 0891,

5  0892, 0893, 0894, 0895, 0896 received in evidence)

6          Go ahead, counsel.

7          MR. LEWIN:  Thank you, your Honor.

8          THE DEPUTY CLERK:  Please state your name for the

9  record and spell it.

10          THE WITNESS:  My name is Thom Browne, T-h-o-m

11  B-r-o-w-n-e.

12          THE DEPUTY CLERK:  Thank you.

13          MR. LEWIN:  By the way, I move those in.

14  DIRECT EXAMINATION

15  BY MR. LEWIN:

16  Q.  Good morning, Mr. Browne.

17  A.  Good morning.

18  Q.  Can you introduce yourself to the jury, please?

19  A.  Good morning.  Good morning, your Honor.

20          My name is Thom Browne.  I am the chief creative

21  officer/creative director of Thom Browne.

22  Q.  Do you have some understanding what this current case is

23  about?

24  A.  I have a lot of knowledge in what this case is about, yes.

25  Q.  Can briefly describe it?

1  A.  Well, it has to do with back in 2006, adidas approached me

2  and demanded that I change my three stripes to not use of three

3  stripes, and so I agreed and changed to four bars.  And for the

4  last 15 years, I have been using those as my mark, and have not

5  heard since over the years from adidas.  And they are now

6  insisting that my use of the four bars is a problem, and that

7  is why I'm here.

8  Q.  Thank you.

9          In 2007, how many employees did Thom Browne, Inc.,

10  have?

11  A.  2007, I had less -- around ten employees.

12  Q.  And how many in the management position?

13  A.  I had one CEO and one CFO.

14  Q.  And at that time were you working exclusively with Thom

15  Browne, Inc.?

16  A.  I was.  This is my business, so yes, I was working for Thom

17  Browne, Inc., but also, too, I was doing a collection for

18  Brooks Brothers in order to fund my business.  And all of the

19  money that I made from Brooks Brothers for that collection went

20  into the business.

21  Q.  You testified that in 2007 you became aware that adidas had

22  objected to your use of bars or stripes on your clothing,

23  correct?

24  A.  Yes, yes.

25  Q.  How did you learn that?

1          MR. HENN:  Hearsay.

2          THE COURT:  I think that was waived by the failure to

3    object to the open-ended and highly objectionable original

4    question put by defense counsel.

5          Overruled.

6    A.  I learned through my CEO, from my CEO Tom Becker.

7    Q.  Mr. Becker is still associated with Thom Browne, Inc.?

8    A.  No.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. LEWIN:

2    Q.  In 2007, where was Thom Browne, Inc., located?

3    A.  In 2007, the store was down in Tribeca, and the offices

4    were on Eleventh Avenue between 24th and 25th, 210 Eleventh

5    Avenue.

6    Q.  Do you recall what was being sold at the store in Tribeca?

7    A.  At the store was a developing collection of tailored

8    clothing, tailored sportswear, accessories, knitwear and

9    footwear.

10   Q.  Do you recall Mr. Becker -- withdrawn.  Did Mr. Becker

11   communicate to you the substance of his phone call with adidas?

12   A.  Yes.  Yes, he did.  Yes.

13   Q.  What was your understanding of that?

14   A.  Well, the phone call came in, and adidas demanded that they

15   had a problem with my using the three stripes, and that was

16   what Tom Becker relayed to me.

17   Q.  And what steps did you take to address this issue?

18   A.  Well, initially it was frustrating because my -- my

19   inspiration was from a varsity reference but I, of course, did

20   not want to fight adidas.  I was a small company, and the last

21   thing I wanted to do was get into a fight with a big company

22   like adidas, so I thought of solutions that I could do in order

23   to replace the three stripes, and because that inspiration was

24   very important to me.

25   Q.  What steps did you take to determine what you would replace

1   the three stripes with?

2   A.   Well, I sat down with my design team, and really thought of

3   all the different incarnations of how I could replace the three

4   stripes.  We sat down and mocked up different numbers of

5   stripes as opposed to the three:  One stripe, two stripes, five

6   stripes, four stripes, and we ended up at the 4-Bars looked the

7   best and it stayed true to that initial inspiration

8   Q.   Why not no stripes?

9   A.   I knew that I needed some -- like an external signifier for

10  people to relate my collection to, and so I never really

11  thought of -- I needed something that people could see

12  externally.

13  Q.   How long did it take you to determine that you would use

14  four stripes?

15  A.   I mean, it took us awhile because we had to really think

16  about it, and it was something that I wanted to be able to use

17  long term, and so it took awhile, and it just took a lot of

18  commitment to staying true to that initial varsity reference,

19  and the 4-Bars on the left-hand sleeve felt like it worked.

20  Q.   In determining to use 4-Bars, did you use any reference

21  other than yourself?

22  A.   The reference for the 4-Bars was really, it was my decision

23  and my decision to work with my design team in regards to

24  staying true to that sports and varsity reference, and that's

25  where we ended up with 4-Bars.

1  Q.  Sir, you were here when Mr. Henn gave his opening

2  statement, were you not?

3  A.  Yes.

4  Q.  Do you recall Mr. Henn suggesting that you were possibly

5  aware of other lawsuits that adidas had filed concerning its

6  trademarks?

7  A.  I heard him say that, yeah.

8  Q.  Other than this current trademark dispute, were you aware

9  in 2007 of any other litigation conducted by adidas?

10 A.  No.

11 Q.  After you made a determination that change from three bars

12 to four, did you speak to anyone at adidas?

13 A.  Personally, no.

14 Q.  Did you have some understanding that anyone under your

15 direction had communicated to adidas?

16 A.  Yes, I was under the assumption that Tom Becker spoke with

17 adidas.

18 Q.  After determining to make the change itself, what steps did

19 the company take?

20 A.  After making the change, I was committed to using that as

21 the new mark, and I started developing the collection, and I

22 started using it as a part of the collection going forward.

23 Q.  Did you change the collection in order to use the 4-Bars

24 rather than three?

25 A.  No, the collection stayed true to what it was at the

1    beginning, and at the beginning it was taking the idea of

2    tailored clothing and the idea of tailored sportswear and

3    really making it almost one idea.

4    Q.  After you made the change between the years 2007 and 2018,

5    did you ever hear from anyone at adidas?

6    A.  No.

7    Q.  Can we look at DTX-451, please, and publish this.

8            MR. HENN:  I don't believe that was on the list you

9    read off.

10           MR. LEWIN:  I'll check.  Your Honor, we have it on

11   ours as no objection, but we can do some background for it.

12           MR. HENN:  I don't have an objection.  It just wasn't

13   in evidence.

14           THE COURT:  If it wasn't previously received, it's

15   received.

16           MR. LEWIN:  Thank you.

17           (Defendant's Exhibit 451 received in evidence)

18   Q.  Can you identify this document, sir?

19   A.  Yes.  These are sketches for samples to be made for the --

20   on the left the autumn/winter '07-'08 ladies collection, and on

21   the right the spring/summer '09 collection.

22   Q.  How much bars are on the sketches on the left?

23   A.  On the left, there are 4-Bars on the left-hand sleeve.

24   Q.  I think it's reversed.  How many bars are on the '07/'08

25   ladies wear?

1    A.   There's three bars.

2    Q.   Over on the spring/summer '09, can we just take one of the

3    styles and bring that up?  Yes.

4              How many bars are on this?

5    A.   This is after I changed; it has 4-Bars.

6    Q.   Do you know whether the company actually produced these

7    garments?

8    A.   These samples we did release, yes.

9    Q.   Were these samples sold to the public?

10   A.   These samples were offered for sale, yes.

11   Q.   We can take that down.  Thank you.

12             Sir, how long have you held the role of chief creative

13   director of Thom Browne?

14   A.   Ever since I created the collection in -- I started

15   developing the collection 2001 and officially started the

16   collection 2003.

17   Q.   For the avoidance of doubt, did you design the suit you're

18   wearing today?

19   A.   Yes.  I only wear my own clothes.

20   Q.   Can you tell the jury a little bit about your background?

21   A.   Sure.  I was born in Allentown, Pennsylvania in 1965 to two

22   attorneys, actually.  And I --

23             THE COURT:  You have my condolences.

24   Q.   It gets worse, your Honor.

25   A.   Yeah, it gets worse.  There were seven of us.  I was the

middle child, and I went to public school.  We all went to

public school, and we all were -- my parents were very serious

about school and sports, and I think they put us in sports in

order to have someplace to put us and not have to worry about

us.

         I swam and played tennis growing up.  We were very

serious about our sports, and I swam and played tennis through

high school, and then I graduated and went to the University of

Notre Dame.  I swam at school, and I entered school as a

Japanese studies major, but because of my swimming, I couldn't

go to Japan for my sophomore year, so I had to change and then

entered into the business school at Notre Dame.  I swam all

four years, and I graduated and after -- well, before

graduating, my parents asked me what I was going to do, and

they were advising me to go to law school, and I told them that

was the last thing I would ever want to do.

         So I graduated, really not really knowing what I

wanted to do, but I did graduate and had a job at a consulting

firm here in New York, which was good because at least it got

me here to New York because the one thing my parents paid

everything through college, but after college we were all on

our own.  So I was here.  I had a job at a consulting firm and

had no idea what I was doing, didn't like what I was doing, so

nine months later I quit.

         My father asked me what I was going to do, and I said

1    I have no idea what I'm going to do, but I was going to let

2    life lead me to whatever was in store for me.  The next you

3    know, six, seven years I spent some time doing everything here

4    in New York.  I was a receptionist at some places.  I hung up

5    on people, so I got fired.  I did a lot of production,

6    production work on films and commercials.

7              And then I moved to LA because I needed just a change

8    of scenery from New York.  I went there initially for two weeks

9    and lasted, actually, five years later I was still out in LA.

10   It was very seductive.  Out in LA too I did a lot of the same

11   type of things, a lot of small jobs, but really trying to still

12   figure out what I wanted to do.  My best friend from LA started

13   his own collection in the mid Nineties, taking vintage clothing

14   and retailoring them for his collection, and that was pretty

15   much the entree into what was an interest that I thought was

16   something that I could actually think about for myself.

17   Unfortunately, I was broke in LA, and I thought if I was going

18   to figure out and really start being serious about my life, I

19   needed to get back to New York.

20             I sold my car.  I moved back to New York, and a good

21   friend of mine was at Giorgio Armani, and he very graciously

22   and very generously gave me a job in the showroom.  And that

23   was my first job in fashion.  My first job was at Giorgio

24   Armani in the wholesale department at -- with the Giorgio

25   Armani Collection here in New York.  And it was probably one of

1   the best initial jobs because you, of course --

2              MR. HENN:  Your Honor, objection.  I'm patient, but I

3   feel like we're in a narrative now.

4              THE COURT:  I think we need to exercise a certain

5   amount of concision here, so -- how long were you at Armani?

6              THE WITNESS:  I was at Armani two years.

7              THE COURT:  Why did you leave?

8              THE WITNESS:  During my time at Giorgio Armani, I

9   actually through a mutual friend met Ralph Lauren, and Ralph

10  Lauren at that time just purchased Club Monaco, and he was

11  locking for a creative director for men's and women's, and he

12  offered me the job, and it was interesting to me because it got

13  me into more of the design side of the fashion business.  So

14  that was my entree into actual design.

15             MR. LEWIN:  Your Honor, I would like to show the

16  witness -- withdrawn.  I'm sorry.

17  Q.  You indicated at Notre Dame you swam and played football.

18  Is that correct?

19  A.  I swam.

20  Q.  You swam?

21  A.  I don't think I would make it on a team.

22  Q.  Certainly not these days.  Do you still swim?

23  A.  I swim some, but I run more than I swim now.

24  Q.  When you're running, what do you wear?

25             THE COURT:  Hold it.  I recall that Notre Dame

1    football is not like it what once was, so...

2    Q.  Sir, when you're running, what do you wear?

3    A.  Running shorts, run running clothes and running shoes.

4    Q.  I'm sorry?

5    A.  And running shoes.

6    Q.  Anything else?

7    A.  Sometimes I wear my cardigans, sometimes I wear my knits,

8    but, you know, I wear things to run in.

9            MR. LEWIN:  Your Honor, we'd like to show the witness

10   DTX-799.  This has been objected to by counsel.  It's a video.

11   So if we could just publish the first little bit for the judge

12   and counsel.

13           MR. HENN:  Because it's a video, it might be easier to

14   handle the objection at sidebar, your Honor.

15           MR. LEWIN:  That's enough.  It doesn't change

16   substance from there, your Honor.

17           THE COURT:  Ground of objection?

18           MR. HENN:  Hearsay.  In this part here he is offering

19   unsworn out-of-court statements.

20           THE COURT:  Sustained.

21   BY MR. LEWIN:

22   Q.  Sir, you indicated a moment ago that you sometimes wore

23   your own clothes for running, correct?

24   A.  Yes.

25   Q.  And were those clothes that you were wearing in 2007 for

1   running on sale in your shops?

2   A.   Yes.

3   Q.   Were they on sale anywhere else other than your shop?

4   A.   Yeah, in 2007 I was selling my collection in my own shop,

5   also at Bergdorfs and Colette in Paris were the first stores

6   that were carrying my collection, and at that point there were

7   other stores around the world that were also carrying the

8   collection.

9   Q.   In addition to the suits of the sort you're wearing, when

10  you created your collection, what other products were involved?

11  A.   At that time in 2007, it was a full collection of designer

12  sportswear and tailored clothing for both men and women.

13  Q.   You just used the term sportswear.  What does that mean to

14  you?

15  A.   Sportswear is items of clothing that are, you know, less

16  tailored and easier to wear than a, you know, a strict tailored

17  jacket.  But in my opinion I -- and this is what is important

18  for people to see in my collection is that I don't --

19            MR. HENN:  Objection.  Opinion.

20            THE COURT:  Yes, sustained.

21            He answered the question.  You asked him what

22  sportswear was, he told you.

23            MR. LEWIN:  I'm sorry, your Honor.  It's hard for me

24  to hear when counsel was speaking.

25            What was the objection just so I'm clear?

1          MR. HENN:  Opinion.

2          MR. LEWIN:  Thank you.

3     BY MR. LEWIN:

4     Q.  What is a collection?

5     A.  A collection is a group of looks and pieces of clothing

6     that create one idea.

7     Q.  And when you started your company, where did you start the

8     company physically?

9     A.  I started my company in my apartment.  I didn't want to get

10    external funding, and so I self-funded my collection by

11    starting in the apartment and working with a tailor here in New

12    York and learning a lot about -- and everything about making

13    handmade clothing; and out of my apartment I had private

14    clients that came and I offered to make them clothing.

15    Q.  You said that you moved to a store in Tribeca.  When did

16    that occur?

17    A.  Well, initially I moved out of my apartment to my location

18    in the meat packing area, which was still the made-to-measure

19    business and then the collection developed in a way that I

20    could have more off-the-rack items for people to buy in the

21    store, so I moved down to Tribeca at that point.

22    Q.  You mentioned earlier also that you sold clothes initially

23    to Bergdorf Goodman, correct?

24    A.  Yeah, my first accounts in the first stores I sold to were

25    Bergdorf Goodman and Colette in Paris.

1  Q.  Do you still sell to Bergdorf Goodman?

2  A.  Yes.

3  Q.  When you started designing your own collection, did you

4  have a goal in mind?

5  A.  Yeah, initially I wanted to -- the last thing the world

6  needed was another designer, so I wanted to do something that

7  meant something to people, and I wanted to create a collection

8  that had a true American sensibility but melded the idea of

9  handmade tailoring and handmade clothing of the best quality

10 with a more sportswear, more American, you know, somewhat

11 Fifties aesthetic.  So it was the melding of the sportswear and

12 the tailoring that I really wanted people to see, and the

13 proportion was really very important to me.

14 Q.  Have you received any recognition from your industry for

15 the work being done in fashion?

16 A.  Over the years, I have.  I am very proud of what I've been

17 able to do, and I love being in the fashion business.  I've won

18 the CFDA menswear designer of the year award three times.  I've

19 won the GQ men's designer of the year two times:  Here in the

20 U.S., once in Germany.  I've won the Couture Council FIT award

21 from FIT once, I think in 2012.  The Cooper Hewitt National

22 Design award from the White House in 2011 or '12.  So over the

23 years, I've been lucky in winning awards.

24 Q.  You mentioned the CFDA.  What is that?

25 A.  CFDA is Council for Fashion Designers of the America.

1    Q.  Do you play any role in CFDA today?

2    A.  I've been a proud member since 2006, and most recently I

3    took over from Tom Ford as the chairman earlier this year.

4    Q.  What is the role of the chairman of the CFDA?

5    A.  My role as chairman is to really promote the importance of

6    American fashion and the amazing diversity that we have here in

7    the fashion world and to promote it around the world, American

8    fashion around the world.

9    Q.  After you received these awards, what happened?

10              MR. HENN:  Objection.

11              THE COURT:  Too vague.

12   Q.  Sir, do you give interviews in the ordinary course of

13   business?

14   A.  I give a lot of interviews, yeah.

15   Q.  Did you give interviews after receiving these awards?

16   A.  I have given a lot of interviews over the years, yes.

17   Q.  Now, you mentioned integrating some sports or what I think

18   you called sporting sensibility in your garments, correct?

19   A.  Yes.

20   Q.  What do you mean by sporting sensibility?

21   A.  Well, sports are so important to me, and they're very

22   authentic to who I am, so it's important that there is a

23   sporting sensibility, a, you know, a more easy interpretation

24   of sometimes what the tailored ideas that I do.  And it is the

25   melding of those two ideas that I think is what is unique in my

1    collection.

2              MR. LEWIN:  Your Honor, we'd like to show the witness

3    DTX-139.  I think there's an objection on the part of counsel

4    to this.

5              MR. HENN:  No, there was not an objection to the

6    exhibit.

7              MR. LEWIN:  Thank you.

8              THE COURT:  Received.

9              (Defendant's Exhibit 139 received in evidence)

10   Q.  Sir, you can publish this then.  Thank you.

11             Do you recognize the first page of this document?

12   A.  Yes.

13   Q.  Can you describe to the jury briefly what it is?

14   A.  This is the collection for fall/winter 2009, which is good

15   to see because this is what I'm saying when I mix the ideas of

16   a more sportswear sensibility into a tailored collection.  And

17   you'll see that in the 4-Bars on the varsity-inspired sweater

18   at the bottom -- on the bottom row, and -- yeah.

19   Q.  In addition, can you place this document in time for us?

20   A.  This was fall/winter of 2009, so this was shown in the

21   probably January of 2009.

22   Q.  Can I see page 2, please.  Can I highlight the second from

23   the right in the first row?  Do you recognize this garment,

24   sir?

25   A.  Yes.

1    Q.  Can you describe it for the jury?

2    A.  Well, this encapsulates really what I think my collection

3    represents, which is that sporting varsity-inspired sensibility

4    in a tailored garment, and you see that in the 4-Bars on the

5    left-hand sleeve of the jacket which gives a very seriously

6    handmade tailored view I think more varsity sporting

7    sensibility.

8    Q.  Can we go to page 1, please, and the photo on the bottom.

9    Yep.  Thank you.

10         Do you recognize this photograph, sir?

11   A.  Yeah.  This is another look from the collection, and it

12   shows, you know, how the collection has developed in regards

13   not to just tailored pieces, but a more sportswear-inspired

14   Irish knit with the 4-Bars on the left-hand sleeve.

15   Q.  Can we go to demonstrative Exhibit DDX.3.

16         Sir, have you seen this document before today?

17   A.  Yes.

18   Q.  What is it?

19   A.  One, it's a lot of work, but it is collections over the

20   years in regards to usage of the 4-Bars on more conceptual

21   pieces and also to, you know, the more sportswear, you know,

22   luxury sportswear pieces.

23   Q.  Looking at this document, are there any of your trademarks

24   on these garments?

25   A.  Yeah.

1   Q.  Let's look at fall 2009 on the first page right at the top.

2   That's the same one we just looked at, correct?

3   A.  Yes.  On this you see -- on this Irish knit, you see the

4   4-Bars on the left-hand sleeve, but you also see the 4-Bars on

5   the stole.

6   Q.  Can we look at fall 2013 lower right?  What do we see here,

7   sir?

8   A.  This is another example of the 4-Bars on a more conceptual

9   piece, and this is a more conceptual show, which was a very

10  important part of what I -- was how I showed my collection.

11              MR. LEWIN:  Your Honor, we have a demonstrative rack

12  of clothes.

13              THE COURT:  Yes, all right.  So I have considered the

14  various arguments of counsel.  I will allow you to show the

15  rack in its current form.

16              MR. LEWIN:  Thank you.  Can we bring the rack in,

17  please.

18  Q.  We just wheeled into the courtroom a rack of clothing.  Do

19  you recognize this clothing, sir?

20  A.  Yes, I do.

21  Q.  Do you know who selected the clothing that's on the rack?

22  A.  We did, yes.

23              MR. LEWIN:  Can we walk these up to the witness, your

24  Honor?

25              THE COURT:  All right.

1    Q.  Before discussing those, sir, I would like to ask you

2    whether or not generally you can describe what is on the rack?

3    A.  The goods on the rack show a good, I guess, representation

4    of my collection in regards to the more uniform pieces that we

5    have in the collection, and the idea of a classic American

6    sensibility in regards to the usage of the 4-Bars on the pieces

7    of clothing.

8    Q.  We just handed up to you for your personal examination two

9    garments, correct?  Can you describe it?  And as you describe

10   it, if you would hold it up, sir.

11   A.  Yes.  This is one of the waffle hoodies that I have in the

12   collection.  What you see is the usage of the 4-Bar on the

13   left-hand sleeve, and then you also see the red, white and

14   blue -- white, red, white and blue and white tab on the back

15   neck, which for me was a locker loop on the back of a clothing.

16   When you were a kid, you had a locker loop to hang your

17   clothing on a locker loop.  But also too the initial

18   inspiration is from the swimming medals that I won growing up.

19   So that is where the ribbon came into play.

20   Q.  Sir, what's the, if you know, suggested retail price for

21   that garment?

22   A.  I'm not a hundred percent sure.  It's around $1,200.

23   Q.  You can put that down for the moment if you don't mind.

24       If you would show the other garment in your hand.

25   A.  This is the bottom, the sweat bottom, the cotton Piqué

1    sweat bottom.  That would have been like shown with the hoodie.

2    And this also has the 4-Bars on the left-hand leg, and the

3    white, red, white, blue and white tab on the back, which is

4    also the signifier of my collection.

5    Q.  Can you tell us what the retail price of that would be,

6    manufactured suggested price?

7    A.  Those are around a thousand dollars, $1,200.

8    Q.  I'm sorry?

9    A.  Around a thousand dollars.

10   Q.  So the combined two together would be at least several

11   thousand?

12   A.  Yes.

13   Q.  And, sir, do these garments contain the characteristics of

14   your collection?

15   A.  Yeah.  These are (1) not only the quality of construction

16   and the quality of fabric, but it's also the 4-Bars on the

17   left-hand leg of the sweat trouser and also the white, red,

18   white, and blue and white tab on the back of the trouser.

19   Q.  Thank you, sir.

20          MR. LEWIN:  I would like to show just a couple of

21   other garments, your Honor, if I may?

22          THE COURT:  Yes, although find a spot around five or

23   ten minutes from now to break.

24          MR. LEWIN:  That's all it will take.

25          THE COURT:  Okay.

1    Q.  You can collect the other two while you're up there.  Thank

2    you.

3            Sir, do you recognize this garment?

4    A.  Yes.

5    Q.  Can you describe it for the jury, please?

6    A.  This is one of my sports coat.  It's a navy sports coat

7    with a tonal 4-Bar on the left-hand sleeve.  It's a

8    hand-tailored navy wool jacket with a white Oxford shirt and

9    navy cashmere tie, and this is what I think of as

10   quintessential melding between tailoring and sportswear; it's

11   luxury sportswear.

12   Q.  You said tonal.  What does that mean?

13   A.  Tonal means it's similar and not as contrasting a color of

14   the use of the 4-Bars.

15   Q.  Sir, with respect to that blazer or dress jacket, do you

16   know what the retail price of that would be?

17   A.  This jacket would be around $2,400.

18           THE COURT:  Of course, now you'll have to sell it,

19   it's used, but...

20   Q.  If you would like to take that garment back.

21           MR. LEWIN:  I will show him one more, your Honor, and

22   then I'm done.

23   Q.  Have you seen this garment before today, sir?

24   A.  Yes.

25   Q.  Can you describe it for the jury?

1    A.  This is a camel double-faced cashmere sweat top with the

2    4-Bars on the left-hand sleeve, the mark, the 4-Bars logo and

3    then also the white, red, white, blue and white tab on the

4    back.

5    Q.  What is the suggested retail price of this?

6    A.  This is around $2,500.

7    Q.  You characterize that as a sweatshirt?

8    A.  Cashmere sweatshirt, yes.

9    Q.  Where is that made?

10   A.  This is made in Italy.

11   Q.  In?

12   A.  In Italy.

13   Q.  Is it sold in the United States?

14   A.  Yes.

15   Q.  Are all the garments that you've just examined and that are

16   otherwise on that rack sold in the United States?

17   A.  Yes.

18   Q.  Thank you.

19          THE COURT:  Counsel, is this a good place?

20          MR. LEWIN:  It is perfect, your Honor.

21          THE COURT:  Ladies and gentlemen, we'll give you your

22   mid-morning break and resume in 15 minutes.

23          (Continued on next page)

24

25

1          (Jury not present)

2          THE COURT:  I would just add to my ruling with respect

3    to the rack, that I also think to some extent the door was

4    owned to this by adidas's showing things like their

5    interactions with Gucci and the like, the very broad scope of

6    their mark use, and also there was the issue of whether Thom

7    Browne had changed its collection and was infringing more on

8    Gucci than previously, and I think this is relevant to that as

9    well.

10         We'll see you all in 15 minutes.

11         (Recess)

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2               THE COURT:  All right, counsel.

3               MR. LEWIN:  Thank you, sir.

4     BY MR. LEWIN:

5     Q.  You mentioned earlier the Grosgrain ribbon or Grosgrain

6     signature.  Do you recall testifying to that?

7     A.  Yes.

8     Q.  When did you start using the Grosgrain ribbon?

9     A.  I started using the white, red, white and blue and white

10    Grosgrain the same time as the 4-Bars; actually, at the same

11    time as the three bars, three bars initially.

12    Q.  When was that?

13    A.  2003, 2004.

14    Q.  Why did you start using those ribbons as indicators?

15    A.  The one thing I learned from Ralph Lauren was to have an

16    indicator that showed externally what your -- that it was your

17    collection, and that's one of the biggest things I learned from

18    him.  That was the reason why I adopted the 4-Bars on the

19    left-hand sleeve and the white, red, white and blue and white

20    Grosgrain ribbon.

21    Q.  Do you continue using that ribbon today?

22    A.  Yes.

23    Q.  If you could, could you estimate the percentage of your

24    overall collection that carries the Grosgrain ribbon?

25    A.  The Grosgrain ribbon a hundred percent.

1    Q.   What locations do you consider your trademark?

2    A.   The trademark is mostly the locker loop on the back, but

3    also too in the ways of reinforcing the buttonholes and the

4    front plackets of specific items.

5    Q.   Do you consider the vertical stripe on the side of pants

6    that were shown earlier to be your use of a trademark?

7    A.   No.

8    Q.   What do you consider that?

9    A.   That's a design, you know, choice.

10   Q.   **Do you use the Grosgrain ribbon in your runway shows?**

11   A.   Yes.

12   Q.   Sir, you talked about the 4-Bars in showing the jury some

13   of those clothes.  When did you adopt the 4-Bar -- the

14   three-bar signature?  Pardon me.

15   A.   The three bars I adopted with my initial cardigan sweater

16   in the rack in my apartment.

17   Q.   And you adopted the 4-Bar in response to the adidas --

18   A.   Yeah.

19   Q.   Do you use the 4-Bar in any special fashion?

20   A.   I use it in a way that is in a bolder way so you actually

21   can see it.  So if I'm going to use it as an indicator, it is

22   important that people see it.  And I use it actually, you know,

23   primarily just on the left-hand sleeve and the left-side

24   trouser.

25   Q.   Can I have DTX-879?

1            MR. LEWIN:  Your Honor, this has been admitted.  May I

2      approach?

3            THE COURT:  Yes.

4      Q.  Sir, looking at 879, do you recognize this garment?

5      A.  Yes.

6      Q.  Can you tell the jury what it is?

7      A.  This is a cotton sweat hoodie with the signature white,

8      red, white, blue and white detail on the back tab.  And then

9      just the design choice of the white, red, white, blue and white

10     signature down the sleeve.

11     Q.  And what's the retail price on that garment?

12     A.  It's I would say around $1,200.

13     Q.  Can I show the witness 886, please?

14           MR. LEWIN:  Your Honor, may I approach again?

15           THE COURT:  Yes.

16           MR. LEWIN:  Thank you.

17     Q.  I want to show you, sir, what has been marked as

18     Defendant's Exhibit 886 and ask you if you recognize that

19     garment?

20     A.  Yes.

21     Q.  And can you describe the garment for the jury, please?

22     A.  It is a cotton sweatpant with the signature white, red,

23     white, blue and white on the back, and just the choice of the

24     five, the white, red, white, blue and white stripe down the

25     leg.

1  Q.  Sir, is there anything special about the way that stripe is

2  integrated into the garment?

3  A.  Well, it is intarsia-ed into the garment.  It means it's

4  sewn into the side of the trouser as opposed to just appliquéd

5  onto the trouser, which speaks to the quality of the sweat

6  trouser.

7  Q.  Do you happen to know what the suggested retail price of

8  that is?

9  A.  That's approximately a thousand to $1,200.

10  Q.  Combined jacket and pants that you're looking at then would

11  more or less be about $2,000, correct?

12  A.  Yes.

13  Q.  Earlier you testified that you switched from three to

14  4-Bars because of the adidas call, correct?

15  A.  Yes.

16  Q.  Can I have DTX-185, please, up on the screen.

17          MR. LEWIN:  This is admitted, your Honor.

18          THE COURT:  Okay.

19  Q.  And I want to ask you if you've seen that before?

20  A.  Yes.

21  Q.  Can you tell the jury what you're looking at?

22  A.  That is one of my cashmere cardigans prior to my changing

23  to the 4-Bars on the left-hand sleeve, and it shows the white,

24  red, white and blue and white Grosgrain detailing in the

25  placket and in the sleeve placket and then the three stripes,

1    three bars on the left-hand sleeve.

2    Q.  This is an example of one of your sweaters that used the

3    three bars before you switched over, right?

4    A.  Yes.

5    Q.  Okay.  Now, you mentioned also earlier that you were

6    involved in sports in Notre Dame, correct?

7    A.  Yes.

8    Q.  And as a result of that, you made some effort to

9    incorporate sporting influence into your goods?

10   A.  Every collection.  And I feel every garment that I design

11   has some sort of sporting reference or influence.

12   Q.  I think you also testified, did you not, that the 4-Bar

13   reference or 4-Bar signatures was an effort to maintain that

14   sporting influence, correct?

15   A.  For me the 4-Bars was to maintain that varsity, that Ivy

16   League, that true American sportswear influence and reference.

17   Q.  Can we put up DTX-93.

18          MR. LEWIN:  This has been admitted, your Honor.

19   Q.  Do you recognize this document, sir?

20   A.  Yes.

21   Q.  Can you just tell us what the document is briefly again?

22   A.  This was a document to introduce new employees to Thom

23   Browne and why they were working at Thom Browne, and also too

24   to show potential stores what the collection was all about.

25   Q.  If we could turn to page 19, please.

1          What does this show?

2    A.   This shows the inspiration to the use of the -- for me now

3    the 4-Bars on the left-hand sleeve, but initially that is where

4    I referenced the inspiration for the three bars.

5    Q.   These are collegiate sweaters, are they not?

6    A.   Yes.

7    Q.   Would it be fair to say when you use the term reference,

8    that that equates to inspiration?

9    A.   It's definitely inspiration.

10   Q.   Other than a name tag, do you normally put your personal

11   name on your goods?

12   A.   I -- very rarely except for on the paper tab on some of my

13   knits, which is an old tailoring tool.

14   Q.   How do you determine which products will carry your 4-Bar

15   signature?

16   A.   It's a personal choice in regards to what garments I feel

17   like look best with it, and I feel like it is mostly when I

18   wanted a more tailored piece to feel or have a sportswear

19   sensibility to it.

20   Q.   How do you determine what garments will carry the Grosgrain

21   signature?

22   A.   The Grosgrain tab on the back actually is on every garment

23   that I do.

24   Q.   You heard some testimony while you were here about your

25   runway shows, correct?

1   A.  Yes.

2   Q.  I would like to show you DTX-89 and DTX-109 side by side,

3   please.  These have both been admitted.

4          Can you describe for the jury what we're looking at?

5   A.  Yes.  This is the fall collection 2006.  This was the

6   collection which was an ice skating inspired collection where I

7   tortured all my models and put them on ice skates and made them

8   skate on a fake ice skating rink in a gallery here in New York,

9   and it was -- what I feel is the most important thing to see is

10  the representation of sportswear and tailoring melding into one

11  and creating true designer sportswear.

12  Q.  We can take those down.  Thank you.

13         Can we put up DTX-793 which is also admitted.  Can we

14  show the photos a little bit enlarged.  Thank you.

15         Can you describe for the jury what they're looking at

16  A.  This was a collection I think the next fall, and it was

17  in -- I felt like in especially menswear, it was important to

18  start showing more conceptualized ideas, especially in regards

19  to tailoring and in mixing the idea of sportswear and tailoring

20  in a conceptual way to make clothing for men more interesting.

21  Q.  You mentioned earlier -- withdrawn.

22         Sir, you mentioned -- we discussed earlier that

23  transition from three bars to 4-Bars.  Do you remember that?

24  A.  Yes.

25  Q.  And there came a time, did there not, when you revealed the

1    use of 4-Bars to the public in a runway show, correct?

2    A.   Yes.

3    Q.   When was that?

4    A.   It was first revealed in actually a sweatshirt and sweat

5    bottom in 2008 for the spring 2009 collection which I showed

6    down in my store.

7    Q.   I was just about to say, was there a runway show of sorts

8    at least for that collection?

9    A.   Well, I was close to going out of business at that point,

10   so I had to use my store for the venue, and it was the first

11   idea of sweats in my collection which I paired with actually a

12   trench coat.

13   Q.   I'd like to put up DTX-146, if I may.

14        Do you recognize these photos, sir?

15   A.   Yes.

16   Q.   Can you tell the jury what this is?

17   A.   This was the spring/summer collection, which was a tennis

18   inspired collection that I showed in the gallery on Tenth

19   Avenue and 35th Street.

20   Q.   Do you often show your clothes with sports themes?

21   A.   I use sports references in inspirations all the time

22   because it's so true to me, and I feel like taking the idea of

23   tailored and handmade tailoring and using it in a sports

24   reference is more interesting, or makes it more interesting.

25   Q.   What was the theme of this show that we're looking at?

1    A.  This was a loose reference to tennis.

2    Q.  Do you remember the products that you designed for this

3    show?

4    A.  Yeah, this was a full collection of tailored outerwear

5    sportcoats, trousers.  There were knits.  There were bomber

6    jackets, more sportswear-inspired tailored pieces, and then

7    more tailored pieces and then accessories and footwear.

8    Q.  Did these products or any of them offer -- carry the 4-Bar

9    design?

10   A.  Some of them did, yeah.

11   Q.  Were these products offered for sale to the public?

12   A.  Everything that is seen here was offered for sale.

13   Q.  Did they go through the channels of trade that you

14   described earlier, the multibrand stores?

15   A.  Yes, they were in my stores and then in the various stores

16   around the world, along with my store.

17   Q.  Do you know whether this show we're looking at received any

18   media coverage?

19   A.  All my shows are covered by, you know, press like *The New*

20   *York Times*, *Vogue*, the *Business of Fashion*.  So, yes, it was

21   covered by those.  *Women's Wear*.

22   Q.  Thank you.

23        When you transitioned from three to four, did you

24   withdraw the three-stripe garments from sale?

25   A.  We initially -- well, we certainly stopped designing the

1    three stripes and switched to four, and I think there were

2    probably some three-striped garments in the market which I

3    don't know actually how it was handled, but I know going

4    forward there were no more three bars.

5    Q.  You read my mind.  Thank you.

6            Now, in 2009, did you have any other runway shows?

7    A.  2009, this was the first year that I actually showed in

8    Europe.  So it was the first show that I brought my men's

9    collection over to Europe, and I was invited by the Pitti

10   Immagine Trade Show in Florence to be the guest designer and

11   show at that trade show.

12   Q.  Can anybody attend one of those trade shows?

13   A.  No.  It's just like any fashion show; it is an invited

14   show, and you have to be invited to go.

15   Q.  Did Thom Browne have invitations out?

16   A.  We did, but the Pitti Immagine was run by them, so they

17   handled most of the coverage and the attendees of the show.

18   Q.  Now, do you recall when that show actually took place?

19   A.  Yes, in January of 2009.

20   Q.  2009?

21   A.  Yes.

22   Q.  Was there a record made of that show?

23   A.  Yes.  It was a show that I -- I film all my shows, and I

24   produce and film all of my shows, and there is a film of that

25   show.

1           MR. LEWIN:  Your Honor, we would like to show a video

2     of a little bit of that show.  It's been objected to.

3           MR. HENN:  Relevance.  Outside the U.S. there's been

4     no testimony that anyone from adidas was there.

5           THE COURT:  Sustained.

6           MR. LEWIN:  Your Honor, if I may.  I know you

7     sustained it, but I would like to respond on this one.

8           THE COURT:  Okay.

9           MR. LEWIN:  I think there's been testimony --

10          THE COURT:  Sidebar.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So I should note for the record that I

3   denied adidas' motion in limine on this, so the door is open,

4   but I am not seeing the relevance of this particular video.

5          MR. LEWIN:  Well, your Honor, there's been testimony,

6   which I can elicit from this witness as well, that a number of

7   the people that attend this presentation are buyers from the

8   United States that see these goods on the runway in the United

9   States.  There's been media coverage.  There's been much made

10  of the inability to find Thom Browne through the years.  This

11  was a huge step forward, and it broke all the rules.

12         THE COURT:  Surely not all.

13         MR. LEWIN:  Well, not all, but I will tell you in

14  advance it is unique in the sense that it exhibits one garment

15  and most runway shows --

16         THE COURT:  So, I don't think you've established yet

17  the foundation.

18         MR. LEWIN:  No.  I was going to.

19         THE COURT:  All right.  So assuming he can establish

20  the foundation that he just indicated, any further objection?

21         MR. HENN:  Assuming the foundation includes some

22  tieback to our client that someone at adidas either attended or

23  was privy to the video.

24         THE COURT:  No, I think you have relied, and I have

25  with certain limits allowed arguments about, you know, what's

1    out there, and I think that would be true here, but lay the

2    foundation.

3                MR. LEWIN:  That's exactly right.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2      BY MR. LEWIN:

3      Q.  Mr. Browne, a moment ago you gave some testimony about

4      attending a show in Italy in 2009.  Do you recall that?

5      A.  Yes.

6      Q.  And do you recall that you stated that you were invited

7      there, correct?

8      A.  Yes.

9      Q.  And do you also recall that you indicated that there were

10     invitations sent out by Thom Browne, Inc.?

11     A.  Yes.

12     Q.  And can you give us a high-level view of who was invited?

13     A.  It would have been all the press that were at the trade

14     show, *The New York Times*, *Vogue*, *DNR* –– I think it was *DNR* back

15     then, *Women's Wear*, all the press around the world, and then

16     so ––

17              THE COURT:  I'm sorry.  Just so I'm clear, I'm not so

18     interested, despite counsel's question, who was invited.

19              What I want to know is who was actually there.

20              THE WITNESS:  It was press, celebrities.

21              THE COURT:  The press included who, to your knowledge?

22              THE WITNESS:  There were so many.  There was like *The*

23     *New York Times*, all of the fashion magazines like *Vogue*,

24     *British Vogue*, *Japanese Vogue*, like *Business of Fashion*,

25     *Women's Wear Daily*, which is a trade publication and ––

1              THE COURT:  That's what I wanted to know.

2    Q.  Were buyers there?

3    A.  Yes.

4    Q.  And from where did those buyers come?

5    A.  Buyers from stores from everywhere in the world.

6    Q.  Were any of your U.S. buyers there?

7    A.  There were buyers, I'm sure, from Bergdorfs, Saks, from

8    Nordstrom, from Nieman Marcus, from Barneys.

9    Q.  Next question:  Was there anything special about your

10   presentation at the Pitti Immagine show, the Italian show?

11   A.  I did choose to show in a way that was not typical of a

12   normal runway fashion show.

13   Q.  What do you mean by that?

14   A.  I took the fundamentals of my collection, which was

15   basically the gray suit and the men's uniform, and multiplied

16   it 40 times and showed it in a way that I wanted people to see

17   the one focused idea that -- which is where the whole

18   collection and the idea of the collection came from.

19              MR. LEWIN:  **Your Honor, we'd move --**

20              THE COURT:  You've laid the adequate foundation.

21              MR. LEWIN:  Thank you, sir.

22   Q.  Can we call up DT-795 and publish to the jury.

23              THE COURT:  For the record, this exhibit is received.

24   The objection stated both in court and at the sidebar are

25   preserved.  Go ahead.

1          MR. LEWIN:  Thank you, your Honor.

2          (Defendant's Exhibit 795 received in evidence)

3          (Video played)

4   Q.  Can you describe for the jury while this rolls what we're

5   looking at?

6   A.  This was the introduction.  It was a replication of, I

7   thought, almost the monotony of a man's business life.  And

8   what you see is him, the moderator of the room wearing the

9   uniform which was then replicated in -- which is something I

10  like to do, the idea of replication and uniformity.  So you

11  see --

12  Q.  Go ahead, I'm sorry.

13  A.  You see that American man's working uniform multiplied in

14  40 ways in one single way.  And then you see the monotony of

15  his day, sitting down at a desk behind a typewriter and then

16  throughout the show you see him opening his briefcase and

17  taking out his peanut butter and jelly sandwich.  So having fun

18  with the idea of the monotony of the businessman's life.

19  Q.  Sir, do you see any of your sweaters other than -- I'm

20  sorry, withdrawn.

21          Are these all your products, Thom Browne products?

22  A.  These are all mine.  This is my collection, yes.

23  Q.  Is the cardigan being worn by the fellow sitting at the

24  desk by himself your product?

25  A.  Yes, that is.

1    Q.  And are the cardigans that are being put on by the models

2    at their various desks your products?

3    A.  Yes.

4    Q.  And how many stripes are those products?

5    A.  Those sweaters have the 4-Bars on the left-hand sleeve.

6    Q.  Do you see any of those products on the rack next to the

7    wall?

8    A.  Yes.

9    Q.  Who designed this show?

10   A.  I designed the show.

11   Q.  Who choreographed it?

12   A.  I choreographed the show.

13   Q.  Do you recall whether or not this show and your

14   participation in it received any media coverage?

15   A.  Yes, it received all the coverage from all the media and

16   press that was at the event, from the *New York Times* to *Vogue*

17   to *Women's Wear*, so it was covered by everyone at the trade

18   show at that time.

19   Q.  As a result of this show, did you sell garments?

20   A.  At that time the -- the collection was being a lot more

21   well-known, the business I have to say, wasn't growing as much

22   as I would have liked it to, but it was definitely a collection

23   that people knew, but the business sometimes didn't equate to

24   the recognition.

25   Q.  Is there not a practice of taking orders in connection with

1   a show when you attend it?

2   A.  Yes, of course.  After the show, then there was -- the

3   collection is in the showroom, and it was open to be bought by

4   all the retailers around the world.

5   Q.  Now, in 2008 and 2009, you mentioned that you had a number

6   of design collections, correct?

7   A.  Yes.

8   Q.  Did those collections vary as to what products are

9   incorporated in each seasons of goods?

10  A.  No.  The one thing about my collection is that it always

11  represented what it was at the beginning.  It just developed in

12  ways that made the collection more broad.  It was always

13  tailored based, but tailored sportswear was something that was

14  also being developed, and then the accessories and other areas

15  of a growing collection was how it was growing.

16  Q.  You testified earlier that some of the products that you

17  had recognized were a pair of sweatpants, correct?

18  A.  Yes, uh-huh.

19  Q.  Do you recall when you incorporated sweatpants into the

20  line of products that you were offering to the public?

21  A.  Yeah.  The first sweatpants were introduced in the

22  collection that I showed down in my store in the summer of

23  2008.

24  Q.  2008, is that what you said?

25  A.  Yeah.

1   Q.  Have you ever not sold sweatpants since 2008?

2   A.  No.  From that day on, they sell really well, so we sell a

3   lot of sweatpants.

4   Q.  Did the sweatpants represent for you a departure from the

5   product that you had been selling?

6   A.  No.  It was just the normal development of a designer

7   collection.  And you saw that in the way that it was shown in

8   that collection in that the sweats were worn with a fully

9   tailored outerwear piece.  So it encaps -- like it's a full

10  collection.

11  Q.  Would the same be true with your sweatshirts?

12  A.  It was worn with a sweatshirt as well, yeah.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. LEWIN:

2    Q.  And why did you decide to expand from the suits to the

3    sportswear that you just described?

4    A.  It's just the natural growth of a collection.  I mean, the

5    most important thing is for my customer almost to be able to

6    come to me for anything he wants, and that entails his tailored

7    clothing that he will wear to work or to play in and also to

8    the more -- the easier pieces to wear in, I guess, a more

9    casual way.

10   Q.  Thank you.

11          Sir, you heard some testimony earlier I think about

12   what was called the compression collection, correct?

13   A.  Yes.

14   Q.  Now who designed that?

15   A.  I did.

16   Q.  And when was that introduced?

17   A.  That was introduced, I think, in 2020.

18   Q.  Do you consider that part of your natural expansion?

19   A.  Yes.

20   Q.  Why did you add them; any particular purpose?

21   A.  Yeah.  I mean, initially I wanted them for myself.  So I

22   wanted to play with the idea of doing something that was, um,

23   for me it was more of an undergarment than it was for

24   functional sportswear, but it was developed in a way that it

25   could be used more in a functional way.

1    Q.  Well, it has a technical fabric, does it not?

2    A.  Yeah, it's technical.  And it's designed to be worn as

3    designer sportswear.

4    Q.  Have you ever designed and sold products that would fall

5    into the same kind of a category as the compression pants?

6              MR. HENN:  Objection, foundation, vague.

7              THE COURT:  Sustained as to vague.

8    Q.  Did you ever design swim trunks, sir?

9    A.  Yes.

10   Q.  Did you design them for the purpose of swimming?

11   A.  You can swim in them, yes.

12   Q.  And how long have swim trunks been in your line?

13   A.  For a long time.

14   Q.  How long is that, do you recall?

15   A.  I would say over ten years.

16   Q.  All right, sir.  Have you ever testified at a trial before

17   today?

18   A.  No.  No.

19   Q.  And you recall that adidas took your deposition in

20   preparation for this litigation?

21   A.  Yes.

22   Q.  Do you remember that during that deposition there were

23   certain things you simply didn't recall; do you recall that?

24   A.  Yes.

25   Q.  If you could -- withdrawn.

1          Did your business grow from the time that adidas

2     contacted you in 2007 -- 2008 to today?

3     A.   Yeah.  It's grown from around five or around $5 million to

4     over 300 million.

5     Q.   Was that growth steady?

6     A.   No.

7     Q.   Better years than others?

8     A.   Better years than others, yes.  2009 was not such a good

9     year.

10    Q.   After that?

11    A.   After that it started a little more steady, but from 2015

12    until now, it's gotten...

13    Q.   And what was, if you can tell the jury, what you think was

14    responsible for your growth?

15    A.   I think it was through the response to the development of

16    the collections, things that people were responding to, the

17    recognition of the collection, and I think it was something

18    that became, I guess, worthy of people buying clothing from my

19    collection.

20    Q.   And you believe that any part of your growth is

21    attributable to the use of your trademarks?

22             MR. HENN:  Objection.

23    A.   Yes.

24             THE WITNESS:  Sorry.

25             MR. HENN:  Speculation.

1              THE COURT:  Sustained.

2    Q.  Sir, do you have -- have you done any studies -- withdrawn.

3              You know that as part of this case the plaintiff is

4    asking the court to issue an order to prevent you from using --

5              MR. HENN:  Objection.

6              MR. LEWIN:  OK.

7              THE COURT:  Sustained.

8              Just put questions.

9    Q.  What do you think would happen to your company if you

10   stopped using four bars?

11             MR. HENN:  Speculation.

12             THE COURT:  Sustained.

13             MR. LEWIN:  I pass the witness.

14             THE COURT:  Cross-examination.

15   CROSS-EXAMINATION

16   BY MR. HENN:

17   Q.  Mr. Browne, on your direct examination you were shown this

18   blue jacket, correct?

19   A.  Yes.

20   Q.  And it has, I think you called them, a tonal use of the

21   four bars?

22   A.  Yes.

23   Q.  So in your view that is the four bars trademark, even

24   though it is not white?

25   A.  Yes.

1    Q.  And to be clear, I think you said that this was an example

2    of sportswear?

3    A.  Tailored sportswear.

4    Q.  And also something that has sporting sensibility?

5    A.  Yes.

6    Q.  Adidas is not claiming this sport coat infringes its

7    rights; you're aware of that, right?

8    A.  Yes.

9    Q.  Is there anything on that rack over there that is not

10   sportswear under your definition?

11   A.  It's all tailored sportswear or sportswear.

12   Q.  Sportswear?

13   A.  Tailored sportswear.

14   Q.  Sportswear?

15   A.  Tailored sportswear.

16   Q.  Sportswear?

17   A.  Tailored sportswear.

18   Q.  Sportswear?

19   A.  Tailored sportswear.

20   Q.  You were also handed a couple of products bearing your

21   Grosgrain mark.

22          You have them next to you?

23   A.  Yes.

24   Q.  And if I understand your testimony, the only use of your

25   Grosgrain mark on those is the little flag on the back?

1    A.   Yes.

2    Q.   Can you just hold that up so we can see the little flag?

3    A.   It's a loop.

4    Q.   I'm sorry.  Loop?

5    A.   Locker loop, yeah.

6    Q.   OK.  Now, you're aware adidas is not challenging Thom

7    Browne's use of the little loop, correct?

8    A.   If you say so, yes.

9    Q.   And you said that the use of the stripes running all the

10   way down the side of those pants, that was just a design choice

11   that you made?

12   A.   Yes.

13   Q.   With regard to the jacket?

14   A.   Do you want me to hold it up?

15   Q.   Please.  Thank you.

16          The stripes running down the sleeves of that jacket,

17   that is just a design choice you made?

18   A.   Yes.

19   Q.   Thanks.  You can put those back.

20          Mr. Browne, prior to this case you were aware of the

21   Three-Stripe Mark, correct?

22   A.   Adidas'?

23   Q.   Yes.

24   A.   Yes.

25   Q.   You were aware of adidas' Three-Stripe Mark?

1   A.  Yes, yes.

2   Q.  And, in fact, you've been aware of that since long before

3   you started your company?

4   A.  Yes.

5   Q.  Other than adidas, are you aware of any other company that

6   uses three stripes as a branding device on apparel?

7   A.  Um, I -- yes.

8            MR. HENN:  Your Honor, if we could pull up, for

9   impeachment purposes, Mr. Browne's transcript.

10           Nita, if you'll just show it to the court and the

11  witness.  It's page 109.

12           At lines seven to ten, your Honor.

13           Nita, there you go.

14           THE COURT:  All right.  You can read that.

15           You can show it the jury.

16           MR. HENN:  Show it to the jury.

17  BY MR. HENN:

18  Q.  Mr. Browne, I asked you:  Other than adidas, are you aware

19  of any other apparel brand that uses three stripes as a

20  branding device on apparel?

21           Your answer was no; correct?

22  A.  Yes.

23           MR. HENN:  Take that down, Nita.

24  Q.  Other than adidas, you're not aware of any other brand that

25  uses three stripes as a branding device on footwear either, are

1    you?

2    A.  Not specifically, no.

3    Q.  You don't consider Thom Browne and Prada to be competitors,

4    correct?

5    A.  No.

6    Q.  And you don't consider Gucci to be a competitor of Thom

7    Browne?

8    A.  No.

9    Q.  In fact, in your opinion, Thom Browne has no competitors?

10   A.  No, no direct competitors.

11   Q.  We had a bit of a double negative there.

12          It's your testimony that Thom Browne has no

13   competitors, correct?

14   A.  Yes.  Sorry.

15   Q.  With regard to advertising, the company has chosen not to

16   do traditional forms of advertising, correct?

17   A.  Yes.

18   Q.  In fact, you've never done that kind of advertising?

19   A.  No.

20   Q.  The company promotes its brand primarily through those

21   fashion shows we looked at examples of?

22   A.  More than just fashion shows.  Also by wearing it

23   ourselves, we represent the collection.

24   Q.  Fair.

25          And the company also posts on social media?

1    A.   Yes.

2    Q.   You personally review and approve the social media posts of

3    the company, don't you?

4    A.   Mostly Instagram, yes.

5    Q.   I'm sorry?

6    A.   Mostly Instagram, yes.

7    Q.   If we can pull up Exhibit 385.

8             Do you recognize this as a post of Thom Browne?

9    A.   Yes.

10   Q.   And so you would have approved the post we see on this

11   page, correct?

12   A.   Yes.

13   Q.   If we go over to page two.

14            You approved this post as well?

15   A.   Yes.

16   Q.   Go to page seven.

17            You approved this post?

18   A.   Yes.

19   Q.   Do you also approve the language where it says Thom Browne

20   athletic uniform?

21   A.   Yes.

22   Q.   You would agree that that's athletic apparel?

23   A.   Non-functional athletic uniform, yeah.

24   Q.   You didn't tell the public this is a Thom Browne

25   non-functional athletic uniform, did you?

1    A.  No.

2              MR. HENN:  If we pull up just for the witness, please,

3    for the moment, Exhibit 386 at page three.

4              Before I do that, your Honor, we would offer Exhibit

5    385 into evidence.

6              MR. LEWIN:  No objection.

7    Q.  Do you recognize page three of Exhibit 386 as another post

8    of Thom Browne?

9              THE COURT:  I'm sorry.  By the way, I should have said

10   received for the other exhibits that there was no objection.

11             (Plaintiff's Exhibit 385 received in evidence)

12             MR. HENN:  We took silence as assent, your Honor.

13   BY MR. HENN:

14   Q.  Mr. Browne, do you recognize page three of 386 as a post of

15   your company?

16   A.  Yes.

17   Q.  And you approved that as well?

18   A.  I don't remember this one, but yes.

19   Q.  If we go back to the first --

20             MR. HENN:  Well, let me pause there.  Your Honor, we

21   would offer the first three pages of Exhibit 386 as a new

22   plaintiff's exhibit, and I'll get you the number that is next

23   in cue.  There was an objection to the overall exhibits.  I'm

24   pulling these pages out.

25             Is there any objection to the first three pages?

1           MR. LEWIN:  No objection.

2           THE COURT:  Received.

3           (Plaintiff's Exhibit 386 received in evidence)

4           MR. HENN:  Go back to page three, please, and let's

5    publish that to the jury.  I don't think they've had a chance

6    to see it.  386, page three, Nita.  Exhibit 386.  There we go.

7           If we can zoom out and see the whole post.  Thank you.

8    BY MR. HENN:

9    Q.  Mr. Browne, this was the post that we were just talking

10   about before the colloquy with the court, correct?

11   A.  Yes.

12   Q.  You see that there are four images that were posted by Thom

13   Browne there, right?

14   A.  Yes.

15   Q.  If we can go back to the first page of exhibit, this

16   exhibit, do you see a blowup of one of those images that Thom

17   Browne posted out?

18   A.  Yes.

19   Q.  Do you notice that the model in this image is wearing

20   adidas shoes?

21   A.  I didn't notice that.  Now I do.

22   Q.  If we can go back.

23          Do you notice that the model is wearing adidas

24   sunglasses?

25   A.  Yes.

1    Q.  This was an image that Thom Browne posted as a way of

2    promoting its compression collection, correct?

3    A.  I don't remember it, but yes.

4              MR. HENN:  All right.  Nita, let's go and now just to

5    the witness.

6    Q.  First, Mr. Browne, you mentioned that you do a lot of

7    interviews.

8              Do you remember that testimony?

9    A.  Yes.

10   Q.  And often the company will provide the media with some

11   photographs that they can use in their articles about you, you

12   and your company, correct?

13   A.  Yeah.

14   Q.  I'm sorry?

15   A.  I'm sorry.  Yes.

16             MR. HENN:  Let's look at page four of 386.  If we can

17   go to page four, Nita, and just zoom in on the photos.

18   Q.  Mr. Browne, do you recognize these as photographs that your

19   company provided to media in connection with promoting some of

20   your performance product?

21   A.  I don't remember these, sir.

22   Q.  You see down below in the lower right where it says Thom

23   Browne as the source?

24   A.  Yes.  Yes.

25             MR. LEWIN:  Objection, your Honor.

1          THE COURT:  Sustained.

2          MR. HENN:  All right.  Take those down.

3          THE COURT:  I sustained the objection to your making

4    reference publicly to something that was not in evidence.  I

5    haven't ruled yet on the admissibility.

6          MR. HENN:  Fair.  Let's pull up that --

7          Thank you, your Honor, for that clarification.

8          Let's pull back up that page, Nita, page four.

9    BY MR. HENN:

10   Q.  Mr. Browne, are you familiar with this article?

11   A.  No.

12   Q.  All right.

13         THE COURT:  Are those articles in the pictures your

14   clothing?

15         THE WITNESS:  Yes.

16         THE COURT:  And --

17         MR. HENN:  Your Honor --

18         THE COURT:  -- would it be your practice to authorize

19   or not authorize photos of your clothing in periodicals?

20         THE WITNESS:  Sometimes the publication will take the

21   photos.

22         THE COURT:  OK.  And in this case, having looked at

23   the fine print that was referenced before, does that refresh

24   your recollection as to whether or not you authorized these

25   photos?

1          THE WITNESS:  No.

2          THE COURT:  OK.

3          MR. HENN:  Your Honor, I would suggest since he's

4    admitted that these are at least Thom Browne products that we

5    allowed to show to the jury the images as a demonstrative.

6          THE COURT:  If what you're trying to say in that

7    mumbling is that you are still offering this exhibit, the

8    exhibit is received.

9          MR. HENN:  Thank you, your Honor.

10         Nita, publish that, please to the jury.

11   Q.  Mr. Browne, do you recognize your products in the images we

12   see on the screen?

13   A.  Yes.

14   Q.  And on the image on the left, the model is standing beside

15   an athletic field?

16         MR. LEWIN:  Objection, your Honor.

17         THE COURT:  Really, I think it's unclear, but the jury

18   will evaluate it for themselves.

19         MR. HENN:  Fair enough.

20   Q.  Mr. Browne, you mentioned earlier that sometimes your name

21   appears on a paper label.

22         Is the paper label you're referring to the little

23   square white box we see on the right?

24   A.  Yes.

25         MR. HENN:  All right.  We can take that down, Nita.

1            If we can pull up Exhibit 1030.  Go to the second --

2    excuse me -- page -- well, let's go to page 106.

3            This is one that was not objected to, your Honor.

4    Q.  Mr. Browne, do you see the suit that is being advertised on

5    page 106 of 1030?

6    A.  Yes.

7    Q.  Is that what you refer to as your uniform?

8    A.  Yes.

9    Q.  Is that also an example of tailored clothing?

10   A.  Yes.

11   Q.  Have you also heard that referred to as the shrunken suit?

12   A.  Yes.

13   Q.  It's called a shrunken suit because of the shorter pant leg

14   and it is more tailored into the body?

15   A.  And the shorter jacket as well.

16   Q.  That suit is still a core focus of your brand, correct?

17   A.  Yes.  Everything starts from that gray suit.

18            MR. HENN:  Nita, you can take that down.

19   Q.  The company has not done any market research to measure or

20   success what consumers perceive to be the Thom Browne brand,

21   correct?

22   A.  Not that I'm aware of.

23   Q.  You're also not aware of any market research that measures

24   recognition of your four-bars design, correct?

25   A.  Not that I'm aware of.

1   Q.  You're not aware of any market research to measure

2   recognition of the red white and blue Grosgrain design?

3   A.  Not that I'm aware of.

4   Q.  The company has, in fact, never attempted to measure

5   consumer's awareness of its brand, correct?

6   A.  No.  We do what we want to do.

7   Q.  Without measurement?

8   A.  You know, that's not my -- I design the clothes.  I don't

9   get involved in those things.

10  Q.  In addition to being the chief creative officer, you also

11  sit on the board of directors, correct?

12  A.  Yes.

13  Q.  And you've been on the board of directors since your

14  company was founded?

15  A.  Yes.

16          MR. HENN:  Let's pull up Exhibit 847.  We'll offer

17  this in evidence, your Honor.  There's been no objection

18  raised.

19          Yes.  847, Nita, please.  Thank you.

20          Your Honor, we would offer Exhibit 847.  There is no

21  objection.

22          MR. LEWIN:  No objection.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 847 received in evidence)

25          MR. HENN:  If we can go over to page 28.

1  BY MR. HENN:

2  Q.  Mr. Browne, you recognize this as minutes from the board of

3  directors of Thom Browne from November 15, 2018, correct?

4  A.  Yes.

5  Q.  And you were in attendance; you're listed first, right?

6  A.  Yes.

7  Q.  And your CEO Rodrigo Bazan is listed second?

8  A.  Yes.

9  Q.  If we go down to the bullet point that states, Currently

10  brand awareness is not being measured.

11        It might be on the next page, I'm sorry.  it might be

12  on page 29.  There it is.  Thank you.  Sorry.

13        It's right above where it says fashion show.  There is

14  a bullet point, do you see that, Mr. Browne, it says Galli

15  explained that these activations have ROI equal five.

16        Do you see that?

17  A.  Um-hmm, yes.

18  Q.  And the last sentence of the board minutes reads, currently

19  brand awareness is not being measured.

20        Was that accurate at the time?

21  A.  Yes.

22  Q.  If we go to a board meeting that took place the following

23  year on page 12.

24        This is the board meeting minutes from October 27,

25  2019, correct?

1    A.  Yes.

2    Q.  You were also at this board meeting with your CEO,

3    Mr. Bazan?

4    A.  Yes.

5    Q.  If we go over to page 14.  Under "other" at the bottom.

6    Nita, you may want to put the two pages side by side because it

7    kind of runs over.

8            Mr. Browne, this states, Norsa suggested to run a

9    survey to measure and track TB brand awareness; Rodrigo and

10   Thom did not find it necessary or useful.

11           Do you see that?

12   A.  Yes.

13   Q.  Who is Norsa?

14   A.  He was on the board.

15   Q.  He was with Ferragamo?

16   A.  I think so, yes.

17   Q.  But served on your board of directors?

18   A.  At that time, yes.  But he's no longer.

19   Q.  It says, Angelo thought it could be helpful to measure the

20   intangible return of projects such as the Olympic one aimed at

21   boosting brand awareness (pre v. post).

22           Do you see that?

23   A.  Yes.

24   Q.  And Angelo is a reference to Angelo Zegna, one of the

25   owners?

1    A.  Yes.

2    Q.  You did not think it was necessary or useful to measure

3    your brand awareness, correct?

4    A.  No.

5    Q.  And that meeting was in 2019.

6            I'm correct that, as we sit here today in 2023, you

7    still have not done market research to measure brand awareness?

8    A.  Not that I'm aware of, no.

9            MR. HENN:  Let's take that down, Nita.

10   Q.  You were not a part of the conversation between your then

11   CEO Tom Becker and Vanessa Backman at adidas back in 2007,

12   correct?

13   A.  No.

14   Q.  That is correct, you were not a part of that?

15   A.  Correct.  Yes, I was not a part of the conversation.

16   Q.  In fact, other than this case, you've never spoken to

17   anyone at adidas concerning Thom Browne's use of stripes?

18   A.  No.

19   Q.  You testified on direct that your decision to add a stripe

20   and go to four stripes was just a design choice you made in

21   collaboration with your team, correct?

22   A.  Yes.

23   Q.  And at the time you decided to use those four stripes, you

24   did not check with the Pryor Cashman law firm to see if that

25   infringed adidas' rights, did you?

1    A.  I did not.

2    Q.  And no one at Thom Browne checked the law firm, did they?

3    A.  I'm not sure.

4           MR. LEWIN:  Objection, your Honor.

5    Q.  At the time you decided --

6           THE COURT:  OK.  Rephrase.

7    Q.  At the time you decided to use four stripes, you also

8    didn't check to see what other lawsuits adidas had filed

9    concerning four stripes, did you?

10   A.  No.

11   Q.  And you didn't ask Pryor Cashman to go see if adidas had

12   filed dozens of lawsuits against companies for using four

13   stripes, did you?

14          MR. LEWIN:  Objection.

15          THE COURT:  Ground?

16          MR. LEWIN:  He's testifying, your Honor.

17          THE COURT:  Pardon?

18          I didn't hear you.

19          MR. LEWIN:  I'm sorry, your Honor.  Testifying.

20          THE COURT:  No.  Overruled.

21          You may answer.

22   A.  I'm sorry.  Can you repeat question?

23   Q.  Sure.

24          You didn't ask Pryor Cashman, the law firm, to take a

25   look and see if adidas files dozens of lawsuits about four

1   stripes, did you?

2   A.  Personally, no.  I relied on my CEO to do that type of

3   thing.

4   Q.  In 2008, did you become aware of the verdict in the *adidas*

5   *Payless* case?

6   A.  No.

7   Q.  You're familiar with the concept of negative space in

8   design?

9   A.  Yes.

10  Q.  Where is the negative space in your four bars design on

11  this sweat pant?

12  A.  It would be the gray between the white stripes.

13  Q.  How many of those gray stripes are there?

14  A.  There are three.

15          MR. LEWIN:  Objection to characterizing.

16          THE COURT:  Overruled.

17  Q.  And at the time you decided to change from three to four

18  stripes, did you give any consideration to the impact of the

19  negative space in your design?

20  A.  No.

21  Q.  At your company, there are no guidelines or rules on the

22  way in which the company can use its four-bars mark, correct?

23  A.  There are general rules, yes.

24          MR. HENN:  Let's pull up the testimony from his

25  deposition at page 50, please, and just publish it to the

1   witness and the court.  At lines nine to 15.

2           (Pause)

3           THE COURT:  It's not and open and shut, but...

4           MR. HENN:  Thank you.

5           If we can publish that to the jury, please.

6   BY MR. HENN:

7   Q.  Mr. Browne, in your deposition I asked:  Are there any

8   guidelines or restrictions on the ways in which Thom Browne,

9   the company, uses the four bars mark?  And you answered:  I

10  can't really say.

11          Correct?

12  A.  Yes.

13  Q.  And then I asked:  Are you aware of any guidelines or

14  rules?  And your answer was, no.

15          Right?

16  A.  That's what it says, yes.

17          MR. HENN:  Take that down, Nita.

18          I want to ask about how you define your four-bar

19  signature.  If we pull up Exhibit 55, Plaintiff's 55, I should

20  say.  If we go over to page 54.

21  Q.  Mr. Browne, looking at the shoes, is that the use of your

22  four-bar mark?

23  A.  That's a design choice of use of the four bars.

24  Q.  So that wasn't you trying to use your trademark, that was

25  you making a design choice to put four stripes vertically on

1   the shoe?

2   A.  Yes.

3           MR. HENN:  And then, Nita, go back to Plaintiff's

4   Exhibit 1030.  Let's go over to page 21.

5           If we go to the second row, the blue shirt three over

6   with the white stripes on the sleeve.

7   Q.  That is your four bars mark, right?

8   A.  Yes.

9   Q.  And that's because it's four white parallel lines?

10  A.  Four white parallel bars, yes.

11          MR. HENN:  Back out, Nita, and just go over on that

12  same row to the left, the blue Oxford with the stripes on the

13  sleeve.

14  Q.  Is that also your four-bars mark?

15  A.  Yes.

16  Q.  Even though it is multicolored?

17  A.  Yes.

18          MR. HENN:  Back out, Nita.

19          If we go to the one the second shirt at the top of the

20  page.

21  Q.  Is that also your four-bars mark?

22  A.  Yes.

23  Q.  Even though it is multiple colors?

24  A.  Yes.

25  Q.  What if we go to page 23, the second row, second shirt.

1          Even though that's pink on pink, is that still your

2    four-bars mark?

3    A.   Yes.

4    Q.   What if we go to page 24, bottom row, third shirt.

5          Is that your four-bar mark?

6    A.   Yes.

7    Q.   Even though it's red blue red blue?

8    A.   Yes.

9    Q.   So in terms of what your four-stripe mark is, it matters

10   not if it's all the same color, multiple colors, or all the

11   stripes themselves are comprised of different colors?

12   A.   Yes.  Four parallel bars.

13   Q.   All four parallel bars, that's your mark?

14   A.   The way I use it, yes.

15   Q.   Other than Thom Browne, you're not aware of any other brand

16   that uses four parallel stripes or bars as branding device on

17   apparel, correct?

18   A.   No.

19   Q.   It is correct?

20   A.   Yes, it's correct.  Yes.

21   Q.   Sorry.  It's my questions.  I'm creating a double negative,

22   and I apologize for that.

23          Other than Thom Browne, are you aware of any other

24   brand that uses four parallel stripes or bars as a branding

25   device on apparel?

1    A.   No.

2    Q.   Other than Thom Browne, are you aware of any other brand

3    that uses four parallel stripes or bars as a branding device on

4    footwear?

5    A.   No.

6    Q.   All right.  We've been talking about four bars.  I would

7    also like to get confirmation of what constitutes use of your

8    Grosgrain mark.

9         If we go to Plaintiff's Exhibit 56, at page one you

10   see a couple of pairs of sweatpants with the Grosgrain ribbon,

11   which has been sitting nicely on the table, running all the way

12   down the leg of the sweatpants, correct?

13   A.   Yes.

14   Q.   And so is that your Grosgrain mark?

15   A.   That is the use of my Grosgrain mark in a design decision

16   way.

17   Q.   So you would say that's still your trademark, even though

18   it runs all the way down the side of the pants?

19   A.   No.  It's a design choice.  It's a design decision.

20   Q.   So if you take this ribbon and you run it down the pant

21   leg, that's a design choice?

22   A.   Yes.

23   Q.   But if you roll it up and fold it up into a loop, that's

24   the trademark?

25   A.   Yes.

1   Q.  Let's look at page two.

2        Now, with regard to the shorts, you understand because

3   it says shorts only, adidas is only accusing the shorts of

4   infringing.

5        But I'm curious about the use around the cuff.  Is

6   that also your Grosgrain trademark?

7   A.  No.

8   Q.  It's just a design choice?

9   A.  Design choice.

10  Q.  All right.  Let's go over to the shoes.  Let's go to page

11  eight.

12       With regard to the shoes, is that also your Grosgrain

13  trademark?

14  A.  The tab on the back, yes.

15  Q.  So the tab on the back is the trademark.

16       What about the stripes on the side of the shoe angled

17  forward?

18  A.  Design choice.

19  Q.  And the Grosgrain ribbon that's been sitting on counsel's

20  table, this is the standard width of the stripes that you use

21  for your Grosgrain?

22  A.  That is the Grosgrain ribbon, yes.

23  Q.  The way you presented red and blue stripes on the shoes,

24  though, is much wider, correct, than the stripes we see here?

25  A.  Yeah.  It's a design choice.

1   Q.  It was a design choice to make those stripes wider?

2   A.  Yes.

3   Q.  Maybe 10 millimeters in width?

4   A.  I don't know --

5           MR. LEWIN:  Objection, your Honor.

6           THE COURT:  Ground?

7           MR. LEWIN:  Speculation.  He doesn't have a measuring

8   device.

9           THE COURT:  Overruled.

10  Q.  About 10 millimeters, right?

11  A.  I don't know exactly.

12  Q.  You designed these, didn't you?

13  A.  Yes.

14  Q.  And when you sent them off to be manufactured, you knew the

15  width of those stripes, didn't you?

16  A.  When they were designed, I did, yes.

17  Q.  And you were here when we looked at adidas' brand

18  guidelines, weren't you?

19  A.  Yes.

20  Q.  Do you remember the width of an adidas stripe?

21  A.  I don't remember offhand.

22          MR. HENN:  Nita, you can take those down.

23  Q.  How many products do you currently have in your range?

24          We just have a few here.  How many are in your current

25  range?

1  A.  Hundreds.

2  Q.  What about last season, hundreds?

3  A.  Hundreds, yeah.

4  Q.  On average, over the last decade, have you always had

5  hundreds of products in your range?

6  A.  Yeah.  It's a focused collection.  It's not, like, it's not

7  more than hundreds.

8  Q.  OK.  Fair.

9        It's just hundreds of products, right?

10  A.  Yes.

11  Q.  Now in 2010, your company had only one retail location

12  still, right?

13        Your own store?

14  A.  No.  I think Japan was open at that time, too.

15  Q.  Sorry.  For purposes of my questions, we're just going to

16  talk about the U.S.

17  A.  Sorry.

18  Q.  So I'll do better defining my question.

19        In 2010 your company only had one store in all of the

20  United States, correct?

21  A.  Yes.

22  Q.  And that was in the one here in TriBeCa?

23  A.  Yes.

24  Q.  And between spring of 2010 and 2017, you had no other of

25  your own retail locations anywhere in the U.S.?

1    A.   Um, no.

2    Q.   You opened your Miami store in 2018, correct?

3    A.   I don't remember when the other stores opened over the

4    years.

5    Q.   All right.  You opened a Miami store at some point, right?

6    A.   Yes.

7    Q.   Do you believe it was before 2018?

8    A.   Possibly.  I don't remember when it opened.

9    Q.   You opened a third store in 2020 in California, correct?

10   A.   Yes.

11   Q.   And I believe you opened a store recently in San Francisco

12   at the end of 2022, correct?

13   A.   Yes.

14   Q.   Let's pull up Plaintiff's Exhibit 1008.

15          This is a deck you looked at, I believe, on your

16   direct.  You just looked at it with a defense exhibit number on

17   it.

18          MR. HENN:  There's no objection to this, your Honor.

19          THE COURT:  All right.

20          MR. HENN:  If it's not in, we'll offer it.

21   Q.   If we can go over to page seven.

22          Is it true that when the store opened, you had no

23   ready to buy items, only custom suits?

24   A.   In my Little West 12th Street store, yes.

25   Q.   If you go over to page ten.

1          This shows the first big runway show was in 2009.  Do

2   you see that?

3   A.  I think all of my shows are big.  But yes, that was the

4   first show in Europe, yes.

5   Q.  Was it also the first show that wasn't in your own store?

6   A.  I've only done one show in my store.

7   Q.  That was the one in '08?

8   A.  That what the one in '08, yes.

9   Q.  I assume that one was also invitation only?

10  A.  Yes.

11  Q.  How big was your store at that time?

12  A.  It was one side of the building.  It was approximately

13  2,500 square feet.

14  Q.  On the next few pages --

15          Let me pause.  I think you said that the products you

16  show on the runway, you then offer for sale.  Is that always

17  the case?

18  A.  There were a lot of -- there are pieces in my collections

19  that are easier to buy than others.

20  Q.  So these --

21  A.  Everything is for sale.

22  Q.  Bunny ear mask, was that offered for sale?

23  A.  We sold quite a few of those.

24  Q.  If we go over to page 11.

25          These are images from one of your runway shows?

1  A.  Yes.

2  Q.  If we go over to page 12.

3          These are also from one of your runway shows?

4  A.  Yes.

5  Q.  Is this sportswear, by the way?

6  A.  It's the combination of tailoring and sportswear, yes.

7  Q.  All of these products you would characterize as sportswear

8  and tailoring?

9  A.  Designer tailoring and sportswear, yes.

10  Q.  OK.  Page 13.

11          Another runway show?

12  A.  Yes.

13  Q.  Is this also sportswear?

14  A.  Tailored sportswear, yes.

15  Q.  Page 14.

16          More tailored sportswear?

17  A.  Yes.

18  Q.  From another runway show?

19  A.  Yes.

20  Q.  How about page 15.

21          We looked at the video during your direct.  Is it your

22  testimony that that is also tailored sportswear?

23  A.  Yes.

24  Q.  You are aware, by the way, that adidas is not accusing any

25  of these cardigan sweaters of infringement, right?

1    A.  If you say so, yes.

2    Q.  Go over to page 21.

3           This is about the Grosgrain, and it says, the second

4    bullet says, protect high-usage areas of suits.

5           Is that how you originally used the Grosgrain?

6    A.  Yes.

7    Q.  And by high-usage areas, that would have been, say, inside

8    where the buttons are on my suit jacket?

9    A.  Yes.

10   Q.  Or in what I now know is called the placket, where the

11   buttons are on a shirt?

12   A.  Shirts or cardigans, yeah.

13          MR. HENN:  So if we go over to Exhibit 1030, again,

14   Nita.  Actually, I'm sorry, Nita.  Let me stay on that for just

15   one more second.  It was 1008 at page 21.

16   Q.  At the very bottom there this says classic colon

17   red/white/blue Grosgrain.

18          Do you see that?

19   A.  Yes.

20   Q.  Now, when you were on the stand, you said white red white

21   blue white?

22   A.  Yes.

23   Q.  Is there a difference between the red white blue Grosgrain

24   and what you're calling white red white blue white Grosgrain?

25   A.  The Grosgrain in the image is correct.  The verbal

1   description is incorrect.

2   Q.  What you're counting as those outside whites is the skinny

3   little white edge on the ribbon?

4   A.  Yes.  Yes.

5   Q.  The much thinner white one on the edge?

6   A.  Yes.

7              MR. HENN:  Now, Nita, if we can go to page 1030.  Over

8   to page 13 -- excuse me, over to page 103.  If you can just

9   zoom in at the shirt on the top, Nita.

10  Q.  That's an example of the Grosgrain being used in the

11  placket of a shirt, correct?

12  A.  Yes.

13  Q.  And adidas doesn't accuse that of infringement, correct?

14  A.  Yes.

15             MR. HENN:  Go over to page 109.  Zoom in on the cuff

16  of the suit jacket.

17  Q.  That's an example of the Grosgrain being used in that area

18  of the suit, correct?

19  A.  Yes.

20  Q.  And adidas isn't accusing any of that of infringement,

21  right?

22  A.  Yes.

23  Q.  Go over to page 112.

24             There is an example on the back of a suit jacket of

25  what I think you called the loop, right?

1    A.  The locker loop, correct.

2    Q.  Is it your testimony that a pinstripe business suit becomes

3    sportswear because it has the locker loop on the --

4    A.  As a sportswear sensibility, yes.

5    Q.  And you're aware adidas doesn't accuse any business suits

6    of infringement, right?

7    A.  If you say so, yes.

8    Q.  If we can pull up Exhibit 1314.

9         I think we looked at some of these images on your

10   direct, but this is a portion of your website that reflects

11   images from your various runway shows.

12        Are you familiar with these?

13   A.  Yes.

14        MR. HENN:  And if this isn't in evidence, your Honor,

15   we offer it at this point.

16        I don't think there was an objection, right, Harold?

17        MR. LEWIN:  No objection.

18        THE COURT:  Received.

19        (Plaintiff's Exhibit 1314 received in evidence)

20   BY MR. HENN:

21   Q.  Now, you mentioned that because these models were ice

22   skating, this product had a sporting sensibility, is that what

23   your testimony was?

24   A.  Yes.

25   Q.  All right.  If we go over to page five.  We looked at this

1   as well.

2           Is it your testimony that these all have a sporting

3   sensibility?

4   A.   Yes.

5   Q.   Would you characterize them as sportswear?

6   A.   Tailored sportswear.

7   Q.   Let's go to page ten.

8           These are from your 2008 runway show, right?

9   A.   I don't remember the year.  But yes, it was my surface

10  show.

11  Q.   Is it your testimony that these are also examples of Thom

12  Browne's sportswear?

13  A.   Yes.

14  Q.   If we can go to page 15.  Same exhibit, 1314, page 15.  We

15  looked at these on your direct.

16          Is it your testimony that these are sportswear because

17  you had them walking on kind of a mock tennis stadium?

18          MR. LEWIN:  Objection, mischaracterizing testimony.

19          THE COURT:  No.  You can ask him whether that's his

20  position.

21          Overruled.

22  Q.   Mr. Browne.

23  A.   What is the question again?

24          Sorry.

25  Q.   Are these sportswear because you had the models walking on

1    a mock tennis stadium?

2    A.   Yes.

3    Q.   And when you talk about your tennis collection, is this

4    some images of that, or is that something different?

5    A.   I've done a couple of collections that have had tennis as

6    an inspiration.

7    Q.   You're not suggesting that anyone would play tennis in

8    these outfits, though, are you?

9    A.   They could, but it wasn't the intent.

10   Q.   Is that sort of like the answer you gave about the

11   swimwear, where you say they weren't in design for swimming,

12   but you could swim in them?

13   A.   Yes.

14             THE COURT:   Sustained.

15   Q.   Let's go over to page 20.

16             These are shots from your 2010 runway show, right?

17   A.   Yes.

18   Q.   Is this sportswear as well?

19   A.   Yes.

20             MR. HENN:   Nita, can we zoom in on the lower right

21   image.

22   Q.   It's your testimony that that is sportswear?

23   A.   Yes.

24   Q.   Let's go over to page 26.  This is from your 2011 show.

25             Do you see that?

1    A.   Yes.

2    Q.   Is this also what you would characterize as sportswear?

3    A.   Tailored sportswear and sportswear, yes.

4    Q.   If we go over to page 30.  Zoom in on those.

5         This is from your 2012 runway collection, correct?

6    A.   Yes.

7    Q.   Is this sportswear?

8    A.   It's tailored sportswear.

9    Q.   Including the spiked mask in the first image?

10   A.   Yes.

11   Q.   Let's go over to page 35.  If we can zoom in on the images

12   at the bottom.

13        These are from your 2013 collection, correct?

14   A.   Yes.

15   Q.   More sportswear?

16   A.   Yes.

17   Q.   Let's go to page 40.

18        These are from your 2014 show.  Is this sportswear?

19   A.   Tailored sportswear, yeah.

20   Q.   Let's go over to page 65.

21        These are from your 2016 show, correct?

22   A.   Yes.

23   Q.   Is that also sportswear?

24   A.   More tailored sportswear, yes.

25   Q.   One last page before the lunch break.  Let's go to page 70.

1    If we can zoom to the bottom pictures.

2              Are those sleeves that hang all the way to the floor?

3    A.  Yes.

4    Q.  Is that also sportswear?

5    A.  Yes.

6    Q.  So, Mr. Browne, when you say that you've been selling

7    sportswear since the beginning, this is the kind of stuff

8    you're talking about?

9    A.  Yeah.  Combination of tailoring and sportswear, yes.

10             MR. HENN:  Thank you.  Your Honor, it's one o'clock.

11   Is this an appropriate break?

12             THE COURT:  Sure.

13             So, ladies and gentlemen, we will take our lunch break

14   and resume at two o'clock.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Does plaintiff's counsel want to give me a

3    ballpark on how much more you have on cross?

4              MR. HENN:  On cross, not long.  I know you don't like

5    answers like that.  Can I give you --

6              THE COURT:  When we come back you can give me a

7    ballpark.  That's fair enough.

8              We'll see you at two o'clock.

9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N19Qadi4                    Browne - Cross

1                      AFTERNOON SESSION

2                        2:00 p.m.

3            (Jury present)

4            MR. HENN:  For the record, your Honor, during the

5    lunch break we identified exhibit numbers of the two exhibits

6    that were new created out of 386.  So the first three pages of

7    Exhibit 386 are now Plaintiff's 1319, and the article on pages

8    4 and 5 of 386 is now 1320.

9            THE COURT:  Those are received.

10           (Plaintiff's Exhibit 1319 and 1320 received in

11   evidence)

12   CROSS-EXAMINATION CONTINUED

13   BY MR. HENN:

14   Q.  Mr. Browne, would you agree that in 2016 the brand was

15   still a niche brand with very low global awareness beyond its

16   core customers?

17   A.  No.

18   Q.  Let's pull up Exhibit 854.

19           MR. HENN:  We would offer this in evidence, your

20   Honor.

21           MR. LEWIN:  I am just reading it now.  No objection

22   your Honor.

23           THE COURT:  Received.

24           (Plaintiff's Exhibit 854 received in evidence)

25   Q.  Mr. Browne, this is an email from your CEO at the top.  Do

1    you see that?

2    A.  Yes.

3    Q.  And then lower on that same page, you see that it's

4    forwarding a message from Tomasso Galli.  You see that at the

5    bottom?

6    A.  Yes.

7    Q.  Mr. Galli is your current CFO?

8    A.  No.

9    Q.  Was he your CFO at some point?

10   A.  No.

11   Q.  What was his role?

12   A.  He's the head of communication.

13   Q.  Head of communication communicating with your CEO, correct?

14   A.  Yes.

15   Q.  And if we go over to page 2, we have the communication

16   marketing strategy from 2016.  Do you see that?

17   A.  Yes.

18   Q.  If we go down to the second bullet point, it says, "The key

19   growth pillars have been identified in women's RTW" -- that's

20   ready to wear, right?

21   A.  Yes.

22   Q.  --"accessories and sportswear for both men and women."  You

23   see that?

24   A.  Yes.

25   Q.  Is it true that in 2016 the company considered sportswear

1  for both men and women to be key growth pillars of the company?

2  A.  Yes, both non-functional sportswear or tailored sportswear,

3  yeah.

4  Q.  If we go down to a fourth bullet, it says TB.  You

5  understand that refers to Thom Browne?

6  A.  Yes.

7  Q.  "TB has a very strong following amongst a core nucleus of

8  loyal, enthusiastic customers but is still a niche brand with

9  very low global awareness beyond those customers and the

10  fashion circle."  Do you see that?

11  A.  Yes.

12  Q.  In 2016 and 2017, Thom Browne's sportswear segment was

13  greatly expanded, correct?

14  A.  Greatly is relative, yes.

15  Q.  Well, let's pull up Exhibit 858.

16        MR. HENN:  We would offer this into evidence,

17  Mr. Lewin.

18        MR. LEWIN:  No objection.

19        THE COURT:  Received.

20        (Plaintiff's Exhibit 858 received in evidence)

21  Q.  You recognize the cover of this is an email from Mark

22  Baldino, senior PR manager to you, correct?

23  A.  Yes.

24  Q.  From November of 2017, right.

25  A.  Yes.

1  Q.  And there is an attachment there MFF translation.  Do you

2  see that next to attachments?

3  A.  Yes.

4  Q.  Let's go look at the attachment, page 3.

5        You gave an interview, did you not, where you were

6  asked certain questions, and then you provided answers for a

7  reporter at MFF Fashion.  Do you recall that?

8  A.  Not specifically but, yes.

9  Q.  You do lots of interviews?

10 A.  Yes.

11 Q.  If we scroll down on this page, there is a question that

12 says: "In what direction are you headed?"  Do you see that?

13 A.  Yes.

14 Q.  Let's pull that up.  You were asked in what direction are

15 you headed, and the reporter says you responded with, "I'm

16 working a lot on the collections.  An important part of the

17 offer is still concentrated on classic apparel and more formal

18 tailoring which is an integral part of the brand DNA.  Plus,

19 the sportswear segment was greatly expanded in the past two

20 seasons."

21        Is that what you told the reporter?

22        MR. LEWIN:  Objection.  Foundation.

23        THE COURT:  Overruled.

24 A.  That is the translation from Italian, yes.

25 Q.  And that's what was communicated to the public?

1              MR. LEWIN:  Objection.

2              THE COURT:  Overruled -- I'm sorry.  Sustained.  You

3    can argue that, but sustained as to this witness.

4              MR. HENN:  Fair enough.

5              Nita, you can take that one down.

6    Q.  Mr. Browne in 2018, the next year, the company had one of

7    its business priorities to expand its collection of both

8    sportswear and outerwear, correct?

9    A.  Yes.

10   Q.  And if we pull up Exhibit 1000, we'd offer this in

11   evidence, your Honor.

12             MR. LEWIN:  On its face, I have no objection, your

13   Honor, at this point.

14             THE COURT:  If it's coming in, it's coming in for all

15   purposes.

16             MR. LEWIN:  I understand that, sir.

17             (Plaintiff's Exhibit 1000 received in evidence)

18   BY MR. HENN:

19   Q.  Do you see that this is an email sent to Rodrigo Bazan,

20   your CEO in 2019?

21   A.  Yes.

22   Q.  It has an attachment "TB overview from March of 2019."  Do

23   you see that?

24   A.  I don't see it.

25   Q.  Next to attachments.

1   A.  Okay.  Yes.  Yes.

2   Q.  If we go over and look at the attachment on page 10, blow

3   up the slide itself.

4        This slide from the deck identifies "2018 business

5   priorities."  Do you see that at the top?

6   A.  Yes.

7   Q.  And in bold and all capitals, it reads, "Expanding Brand

8   Awareness to a wider audience."  Do you see that?

9   A.  Yes.

10  Q.  That was one of the business priorities of the company in

11  2018, correct?

12  A.  Yes.

13  Q.  Under product, it says MRTW.  That stands for men's

14  ready-to-wear, correct?

15  A.  Yes.

16  Q.  And one of those business priorities was "expanded fit,

17  sportswear and outerwear," correct?

18  A.  Yes.

19  Q.  You're aware that in 2018, adidas objected to your use of

20  the 4-Bars on athletic apparel and Grosgrain down the sides of

21  athletic apparel and shoes.  You're aware that happened in

22  2018?

23         MR. LEWIN:  Objection to characterization, sir.

24         THE COURT:  I'm unclear whether you're saying he knew

25  that in 2018 or whether he knows that now.  Sustained.

1    Q.  In 2018, did you become aware that adidas objected to your

2    use of the 4-Bars on athletic apparel and the use of the

3    Grosgrain down the sides of athletic apparel and on shoes?

4    A.  I don't know when exactly I was made aware of it.

5    Q.  In 2018, your company did a deal with the Barcelona

6    football club, correct?

7    A.  I don't exactly know if it's 2018, but yes, we did a

8    collaboration.

9    Q.  It was a multiyear deal?

10   A.  It was for three years.

11   Q.  That included outfitting players like Lionel Messi?

12   A.  Yes, the entire team.

13   Q.  In the fall of 2018, you did a deal with the Cleveland

14   Cavaliers to provide them with product?

15   A.  It wasn't a deal, but yes, we made clothing for the

16   Cleveland Cavaliers.

17   Q.  That was worn around the NBA playoffs that year, correct?

18   A.  Yes.

19   Q.  One of those deals with the Cavs and Barcelona was to

20   expand the awareness of Thom Browne to people that hadn't

21   considered the brand previously, correct?

22   A.  Yes.

23   Q.  And, in particular, you wanted to expand the awareness of

24   your brand to people who were fans of sports like the NBA and

25   soccer, right?

1    A.  Amongst other people, yes.

2    Q.  Nita, you can take that exhibit down.

3         You launched your compression collection in 2020,

4    correct?

5    A.  Yes.

6    Q.  That was after adidas had objected to the stripes you were

7    using, correct?

8    A.  Yes.

9    Q.  And the compression collection was the company's first

10   expansion into proper athletic wear, correct?

11   A.  Yes.

12   Q.  If you pull up Exhibit 859.

13        MR. HENN:  There was no objection to this on the

14   list --

15        MR. LEWIN:  We have no objection.

16        THE COURT:  Received.

17        MR. HENN:  We'll offer that.

18        (Plaintiff's Exhibit 859 received in evidence)

19   Q.  This email chain is between Matthew Foley, vice-president

20   of communications for your company, and a reporter named Steff

21   Yotka.  Are you familiar with this?

22   A.  Yes.

23        MR. LEWIN:  Excuse me, but we're not seeing that on

24   our screen.  It looks like it's directed to someone other than

25   the person you mentioned.  It has a cc. to Conde Nast person.

1    It looks like an internal document.

2              THE COURT:  I'm not sure what defense counsel is

3    saying, but I do know that it's not an objection in accordance

4    with my rules.  It's a lengthy statement --

5              MR. LEWIN:  Objection.

6              THE COURT:  -- which I accordingly disregard and

7    overrule the objection.

8    BY MR. HENN:

9    Q.  Let's go over to page 3.  So at the bottom -- and, Nita, if

10   you could put pages 3 and 4 side by side, and then if you'll

11   blow up the email on bottom of page 3, just the top two

12   paragraphs at page 4 and put those side by side.

13             In November of 2020, your vice-president of

14   communications wrote to Steff the email we see on the left side

15   of the screen.  Do you see that?

16   A.  Yes.

17   Q.  And at the bottom of the page, Mr. Foley tells the reporter

18   at the very bottom, "The football kit this year includes the

19   launch of Thom's first expansion into proper athletic wear - a

20   compression running category."  Do you see that?

21   A.  Yes.

22   Q.  In fact, he bolded "proper athletic wear - a compression

23   running category," right?

24   A.  Those were his words, yes.

25   Q.  They were accurate, were they not?

1    A.  Those were his words, yes.

2    Q.  Were they accurate?

3    A.  Yes.

4    Q.  And at the top of the next page, he says, "We'd love to

5    continue our history of partners with you and your team to

6    launch the exclusive first preview, which includes a look at

7    this newly launched compression category, a first for the

8    brand."

9           Do you see that?

10   A.  Yes.

11   Q.  And it was a newly launched category, a first for the

12   brand?

13   A.  Yes.

14   Q.  Pull up Exhibit 194.

15          MR. HENN:  This is already in evidence, your Honor.

16   Q.  Could we just zoom in on the title and the by line, Nita,

17   and the date.

18          This is the article that resulted from the email

19   exchange we just looked at with Mr. Foley, correct?

20          MR. LEWIN:  Objection.

21          THE COURT:  If you know, you may answer.

22   A.  This was an article that was written about it, yes.

23   Q.  By Steff Yotka?

24   A.  That's what it says, yes.

25   Q.  You can take that down.

1           Now, prior to the launch of the compression line, you

2     would agree with me that the company did not offer anything

3     that you would characterize as proper athletic wear, correct?

4     A.   Yes, and the compression was not purely functional.

5     Q.   Meaning, it wasn't really technical running gear?

6     A.   Yes.

7     Q.   Same with the shoes, they weren't really running shoes?

8     A.   Exactly, yes.

9     Q.   But you called them running shoes on the website?

10    A.   Yes.

11    Q.   And you did an interview about the fact that this was a

12    running collection?

13    A.   That's the term I used, yes.

14    Q.   Also in 2021, the company had a section of its website that

15    it called active wear.  Do you remember that?

16    A.   Not specifically, but yes.

17    Q.   Let's pull up Plaintiff's Exhibit 998.

18           MR. HENN:  There were no objections to this, your

19    Honor, so we would offer it.

20           MR. LEWIN:  No objection.

21           THE COURT:  Received.

22           (Plaintiff's Exhibit 998 received in evidence)

23    Q.   You recognize this as a portion of Thom Browne's website?

24    A.   Yes.

25    Q.   If we zoom down to the lower left, Nita, to the text on the

1   bottom left.  You see the capture URL there, Mr. Browne?

2   A.   Yes.

3   Q.   That's basically the address of the website?

4   A.   Yes.

5   Q.   You see out on the right, after one goes through your

6   website, you would get to the section for man and then active

7   wear, correct?

8   A.   That's what it says, yes.

9   Q.   This was captured in October of 2021, right?

10  A.   Yes.

11  Q.   Then, Nita, if you back out from there and you go to the

12  very top left -- this is, of course, compressed because it's

13  fit onto an eight and a half by eleven, but if you go up to the

14  upper left, you see the category of these products is man

15  active wear?

16  A.   Yes.

17  Q.   If we go to your site today, you've 's taken down the word

18  active wear from the whole site, haven't you?

19  A.   I'm not aware of that, but -- I'm not aware of that.

20  Q.   Let's take this one down.  Go to plaintiff's 876.

21           MR. HENN:  We would offer this in evidence.  There was

22  no objection.

23           MR. LEWIN:  No objection.  There is no objection.

24           THE COURT:  Received.

25           (Plaintiff's Exhibit 876 received in evidence)

Q.  Mr. Browne, you recognize this as an email exchange between

you and your CEO from October of 2021?

A.  Yes.

Q.  And he's sharing with you his product strategies, correct?

A.  Yes.

Q.  If we go over to page 2, these are the actual product

strategies that he conveyed to you, correct?

A.  Yes.

Q.  If we go over to page 3, which is the second page of the

attachments, and under the category additional, Nita, if you

can just blow up the whole section entitled Expand Athletic

Expression.  This states in all caps and underlined "Expand

Athletic Expression," does it not?

A.  Yes.

Q.  And specifically within that, it identifies the compression

products, which it categorizes as a new group, correct?

A.  Yes.

Q.  And also footwear to define the total concept?

A.  Yes.

Q.  So it is true that in 2021, one of the business strategies

of Thom Browne was to expand athletic expression, correct?

A.  Yes.

Q.  Including with its compression line and footwear?

A.  According to this document, yes.

Q.  And that was three years after adidas raised its objection

1  | here to the stripes on the sides, correct?

2  | A.  Yes.

3  |          MR. HENN:  No further questions.

4  |          THE COURT:  Just before we head into redirect, I'm a

5  | little unclear because we heard all these terms sportswear,

6  | active wear, tailored sportswear, and so forth.

7  |          So, with respect to sportswear, Webster's dictionary

8  | gives two definitions.  One is "clothing suitable for

9  | recreation."  And second is "broadly, clothing for casual or

10 | informal wear."

11 |          Do you agree with that?

12 |          THE WITNESS:  Yes.

13 |          THE COURT:  Now, Webster's doesn't have a definition

14 | for tailored sportswear, but what I thought I understood from

15 | your testimony is you would take the concept of casual clothing

16 | and dress it up with the kinds of features that are more

17 | traditionally associated with more formal wear.  Do I have that

18 | right?

19 |          THE WITNESS:  Yes.

20 |          THE COURT:  Now, what's the difference between

21 | sportswear and active wear?

22 |          THE WITNESS:  Active wear is more functional, truly

23 | functional clothing that's made for sports.

24 |          THE COURT:  Active wear is where you're really working

25 | out, or things like that?

1              THE WITNESS:  Yes.

2              THE COURT:  Whereas sportswear can be something you're

3      wearing casually, but you want to have a sporty look?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.  Go ahead, counsel.  Redirect.

6      REDIRECT EXAMINATION

7      BY MR. LEWIN:

8      Q.  I'll be brief.

9              You saw some documents earlier that indicated that at

10     a board of directors meeting, you were not in favor of market

11     research of the brand, correct?

12     A.  I don't like market research, yeah.

13     Q.  Does Thom Browne conduct market research?

14     A.  Not that I'm aware of, no.

15     Q.  Do you know why?

16     A.  We don't work that way.  We work more in a designer way,

17     more instinctual.  We do more like what we feel is right for

18     us, and that's how we conduct our business.

19     Q.  Now, you talked about -- let me ask you, what is your

20     understanding of the 4-Bar design as a trademark?

21     A.  The 4-Bar is four parallel bars on the -- asymmetrically

22     designed on the left-hand sleeve or leg of pieces of clothing

23     in my collection.

24     Q.  And you recall the shoes that were displayed to you, you

25     were questioned on direct by counsel?

N19Qadi4                    Browne - Redirect

1   A.  Yes.

2   Q.  Do you still sell those shoes?

3   A.  No, we haven't sold them for years.

4   Q.  You used the term running shoes, correct?

5   A.  Yes.

6   Q.  Do you intend to convey to the public that these are shoes

7   to run in?

8   A.  No, I would advise not running in my running shoes.

9   Q.  Does that hold true with the term active wear -- withdrawn.

10  I'm sorry.

11          You finally were questioned as to whether or not there

12  was a strategic statement regarding the expansion of

13  compression wear right at the end of counsel's discussion with

14  you.  Do you remember that?

15  A.  Yes.

16  Q.  Did that ever occur?

17  A.  No.

18  Q.  Why not?

19  A.  It wasn't something that was that much of a priority in

20  regards to developing new categories and parts of the business.

21          MR. LEWIN:  Can I show the witness the *DNR* article?

22  Do you have it?  PX-175, I believe it is.  One moment, your

23  Honor.

24          MR. HENN:  It's outside the scope, your Honor.

25          THE COURT:  I'm sorry?

1     MR. HENN:  It's outside the scope of the cross.

2     Should have done this on direct.

3          THE COURT:  Overruled.  You can have recross.

4     BY MR. LEWIN:

5     Q.  You've seen this before, have you?

6     A.  Yes.

7     Q.  Can we expand it just to the photograph?  Can you describe

8     the items showing the three bars right in front?

9     A.  That's a tailored sportswear jacket with the three bars on

10    the left-hand sleeve.

11    Q.  Do you still carry that item today?

12    A.  Not with three bars, but with 4-Bars, yes.

13    Q.  And is one of the items on the rack a 4-Bar version of the

14    same sports coat?

15    A.  No.

16    Q.  Up here?

17    A.  Oh, yes.  Up there, yes.

18    Q.  What is the price of a 4-Bar sports jacket?

19    A.  Depending on the fabric, they range between $2,500 to --

20    they can be up to $6,000.

21         MR. LEWIN:  No further questions, your Honor.

22         THE COURT:  Anything else?

23         MR. HENN:  Don't need the recross.

24         THE COURT:  Very good.  Thank you very much.  You may

25    step down.

1          (Witness excused)

2          THE COURT:  Call your next witness.

3          MR. MALDONADO:  Your Honor, we call Rodrigo Bazan.

4   RODRIGO BAZAN,

5        called as a witness by the Defendant,

6        having been duly sworn, testified as follows:

7   DIRECT EXAMINATION

8   BY MR. MALDONADO:

9          DEPUTY CLERK:  State your name and spell it slowly for

10  the record.

11         THE WITNESS:  My name is Rodrigo, R-O-D-R-I-D-G-O.

12  Bazan is my last name, B-A-Z-A-N.

13         THE COURT:  Counsel.

14  BY MR. MALDONADO:

15  Q.  Good afternoon, Mr. Bazan.  Could you please introduce

16  yourself to the jury?

17  A.  Yes.  Good afternoon.  As I mentioned, my name is Rodrigo

18  Bazan.  I'm the CEO of Thom Browne.

19  Q.  Can you tell the jury a little bit about your background,

20  where you're from?

21  A.  Sure.  I was born in Argentina.  I lived till I was 16.  I

22  did a year as a student exchange in Germany a year when I was

23  17.  I was educated at the University in Buenos Aires, a

24  five-year degree.  I'm a CPA, certified public accountant.  I

25  finished with six months' experience at the USC in California.

1  I worked throughout my studies.  I started to work full time

2  when I was 21, and I worked for Deloitte & Touche.  It's an

3  accounting, auditing and consulting firm.  And later on I was

4  offered opportunity to work in London in a company called

5  Motorola, a technology phone company.

6  Q.  Thank you.  Can you please tell the jury about your career

7  in fashion?

8  A.  Sure.  So subsequently to Motorola, I was offered a similar

9  position to the one I had in Motorola in Florence, Italy at

10  Gucci Group, and I worked at Gucci Group for a year, based in

11  Florence doing similar projects I did for Motorola.

12        After that, I was offered opportunity to be a chief

13  financial officer for Alexander McQueen.  This was when

14  Mr. McQueen was alive, and the company was part of Gucci Group.

15  Gucci Group was the company at the time of the group that had

16  just acquired companies such as Yves Saint Laurent, Bottega

17  Veneta, Balenciaga, Alexander McQueen, and Stella McCartney.

18        Subsequently, I worked with Alexander McQueen as a

19  startup company for five and a half years.  After that

20  opportunity, I was offered to join Louis Vuitton Moët Hennessy.

21  It's a group based out of Paris.  So I moved to Paris, had to

22  learn French, and I worked in Paris at running the Marc Jacobs

23  business, an American designer, for close to four years.  I

24  happened to build a very diverse team, a very young team, and

25  international team.

1          After that opportunity, I was offered to join

2    Alexander Wong, an American designer, New York based, and I

3    became the first president of the company in 2010, end of 2010.

4    This position I held for five and a half years, and I worked

5    with Alexander Wang, Alex himself, the family and the employees

6    for that period where we did a number of very interesting

7    development, growth of the company.  We repositioned to

8    designers.  He was a designer that was very influential in that

9    moment for the generation of our youth.

10          In 2015, I was suggested by Domenico DeSole to speak

11   with Mr. Thom Browne and potentially to look if we could work

12   together.  And that's when I have around eight months of

13   conversations with Thom, four meetings with him, and I decide

14   to join the company the week after I resigned from Alexander

15   Wang.

16   Q.   What brought you to Thom Browne?

17   A.   What brought me to Thom Browne was the great opportunity I

18   identified because Thom had done something very unique.  He had

19   established himself as a very different designer, a highly

20   talented designer.  He had created something, which is

21   difficult to do.  You are called a designer when you do

22   something different when you create something which is worthy

23   of museums.  Thom created a different silhouette.  He started

24   with a suit with a (indiscernible) and that led to creating a

25   collection, always anchored on this original idea.  The

1  company--

2  Q.  Mr. Bazan, can you move a little closer to the microphone,

3  please?

4  A.  Sure.  The company was relatively small, so there was a

5  great opportunity to expand.  There was also great shareholders

6  coming in.  There was new owners coming to the company with

7  Thom Browne, and I felt it was a unique opportunity; so the

8  commission of a unique design talent, incredible collections, a

9  very unique way to create product and collections and the

10  opportunity to expand.

11  Q.  What did you do to prepare yourself for your new position

12  with Thom Browne?

13  A.  I closed myself for a couple of weekends, and I looked at

14  every single image of Thom's collections of the previous 10, 15

15  years and looking at all of them, I screenshot 82 images that I

16  found interesting from those collections.  And then I put down

17  four questions -- three questions that I wanted to ask Thom,

18  and I asked for a last meeting with Thom, just to clarify.

19  It's quite possible that if you do something for a group in

20  fashioning, you're talking to somebody else, you think that

21  most likely you want to do something together, but you have to

22  understand what to do together.  So that meeting was for me,

23  eventually for Thom and for the chairman of the company very

24  good to define what we wanted to do together.

25  Q.  Can you please describe for the jury the design aesthetic

1    of Thom Browne?

2    A.   The design aesthetics of Thom Browne are a timeless design.

3    It all starts from a gray suit.  So tailoring is a very

4    important element of the brand.  It is a sporting inspiration

5    of everything that Thom has done, from the suit itself to every

6    single product that makes part of the collection.  Thom always

7    came to work with the highest quality of raw materials,

8    fabrics, textiles, all the elements that make a garment the

9    highest quality of construction of the garment.  He was

10   inspired this mid-century moment, this period -- I'm not

11   American -- but Forties, Fifties I learned through Thom this

12   highly influential moment when --

13             MR. HENN:  Objection.  Hearsay.

14             THE COURT:  Sustained.

15   A.   This highly influential moment --

16             THE COURT:  No, when there's an objection, and I

17   sustain the objection, you stop.

18             THE WITNESS:  Okay.

19   Q.   How would you describe the look that Thom Browne created in

20   his men's suiting?

21   A.   Completely different.  Thom took traditional jackets,

22   pants, raw materials, all natural materials, and he did

23   something very different; he twisted the proportions.  He

24   shrank the jacket.  He raised the pant.  He made the pants sit

25   higher on the waist, and that defined a new silhouette and

1   that's what recognizes him as a designer.  He changed

2   something, and that was later on a big influence to the

3   menswear world.

4   Q.  Can we please pull up Defendant's Exhibit 91.

5           MR. MALDONADO:  Actually, your Honor, I should have

6   done this at the beginning of the examination, but there's a

7   number of exhibits that the parties have stipulated to I'd like

8   to read into evidence.

9           THE COURT:  Go ahead.

10          MR. MALDONADO:  We have Plaintiff's Exhibit 192,

11  Defendant's Exhibit 73, 90, 91, 102, 103, 131, 154, 352, 353,

12  402, 479, 586, 642, and 643.

13          THE COURT:  Those are all received.

14          (Plaintiff's Exhibit 192 received in evidence)

15          (Defendant's Exhibits 73, 90, 91, 102, 103, 131, 154,

16  352, 353, 402, 479, 586, 642, and 643 received in evidence)

17  BY MR. MALDONADO:

18  Q.  Pull up Exhibit 91, please?  Have you seen this document

19  before?

20  A.  Yes, I have.

21  Q.  Can you tell you also what it is, please?

22  A.  It's a version of our brand presentation.

23  Q.  If we look at page 8, can you tell the jury what we see

24  here on page 8?

25  A.  Yes.  This is the iconic image that shows the shorter

 1   jacket, this shorter pants, as well showing the ankles, these

 2   pants sitting higher up on the waist, gray suiting, and it's on

 3   the back of a classic car from that period, the mid-century

 4   period, an iconic image of what Thom created in menswear.

 5   Q.  Thank you.  If you would turn to the next page, page 9, and

 6   maybe you could tell the jury what we see on this picture,

 7   please.

 8   A.  This is the same thing that Thom did for women.  He created

 9   exactly the same tailoring identity for women.  It's a gray

10   jacket short, the pants sitting high, showing the ankles

11   clearly, and sitting high on the waist.  The same materials and

12   the same idea applied to women's.

13   Q.  Thank you.  Can we now pull up Exhibit 103, please,

14   Defendant's Exhibit 103.

15        Have you seen this document before, Mr. Bazan?

16   A.  Yes.

17   Q.  Tell us what this is.

18   A.  It's a document that shows an introduction to the brand.

19   Q.  If we look at page 8, explain to the jury what's shown

20   there.

21   A.  This shows this shorter jacket, gray jacket, higher pant.

22   It shows the one of the two trademarks, the Grosgrain, this

23   five-color Grosgrain, which is a specific raw material that has

24   colors white, red, white, blue and white.  And it's shown on

25   the back of the neck, and in this case on the vents in the

1    jacket.

2    Q.  Where is the Grosgrain ribbon used in which classic

3    positions on your suiting?

4    A.  It's on the back of the collar for any jacket or top; on

5    the back of the pant for any short or long pant; on the vents

6    of the jacket or cardigans; on the placket in the front; and on

7    the back of the shoe.

8    Q.  Why it used in the button vents that you pointed to?

9    A.  It's a reinforcement, traditional reinforcement of

10   high-quality tailoring, but in this case Thom made this a clear

11   identifier.

12   Q.  Could we look at page 9, please.  Tell the jury what we see

13   here.

14   A.  This is a similar gray jacket and tailoring outfit showing

15   the clear four-band horizontal on the left sleeve that make it

16   a big identifier of Thom Browne; this is a Thom Browne jacket.

17   Q.  And you mentioned earlier you heard testimony about a Thom

18   Browne look to his suiting.  Were other designers at the time

19   using similar looks?

20   A.  No.

21   Q.  Now, as CEO of Thom Browne, are you familiar with the

22   trademarks owned by Thom Browne?

23   A.  Yes, I am.

24   Q.  Tell the jury what the trademarks are that Thom Browne

25   owns.

1   A.  The trademarks that we own are our Grosgrain, our

2   five-color Grosgrain that I mentioned earlier, our four-band

3   use on the left sleeve, on the left upper thigh or leg, our

4   name Thom Browne, and we have registrations, federal

5   registrations for the Grosgrain, and also for a paper label

6   that carries the 4-Bar.

7   Q.  If we could pull up Defendant's Exhibit 131, please.  Can

8   you tell the jury what this is, please?

9   A.  This is the Grosgrain:  The white, red, white, blue, white

10  Grosgrain federal registration.

11  Q.  When did Thom Browne apply to register this trademark in

12  the U.S.?

13  A.  2012.

14  Q.  What are the goods that this registration covers?

15  A.  It includes clothing in general, jackets, blazers, shirts,

16  sweaters, cardigans, T-shirts, underwear, hood wear, swimwear,

17  running shoes, footwear.

18  Q.  Does this trademark registration indicate when the

19  trademark was first used in connection with these goods?

20  A.  Yes, 2004.

21  Q.  Thank you.

22          What about the 4-Bars?  Do you own a trademark

23  registration for the 4-Bars?

24  A.  No, we own a trademark for the paper label that includes

25  4-Bars.

1    Q.  Why did you -- have you ever applied to register the

2    4-Bars?

3    A.  No.

4    Q.  Why not?

5    A.  Because we have limited resources.  We have global

6    registrations for trademarks.  The paper label was already a

7    registration, and it's being used in such a unique way that we

8    didn't apply.

9    Q.  Does Thom Browne take efforts to protect its trademarks?

10   A.  Yes, we do.

11   Q.  What do you do in that regard?

12   A.  We monitor digitally.  We monitor the market where we are

13   present.  We also use contacts with customs in several

14   countries.

15   Q.  We talked about your U.S. registration for the Grosgrain.

16   Does Thom Browne also own foreign registrations?

17   A.  Yes.

18   Q.  Do you own a foreign registration for the Grosgrain?

19   A.  We own in specific countries.

20   Q.  Sorry?

21   A.  We own in specific the countries, I believe.

22   Q.  How about in the European --

23            MR. HENN:  Objection.  Relevance.  European filings.

24            THE COURT:  Sustained.

25            MR. MALDONADO:  Your Honor, can I be heard on that?

1              THE COURT:  All right.

2              (Continued on next page)

1          (At the sidebar)

2              MR. MALDONADO:  So this particular European filing is

3     the very filing that brought Thom Browne to adidas's attention

4     in 2018.

5              THE COURT:  That's true.  But --

6              MR. MALDONADO:  And there a very limited question.

7              THE COURT:  I'm not sure why -- that was adidas's.  I

8     thought we were talking about now what Thom Browne does to

9     protect its trademark.

10             MR. MALDONADO:  We're talking about application that

11    they filed in the EU, which is the application that brought

12    Thom Browne to adidas's attention.  I have very limited

13    questions.

14             THE COURT:  I'll allow a few questions on it.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2       BY MR. MALDONADO:

3       Q.   Mr. Bazan, did Thom Browne apply to register the Grosgrain

4       ribbon in the European Union?

5       A.   Yes.

6       Q.   When was that?

7       A.   2016, '17.

8       Q.   Is that the same Grosgrain ribbon that you had already

9       registered in the United States?

10      A.   Yes, it is.

11      Q.   Did that registration issue?

12      A.   No.

13      Q.   Why not?

14      A.   So far I think it was rejected or requested to be rejected

15      by adidas.

16      Q.   Thank you.

17                    Is Thom Browne a luxury brand?

18      A.   Absolutely, yes.

19      Q.   Why do you say that?

20      A.   Because Thom always aimed to have the highest quality of

21      raw materials, the most elevated way to construct the garment.

22      Our jackets are full canvas jackets.  That means that every

23      piece of the jacket is cut, sewn together, and is meant to look

24      the worst on the first day.  From that moment on, it will mold

25      like a glove to your hand.  Thom created product that was

N19Qadi4                    Bazan - Direct

1    envisioned to be in a vintage store 20 years from now.  So it's

2    combination of raw materials, construction of the garment, and

3    the distribution that we chose to do is limited distribution.

4    Q.  Where are your factories located?

5    A.  Italy, the majority of them.  Japan, great quality of

6    production for certain materials.  And England for shoes and

7    cashmeres.

8    Q.  Thank you.

9         How would you describe the quality of Thom Browne's

10   products?

11   A.  Exceptionally high, passionately hi.

12   Q.  Please tell the jury the types of products that Thom Browne

13   sells?

14   A.  We sells jackets, coats, pants, shorts, skirts, sweaters,

15   cardigans, jerseys, sweatshirts, sweatpants, T-shirts, polos,

16   socks, footwear, accessories.

17   Q.  And do all of these products have anything in common?

18   A.  Yes, they have this absolute passion for quality,

19   absolutely drive to have the best raw materials, and always

20   this timeless design and this aim that they will be in a

21   vintage store 20 years from now, and you will want to buy them.

22   Q.  And the products you just mentioned, were those all sold by

23   Thom Browne when you joined the company in 2016?

24   A.  Yes.

25   Q.  And you said you reviewed all the collections that went

1    back 10 to 15 years.  Were these products in most collections

2    as well?

3    A.  Yes.

4    Q.  Has there been any change in the quality of Thom Browne's

5    products since you joined the company?

6    A.  Absolutely no.

7    Q.  Can you tell us if Thom Browne has done any market research

8    to measure the recognition of the 4-Bars or the Grosgrain?

9    A.  No, we have not.

10   Q.  Why not?

11   A.  Because when you are a designer company of this type where

12   the majority of the efforts, passion and funds have gone into

13   the product, Thom created a new market, so you're not trying to

14   tap into anybody's market.  You're creating something

15   different.  And if you're successful as a designer doing that,

16   you're creating a demand for the product.

17   Q.  Does Thom Browne the company have any information regarding

18   the association of the 4-Bars or the Grosgrain with the company

19   Thom Browne?

20   A.  No.

21   Q.  You have a store here in New York, right, in Tribeca?

22   A.  Yes.

23   Q.  And you have stores throughout the world?

24   A.  Yes, we have 105 stores today.

25   Q.  When you open new stores, what do you see in terms of

1  sales?

2  A.  We see that particularly during the first era of opening a

3  market or store, the majority of the transactions do include

4  4-Bar items.  That's the first to go item for a new client of

5  Thom Browne.

6  Q.  What does that tell you about the 4-Bars?

7           MR. HENN:  Objection.

8           THE COURT:  Sustained.

9  Q.  Does Thom Browne have a relationship with Lionel Messi?

10  A.  We had a relationship with Football Club Barcelona that had

11  Lionel Messi as one of the players, yes.

12  Q.  When was that relationship?

13  A.  2018 for three years.

14  Q.  Were you involved in that relationship?

15  A.  Yes, I was.

16  Q.  Do you have an agreement with FC Barcelona?

17  A.  It expired two years ago.

18  Q.  What did you do for that team?

19  A.  We were approached by the Football Club Barcelona to do

20  something very different, to dress the team in formal wear, and

21  this was for specific out-of-town games and specific important

22  games of champions league.  So this was absolutely for the

23  processing between getting ready in the training ground, going

24  to the airport, flying to the other city, and going to the

25  hotel.  We didn't do anything in the pitch.  We had a specific

 1   formal wear agreement.

 2   Q.  And did FC Barcelona tell you that Mr. Messi was sponsored

 3   by adidas?

 4   A.  No.

 5   Q.  Did FC Barcelona ever tell you that Mr. Messi's

 6   relationship with adidas restricted anything he could do with

 7   your company?

 8            MR. HENN:  Hearsay.

 9            THE COURT:  Sustained.

10   Q.  I'd like to show you an article that's been marked as

11   Plaintiff's Exhibit 192, and ask you if you've seen this

12   article before?

13   A.  Yes, I have.

14   Q.  If we look at page 7 of this article, what does this

15   article say about Thom Browne's outreach to athletes?

16   A.  That "this athlete outreach is not part of an overarching

17   strategy, nor is it a post-Zegna power play.  Simply put, a lot

18   of basketball and soccer players are already Thom Browne

19   clients."

20   Q.  Would you agree with that statement?

21   A.  Absolutely, sir.

22   Q.  And at the time that you entered into the relationship with

23   FC Barcelona, did Thom Browne have soccer players and

24   basketball players as clients?

25   A.  Yes.

1    Q.  Do you still have those people as clients today?

2    A.  Yes.

3    Q.  If we look at page 8, what does this -- does this article

4    say anything about Thom Browne providing sportswear to FC

5    Barcelona?

6    A.  Yes.  It says that "you won't see the team boarding the

7    plane in 4-Bar striped cashmere.  Like the Cavs, they wear the

8    same codified Thom Browne uniform, the label's foundational

9    gray suit."

10   Q.  Has Thom Browne ever provided sweatpants to FC Barcelona

11   team?

12   A.  No.

13   Q.  Does Thom Browne have any plans to provide sportswear or

14   sporting uniforms to FC Barcelona?

15   A.  No.

16   Q.  Has Thom Browne ever provided clothes to be worn on a

17   playing field by athletes?

18   A.  No.

19   Q.  Does Thom Browne have any plans to provide clothing to be

20   worn on a playing field to athletes?

21   A.  No.

22   Q.  Now, you've heard of adidas, correct?

23   A.  Yes.

24   Q.  And you're familiar with adidas's three stripes?

25   A.  Yes.

1  Q.  And have you had an opportunity to compare Thom Browne's

2  4-Bars to adidas's three stripes?

3  A.  Yes.

4  Q.  And how do they compare?

5  A.  They are completely different.

6          MR. HENN:  Objection.  Opinion testimony from a lay

7  witness.

8          THE COURT:  Well, I think this falls, to a limited

9  extent, within the lay opinion exception to the lay witness

10  rule.  So we'll take it one question at a time or one answer at

11  a time, but I will allow it so far.

12          MR. MALDONADO:  Thank you, your Honor.

13  Q.  You may answer the question.

14  A.  Can you ask the question again?

15  Q.  Sure.  How does Thom Browne's 4-Bar design compare to

16  adidas's three stripes?

17  A.  They are completely different.  The adidas is three

18  vertical stripes on both sides, so they're symmetrical.  They

19  run on tops and bottoms, and pants.  They're thin stripes.

20  They are hull stripes.  They have equal spacing.

21          In the case of Thom Browne is 4-Bars on the arm or the

22  leg.  They're horizontal.  So they're asymmetrical.  They're

23  wide bands with narrow spacing.  So visually it's a completely

24  different effect.

25  Q.  Thank you.  Have you performed a similar comparison of the

1    Grosgrain signature with the three stripes?

2    A.   Yes.

3    Q.   And how do they compare?

4              MR. HENN:  Same objection.

5              THE COURT:  Same ruling.

6    A.   It's completely different.  In the adidas, it's the same

7    colors, always white stripes.

8              In the case of Thom Browne is five lines:  White, red,

9    white, blue, white.  So visually it's a completely different

10   effect.  And it's five, not three.

11   Q.   Since you've been with Thom Browne, have you been aware of

12   any reports of confusion between any products of Thom Browne

13   and any product of adidas?

14   A.   No.

15   Q.   So we talked earlier --

16             THE COURT:  Let me ask you this:  Are you saying

17   you've never seen an adidas stripes that are angled, vertical,

18   horizontal or anything else?

19             THE WITNESS:  I've seen what's used here for playing

20   football soccer, so running from here down the sleeve.  So it

21   could be seen as vertical but it's horizontal.  They're running

22   from here all the way down, that I've seen.

23             THE COURT:  Have you ever seen adidas three stripes in

24   anything other than white?

25             THE WITNESS:  Not that comes to my mind.

1              THE COURT:  All right.

2      BY MR. MALDONADO:

3      Q.  We talked a little bit earlier about your enforcement

4      efforts for your trademarks.  Has Thom Browne been involved in

5      any lawsuits besides this one with respect to its 4-Bars?

6      A.  No.

7      Q.  Has Thom Browne been involved in any lawsuits except this

8      one with respect to the Grosgrain?

9      A.  No.

10     Q.  Tell the jury a little bit about how Thom Browne goes about

11     enforcing its trademarks.

12     A.  As I mentioned earlier, we monitor what's happening in the

13     market, customs inform us also when an import process includes

14     something similar to our trademarks.  When we see something

15     similar, visually similar, we work with our lawyers, reach out

16     to the other party, sometimes we know the other party, and we

17     have a constructive conversation to say this potential

18     infringement.

19     Q.  Have you ever reached out to someone who was using three

20     stripes?

21     A.  Yes.

22     Q.  Who is that?

23     A.  Ross Young, for example.

24     Q.  Tell us a little bit about that.

25     A.  At that time, we had a shareholder in common, and Ross

1    Young, they showed us a look book that was about to be

2    published, new collection that included a combination of white,

3    red, blue that was used similarly to Thom Browne.  So we spoke

4    to the other party and constructively resolved it.

5    Q.  So that was concerning the Grosgrain ribbon of yours?

6    A.  Correct.

7    Q.  It wasn't concerning the 4-Bars?

8    A.  No.

9    Q.  How do you resolve your disputes or how have you resolved

10   them in the past with third parties?

11   A.  We speak to our lawyers, which know the field better than

12   myself.  We take a proper legal assessment on rights.  We have

13   a constructive conversation, and usually when there's two

14   intelligence lawyers, there's always a resolution.

15   Q.  And after you reach a resolution with a third party, do you

16   monitor their compliance?

17   A.  Yes, we do.

18   Q.  How do you do that?

19   A.  Through visiting the stores, to seeing what they're doing

20   online through -- those are the most important.  We have a

21   large distribution of 400 doors globally, so if they are

22   sitting next to us, we will notice that quickly.

23   Q.  Does Thom Browne sell footwear as well as clothing?

24   A.  Yes, we do.

25   Q.  Does Thom Browne sell sneakers?

1    A.  Yes, we do.

2    Q.  If we could pull up Exhibit 55, please, Plaintiff's 55,

3    page 54.  Have you seen this before?

4    A.  Yes.

5    Q.  And what are these two items on the screen?

6    A.  These are our sneakers with the decorative use of 4-Bars.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  I'm sorry.  Forgive me.  On the screen,

2    your four bars are vertical; yes?

3            THE WITNESS:  Yes.

4            THE COURT:  And over there on the rack, the first item

5    is a four bars that are horizontal, right?

6            THE WITNESS:  The first item, the hat?

7            THE COURT:  Right there.

8            THE WITNESS:  The hat?

9            The first --

10           THE COURT:  The one that is closest to us.

11           THE WITNESS:  So the hat, the little beanie hat.

12           THE COURT:  Whatever it is.

13           THE WITNESS:  Yes.  It's a little hat, so it doesn't

14   have two sides.  That's why it is in the center, like in the

15   tie.

16           THE COURT:  No, no, no.

17           Can someone hold up the first item, please.

18           I'm sorry.  That is not what I had in mind.  The next

19   one.  The next item.

20           We'll use both of those items.  So in the hat --

21           THE WITNESS:  Yeah.

22           THE COURT:  -- the bars are vertical; yes?

23           THE WITNESS:  Yes.

24           THE COURT:  In the scarf, the bars are horizontal;

25   yes?

1              THE WITNESS:  Yes.

2              THE COURT:  And then if you want to put those down, or

3    use your third hand, if you could take one of the ones with

4    angled.

5              So there, they are angled, right?

6              THE WITNESS:  They are horizontal.

7              THE COURT:  Well, then let's take the one further, two

8    up.

9              THE WITNESS:  They are horizontal.

10             By the time you put it on, this shows horizontally.

11             THE COURT:  You think that is horizontal as it is

12   being shown to you now?

13             THE WITNESS:  Yes, yes.

14             THE COURT:  How do you define horizontal?

15             THE WITNESS:  When you put the garment on, it's like

16   this.  It shows --

17             THE COURT:  I see.

18             THE WITNESS:  So...

19             THE COURT:  So why does the angle matter at all?

20             THE WITNESS:  The angle --

21             THE COURT:  You use both vertical and horizontal,

22   right?

23             THE WITNESS:  The trademark is the horizontal.

24             THE COURT:  Answer my question.

25             Do you use both vertical and horizontal?

1                THE WITNESS:  Yes.

2                THE COURT:  And do you use items that as they appear

3      in the showroom are angled?

4                THE WITNESS:  We call them horizontal because when you

5      put them on --

6                THE COURT:  Answer my question.

7                Do they appear in the showroom as angled?

8                THE WITNESS:  Yes.

9                THE COURT:  Thank you.

10                Go ahead, counsel.

11     BY MR. MALDONADO:

12     Q.  The court showed you a hat there that had four vertical

13     bars on it.

14                Did you see that?

15     A.  Yes.

16     Q.  And do you understand that that is a product that is not

17     accused of infringement in this case?

18     A.  Yes.

19     Q.  OK.  And the footwear that we're showing you on the screen

20     here with the four stripes, are these items that are still in

21     the collection?

22     A.  No.

23     Q.  How would you characterize the sales of these two sneakers?

24     A.  Very small, in the hundreds of units.

25     Q.  If we can turn now to Plaintiff's Exhibit 56.

1              Have you seen this before?

2   A.  Yes.

3   Q.  OK.  If we turn to page eight.

4              Do you see footwear on this page?

5   A.  Yes.

6   Q.  Do you understand those to be sneakers that are accused of

7   infringement in this action?

8   A.  Yes.

9   Q.  OK.  And are these four sneakers still in the collection?

10  A.  They are not.

11  Q.  How would you characterize the sales of these sneakers?

12  A.  Very small.  In the hundreds of units.

13  Q.  OK.  So is Thom Browne selling any of the footwear that's

14  been accused of infringement in this action?

15  A.  No.

16  Q.  Now let's talk about how the company has changed since you

17  joined it.

18             Has Thom Browne's product line expanded at all since

19  you joined the company?

20  A.  Yes.  We expanded into a whole collection of women's,

21  women's wear, women's accessories and footwear.  We also

22  expanded into kids.  And they are inspired in the same designs,

23  the same raw materials, the same graphics, trademarks applied,

24  and so we did expand significantly.

25  Q.  And in terms of distribution, have you expanded at all?

1   A.  When I joined, we had 14 stores.  Right now we have 105

2   stores.

3          When I joined, we had very small amount of

4   distribution for women's, and today we have similar amount of

5   close to 400 of women's distribution as well, wholesale

6   distribution.  Nordstrom, Neiman Marcus, Bergdorf Goodman, and

7   used to be Barney's before he went bankrupt.

8   Q.  You mentioned 105 stores.

9          How many of those are in the U.S.?

10  A.  Five.

11  Q.  Has your business changed at all with respect to e-commerce

12  since you joined the company?

13  A.  Yes, we expanded significantly.  We ship globally as a

14  business, and that includes for us *ThomBrowne.com* shipping

15  globally, direct relationship with Farfetch.  Farfetch is the

16  largest platform for e-business for luxury.  And we also have

17  other platforms, such as Tmall in China, we sell ourselves.

18  Q.  Thank you.  Can we pull up Defendant's 102, please.

19          Have you seen this document before?

20  A.  Yes.

21  Q.  If you look at page five.

22          Can you tell us what this tells us about Thom Browne?

23  A.  It tells us that Thom Browne retail environment is unique,

24  and it is a true reflection to the brand.  It mixes gray marble

25  from the walls, brushed and burnished brass, bespoke the poured

1    Terrazzo, and almost always vintage furniture.

2            The store is unexpected, yet designed to feel like the

3    interior of a home.  Always protected from view with either

4    venetian blinds or a marble facade.

5    Q.  Thank you.

6            Since you joined the company in 2016, has Thom Browne

7    expanded into sportswear?

8    A.  Yes.

9    Q.  How do you define sportswear?

10   A.  Thom Browne's sports is anything which is not tailoring.

11   So tailored garment, jacket, pant, the skirt, the short, coat,

12   anything which is not tailoring is sportswear.

13   Q.  And how has the sportswear business grown over the last ten

14   years?

15   A.  Significantly, as the collections have expanded into

16   women's, into kids.

17   Q.  I would like to show you a document that's been marked as

18   Exhibit Defendant's 479.  I would ask you to take a look at

19   this.

20           Have you seen this before?

21   A.  Yes, I have.

22   Q.  What is this?

23   A.  This is a line sheet, so the way our product is presented

24   for a specific season.

25   Q.  Can you explain what a line sheet is?

1    A.  Yes.  We do seasonal collections, in this case is fall/

2    winter 2016, and this is category by the sales team, outerwear

3    within sportswear.

4    Q.  In 2016, when you joined the company, did Thom Browne

5    consider varsity jackets to be sportswear?

6    A.  Yes.

7    Q.  Let's look at Defendant's Exhibit 586, please.

8           Have you seen this document before?

9    A.  Yes.

10   Q.  What season is this from?

11   A.  Spring/summer 2018.

12   Q.  What types of products are shown in this line sheet?

13   A.  This is shirting, so shirts of all kinds within the

14   sportswear category.

15   Q.  Has Thom Browne been following a plan to grow its

16   sportswear business?

17   A.  Yes.

18   Q.  How so?

19   A.  With expansion into women's collections, full collection

20   that didn't -- it wasn't a complete collection seven years ago.

21   Kids, which have the same reflection of product.  We have

22   jackets, we have pants, we have swimwear, we have sweatshirts,

23   we have sweatpants, we have T-shirts, polos.  There's a whole

24   collection of kids that reflects the same aesthetics, the same

25   designs for kids.

1    Q.  Are you familiar with the compression collection?

2    A.  Yes, I am.

3    Q.  Tell us about that, how that came to be.

4    A.  That is a collection of five items, and it was presented

5    two years ago.  It's the perfect continuation of the sweatpants

6    and sweatshirts, our five garments, that if you buy a

7    combination of them is $3,740, the outfit with sales tax,

8    $4,000.  And our layering pieces, beautiful, have the same very

9    high-quality materials, very high-quality of construction of

10   the garment, very high price point.  Timeless design and very

11   unique set of proportions in the fit.

12   Q.  When Thom Browne was designing the compression collection,

13   did you run performance tests on the fabric or the materials

14   that were used?

15   A.  I don't believe, no.

16   Q.  And how does the compression collection fit within the Thom

17   Browne collection?

18   A.  It all fits together because the collection have in total,

19   in common, the quality, the color theme.  The first collection

20   was in gray.  The fit is very unique.  The visual identity is

21   very unique, and you can actually layer that collection of

22   compression with a jacket, with a coat, with our footwear.  All

23   fits together.

24   Q.  What can you tell the jury about the price points for Thom

25   Browne's products?

1    A.  Exceptionally high.  Very high.

2    Q.  Can you give us some examples, please?

3    A.  Our price point start at $500.  Our suits are $3,500 plus

4    sales tax.  Our sweatpants are $800 plus.  Our sweatshirts are

5    seven, $800 plus.  Our T-shirts are $350 plus.  Our polos are

6    $400 plus.  Our footwear is $450, but for most of them, $600

7    plus.  Our coats are $2,000 plus.  Cashmere sweaters are $1700

8    plus, cardigans.

9    Q.  Why are your prices so high?

10   A.  Because the quality of raw material is very high.  It's the

11   best raw material for that specific garment.  The best quality

12   construction.  We have fair margins.  We don't have inflated

13   margins.

14   Q.  And how do your Thom Browne's prices compare to adidas'

15   prices?

16   A.  They are ten times higher.  The sweat pant is $70, I

17   believe, in adidas, and seven, $800 in Thom Browne.

18   Q.  Thank you.

19          MR. MALDONADO:  Your Honor, I'm about to get into a

20   new area.

21          Should we take our afternoon break now?

22          THE COURT:  All right.  Ladies and gentlemen, we'll

23   take a 15-minute break at this time.

24          (Continued on next page)

25

1          (Jury not present)

2          THE COURT:  You can step down.  I'll see you in

3    15 minutes.

4          (Witness temporarily excused)

5          THE COURT:  Do you want to give me a ballpark how much

6    more you have?

7          MR. MALDONADO:  I don't think I have more than half an

8    hour, your Honor.

9          THE COURT:  All right.  Who is your next witness?

10         MR. MALDONADO:  Robert Childs.

11         THE COURT:  How long is he going to be on direct?

12         MR. MALDONADO:  He'll be on the stand an hour, more or

13   less.

14         THE COURT:  All right.  See you in 15 minutes.

15         MR. LEWIN:  Your Honor, a moment of housekeeping.

16         THE COURT:  Yes.

17         MR. LEWIN:  I neglected to move in the three physical

18   garments that we showed as exhibits.  Items 879, 886, 896.

19   There was no objection.

20         MR. HENN:  I thought we agreed in advance those were

21   all demonstrative exhibits.  Now you want to introduce them?

22         MR. LEWIN:  Those three.

23         MR. MALDONADO:  Those were identified as exhibits.

24         MR. HENN:  That's fine.  No objection.

25         THE COURT:  Received.

1              (Defendant's Exhibits 879, 886, 896 received in

2      evidence)

3              All right.

4              (Recess)

5              THE COURT:  Please bring in the jury.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  Counsel.

3                MR. MALDONADO:  Thank you, your Honor.

4    BY MR. MALDONADO:

5    Q.  Mr. Bazan, have you done any studies on who the customers

6    of Thom Browne are?

7    A.  Yes, we have.

8    Q.  Can you tell us about that study?

9    A.  Yes.  We work with Farfetch, the luxury platform online.

10   They have data scientists, and they have allowed us to

11   analyze -- they analyze for us 25,000 transactions in specific

12   year, and they manage to specifically show us the pattern of

13   purchases of those clients.  This is data, and also which other

14   brands the clients buy.

15   Q.  Can you explain more about what Farfetch is?

16                MR. HENN:  Objection, your Honor.

17                Can I explain this on a sidebar?

18                THE COURT:  Yes.

19                (Continued on next page)

20

21

22

23

24

25

1           (At the side bar)

2           MR. HENN:  I did not object to the initial

3    foundational question, wanted to see if the foundation was

4    going to be laid.  We have a best evidence rule issue, if he's

5    going to talk at all about this study, because this study is

6    not going to be an exhibit in the case.

7           THE COURT:  He's not being offered as an expert,

8    therefore, I don't see how you can overcome the hearsay problem

9    that alone the other issues just raised about best evidence.

10           MR. MALDONADO:  We have exhibits that are the results

11   of the survey that they haven't objected to, and he's going to

12   talk about the results as reported to him about his

13   competitors.

14           THE COURT:  If they are exhibits that haven't been

15   objected to and he can identify them, you can put them before

16   the jury.  I don't see how he can go any further than that.  So

17   that's the most I'll allow.

18           MR. MALDONADO:  OK.

19           (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2     BY MR. MALDONADO:

3     Q.  Mr. Bazan, you mentioned a study that was done by Farfetch

4     regarding your competitors, is that correct?

5     A.  Yes.

6     Q.  Let's pull up Exhibit 642, please.

7          Can you identify what this is?

8     A.  This is the recut that Farfetch data scientists did of peer

9     brands, and this is specifically page of menswear.

10    Q.  I'm sorry.  Is this the results of the study that you just

11    described?

12    A.  Correct.

13    Q.  OK.  What does this show us?

14    A.  This is the data of the 25,000 transactions, roughly 9,000

15    clients behind those transactions, and they managed to give us

16    what they call share of wallet, the data of 10,000, how much

17    brand clients this was, how much do they buy of other brands,

18    and the order of importance.

19    Q.  If we could look, please, to direct your attention to

20    column one of this report.

21          And can you explain what that shows?

22    A.  This shows men's shoes, trainers category, and it shows a

23    client of Thom Browne buys Balenciaga, Givenchy, Valentino,

24    Gucci, Saint Laurent.

25    Q.  Is adidas identified as a competitor of Thom Browne in this

1    report?

2    A.  The data does not show it at all in this report.

3    Q.  Thank you.

4          Let's move on to Exhibit 643, please.  Can you

5    identify this, please.

6    A.  This is the same analysis done for women's transactions,

7    womenswear.

8    Q.  Is this the results of the Farfetch analysis that you

9    described?

10   A.  It was the same and done at the same time, correct.

11   Q.  This is from womenswear as the previous one, menswear?

12   A.  Correct.

13   Q.  If we can look at page two column two and walk us through

14   that, please?

15   A.  This is women's category, shoes, trainers.  And the client

16   of Thom Browne buys, in order of importance of dollars spent,

17   Saint Laurent, Valentino, Balenciaga, Givenchy, and Gucci.

18   Q.  Is adidas listed as a competitor of Thom Browne under

19   women's trainers?

20   A.  The data doesn't even show it anywhere.

21   Q.  Does adidas advertise and sell its products on Farfetch?

22          MR. HENN:  Foundation.

23   A.  Yes.

24   Q.  Can you tell us has Thom Browne done any studies to

25   profile --

1              THE COURT:  Wait.

2              Sustained.  But if you can lay a foundation, you may.

3              The question was:  does adidas ties and sell its

4     products on Farfetch?

5              MR. MALDONADO:  OK.

6              THE COURT:  There was an objection, foundation.

7              The witness answered, but the witness's answer will be

8     stricken if you can't lay a foundation.

9              MR. MALDONADO:  Thank you, your Honor.

10    BY MR. MALDONADO:

11    Q.  Mr. Bazan, have you had occasion to visit the Farfetch

12    website?

13    A.  Yes, I have.

14    Q.  And do you know whether --

15             Have you ever seen adidas' goods offered for sale on

16    the Farfetch website?

17    A.  Yes, I have seen them offered on the website.

18    Q.  Thank you.

19             THE COURT:  I will overrule the objection.

20             MR. MALDONADO:  Thank you, your Honor.

21    Q.  Has Thom Browne done any studies to profile the typical

22    Thom Browne customer?

23    A.  The typical client, no.  We have a wide range and we're

24    very happy to dress any ages, any genders, any nationalities.

25    The client is treated by liking or enjoying or having been an

1    attention and interest with what Thom Browne creates.

2    Q.  Does Thom Browne market its products to particular types of

3    customers?

4    A.  No, we don't.

5    Q.  As CEO of Thom Browne, are you familiar with how Thom

6    Browne advertises its brand?

7    A.  Yes.

8    Q.  Does Thom Browne do any traditional advertising such as TV,

9    radio, or print?

10   A.  No, we don't.

11   Q.  Why not?

12   A.  Because we communicate first and most importantly through

13   the fashion shows.  It's a created company, it's a designer

14   company, and the fashion shows portray seasonally what the new

15   collections are, what the image of the brand is.  A large

16   amount of time, effort, funds go into the fashion shows.  And

17   the fashion shows are held in New York Fashion Week or in Paris

18   Fashion Week.  Thom was invited in 2009 to show in Pitti

19   Florence, which is a great platform to show the collections.

20        When you're showing in those fashion weeks, you have a

21   very great platform of visibility where press is there, where

22   buyers are there for multi-brand stores, and celebrities are

23   there.

24        So that's where the majority of our funds and efforts

25   go.

1   Q.  You mentioned buyers.  Can you explain to the jury what

2   buyers are?

3   A.  The buyers are the merchants.  The buyers from such as

4   Saks, Neiman Marcus, Nordstrom, Bergdorf Goodman, or Barney's

5   in the past.  They are the merchants that go to identify new

6   brands, new designers, new product.

7           They curate and make a selection of product that they

8   want to carry in the stores, and they actually make the buy for

9   the stores.

10  Q.  They make the buy of the stores at the fashion shows?

11  A.  Subsequently.  The day after, two days after, we open

12  what's called market week.  And we open to buyers, so by

13  appointment, to come and see the full collection.  The

14  collection includes not only what was in the runway, on the

15  fashion show, but also complete collection.  And they spend

16  hours or a full day going through the collection, giving a

17  judgment, and ultimately buying what they are going to carry in

18  the stores.

19  Q.  We'll talk some more about that in a little bit.

20          In the meantime, you mentioned that you sell your

21  product to wholesalers, is that correct?

22  A.  Correct.

23  Q.  And give us examples of wholesalers?

24  A.  Stores such as Saks, Neiman Marcus, Nordstrom's, Bergdorf

25  Goodman, and Barney's was a very important client of ours.

1   Barney's New York.

2   Q.  You mentioned Thom Browne doesn't do any of its own

3   advertising to your wholesale customers.

4        Do you know if your wholesale customers are doing

5   advertising?

6   A.  They create what's call catalogs and they do campaigns.

7   And at times they include brands that they find interesting,

8   yes.

9   Q.  If we can go back to Defendant's Exhibit 103, please,

10  page 65.

11       Can you tell us what this page shows?

12  A.  This shows the image created by our store, our client,

13  wholesale client I.T in Hong Kong, and they create their own

14  advertising campaign, and they applied on a billboard on top of

15  their stores.  So this image includes Thom Browne looks from

16  the show, but it wasn't shot by us.

17  Q.  So this is advertising of Thom Browne products by your

18  wholesale customer?

19  A.  Correct.

20  Q.  And if we turn to the next page, page 66.

21       Is that the image from the billboard?

22  A.  One of the two, yes.

23  Q.  And what does this show?

24  A.  It shows two complete looks from the runway.  It was a

25  Paris show in this case.  I remember the show.  And they

1    directed and created their own advertising based on our

2    clothes.

3    Q.  Thank you.

4            Does Thom Browne use digital communications?

5    A.  Yes, we do.

6    Q.  Give us examples of a digital communication that Thom

7    Browne uses?

8    A.  Our website, social media, Instagram, Facebook, WeChat in

9    Asia, in China.

10   Q.  You mentioned Facebook.

11           How long has Thom Browne been using Facebook?

12   A.  I believe 2009.

13   Q.  How many Facebook followers does Thom Browne have?

14   A.  190,000.

15   Q.  You also mentioned Instagram?

16   A.  Yes.

17   Q.  How long has Thom Browne been on Instagram?

18   A.  Same, 2012.

19   Q.  How many followers does Thom Browne have on Instagram?

20   A.  1.3 million followers.

21   Q.  I would like to show you a document. please show this only

22   to the witness.  Defendant's Exhibit 765.

23           Can you identify this document for us?

24   A.  Yes.  This is called a clippings report, so it's a report

25   that our team puts together with the most significant press for

1    a specific period.  And this is November 13 of a certain year

2    through December 2, which is not the most significant moment of

3    visibility because our shows happen in September or October.

4    Q.  What is the information contained in this report generally?

5    A.  This is all including unsolicited press.  These are

6    coverage in magazines, in newspapers, or websites of the same

7    media channels, third-party, that includes stories, garments,

8    looks of Thom Browne, sometimes interviews of Tom, sometimes I

9    do an interview on the business.  But it's largely what we call

10   editorials.

11   Q.  And how often is this material compiled?

12   A.  On a monthly basis.

13   Q.  Who compiles this material within your company?

14   A.  Our PR team.

15   Q.  OK.  And is this a documents that created in the ordinary

16   course of business?

17   A.  Yes, it is.  It's very important.

18             MR. MALDONADO:  Your Honor, I would like to offer this

19   document as evidence, Exhibit 765.  I believe there's an

20   objection.

21             MR. HENN:  We have multiple objections.  Relevance,

22   this is 2021, hearsay to the content.

23             THE COURT:  Well, on the present record, sustained.

24             If you want a sidebar on particular items of it, I'll

25   be happy to hear you.

1          MR. MALDONADO:  Yes, please, your Honor.

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  So most obviously the fact that it's kept

3       as an ordinary business record of Thom Browne doesn't mean that

4       self-serving statements in the underlying records regarding

5       Thom Browne aren't still objectionable under the hearsay rule.

6            MR. MALDONADO:  OK.  So we're not offering it for the

7       statements that are in the articles.  We're offering it for the

8       fact that one of the arguments made by plaintiff in this case

9       is that they didn't know about Thom Browne.

10           So this is unsolicited media that shows the extent

11      Thom Browne has been in the media, in the news media, and would

12      have been known to people following fashion.  And it's not the

13      truth of the statements in the articles, it's just the fact

14      that they were out there, as well as social media posts out

15      there showing the visibility on social media.

16           And so it all goes to that, and that's a very

17      important part of their case.

18           THE COURT:  All right.

19           MR. HENN:  That is why I started with relevance.  This

20      collection, there may be older ones, but this collection is all

21      from 2021, after we filed our lawsuit.  It can't go to laches.

22           MR. MALDONADO:  There is continuing -- there is a

23      continuing argument of what's been happening in terms of harm

24      that's been happening from 20 --

25           THE COURT:  No.  No, I think it's too remote.  It may

1    not be totally irrelevant, but it requires inferences on the

2    jury's part to put it into a right proper timeframe.

3             Adding to that is the difficulty the jury would have

4    in disregarding the truth of the assertions made and just

5    taking it for the fact that it was out there.  I think the

6    combination of those weaknesses supports the exclusion of the

7    exhibit.

8             MR. MALDONADO:  Your Honor, may I proffer now that

9    we're here?

10            THE COURT:  Yes.

11            MR. MALDONADO:  We have a similar report from an

12   earlier timeframe.

13            THE COURT:  That I will receive.  If it's the proper

14   timeframe, I will receive it and instruct the jury, however,

15   that they are not to take it for its truth but only for the

16   fact that it's out there.

17            MR. MALDONADO:  Thank you, your Honor.

18            (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          MR. MALDONADO:  Give me one second, your Honor.

3          (Pause)

4          637.  Can we please pull up Exhibit 637.

5     BY MR. MALDONADO:

6     Q.  Mr. Bazan, before you is an exhibit marked Exhibit 637.

7          Do you recognize this document?

8     A.  Yes, I do.

9     Q.  Can you please tell us what it is?

10    A.  It's a clipping report, same collection of a specific

11    period of editorials, unsolicited press in magazines,

12    newspapers, or their online versions.

13    Q.  What is the date on this report?

14    A.  August 18, 2017.

15         MR. MALDONADO:  Your Honor, we offer Exhibit 637.

16         MR. HENN:  Same objection, your Honor.  This is from

17    2017.

18         THE COURT:  When was this lawsuit filed?

19         MR. HENN:  It was filed in --

20         THE COURT:  You filed it in 2021.

21         MR. HENN:  Filed in 2020, and the objection date was

22    May 2018.

23         THE COURT:  This is the earlier period.

24         If your objection is the hearsay objection, I will

25    instruct the jury as to that.

1          So, ladies and gentlemen, one of the issues in this

2     case that you've already heard a lot about is laches, namely

3     the question of even assuming, for the sake of argument, that

4     there was infringement or dilution, that Thom Browne asserts

5     that adidas waited much too long to bring this lawsuit.  They

6     should have brought it much earlier.

7          I'm going to give you detailed instructions about that

8     at the close of all the evidence.  But one of the questions

9     that has been in dispute is whether adidas knew about Thom

10    Browne and after that earlier contact in 2006, when Thom Browne

11    eliminated the Three-Stripe Mark, and whether they knew about

12    Thom Browne was now using a four-stripe mark, which adidas says

13    consumers would have seen as similar, or whether they knew

14    about the Grosgrain mark, etc.

15         You may recall you heard testimony from Ms. Vanderhoff

16    that they really didn't know that Thom Browne was engaging in

17    this until someone in Europe brought it to their attention.

18    And this particular piece of evidence is being offered by Thom

19    Browne to show that there was a lot of media coverage of Thom

20    Browne from an earlier date and, therefore, you can look at it

21    from that standpoint.

22         Now some of the clippings make all sorts of assertions

23    about Thom Browne.  None of those are being offered for their

24    truth or falsity.  It's irrelevant.  The only question for you

25    is whether it was being publicized widely before adidas brought

1   this lawsuit, and if so when, and if so what is the likelihood,

2   in your opinion, that it would have been picked up by adidas if

3   adidas had done their homework, so to speak.

4                So with those limitations, it is received.

5                (Defendant's Exhibit 637 received in evidence)

6                MR. MALDONADO:  Thank you, your Honor.

7                If you can take a look at page 13 of this Exhibit 637,

8   please.

9   BY MR. MALDONADO:

10  Q.   Can you tell us what we see on this page?

11  A.   It's an article from *Towne & Country* magazine how

12  Elizabeth Taylor's grandchildren are keeping her legacy alive.

13  Q.   What's the date of the article?

14  A.   May 8, 2017.

15  Q.   If you scroll to the bottom of this page.

16               Can you tell us what we see on the screen?

17  A.   Yes.  It says here, Grandson Rhys Tivey in a Thom Browne

18  shirt and sweater.

19  Q.   Is that Thom Browne clothing?

20  A.   Absolutely.

21  Q.   Can you tell us, again, what are these articles, these news

22  articles in the clipping report?

23               Generally describe what they are.

24  A.   What they are is unsolicited press or communication on the

25  brand.  This means that a journalist, a team of stylists, find

1    interest in the brand, find interest in the designs to show.

2    For example, they contact our team, they want to borrow pieces,

3    and they ship the collection.

4            In many cases, this may well be that this gentleman is

5    a client of Thom Browne and he wants to be portrayed wearing

6    Thom Browne, being part of the Thom Browne team.

7    Q.   Thank you.

8            Let's talk a little bit about the marketing that Thom

9    Browne does.

10           You mentioned fashion shows use a type of marketing

11   that Thom Browne does?

12   A.   Yes.

13   Q.   What are some other types of marketing that Thom Browne

14   does?

15   A.   Everything starts with a fashion show because the

16   creativity for the season is put together and it's shown in the

17   collection.  As part of that, then we engage with press that

18   wants to shoots the collection in editorials.  We shoot also

19   our own content.  We shoot the collections in the look book

20   format, if it's not a show.  And we also engage with

21   celebrities that are very happy to be dressed Thom Browne.

22           This is unpaid.  And this is something that they want

23   to wear the brand, so we work with them directly.  Some may

24   well be clients of Thom Browne, some are their stylists

25   suggestion the brand.  And on an unpaid basis, we dress them

1   for specific occasions, and they are shot.

2          And all this content is the way that Thom Browne is

3   known to the public.  This word of mouth.  It's either the

4   client telling to another client because he or she is wearing

5   it, the department store displaying and communicating this new

6   brand, this very interesting brand, or this magazine

7   considering Thom Browne the brand of the designer is really

8   interesting and, therefore, portraying that in their own

9   platforms.  And the celebrities themselves, which are highly

10  popular.

11  Q.  You mentioned that celebrities wear Thom Browne clothing?

12  A.  Yes, they do.

13  Q.  Do you pay them to wear your clothing?

14  A.  No.  We never pay the celebrity to wear our clothes.  This

15  could be athletes, this could be our clients of Thom Browne,

16  this could be performers, singers, it could be actress and

17  actresses on TV or of film.  There is a number of them.

18  Q.  OK.  If we can pull up -- I believe there is an objection.

19  Let's pull this up for the witness only to demonstrative

20  Exhibit 4.

21          Can you tell the jury who some of these celebrities

22  are who have worn Thom Browne clothing?

23          MR. MALDONADO:  Actually, your Honor, I would like to

24  publish this to the jury.  I believe there's an objection.

25  It's a demonstrative.

1           THE COURT:  All right.

2           MR. HENN:  Sidebar, your Honor.

3           THE COURT:  All right.  Sidebar.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. HENN:  Our objection to this demonstrative is on

3    the basis that it is misleading because there is no date

4    assigned to any of these celebrities.  And it suggests that

5    these are people that have been wearing this stuff all the

6    time, and it's a very long list, unless this witness can say

7    who is wearing it back in the relevant laches period.

8          THE COURT:  I think it just remains on his screen, he

9    can use it to refresh his recollection, but you need to

10   identify when this occurred.

11         MR. MALDONADO:  OK.

12         THE COURT:  Also, you had said a half hour.  It's been

13   just about a half hour.

14         MR. MALDONADO:  Has it been?

15         THE COURT:  I'll give you five more minutes.

16         MR. MALDONADO:  OK.  Thanks.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1                    (In open court)

2       BY MR. MALDONADO:

3       Q.  What are some of the celebrities that have worn Thom Browne

4       clothing?

5       A.  Lebron James, an athlete and very long-time client of Thom

6       Browne, Russell Westbrook, Shai Alexander, Steph Curry, Lindsey

7       Vonn, Eileen Gu, Dwyane Wade, Odell Beckham Jr., Ashley Harris.

8                    In the music category we dress for Met Gala, Janet

9       Jackson attended our show, Erykah Badu, Doja Cat, Lyzza --

10      Q.  Thank you.

11                   Can you tell us what percentage of Thom Browne

12      clothing bears the four bar signature?

13      A.  Around 40 percent of our products bear the four bars.

14      Q.  What's the value of the four-bar brand to the company Thom

15      Browne?

16                   MR. HENN:  Objection, foundation.

17                   THE COURT:  Sustained.

18      Q.  Has Thom Browne done any economic analysis of the harm it

19      would suffer if it had to stop using the four bars?

20      A.  No, we haven't done it.

21      Q.  Why not?

22      A.  Because it would just be way too big, way too significant.

23      We would have to rebrand completely.

24                   MR. HENN:  Objection.

25      A.  We would have to --

1          THE COURT:  No, no.  There's an objection.

2          Well, I'll let the answer stand as it has gone so far,

3     but no further.

4     BY MR. MALDONADO:

5     Q.   How has Thom Browne invested in its branding?

6     A.   We have put the majority of our funds, time, and designer

7     efforts and company efforts on branding.  This is not -- this

8     doesn't start a commercial company.  It doesn't start as

9     something to straight away sell a lot of product.

10         We started with a very, a very conceptual brand, a

11    very unique brand, extremely high quality and, therefore, it's

12    been 20 years in the making for it to be identified as a brand

13    of high quality, of a unique design to be represented in the

14    best in the world, to have our own dedicated spaces.  And all

15    this has been done respecting the original codes.

16         And the four-bar is the key trademark, the key

17    identifier of the product.  It's what a lot of clients first

18    relate to.

19    Q.   Has Thom Browne ever heard from adidas since 2007?

20    A.   2018 when they contact us.

21    Q.   Prior to 2018.  Sorry, between 2007 and 2018?

22    A.   Adidas came to our office in 2016.

23    Q.   Can you tell us about that?

24    A.   Yes.  I had a relationship with Nick Galloway.  Nick

25    Galloway was and is still the head of design for adidas

1    originals.  I worked with him when I was in Alexander Wang in

2    the collaboration that we did there.  We had a very good

3    working relationship.  He was always present in fashion week.

4    We remain in contact.  And one day I invited him to the

5    showroom.

6    Q.  When was this?

7    A.  In September 2016.

8    Q.  OK.  Continue.

9    A.  Our showroom in New York.  And he met Thom, we had a

10   conversation, he saw the collection that was there, and he was,

11   as a designer, very congratulatory, very positive to Thom.  He

12   really celebrated what Thom had been doing.  He knew what Thom

13   had been doing.  And I walked him through the collection that

14   we had for the season.

15   Q.  What collection did you walk him through?

16        What items were there?

17   A.  It must have been spring/summer 2017.

18   Q.  What types of items were on display?

19   A.  Jackets, coats, spring summer, sweaters, sweatpants,

20   sweatshirts, shirts, T-shirts, anything that makes our

21   collection.

22   Q.  And do those items bear the four-bar signature?

23   A.  Some of them did, yeah.

24   Q.  And did those items bear the Grosgrain signature?

25   A.  Most of them did include it.

1  Q.  When you showed Mr. Gallaway your collections, did he voice

2  any complaints?

3  A.  None at all.  He was very complimentary to Thom.

4  Q.  Sorry.  Did he complain about the four-bar signature?

5  A.  Not at all.

6  Q.  Did he complain about the Grosgrain?

7  A.  Not at all.

8  Q.  So can you please let the jury know why Thom Browne is

9  fighting this fight?

10          MR. HENN:  Objection.

11          THE COURT:  Sustained.

12          MR. MALDONADO:  I don't have any further questions,

13  your Honor.

14          THE COURT:  Cross-examination.

15  CROSS-EXAMINATION

16  BY MR. HENN:

17  Q.  Mr. Bazan, do you recall being asked on your direct

18  examination about the shoes that are accused of infringement in

19  this case?

20  A.  Yes.

21          (Continued on next page)

22

23

24

25

1   BY MR. HENN:  (Continued)

2   Q.  And you were shown the shoes that have the Grosgrain on the

3   side of the shoe where it's got the red and blue stripes.  Do

4   you recall that?

5   A.  Yes.

6   Q.  And you were asked how many of those you sold.  Do you

7   remember that?

8   A.  I don't remember specifically.

9   Q.  You said that the sales of those shoes were very small.  Do

10  you remember that?

11  A.  As I said earlier today, very small, yeah.

12  Q.  And I think you said they were in the hundreds of units.

13  Is that correct?

14  A.  Yes, I said that.

15  Q.  How many hundreds of units do you think is a very small

16  number?

17  A.  Anything less than 600, 700.

18  Q.  You were also shown images of the shoes with the four

19  vertical white stripes on them.  Do you recall that?

20  A.  Yes.

21  Q.  And you said similarly that those were sales that were very

22  small, correct?

23  A.  Yes.

24  Q.  Were those also in the hundreds of units?

25  A.  Yes.

1   Q.  Six, 700 of units?

2   A.  Or less.

3   Q.  Or less.  And your view is that that makes the combination

4   of sales of all of those shoes very small?

5   A.  Yes, it does.

6   Q.  You mentioned that you had stopped selling those shoes with

7   the four vertical stripes on them?  Is it correct that you

8   stopped selling those?

9   A.  I said they're not part of the collection any more.

10  Q.  Not part of the collection any more?

11  A.  Mmm-hmm.

12  Q.  Are they still for sale?

13  A.  I don't know if they're part of an outlet.

14  Q.  Do you know if they were still on sale on your own website

15  as of May 2022?

16  A.  I don't think so.

17  Q.  Let's pull up the document, Nita, that I provided to you.

18  So just for the witness at this point -- your Honor, this is

19  not on our witness list.  It's being used for impeachment

20  purposes?

21          THE COURT:  All right.

22  Q.  Mr. Bazan, do you see on your screen a page from Thom

23  Browne's website?

24  A.  Yes.

25  Q.  And if we go to the lower left corner, do you see that that

1    was captured in May of 2022?

2    A.  This shoes is different, if I may say.  This is a tuxedo

3    because it's black, and it has a tuxedo.  The one I was shown

4    before was a dark gray.  It was completely flat.  You can see

5    the shape of -- the same as the type of shoes I'm wearing.  The

6    upper is black.  It's another shoe.

7    Q.  If we blow up on the upper right, this sneaker you're

8    suggesting is for tuxedos?

9    A.  When it's black, it's always tuxedos, yes.

10   Q.  So the company is still selling shoes with four white

11   vertical stripes on them then?

12   A.  Today, no.

13   Q.  But as of May?

14   A.  If it's there, yes.

15   Q.  The Judge asked you about the vertical stripes on the hat,

16   the horizontal stripes on the scarf, and the diagonal stripes

17   on the sleeve of the suit.  Do you remember that?

18   A.  Yes.

19   Q.  Is that all one 4-Bar trademark?

20   A.  The horizontal --

21           MR. MALDONADO:  Objection.

22           THE COURT:  I'll allow it.  Overruled.

23   A.  Can you ask the question again?

24   Q.  Sure.  Is it the same 4-Bar signature, whether it is

25   vertical, horizontal or diagonal, on Thom Browne's products?

1    A.  The trademark is the one used horizontally.  Horizontally

2    just to clarify what I meant is that when it's designed to be

3    worn on your sleeve, so it's like this horizontal, that's the

4    trademark on the arm or on the leg.  We also use the decorative

5    uses like the one on the hat.

6    Q.  What about on the scarf?

7    A.  It's another decorative use.

8    Q.  And the one on the shoes?

9    A.  It's another decorative use.

10   Q.  Mr. Bazan, you've only been CEO of Thom Browne since May of

11   2016 correct?

12   A.  Correct.

13   Q.  Prior to that, you had no employment relationship with Thom

14   Browne?

15   A.  Correct.

16   Q.  You said when you joined, you said it was a small company.

17   Do you recall that testimony?

18   A.  Yes.

19   Q.  That was in fact one of the reasons you wanted to join,

20   right?

21   A.  One of the reasons.  There was new investors coming to the

22   company, and, most importantly, the respect I had built on what

23   I had seen on looking at all of Thom Browne's collections.

24   Q.  Prior to joining Thom Browne, you had been president of

25   Alexander Wang, correct?

1    A.  Correct.

2    Q.  And I think you mentioned you worked with adidas during its

3    collaboration with Alexander Wang, correct?

4    A.  At the end of my term with Alexander Wang, I work on what

5    was a collection that ended up launching after I left, correct.

6    Q.  You also spent some time working at Gucci?

7    A.  Gucci Group, correct.

8    Q.  You consider Thom Browne's competitors to include Gucci,

9    correct?

10   A.  Yes.

11   Q.  You mentioned that Thom Browne sells its products and had

12   sold its products at Nordstrom.  Do you recall that testimony?

13   A.  Yes.

14   Q.  Let's pull up Plaintiff's Exhibit 1307 at page 2.

15           MR. HENN:  We'd offer this, your Honor.  I don't think

16   there is an objection.

17           MR. MALDONADO:  Only one page?  No objection, your

18   Honor.

19           THE COURT:  Received.

20           (Plaintiff's Exhibit 1307 page 2 received in evidence)

21   Q.  You recognize this as a capture of some Thom Browne's

22   products being sold at Nordstrom?

23   A.  Yes.

24   Q.  From December of 2021?

25   A.  Yes.

1   Q.  If we just highlight the bottom row, please.  This includes

2   the compression T-shirt on the left, correct?

3   A.  Yes.

4   Q.  Compression tights as well as running shorts, correct?

5   A.  Yes.

6   Q.  Take that down.

7           Let's pull up 1309.  Go to page 2.

8           MR. HENN:  I offer this one as well.  Do you have any

9   objection?

10          MR. MALDONADO:  No objection.

11          THE COURT:  Received.

12          (Plaintiff's Exhibit 1309 page 2 received in evidence)

13  Q.  You recognize this as some Thom Browne products being

14  offered by Saks on its website?

15  A.  Yes.

16  Q.  Take that down.  Let's pull up 371 just for the witness at

17  this point, Nita, and us.

18          MR. HENN:  We'd offer Exhibit 371.

19          MR. MALDONADO:  No objection.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 371 received in evidence)

22  Q.  Let's publish that.

23          Mr. Bazan, do you recognize Exhibit 371 as Thom Browne

24  products being sold on FARFETCH?

25  A.  Yes.

N19Qadi6                    Bazan - Cross

1    Q.  Thank you.  Take that down.

2            You testified on direct that you don't think it's

3    necessary to measure or do market research.  Do you recall

4    that?

5    A.  Yes.

6    Q.  Your company thus has no market research concerning

7    awareness or recognition of its 4-Bars trademark, correct?

8    A.  Yes.

9    Q.  And the company has not conducted any market research that

10   shows that consumers are looking specifically for the four

11   bands on products, correct?

12   A.  No.  We have the presence of the buyers ever since they're

13   in the showroom and the reaction to the collection of the

14   4-Bars that we have.

15   Q.  And the company hasn't done any market research during the

16   time you've been there?

17   A.  Correct.

18   Q.  The company also has no market research concerning any

19   awareness of the Grosgrain as Thom Browne trademark, correct?

20   A.  Yes.  We have at the same time the same feedback in the

21   showroom when the buyers come and tell us what they think, what

22   they want to buy, and what they clearly like and recognize in

23   collections.

24   Q.  But you've never done any quantitative research among

25   consumers as to their awareness level of the four stripes or

1  the Grosgrain, correct?

2  A.  No.

3  Q.  And at the time the company decided to start using four

4  stripes instead of three, the company didn't do any market

5  research to test how consumers would perceive that, did they?

6  A.  I don't think so.  I wasn't part of the company.

7  Q.  You mentioned that Thom Browne does not have a target or

8  typical customer.  Do you remember that?

9  A.  Yes.

10  Q.  And that Thom Browne will sell to anyone regardless of age,

11  gender, nationality, I think you said.  Is that correct?

12  A.  Yes.

13  Q.  And in terms of targeting, your advertising and marketing

14  today, that is still true?

15  A.  The unsolicited coverage by the media is done by

16  journalists and stylists that decide to shoot, correct.

17  Q.  I should have been more specific.  Your social media

18  presence, do you remember talking about that?

19  A.  Yes.

20  Q.  That is available to everyone, correct?

21  A.  Yes.

22  Q.  And I think you mentioned that today you have quite a few

23  followers at both of the social media sites that you

24  referenced?

25  A.  Yes.

1    Q.  You're not involved personally in the design of those

2    social media posts, are you?

3    A.  No, I am not.

4    Q.  With regard to the compression products, the compression

5    line, those are not actually designed for athletic activities

6    like running, correct?

7    A.  They could be used for running but their primary intention

8    designing them is to respect the same idea of quality, extreme

9    quality, unique fit, same color themes and extremely high

10   quality of manufacturing.  And in my case I've seen them mostly

11   worn as a layering piece at an airport, in a lounge, business

12   class lounge, first class lounge or walking around SoHo.

13   Q.  I think you said on direct, you didn't do any performance

14   tests to see if they could be used for actual running

15   activities, correct?

16   A.  Not that I'm aware of.

17   Q.  I want to pull up Plaintiff's Exhibit 857.  This will be

18   just for the witness and for us at the moment.

19          Do you recognize this as an email that you sent to

20   Rickie DeSole in 2016?

21   A.  Yes.  If I may read it.  Show me the date again.  Sorry.

22   Go up.  Thank you.  If you can go up a bit?  Yes.

23          MR. HENN:  Your Honor, we'd offer Exhibit 857.

24          MR. MALDONADO:  No objection.

25          THE COURT:  Received.

1        (Plaintiff's Exhibit 857 received in evidence)

2   Q.  At the time that you sent this in 2016, Mr. DeSole was a

3   member of Thom Browne's board of directors, correct?

4   A.  Yes.

5   Q.  And the third line of this email states, "This is my first

6   recap of several meetings with Thom and some of our key members

7   of our design, commercial retail and development production."

8   Do you see that?

9   A.  Yes.

10  Q.  And if I understand it correctly, you joined the company

11  shortly before this, and you sat down with a whole bunch of

12  people in the company to get a handle of what was going on.  Is

13  that fair.

14  A.  I sat down with Thom and some key members to get to

15  understand the brand really well, the company really well and

16  start discussing ideas.  I was an external so, I had the

17  benefit of thinking of new things and attain ideas.

18  Q.  You attached a PDF to this email.  You see it says, "Draft

19  of ideas for Thom to review."  Do you see that?

20  A.  Yes.

21  Q.  And you compiled some notes and thoughts from your meetings

22  with all of those key people, and you sent it to the members of

23  the board of directors, correct?

24  A.  Yes.

25  Q.  Go over to page 3.  At the top we have a part of your

1    recap, and this part is entitled, "Expanding the unstructured

2    world."  Do you see that?

3    A.  Yes.

4    Q.  And the first line says, "A very focused approach on adding

5    styles to the current offering."  Do you see that?

6    A.  Yes.

7    Q.  Very focused is underlined?

8    A.  Yes.

9    Q.  If we go over to sportswear, this is the list of the

10   focused approach you proposed to take, correct?

11   A.  Yes.

12   Q.  So that expansion that focused expansion to add styles

13   include American sportswear expression, correct?

14   A.  Yes.

15   Q.  And at the bottom bullet point, it says, "Current jersey,

16   knitwear, polo, T-shirts, complemented by outerwear,

17   down-jackets and sportswear piece," correct?

18   A.  Yes, by additional sportswear pieces, there were already a

19   number of sportswear pieces in the collection.

20   Q.  Yes.  So the idea in 2016 was that you were going to expand

21   those and add nuance, right?

22   A.  And I also mentioned the outerwear collection, which is a

23   signature part of our collection yes, today.

24   Q.  And if we go over to page 5, we've got your plan for

25   footwear at the bottom, or at least some notes on footwear at

1    the bottom.  Blow up that part.

2           You wrote that, "Our signature will always be our

3    classic North Hampton style offering."

4           can you tell the jury what you meant by classic North

5    Hampton style?

6    A.   The type of shoe that I'm wearing, British structured

7    footwear.

8    Q.   And then it says, "Complemented by soft sole component

9    (world of sportswear/American elevated expression."

10          Do you see that?

11   A.   Yes.

12   Q.   At this time, you were also considering adding or

13   complementing the loafers you're wearing with more sportswear

14   inspired footwear, correct?

15   A.   Yes.

16   Q.   Take that down.

17          And then in 2018, one of the company's priorities was

18   to expand sportswear even further, correct?

19   A.   Into women's, into kids, yes.

20   Q.   Well, in 2018, you did your deal with the Cavaliers team

21   where you dressed all the players for all the playoff games,

22   correct?

23   A.   It wasn't -- to be precise, it wasn't a deal with the

24   Cavaliers.  Mr. Lebron James is a client of Thom Browne.

25   Dwyane Wade is a client of Thom Browne.  They were both players

1    of the team.  Dwyane Wade presented and award to Thom, and at

2    the dinner table at that award, I said, "Would you wear this to

3    the games because we're about to dress FC Barcelona because

4    they asked us to."  And Thom explained the idea, the uniformity

5    of all the players.  And weeks after or days after, the

6    followup that Lebron James wanted to dress the team with Thom's

7    clothes for the playoffs.

8    Q.  And that was in the fall of 2018?

9    A.  It was in the -- it was playoffs in May, I think May 2018.

10   Q.  And then in May 2018, you also entered your deal with FC

11   Barcelona, yes?

12   A.  We started, yes.

13   Q.  Let's pull up Plaintiff's Exhibit 849.

14            MR. HENN:  I offer this in evidence.

15            MR. MALDONADO:  No objection.

16            THE COURT:  Received.

17            (Plaintiff's Exhibit 849 received in evidence)

18            THE COURT:  We only have about six or ten minutes

19   left.

20            MR. HENN:  Got my watch right here, your Honor.

21   You've trained me well.

22   Q.  This is the sponsorship agreement between FC Barcelona and

23   Thom Browne, correct?

24   A.  Correct.

25   Q.  If we go to page 2, it states "term" at the bottom?

1   A.  Yes.

2   Q.  The term was from July of 2018 until June of 2021.  Do you

3   see that?

4   A.  When the new season starts in Europe after the summer.

5   Q.  You were aware, sir, that adidas objected to Thom Browne's

6   use of the 4-Bars and Grosgrain ribbons in the spring of 2018,

7   correct?

8   A.  Yes.  And this agreement is for formal wear.  So anything

9   that happens traveling, so the travel outfit not on the pitch.

10  Really specific.  FC Barcelona is sponsored by Nike.

11  Q.  One of their key players, of course, is Lionel Messi.  Yes?

12  A.  Yes.

13  Q.  When he's on the field, he's wearing adidas three stripes.

14  Yes?

15  A.  No, when he's in the field, he's wearing Nike.  Nike is the

16  sponsor of the team.

17  Q.  Fair.  Fair enough.  When he plays for Argentina, he's

18  wearing three stripes.  Yes?

19  A.  Because he -- that's the sponsor for Argentina National

20  Team.

21  Q.  And you're aware he has a deal with adidas?

22  A.  Yes.

23  Q.  In fact, that's been around for a long time, and you're

24  well aware of that?

25  A.  Yes.

1    Q.  And then when he gets out of his uniform, he puts on Thom

2    Browne clothes.  Is that the idea?

3            MR. MALDONADO:  Objection.  Objection.

4    A.  No, he --

5            MR. MALDONADO:  Objection.

6            THE COURT:  No, I'll allow it.  Go ahead.  You may

7    answer.

8    A.  Can you ask the question again?

9    Q.  Yes.  So the idea is whatever he's wearing on the field, he

10   wears on the field, and then afterwards he puts on Thom

11   Browne's 4-Bars apparel.  Yes?

12   A.  No.  Just to be precise, the way it works is that the team

13   has a deal with a performance sports company Nike.  So anything

14   that they wear on the field is Nike.  In the case of FC

15   Barcelona is adidas I believe in the case of Argentina National

16   team.  The players have separate of their own deals.  I think

17   they wear different footwear.  That's the only thing they can

18   wear differently.  Thom Browne has the rights to this

19   agreement.  They reach out to us to dress the team in formal

20   wear from the training ground into the game to be united as a

21   team.  So into the airport, on the flight, and getting to the

22   next hotel.  So this is a tradition in European soccer, and

23   Barcelona was -- FC Barcelona was visionary enough to choose

24   Thom Browne to do it, and the players themselves in the first

25   trip happily posted.  So players such as Lionel Messi, he

1   himself posted the images himself on social media.

2   Q.  And that deal ran for 2018 through 2021?

3   A.  Three seasons, correct.

4   Q.  Let's pull up 788.  Now we're into 2019.

5         MR. HENN:  We'd offer 788 into evidence.

6         MR. MALDONADO:  No objection, your Honor.

7         THE COURT:  Received.

8         (Plaintiff's Exhibit 788 received in evidence)

9   Q.  These were the personal goals that you sent as CEO for 2019

10  to Mr. Zegna, the owner of the company, correct?

11  A.  One of the owners.  Zegna Company and Thom Browne are the

12  owners of the company, correct.

13  Q.  The attachment there is, CEO 2019 personal goals.  It's a

14  PDF that's attached to the email, correct?

15  A.  Yes.

16  Q.  And we see that on page 2, and the highlighted part says,

17  "number one, drive the below product strategies."  Do you see

18  that?

19  A.  Yes.

20  Q.  And under "Products" men's ready to wear, "MRTW," you say

21  "develop the architecture of product and range from full canvas

22  tailoring, through unconstructed outerwear, sportswear

23  (including knits and jersey), T-shirts."  Correct?

24  A.  Yes.

25  Q.  So in 2019, your number one goal was to drive those types

1    of products as a company?

2    A.  One of the goals, yes.

3    Q.  Just conveniently happened to be the first one you listed?

4          MR. MALDONADO:  Objection.

5          THE COURT:  Overruled.

6    A.  It's -- in order of significance, the business is still

7    men's ready to wear, around two-thirds; and women's ready to

8    wear around a third, so it's in order of importance in terms of

9    what we were focusing on.

10   Q.  And the next line down, the last one I'm going to point to

11   before we break, "Specifically develop a down-jacket." Do you

12   see that?

13   A.  Yes.

14   Q.  And you understand that's one of the accused products in

15   the case?

16   A.  Yes, the $2,500 plush down-jacket which I mentioned was

17   part of our --

18         THE COURT:  No.  No.  No.  You've answered.

19         MR. HENN:  Your Honor, this is a good breaking point.

20         THE COURT:  Ladies and gentlemen, We're making great

21   progress but we still have more to go.  We will see you at 9:30

22   tomorrow.  Have a good evening.

23         (Continued on next page)

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.

3          Now, you may recall that we need to reach a decision

4   by no later than the end of the day tomorrow as to whether to

5   excuse Juror No. 4 permanently so she can attend the funeral,

6   or the alternative was to not sit on Wednesday afternoon so

7   that she could go but still participate in the proceedings, and

8   that will turn on when the evidence in this case will con

9   include.

10          So I want counsel to consult with each other tonight

11  and to give me tomorrow morning a binding representation of who

12  are the remaining witnesses, how long they will take, and when

13  the evidence will conclude.  And if the answer is it will

14  conclude by midday Wednesday, then of course we can excuse the

15  juror just for the one day, not sit with the jury, and we can

16  use that time for the charging conference.

17          If, to take a different extreme, the evidence will not

18  conclude until midday Thursday, I can't imagine it would be

19  later than that, but anyway, midday Thursday, then I don't

20  think we can excuse the juror -- I'm sorry -- we'll excuse her

21  permanently because we'll need to keep going Wednesday

22  afternoon with the rest of the jury.

23          So it's totally in your respective ballparks, but I

24  need to know the answer by tomorrow morning so I can advise the

25  juror appropriately by tomorrow afternoon.

N19Qadi6

1          MR. MALDONADO:  One option we had discussed previously

2     was having the charging conference Wednesday afternoon and then

3     excusing the jury during the charging conference while the

4     juror attended the funeral and after.

5          THE COURT:  I'm willing to do that if the evidence is

6     concluded by midday Wednesday.  Then we can give the jury

7     Wednesday afternoon off, have the charging conference, have any

8     of motion practice, do all of that, and that would be fine.

9     That's great.  I'm all for that.  What I don't want to do

10    though is have the situation if you don't think you can finish

11    by midday Wednesday, then I would just excuse the juror

12    permanently, continue with the jury Wednesday afternoon, and if

13    necessary into Thursday morning, and in that case we would have

14    the charging conference Wednesday evening and summations on

15    Thursday afternoon.  Whereas on the first alternative, we would

16    have summations on Thursday morning, and I would charge the

17    jury midday.  You should also think overnight how long you each

18    want for your closing arguments.  Plaintiff goes first;

19    defendant second.

20          By way of guidance, I would say that anyone who

21    suggests more than two hours will probably meet with strong

22    opposition of the Court.  So I think in this kind of case, to

23    be frank, I think an hour and a half is probably a good goal

24    for people to aim for, but, again, I'll hear from you tomorrow

25    morning.

1          In light of all of that, let's get together at 9:00

2     tomorrow morning so we can go over all of this.

3          DEPUTY CLERK:  To put a fine point on it, this is the

4     note.  The memorial is in Yonkers.  I think she would have to

5     be relieved if you were going to give her the afternoon off at

6     noon sharp for her to make it at 1:30.

7          THE COURT:  Okay.  Did you hear what my deputy --

8          MR. HENN:  Yes.

9          MR. MALDONADO:  Yes.

10          THE COURT:  We could start, if necessary, at 9:00 on

11     Wednesday rather than 9:30 to give us a little bit more time

12     for that.  So anyway all of that will be decided tomorrow

13     morning.  Anything else any one needs to raise?  Very good.

14     Thanks so much.

15          (Trial continued to January 10, 2022 at 9:00 a.m.)

1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3    JOHN PLUMPE

4   Direct By Mr. Flemming . . . . . . . . . . . 777

5   Cross By Mr. Conley  . . . . . . . . . . . . 800

6    THOM BROWNE

7   Direct By Mr. Lewin . . . . . . . . . . . . 803

8   Cross By Mr. Henn . . . . . . . . . . . . . 451

9   Cross By Mr. Henn . . . . . . . . . . . . . 487

10  Redirect By Mr. Lewin . . . . . . . . . . . 501

11   RODRIGO BAZAN

12  Direct By Mr. Maldonado  . . . . . . . . . . 504

13  Cross By Mr. Henn  . . . . . . . . . . . . . 561

14                   PLAINTIFF EXHIBITS

15  Exhibit No.                            Received

16   568 and 569  . . . . . . . . . . . . . . . 787

17   414  . . . . . . . . . . . . . . . . . . . 790

18   918  . . . . . . . . . . . . . . . . . . . 792

19   919  . . . . . . . . . . . . . . . . . . . 793

20   920  . . . . . . . . . . . . . . . . . . . 793

21   385  . . . . . . . . . . . . . . . . . . . 457

22   386  . . . . . . . . . . . . . . . . . . . 458

23   847  . . . . . . . . . . . . . . . . . . . 463

24   1314  . . . . . . . . . . . . . . . . . . . 481

25   1319 and 1320  . . . . . . . . . . . . . . . 487

1    854    . . . . . . . . . . . . . . . . . 487

2    858    . . . . . . . . . . . . . . . . . 489

3    1000    . . . . . . . . . . . . . . . . 491

4    859    . . . . . . . . . . . . . . . . . 494

5    998    . . . . . . . . . . . . . . . . . 497

6    876    . . . . . . . . . . . . . . . . . 498

7    192    . . . . . . . . . . . . . . . . . 509

8    1307 page 2    . . . . . . . . . . . . . 566

9    1309 page 2    . . . . . . . . . . . . . 567

10    371    . . . . . . . . . . . . . . . . 567

11    857    . . . . . . . . . . . . . . . . . 571

12    849    . . . . . . . . . . . . . . . . . 574

13    788    . . . . . . . . . . . . . . . . . 577

14                    DEFENDANT EXHIBITS

15    Exhibit No.                            Received

16    0082, 0089, 0091, 0093, 0102, 0103, if  . . 802

17            I may, 0104, 0105, 0106, 0107,

18            0108, 0109, 0110, 0112, 0113,

19            0114, 0115, 0127, 39, 145,

20            146, 155, 185, 186, 187, 319,

21            354, 382, 427, 449, 450, 451,

22            452, 453, 454, 479, 483, 551,

23            586, 793, 873 0874, 0875,

24            0876, 0877, 0878, 0879, 0880,

25            0881, 0882, 0883, 0884, 0885,

```
1              0886, 0887, 0888, 0889, 0890,

2              0891, 0892, 0893, 0894, 0895,

3              0896

4    451  . . . . . . . . . . . . . . . . . 411

5    139  . . . . . . . . . . . . . . . . . 421

6    795  . . . . . . . . . . . . . . . . . 444

7    73, 90, 91, 102, 103, 131, 154, 352,  . . . . 509

8              353, 402, 479, 586, 642, and

9              643

10   879, 886, 896  . . . . . . . . . . . . . . 537

11   637  . . . . . . . . . . . . . . . . . 553

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```