N1AQadi1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADIDAS AMERICA, INC., an Oregon corporation;
and ADIDAS AG, a foreign entity,

                Plaintiffs,

         v.                      21 Civ. 5615 (JSR)

THOM BROWNE, INC., a Delaware corporation,

                Defendant.

------------------------------x

                          New York, N.Y.
                          January 10, 2023
                          9:15 a.m.

Before:

                  HON. JED S. RAKOFF,

                          District Judge
                          -and a Jury-

                    APPEARANCES

KILPATRICK TOWNSEND & STOCKTON LLP
      Attorneys for Plaintiffs
BY:  R. CHARLES HENN, JR.
      H. FORREST FLEMMING III
      BETHANY R. NELSON


WOLF GREENFIELD & SACKS, PC
      Attorneys for Defendant
BY:  ROBERT MALDONADO
      HARLEY LEWIN
      BRYAN CONLEY
      TONIA SAYOUR

ALSO PRESENT:
NITA GRAY, adidas paralegal
MICHAEL PUSTERLA, Thom Browne paralegal

1          (Trial continued; jury not present)

2          THE COURT:  Thank you very much for your chart of the

3     remaining witnesses which would have the evidence concluded by

4     1:00 p.m. tomorrow.  Now the juror who has to go to the funeral

5     I'm told has to leave at 12:00.  So I think what makes sense is

6     I will ask the jury to come in at 9:00 tomorrow.  That will

7     pick up a half hour and maybe we can shorten things as we go

8     along.  If we can't, and we have a half hour of testimony on

9     Thursday morning before we start summations, it's not the end

10    of the world.

11         Yes?

12         MR. HENN:  The other thing I wanted to raise, your

13    Honor, is that we do have two significant objections with

14    regard to two of the witnesses that could, frankly, shorten

15    their testimony depending on what your ruling is on those.  I

16    don't know if you want to hear those arguments now.

17         THE COURT:  We will at least spend a few minutes.

18    Because of the schedule, I want to start promptly at 9:30 if

19    the jury is here, but we can at least start hearing that.

20         MR. HENN:  Sure.

21         THE COURT:  But before we get to that, you were also

22    going to tell me how long you wanted for your closing

23    arguments.

24         MR. HENN:  You proposed 90 minutes.  That works for

25    me.

1        THE COURT:  Okay.

2        MR. MALDONADO:  That's fine, your Honor.

3        THE COURT:  Excellent.

4        What are they?

5        MR. HENN:  The first relates to a witness who will

6   be -- this afternoon Langellier, I think is how he pronounces

7   his name.  There are three exhibits defense plans to introduce

8   with him, Exhibits 188 through 190.  What these exhibits are

9   are multipage collections of individual invoices that Thom

10  Browne sends out to stores like Barneys, Bergdorf and

11  Nordstrom.  That's what they are.  In some cases they are

12  hundreds of pages long.  These have sporadic highlighting

13  within them, which we think is what Thom Browne will argue are

14  4-Bar products that were sold to those companies.  The reason

15  they want them is they relate -- they're older invoices from

16  back in the 2010, 2011 timeframe.

17       We have two objections to them.  The first is a 401,

18  403 issue which is, for example, Exhibit 188, 430-something

19  pages long.  Within that, there are a handful that have

20  highlighting on them.  And so by putting in the 400 pages, of

21  course, it suggests look at all these sales when in fact it's

22  these tiny highlights.

23       The second issue is there is no evidence in the record

24  nor is there any evidence on Defendant's Exhibit list that

25  would allow a juror to see what any of those highlighted

products look like.  They have SKU numbers but none of those

SKU numbers match images that defense and, frankly, we have put

in the record.  There are some of those descriptions that

mention 4-Bars but a lot don't, and so there's no way for a

juror, for example, to assess whether this one highlighted

portion in this 400-page document actually was a 4-Bar product

and assess whether, for example, adidas should have known about

it.

That issue is compounded by the witness they have

chosen to try and put this in.  The witness they've chosen to

put in is a witness who has never been responsible for

wholesale sales of these accounts.  He's responsible for Thom

Browne's own stores.  The person who is responsible for the

wholesale sales, Mr. Sternstein, they withdrew as a witness.

Their 30(b)(6) witness, who, by the way, testified on behalf of

the company that he had no idea what the highlighting meant, so

he would not have notice of what the highlighting meant, was

here all last week, and they removed or they never named him as

a witness.

So we've got a witness who doesn't know anything about

it.  We've got 30(b)(6) testimony binding them to the fact that

they don't know what the yellow highlighting means, and we've

got hundreds of pages of sales, which only a tiny fraction

appears to be remotely relevant.  For those reasons, we think

those exhibits should be excluded and the witness shouldn't be

N1AQadi1

1    able to talk about them.

2           THE COURT:  I think the problem of multipages could be

3    dealt with by simply preparing a new exhibit that only has the

4    highlighted items, but let me hear from defense counsel of the

5    other objections.

6           MS. SAYOUR:  Yes, your Honor.  At the outset, I just

7    want to note these exhibits are listed on plaintiff's own

8    Exhibit list.  We are using our defendants numbers, but they

9    are on Plaintiff's Exhibit lists.  They are Plaintiff's Exhibit

10   1184, 1186 and 970.  I don't know that they've objected to

11   those.

12          On the grounds of relevance and prejudice, part of the

13   testimony is going to come in through this witness.  I'm not

14   planning to go through the 400-and-some-odd pages, but I will

15   show him the relevant pages and do the matchup to some of

16   the --

17          THE COURT:  What are the highlighted items?

18          MS. SAYOUR:  They are 4-Bar sweatpants with the

19   4-Bars, different colors.  So there will be an invoice, for

20   example, to Barneys which would have, you know, that particular

21   style, and it would show the sales to Barneys in 2011.

22          THE COURT:  And how does he know about this?

23          MS. SAYOUR:  Well, at the time he wore -- he'll

24   testify to this, I believe, but he wore many hats, so back in

25   the day when the company was smaller --

1    THE COURT:  Well, he wore many hats but were they all

2  with the 4-Bars?

3    MS. SAYOUR:  He does have knowledge of those early

4  days from the company.

5    THE COURT:  Well, I think that given those

6  representations, I will give the choice to plaintiff's counsel.

7  Would you prefer we reduce the exhibit just to a new exhibit

8  that has only what are now the highlighted items and therefore

9  the jury will not be blessed with all the other entries, or do

10  you prefer to put in the whole entry and say to the jury, look

11  how small a percentage of this were bought.

12    MR. HENN:  I anticipated if you were going to let it

13  in, we've got to let it in all so we can point out the little

14  needles in the big haystack.

15    THE COURT:  So we'll proceed on that.

16    MR. HENN:  Do you want to take up the other one?

17    DEPUTY CLERK:  All jurors are present.

18    THE COURT:  All jurors are present, so we'll take it

19  up at a recess.

20    MR. HENN:  Sounds good.

21    (Continued on next page)

22

23

24

25

1       (Jury present)

2   RODRIGO BAZAN, resumed.

3   CROSS-EXAMINATION CONTINUED

4   BY MR. HENN:

5       THE COURT:  Good morning, ladies and gentlemen.  I

6   wanted to give you a little heads up on our schedule.  We are

7   hopeful and modestly confident that we can conclude the

8   evidence in this case by around noon tomorrow, in which case we

9   would just stop at noon so that Juror No. 4 can go to that

10  funeral.  And I take it if you leave right at noon, that will

11  work?

12                      (Juror nods yes)

13      THE COURT:  Very good.  But to make that all work, we

14  need to start at 9:00 a.m. tomorrow rather than at 9:30.

15      So the good news is tomorrow we will only be sitting

16  from 9:00 to 12:00.  The bad news is you've got to get up a

17  little bit early.  Is that a problem for anyone?

18          (Jury indicating no)

19      THE COURT:  Very good.  Let's continue.

20  BY MR. HENN:

21  Q.  Nita, will you pull up Exhibit 55 at page 54.

22      Mr. Bazan, do you remember yesterday when I asked you

23  about the sales of the shoe there in the middle?

24  A.  Yes.

25  Q.  And you told us that the shoe is no longer for sale by the

N1AQadi1                    Bazan - Cross

1    company?

2    A.  Yes.

3    Q.  And when I asked whether it was still for sale in May of

4    2022, you suggested that the document I showed you referenced a

5    different shoe.  Do you remember that?

6    A.  Yes.

7    Q.  Let me have Nita pull up just for the witness again -- let

8    me pause.  Do you see that MFD number next to the shoe

9    Mr. Bazan?

10   A.  Yes.

11   Q.  You understand that's the number that allows you to track

12   what shoe is what in the system?

13   A.  Yes.

14   Q.  Nita, will you just for the witness pull up the other

15   exhibit side by side with this one?  If you will pull out the

16   corresponding MFD numbers from those exhibits and blow them up.

17          Mr. Bazan, do you see that the exhibit I showed you

18   from May of 2022 bears the same SKU number as in the accused

19   shoe?

20   A.  Yes.

21          MR. HENN:  Your Honor, we would offer that impeachment

22   exhibit as Exhibit 1321 and ask it be published.

23          MR. MALDONADO:  I was focusing on the other one.

24   Object on hearsay grounds.

25          MR. HENN:  It's an image from Thom Browne's website,

1   your Honor.

2            THE COURT:  Well, is there someone who -- are the

3   parties agreed on that; that it's from the Thom Browne website?

4            MR. HENN:  Yes.  Authenticity was stipulated.

5            THE COURT:  Then the hearsay objection is overruled

6   and the exhibit is received.

7            (Plaintiff's Exhibit 1321 received in evidence)

8   Q.  May we just publish that for the jury?

9            So you see, Mr. Bazan, that those are in fact the same

10  shoe?

11  A.  Yes, I see, and I was focused on the one on the bottom.

12  Q.  If we take out the blowups, Nita and just allow the jury to

13  see Exhibit 1321, that is from your website, correct,

14  Mr. Bazan?

15  A.  Yes.

16  Q.  And if you look at the bottom captured timestamp, this is

17  what the website looked like as of May 2022, right?

18  A.  Yes.

19  Q.  That was years after adidas objected to the use of four

20  stripes by Thom Browne, correct?

21  A.  Yes.

22  Q.  We could take that down.

23            I believe when we finished up yesterday, we were

24  talking about the expansion into sportswear, and we had gotten

25  as far as 2020.  I want to now look at 2021.  We can pull up

Plaintiff's Exhibit 876.  This is already in evidence.

Mr. Bazan, do you recognize this as an email from you to Mr. Browne sharing your product strategies in 2021?

A.  Yes.

Q.  If we go over to page 3, we have one of your product strategies to expand athletic expression, correct?

A.  Yes, and this was an idea, something that was considered. In fact, this never happened.  And, if anything, this was planning it was going to be in the same very high quality, almost obsessively high quality of compression that you've seen in clothing, but in fact it never happened.  It never was even developed.

Q.  Never expanded into compression?

A.  No.  Roll-out technology to bags and footwear.  We already had compression at that time.  This was expansion into the following categories.

Q.  I see.  So the expansion into compression was 2020.  You thought about doing it again in 2021, but you never followed through?

A.  We considered if the materials are of very high quality thousands of dollars could make into another category, different category.  In fact, it was never developed.

Q.  Take that down.  We will shift that over to another area.

You talked on direct about the fact that you periodically enforce your own trademark marks against other

1    companies.  Do you recall that testimony?

2    A.  Yes.

3    Q.  And you mentioned that you had enforced Thom Browne's

4    trademark rights against Rossignol?

5    A.  Yes.

6    Q.  That was a situation in which Rossignol was using three

7    stripes?

8    A.  They were using, I recall, a very similar placket in the

9    front of the jacket like the one I'm wearing, very similar in

10   the same positioning, and I believe also in the back of the

11   collar, if I'm not incorrect.

12   Q.  You said on direct that it was three stripes.  Was theirs

13   three stripes or more?

14   A.  Ours your five:  White, red, white, blue, white.  Theirs, I

15   believe, they were three colors.

16   Q.  And so even though yours was five, you enforced your

17   trademark rights against their use of three colors, correct?

18   A.  We contacted them because the use of these type of plackets

19   in the position was extremely similar or the same as ours, and

20   in fact they amicably stopped doing that.

21   Q.  You say it was similar.  It wasn't identical, right?  Yours

22   is five; theirs is three, right?

23   A.  Yes.

24   Q.  So it was similar, and what concerned you was the similar

25   look and the similar placement?

1    A.  Yes, and also that it came across in outerwear very similar

2    to what we do.

3    Q.  Also similar products?

4    A.  Yes.

5    Q.  You also enforced your rights in these various striped

6    designs against other companies, haven't you?

7    A.  Yes.

8    Q.  Against Moncler?

9    A.  Yes.

10   Q.  Tommy Hilfiger?

11   A.  Yes.

12   Q.  Zara?

13   A.  Yes.

14   Q.  Vilebrequin, V-I-L-E-B-R-E-Q-U-I-N?

15   A.  I understood.  Yes.

16   Q.  You enforced against them as well?

17   A.  Yes, we -- our lawyers contacted them and we amicably

18   always resolved any type of possible infringement of confusion.

19   Q.  And those companies agreed to stop doing the infringing

20   designs?

21   A.  Yes.  From the followup that we did, we never had any more

22   problems with any of them.

23   Q.  And in each case you took that action because you were

24   concerned that it was similar to your design?

25   A.  We took the action because it was going to be possibly

1   confusing for them and for us, and because of the participation

2   of diligent lawyers in both parties, it didn't make sense for

3   either party to do that.

4   Q.  You were concerned about the potential confusion.  In any

5   of those cases, had you ever had an actual consumer express

6   confusion?

7   A.  No.

8   Q.  Let's shift gears.

9        You mentioned that Thom Browne has a number of

10  celebrities who wear the 4-Bars clothing.  Do you recall that

11  testimony?

12  A.  Yes.

13  Q.  It is correct that once someone buys Thom Browne clothing,

14  they can wear it wherever they want and however they want?

15  A.  Yes.

16  Q.  Can we pull up from Plaintiff's Exhibit 386, just page 47?

17       MR. HENN:  Your Honor, we would offer this page as

18  Exhibit 1322.

19       MR. MALDONADO:  Objection.  Hearsay.

20       MR. HENN:  Not offered for the truth, your Honor.

21       THE COURT:  All right.  So, ladies and gentlemen, this

22  is not being offered for the truth of what was said but rather

23  just for the fact that it appeared.  So with that

24  understanding, it will be received.

25       (Plaintiff's Exhibit 1322 received in evidence)

1    Q.  Mr. Bazan, do you recognize Ms. Jenner there wearing Thom

2    Browne sweatpants?

3    A.  Yes.

4    Q.  She's wearing that with just a black turtleneck and

5    non-Thom Browne shoes, correct?

6    A.  I believe so.

7    Q.  Can we go over to page 53 of this Exhibit?

8            MR. HENN:  Your Honor, we would offer pages 53 and 54

9    as Plaintiff's Exhibit 1323.

10            THE COURT:  On the same terms?

11            MR. HENN:  Same terms.

12            THE COURT:  Received on the same terms.

13            (Plaintiff's Exhibit 1323 received in evidence)

14    Q.  Mr. Bazan, do you recognize Brandon Ingram down there, one

15    of the athletes who wears Thom Browne?

16    A.  I see an athlete wearing Thom Browne.  I don't recognize

17    him specifically, but yes.

18    Q.  If we go to the second page, this is a little strange

19    because of how it's captured on the internet, but it's one

20    picture, page 54.  At the top there, you see the bottom half of

21    Mr. Ingram, and you see he's wearing adidas shoes with his Thom

22    Browne outfit?

23    A.  I guess they're adidas.  I don't know specifically the

24    style.

25    Q.  You see the three stripes on the side, correct?

1  A.  A little bit covered but possibly is.

2  Q.  If we stay on this exhibit now and go over to page 63.

3          MR. HENN:  We would offer this one page, your Honor,

4  as Plaintiff's Exhibit 1324, same terms.

5          MR. MALDONADO:  Same objection.

6          THE COURT:  Same ruling.  Received.

7          (Plaintiff's Exhibit 1324 received in evidence)

8  Q.  Nita, if you'll zoom in on the photograph.

9          Mr. Bazan, do you recognize this as a football game

10  that was organized by the company?

11  A.  Yes, possibly before I joined the company.

12  Q.  You invited the media to attend and photograph the game?

13  A.  Friends of the brand, yes, and some media.

14  Q.  Can you tell me what shoes all of those players are

15  wearing?

16  A.  It looks like it's adidas.

17  Q.  Was it Thom Browne's decision to outfit the players in a

18  football game with Thom Browne sweats and adidas shoes?

19  A.  I don't know myself because I think it's a game before I

20  joined the company, but I don't know.

21  Q.  Take that down.  The company has a Facebook page, correct?

22  A.  Yes.

23  Q.  If we go to Plaintiff's 222.

24          MR. HENN:  Your Honor, we'd offer this in evidence.

25  It's a post from Mr. Browne's account or, excuse me, the

1  company's account.

2              THE COURT:  Any objection?

3              MR. MALDONADO:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 222 received in evidence)

6  Q.  Mr. Bazan, you recognize this as a post that Thom Browne

7  put out on Facebook?

8  A.  Yes, it looks like a post from Thom Browne.

9  Q.  In this instance, you've got someone wearing Thom Browne's

10 compression apparel.  Is that correct?

11 A.  Yes, I guess it's one of the friends of the brand that were

12 invited to shoot themselves.  I guess he's wearing the way he

13 prefers.

14 Q.  Can you tell me what socks he's wearing in the photograph

15 that Thom Browne posted?

16 A.  It looks like a trefoil from adidas and looks like he has

17 Nike sneakers.

18 Q.  Was Thom Browne intentionally or why did Thom Browne

19 intentionally decide to post a photograph of someone wearing

20 Thom Browne apparel with adidas socks?

21 A.  I don't know, but it's -- as I say, it's unpaid always when

22 we engage with celebrities or athletes, and this looks like

23 something taken by himself.

24 Q.  That was then reposted by Thom Browne on its account?

25 A.  Because I guess he's a friend of the brand and our team

1   decided to post the image, yes.

2   Q.  Then Dan Levy is also someone who wears Thom Browne,

3   correct?

4   A.  And I believe a client also of Thom Browne.

5   Q.  Can we pull up Plaintiff's Exhibit 852.  We should just

6   show this to the witness first.

7            Mr. Bazan, do you recall us looking at this television

8   ad during your deposition?

9   A.  Yes.

10  Q.  This was an advertisement in which Mr. Levy was wearing

11  Thom Browne apparel, correct?

12  A.  Yes.

13           MR. HENN:  Your Honor, we offer Exhibit 852.

14           MR. MALDONADO:  Well, your Honor, I would object

15  because it's just a screen image that's on the screen, but if

16  it's the video, there's no objection.

17           MR. HENN:  We are going to play the video, your Honor.

18           THE COURT:  All right.  So the video is received.

19           (Plaintiff's Exhibit 852 received in evidence)

20  Q.  Nita, if you will play Exhibit 852 for us.  Just one time

21  through should be sufficient.

22           (Video played)

23           MR. HENN:  It's not on the jury's screen.  Publish to

24  them before you play and start it over.

25           There we go.  Play it again.

1           (Video played)

2    Q.  You saw Mr. Levy there in the ad wearing Thom Browne

3    apparel in the gym?

4    A.  I see him wearing in this very ironic way.  It looks like

5    somebody is not even trying to exercise.  He just wants to show

6    off his look.  He's a client of the brand.  I believe he bought

7    the merchandise.  Like Lebron James brought the merchandise and

8    has an ad of him walking to a plane.  So it's similar ad.

9    Q.  So once they buy the product, they can then wear it out in

10   the public however they want?

11   A.  Like you could do as well.

12   Q.  Including in television advertising?

13   A.  We don't control that.  And everything that we do is

14   unsolicited.  So if somebody likes it, enjoys it, Lebron James

15   did it in an ad, and in this case Dan Levy did it also.

16   Q.  Post sale, after sale, you no longer have any control on

17   how it appears, correct?

18   A.  I don't think so.

19   Q.  Let's pull up Plaintiff's Exhibit 999.

20           Mr. Bazan, do you recognize this as a capture from

21   Thom Browne's website of last assume err, 2022?

22   A.  Yes.

23           MR. HENN:  Your Honor, we offer exhibit 999.

24           MR. MALDONADO:  No objection.

25           THE COURT:  Received.

1              (Plaintiff's Exhibit 999 received in evidence)

2    Q.  Publish that, Nita.

3              Mr. Bazan, what we see on the first page of Exhibit

4    999, that was the top of the home page of Thom Browne's website

5    last summer, correct?

6    A.  Yes.

7    Q.  And if we look at the model at the very top of the page,

8    how many stripes are on those shorts?

9    A.  Four.

10   Q.  How many stripes do you see on those shorts?

11   A.  Four.  I'm wearing glasses and I have an image here.  It's

12   one, two, three and four.  There's a white line in between the

13   third and the fourth.

14   Q.  Gotcha.  Let's back out of that picture.

15             What about the lower left image, how many stripes are

16   on that product?

17   A.  Four.

18   Q.  How many stripes do you see in the picture that was on the

19   website?

20   A.  One, two, three, four.

21   Q.  Take that down.

22             Thom Browne has an Instagram account, correct?

23   A.  Yes.

24   Q.  Let's pull up Exhibit 219.  Zoom in at the top.

25             You recognize this as an Instagram post of the Thom

1   Browne account?

2   A.  Yes.

3           MR. HENN:  Your Honor, we offer Exhibit 219.

4           MR. MALDONADO:  No objection.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 219 received in evidence)

7   Q.  Mr. Bazan, do you see there where one of the consumers

8   posted "thought it was adidas, sorry."  And tagged adidas at

9   adidas?

10  A.  Yes, I see one comment out of hundreds of thousands of

11  comments on our post.

12  Q.  Do you see hundreds of thousands of comments here?

13  A.  If you collect them all the time that we're looking at,

14  there's hundreds of thousands of comments I believe on social

15  media how Thom Browne looks.

16  Q.  It's your testimony that as to this one post, there are

17  hundreds of thousands of comments?

18  A.  Not on this post.  On the collective of all.  You're

19  showing me one with one comment and that is I think it's worth

20  putting into perspective.  We don't even know who the person is

21  that commented.

22  Q.  Let's look at Exhibit 217.  We can zoom in at the top.  You

23  recognize this as another Instagram post from Thom Browne?

24  A.  Yes.

25          MR. HENN:  And, your Honor, we offer Exhibit 217.

N1AQadi1                    Bazan - Cross

1              MR. MALDONADO:  Objection.  Hearsay.

2              MR. HENN:  This is the subject of a motion in limine

3    your Honor that you denied.

4              THE COURT:  Received on the same terms as previously

5    noted.

6              (Plaintiff's Exhibit 217 received in evidence)

7    Q.  Mr. Bazan, do you see that one of the comments out to the

8    right on the screen, the person wrote "so hashtag adidas"?

9    A.  Yes, I see it, and my same comment as the previous image.

10   If you had found a thousand of them, you would be showing a

11   thousand.  I think there were a handful that have been shown to

12   me.

13   Q.  Do you see how the shorts in the model cover most of the

14   top stripe?

15   A.  Not most.  I think on the left angle you can see most of

16   it.

17   Q.  You would agree that someone buying your tights could then

18   wear them under shorts out in the public as we discussed?

19   A.  Yes.

20   Q.  And those shorts might cover one or more of the stripes,

21   correct?

22   A.  May or may not.

23   Q.  Let's pull up Exhibit 218.  Do you recognize this as a

24   Facebook post from Thom Browne?

25   A.  Yes.

1    MR. HENN: Your Honor, we offer Exhibit 218.

2    MR. MALDONADO: Same objection.

3    THE COURT: Same ruling.

4    (Plaintiff's Exhibit 218 received in evidence)

5  Q.  If we could publish that.

6    Mr. Bazan, before we look at the comments -- if you

7  look at the picture there on the left, with regard to the male

8  model, how many stripes are on the shorts?

9  A.  I know it's four because I know the article.

10 Q.  But how many are in the picture when the person is walking?

11 A.  Because it's covered by the hand in this specific, look you

12 see less.

13 Q.  You see three, right?

14 A.  I see two completely.  Another one partially covered.  But

15 you see very clearly on the sleeve, as the sleeve usually hangs

16 with his arm is down like this, you can see very horizontal

17 four stripes on both male and female in the picture.

18 Q.  With regard to the tights on the male model, you will agree

19 that only three of the stripes are visible because the shorts

20 are covering one of the stripes completely?

21 A.  In this specific image.

22 Q.  Can we turn over to page 2.

23    You see the comment in the lower right, "How come

24 there's four stripes?  Is that Lavo market mock adidas."  Do

25 you see that?

1   A.  I see the comment about the four stripes, so clearly even

2   though you ask me if I'm confused about the four stripes, the

3   comments pointed to the four stripes, yes.

4   Q.  Since adidas initiated this lawsuit, Thom Browne has not

5   taken any steps to reduce the risk that consumers would be

6   confused by your products, correct?

7   A.  We continue the ordinary business that we've been doing on

8   a trademark we've been using for over 13, 14, 15 years, so we

9   continue to do the same product strategies, the same very

10  elevated positioning.  We never compromise on that.  And we

11  expanded in the same way, particularly for the women's, kids,

12  and all of our own stores, which are over a hundred today.

13  Q.  So if I understand your testimony, it was just business as

14  usual.  You didn't take any steps to reduce confusion?

15  A.  We continue to be correct about the way we use our own

16  trademark vis-a-vis other trademarks, yes.

17          MR. HENN:  No further questions.

18          THE COURT:  Redirect.

19  REDIRECT EXAMINATION

20  BY MR. MALDONADO:

21  Q.  Good morning, Mr. Bazan.

22  A.  Good morning.

23  Q.  Do you recall counsel asking you about various shoe items

24  that have been accused of infringement in this case?

25  A.  Yes.

1   Q.  And that you had testified that the sales of those items

2   were small?

3   A.  Yes.

4   Q.  Over what period of time did those sales occur?

5   A.  I guess over the years that the product was present in our

6   collection.

7   Q.  Do you know how many years those products were present in

8   the collection?

9   A.  Could be three, four, five in total.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. MALDONADO:

2   Q.   Thank you.

3           If we can take a look at Plaintiff's Exhibit 857,

4   please, page three.

5           Mr. Bazan, this is a document that was shown to you

6   during your cross-examination.

7           Do you remember this document?

8   A.   Yes.

9   Q.   And in this document there are two columns in the chart,

10  correct?

11  A.   Yes.

12  Q.   One of which is tailoring on the left?

13  A.   Yes.

14  Q.   And sportswear on the right?

15  A.   Yes.

16  Q.   And do those two columns represent all of the clothing that

17  is sold by Thom Browne?

18  A.   Yes.

19  Q.   So all clothing fits either into the tailoring category or

20  the sportswear category?

21  A.   All the clothing, yes.

22  Q.   Yes, correct.

23          That comports with your earlier testimony as to what

24  your definition of sportswear is, correct?

25  A.   Correct.  Anything that which is not tailoring, so tailored

1    jacket, coat, the pant, skirt, is sportswear.

2    Q.  OK.  If we can look now at exhibit, Plaintiff's Exhibit

3    788, at page two.  This is a document that counsel showed to

4    you.

5              Do you remember this document?

6    A.  Yes.

7    Q.  And counsel asked you about development of a down jacket.

8              Do you recall that testimony?

9    A.  Yes.

10   Q.  Does Thom Browne currently sell down jackets?

11   A.  Yes.  We have a wide range of outdoor, including down

12   jackets, correct.

13   Q.  Approximately how many down jackets do you sell?

14   A.  Units or how many styles?

15   Q.  How many styles?

16   A.  How many styles?  I would say ten.  Just to be clear, a

17   style is a specific jacket and come in different colors.  At

18   least we have ten down jacket styles, which can relate to close

19   to 50 or 70 color applications, materials, and colors.

20   Q.  And you're familiar with of the products accused of

21   infringement in this case?

22   A.  Yes, I am.

23   Q.  Are all of your down jackets accused of infringement in

24   this case?

25   A.  A good amount of them, including the trademark four-bar.

1    Q.  I'm sorry?

2    A.  A good amount of them, include the four-bar trademark.

3    Q.  But not all of them are accused?

4    A.  No.

5    Q.  Now, you might recall, Mr. Bazan, you might recall Mr. Henn

6    asking you about the appearance of the four bars on various

7    items of clothing?

8    A.  Yes.

9    Q.  How does Thom Browne define its four-bar trademark?

10   A.  We define it as horizontal, always on the arm, always on

11   the leg.  It could be white, could be tonal, could be in

12   different colors, but mostly white.  Assymetrical, only one

13   side of the leg and the arm, and thick, thick bands that you

14   see with a narrow spacing.

15   Q.  Does Thom Browne ever use its four-bar trademark vertically

16   on a sleeve?

17   A.  No.

18   Q.  Does Thom Browne ever use its four-bar trademark vertically

19   on a pant leg?

20   A.  No.

21   Q.  Now, counsel asked you about various items on the rack and

22   various items that were and were not accused of infringement.

23          Are you familiar with the products that have been

24   accused of infringement in this action?

25   A.  Yes.

1   Q.  OK.  Do you recall which was the item that adidas

2   originally accused of infringement in 2006?

3   A.  I think it's the one in the image.

4   Q.  What was the product?

5   A.  It's a cashmere cardigan which retails at $1700 today.

6   Q.  Do you recall it was a sport coat?

7   A.  Yes.

8   Q.  OK.  And are sport coats accused of infringement in this

9   case?

10  A.  I think so, yes.

11  Q.  OK.  Let's look at the Exhibit 55, please.

12          If you could flip through the pages and tell me if you

13  see any sport coats.

14  A.  It's not included there, no.

15  Q.  So the sport coat was accused of infringement in 2006, but

16  is not accused of infringement today, correct?

17  A.  Correct.

18  Q.  OK.  When the complaint was filed in this case, did you

19  have a chance to review the complaint?

20  A.  Yes.

21  Q.  And do you see the items that were accused of infringement

22  in the complaint?

23  A.  2000, sorry, seven?

24  Q.  In this lawsuit, the complaint that was filed by adidas.

25  A.  The image of 2006?

1    Q.  Did you review the complaint?

2    A.  Yes.

3    Q.  And did you see in the complaint images of the items that

4    were accused of infringement when the complaint was filed?

5    A.  If I see images of?

6              MR. MALDONADO:  Can we pull up the complaint, please.

7    A.  Yes.

8              MR. HENN:  Your Honor, we have an objection to the

9    exhibit and the line of questioning.  A sidebar would be

10   helpful.

11             MR. MALDONADO:  Your Honor, the complaint would just

12   be used to refresh.

13             THE COURT:  Brief sidebar.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. HENN:  As your Honor is aware, at the outset of

3   the litigation you might include things in a complaint that

4   over the course of discovery you remove from what is being

5   asserted.  And the jury should not be clouded in their view of

6   what is being asserted at trial with what at the point of a

7   notice pleading was included.  It's incredibly -- it's not

8   appropriate to show the jury what was at one point potentially

9   within the case when we have specifically narrowed for trial

10  the issue, the items that are to be tried, and that is what is

11  in Exhibits 55 and 56.

12         MR. MALDONADO:  It's actually not narrowed.  It's

13  expanded, and it goes to what our client understands they can

14  and cannot do in the business, as to what is accused and not

15  accused, and I think that can change over time.  He can make

16  that argument if he wants to, but that --

17         THE COURT:  No.  I think the purpose of a complaint is

18  simply to formally initiate a lawsuit and put the other side on

19  reasonable notice of what's being claimed.  It is not evidence.

20  It is frequently subject to modification as time goes on, and I

21  think the jury would not understand that and, therefore, would

22  read more into this than really is valid.

23         So the objection is sustained.

24         MR. MALDONADO:  Thank you.

25         (Continued on next page)

1          (In open court)

2          MR. MALDONADO:  If we can put Exhibit 55 back up on

3     the screen, please.

4     BY MR. MALDONADO:

5     Q.  Mr. Bazan, you're familiar with this listing of accused

6     products?

7     A.  Yes, I am.

8     Q.  Can you please stay on page one.

9          And this document was originally served on June 3, is

10    that correct?

11    A.  Yes.

12    Q.  You see then it was updated on June 29 and July 22, is that

13    correct?

14    A.  Yes.

15    Q.  Let's look at Exhibit 56, please.

16          You understand this to be the accused Grosgrain

17    products?

18    A.  Yes.

19    Q.  And this document was originally served on June 3, is that

20    correct?

21    A.  Yes.

22    Q.  And then it was updated on June 29?

23    A.  Yes.

24    Q.  Thank you.

25          If we go back to Exhibit 55, we can look at page 57.

1           And you see this cardigan hoodie cashmere cardigan

2    hoodie on the screen in front of you?

3    A.  Yes.

4    Q.  And you understand that to be a product accused of

5    infringement?

6    A.  Yes.

7    Q.  If you look over here on the rack, we have a cashmere

8    cardigan sweater.

9           Do you see that?

10   A.  Yes.

11   Q.  And that does not have a hood?

12   A.  Correct.

13   Q.  And do you understand that that is a product that is not

14   accused of infringement?

15   A.  Correct.

16   Q.  So sitting here today, as CEO of Thom Browne, do you have

17   any clarity as to which items Thom Browne can and cannot

18   produce in its business going forward in view of the

19   infringement allegations that have been made in this action?

20   A.  No.

21   Q.  Counsel showed you various social media posts.

22          Do you remember that?

23   A.  Yes.

24   Q.  And he showed you comments made by various users.

25          Do you recall that?

1   A.  A handful, yeah.

2   Q.  And do you know if any of those users who posted those

3   comments are employees of adidas?

4   A.  No.

5              MR. MALDONADO:  I have no further questions, your

6   Honor.

7              THE COURT:  All right.  Anything else?

8              MR. HENN:  Nothing from me, your Honor.

9              THE COURT:  Thank you very much.  You may step down.

10             (Witness excused)

11             Please call your next witness.

12             MR. MALDONADO:  Your Honor, the defense calls Robert

13  Childs.

14             THE DEPUTY CLERK:  Yes, please.  Remain standing.

15   ROBERT CHILDS,

16       called as a witness by the Defendant,

17       having been duly sworn, testified as follows:

18             Please be seated.  State your name and spell it slowly

19  for the record.

20             THE WITNESS:  OK.  My name is Robert Childs.

21  R-o-b-e-r-t C-h-i-l-d-s.

22             THE COURT:  Counsel.

23             MR. MALDONADO:  Your Honor, before we get started, we

24  have certain exhibits that have no objection that we would like

25  to read into the record.

1          THE COURT:  Yes.

2          MR. MALDONADO:  Plaintiff's Exhibit 253, Plaintiff's

3   Exhibit 1314, Defendant's Exhibit 82, 122 through 127, 140,

4   141, 142, 144 through 147, 153, 375, 376, and 460.

5          THE COURT:  Received.

6          (Plaintiff's Exhibits 253 and 1314 received in

7   evidence)

8          (Defendant's Exhibits 82, 122 through 127, 140, 141,

9   142, 144 through 147, 153, 375, 376, and 460 received in

10  evidence)

11  DIRECT EXAMINATION

12  BY MR. MALDONADO:

13  Q.  Good morning, Mr. Childs.

14         Can you please introduce yourself to the jury?

15  A.  Good morning.  Yes.  Robert Childs.  36.  From Key West,

16  Florida, and been living in New York the past 18 years, and

17  employed at Thom Browne.

18         THE COURT:  Get a little bit closer to the mic.

19         THE WITNESS:  Sorry.

20  Q.  You said you were employed by Thom Browne.

21         What's your position at Thom Browne?

22  A.  I currently am the women's, director of women's.

23  Q.  You mentioned that you moved to New York to go to school.

24         Where did you attend school?

25  A.  I went to FIT, Fashion Institute of Technology, here in

1    New York City.

2    Q.  What years did you attend FIT?

3    A.  I was there from 2005 to 2007.

4    Q.  And what degree did you graduate with from FIT?

5    A.  An associate's in menswear design.

6    Q.  And tell the jury about the types of classes that you took

7    at FIT to get your degree.

8    A.  Yeah, so, classes?  There was menswear history classes that

9    we took, tailoring classes, pattern making.  It was very hands

10   on, like, more of a technical program, so a lot of pattern

11   making.  And then our history design and things like that.

12           So, yeah, courses like that.

13   Q.  And when did you come to know Thom Browne?

14   A.  While I was in school, seeing his fashion shows online.

15   Q.  OK.  Did you ever visit his stores?

16   A.  Not while I was in school.  Not his store itself, no.

17   Q.  Have you ever had the opportunity while you were a student

18   to view his clothing?

19   A.  Yeah.  As we do while we're in school, we would go on, I

20   guess, research trips to different stores around town, and so

21   that is when I first saw the brand, like, actually physically

22   in the store, yeah.

23   Q.  Where did you see it?

24   A.  It was a store called Jeffrey's down in the Meatpacking

25   District.  It's no longer there now, but yeah.  It was one of

1    the stores that carried Thom at the time.

2    Q.  Tell us about your first experience with Thom Browne

3    clothing.

4           MR. FLEMMING:  Objection, relevance.

5           THE COURT:  Sustained.

6    Q.  While you were at the Jeffrey's store, did you see Thom

7    Browne's clothing?

8    A.  I did, yeah.

9    Q.  Tell us what you saw.

10   A.  I saw a rack of clothing that I had only seen in photos

11   online and of the shows.  And, um, yeah, it was just including

12   that stood out as Thom Browne.

13   Q.  And were you interested in Thom Browne's clothing at the

14   time?

15   A.  Sure.  Yeah, definitely.  From the shows and how special

16   the shows were, the clothing itself was very attractive because

17   of how fun the shows were presented.  So definitely was very

18   interested in getting to see the clothing and seeing them up

19   close and touching them.

20   Q.  At some point did you apply for a job at Thom Browne?

21   A.  I did, yes.

22   Q.  When was that?

23   A.  In 2007 is when I applied.

24   Q.  And what was the interview process like?

25          MR. FLEMMING:  Objection, relevance.

1          THE COURT:  Sustained.

2   Q.  Did you meet with Thom Browne when you applied for your

3   job?

4   A.  I did, yeah.

5   Q.  And tell us about that meeting.

6          MR. FLEMMING:  Same objection.

7          THE COURT:  Sustained.

8   Q.  What was your initial --

9          When did you start working at Thom Browne?

10  A.  I started working in -- after I graduated, right after I

11  graduated, in the summer of 2007.

12  Q.  What was your title at the time?

13  A.  My title was assistant designer.

14  Q.  What were your responsibilities as assistant designer?

15  A.  Various things.  So we worked -- we had a really small team

16  at the time and worked out of the factory, where we made a lot

17  of the clothing.  So it was very hands-on training and

18  experience.

19          So we would receive fabrics.  It was my responsibility

20  to check fabrics, and we would maybe have to make little

21  prototypes or examples of things that we wanted to launch with

22  the tailors at the factory.

23          So I would work on things like that, helping take

24  notes during fittings.  Yeah, really just, like, that

25  assistant-level stuff, trying to get my designs noticed.

1    Q.  OK.  And you said it was a very small design team at the

2    time.

3            Who was on the design team in 2007?

4    A.  It was myself, Sam Lothrop, and Thom.

5    Q.  OK.  And how long were you in that position for?

6    A.  About two, two and a half years, until I moved into another

7    position.

8    Q.  What was the next position?

9    A.  I became the design director after Sam had left the

10   company.

11   Q.  And were you design director of a certain collection?

12   A.  It was all one collection, so really it was the Thom Browne

13   collection.

14   Q.  OK.  How long were you in that position for?

15   A.  Um, I was there until 2011, so from -- yeah, for the last,

16   about, two years of the company.

17   Q.  And then you left Thom Browne for a period of time?

18   A.  Yes.

19   Q.  Where did you go?

20   A.  I went to the company -- this company called Adam Kimmel.

21   Q.  At some point did you return to Thom Browne?

22   A.  I did.

23   Q.  When was that?

24   A.  In 2019 I came back.

25   Q.  You've been there ever since?

1    A.  Yes.

2    Q.  OK.  Thank you.

3         When you became design director, how did your

4    responsibilities at Thom Browne change?

5    A.  Um, back then, it was managing a lot of interns, being

6    responsible for, like, the full breadth of taking Thom's vision

7    and idea through to the final samples, customizing fabrics,

8    interactions with the factories, more of a managerial role.

9    And a lot more, like, getting design elements and ideas, like,

10   through the process as opposed to kind of being the assistant

11   in that process.

12   Q.  OK.  Back in 2007 when you worked at Thom Browne, where

13   were Thom Browne's products sold?

14   A.  Um, we were sold around the world at the time.  But in New

15   York we were at a store called Barney's, store called Bergdorf,

16   other stores in Europe and Japan and, yeah, a store called

17   Colette in Paris.

18   Q.  Did Thom Browne also have its own boutique retail stores?

19   A.  Yes, we did.

20   Q.  Did you have any in New York City?

21   A.  We had our one shop in New York City, yes.

22   Q.  What were the types of clothing that were sold by Thom

23   Browne in 2007, when you joined the company?

24   A.  A similar assortment to what we have today.  Knitwear,

25   cut and sew, jersey, polo T-shirts, underwear, tailoring,

outerwear, formalwear, just footwear.  We had some bags and

accessories.  So, yeah, really similar to today, but today,

much broader.

Q.  Did you sell knitwear in 2007?

A.  We did, yes.

Q.  What types of knitwear did you sell in 2007?

A.  So sweaters, duffle coat sweaters, cardigans, pullover

sweaters, polo T-shirts, knit T-shirts, tank tops.  Yeah,

really any sort of, like, knit sweater you would have today, we

were offering it.

Q.  And you mentioned cut and sew and jerseys.

        What do you mean by that?

A.  So from -- I put knits in kind of a two-bucket system.  So

there is full-fashion knits, which are more of, like, the

chunkier sweaters, like cashmere sweaters and, like, cardigans

and things like that, that are more kind of -- I'm not like a

technical designer as far as knitwear, but that's the -- it's

more of a thicker yarn.  And then you have, like, T-shirts and

polo T-shirts, and those are more cut and sew.  So, and how

they are engineered on the machine is, like, they are different

processes.  Yeah.

Q.  OK.  Can we pull up Exhibit 460, please.

        Have you seen this document before, Mr. Childs?

A.  Yes.

Q.  Can you tell us what this is?

1    A.  This is an item list of products.

2    Q.  These are products that were -- what are these products

3    here in this list?

4            MR. FLEMMING:  Objection, 602.

5            MR. MALDONADO:  There's no objection to this document,

6    your Honor.

7            MR. FLEMMING:  To the testimony, I'm sorry.

8            THE COURT:  Grounds of the objection?

9            MR. FLEMMING:  602, personal knowledge.  He started in

10   the summer of 2007.

11           THE COURT:  All right.  Lay a foundation.

12   BY MR. MALDONADO:

13   Q.  OK.  Have you seen this document before, Mr. Childs?

14   A.  Yes.

15   Q.  And what does this document represent?

16   A.  A list of items that Thom Browne offers.

17   Q.  Are these products that were sold when you were at Thom

18   Browne in 2007?

19   A.  Yes.

20   Q.  OK.

21           THE COURT:  Did you prepare this list?

22           Did you prepare this list?

23           THE WITNESS:  I did not prepare this list, your Honor.

24           THE COURT:  All right.  Put another question.

25   Q.  OK.  Do you want to flip down.  Scroll down, please.

1        Does this list represent the full collection of

2    products that were sold by Thom Browne in 2007?

3        MR. FLEMMING:  Same objection.

4        THE COURT:  If you know.

5    A.  Full products offered for sale.

6    Q.  In 2007, was Thom Browne selling any compression products?

7        MR. MALDONADO:  You can take it down, please.

8    A.  Can you help define compression?

9    Q.  Compression.

10   A.  Like, we sold leggings and long johns and things like that,

11   that could be categorized as compression.

12   Q.  Were you selling sweatpants in 2007?

13   A.  We were selling knit pants, not specifically, like,

14   sweatpants as we know them today.  But yeah, we sold knit

15   trousers and knit leggings, yeah.

16   Q.  When did Thom Browne first sell sweatpants?

17   A.  First offered in 2009.

18   Q.  Were you involved in the design of these sweatpants that

19   were first sold by Thom Browne?

20   A.  Sure, yeah.

21   Q.  And tell us about the design process for the sweatpants.

22   A.  So we were -- the company was growing and Thom really

23   wanted to be able to offer the breadth of clothing that we had

24   to our customer in various ways, as opposed to as -- how to

25   explain, like, like a life -- he wanted them to create a

1    lifestyle company of the brand, right.  So you could wear it to

2    work, you could wear it on the weekends, wear it when you're

3    lounging, things likes that.  So just progressing into those

4    categories.

5          Thom wanted to have a sweat pant that our customer

6    could wear on the weekends, and so he wanted to have it with

7    all the design details of what we were already doing.  Our fit,

8    like, the quality.  But then also, like, have some irreverence

9    of -- the idea was to create something that fulfilled those

10   boxes.

11   Q.  Thank you.  Let's look at Exhibit 147, please.

12          What is this document that you're looking at here?

13   A.  This is the spring/summer 2010 runway show.

14   Q.  What was the theme of this runway show?

15   A.  It was a Robinson Crusoe sort of show.

16   Q.  If we look at the second page there, if we look at the

17   middle row on the left, first figure there.

18          Can you tell us what this is?

19   A.  This is the sweatshirt and sweat trouser, sweat pant.

20   Q.  And were these the first sweatpants sold by Thom Browne?

21   A.  Yes.

22   Q.  And you said this was from the spring/summer 2010

23   collection?

24   A.  Yeah.

25   Q.  And when did this runway show take place?

1   A.  This would have been shown in 2009, September of '09.

2   Q.  September '09?

3   A.  Yeah.

4   Q.  And that is the first public display of sweatpants by

5   Thom Browne?

6   A.  Yes.

7   Q.  And those bear the four-bar design, correct?

8   A.  They do.

9   Q.  Were you selling swimwear in 2007?

10  A.  Yes.

11  Q.  You said you joined the company in 2007.

12          How big was the company in 2007?

13  A.  Um, very small.  It was maybe 15 people, I want to say,

14  including the store staff.  So yeah, quite small.

15  Q.  And when you started at Thom Browne, was there a particular

16  type of clothing that Thom Browne was known for at that time?

17  A.  Our tailored sportswear it would be.

18  Q.  And as you added new lines or new products to your lines of

19  clothing, such as sweatpants, how were they designed to fit in

20  with the collection?

21  A.  Um, again, just making sure that the proportions and

22  quality were there.  And then also Thom always wanted, like,

23  it's -- he has always said it's such a serious --

24          MR. FLEMMING:  Objection, hearsay.

25          THE COURT:  Sustained.

1   Q.  You're familiar with the branding elements incorporated

2   into your designs for these products?

3   A.  Yes.

4   Q.  Which are they?

5   A.  We have our Grosgrain branding, which is this ribbon here,

6   which is the white/red/blue/white Grosgrain --

7            MR. MALDONADO:  Your Honor, can I use this, the

8   demonstrative?

9            THE COURT:  Yes.

10  Q.  Handing you a demonstrative Exhibit 14, Defendant's

11  Demonstrative 14.

12           Can you tell us what that is?

13  A.  This is our white/red/white/blue/white Grosgrain.

14  Q.  Is that a product specifically manufactured for Thom

15  Browne?

16  A.  This is, yes.

17  Q.  What's the material it's made of?

18  A.  I don't know specifically, but it's a polycotton blend, I

19  believe.

20  Q.  And is the Grosgrain ribbon always in those colors?

21  A.  For us, yes.

22  Q.  Is that the Grosgrain ribbon you've been using since you

23  were at the company in 2007?

24  A.  Yes.

25  Q.  You mentioned that you --

1           I'm sorry.  Did you mention the four bars?

2    A.  No.

3    Q.  OK.  Are there other branding elements that you use?

4    A.  Yes.  We use four-bar branding as well as, um, this little,

5    like, laundry tag as well.

6    Q.  When you started in 2007, was Thom Browne using the four

7    bands, four bars?

8    A.  No.

9    Q.  What were they using?

10   A.  Three, three bands.

11   Q.  Were you involved in the change from three bars to four

12   bars?

13   A.  I was.

14   Q.  Can you tell us how that came about?

15   A.  Yeah.  As I mentioned, we worked at the factory on a really

16   small team and --

17   Q.  Go ahead.

18   A.  And so as we're set up, like, every day, we sat down at the

19   table.  And Thom came in one day and told us that --

20           MR. FLEMMING:  Objection, hearsay.

21           THE COURT:  You can't testify to what anyone else told

22   you, just what you observed and said yourself.

23           THE WITNESS:  OK.

24           THE COURT:  Sustained.

25           THE WITNESS:  So I can't say what someone said?

1          THE COURT:  No, you can't.

2          THE WITNESS:  OK.

3          THE COURT:  So the question was?

4          MR. MALDONADO:  Your Honor, I can pose a new question.

5          THE COURT:  All right.  Why don't you do that.

6    BY MR. MALDONADO:

7    Q.  At some point, did you change from three bars to four bars?

8    A.  Yes.

9    Q.  And what was that design process like?

10   A.  Um, we -- I had to change the layout from three to four.

11   It was a lot of trial and error.  We were cutting paper,

12   playing with different layouts of the bars on the left sleeves

13   and the left side of the trouser, of different samples that we

14   had at the factory, playing with proportion and spacing and

15   things like that, until we got to somewhere we really liked the

16   look of.  And then we would launch a sample.

17   Q.  Who decided on the four bars?

18   A.  It would have been Thom.

19   Q.  During that meeting or the process where you changed from

20   three to four, did you consider other options besides bars?

21   A.  Besides bars, no.  Because it wouldn't have been true to

22   the original idea of it, which was this varsity-inspired bands

23   along the arm or sleeves of jackets.

24   Q.  And in the design process when you were thinking of new

25   ideas, did you have an understanding of any limitations that

1    you had in your design process with respect to the use of bars?

2    A.  Well, it had to fit within a certain space.  So the

3    limitations were identifiably, you know, where it had to be on

4    the garment and garments.  So yeah, the limitations were

5    working within that.

6    Q.  Were the limitations on the number of bars you could use,

7    for example?

8    A.  Yeah, yes.  We couldn't use three.

9    Q.  Any other limitations?

10   A.  Not that I was told.

11   Q.  OK.  And in connection with your responsibilities, did you

12   communicate with your factory?

13   A.  Yes.

14   Q.  Who was your factory at the time?

15   A.  Which factory?

16   Q.  For your knitwear products?

17   A.  The factory we caused was Corgi, it was called.

18   Q.  I would like to pull up Exhibit 83, please.

19         Do you recognize this e-mail?

20   A.  I do.

21   Q.  And in the course of your work in the design team, did you

22   review e-mails between Thom Browne and Corgi?

23   A.  Yes.

24   Q.  Is this one of the e-mails that you have seen during that

25   time?

1    A.  I have seen this, yes.

2            MR. MALDONADO:  OK.  Your Honor, I would like to offer

3    Exhibit 83.

4            MR. FLEMMING:  No objection.

5            THE COURT:  Received.

6            (Defendant's Exhibit 83 received in evidence)

7    Q.  What's the date on this e-mail?

8    A.  The 1st of April, 2008.

9    Q.  And this is an e-mail from Sam Lothrop to Lisa Wood?

10   A.  It was.

11   Q.  Is this in connection with the change if three bars to four

12   bars?

13   A.  Yes.

14   Q.  And did Mr. Lothrop convey to Ms. Wood the reason that the

15   change was being made?

16   A.  Yes, or he told her we were changing it, yes.

17   Q.  And what was the reason?

18   A.  Because adidas was threatening us, to sue us.

19   Q.  Thank you.

20           If we can move on to Exhibit 146, please.

21           When did Thom Browne first publicize the four bars?

22   A.  It was in 2000 -- it was our 2009 show.

23   Q.  For which collection?

24   A.  I believe this is from spring/summer 2009.

25   Q.  And on the screen in front of you, what do you see in front

1   of you there?

2   A.   This is the spring/summer 2009 show.

3   Q.   Is this what you referred to as a look book?

4   A.   Yeah.  This would be a look book of the show.

5   Q.   What does that mean?

6   A.   Um, a set of images presented to the public of the

7   collection.

8   Q.   So these are the items on the runway at the collection for

9   this show?

10  A.   Yes.

11  Q.   OK.  And you said this is a debut of the four-bar

12  trademark?

13  A.   This was the first season we debuted the four-bar, yes.

14  Q.   If we look at the second row to the leftmost image.

15        Is that the four-bar, the first public display of the

16  four-bar trademark?

17  A.   Yes.

18  Q.   And when was this show held?

19  A.   This show was in 2008, so it would have been the September

20  of '08.

21  Q.   And what types of clothing did you use the four-bar

22  trademark on?

23  A.   Knitwear, we used it on socks.  I believe, at the time, we

24  had it on jackets, knitwear.  Did I say that?

25  Q.   Did you have it on shirts?

1   A.  I believe so, yes.

2   Q.  And did you use it on the same items that you used three

3   bars on?

4   A.  Yes.

5   Q.  And were the sweatpants available for sale in your TriBeCa

6   store?

7   A.  When?

8   Q.  In 2010.

9   A.  They would have been available, yes, in 2010, yes.

10  Q.  And you've been to the TriBeCa store?

11  A.  Yes.

12  Q.  Did you work out of the TriBeCa store at any time?

13  A.  Yeah.

14  Q.  And you've seen the sweatpants back in 2010 in the TriBeCa

15  store?

16  A.  Yes.

17          MR. FLEMMING:  Objection, leading.

18          THE COURT:  I'll allow it.

19  Q.  I would like to show you Exhibit 896, please.

20          Can you explain to the jury while we're wait for the

21  exhibit, what is the process for manufacturing the sweatpants

22  with the four bars, how did the four bars apply to the

23  sweatpants?

24  A.  The original design, and how we still do it today, we

25  engineered the fabric to have the four bars, like, knit into

1    the fabric itself, instead of applying it on top or printing it

2    or anything like that.  It's actually the fabric is woven

3    specifically and engineered specifically to be incorporated

4    within the fabric.

5              MR. MALDONADO:  Your Honor, may I approach?

6              THE COURT:  Yes.

7    Q.  Mr. Childs, are those sweatpants sold by Thom Browne?

8    A.  Yes.

9    Q.  Can you please hold them up for the jury.

10             Can you please show the jury what you were just

11   describing as to how these stripes are woven into the

12   sweatpants?

13   A.  Yes.  So you can see that -- I have it inside out, so the

14   stripes are actually visible on the inside as well because of

15   the process that we use.  It's knit actually continuously on

16   the knit machines, and then every so often there will be

17   another stripe, so that when we do the grading and the

18   manufacturing, they could cut the four bars specifically where

19   we want them to cut it.

20   Q.  Thank you.

21             Are you familiar with adidas' sweatpants?

22   A.  Yes.

23   Q.  Have you seen them?

24   A.  I've seen some, yes.

25             MR. MALDONADO:  OK.  Your Honor, I would like to

1    approach the witness, please.

2              THE COURT:  Yes.

3    Q.  Mr. Childs, handing you Demonstrative Exhibit No. 8.

4              Have you seen those before?

5    A.  Yes.

6    Q.  Are those the adidas sweatpants?

7    A.  They are.

8    Q.  And can you please describe how the stripes are applied to

9    those sweatpants?

10   A.  So these are --

11             MR. FLEMMING:  Objection, 402 and 403.

12             THE COURT:  Overruled.

13   A.  These are seen on to the surface of the fabric down the leg

14   on both sides, just like how we would call top apply.

15   Q.  Thank you.

16             MR. MALDONADO:  Your Honor, is it possible to pass

17   these exhibits to the jury so they can see for themselves?

18             THE COURT:  Yes.

19             MR. MALDONADO:  Thank you.

20   Q.  Does Thom Browne apply its stripes the same way as adidas

21   does to the sweatpants?

22   A.  No.

23   Q.  OK.  Let's pull up Exhibit 145, please.

24             Thom Browne participates or holds runway shows,

25   correct?

1    A.  Yes, we do.

2    Q.  How many runway shows per year does Thom Browne have

3    presently?

4    A.  Two, two per year.

5    Q.  Two per year.

6         Are you involved in those runway shows?

7    A.  Less so these days, but in the past, a lot more, yeah.

8    Q.  What has your involvement been with the runway shows?

9    A.  Um, everything from, I mean, getting the samples there and

10   finish on time.  And then back when I originally worked there,

11   here at Thom Browne, it was a lot more management backstage,

12   dress, making sure the models were dressed, making sure that

13   they were styled correctly, making sure that they were in the

14   right order for how Thom wanted them to go out to be seen.

15   Yeah.

16   Q.  OK.  And where are Thom Browne's --

17        Where are the runway shows held, what cities?

18   A.  Around the world.  We show in New York, Paris, Italy.  I

19   think those are the only three countries.

20   Q.  That is now, presently?

21   A.  Presently, yeah.

22   Q.  And when you started back in 2007, 2008, what cities were

23   the runway shows held in?

24   A.  In New York.

25   Q.  Only in New York?

1    A.  Yeah.

2    Q.  OK.  In front of you is an exhibit here.

3            Is this a look book from a runway show?

4    A.  Yes.

5    Q.  Now, which runway show is this?

6    A.  This is the spring/summer 2008 runway show.

7    Q.  What's the theme for this show?

8    A.  This was a surf theme.

9    Q.  And does this show include swimwear?

10   A.  It does.

11   Q.  OK.  Let's scroll down to the next page, please.

12           If you want to zoom in on that figure in the lower,

13   next.  There is one.

14           Is that part of the collection?

15   A.  Yes.

16   Q.  If we go to two images to the left there.

17           Is that a swimwear?

18   A.  The first one you had was a board short, but this could be

19   worn as one.

20   Q.  OK.  Let's pull up the next exhibit, please, Plaintiff's

21   Exhibit 1314.

22           Can you tell us which show this is?

23   A.  This is the fall/winter 2006 fashion show.

24   Q.  OK.  What's the theme for this show?

25           MR. FLEMMING:  Objection, foundation for this time

1    period.

2              THE COURT:  If you can lay a foundation.

3    Q.  Are you familiar with the fall/winter 2006 show?

4    A.  I'm familiar with it, yes.

5    Q.  Have you seen images from that show?

6    A.  Yes.

7    Q.  Are the images in this exhibit the images from that show?

8    A.  They are.

9              MR. FLEMMING:  Objection, cumulative.

10             THE COURT:  Overruled.

11   Q.  What was the theme for this runway show?

12   A.  It's, like, ice skating.

13   Q.  OK.  If we can pull up the next exhibit, please, 146.

14             Which show is this on the screen?

15   A.  This was the spring/summer 2009 runway show.

16   Q.  And what was the theme of the spring/summer 2009 runway

17   show?

18   A.  It's tennis.

19             MR. FLEMMING:  Objection, cumulative.

20             THE COURT:  Definitely not.

21             Overruled.

22   A.  Tennis, tennis theme.

23   Q.  OK.  If we scroll down, please.  Right there, on the right

24   side, middle right.

25             What is that image what is the model wearing in that

1    image?

2    A.   He's wearing a wetsuit and a terry cloth coat.

3    Q.   What material is the wetsuit made of?

4    A.   Neoprene.

5    Q.   That was in 2009, you said?

6    A.   Presented in 2009, yes.

7    Q.   Where was that show held?

8    A.   That was here in New York.

9    Q.   Can we now turn to Exhibit 147, please, and tell me what

10   show this is?

11   A.   This is the spring/summer 2010 runway show.

12   Q.   What was the theme for this show?

13   A.   That was the Robinson Crusoe kind of walk-to-shore show.

14   Q.   That is where the sweatpants were debuted?

15   A.   Yes.

16   Q.   Where was that show held?

17   A.   That was in our store downtown in New York.

18   Q.   Can we look at Exhibit 140, please.

19             What show is this?

20   A.   This is the fall/winter 2010 runway show.

21   Q.   Where was that held?

22   A.   This was at the Armory Uptown here in New York.

23   Q.   What was the theme for this show?

24   A.   This was, like, a football kind of rugby theme.

25   Q.   OK.  If we look at the lower right image on this page, what

1    do we see there?

2    A.   We see a coat and boots.

3    Q.   What kind of decoration do we see on this image?

4    A.   So this we call this framing, intarsia framing.  We take

5    the different color materials and actually seam it into the

6    garment itself, as opposed to a decorative trim, let's say.

7    It's actually woven into -- not woven, but sewn into the

8    garment to become part of the garment, as opposed to a

9    decorative element of the garment.

10   Q.   Thank you.

11           If we can pull up Exhibit 153, please.

12           Can you tell us what show this is?

13   A.   I believe this is the women's runway show.  Season, I think

14   it's 20 --

15   Q.   Zoom in on the --

16   A.   -- 10?  Or is it --

17   Q.   -- the date.

18   A.   2011.

19   Q.   2011.  Is this the first women's show?

20   A.   Yes.

21   Q.   Back when you started at Thom Browne, did Thom Browne have

22   a women's collection?

23   A.   When I started, the women's selection was very small.  I

24   wouldn't call it a complete collection, but we had a women's

25   offering.

1   Q.  Today, do you have a women collection?

2   A.  Yes, we do.

3   Q.  Are you the design director for that collection?

4   A.  Yes.

5   Q.  When you started in 2007, did Thom Browne have a children's

6   collection?

7   A.  We did not, no.

8   Q.  Do you have a children's collection today?

9   A.  Yes.

10  Q.  Let's look at exhibit -- I'm sorry.  This exhibit on the

11  screen was the women's collection.  Let's look at 141, please.

12          What show is this?

13  A.  This was the fall/winter 2011 men's runway show.

14  Q.  If you look at page two.

15          These are items in that collection, correct?

16  A.  Yes.

17  Q.  Look at the upper left.  I'm sorry, first row.

18          Is that the similar intarsia use of the red, white and

19  blue you were talking about?

20  A.  Yes.  This would be intarsia into the knitwear, like, on

21  the scarf and the cardigan.

22  Q.  OK.  If we can look at Exhibit 142, please.

23          What show is this?

24  A.  This is the fall/winter 2012 men's runway show.

25  Q.  What was the theme for this show?

1    A.   It was punk footballer.

2    Q.   Let's look at the upper right image there.

3         What do we see here?

4    A.   It's, like, a classic rugby stripe, and it has the four

5    bars on his left sleeve and also our Grosgrain used as a chin

6    strap.

7    Q.   Thank you.  Can we look at Plaintiff's 1314, please.  Page

8    35, please.

9         What show is this?

10   A.   It's the spring/summer of 2013, men's show.

11   Q.   What's the theme for this show?

12        MR. FLEMMING:  Objection, 602.

13        THE COURT:  Overruled.

14   Q.   What is the theme for this show, please?

15   A.   I don't know exactly the theme, but I'd say magus whaler.

16   Q.   If we look on this page on the screen, do we see the four

17   bars?

18   A.   We do, yes.

19   Q.   If we look at now -- what's the next one, page 40.

20        What is this show?

21   A.   This was another women's runway show.

22   Q.   Do you know when this show was held?

23   A.   2013.

24   Q.   If we look at page 46.  Scroll down.

25        These are items that were sold in 2014, correct?

1    A.  Yes.  Oh, they would have been available in 2013.

2    Q.  OK.  Let's turn now to page 60, please, this same exhibit.

3            Which show is this?

4    A.  Men's spring/summer 2015 runway show.

5    Q.  What was the theme for this show?

6    A.  Um, I think it was, like -- what's the word -- like,

7    robotics, but also, like -- I don't know the word.  Anatomy of,

8    like, robotics in a way.

9    Q.  If we look at page 62, please.  Scroll down.

10           These are various looks in that runway show, is that

11   correct?

12   A.  Yes.

13   Q.  Let's look now at page 66, please.

14           If you can tell us what show this is?

15   A.  This is the women's fall/winter 2016 runway show.

16   Q.  If we look at page 68.

17           Do you see the Grosgrain featured in this runway show

18   as well?

19   A.  Um-hmm, yes.

20   Q.  Now, if we can go to page 70.

21           And tell me what show this is?

22   A.  Men's fall/winter 2017 runway show.

23   Q.  OK.  Switch up to page 74.  These are all items within that

24   collection.  If we look at the third image on the top line.

25           Can you describe that image there?

1   A.  This is Chesterfield overcoat with, like, elongated

2   sleeves.  And then anywhere you would have a seam it was

3   buttoned.  It was all buttoned together.

4   Q.  OK.  If we can turn now to page 75.

5           What show is this?

6   A.  This was the fall/winter 2022 runway show.

7   Q.  OK.  If we jump to page 78, please.

8           On the bottom row there, second image, you see the

9   four bars?

10  A.  Yes.

11  Q.  Now if we can turn to page -- I'm sorry -- to Exhibit 144,

12  please.

13          Which show is this?

14  A.  It's the fall/winter of 2018 runway show.

15  Q.  And on the first page there, do we see, is that one of your

16  down jackets?

17  A.  This is a down coat, yes.

18  Q.  And do you see the four bars on the sleeve there?

19  A.  Yes.

20  Q.  So throughout the runway shows that we just looked at from

21  2007 through 2018, did Thom Browne consistently display apparel

22  feature the four bars?

23  A.  Yes.

24  Q.  And did Thom Browne consistently display apparel featuring

25  the Grosgrain signature?

1    A.  Yes.

2    Q.  And all the time you've been at Thom Browne, have you ever

3    been made aware of any instances of consumers, confused between

4    Thom Browne's products and adidas' products?

5    A.  I have not, no.

6              MR. MALDONADO:  Thank you.

7              I pass the witness.

8              THE COURT:  Cross-examination.

9    CROSS-EXAMINATION

10   BY MR. FLEMMING:

11   Q.  Mr. Childs, you started working for Thom Browne in 2007,

12   correct?

13   A.  Yes.

14   Q.  And when you started in 2007, your impression of the Thom

15   Browne brand was impeccably tailored clothing, is that right?

16   A.  Yes.

17   Q.  And back in 2007, Thom Browne made what you described as

18   subtle nods to athletic-wear?

19   A.  Yes.  There was always an element of sports in the

20   collection, yes.

21   Q.  Let's bring up Exhibit 1319 already in evidence.

22              These items we're looking at are actual athletic-wear,

23   correct?

24   A.  I can't -- I don't know.

25   Q.  You don't know?

1   A.  I mean...

2   Q.  Are you head of design for womenswear at Thom Browne?

3   A.  Yes.

4   Q.  And these are women's clothing?

5   A.  This is on a woman, yeah.

6   Q.  And this is active-wear, correct?

7   A.  Um, I mean, these are our compression, like, top and

8   trouser.

9   Q.  Released in 2020, correct?

10  A.  I'm not sure when it was released.

11  Q.  So back in 2007, you testified that Thom Browne was using a

12  three-bar design, is that correct?

13  A.  Yes.

14  Q.  And you personally didn't have any interactions with adidas

15  during that time?

16  A.  I did not, no.

17  Q.  But Thom Browne decided to switch from three bars to four

18  bars, right?

19  A.  In 2008, yes.

20  Q.  And you were part of those discussions?

21  A.  Yes.

22  Q.  As far as timing, it actually took less than a month to

23  come up with the four bars review samples and make a decision?

24  A.  Our process was within a month, yes.

25  Q.  And Mr. Browne made the ultimate decision?

1    A.  He would have, yes.

2    Q.  And at that time Thom Browne was not making sweatpants, is

3    that what you testified?

4    A.  We were making sweat pant-type things, like, knit trousers,

5    yeah, so...

6    Q.  So to you, knit trousers are the same thing as sweatpants?

7    A.  Not as maybe we all know them, but, I mean, they are casual

8    pants, yeah.

9    Q.  And I want to talk about the Grosgrain for just a bit.

10        Thom Browne doesn't have any written guidelines for

11   how the Grosgrain should appear on clothing, correct?

12   A.  We might have a brand book that has it, yeah.

13        MR. FLEMMING:  Can we show just the witness and the

14   court page 56 of the transcript going into page 57.

15        Page 56 of the transcript going into page 57, just

16   show the witness and the Court.

17        I'm looking at page 56, starting at 22, Nita, so keep

18   going.

19        THE COURT:  I'm sorry, to where?

20        MR. FLEMMING:  Keep scrolling, please, to the bottom.

21        Starting at line 22 of 56 and going through line four

22   of 57.

23        Permission to impeach.

24        MR. MALDONADO:  Objection, your Honor.

25        THE COURT:  Let me see the whole thing.

1           I don't think it's inconsistent.  Overruled.

2    BY MR. FLEMMING:

3    Q.  So really it's up to just Mr. Browne to decide --

4           THE COURT:  I'm sorry.  I said overruled.  I meant

5    sustained.

6           MR. FLEMMING:  Understood, your Honor.

7    Q.  So really it's just up to Mr. Browne to decide how the

8    Grosgrain is to appear on clothing?

9    A.  Yes.

10   Q.  And Thom Browne uses the Grosgrain horizontally on sleeves,

11   is that right?

12   A.  We have, yes, we do.

13   Q.  And also vertically down sleeves?

14   A.  We do, yes.

15   Q.  And diagonally across shirts?

16   A.  Yes.

17   Q.  And vertically down shorts, too, right?

18   A.  Yes.

19          MR. FLEMMING:  Let's bring up just for the witness

20   Exhibit 884.

21          We offer this Exhibit into evidence.

22          MR. MALDONADO:  No objection.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 884 received in evidence)

25          MR. FLEMMING:  We can publish that to everyone.

1    BY MR. FLEMMING:

2    Q.  Mr. Childs, this is a Thom Browne brand book, correct?

3    A.  It just says Thom Browne.  I don't know.

4    Q.  Let's go to the second page.  One more.

5          You recognize this as a brand book, correct?

6    A.  It's called a brand book, yes.

7    Q.  Let's turn to page five, please.

8          In the next to last paragraph, do you see a reference

9    to an award in 2017?

10   A.  2017, yes.

11   Q.  So it's fair to say that this brand book was written

12   sometime in 2017 or later?

13   A.  After 2017, I mean, around or after 2017, sure.

14   Q.  Let's turn to page four.

15          And this page starts the brand identity section of

16   this Thom Browne brand book?

17   A.  Oh, yes.  I'm sorry, yeah.

18   Q.  Yes.  Let's go to page nine next.

19   A.  Sorry.

20   Q.  Do you see there on the right side of the page where it

21   says in all caps four-bar stripe?

22   A.  Yes.

23   Q.  And do you see just below that where it says, a brand

24   standard inspired by the classic look of arm band stripes on

25   collegiate athletics sweaters?

1          Do you see that?

2     A.   Yes.

3     Q.   And there are no sweaters accused in this case, correct?

4     A.   I don't know.

5     Q.   On the next page, page ten.  It may be the next page.

6     There we go.

7          This page describes the Thom Browne uniform, correct?

8     A.   The basic, yes, basic uniform, yes.

9     Q.   And the first items are a gray tie, silver tie bar, and

10    white pocket square, correct?

11    A.   Yes.

12    Q.   Do you see underneath that where it refer to the RWB

13    stripe.

14         Does that refer to red, white and blue Grosgrain?

15    A.   Below, the first sentence there?

16    Q.   Below the words pocket square in all caps.

17    A.   The enamel stripe, yes.

18    Q.   So the RWB stripe is the red, white and blue Grosgrain

19    design?

20    A.   Not as it refers to here.

21    Q.   So there is a difference between the red, white and blue

22    stripe and what you call the white/red/white/blue/white design

23    earlier, is that what I'm hearing?

24    A.   No.  Just different application, I guess, is what I'm

25    saying.

1    Q.   So the Thom Browne uniform also includes a gray cardigan,

2    correct?

3    A.   Yes.

4    Q.   There are no cardigans accused of infringement in this

5    case?

6    A.   I'm unsure.

7    Q.   And it also includes a white Oxford shirt?

8    A.   Um-hmm yes.

9    Q.   And you're not aware of any Oxford shirts being accused of

10   infringement in this case?

11   A.   I don't know, no.

12   Q.   So you left Thom Browne in 2011, correct?

13   A.   I did.

14   Q.   And your involvement between 2011 and 2019 just included a

15   few freelance projects?

16   A.   Um, I -- I went and worked for a couple other brands and

17   started my own brand in between.

18   Q.   Let's bring up Defendant's Exhibit 460, which you looked at

19   earlier.

20            You described this as a list of Thom Browne's

21   products, product offerings in 2007?

22   A.   Yes.

23   Q.   And the date is January 6, 2007, right?

24   A.   Yes.

25            MR. FLEMMING:  All right.  Let's go to the last page

1 | of this document.

2 |        This should be published for everyone, Nita, it's

3 | already in.  I don't think you missed anything.

4 | Q.  We're looking at the last page, right?

5 | A.  If you say so, yeah, I guess.  Yes.

6 | Q.  So this is a 30 --

7 | A.  Yeah, yeah.

8 | Q.  This is a 36-page document?

9 | A.  Yeah.  It was just zoomed in, I should say.  Yes.

10 | Q.  Let's go back to the first page.

11 |        I counted about 51 entries per page, is that fair to

12 | say, each page lists approximately 50 products?

13 | A.  Um, I could count them.  Yeah.  Yes, if you say so.

14 | Q.  There's some highlighting in this document.

15 |        Did you see that when you were reviewing it?

16 | A.  I don't remember.  I don't recall.

17 |        MR. FLEMMING:  Let's slowly scroll through all the way

18 | to page 25, please.

19 |        Maybe not too slowly.  Sorry, everybody.

20 | Q.  Do you see the highlighting on this page?

21 | A.  I do.

22 | Q.  Do you know why it's there?

23 | A.  I do not.

24 | Q.  Do you know what cotton sheer means?

25 | A.  That would reference to a shirting fabric.

1   Q.  A shirting fabric.

2           So what would this shirt look like?  Is it, like, a

3   button-down?

4           What is it?

5   A.  Yeah, like an Oxford -- sheer would be a sheer cotton, and

6   it would have quad stripes on it, so four stripes.

7   Q.  What are quad stripes?

8   A.  Um, four stripes.

9   Q.  But that's not the four bars?

10  A.  No, like a striped shirt.

11  Q.  Because this was in 2007 and the four bars weren't adopted

12  until 2008, right?

13  A.  Yes.

14  Q.  OK.  So let's go to page 28, where there is more

15  highlighting.

16          What's highlighted here are cashmere V-neck pullovers,

17  correct?

18  A.  Yeah, pullovers.

19  Q.  And you wouldn't describe cashmere V-neck pullovers as

20  active-wear, right?

21  A.  No.

22  Q.  Let's go to page 32.  You see more highlighting, and they

23  are all for knit cardigan sweaters, is that right?

24  A.  Yes, looks to be knit.

25  Q.  Like the one that was held up just a few minutes ago?

1  A.  Um, I didn't see a cardigan.

2  Q.  A cardigan was not held up for you?

3  A.  No.

4  Q.  Let me hold it up again and see what product you're talking

5  about.

6          MR. FLEMMING:  Thank you, Charlie.

7  Q.  Is that not a cardigan sweater?

8  A.  That is, yes.

9  Q.  So Thom Browne was swelling cardigan sweaters in 2007,

10 right?

11 A.  Yes.

12 Q.  But that's not active-wear, right?

13 A.  Not as we know today, no.

14 Q.  And you're not aware of adidas accusing any cardigan

15 sweaters of infringement?

16 A.  Not that I know of.

17         MR. FLEMMING:  No further questions.

18         THE COURT:  Any redirect?

19         MR. MALDONADO:  No, your Honor.

20         THE COURT:  Thank you very much.  You may step down.

21         (Witness excused)

22         All right.  We'll take our midmorning break at this

23 time.

24         (Continued on next page)

25

1           (Jury not present)

2           THE COURT:  There was another dispute that plaintiff's

3    counsel said he wanted to bring to my attention.

4           MR. HENN:  Yes, your Honor.

5           So you will recall that we had an expert,

6    Dr. D'Arienzo, who the court opted to exclude from testifying

7    on the grounds that although he had lots of experience in the

8    fashion industry, he did not adequately engage in what you

9    deemed as a scientific method to review a bunch of stripes

10   designs and opine on what impact that would have to consumers.

11          THE COURT:  Not a scientific method, but a Rule 702

12   methodology.

13          MR. HENN:  Fair.

14          Defense intends to introduce testimony from

15   Ms. Arbuckle, and we moved in limine on a number of issues.

16   And your Honor, at the outset of the case, before you had ruled

17   on Dr. D'Arienzo's testimony, you said that she should be

18   permitted to testify as to the existence of three stripes --

19   excuse me -- striped products being in the marketplace.

20          We believe in light of the ruling on Dr. D'Arienzo,

21   given that Ms. Arbuckle did nothing more than go on the

22   Internet and pull pictures of stripes, she should not be able

23   to offer any expert testimony on what is purely a factual

24   issue, are there stripes out there.

25          And further, she admits that she has no information at

1    all about the scope of sales of any of those products.  So even

2    if you were to allow her to come in, I guess, as a fact witness

3    to say, I found out of these things, she admitted without

4    qualification in her deposition that she has no support for the

5    extent of any of this stuff being sold.

6           And so we would ask that she be excluded, and to the

7    extent you have any doubts, we would suggest you ask her

8    similar questions to what Dr. D'Arienzo was asked and confirm

9    she did nothing more than just go on line and pull a bunch of

10   stripes.

11          MR. MALDONADO:  Your Honor, first, as an initial

12   matter, this is the arguments that were already raised and

13   brought to the court's attention in connection with the

14   Daubert, as well as to exclude evidence of third-party use.

15          So I believe the court has ruled --

16          THE COURT:  So let me mention -- and there is no way

17   the court reporter will be able to fairly pick this up -- but

18   although it is spelled D-a-u-b-e-r-t, Mr. Daubert pronounces

19   his name Daubert, not Dau-bear.

20          Now that we have that corrected, go ahead.

21          MR. MALDONADO:  We believe these arguments were

22   already made in connection with plaintiff's Daubert motion as

23   wells as the evidence to third-party use the court has already

24   ruled on.

25          Secondly, I don't believe that Ms. Arbuckle's

1    testimony is in any way limited by the court's ruling as to

2    Mr. D'Arienzo.  I think that the evidence and the impact of

3    third-party use on the issues in this case are independent of

4    whatever opinion that Mr. D'Arienzo would have offered if he

5    were on the stand.

6              Ms. Arbuckle has extensive experience in fashion

7    history.  She will testify that not only as to -- she will

8    testify as to how designers view evidence of third-party use in

9    the marketplace, how it affects the designing process, and how

10   that comes to bear on the issues in this case.

11             We believe that, you know, as the court permitted, she

12   would testify as to third party use.  If she were permitted to

13   so testify, as our case was guided by that rulings, obviously,

14   and we don't see any reason that she should be excluded at this

15   point.

16             THE COURT:  All right.  I want to go back and look

17   again at my own notes, so we'll take this up at the next break.

18             It doesn't look like we'll get to her before the next

19   break.

20             MR. MALDONADO:  OK, your Honor.  Also, I believe the

21   plaintiff rested their case, so we have a motion.

22             THE COURT:  Have we now completed the witnesses that

23   you were going to call?

24             MR. HENN:  We have, your Honor.  The plaintiff rests.

25             THE COURT:  Go ahead.

1           MR. MALDONADO:  OK, your Honor.

2           The defendant moves for judgment as a matter of law

3     under Rule 58 on all adidas' claims under the Lanham Act, New

4     York law, and the common law.  More specifically, we move on

5     the following issues and claims:

6           The first is no willfulness or bad faith.  Thom Browne

7     moves for JMOL under 50(a) as adidas has failed to present

8     legally sufficient evidence of bad faith or willfulness in

9     order to prove bad faith infringement or dilution.  Adidas

10    needs to show that Thom Browne adopted the accused marks with

11    bad faith or a predatory intent --

12          THE COURT:  Let me just cut you off for a second

13    because I do think there is a serious issue -- I'll hear from

14    plaintiff's counsel in a second -- as to where there is

15    sufficient evidence to go to the jury on the question of

16    willfulness or bad faith.  But that does not eliminate any of

17    the claims, that just eliminates one of the issues relevant to

18    the claims.

19          MR. MALDONADO:  Correct.  That is one of the items on

20    their verdict form as for a finding of willfulness.

21          THE COURT:  My verdict form, I'll tell you in advance,

22    is going to be three lines.

23          On the claim of infringement, do you find the

24    defendant liable or not liable?

25          On the claim of dilution, do you find the defendant

1    liable or not liable?

2             If you find liability, how much do you award in

3    damages?

4             And I guarantee you that will be the verdict form, so

5    you don't need to worry about that.  But it is still relevant.

6    You're entitled to have issues excluded even if they don't

7    exclude entire claims.

8             MR. MALDONADO:  Right.

9             THE COURT:  I do think there is a serious issue as to

10   any evidence of willfulness or good faith, but go ahead and

11   complete your...

12            MR. MALDONADO:  Certainly, your Honor.

13            There is simply no evidence presented of bad faith

14   adoption of the plaintiff's trademark.  The evidence is that

15   plaintiff adopted its trademark, it's original three bars as a

16   varsity reference, switched to four bars in response to adidas'

17   claims --

18            THE COURT:  Right.

19            Is there anything else you want to single out in

20   addition to the willfulness?

21            MR. MALDONADO:  Yes.  Sorry, we have other issues.

22            The second issue is on damages.  There was a request

23   in this case for punitive damages.

24            THE COURT:  Yes, I do want to hear, of course, from

25   plaintiff's counsel.  I think the likelihood of my allowing

1    punitive damages to go to the jury is, at my present thought

2    about it, is zero.

3              But we'll see what plaintiff's counsel has to say.

4              MR. MALDONADO:  OK.  Your Honor, the next issue that

5    we have is discouragement of profits and actual damages.  Our

6    argument here, your Honor, is that adidas has not presented a

7    legally sufficient case or a legally sufficient evidence to

8    meet its burden to show its entitlement to damages,

9    particularly discouragement of profits under the decision in

10   *Romag Fasteners v. Fossil*, the Supreme Court's decision.

11             Thom Browne further moves on adidas' claim of a

12   reasonable royalty, as the Lanham Act does not support the

13   awarding of a reasonable royalty as a proxy proven actual

14   damages in a trademark case, because this is not a case of a

15   holdover licensee or franchisee situation.  There was no actual

16   license agreement between the parties, and Thom Browne never

17   actually used adidas' marks only in allegedly confusingly

18   similar marks.

19             THE COURT:  All right.  So I'm going to want to hear

20   responses on all of this.

21             MR. MALDONADO:  I have --

22             THE COURT:  You have more?

23             MR. MALDONADO:  I do have more.  Sorry, your Honor.

24             THE COURT:  Silly me.

25             MR. MALDONADO:  We also move on the issue that there

1    is no -- on the issue of initial interest and post-sale

2    confusion.  There has been no evidence presented of initial

3    interest confusion, and the point-of-sale confusion, we

4    believe, is inapplicable in a case such as this, where the

5    allegedly infringing product is of superior quality as opposed

6    to an inferior quality.

7            THE COURT:  Maybe I misunderstood.  I thought they

8    were not claiming point of sale?

9            MR. MALDONADO:  Post-sale.  I meant post-sale, your

10   Honor.

11           THE COURT:  Sorry.

12           MR. MALDONADO:  We don't believe that a post-sale

13   confusion theory is applicable in a case such as this, where

14   the accused product is of a far superior quality than the

15   plaintiff's product, and there is no possibility of harm to

16   adidas even if there were confusion in a post-sale context.

17           With respect to the unregistered marks, common law

18   marks that they assert, we move for a judgment on that as well.

19   We don't believe that adidas has proven any rights to any marks

20   beyond what is cited in their registrations, and they haven't

21   proved that they own any common law rights that extend beyond

22   those marks.

23           As to dilution --

24           Sorry, one last thing on confusion.  We don't believe

25   that they presented any evidence of confusion as to any of

1    their claims, so we move on that basis as well.

2            Then finally, as to dilution, we believe that their

3    dilution claims fail as a matter of law because the products

4    here are related products.  Dilution is intended to apply where

5    two parties are selling unrelated goods and the use of the mark

6    on unrelated goods dilutes the distinctive quality of the

7    trademark.  That is not the case here.  The parties sell

8    related goods, and so we believe that the dilution claim fails

9    as a matter of law.

10           Then finally, your Honor, we feel that they proved to

11   prove fame with respect to the dilution claim.  Adidas needs to

12   show fame at the time Thom Browne adopted its marks, its

13   Grosgrain in 2005, its four-bar signature in 2009.  We believe

14   that there is insufficient evidence of these marks having

15   acquired fame prior to those dates, there is no evidence of

16   sales prior to those dates, and no marketing and advertising

17   activity that would support their claim.

18           For these reasons, we believe that we are entitled to

19   judgment on that claim as well.

20           THE COURT:  OK.  So I'm very glad we were moving so

21   swiftly this morning, and I want to continue that.  So rather

22   than hear from plaintiff's counsel now, we'll find a place

23   later in the day to hear from defense counsel on those various

24   points.  So take five more minutes and then we'll resume.

25           (Recess)

1          MS. SAYOUR:  The defense calls Lucas Langellier.

2          (Jury present)

3          THE COURT:  While you were out, they called this

4   witness so you can just swear him in.  He hasn't been sworn in

5   yet.

6    LUCAS LANGELLIER,

7        called as a witness by the Defendant,

8        having been duly sworn, testified as follows:

9   BY MS. SAYOUR:

10          DEPUTY CLERK:  State your name and spell it slowly for

11   the record.

12          THE WITNESS:  Lucas Langellier.  L-A-N-G-E-L-L-I-E-R.

13          THE COURT:  What's your first name.

14          THE WITNESS:  Lucas.

15   BY MS. SAYOUR:

16   Q.  Good morning, Mr. Langellier?

17   A.  Good morning.

18   Q.  Can you please introduce yourself to the ladies and

19   gentlemen of the jury?

20   A.  Yes.  I'm Lucas Langellier.  I am vice-president of retail

21   for Thom Browne.  I've been with the company since

22   January 2010.

23   Q.  So you've been with the company for about 13 years?

24   A.  Yes.

25   Q.  When did you start with Thom Browne?

1  A.  So I started I guess 13 years ago almost to the day.

2  Q.  January?

3  A.  Yes.

4  Q.  In January 2010, what position did you hold with Thom

5  Browne?

6  A.  I started with sales in the Tribeca in New York.

7  Q.  Can you take us through your positions at Thom Browne,

8  starting in 2010 and just give us the titles and the years?

9  A.  Yes, so I started in sales in 2010 in the New York store.

10  In 2011 I became store manager.  In 2012 I became director of

11  retail for globally, and then I was also in charge of

12  ecommerce.  And in 2017 I was promoted to vice-president of

13  retail overseeing global sales for retail.

14  Q.  And vice-president of retail is your current title?

15  A.  That is correct.

16  Q.  When you began working for Thom Browne in 2010, where did

17  you work?

18  A.  In New York in the Tribeca store.

19  Q.  And where is that store located?

20  A.  100 Hudson Street.

21  Q.  So if I call the store the Tribeca store during this

22  testimony, you'll understand that I'm referring to that store?

23  A.  Yes.

24  Q.  What were your primary responsibilities in 2010 at the

25  Tribeca store?

A.   So in 2010, as we were a very small company, we all wore

many hats.  So while I was in charge of sales, I also helped

run the store, so that would include all of operations,

merchandising, visual merchandising, and then of course

customer service.

Q.   You mentioned visual merchandising, right?

A.   Yes.

Q.   What do you mean by that?

A.   So visual merchandising is when a store gets a new

shipment, you rotate the merchandise throughout the store.  So

as we have very little foot traffic in this location, we always

wanted the store to be fresh and new every time a customer

would come back so that if they had alterations, let's say, ten

days, when they would come back, you would want the newest

arrivals out.

Q.   Did you have any responsibilities relating to the products

themselves?

A.   Yes.  I would also have been in charge of training, and we

would all sit through product knowledge, so I was very versed

in that part of the product as well.

Q.   What were your responsibilities as, I guess was it,

director of retail, the second position you took on?

A.   That is correct.

Q.   What were your responsibilities in that role?

A.   So in 2011 and '12 we started expanding into Asia Pacific.

1  We opened three stores in Japan and two in Korea.  So I oversaw

2  those stores as well as the New York store.

3  Q.  How did your responsibilities change when you became VP of

4  retail at Thom Browne?

5  A.  Again, this was a time where we continued to expand into

6  new markets, and we had as a CEO at the time -- so in 2017 when

7  I was promoted to vice-president of retail under Rodrigo Bazan,

8  we started expanding further and therefore my job was to -- to

9  take our business in New York and expand it throughout the

10  world specifically China, Japan.

11  Q.  So I know we've been talking a little bit about the Tribeca

12  store, right?  Had there always been one store for Thom Browne?

13  A.  In 2010, there was one store.  Today we have many more

14  stores.

15  Q.  How many stores do you have today?

16  A.  Today we have a hundred stores approximately, 70 of which

17  are all under my umbrella.

18  Q.  I want to be clear when you're talking about stores, are

19  you talking about all the stores where Thom Browne products are

20  located in or --

21  A.  No, I'm talking about retail Thom Browne stores.  There is

22  another avenue of sales, and that would be through wholesale

23  partners which would be department stores.

24  Q.  Okay.  So maybe we can back up a little.  How does Thom

25  Browne sell its clothing?

1    A.   So we have three main avenues:  One which is retail, our

2    own brick-and-mortar stores.  The second would be ecommerce,

3    which we run a global ecommerce site.  And then the third would

4    be through wholesale, which is department store business.

5    Q.   About how many retail locations are there today in the

6    United States?

7    A.   Approximately 400 doors.

8    Q.   Is that for retail?

9    A.   No, that would be for the wholesale business.

10   Q.   For retail, about how many --

11   A.   Retail is one hundred.

12   Q.   And in the United States, how many retail locations are

13   there today?

14   A.   Today in the United States there's five.

15   Q.   And where are they located?

16   A.   We have two in California, San Francisco, Orange county.

17   We have Miami, Florida.  We have New York, New York, of course.

18   And we have Boston, Massachusetts.

19   Q.   Do you know when those locations each opened up?

20   A.   Yes.  So New York opened in 2007, followed by Miami in

21   2016.  2020 would have been South Coast Plaza.  And just

22   recently Boston and San Francisco.

23   Q.   I think you mentioned there are 400 doors.  Is that what

24   you said earlier when we were talking about wholesale?

25   A.   Yes.  So I say doors because Saks Fifth Avenue or at the

time prior to when we were selling at Barneys, those are big

retailers, but they have many doors within their company.

Q.  When you started with Thom Browne, did you have any

responsibilities with respect to wholesale?

A.  I did help the wholesale team, yes.

Q.  How did you help them?

A.  During sales appointments, we -- like I said before, the

company was quite small, so everybody chipped in to help at

these times.  So after a fashion show, we sell the collection

to wholesale doors, and we do the buying for our retail doors.

So I would participate in the sales after the fashion shows.

Q.  Let's talk a bit about retail.  If we can bring up

Plaintiff's Exhibit 175, please.  It's already admitted.  And

we can jump to page 2.

        Mr. Langellier, do you recognize that photograph?

A.  So this would have been a photograph of the New York store

in, I would say, probably 2007 or '8.

Q.  Is this what the store looked like when you started working

there in 2010?

A.  It did.

Q.  And can you describe what you see in that photograph?

A.  So here we have a gray vinyl sports coat.  We have some --

a navy blue tipped jacket.  Then on the coffee table there, you

can see some folded knits.

Q.  What about the store today, does it still look like this?

1    A.  It definitely still resembles this.  However, in 2016 we

2    did remodel and expand when we added a women's store to this

3    same location.

4    Q.  Now, you talked earlier about visual merchandising.  Do you

5    remember that?

6    A.  Yes.

7    Q.  Can you describe how you visually merchandised this store

8    with reference to the photograph?

9    A.  Yes, so, again, because the store holds approximately 100

10   to 125 different SKUs, and what I mean by how many items go on

11   each rack, the store buy and the inventory of the store at this

12   time was probably 2,500.  So those items would have been in

13   what we call the back of house.  So we each probably two-week

14   period, we would change bringing out what's in the back and

15   replenishing from the sales floor which would change the

16   appearance of the store.

17   Q.  You referred to a number 2,500?

18   A.  Yes.

19   Q.  What were you referring to?

20   A.  Units of merchandise within the store.

21   Q.  How big was the store?

22   A.  2,000 square feet.

23   Q.  How would you compare the Thom Browne Tribeca store to a

24   department store?

25   A.  The Thom Browne store, I mean, first and foremost it's our

own environment which is the concept of the store being gray

marble with terrazzo floors just to start with.  We also carry

a much larger collection and offering than a department store.

Q.  Can you describe how a sales associate would interact with

a customer who walked into the Tribeca store?

A.  Yes.  So we try to -- we strive to give the best customer

service possible.  With that being said, we greet customers.

We ask a lot of questions, and we do that because we know that

we have limited merchandise on the sales floor, and we have a

lot more items in the back.  What we're trying to do is we're

trying to build a relationship with the customer.

        Another point of what we try to do is get to know

exactly what they are really looking for so that we can bring

out additional items to show them

Q.  Were there expectations for sales associates that worked at

the Tribeca store in 20108?

A.  Yes, there were expectations.

Q.  What were those expectations?

A.  It started with giving the best customer service possible

to build a relationship with our customer who walks in and also

be able to reach out to that customer thereafter.

Q.  Were they required to interact with the customer?

A.  Yes.

Q.  So would you say it would be standard practice at Thom

Browne in 2010 to interact with a customer that walked into the

1    store?

2    A.  Absolutely.  And it's still the same today.

3    Q.  And why is that?

4    A.  How we grow a business is in two ways.  It's new clients,

5    which is probably 50 or 60 percent of our business, but we as

6    leaders really try to grow and continue to build a relationship

7    with our current clients, and we do that by getting to know

8    them, getting to know what they're looking for, and continue to

9    help them season after season.

10          MS. SAYOUR:  Your Honor, I have some binders I think

11   that would help given some of the volume of the exhibits, if I

12   can approach the witness with those binders.

13          THE COURT:  All right.

14   Q.  Thank you.  I'd like to talk a little bit about the

15   product.  Which Thom Browne collection was available for

16   purchase at the Tribeca store when you started in 2010?

17   A.  So that would have been our spring/summer 2010 collection.

18   Q.  And what specific kinds of apparel were displayed in the

19   Tribeca store in 2010?

20   A.  As a flagship store, we carry a large collection of what

21   was on the runway, which also has more commercial items that

22   support the runway items.  So that would be tailoring from

23   suiting to overcoats and outerwear to Oxford shirting, polos,

24   T-shirts, jersey, shoes, predominantly leather-soled shoes,

25   ties, kind of the whole collection that you would see, an

1    overall assortment.

2    Q.  Was apparel featuring the 4-Bar signature displayed in the

3    store in 2010?

4    A.  Yes.

5    Q.  What kinds of apparel featuring the 4-Bar signature were

6    displayed in the store in 2010?

7    A.  So from the time I started, we put 4-Bar apparel or stripes

8    on a lot of different apparel.  So in the picture you'd shown

9    earlier, there was a jacket but we also have T-shirts, polos,

10    sweats, both tops and bottoms, that would have a 4-Bar insignia

11    on the left-hand side.

12    Q.  Were sweatpants featuring the 4-Bar design displayed on the

13    store shelves in 2010?

14    A.  They would have been.

15    Q.  And what about apparel featuring the Grosgrain ribbon

16    signature, would that also have been displayed in the store in

17    2010?

18    A.  Yes.

19    Q.  I'd like to put up, which I believe is in evidence,

20    DTX-147.  Are you familiar with this document?

21    A.  So this is -- yes, I am.

22    Q.  Can you describe it?

23    A.  This is a lookbook from the spring/summer 2010 collection.

24    Q.  And if we can turn to page 2, can you describe the look

25    that's in the first image in the middle row?

A.  So that would be look nine of the spring/summer 2010

collection, which this show was in our New York Tribeca store.

What the gentleman is wearing is a khaki Macintosh overcoat

tipped with gray Grosgrain, cotton loopback sweatpants with

4-Bar insignia on the left leg and also a cotton loopback

sweatshirt underneath the jacket.

Q.  Would the cotton loopback sweatshirt also have the 4-Bar

signature?

A.  It would have.

Q.  Now, what is this document exactly?

A.  So, a lookbook is somewhat just that.  There's a line of

photographers at the end of a runway, and they're all taking

photos for major publications, so *Vogue* or *GQ*.  We also have a

photographer there that's taking pictures for Thom Browne.  We

use these lookbooks in several ways.  First, to communicate to

our own customers, but also for always -- coming back to

identify the looks that come down the runway.  So we use it as

a selling tool, both printed and digitally.

Q.  So it's called a lookbook, right?

A.  That is correct.

Q.  So is it a book?

A.  Yes, it can be a book.  In these days, it was definitely a

book.

Q.  And what would be the purpose of the book?

A.  So for product information, for visual merchandising, for

1  sending to customers, but also it is just our reference of that

2  show.

3  Q.  Were physical lookbooks available in the Tribeca store?

4  A.  Yes, physical and then digitally on our ecommerce website.

5  Q.  And that would be every year that there was a lookbook?

6  A.  Every year, yes.

7  Q.  Or actually every season there was a lookbook?

8  A.  Correct.  Sometimes four times a year.

9  Q.  So were the clothing items that this model is wearing in

10  what you referred to as look nine, were those offered for sale

11  in the Tribeca store in 2010?

12  A.  Yes, they were.

13  Q.  Can you describe how it goes from a look like this from the

14  runway into the Tribeca store?

15  A.  So Thom designs outfits, and we try to visualize visual

16  merchandise in outfits as well.  So this would have been shown

17  in our New York Tribeca store as an outfit.  So it would have

18  been with the sweatpants, sweatshirt and the overcoat.

19  Somewhat what we call stacks together.

20  Q.  Did you purchase these products or these looks for the

21  Tribeca store in 2010?

22  A.  Yes, we did.

23  Q.  Can you describe that process of purchasing the products in

24  2010?

25  A.  Yes.  So after a runway show, we have a market, and the

1    market is for all store buyers and also wholesale buyers, which

2    is department stores, to come and view the collection and place

3    orders.  That's where we would have seen the assortment and

4    made the buy, what we call.

5    Q.  I'd like to show you the next exhibit, which is not in

6    evidence yet, it's DTX-95.

7            MS. NELSON:  No objection.

8            THE COURT:  Received.

9            (Defendant's Exhibit 95 received in evidence)

10   Q.  Mr. Langellier, can you describe this document?

11   A.  So this is what we refer to as a line sheet which we use

12   after a runway show to differentiate the product shown.

13   Q.  What is a line sheet?

14   A.  So a line sheet breaks down the product from the style

15   number, what the content of the product is, it gives a

16   description and it gives sizing and retail and wholesale

17   pricing.

18   Q.  If we can turn to page 3 of this document, please.  If we

19   can enlarge the top two.  Do you see that?

20   A.  Yes.

21   Q.  Is that look nine that we were just talking about earlier?

22   A.  That is.

23   Q.  Can you explain what's shown in that?

24   A.  So this line sheet is actually very helpful because what we

25   did at the time was take the runway look and match it next to

1    the item with all the content of this.  So this shows look

2    number nine, the sweatshirt, the content of it, the style

3    number, the sizing, and what this particular store had placed

4    as far as the quantities.

5    Q.  And what collection is this from?

6    A.  This would have been spring/summer 2010.

7    Q.  If we can go to pages 12 and 13.  Can you describe what's

8    in the lower right-hand image and the upper left-hand image on

9    those side-by-sides?

10   A.  So these are sweat shorts and cotton loopback fabric with

11   the 4-Bar on the left side and also a zip-up hooded sweatshirt

12   in gray with the 4-Bars again on the left-hand arm.

13   Q.  Were these items available at the Tribeca store in 2010?

14   A.  Yes, they were.

15   Q.  And what about 2011?

16   A.  Yes, they were available in 2011, and they're available

17   today, a version of them.  There's been an evolution but the

18   same product.

19   Q.  And is that the same thing for the -- on page 3 the

20   sweatpants and the sweatshirt that we looked at?

21   A.  That is correct.

22   Q.  So these items have been sold at the retail store the

23   entire time you've been at the company?

24   A.  Yes, they have.

25   Q.  Now, how would, I guess, these items have been displayed in

the Tribeca store in 2010?

A.   So they would have been displayed in two ways.  We have

hanging, like rolling racks on hangers of merchandise, and we

also have shelving units we call etageres that also display

merchandise.  So one of the two ways they would have been

displayed.

MS. SAYOUR:  If we can pull up -- actually, let's do

this in the interest of efficiency.

I'd like to mark the next few exhibits, and what we've

done is combine them together, and let's start with DTX-470

through 492.  Although I will say that DTX-479 and 483 are

already in evidence.  We offer those into evidence.

MS. NELSON:  No objection.

THE COURT:  Received.

(Defendant's Exhibits 470 through 492 received in

evidence)

Q.   Mr. Langellier, there are two binders in front of you, if

you can pull the first binder and go to tab 14.  Publish it to

the jury, please.

A.   It's the same that's on the screen.  Can I use the screen?

Q.   Yes, you can use the screen if that would be easier for

you.  Do you recognize this document?

A.   So this would be a line sheet from the fall/winter '16

men's collection.

Q.   Can you describe what this line sheet is?

1   A.   So this line sheet is used for -- during wholesale market

2   to give description of the product that is being sold, both to

3   retail and wholesale.

4   Q.   And what is the description on the top of the document?

5   A.   So knit jersey, fall/winter '16 men's collection.

6   Q.   And if we turn to 471.  Do you see that on the screen?

7   A.   Yep.

8   Q.   What is this document?

9   A.   So this is another page of the same line sheet breaking

10  down what was available in that season, which this would be a

11  cashmere pullover crewneck sweater with a navy with 4-Bar on

12  the left-hand sleeve.

13  Q.   Rather than go into every single one of these

14  Mr. Langellier, would you have line sheets for different items

15  for each year?

16  A.   Correct.  Each season for each collection it has, to some

17  extent, a book of line sheets.

18          MS. SAYOUR:  Your Honor, I'd like to move into

19  evidence DTX-493 through 510, 511 through 526, 595 through 616,

20  617 through 633, 735 through 746.

21          MS. NELSON:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibits 493 through 510, 511 through

24  526, 595 through 616, 617 through 633, 735 through 746 received

25  in evidence)

1  Q.  Mr. Langellier, if you can look at tab number 158, which is

2  in book 2, this would be DTX-493 through 510.  What are these

3  documents?

4  A.  So this would have been a line sheet from the fall/winter

5  '17 men's collection, and this would be specifically jackets.

6  Q.  Can you just scroll through what's in front of you briefly.

7  It's separated out by a blue slip sheet.  Are these line sheets

8  for the whole collection in fall/winter 2010?

9          MS. NELSON:  Objection.

10  A.  Yes, both men and women's.

11          MS. NELSON:  Mischaracterizes the document.

12          THE COURT:  I think that's for cross-examination.

13          That's not an objection.  Overruled.

14  A.  I'm sorry can you re-ask the question?

15          MS. SAYOUR:  Can you repeat the question please, court

16  reporter?

17          THE COURT:  I'll read it.  "Are these line sheets for

18  the whole collection in fall/winter 2010?

19          "Objection."

20          Then there was an answer, "Yes, both men's and

21  women's."

22          And then there was an elucidation of the ground for

23  the objection: "Mischaracterizes the document."

24          The Judge overruled that.

25          So I don't think there is any other question.

1          MS. SAYOUR:  Maybe there wasn't.  Maybe I got lost in

2     the objection.  Thank you, your Honor.

3     BY MS. SAYOUR:

4     Q.  If we can turn to tab 16 in your binder.  Can you briefly

5     scroll through and describe what this document is?

6     A.  This would be a line sheet -- sheets for the collection of

7     fall/winter '18 men's collection.

8     Q.  Is the women's collection in those documents?

9     A.  Yes, the women's is closer to the end of the selection.

10    Q.  For the record, this is DTX-511 through 526.

11         Is that right, Mr. Langellier?

12    A.  That is correct.

13    Q.  If we look at tab 17, which is 595 through 615.

14    A.  Yes, this would be the line sheets for SS-19 men's

15    collection.

16    Q.  I believe I misspoke it's 595 through 616.  Can you

17    describe these?

18    A.  Yes, this is the line sheets for SS-19 men's collection.

19    Q.  Is the women's collection also included?

20    A.  It is towards the end.

21    Q.  If we can turn to tab 18.

22         This would be DTX-617 through 633.  Can you describe

23    these documents?

24    A.  These would have been line sheets for spring/summer '20

25    men's and women's collection.

Q.  And, finally, if we can go to the last tab, tab 19, DTX-735

through 746.  Can you describe these documents?

A.  This would have been the line sheets for SS-15 early

collection and runway collection.

Q.  Thank you.  We talked a little about retail.  I'd like to

turn now and talk a little about wholesale.  Can you describe

what you mean by wholesale?

          MS. NELSON:  Objection.  Foundation.

          THE COURT:  Overruled.

A.  So three ways of Thom Browne doing business is through our

retail brick-and-mortar stores.  The second way is through our

ecommerce platform.  And the third is through wholesale.

Wholesale is the department stores and specialty stores that we

sell Thom Browne products in.

Q.  And in the years 2010 through 2012, did you have occasion

to assist with sale of the products at wholesale?

A.  Yes, all of them.

Q.  How so?

A.  As we were a small team, at the time I bought for our

retail stores, and I also would assist wholesale clients during

those times and market after the fashion runway show.

Q.  Which department stores was Thom Browne selling to at

wholesale when you started with the company?

A.  So during 2010, Barneys New York, Bergdorf Goodman, Neiman

Marcus would have been some of the main U.S. retailers.

N1AQadi3

1    Q.  I'd like to show you an exhibit that's marked as DTX-97.

2    Are you familiar with this document?

3    A.  Yes, I am.

4    Q.  What is it?

5    A.  So this is a line sheet that we would use during wholesale

6    market, and we would give this to the people making the buys

7    for the stores where they could outline their purchase.

8           MS. SAYOUR:  Your Honor, I'd like to offer DTX-97 into

9    evidence.

10          MS. NELSON:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 97 received in evidence)

13   Q.  If we can go to page 24.  And before we do that, do you

14   know what season this is from?

15   A.  I do not know what specific season this is from.

16   Q.  If we can go to page 24.  And if we can blow up the bottom

17   two images, please.  Do you recognize those garments?

18   A.  So this would have been cotton loopback sweatshirts.

19   Q.  Do they feature the 4-Bar signature?

20   A.  They do.

21   Q.  If we go to page 27.

22   A.  These are cotton loopback sweats with the 4-Bar on the

23   left-hand side, supplier code, which we call style number

24   MJQ001-W 4769.

25   Q.  What is the supplier code, Mr. Langellier?

1   A.  Supplier code is a style number that we would use to input

2   into our ERP system.

3   Q.  I would like to show you another exhibit not in evidence

4   yet, DTX-98.  Are you familiar with this document?

5   A.  This is a line sheet.  Yes.  Spring/summer 2011.

6            MS. SAYOUR:  Your Honor, we'd like to offer this

7   document into evidence.

8            MS. NELSON:  No objection.

9            THE COURT:  Received.

10            (Defendant's Exhibit 98 received in evidence)

11   Q.  If we can pull up DTX-99.

12            Mr. Langellier, are you familiar with this document?

13   A.  Yes, line sheet.

14   Q.  What is the year or the season for this document?

15   A.  I believe it is fall/winter 2011, but it is not written on

16   this document, so ...

17            MS. SAYOUR:  Your Honor, we'd like to offer this

18   document into evidence.

19            MS. NELSON:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit 99 received in evidence)

22   Q.  I'd like to show you an exhibit marked DTX-188.  Are you

23   familiar with this document?

24   A.  So, yes, this is an invoice.

25   Q.  An invoice to who?

N1AQadi3

1    A.   This is an invoice to Barneys New York.

2    Q.   What is the date?

3    A.   January 7 2011.

4            MS. SAYOUR:  Your Honor, I'd like to move this exhibit

5    into evidence.

6            MS. NELSON:  Objection.  I think it would be helpful

7    to discuss as a sidebar issue.

8            THE COURT:  All right.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1AQadi3

1      (At the sidebar)

2      MS. NELSON:  We discussed this previously.  This

3  witness is only in the retail capacity and has never had a role

4  in wholesale.  He testified that at no date assisted after

5  shows.  He's now being asked to speak to very detailed, very

6  long invoices of which he had no knowledge.  The bottom of the

7  invoice, the name on the spreadsheet is not his.  He wasn't the

8  witness named on 30(b)(6) or the witness in charge of

9  wholesale.

10      MS. SAYOUR:  Your Honor, the witness testified this

11  morning that he was involved in some of the wholesale

12  purchasing and selling, is actually what I should say.  And

13  he -- I'm not going to show him the whole document.  I'm about

14  to match up some of the style numbers which I laid the

15  predicate for in the previous document with the invoice to show

16  exactly what it was.

17      THE COURT:  I'm going to receive the document, but I

18  think the jury is really losing focus so far.  Most of this has

19  consisted of just offering these documents and with until now

20  no objection, and the question the jury is asking themselves is

21  one of two questions:  Either, so what?  Or, oh, is it time for

22  our nap?  So I strongly suggest you get to the point.

23      MS. SAYOUR:  Which I will do, your Honor.  Thank you.

24      (Continued on next page)

25

1          (In open court)

2          THE COURT:  Okay.

3          MS. SAYOUR:  I'd like to offer DTX-188 into evidence,

4    your Honor.

5          THE COURT:  Received.

6          (Defendant's Exhibit 188 received in evidence)

7    Q.  If we can publish it to the jury, please, and go to page

8    100.

9          Mr. Langellier based on this document, does Thom

10   Browne sell sweatpants to Barneys with the 4-Bar signature in

11   2011?

12   A.  Yes.

13   Q.  If we can pull up DTX-97 and go to page 27.  Are these the

14   sweatpants that were sold to Barneys in 2011?

15   A.  That is correct.  It is the same style number and

16   description.

17   Q.  Thank you.  I believe that you testified earlier that some

18   of the department stores that Thom Browne sold to in 2011 was

19   also Bergdorfs?

20   A.  That is correct.

21   Q.  Your Honor, I'd like to show you -- Mr. Langellier, I'd

22   like to show you what's been marked as DTX-189.  Are you

23   familiar with this set of documents?

24   A.  Yes, this is an invoice to Bergdorf Goodman dated

25   January 14, 2011.

1          MS. SAYOUR:  Your Honor, I'd like to offer DTX-189

2     into evidence.

3          MS. NELSON:  Same objection.

4          THE COURT:  Same ruling.  Received.

5          (Defendant's Exhibit 189 received in evidence)

6     Q.  Can you describe what's in this document for the jury,

7     please?

8     A.  So this would have been products that Bergdorf Goodman had

9     bought.  Here you can see in the description.  It says

10    sweatpants heather gray with four stripes on left leg.

11    Q.  I'd like to also now show you what's been marked as

12    DTX-190.  Are you familiar with this document?

13    A.  This would have been an invoice for Nordstrom dated

14    January 5, 2011.

15         MS. SAYOUR:  Your Honor, I'd like to offer DTX-190

16    into evidence.

17         MS. NELSON:  Same objection.

18         THE COURT:  Received.

19         (Defendant's Exhibit 190 received in evidence)

20    Q.  You can take that down.

21         Mr. Langellier, you talked about retail stores.  I

22    think we talked about department stores.  I'd like to shift

23    gears for a minute and talk about online.

24         Does Thom Browne have a website?

25    A.  We do, ThomBrowne.com.

1   Q.  Was that website available one you started in 2010?

2   A.  Yes, it was.

3   Q.  I'd like to show you what's been marked as Exhibit DTX-333.

4   Are you familiar with this document?

5   A.  So this is an archived image of the website showing the

6   2010 fall/winter collection.

7           MS. SAYOUR:  Your Honor, I'd like to offer DTX-333

8   into evidence.

9           MS. NELSON:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 333 received in evidence)

12  Q.  Can you walk us through what's on this page, Mr.

13  Langellier?

14  A.  So this landing page is a lookbook of the fall/winter 2010

15  collection.

16  Q.  And you see an archive tab over to the left?

17  A.  Yes, I do.

18  Q.  Can you describe that tab?

19  A.  So that would have been there to show all of the past

20  collections that Thom had designed.

21  Q.  And this was in 2010, right?

22  A.  Correct.

23  Q.  Does the website today have an archive tab?

24  A.  Yes, it still has an archive today which shows collections

25  all the way back to 2007.

1   Q.   Now, did the website have a shopping feature in 2010?

2   A.   It did not.

3   Q.   Was a shopping feature added at some point?

4   A.   In 2011 we added the function of a shopping page on

5   ThomBrowne.com.

6   Q.   I'd like to show you what's been marked as DTX-334.  Are

7   you familiar with this document?

8   A.   Yes.  So this would be an archived image of what the

9   website was like in 20 -- sorry -- in 2011 when we launched the

10  shopping feature.

11          MS. SAYOUR:  Your Honor, I'd like to offer DTX-334

12  into evidence.

13          MS. NELSON:  No objection.

14          THE COURT:  Received.

15          (Defendant's Exhibit 334 received in evidence)

16  Q.   Can you describe what's shown on this page?

17  A.   This would have been the landing page to the shopping page

18  on ThomBrowne.com, and it was broken down into categories.  The

19  first one would have been shirts, the next one tie and

20  accessories, leather goods, knits and then black tie and

21  tailoring.

22  Q.   And if we can, you said that's knits, right?  That's a

23  category.  Is that the second to last one?

24  A.   Correct.

25  Q.   If we can turn to DTX-335.  Can you describe this document?

1   A.   So when you would click onto knits, this would go to the

2   next page which would have been where you can purchase --

3   select and purchase -- this is a cashmere cardigan -- in three

4   different colors with the 4-Bars on the left-hand sleeve.

5          MS. SAYOUR:  Your Honor, can we move DTX-335 into

6   evidence, please.

7          MS. NELSON:  No objection.

8          THE COURT:  Received.

9          (Defendant's Exhibit 335 received in evidence)

10  Q.   Can you describe for the jury this page?

11  A.   Yes.  So these are cashmere cardigans in three different

12  colors bearing the 4-Bar detail on the left-hand sleeve.

13  Q.   There are also Grosgrain ribbon detail?

14  A.   Yes, both in the placket and in the cuff.

15  Q.   Mr. Langellier, has online shopping been available on the

16  website since 2011 until today?

17  A.   Yes, it has.

18  Q.   Have products bearing the 4-Bar signature been available

19  for sale on the Thom Browne website since 2011?

20  A.   Yes, when we launched the website in 2011, this was

21  available.

22  Q.   What about products bearing the Grosgrain signature, would

23  those have been available since 2011?

24  A.   That is correct.

25  Q.   I just want to ask you a couple questions about adidas.

1          Has anyone ever told you that your 4-Bar signature

2    products look just like adidas?

3          MS. NELSON:  Objection.  Hearsay.

4          THE COURT:  No.  I don't think it's being offered for

5    its truth.  I think it's being offered for whether or not such

6    a claim was ever made to them.

7          Overruled.  You may answer.

8    A.   No, nobody has ever said to me that it's confused Thom

9    Browne 4-Bar stripes with adidas.

10   Q.   Has anyone ever told you that your Grosgrain signature

11   products look like adidas's trademark?

12   A.   No.

13   Q.   Has anyone ever told you that your 4-Bar signature product

14   looked like adidas's product?

15   A.   No.

16   Q.   And has anyone ever told you that your Grosgrain signature

17   products look like adidas's product?

18   A.   No.

19          MS. SAYOUR:  I pass the witness, your Honor.

20          THE COURT:  Cross-examine.

21   CROSS-EXAMINATION

22   BY MS. NELSON:

23   Q.   Mr. Langellier, you started as sales associate in Thom

24   Browne's New York store in 2010, right?

25   A.   That is correct.

1    Q.  And between 2010 and 2012, you were a manager of Thom

2    Browne's New York retail store, right?

3    A.  That is correct.

4    Q.  You had no managerial role at that time relating to

5    wholesale sales, right?

6    A.  That is correct.

7    Q.  And from 2012 to 2016, you were retail director at Thom

8    Browne?

9    A.  That is correct.

10   Q.  Your job responsibilities did not involve department

11   stores?

12   A.  We -- as a small company, everybody wore multiple hats, so,

13   yes, I was involved with department stores in the wholesale.

14   Q.  As retail director between 2012 and 2016, you had no

15   managerial role over wholesale sales, right?

16   A.  No managerial role, correct.

17   Q.  I'd like to pull back up Defendant's Exhibit 190.

18   Mr. Langellier, you testified this being an invoice Nordstrom,

19   correct?

20   A.  It is Nord -- yes.

21   Q.  Are you aware that there's certain pages of this invoice

22   that are highlighted?

23   A.  I did see highlights, yes.

24   Q.  But you don't know who did the highlighting?

25   A.  I do not.

1   Q.   You didn't do the highlighting?

2   A.   I did not do the highlighting.

3   Q.   If we could scroll until we hit the first highlighted page,

4   please.  If you could back up a couple pages.  Page 15.  You

5   would agree with me that the first highlight appears on page 15

6   of this document?

7   A.   Sure.

8   Q.   If we could zoom out just a little bit so the whole page is

9   visible.

10          The highlighted item reads: PO hoodie, a lot of

11  abbreviations, 4-Bar stripes in gray, correct?

12  A.   That is what it reads.

13  Q.   On the face of the document, you can't see what this

14  product looked like, right?  I'm sorry.  On the face of this

15  document, you can't see what this product looked like, correct?

16  A.   There is no picture of a product, no.

17  Q.   And the highlighted product has the number three next to

18  it, right?

19  A.   Yes, it does, of seven.

20  Q.   Indicating of the highlighted item, the highlighted item

21  was three units, right?

22  A.   Three units.

23  Q.   Meaning three units were purchased?

24  A.   Three units of seven, yes.

25  Q.   I'd like to scroll to the next page.  Once again, you see a

1   highlighted row, right?

2   A.  I see.

3   Q.  Without an image?

4   A.  That is correct.

5   Q.  And, again, three units is highlighted?

6   A.  Three units is highlighted.

7   Q.  Let's go to the next highlighted page.  We are now on page

8   23, right?

9   A.  23 at the top I see, yes.

10  Q.  And the highlighted row doesn't say 4-Bar, right?

11  A.  Because it is not 4-Bar.

12  Q.  And there's four units highlighted?

13  A.  Yes.

14  Q.  And let's go to the next highlighted page.  We are now on

15  page 24, right?

16  A.  Yes.

17  Q.  Once again, you see three units?

18  A.  I see three units.

19  Q.  And let's go to the next highlighted page.  We are now on

20  page 36, right?

21  A.  Yes, I see that at the top.

22  Q.  Four units are highlighted?

23  A.  Yes, four units.

24  Q.  Indicating four units of this item were sold?

25  A.  Yes.

1  Q.  And go to the final highlighted page.  The highlighted item

2  is listed as a crewneck sweatshirt and appears to be light blue

3  cotton terry.  Is that right?

4  A.  That is correct.

5  Q.  No mention of stripes?

6  A.  No mention of stripes.

7  Q.  No mention of a 4-Bar?

8  A.  No mention of the 4-Bar.

9  Q.  But the line's highlighted?

10  A.  Yes, it is.

11  Q.  And it shows five units, right?

12  A.  Yes.

13  Q.  If we were to do that math, it looks like there's 22 units

14  included in all of these invoices.  Does that sound right to

15  you?

16  A.  I guess.

17  Q.  So out of 39 pages, there are six highlighted pages?

18  A.  I'm sorry, I didn't bring a calculator.

19  Q.  Let's pull up Exhibit 189.  Once again, you see that

20  there's highlighting on this page?

21  A.  Yep.

22  Q.  Do you know how many pages in this exhibit are highlighted?

23  A.  I do not.

24  Q.  Do you know the total number of units that these invoices

25  show were sold to Bergdorf Goodman?

1    A.  I do not.

2    Q.  Would you agree with me that it's less than 60?

3    A.  I don't know, honestly.

4    Q.  Do you have any reason to doubt that these invoices reflect

5    only 60 units of sales?

6    A.  If we go through them, we can determine that.

7    Q.  Let's start with the first page.  You see 12 units, right?

8    A.  Yes.

9    Q.  Scroll until the next page is highlighted.  So we had to

10   scroll all the way to page 21 to find another highlighted page,

11   correct?

12   A.  Yes.

13   Q.  And this page reflects 25 units?

14   A.  Yep.

15   Q.  Let's go to the next highlighted page, page 35.  13 units,

16   do you agree?

17   A.  Yes.

18   Q.  Let's go to the next highlighted page, page 67.  We had to

19   skip all the way to page 67 to see the next highlighted, and I

20   see eight units.  Is that right?

21   A.  That is correct.

22   Q.  When I add those up, I get 58?

23   A.  Okay.

24   Q.  You'd agree with me that within this invoice, there are

25   only certain pages that are highlighted?

1    A.   That is correct.

2    Q.   Let's pull up Exhibit 188.  That's a big one so we won't go

3    through it in full.  Would you agree with me that there are,

4    again, only certain pages highlighted?

5    A.   On this page there's nothing highlighted.

6    Q.   If we could scroll just until we find the first highlighted

7    page.  Keep scrolling.  I believe it is page 96.  We see three

8    highlighted items on this page?

9    A.   That is correct.

10   Q.   That is the first time highlighting appears in this

11   document?

12   A.   This didn't go through 96 pages, the last one you clicked

13   on was 30 though.

14   Q.   Can we please scroll from page 30 through 96?

15        Do you agree with me that the first highlighted page

16   appears on page 96?

17   A.   Yep.

18   Q.   And it reflects 18 units?

19   A.   Yes.

20   Q.   And you don't know the total number of highlighted items

21   that appear in this spreadsheet?

22   A.   I do not know.

23   Q.   You don't even know what the highlighting means as it

24   relates to this page, do you?

25   A.   I assume that these -- I'm assuming that these are 4-Bar

1    sweats.

2    Q.   But there's no images on the page, right?

3    A.   That is correct, just descriptions.

4    Q.   And you didn't do the highlighting, right?

5    A.   I did not do the highlighting.

6    Q.   We can take that one down.

7             I want to the shift gears a little to Thom Browne

8    product focus.  When you decided to work for Thom Browne New

9    York store, you knew Thom Browne was a menswear company, right?

10   A.   Yes.

11   Q.   And Thom Browne's focus has always been tailored?

12   A.   Thom Browne is a clothing designer.

13   Q.   The focus of the Thom Browne brand has always been

14   tailored?

15   A.   Yes, we are also -- we also do tailoring.

16   Q.   One of Thom Browne's brand symbols is the gray tailored

17   suit, right?

18   A.   It is one of them.

19             (Continued on next page)

20

21

22

23

24

25

1   BY MS. NELSON:

2   Q.  That's been described as the DNA of the Thom Browne brand?

3   A.  Yeah.

4   Q.  Thom Browne's retail stores which you oversee are based

5   around tailoring, suiting, and overcoats, right?

6   A.  We carry a full collection of the offering that Thom

7   designs.

8   Q.  But the stores are based around tailoring, suiting, and

9   overcoats, right?

10  A.  We carry the full collection of Thom Browne in our retail

11  stores.

12          MS. NELSON:  I would like to pull up Mr. Langellier's

13  prior transcript just for the witness and the court, please.

14          I would direct you to pages 99 to 100, starting at

15  line 11 of page 99.

16          Again, starting at line 11 of page 99 going through

17  line 10 of page 100, your Honor, I would like to offer that for

18  impeachment purposes.  The question was that Thom Browne's

19  stores are based around tailoring, suiting, and overcoats.

20          MS. SAYOUR:  Objection, your Honor.

21          THE COURT:  The objection is sustained.

22  BY MS. NELSON:

23  Q.  Thom Browne only has one store in the United States, only

24  had one store in the United States when you started in January

25  of 2010, right?

1   A.   That is correct.

2   Q.   And Thom Browne still only has one store in New York City?

3   A.   Yes.

4   Q.   Thom Browne's store in New York City is a destination

5   location because it stands alone in TriBeCa, right?

6   A.   Yes, that is correct.

7   Q.   It's not a highly foot-trafficked store?

8   A.   It is not.  It receives between 10 and 17 footsteps a day.

9   Q.   And it's been about 10 to 15, 17 footsteps a day since you

10  started in 2010, right?

11  A.   That is correct.

12  Q.   And by footsteps, we mean attached to people, people in the

13  store, right?

14  A.   That is correct.

15  Q.   Thom Browne now has a store in Miami, right?

16  A.   That is correct.

17  Q.   And two in California?

18  A.   Two in California.

19  Q.   But the Miami store didn't open until 2018, right?

20  A.   Yes, that is correct.

21  Q.   And the California stores came after that?

22  A.   That is correct.

23          MS. NELSON:  I would like to pull up Exhibit 649, and

24  just for the court and the witness at the moment.

25          Plaintiff's Exhibit 649.

1   Q.  Do you recognize this as a screen capture from Thom

2   Browne's website listing its store locations?

3   A.  That is -- yes, that is our website.

4           MS. NELSON:  I would like to offer this exhibit.

5           MS. SAYOUR:  No objection, your Honor.

6           THE COURT:  Received.

7           (Plaintiff's Exhibit 649 received in evidence)

8   BY MS. NELSON:

9   Q.  So in the upper left-hand corner of this page -- if we can

10  zoom in -- that is a photo of Thom Browne's New York store,

11  right?

12  A.  Yes.

13          MS. NELSON:  If we can zoom in on the upper left-hand

14  corner for everyone.

15  Q.  OK.  I'll ask the question again now that we're zoomed in.

16          This is a screenshot showing an image of the TriBeCa

17  store, is that right?

18  A.  That is correct.

19  Q.  There are no four-stripe products visible in this photo,

20  right?

21  A.  Not that I see.

22  Q.  And Thom Browne's stores reflect a minimalist presentation,

23  right?

24  A.  Yes.

25  Q.  It's been that way since you started in 2010?

1   A.  Yes.

2   Q.  Typically on a 30-inch shelf, such as those that we see

3   here, there would only be one product per shelf?

4   A.  Typically, yes.

5   Q.  And on this shelf we don't see any four-bar products,

6   right?

7   A.  Not in the blurry photo, no.

8           MS. NELSON:  Let's pull up Exhibit 837, again, just

9   for the court and the witness at the moment.

10  Q.  Do you recognize this as an e-mail that you sent to

11  Melissa Jamerson on March 30, 2021, with the subject, retail TB

12  introduction?

13  A.  I do recognize it.

14  Q.  There's an attachment called Thom Browne brand

15  introduction?

16  A.  Yes.

17  Q.  Are you familiar with that attachment?

18  A.  No.

19  Q.  But you recognize this as an e-mail that you sent?

20  A.  Yeah, it is.

21          MS. NELSON:  I would like to offer this exhibit into

22  evidence.

23          MS. SAYOUR:  We have no objection.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 837 received in evidence)

1    BY MS. NELSON:

2    Q.  If we could scroll to page 11, which is part of the

3    attachment to this presentation.

4            Do you recognize these as photos of the Thom Browne

5    New York store?

6    A.  Very old photos, yes.

7    Q.  And there is no apparel with four-bar visible in these

8    photos?

9    A.  There are three stripes on the coffee table, yes.  There is

10   also a three stripes on the wall.

11   Q.  I couldn't hear you.

12   A.  Yes.  There is three stripes on the coffee table.

13   Q.  But not on the products themselves?

14   A.  That is product.

15   Q.  Let's shift gears.  We can take that down and shift gears a

16   little bit to your e-commerce experience.

17           Between 2012 and 2016, your experience included

18   e-commerce, is that right?

19   A.  That is correct.

20   Q.  Prior to 2012, a consumer could not actually purchase a

21   product on Thom Browne's website, right?

22   A.  No.  In 2011, we launched the website with the shopping

23   feature.

24           MS. NELSON:  I would like to pull up Mr. Langellier's

25   testimony.  Again, just publishing to him and the court,

1    please.  I direct you to page 28, specifically 28:21 to 29:9.

2            Further down, please.  Focus being 29:4 to 9.  I would

3    like to offer this for impeachment.

4            MS. SAYOUR:  Objection, your Honor.

5            MS. NELSON:  The question being --

6            THE COURT:  Yes, I understand.

7            The objection is sustained.

8    BY MS. NELSON:

9    Q.  I would like to pull up Exhibit 894.  If you can scroll

10   down the page so the witness can see it.

11           Do you recognize this as a screenshot of Thom Browne's

12   website from 2010?

13   A.  Yes.

14           MS. NELSON:  I would like to offer this into evidence.

15           MS. SAYOUR:  No objection.

16           THE COURT:  Received.

17           (Plaintiff's Exhibit 894 received in evidence)

18   Q.  So on the face of this website, there are no e-commerce

19   capabilities as of 2010, right?

20   A.  In 2010, there was not.

21   Q.  And no products displayed on the home page?

22   A.  I don't see any products on the home page, no.

23   Q.  Prior to 2012, a consumer could purchase Thom Browne

24   products at the Thom Browne store in TriBeCa, right?

25   A.  Yes.

1   Q.  They could purchase them at Barney's New York?

2   A.  Yes.

3   Q.  And they could purchase them at Bergdorf in New York?

4   A.  Yes.

5   Q.  And that is it, correct, Thom Browne New York, Barney's

6   New York, and Bergdorf Goodman would be the only places prior

7   to 2012 a consumer could purchase Thom Browne products?

8   A.  No, that is not correct.  We in the city offered Thom

9   Browne product at Jeffrey's New York, which was in the

10  Meatpacking.

11          MS. NELSON:  I would like to again bring up the

12  witness's testimony, this time pages 29 to 30.

13          THE COURT:  Lines?

14          MS. NELSON:  28:21 to 29:9.  I'm sorry.  My apologies,

15  your Honor.  29:20 to 30:9.

16          MS. SAYOUR:  Objection, your Honor.

17          THE COURT:  Any objection?

18          MS. SAYOUR:  Objection.  Yes, your Honor.

19          THE COURT:  Well, it's a close call, but I will allow

20  it.  You may read that.

21          MS. NELSON:  I would like to publish this to the jury

22  lines 29:20 to 30:9.

23  BY MS. NELSON:

24  Q.  The question:  Prior to 2012, where could a consumer

25  purchase Thom Browne's products in the U.S.?

1          Answer:  Our TriBeCa store, Bergdorf Goodman, Barney's

2    New York.  That would be the major accounts, I would say, from

3    my knowledge.

4          Did I read that correctly?

5    A.  From my knowledge, yes.

6    Q.  I want to shift gears again.

7          Thom Browne's customer base has steadily grown since

8    you started, right?

9    A.  Yes.

10   Q.  It now includes a very wide range of customers from

11   students to seniors?

12   A.  Yeah.

13   Q.  Men and women?

14   A.  Men and women, kids.

15   Q.  And you're familiar with the visual appearance of Thom

16   Browne's stores, right, in store, retail stores?

17   A.  Yeah.

18   Q.  There are not marketing materials such as posters or

19   pictures on the walls of any Thom Browne retail stores,

20   right --

21   A.  No.

22   Q.  -- in the United States?

23         Thom Browne barely even has a sign out in front of its

24   New York store, right?

25   A.  We have a small sign in front of our store, yes.

1    Q.  The lack of posters and pictures on the walls and the small

2    sign has always been the case?

3    A.  Yes.

4    Q.  You don't know of a time when the four bars were displayed

5    in Thom Browne's retail stores other than on the products

6    themselves?

7    A.  I'm sorry.  Can you repeat the question?

8    Q.  Sure.  You aren't aware of any instance where the four bars

9    were displayed anywhere in the store other than on the products

10   themselves?

11   A.  That's fair, yes.

12   Q.  And the same is true of the Grosgrain design?

13   A.  On the product, yes.

14   Q.  And you're not aware of any marketing or advertising Thom

15   Browne has done prominently featuring the four bars outside of

16   the products?

17   A.  Yeah, our fashion shows.

18   Q.  Outside of fashion shows, you're not aware of any other

19   forms of advertising?

20   A.  Not outside of fashion shows.

21   Q.  You're not aware --

22   A.  I'm sorry.  For retail, Barney's New York and Bergdorf's at

23   times would put it in their magazines as well.

24   Q.  You're not aware of any Thom Browne packaging that features

25   the four-bar design, right?

1   A.  Not the four-bar design, no.

2   Q.  You have no knowledge of how many consumers recognize the

3   four bars as a Thom Browne design?

4   A.  No, I don't.

5           MS. NELSON:  I have no further questions.

6           THE COURT:  Any redirect?

7           MS. SAYOUR:  Very brief.

8           THE COURT:  Go ahead.

9   REDIRECT EXAMINATION

10  BY MS. SAYOUR:

11  Q.  Mr. Langellier, during the examination a few moments ago

12  you were shown some prior testimony of yours?

13  A.  Yes.

14          MS. SAYOUR:  Can we pull that prior testimony back up.

15  It was on page 29, line 20, through page 30, line 4.

16  Q.  When you were asked:  Prior to 2012, where could a consumer

17  purchase Thom Browne products in the United States; you

18  answered:  One TriBeCa store, Bergdorf Goodman, Barney's New

19  York.  Those were work the major accounts, I would say, from my

20  knowledge.

21          Do you see that?

22  A.  Yes.

23  Q.  What did you mean by major accounts?

24  A.  They are larger stores that would have carried Thom Browne.

25  Q.  But there would have been other stores that carried Thom

1  Browne at that time?

2  A.  There could have been, yes.  One of them which is Jeffrey's

3  New York, which is a smaller store, specialty store in the

4  Meatpacking District in New York City.

5  Q.  Were there other stores that you can recall?

6  A.  No.

7          MS. SAYOUR:  I have no further questions, your Honor.

8  Thank you.

9          THE COURT:  All right.  Anything else?

10         MS. NELSON:  No, your Honor.

11         THE COURT:  Thank you very much.  You may step down.

12         (Witness excused)

13         All right.  I understand that there are two short

14  videos that need to being played at this point.

15         Go ahead.

16         MR. MALDONADO:  Yes, your Honor, we have two videos.

17  One is 16 minutes and one is 24 minutes.

18         THE COURT:  I see.  I'm sorry.  I didn't realize it

19  was that long.

20         All right.  I'll tell you what we'll do.  We'll take

21  an early lunch.

22         So, ladies and gentlemen, you're in luck.  I know how

23  hungry you are at this time.  So we will take an hour break for

24  lunch and resume at 10 minutes before two.

25         Have a good lunch.

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  I think that rather than hear further from

3    plaintiff's counsel on the pending motions, we'll do that later

4    this afternoon.

5          The court takes notice of the illustrious counsel,

6    Rachel Fleishman, who is invited to come to my chambers and

7    join me for lunch.

8          We'll see you all in an hour.

9          MR. HENN:  Do you want us at an hour, your Honor, or

10   at two?

11         THE COURT:  No, in an hour.

12         I will hand out to counsel proposed jury instructions.

13   This is just the first draft, of course.  We'll have a full

14   conference tomorrow.

15         Look them over tonight, and if you want to add

16   anything as opposed to objecting to something, you should bring

17   with you tomorrow your specific wording that you want.  So I

18   don't want to have to deal with sort of a general, can we put

19   something in about X, Y or Z, or something very specific.  It

20   can be what you suggested in your original submissions or

21   something new, but some specific wording

22         OK.  I'll still see you at 10 minutes to two

23         (Luncheon recess)

24

25

N1AQadi5

1           AFTERNOON SESSION

2                1:50 p.m.

3       (Jury present)

4       MR. MALDONADO:  Defendants call Joanne Arbuckle.

5       THE COURT:  We're all set too show the video?

6       MR. MALDONADO:  Yes, your Honor.

7       THE COURT:  Ladies and gentlemen, we are going to see

8  some videotape testimony, and you evaluate that just the same

9  as you would as if it was a live witness go ahead.

10      MR. MALDONADO:  Your Honor, the defendants would play

11  videotape first of Dana Kabela.

12      (Videotape played)

13      MR. MALDONADO:  Your Honor, we'd like to play the

14  deposition testimony for Taylor Hallbrook.

15      THE COURT:  Okay.

16      (Videotape played)

17      MR. MALDONADO:  Your Honor, we would like to move into

18  evidence the exhibits referenced in the videotape deposition.

19  The parties have agreed to redacted version of Defendant's

20  Exhibit 22 and, then also Plaintiff's Exhibits 140, 141 and

21  142.

22      MR. HENN:  No objection.

23      THE COURT:  Received.

24      (Defendant's Exhibit 22 received in evidence)

25      (Plaintiff's Exhibits 140, 141 and 142 received in

N1AQadi5

1    evidence)

2         MR. MALDONADO:  Your Honor, the defendant calls Joanne

3    Arbuckle.

4         THE COURT:  Before she comes in, come to the sidebar.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So I have now had a chance to review

3   Ms. Arbuckle's report again, as well as the briefing on the

4   motion in limine regarding her testimony, and also to go back

5   and compare it with some of the rulings I made including more

6   recently on some of the other experts.  It seems to me that her

7   report and really the total thrust of most of what she says

8   goes to the aesthetic functionality of the counterclaim that is

9   no longer before the Court, and therefore to that extent is

10  irrelevant.

11         I do think she can offer testimony but not opinions.

12  Just to the appearance of the Three-Stripe Mark as an

13  historical matter in numerous situations, I think that goes to

14  the distinctiveness of the adidas mark and also the strength of

15  the adidas mark which are issues in this case.  But this would

16  be more in the nature than simply saying as someone in this

17  field I went back and looked at -- had access to and looked at

18  numerous places where I found that the three stripes were used,

19  or whatever, complete with visuals accompanying her report.  So

20  that is the limits of which she can testify to.  So you may

21  need to alert her to that just before she comes in.

22         MR. MALDONADO:  Just to clarify.  It's only three

23  stripes, like no other numbers of stripes?

24         THE COURT:  No, it can be other numbers.

25         MR. HENN:  You said no opinion.  In other words, she's

1  not permitted to be able to say what the impact of that may be.

2          THE COURT:  Yes.

3          MR. MALDONADO:  Did I have a few minutes to confer

4  with her?  Thank you.

5          THE COURT:  Yes.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     JOANNE ARBUCKLE,

3          called as a witness by the Defendant,

4          having been duly sworn, testified as follows:

5     BY MR. MALDONADO:

6          THE COURT:  Please be seated.  State your full name

7     and spell it for the record.

8          THE WITNESS:  My name is JoAnne Arbuckle.

9     J-O-A-N-N-E.  A-R-B-U-C-K-L-E.

10    BY MR. MALDONADO:

11    Q.  Good afternoon, Ms. Arbuckle.

12          What is your current occupation?

13    A.  Good afternoon.  I am a consultant in the office of the

14    president at the Fashion Institute of Technology.

15    Q.  Thank you.  Can you tell us what your educational

16    background is?

17    A.  Yes.  I hold an associate's degree in fashion design from

18    FIT, a bachelor's degree from Empire State, State University of

19    New York, and my graduate degree is from NYU.

20    Q.  Do you have an experience working in the fashion industry?

21    A.  I do.

22    Q.  Can you please tell us about that experience.

23    A.  Yes, I was a designer for many years in the industry before

24    I turned to teaching.  In order to teach at FIT, you must be an

25    accomplished executive in your respective design industry.  And

1    when I first began teaching at FIT, I continued to consult in

2    designing in the industry.

3    Q.  Please tell us about your first job in the fashion

4    industry.

5    A.  My first position was for a company by the name of Ban-Rol

6    which was a higher end intimate apparel company and I was at

7    Ban-Rol for approximately a year as an assistant designer.

8    Q.  What types of clothing did you design at Ban-Rol?

9    A.  So that was intimate apparel which is anything from what

10   you would consider daywear, so camisoles, teddies, to sleepwear

11   and loungewear.

12   Q.  And what years did you work at Ban-Rol?

13   A.  That was '74 to '75.

14   Q.  And where did you work next?

15   A.  I then moved on to a company by the name of L.V. Miles as

16   an associate designer, and that company was at the time the

17   second largest sleepwear company in the industry, and we did

18   children's, juniors and ladies sleepwear.

19   Q.  And did you design apparel in that job?

20   A.  I did.  And I then became their design director.

21   Q.  What types of apparel did you design at L.V. Miles?

22   A.  So I did some children's wear but mainly junior and Missus

23   sleepwear, as well as that particular period of time in the

24   industry we were moving away from traditional sleepwear into

25   the more sort of sporty look sleepwear that you might recognize

1    in a night shirt, casual, leisure wear.  And so I really began

2    moving in that direction when I was at L.V. Miles.

3    Q.  Can we please pull up Exhibit 372.  Ms. Arbuckle, can you

4    look at the screen and tell me if you recognize these images?

5    A.  I do.

6    Q.  Just generally tell us in general what the images are?

7    A.  So these are some examples of garments that I designed when

8    I was at L.V. Miles.  We did everything from mass market to

9    department stores, so they might be something that would sell

10   at the time at a J. C. Penney as well as at Bloomingdales.

11   Q.  Let me interrupt you for a second.  Were these designs

12   actually made into products that were sold?

13   A.  These are the designs that were in a catalog that was

14   completed for every season by an illustrator, and so they

15   wouldn't have gone into the catalog if they already weren't in

16   production.

17   Q.  Thank you.

18           MR. MALDONADO:  Your Honor, I offer Exhibit 372.

19           MR. FLEMMING:  Objection.  Relevance.

20           THE COURT:  I think it meets the very broad definition

21   of relevance, so it will be received.

22           MR. MALDONADO:  Thank you, your Honor.

23           Please publish it to the jury.

24           (Defendant's Exhibit 372 received in evidence)

25   Q.  Ms. Arbuckle, can you please describe what's being shown

1  here in these drawings?

2  A.  So these are examples of nightshirts as well as a two-piece

3  sort of a take on a jogging suit that was created with this

4  sort of sporting look to it.  I know that when I did these, I

5  was really looking to sports teams and the influence of sports

6  teams as part of my inspiration.

7  Q.  Did you use stripes in your designs?

8  A.  I did.

9  Q.  Can you tell us where we see those in these designs?

10  A.  Yes.  In the first image, which was a sweatshirt material,

11  there's three stripes on each arm.  In the second, two stripes

12  on one arm.  And in the third, which is a sort of little mini

13  collection, you see the use of stripes in the neck, the arm

14  bands on the two piece.  You see parallel stripes going down

15  one of the sleeves, and then you see parallel stripes that are

16  inserted into a sleeve seam on the neckline.

17  Q.  Take that down.

18       Please tell the jury where you worked after L.V.

19  Miles.

20  A.  After L.V. Miles I went to a company by the name of Beverly

21  Verdon where I continued in the position of head designer where

22  I did women's, children's sleepwear as well as children's

23  sportswear.

24  Q.  After that job, where did you work next?

25  A.  I moved to Candlesticks, which was children's sleepwear and

1  swimwear.  I did not do the swimwear, but that was the company.

2  And from there I moved to Royal Silk, which is a catalog

3  company naturally focused on silk, as is in the name.  I was

4  initially hired to do all of their intimate apparel, and I then

5  moved into overseeing the entire catalog which was women's

6  sportswear.

7  Q.  What types of sportswear did you design at Royal Silk?

8  A.  So the coordinated sportswear that, you know, we would see

9  in a contemporary sportswear department, so jackets, pants,

10  skirts, sweaters, blouses.

11  Q.  How long did you work at Royal Silk?

12  A.  I was with Royal Silk until '94 when I began my own

13  company.  They continued as a client for several years as part

14  of the consulting that I did in the industry.

15  Q.  What was the company that you founded?

16  A.  Design Integrity.

17  Q.  What was the business of that company?

18  A.  I did consulting in design.

19  Q.  What types of apparel did you work on in that job?

20  A.  Mainly children's wear and intimate apparel, I think with a

21  little bit of sportswear.  Certainly sportswear at Royal Silk

22  when they were my client.

23  Q.  And how long did you work for your own company until what

24  year?

25  A.  I closed my company in 2004.  At that point I was very

1   engaged in the work of the college, and it just wasn't

2   something I could give the proper attention to.

3   Q.  When did you join FIT?

4   A.  So I began as an adjunct in 1986.  I became a full-time

5   member of the faculty in 1994 and a full professor in 2006.

6   Q.  What courses do you teach while at FIT?

7   A.  I tenured in the fashion design department, so I taught all

8   of the apparel classes from the intro, the first semester

9   classes through eighth semester, or what we call capstone,

10  where the students create their own collections.

11  Q.  Did you teach any classes having to do with the use of

12  stripes in clothing design?

13  A.  I did.  I taught a certificate program, a credit

14  certificate program that consisted of four courses, and the

15  last course, the capstone project or the end project focused on

16  stripes, and it really was an opportunity where you could teach

17  the students about grain and how stripes reacted with changing

18  grains as well as how you could use stripes to make

19  aesthetically pleasing garments.

20  Q.  At some point did you become dean?

21  A.  I did in 2005.

22  Q.  How long were you in that position?

23  A.  Until 2016.

24  Q.  Is that when you assumed your current position?

25  A.  No.  I stepped down as dean in 2016 and became a deputy to

1    the president for industry partnerships and collaborative

2    programs.

3    Q.  I'd like to pull up Exhibit 404, please, and ask the

4    witness if you recognize this document?

5    A.  I do.

6    Q.  What is this document?

7    A.  It's my CV.

8    Q.  Does this fairly accurately describe your relevant

9    background and experience?

10   A.  It does.

11          MR. MALDONADO:  Your Honor, I'd like to offer Exhibit

12   404 into evidence.

13          MR. FLEMMING:  No objection.

14          THE COURT:  Received.

15          (Defendant's Exhibit 404 received in evidence)

16   Q.  Ms. Arbuckle, when you were at FIT or since you've been at

17   FIT, have you been involved in any exhibitions at the college?

18   A.  Yes, I was involved in specific exhibitions, but as a dean

19   it was my responsibility to oversee all the exhibitions in the

20   School of Art and Design.  The School of Art and Design

21   consists of 17 programs, so there were a substantial number of

22   exhibitions that took place.  Specifically, there was an

23   exhibition on school uniforms that was at the Museum at FIT as

24   well as a City Museum of the City of New York.

25   Q.  When was that?

1   A.   That had to be before 2002.  And I'm very proud of the fact

2   that because the School of Art and Design did not have

3   permanent exhibition space, together with my faculty we

4   garnered the support of the president and the college, and for

5   the first time in the history of the college we had a 4,000

6   square foot gallery open to the public with an entrance on

7   Seventh Avenue for the college.  So quite a beautiful

8   exhibition space that exists today.

9   Q.   Have you offered or contributed to any books in the fashion

10  field?

11  A.   Yes.  I'm the co-author of the *Historical Dictionary of*

12  *Fashion*, and that's a first and second edition.  And I'm an

13  S.A. contributed to the *Encyclopedia of Fashion*.

14  Q.   Tell us a little bit about the *Dictionary of Fashion*?

15           MR. FLEMMING:  Objection.  Relevance.

16           THE COURT:  Sustained.

17           MR. MALDONADO:  Your Honor, may I be heard on that?

18           THE COURT:  No.  What was the other book?

19           THE WITNESS:  It was the *Encyclopedia of Fashion* by

20  Valerie Steele.

21           THE COURT:  Tell us about that.

22           MR. MALDONADO:  The dictionary is the only one I

23  really wanted to ask about.

24           THE COURT:  I'm sorry?

25           MR. MALDONADO:  I said the dictionary was the one I

N1AQadi5

1    wanted to ask her about.

2                THE COURT:  Come to sidebar.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1AQadi5

1          (At the sidebar)

2          MR. MALDONADO:  The dictionary is a dictionary she

3    coauthored that's used in the industry, and it contains

4    definitions for some terms that's being used in this

5    litigation, such as sportswear.

6          THE COURT:  We're not getting into that.  We're

7    getting into, as I indicated previously, she's just going to

8    say:  I was asked, among other things, to look at where stripes

9    have been used in clothing in the past, and here is what I

10   found.

11         MR. MALDONADO:  Okay.  Thank you.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. MALDONADO:

3     Q.  Ms. Arbuckle, were you asked to review the history of the

4     use of stripes in the fashion industry?

5     A.  Yes, I was.

6     Q.  And did you do so?

7     A.  I did.

8     Q.  Tell us what you did in that regard.

9     A.  So I looked to many areas that would communicate how

10    parallel stripes were used in the fashion industry, not only by

11    myself, as you saw examples of.  It's really about how you

12    would do any sort of research, even research for your own line.

13    So I went to numerous museum sites.  I used the special

14    collections area of the FIT library, which is a special

15    collections of relevant primary source materials which consists

16    of rare books and fashion plates and oral histories from

17    designers.  So something like that is a great resource as

18    you're researching something like stripes.  The Smithsonian is

19    another place to go for stripes, and areas of the Naval Museum,

20    as well as exhibitions that have taken place not only at FIT

21    but elsewhere.

22    Q.  You mentioned special collections at FIT.  Who curates that

23    collection?

24    A.  That's Professor Karen Trivette, and she is the head of

25    special collections.  She oversees what's accepted into special

1    collections and how all of it is cataloged, and it's a part of

2    the Gladys Marcus Library at FIT.

3    Q.  Are the items in the special collection dated?

4    A.  Yes, they are.

5    Q.  Do you know whether those dates are verified?

6    A.  They are verified by Karen.  Before they're placed into

7    special collections, everything is verified.

8    Q.  Can we please take a look at Defendant's Exhibit 264.  Can

9    you please just identify this for us first?

10   A.  Yes.  So this is an image that is on the -- it's called the

11   Spark Digital website, which is special collections.  I know it

12   also exists in the special collections itself, the original

13   plate.  And so it's an image of --

14   Q.  Don't describe the image yet.

15   A.  Sorry.

16   Q.  Is this an image that you captured?

17   A.  It is.

18   Q.  Does this accurately reflect the image that you captured?

19   A.  It does.

20            MR. MALDONADO:  Your Honor, I'd like to offer 264 into

21   evidence.

22            MR. FLEMMING:  Objection.  402, 403 and hearsay.

23            THE COURT:  Overruled.  Received.

24            MR. MALDONADO:  Thank you, your Honor.

25            (Defendant's Exhibit 264 received in evidence)

1    Q.  Can we please publish this?

2            Ms. Arbuckle, please explain to the jury what this

3    image shows.

4    A.  So this is an image from the 1800s, 1865, and I'm really

5    looking to the image to the right that communicates the use of

6    stripes on the bodice, on the sleeve, on the sort of overcoat

7    and the hem.  The stripes you can see are used in a couple of

8    ways.  They're used as an embellishment, as a part of the

9    design, but in the bodice area, you're able to use the stripes

10   to cover what has to be a seam because that bodice could not

11   actually --

12           MR. FLEMMING:  Objection.  Opinion.

13           THE COURT:  I think the question is just where are the

14   stripes, and you pointed that out.

15   Q.  Thank you.  Let's move on to the next exhibit, Exhibit 242.

16           Ms. Arbuckle, can you please just first tell us what

17   this document is?

18   A.  Yes.  It's an image from the Naval History and Heritage.

19   Q.  Is this an image that you collected?

20   A.  It is.

21   Q.  Is the image you collected accurately reflected here?

22   A.  It is.

23           MR. MALDONADO:  Your Honor, I move in 242, please.

24           MR. FLEMMING:  Same objection.

25           THE COURT:  Same ruling.  Received.

N1AQadi5

1          (Defendant's Exhibit 242 received in evidence)

2     Q.  Ms. Arbuckle, please explain to the jury what's shown in

3     this image.

4     A.  So it's U.S. Navy Officer's uniform, and that uniform

5     demonstrates the use of parallel stripes on the sleeve as well

6     as down the leg of the pant.

7     Q.  Okay.  Let's look at the next exhibit, Exhibit 210.  And if

8     you can again first tell us what this is.

9     A.  Yes, so this is from the Air and Space Museum, and it's a

10    pilot's uniform.

11    Q.  Is this an image that you collected?

12    A.  It is.

13    Q.  And is this a fair and accurate representation of that

14    image?

15    A.  It is.

16          MR. MALDONADO:  Your Honor, I move in 210.

17          THE COURT:  Same objection.  Same ruling.  Received.

18          MR. MALDONADO:  Thank you.

19          (Defendant's Exhibit 210 received in evidence)

20    Q.  Can you please describe for the jury what's shown in this

21    picture?

22    A.  So this is a TWA pilot's uniform.  Again, it communicates

23    the parallel stripes on the sleeve which speak to --

24          MR. FLEMMING:  Objection.  Opinion.

25          THE COURT:  Yes, just limit yourself to pointing out

1  the stripes.

2  A.  Got it.

3  Q.  Just describe what you see on the screen.

4  A.  Thank you.

5  Q.  And not explain what the meaning is.

6          Thank you, Ms. Arbuckle.  Let's move on then to -- let

7  me ask you, about exhibitions at FIT.  Do you attend any

8  exhibitions at FIT?

9  A.  I try to attend most of the exhibitions at -- certainly at

10 the Museum at FIT, and naturally when I was dean, I attended

11 all of the exhibitions that related to my school, but we have

12 renowned exhibitions at the museum, and more often than not I

13 will attend the opening of those exhibitions.

14 Q.  Are you familiar with the uniformity exhibition?

15 A.  I am.

16 Q.  Can you tell us about that?

17 A.  So the uniformity exhibition was a focus on the positioning

18 of uniforms and how they relate to what designers were doing in

19 the industry, how they -- how these uniforms serve as a source

20 of inspiration.

21 Q.  When was this exhibition held?

22 A.  2016.

23 Q.  And did you attend this exhibition?

24 A.  I did.

25 Q.  Let's pull up Exhibit 239, please.  I'd like you to just

1    identify first what this is?

2    A.   So this is a capture from the uniformity exhibition that

3    was on the FIT website, museum website.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. MALDONADO:

2    Q.  Did you capture these images?

3    A.  Yes.

4    Q.  And do they accurately reflect what you captured?

5    A.  They do.

6            MR. MALDONADO:  Your Honor, I would like to move into

7    evidence 239.

8            THE COURT:  Same objection, same ruling, received.

9            (Defendant's Exhibit 239 received in evidence)

10           MR. MALDONADO:  Thank you.

11   Q.  Ms. Arbuckle, can you describe what is shown on this page,

12   the first page of this exhibit?

13   A.  So at the top of the image you actually see a photo taken

14   from Thom Browne's show, his Pitti show that took place in

15   Italy.  You see the models in uniformity on the runway.

16   Q.  OK.  If we turn to page nine, please.

17           Explain what we see here on page nine.

18   A.  The center photo is another image from the uniformity

19   exhibition, and this is an Army dress uniform.

20   Q.  OK.  If we turn to page six, please.

21           Please explain to the jury what we see in this center

22   photo here.

23   A.  This is another image from that exhibition, and this is

24   where you see a woman's dress from the 1800s that's trimmed in

25   stripes.

1    Q.  Thank you.

2            Let's take a look now at the next exhibit,

3    Exhibit 235.

4            Can you please describe what this is on this exhibit?

5    A.  This is an image from Vogue runway of a Tommy Hilfiger

6    coat.

7    Q.  Is this an image that you captured from the Internet?

8    A.  Yes.

9    Q.  Is this a fair and accurate representation of the image you

10   captured?

11   A.  It is.

12           MR. MALDONADO:  Your Honor, I would like to offer 235.

13           THE COURT:  Same objection, same ruling, received.

14           (Defendant's Exhibit 235 received in evidence)

15   Q.  Can you explain for the jury what is shown in this image,

16   please?

17   A.  This is a coat that has parallel stripes on the sleeve and

18   is a double breasted pee coat.

19   Q.  Is this a military uniform?

20   A.  It's not a military uniform.

21   Q.  Thank you.

22           Can we please now take a look at Exhibit 230, page 11.

23   Going back to the uniformity exhibit, page 11, please.  This is

24   already in evidence.

25           Please describe for the jury what is shown in this

1    image.

2    A.   So this is an image directly from the exhibition.  And in

3    the exhibition, what you would see throughout the exhibition is

4    in the center is a traditional football uniform from, I

5    believe, somewhere around the 1900s.  But what's interesting is

6    how the curated men shows on the left a sequent gown by

7    Geoffrey Beene and on the right is garment by Stella Jean.

8              And the goal here is to show --

9              MR. FLEMMING:  Objection, opinion.

10   A.   That's what I see.

11             THE COURT:  Yes.

12   Q.   Can you please describe the use of stripes here in these

13   images?

14   A.   Yes.  They were parallel stripes on the sleeves of the

15   Geoffrey Beene and the Stella Jean garment.

16   Q.   Do you know the dates of the Geoffrey Beene and Stella Jean

17   apparel?

18   A.   I don't remember them.

19   Q.   OK.  Are you familiar with FIDM?

20   A.   I am.

21   Q.   What does that refer to?

22   A.   Fashion Institute of Design and Merchandising in LA.

23   Q.   OK.  Have you attended any exhibitions there?

24   A.   I haven't attended their exhibitions, no.

25   Q.   Have you aware of any exhibitions that have been held

1    there?

2    A.  I am.

3    Q.  Are you familiar with any exhibitions that were held there?

4            Tell us which exhibitions you're familiar with.

5    A.  So the most recent --

6            THE COURT:  Is this a rival school?

7            THE WITNESS:  We like to think of ourselves as peers.

8            THE COURT:  I thought there was no comparison between

9    FIT and all the rest, but all right.

10           THE WITNESS:  I'm being gracious, your Honor.

11           THE COURT:  All right.  Go ahead, counsel.

12           THE WITNESS:  So...

13           MR. MALDONADO:  We always need to have a West Coast

14   counterpart.

15   A.  So it was, yes, from their sporting women exhibition, which

16   ranged from the 1800s to 1960.

17   Q.  OK.  That's the sporting fashion exhibition?

18   A.  Yes, it is.

19   Q.  And did you research that as part of the research that you

20   did for this case?

21   A.  I did.

22   Q.  And did you review any materials associated with that

23   exhibition?

24   A.  I did.

25   Q.  What did you review?

1   A.   I reviewed the images from the exhibition.  There is also a

2   wonderful book that --

3          Books are often published as part of an exhibition,

4   and so it was the assistant curator who was responsible for

5   being a coauthor and for that exhibition.  And so there's

6   wonderful images of the sort of history of how sportswear for

7   women developed.

8          MR. MALDONADO:  Your Honor, may I approach the

9   witness?

10          THE COURT:  Yes.

11   BY MR. MALDONADO:

12   Q.   I'm handing you a document that's been  marked as

13   Defendant's Exhibit 303.

14          Can you please tell us what that is?

15   A.   Yes.  This is a book, the name of it is Sporting Fashion

16   Outdoor Girls, 1800 to 1960, and it's based on images from that

17   exhibition.

18          MR. MALDONADO:  OK.  If we can take a look at --

19          If we can pull up Exhibit 303 on the screen, please.

20   Actually, I would like to offer the book into evidence, Exhibit

21   303.

22          MR. FLEMMING:  Objection, hearsay, same grounds as the

23   book adidas attempted to offer.

24          THE COURT:  I will receive the book only to the extent

25   of images that the witness refers to.  The rest is not

1   received.

2          MR. MALDONADO:  OK.  Thank you, your Honor.

3          (Defendant's Exhibit 303 received in evidence)

4   BY MR. MALDONADO:

5   Q.  If we can turn to page nine on the screen.  You don't have

6   to look at the book, it will be on your screen.

7          Can you please describe the image that's shown here?

8   A.  Yes.  This is an image from the exhibition that appears in

9   the book, and it's a women's bathing suit from the early 1900s.

10  Q.  Can you please describe the use of stripes on this women's

11  bathing suit?

12  A.  Yes.  There is parallel stripes at the hem of the top at

13  the arm hole and on the collar.

14  Q.  How many stripes do you see?

15  A.  Well, there's three parallel red stripes on the hem and

16  three at the collar and three at the arm hole.

17  Q.  OK.  If we can turn next to page -- what's 296?

18          MR. MALDONADO:  Sorry, one second, your Honor.

19          To page 194 of the book.

20  Q.  OK.  Maybe describe the image that is on the screen now.

21  A.  So this is an image of a woman's ice skating outfit from

22  the 1800s.

23  Q.  And can you describe the use of stripes on this garment?

24  A.  Yes.  They are on the sleeve, which is a very long sleeve,

25  and certainly along the bustle.  I can see that they are

1   somewhere in the bodice area, but I cannot see the detail.

2   Q.  Let's move on to Exhibit 206, please.

3        Can you please describe what this is, first?

4   A.  Yes.  This is from the Smithsonian, and this is an example

5   of a varsity sweater.

6   Q.  Is this an image that you captured?

7   A.  It is.

8   Q.  And does this image accurately reflect what you captured?

9   A.  It does.

10       MR. MALDONADO:  Your Honor, I would like to move in

11  206.

12       THE COURT:  Same objection, same ruling, received.

13       (Defendant's Exhibit 206 received in evidence)

14       MR. MALDONADO:  If we can publish it to the jury,

15  please.

16  Q.  Ms. Arbuckle, if you could please describe what's shown

17  here?

18  A.  Yes.  So this --

19  Q.  One second.  Sorry.

20       OK.  Go ahead.

21  A.  So this is a varsity sweater and it includes the parallel

22  stripes on the shoulder and the sleeve.  It also includes a

23  fraternity and an athlete's name.

24  Q.  How many stripes do you see on this garment?

25  A.  I see three parallel stripes.

1    Q.  Where do you see those?

2    A.  I see them on the shoulder and on the sleeve.

3    Q.  OK.  If we can next look at Defendant's Exhibit 200,

4    please.

5            Can you first identify what this is, please?

6    A.  Yes.  This is a varsity sweater from the Mississippi State

7    University archives.

8    Q.  Is this an image that you captured?

9    A.  Yes, it is.

10   Q.  Does this accurately reflect what you captured?

11   A.  Yes.

12           MR. MALDONADO:  Your Honor, I would like to move in

13   200.

14           THE COURT:  Ditto, ditto, received.

15           (Defendant's Exhibit 200 received in evidence)

16   Q.  Please describe for the jury what is on the screen now.

17   A.  So this is a varsity pullover sweater.  It's from the early

18   1920s, and it shows the school letter on the front and three

19   parallel stripes on the sleeve.

20   Q.  OK.  Can we please turn to the next exhibit, 228.

21           Can you please describe generally what this is?

22   A.  Yes.  This is a capture of *Seventeen* magazine ad.

23   Q.  Did you capture this image?

24   A.  I did.

25   Q.  And is it accurate?

1    A.  Yes.

2            MR. MALDONADO:  Your Honor, I offer 228.

3            THE COURT:  Same objection, same ruling, received.

4            (Defendant's Exhibit 228 received in evidence)

5    Q.  Can you please describe to the jury what is shown at the

6    bottom of that page?

7    A.  So this is, as I shared, a Chanel ad, and it is a couple

8    where they are both wearing varsity sweaters.  And this is

9    somewhere in the 1950s.

10   Q.  Do you see stripes on the sweaters?

11   A.  I do, on the sleeves.

12   Q.  How many stripes do you see?

13   A.  Three.

14   Q.  Thank you.

15           Let's move on to Exhibit 257, please.  And can you

16   please first describe what this is?

17   A.  So this is from the Ralph Lauren website.

18   Q.  Is this an image you captured?

19   A.  Yes.

20   Q.  Is it accurate?

21   A.  Yes.

22           MR. MALDONADO:  Your Honor, I would like to move in

23   257.

24           THE COURT:  Same ruling, same objection, received.

25           (Defendant's Exhibit 257 received in evidence)

1  Q.  Can you please describe for the jury what is shown in this

2  image?

3  A.  Yes.  This is, you know, a current varsity-type sweater

4  that has two parallel stripes on the sleeve by Ralph Lauren.

5  Q.  Thank you.

6          Let's move on to Exhibit 223, please.

7          Please describe what this is.

8  A.  This is an image from the website *24S.com*.

9  Q.  Is this an image that you captured?

10 A.  Yes.

11 Q.  Is it accurate?

12 A.  Yes.

13         MR. MALDONADO:  Your Honor, I move in 223.

14         THE COURT:  Same objection, same rulings, received.

15         (Defendant's Exhibit 223 received in evidence)

16 Q.  Can you please describe for the jury what is shown in this

17 image?

18 A.  So, as I shared, this is a varsity jacket from the brand

19 Celine.  And it's highlighted with stripes at the neck, the

20 sleeve, and the waist.

21 Q.  How many stripes do you see at the neck?

22 A.  I see three.

23 Q.  And how many stripes do you see at the sleeves?

24 A.  Four.

25 Q.  Thank you.

1           Can we please move on to Exhibit 213.

2           THE COURT:  Counsel, find someplace to interrupt just

3  so we can give the jury the midafternoon break.

4           MR. MALDONADO:  OK.  We'll do a couple more, and then

5  we'll take a break.

6           THE COURT:  All right.

7  BY MR. MALDONADO:

8  Q.  Let's move on to the next one.  I think we said 213.

9           Yes.  Can you please describe what this is generally?

10 A.  Yes.  This is from the Givenchy website.

11 Q.  This is an image that you captured?

12 A.  Yes.

13 Q.  Is it a fair and accurate representation?

14 A.  Yes.

15          MR. MALDONADO:  I would like to move if 213, your

16 Honor.

17          THE COURT:  Same objection, same ruling, received.

18          (Defendant's Exhibit 213 received in evidence)

19 Q.  Please describe for the jury what is shown in this image.

20 A.  It's a varsity jacket by Givenchy, and it is highlighted

21 with stripes at the neck, the waist, and the sleeve.

22 Q.  And who is Givenchy?

23 A.  A French luxury brand.

24 Q.  And how many stripes do you see around the collar?

25 A.  Two.

1    Q.  And the sleeves?

2    A.  Two.

3    Q.  And the waist?

4    A.  Two.

5    Q.  And let's now look at Exhibit 227, please.

6            Can you tell us generally what this is?

7    A.  This is captured from the Saint Laurent website.

8    Q.  Did you capture this image?

9    A.  Yes.

10   Q.  Is it fair and accurate?

11   A.  Yes.

12           MR. MALDONADO:  Your Honor, I offer in 227.

13           THE COURT:  Same objection, same rule, received.

14           (Defendant's Exhibit 227 received in evidence)

15   Q.  Can you please describe for the jury what is shown in this

16   image?

17   A.  Yes.  This is another varsity jacket by a luxury French

18   company.  And it has parallel stripes, two parallel stripes at

19   the sleeve, the waist, the neck, with an insert in the arm

20   hole.

21           MR. MALDONADO:  Your Honor, this would be a convenient

22   place to break for our afternoon recess.

23           THE COURT:  Very good.  We'll take a 15-minute break.

24           (Continued on next page)

25

1            (Jury not present)

2            THE COURT:  You can step down.  We'll see you in

3    15 minutes.

4            THE WITNESS:  Thank you.

5            (Witness temporarily excused)

6            THE COURT:  So I want to spend at least a few minutes

7    on one part of the motion to dismiss, mainly punitive damages.

8            So what argument does plaintiff have that there should

9    be punitive damages?

10           MR. HENN:  It overlaps substantially with the

11   willfulness and bad faith issue.  Perhaps I should talk about

12   all of them --

13           THE COURT:  OK.

14           MR. HENN:  -- collectively.

15           First and foremost, I want to make sure that the court

16   does not loose sight against our claims against Grosgrain

17   products in considering willfulness, bad faith, or punitive

18   damages.  The witnesses consistently, Mr. Browne himself

19   testified that their use of the Grosgrain on this product was

20   not his trademark, but instead was a design choice.  He made

21   the choice to take his little ribbon that was supposed to be a

22   trademark here, he made the stripes fatter, identical to what

23   is in adidas' own guidelines about the width of stripes on

24   shoes, angled them forward.  And with regard to the pants, he

25   stretched it out, made it wider.

1          So I'm going to talk about the four stripes, but I do

2    not want us to lose sight of the fact that with regard to the

3    Grosgrain, there's no discussion about the notion that they

4    sort of adopted that iteration as a mark and in good faith.

5    Those were design choices that the jury can infer were done

6    intentionally to bring it closer to adidas as part of the

7    effort to move into athletics, to expand athletic expression.

8          I want to put Grosgrain aside for a minute and return

9    to four bars.  As your Honor is aware, the standard for bad

10   faith and willfulness in the trademark context is either that

11   the mark was adopted on the infringing goods to trade on the

12   goodwill of the mark owner, or that it was adopted for use on

13   the infringing goods with conscientious disregard or willful

14   blindness as to the rights of the mark owner.

15         THE COURT:  Yes, and I'm glad you're addressing all

16   this, because this is another aspect of their motion.

17         But punitive damages goes well beyond what you've just

18   described for willfulness.  Punitive damages requires something

19   that is so wanton and of such, if you will, public importance

20   that it requires the functional equivalent of a criminal

21   penalty.  That's why it is called punitive damages opposed to

22   mere willfulness.  The standard is, in my view, considerably

23   higher.  That is why I was trying to limit it to that.

24         MR. HENN:  Well, in order to sort of get to the point

25   of where we would argue that it is wanton and inappropriate

1    under the punitive damages standard, I sort of have to go

2    through the evidence on willfulness.

3            THE COURT:  All right.  Keep going.

4            MR. HENN:  So the question before the court and before

5    the jury on the issues of all three of this -- willfulness, bad

6    faith, and punitives -- is whether Thom Browne, with regard to

7    the four bars, used that on the accused products in bad faith.

8    The key date and the key product is not back in 2008 when he

9    conceived of the four bars mark because we don't accuse the

10   product that was originally conceived of back at that point.

11   The key time is when it was used on each of the accused

12   products.  Also kind of overlaps with progressive encroachment.

13   I'll get to that at the very end of this discussion of the

14   evidence.

15           But I want your Honor to think of an analogous

16   situation.  McDonald's is known for the golden arches.  If I go

17   and I create a watch company and on the face of the watch I put

18   a little golden M, and I go around selling my watches because I

19   adopted -- my name is Mc Dougall and I want my M on my watch.

20   The mere adoption of it on a watch might not give rise to

21   things like willfulness, bad faith, punitive damages.

22           But if I then, over time I go from watches and then I

23   decide I want to go into apparel.  I decide, you know what,

24   I've got some extra money.  I'm going to open a restaurant down

25   in TriBeCa, and I'll put my big M on it.  Then the question for

1   the court and the jury is, at the moment that you moved into

2   those products, or in that case into those services, have you

3   acted willfully in bad faith and wanton.

4          So I don't want us to lose site and think, oh, well,

5   because adidas didn't show something back in 2006 about what

6   Thom Browne was thinking when he was adopting varsity stripes,

7   that's not the issue.  It's when this comes under these

8   particular products.

9          Now what is the evidence?  2007, he gets a call.  He's

10  made aware of the Three-Stripe Mark from adidas directly.  His

11  lawyers, Pryor Cashman, provide him with a full summary of

12  adidas' trademark registrations and advise him in an e-mail

13  that apparently privilege was waived, that those rights cover

14  horizontal, vertical, and diagonal uses of stripes.

15         He, without bothering to ask Pryor Cashman, simply

16  adds a fourth stripe.  He's already got Pryor Cashman on the

17  payroll.  They've done a search, and he didn't ask them whether

18  it was OK.  It's the *Hilfiger* case, second Circuit.  When you

19  should be doing a search and you didn't do a search, the

20  evidence of willfulness, the Second Circuit has held that.

21         Next, he doesn't consider the fact that adding a

22  fourth stripe creates three stripes, negative space.  It

23  doesn't even consider that aspect.  This witness just now

24  almost, almost admitted that the product either had three red

25  stripes or had four white stripes.  She sort of caught herself

1    because the fact is the reason four stripes is an

2    infringement -- and asking his lawyers would have made this

3    very clear -- is that four creates the impression of three.

4    We've seen that in the survey evidence and otherwise.

5            THE COURT:  I'm a little skeptical of this last

6    argument.  I'm not sure what your evidence is on this.  I am

7    doubtful that, given the basic principles of Gestalt psychiatry

8    and psychology, that the average consumer would perceive that

9    as anything other than four stripes.

10           MR. HENN:  We actually have the empirical data in the

11   record that either proves the Gestalt theory or it shows that

12   people did Count Three.  Remember the verbatims in the Poret

13   survey.  Everyone looked at that and said, I saw three stripes,

14   I saw three stripes, I saw three stripes.  There is only two

15   explanations.  Either they are brain-triggered to adidas and

16   the three stripes is so associated with it, they gave three

17   stripes as a response, or they were looking at the negative

18   space.

19           THE COURT:  All right.  Anyway, keep going.

20           MR. HENN:  So all of that was done, we believe, in

21   willful blindness because he had the trademark reports.  He had

22   the opinion of counsel that said, they own diagonal,

23   horizontal, and vertical.  And instead of bothering to say,

24   Hey, can I put a fourth stripe on, he didn't.  That's the

25   definition of conscientious disregard, knowing that you can get

1    an answer and choosing not to get an answer.

2            That is back in time.  What makes this case even more

3    an example of willfulness is what has happened since then,

4    which is -- let's take it out of the laches context entirely.

5    Let's say that everything he did up to 2018, when we objected

6    in 2018, can't be willful.  That's not the case, but let's just

7    say that that is the case.

8            From the moment of 2018 forward, all of the products

9    that he chose to release after that point the jury could very

10   well decide that was willful.  You not only had the trademark

11   registrations, you knew it covered all these things.  Adidas

12   had specifically reached out about four stripes and about the

13   Grosgrain, and instead of stopping where you were and keeping

14   the same line, waiting for the court to figure it out or

15   otherwise.  No, no, we have a total product expansion that goes

16   into all kinds of new products, culminating in the 2020 release

17   of the entire compression line of products, which he then goes

18   out to the media, and the *Vogue* article that's in the record

19   where he said, I run eight miles a day.

20           THE COURT:  Plus in that argument is the assumption

21   that they clearly knew they were infringing at that point.

22   Because if they didn't, then their reaction is simply we don't

23   agree with you.  We don't think we're infringing.  Get lost.

24           MR. HENN:  So I would encourage the court to read the

25   *Victor Knox* case, which is a Second Circuit affirming your

1    Honor.  And in that case, you found, or at least there was a

2    finding of willfulness as a result of the defendant continuing

3    to move forward after being put on notice by the plaintiff.

4    Obviously there was a dispute.  They challenged it in court.

5    They didn't know that it was infringing.  But the court

6    ultimately said if you expand after you're told of a possible

7    infringement, you essentially do so at your own risk, and the

8    jury shouldn't be precluded from weighing the evidence --

9              THE COURT:  All right.  You're citing weak authority,

10   of course.

11             MR. HENN:  I found it very suspect.

12             THE COURT:  But I'll take a look at that.  I want to

13   give everyone five minutes before we resume.  This argument is

14   not over, by any means.  We will continue it either today or

15   tomorrow.

16             (Recess)

17             THE COURT:  One last thing for counsel to think about.

18             I'm not sure why willfulness is still in this case,

19   putting aside this is separate from punitive damages and good

20   faith.  But we'll discuss that tomorrow, but...

21             MR. MALDONADO:  Thank you.

22             THE COURT:  I'm unclear why it's still in the case at

23   all.  All right.

24             (Continued on next page)

25

1           (Jury present)

2           MR. MALDONADO:  Your Honor, to save some time, the

3    parties have agreed that the next three exhibits will be

4    offered into evidence:  204 --

5           THE COURT:  Oh, my gosh.  I'm going to faint.

6           MR. MALDONADO:  204, 269, and 266, subject to the same

7    objections and the same rulings.

8           Is that OK?

9           THE COURT:  That's fine.  Received.

10          (Defendant's Exhibits 204, 269, and 266 received in

11   evidence)

12          MR. MALDONADO:  Thank you.

13   BY MR. MALDONADO:

14   Q.  Let's pull up Exhibit 204, please.

15          Ms. Arbuckle, can you please describe what's on the

16   screen here?

17   A.  Yes.  This is from the website Mr. Porter, and it's a

18   Burberry varsity jacket.

19   Q.  Can you zoom in on the jacket, please.

20          Can you please describe the use of stripes on this

21   jacket?

22   A.  They are at the neck, the sleeve, and the hem.  There is

23   three at the sleeve, it appears more like two at the waist, and

24   two at the neck.

25   Q.  And who is Burberry?

1    A.   Burberry is a British luxury brand.

2    Q.   Let's look at the next exhibit, 269.

3         Can you please describe what we see here?

4    A.   This is from the Celine website.  This is a Celine track

5    suit, jogging jacket.

6    Q.   OK.  Can you describe the use of stripes on this?

7    A.   Um, this has parallel stripes across the shoulder and down

8    the sleeve.

9    Q.   How many stripes do you see?

10   A.   Um, I see two on a white stripe.

11   Q.   OK.  And who is Celine?

12   A.   Celine is a luxury French brand.

13   Q.   Turning now to Exhibit 266.

14        Can you please describe what's shown here?

15   A.   So this is from the Bloomingdale's site, and this is a pair

16   of Karl Lagerfeld jogging pant.

17   Q.   Who is Karl Lagerfeld?

18   A.   Karl Lagerfeld is a famous luxury designer, Chanel --

19   associated with Chanel.  And this jogging pant has parallel

20   stripes down the outside leg of the pant.

21   Q.   Thank you, Ms. Arbuckle.

22        We would next like to turn to Plaintiff's Exhibit

23   1228.

24        Let's just publish this for the witness.

25        Ms. Arbuckle, have you seen this exhibit before?

1    A.  I have.

2    Q.  And are these images that we either captured for you or on

3    your behalf?

4    A.  They were.

5    Q.  And are they all accurate representations of the images

6    that were captured?

7    A.  They are.

8             MR. MALDONADO:  Your Honor, I would like to move

9    Plaintiff's Exhibit 1228 into evidence.

10            MR. FLEMMING:  We have several objections and would

11   need a sidebar on this one.

12            THE COURT:  OK.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. FLEMMING:  Several issues.

3          Number one, there is an article in this long exhibit

4     that's pure hearsay about how adidas supposedly bought its

5     trademark rights from someone else.

6          MR. MALDONADO:  We can take that out.

7          MR. FLEMMING:  Another issue is that there are

8     annotations made by counsel on many of the products with

9     numbers that make it look like there were up to 700 products,

10    when actually there are just a couple dozen in the first

11    several pages.  Ms. Arbuckle didn't make those annotations.

12    They just said third-party product number 267, so that is

13    misleading and prejudicial.

14          Personal knowledge for a lot of them.  What the

15    witness just said is that she thinks that some of these may

16    have been captured on her behalf, so not by her personally.

17    They are also just screenshots with no context.

18          THE COURT:  Sustained.

19          (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2              MR. MALDONADO:  I have no further questions, your

3    Honor.

4              THE COURT:  Cross-examination.

5              MR. FLEMMING:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. FLEMMING:

8    Q.  Hello, Ms. Arbuckle.

9    A.  Good afternoon.

10   Q.  You talked on your direct testimony about some historical

11   uses of stripes, correct?

12   A.  I did, yes.

13   Q.  And you did some research to find those historical uses?

14   A.  I did.

15   Q.  You went to some museums?

16   A.  I went to museum sites.

17   Q.  So museum websites?

18   A.  Some museum sites, as well as the museum at the Fashion

19   Institute of Technology and the special collections at the

20   library, yes.

21   Q.  And that the special collections included rare books, you

22   said?

23   A.  Yes.

24   Q.  And oral histories, you said?

25   A.  Correct.

1    Q.  And some of your examples went back to the 1800s, correct?

2    A.  That is correct.

3    Q.  There were several examples that went back to the 1800s?

4    A.  That is correct.

5    Q.  Let's show the witness, just the witness, what's been

6    marked as Exhibit 1330.

7           THE COURT:  I knew we would get there eventually, to a

8    number over 1000.

9           MR. FLEMMING:  We offer this into evidence.

10          THE COURT:  Any objection?

11          MR. MALDONADO:  No objection.

12          THE COURT:  Received.

13          (Plaintiff's Exhibit 1330 received in evidence)

14   BY MR. FLEMMING:

15   Q.  Ms. Arbuckle, you reviewed the complaint in this action in

16   forming your opinions in this case, correct?

17   A.  I did.

18   Q.  And you reviewed the adidas trademark registrations that

19   were attached to the complaint, correct?

20   A.  That is correct.

21   Q.  And we are looking at one of those registrations?

22   A.  You are.

23   Q.  And let's look at the left-hand side of the page.

24          Do you see under the registration number it says

25   registered and it gives a date March 8, 2016?

1    A.   Correct.

2    Q.   So the United States Patent and Trademark office granted

3    this registration to adidas hundreds of years after many of

4    your examples that you gave today, is that correct?

5    A.   That is correct.

6    Q.   You can take that down.  Thank you.

7             You are a fashion designer, correct?

8    A.   I am.

9    Q.   But you haven't personally designed any clothing since

10   2004?

11   A.   That is correct.

12   Q.   And you've worked at the Fashion Institute of Technology,

13   FIT, for many years?

14   A.   I have.

15   Q.   And you've been in administrative roles there since 2005?

16   A.   That's correct.

17   Q.   You haven't taught or designed any courses at FIT since

18   2005, is that correct?

19   A.   Well, as --

20   Q.   You haven't taught or designed any courses at FIT since

21   2005?

22   A.   I have not.

23   Q.   So you talked earlier about some, what you called, varsity

24   jackets, right?

25   A.   I did.

N1AsADI6                    Arbuckle - Cross

1    Q.  And you don't know whether consumers associate stripes with

2    varsity jackets, right?

3              MR. MALDONADO:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.  Thom Browne offers varsity jackets, correct?

6    A.  He does.

7    Q.  And he offers them without stripes on the sleeves?

8    A.  Correct.

9    Q.  Let's bring up to the witness Plaintiff's Exhibit 826 and

10   go to page two.

11             MR. FLEMMING:  We offer this into evidence as well.

12             MR. MALDONADO:  Objection, your Honor.

13             May we be heard at sidebar?

14             THE COURT:  OK.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. MALDONADO:  Your Honor.

3          THE COURT:  So if I were defense counsel, I don't know

4    that I would be objecting, since plaintiff's counsel seems to

5    be moving ever further towards opening the door to much of what

6    I excluded at his request previously.  But, of course, that's

7    up to you.

8          So what's the objection?

9          MR. MALDONADO:  I'll withdraw my objection.

10          Thank you, your Honor.

11          THE COURT:  But wait a minute.

12          MR. MALDONADO:  I'm sorry.

13          THE COURT:  I'm sorry.  So, I think, what's the

14    question you're going to put about this particular exhibit?

15          MR. FLEMMING:  Only that there are no stripes on the

16    sleeve.

17          THE COURT:  All right.  That doesn't, by itself,

18    doesn't open the door, but you're getting very close.

19          MR. FLEMMING:  Understood.  I'll be done after this.

20          THE COURT:  All right.

21          (Continued on next page)

22

23

24

25

1             (In open court)

2             MR. FLEMMING:  Can we publish to the jury, your Honor.

3             THE COURT:  Yes.  It's received.

4             (Plaintiff's Exhibit 826 received in evidence)

5    BY MR. FLEMMING:

6    Q.  Ms. Arbuckle, this is a page from the Thom Browne website,

7    correct?

8    A.  That is correct.

9    Q.  And it shows a Thom Browne jacket?

10   A.  It does.

11   Q.  The name is reversed shearling varsity jacket, is that

12   right?

13   A.  Correct.

14   Q.  And there are no stripes or bars on the sleeve of this

15   varsity jacket?

16   A.  There are not.

17            MR. FLEMMING:  No further questions.

18            THE COURT:  Anything else?

19            MR. MALDONADO:  I don't have any further, your Honor.

20            THE COURT:  Thank you very much.  You may step down.

21            THE WITNESS:  Thank you.

22            (Witness excused)

23            THE COURT:  Please call your next witness.

24            MS. SAYOUR:  Your Honor, we call Dr. Joel Steckel.

25            THE DEPUTY CLERK:  Please take the witness stand.

1        Please remain standing and raise your right hand.

2    JOEL STECKEL,

3        called as a witness by the Defendant,

4        having been duly sworn, testified as follows:

5            Please be seated.  Draw close to the microphone.

6            State your name and spell it slowly for the record.

7    Thank you very much.

8            THE WITNESS:  My name is Joel Steckel.

9            THE DEPUTY CLERK:  Please spell it.

10           THE WITNESS:  J-o-e-l S-t-e-c-k-e-l.

11           THE COURT:  Counsel.

12   DIRECT EXAMINATION

13   BY MS. SAYOUR:

14   Q.  Good afternoon, Dr. Steckel.

15   A.  Good afternoon.

16   Q.  Would you please introduce yourself to the ladies and

17   gentlemen of the jury by telling them where you work and what

18   you do?

19   A.  I'm a professor of marketing at the Stern School of

20   Business at New York University.  Currently I'm on sabbatical,

21   and I'm a visiting scholar at the law school of the University

22   of Pennsylvania.

23           MS. SAYOUR:  We have some demonstratives that we would

24   like to bring up to help with today's discussion.

25           With your permission, your Honor, may we publish those

1    to the jury.

2              THE COURT:  Yes.  Let me remind the jury for the

3    umpteenth time.  Demonstratives are not evidence.  That won't

4    be given to you when you start your deliberations.  They are

5    just to help follow the testimony as it was given.

6    BY MS. SAYOUR:

7    Q.  Dr. Steckel, can you go through your educational background

8    starting with your undergrad degree?

9    A.  Sure.  I have a bachelor's degree in mathematics from

10   Columbia University, where I was elected to Phi Beta Kappa and

11   I graduated Summa Cum Laude.  Then I went to graduate school at

12   the Wharton School of the University of Pennsylvania, where I

13   received three degrees:  An MBA, a master of arts in

14   statistics, and my Ph.D. degree was awarded jointly by the

15   departments of marketing and statistics.

16   Q.  And once you got your Ph.D. degree, what did you do next?

17   A.  I became a professor.

18   Q.  And why don't we pull up the next page.

19             Thank you.  Are these --

20             THE COURT:  Given your educational background, you

21   didn't have any choice, did you?

22             THE WITNESS:  Um, no.  That's what we do.  When you

23   get a Ph.D. from one of the top schools, you become a

24   professor.  That's the normal career path.  It's like when you

25   go to medical school, you become a doctor.

1        MS. SAYOUR:  That's fair enough.

2        THE COURT:  If you go to law school, you become a

3   judge.

4        Go ahead, counsel.

5        MS. SAYOUR:  I wasn't going to say it, your Honor.

6   BY MS. SAYOUR:

7   Q.  Are these some of the institutions where you've held

8   academic positions?

9   A.  I think they are all of them, actually.  Yes, in either a

10  professor or visiting professor at all of these institutions,

11  with the exception of the Penn Law School, where I'm just a

12  visiting scholar.

13  Q.  Can you tell the jury some of the kinds of classes that

14  you've taught?

15  A.  Sure.  I've taught a wide variety of classes.  I've been a

16  professor for about 40 years now.  I have taught -- recently,

17  the courses I've taught the most often are introductory

18  marketing and introductory research methods to Ph.D. students.

19  But I've taught courses in pricing and brand strategy and

20  strategic marketing and brand planning, and all sorts of

21  courses on quantitative methods in marketing.

22  Q.  I think you indicated that you're currently a professor at

23  NYU?

24  A.  Yes.

25  Q.  And what classes are you currently teaching?

1    A.  I'm not teaching any currently because I'm on sabbatical.

2    Q.  And that's at the Penn Law?

3    A.  Yes.

4    Q.  What about consulting work, have you done any consulting

5    work?

6    A.  Throughout the years, yes.  Early in my career, I did a lot

7    of work on analyzing data for companies and instructing them on

8    what they could make of the data that they collect within the

9    normal course of business, and how they could measure their

10   customer preferences, things like that.

11           More recently, my work has been more or less focused

12   on doing expert witness work in litigation such as this one.

13   Q.  So have you testified as an expert in other cases?

14   A.  I have.

15   Q.  And what kinds of cases were those?

16   A.  A lot of trademark cases and trade dress cases, antitrust,

17   patent, a wide variety of cases.  When you have training in

18   statistical methodology, that equips you to be able to apply

19   those skills in a wide variety of contexts.

20   Q.  I know sometimes professors write a lot.

21           Have you published any journal articles or on

22   marketing and branding?

23   A.  I have.  And sometimes when they come in the mail, my wife

24   says to me, Honey, we have one of those silly little magazines

25   that only 50 people read again.

1  Q.  What about books?

2  A.  Yes.  I'm the author of four books, an author of four

3  books, coauthor, I like to work with my colleagues, and I have

4  another book coming out this summer, an edited volume entitled

5  *Legal Applications of Marketing Theory*.

6  Q.  Have you given any presentations on marketing and branding?

7  A.  Oh, my gosh, probably in the neighborhood of 100 over my

8  career.

9  Q.  If we can pull up DDX 408.

10          Dr. Steckel, do you know what this is?

11  A.  This is the first page of my c.v.  My resume, if you will.

12          MS. SAYOUR:  Your Honor, we would like to offer this

13  exhibit into evidence.

14          MR. HENN:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit 408 received in evidence)

17          MS. SAYOUR:  Publish it.

18  BY MS. SAYOUR:

19  Q.  I know this is a long 15-page document, and I don't want to

20  go through it in detail.

21          But can you tell us whether this document is an

22  accurate summary of your professional and educational

23  background?

24          You can scroll through it?

25  A.  I believe it is.  It's supposed to be anyway.

1  Q.  If we can turn to page 12.

2              Can you explain -- let's go back to 11.  Can you

3  explain the editorial service category on the bottom of this

4  page?

5  A.  The editorial service category, I think, is actually the

6  one that is most relevant to this matter.  It's my -- it

7  reflects my participation over the years in the peer-review

8  process.  In those silly little magazines that my wife

9  complains about, those magazines, or journals as we call them,

10  publish only about 10 percent of the articles that are

11  submitted to them.  They go through a review process, and in

12  particular, for six and a half years, or actually a little

13  more, I served as an editor-in-chief of one of those journals.

14  And my work there is actually quite similar to my work here

15  today.

16  Q.  I know you said you believe it's relevant to this matter.

17              Why do you believe that?

18  A.  Well, what an editor does at these journals, the editor is

19  ultimately the person who decides whether or not a particular

20  article or particular manuscript gets published in the journal,

21  actually goes into print.  There are really two categories or

22  two sets of criteria that the editor has to use.

23              MR. HENN:  Objection, outside the scope of the report.

24              THE COURT:  Well, I think it's all unnecessary.

25              Sustained.

1    Q.  Dr. Steckel, before we get to your opinions, can you tell

2    us what your assignment was in this case?

3    A.  I was asked to provide opinions and commentary on the

4    report submitted by Dr. Erich Joachimsthaler in this case, and

5    I was asked to do it from a marketing and scientific

6    perspective.

7    Q.  If we can pull up DDX 6 and go to slide four.

8              Dr. Steckel, can you explain your conclusions to the

9    jury about Dr. Joachimsthaler's report with reference to the

10   demonstrative on the screen?

11   A.  My overall conclusion is listed at the top there, that his

12   opinions lack scientific basis and are grounded in baseless and

13   incorrect assumptions and a lot of speculation.  To put it

14   simply, his report was a lot of complicated hand-waving as

15   opposed to scientific investigation.

16   Q.  If we can start with the first one on the side, the

17   Three-Stripe Mark is used inconsistently.

18             Can you explain what you mean by that?

19   A.  Yes.  The Three-Stripe Mark that adidas is asserting in

20   this matter is not always used the same way.  Indeed, at least

21   in Dr. Joachimsthaler's report, it's reflected at three

22   different ways:  In the Trefoil, the Badge of Sport, and with

23   the little empirical study he did where the three stripes were

24   going down the sleeves.  I forgot if it was a sweatshirt or a

25   long-sleeve T-shirt.  So at least even within his report, three

1  stripes were used in at least three different ways.

2          I'm sorry.  Do you want me to go on, counsel?

3  Q.  I don't know if you had something to add to that, but...

4  A.  No.  I was going to give a brief description of each of the

5  four.

6  Q.  You can, but we can do it one at a time.

7          Why don't we break it down.

8  A.  OK.

9  Q.  Can you pull up DDX 23.

10         Dr. Steckel, did you review this document in

11  connection with your report?

12 A.  I did.  It's a set of branding guidelines for adidas.

13         MS. SAYOUR:  Your Honor, we would like to offer this

14 exhibit into evidence.

15         MR. HENN:  It's already in evidence, your Honor.

16         THE COURT:  Yes, I think it's already in.

17         MS. SAYOUR:  My apologies.

18         Can we publish it to the jury?

19         THE COURT:  Yes.

20         MS. SAYOUR:  If we can turn to page two.

21 BY MS. SAYOUR:

22 Q.  Dr. Steckel, did you review this page in connection with

23 your opinions?

24 A.  I did.

25 Q.  And can you explain this page?

1  A.   Sure.  This is a page out of the branding guidelines, and

2  it articulates a common belief and common principle across many

3  companies that brands need to be presented to their customer

4  base or potential customer base consistently so that the

5  customers can more easily form expectations of what they will

6  receive when they purchase a product issued by the company.

7  Q.   What does using a mark inconsistently do to the strength of

8  a brand?

9          MR. HENN:  Objection, your Honor.

10          Sidebar, please.

11          THE COURT:  All right.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the sidebar)

2        MR. HENN:  Your Honor, this witness has a multi-page

3   report.  He has one paragraph that references inconsistent

4   branding, brand usage, and at his deposition I specifically

5   asked whether he was going to offer any opinions on this

6   subject.

7        Do you have an opinion one way or the other as to

8   whether the purported inconsistent use of the Three-Stripe Mark

9   has, in fact, limited the strength of adidas' brand assets?

10        His answer:  I do not.  I haven't tested it.  I

11   haven't done the work.

12        So he should not be able to offer --

13        MS. SAYOUR:  I'm not going to ask him -- he obviously

14   testified he didn't do the work.  I simply asked, the question

15   is straight in his report, whether inconsistency can provide

16   obstacles.

17        THE COURT:  I'm having trouble hearing.

18        MS. SAYOUR:  Whether inconsistencies can provide

19   obstacles on the ultimate issue whether it is limited.

20        THE COURT:  Sustained.

21        (Continued on next page)

22

23

24

25

1              (In open court)

2    BY MS. SAYOUR:

3    Q.  We can go back to DDX 6 and turn to page four.  The second

4    point.

5              Dr. Steckel, can you explain what you mean when you

6    say that the adidas brand associations are speculative in the

7    context of Dr. Joachimsthaler's report?

8    A.  Yes.  So as Dr. Joachimsthaler described in his report,

9    brand associations are things that come to consumer's mind when

10   they see a brand name or a logo or some indicia of the brand

11   itself.  If those are things that come to a consumer's mind,

12   the best source of determining what the relevant brand

13   associations are, are the consumers.  It's what they think of

14   when they see adidas or three stripes or anything.

15             In his report, Dr. Joachimsthaler does not really rely

16   on consumer input.  What he does is essentially use his own

17   imagination and intuition to come up with a list of

18   associations that he does not verify by actually asking

19   consumers.

20             To be totally fair, though, to Dr. Joachimsthaler, one

21   of the things he does do is he takes some associations that are

22   described in adidas documents that may or may not come from

23   consumer input, but he doesn't know where those documents get

24   those associations from.  In particular, the documents don't

25   describe any process that was used to obtain those

1    associations.

2           Furthermore, some of those documents that he relies

3    upon are inconsistent in the associations that they present.

4           Furthermore -- well, I'll stop there.

5    Q.  Thank you.

6    A.  I'll stop there.  I don't want counsel to object too

7    frequently.

8    Q.  What are the brand associations Dr. Joachimsthaler

9    identified?

10   A.  Well, as I read through his report, I came up with

11   approximately 28 associations.  Um, and that was through

12   reading through a long text and trying to write them down as I

13   encountered each one.

14          So according to Dr. Joachimsthaler's report, the

15   adidas brand means a lot of things to a lot of people.  But,

16   you know, if you try to be too many things to too many people,

17   then maybe you end up being nothing.  And without getting

18   consumer input, without any empirical evidence, it's hard to

19   verify that any of those associations actually exists.

20          Furthermore, Dr. Joachimsthaler's report describes the

21   principle that in order to be effective, associations have to

22   have three characteristics:  They have to be strong, they have

23   to be favorable, and they have to be unique.  And that's a

24   common set of three criteria that branding scholars point to

25   when trying to identify powerful brands, that they have strong,

1  favorable, and unique associations.

2          The associations --

3          MR. HENN:  Objection, narrative.  Maybe a question?

4          THE COURT:  Well, I'm going to allow it.  I think it's

5  within the context of the overall question, which was, what are

6  the problems with the other witness's report.

7          So you may go ahead.

8          THE WITNESS:  Thank you.

9  A.  The documents that Dr. Joachimsthaler relied upon not only

10  describe associations for adidas, they describe associations

11  for Nike, too, and all the associations that he says

12  differentiate adidas in the marketplace are dwarfed by the

13  degree to which those associations also belong to Nike.

14          So, for example, Dr. Joachimsthaler talks about adidas

15  is a performance product, is a performance brand.  Well, those

16  documents will tell you that it's less of a performance brand

17  than Nike.  Similarly with style and authenticity, and so --

18          THE COURT:  I think that we need now another question.

19          THE WITNESS:  I was finished anyway.

20          THE COURT:  That's really interesting.

21          THE WITNESS:  That's what my students say.

22  BY MS. SAYOUR:

23  Q.  Whether it comes to brand associations, what is your

24  opinion about what Dr. Joachimsthaler did?

25  A.  Actually, my opinion is more directed to what he didn't do,

1    and what he didn't do is collect any empirical evidence as to

2    the -- of his own as to the associations that he says drive the

3    adidas brand.

4    Q.   How do you weaken brand associations, Dr. Steckel?

5    A.   That's a really good question, and it's a question that

6    current research is investigating.  In principle, in theory,

7    you can weaken brand associations by adding a new and desirable

8    association to a particular brand, or maybe you can have

9    another brand that shares an important association, making it

10   less unique.  But the ability to do that and whether or not

11   that happens, depends on a particular brand.

12            I did some studies on Mercedes and Infiniti, two

13   brands, and Mercedes probably being the stronger brand, where I

14   was able to weaken the associations to Infiniti, but not able

15   to weaken the associations to Mercedes.  And that's why you

16   really need empirical evidence.  If you're going to talk about

17   how a brand may get weakened by weakening its associations.

18   Mercedes was very resistent and Infiniti much less so.

19   Q.   If we can turn back to DDX 6 and move on to point three.

20   That's no evidence that Thom Browne and adidas are competitors.

21            Do you have an understanding of how Dr. Joachimsthaler

22   has defined the area of competition for Thom Browne and adidas?

23   A.   As I understand Dr. Joachimsthaler's report, he described

24   Thom Browne and adidas as competitors in the athleisure

25   segment.  That falls into a very common and dangerous trap that

1    people often fall into when they are describing competition.

2    He's describing competition based on physical features that

3    because they both produced athleisure items, they are therefore

4    competitors.

5          Well, if you look at it that way, then Peter Luger and

6    McDonald's are competitors because they both sell hamburgers.

7    Rolls-Royce and Hyundai are competitors because they both

8    manufacturer cars.  The real key to identifying competition is

9    to recognize that people don't buy products, they buy benefits.

10         And if, for example, Thom Browne sells to people who

11   want the benefit, um, the self-expressive benefit of being

12   exclusive, then Thom Browne's competitors are going to be other

13   products athleisure and, otherwise, that people might buy for

14   that same benefit.

15   Q.  If we can turn to the fourth point, no empirical evidence

16   of brand harm.

17         But before we do that, can you describe what empirical

18   evidence is?

19   A.  Empirical evidence is evidence based on neutral, objective,

20   and systematically collected observations that provide a basis

21   for the conclusion.

22   Q.  Why do you need it?

23   A.  Well, empirical evidence is the cornerstone of scientific

24   inquiry.  You need it so that in order to establish an opinion

25   as scientific and not speculative.  Without empirical evidence

1   and just hearing somebody's opinion, then the basis for that

2   opinion is what I often refer to as "because I said so."

3   Q.  So what is your response to Dr. Joachimsthaler's opinions

4   on harm to the adidas brand because of Thom Browne?

5   A.  It's speculative.  There is no empirical evidence.  It's

6   overly complicated by some jargon about associative networks

7   interfering, overlapping, blurring, etc.  And he has no

8   empirical evidence other than his own imagination that that is

9   what is happening.

10  Q.  I think you understand that plaintiff alleges that

11  Mr. Poret has proffered a survey that is empirical evidence?

12  A.  Well, I have not examined Mr. Poret's survey, but I do

13  understand that it is supposedly -- or the proffer is that it

14  indicates post-sale confusion.

15           Post-sale confusion is really different.

16           MR. HENN:  Objection, outside the scope.  He's just

17  said he didn't look at the survey.

18           THE COURT:  No, I think he's on to a different point

19  now.

20           Overruled.

21  A.  Post-sale confusion is a construct that's different than

22  the type of brand harm that Dr. Joachimsthaler was talking

23  about in his report.

24  Q.  So in your opinion, is Mr. Poret's report empirical

25  evidence of harm to the adidas brand?

1    A.  No.

2              MS. SAYOUR:  I have no further questions.

3              THE COURT:  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. HENN:

6    Q.  Hello, Dr. Steckel.

7    A.  Good afternoon, Mr. Henn.  It's good to see you again.

8    Q.  It's good to see you again.

9              THE COURT:  Well, if you guys want to go out and have

10   a drink, I don't want to continue with this trial.

11             THE WITNESS:  You can join us.

12   BY MR. HENN:

13   Q.  You critiqued Dr. Joachimsthaler for doing, I think you

14   said, hand-waving and not basing his opinion on science.

15             Is that a fair summary of what you said?

16   A.  I think that's fair, yes.

17   Q.  And you have a master's and Ph.D.s in statistics, and you

18   have taught quantitative methods; yes?

19   A.  Among other things.

20   Q.  But in this case you didn't do any surveys, did you?

21   A.  No, that was not per my assignment.

22   Q.  You didn't to any of your own empirical research to measure

23   whether there's an impact from what Thom Browne is doing, did

24   you?

25   A.  That's right.  It was not my assignment.

1   Q.  No one even asked you to look at whether what Thom Browne

2   is doing doesn't hurt adidas, did they?

3   A.  That's right.

4   Q.  And you're not offering any opinion here that what Thom

5   Browne is doing doesn't hurt adidas, correct?

6   A.  Oh, that's a really good question and a really good point.

7   My assignment was to comment on Dr. Joachimsthaler's analysis,

8   not on the subject matter of the case.

9   Q.  So, in other words, you're not offering an opinion here

10  today as an expert that what Thom Browne has done did not harm

11  adidas, correct?

12  A.  That is correct.

13  Q.  And you mentioned in your direct that you designed this

14  whole study to measure Mercedes and Infiniti and what the

15  impact might be on those brands in the context of dilution,

16  correct?

17  A.  Yes, that was academic research.

18  Q.  But you didn't run that study here to do any measurement

19  with regard to adidas and Thom Browne?

20  A.  That is correct, I did not.

21  Q.  But Dr. Joachimsthaler is doing the hand-waving?

22  A.  Yes.

23  Q.  OK.  You also have no opinion in this case as to whether

24  the Three-Stripe Mark is or is not similar to the four bars or

25  the Grosgrain, correct?

1  A.  Oh, that is correct.  I don't have that opinion, and that's

2  another thing Dr. Joachimsthaler hand-waves about, whether the

3  Three-Stripe Mark or the three stripes is similar to the Thom

4  Browne mark.  He just assumes it is.

5  Q.  Well, you would agree that similarity is an empirical

6  question that can be tested with a survey, right?

7  A.  I do.

8  Q.  And yet you didn't even look at Mr. Poret's survey?

9  A.  Because -- that's right.  I didn't look at his survey

10  because it was about a different issue than the one

11  Dr. Joachimsthaler opined on.

12  Q.  Well, you would agree with me that if you show someone a

13  Thom Browne product and you ask them who puts it out and they

14  say adidas, that they obviously thought the stripes were

15  similar, right?

16  A.  I think that's a matter of logic, but not necessarily.

17  Someone could think that all products of that type are put out

18  by adidas.

19  Q.  And that's why an empirical research, we have a control to

20  solve for that, right?

21  A.  In a well-designed study, I think that's fair, yeah.

22  Q.  And so then you would be able to isolate the active

23  ingredient, if you will, and see whether that is what is

24  causing the confusion?

25  A.  Well, as I understood Dr. Joachimsthaler's report was about

1    dilution and brand weakening, not confusion, and that's why I

2    didn't look at Mr. Poret's study.

3    Q.  You understand that in order for someone to see a Thom

4    Browne product and say adidas put that out, that they had to

5    necessarily activate their adidas memory network?

6              MS. SAYOUR:  Objection, outside the scope.

7    A.  Yeah, that's --

8              THE COURT:  Wait a minute.  There's an objection.

9              THE WITNESS:  Sorry.

10             THE COURT:  Overruled.

11   A.  I'm sorry.  Can you repeat the question, please?

12   Q.  Sure.  We're talking about empirical evidence and a

13   situation in which a survey is conducted and respondents are

14   exposed to Thom Browne's products, and they say adidas put it

15   out.

16             You would agree that those respondents necessarily

17   activated their adidas memory network, correct?

18   A.  Not necessarily.  They could have just activated an adidas

19   node that was in some memory network.  But, you know, I don't

20   think the -- I don't necessarily subscribe to the situation

21   that you're describing.

22   Q.  Well, let's talk about some of the principles that you say

23   are mere speculation in Dr. Joachimsthaler's opinion.

24             First, you agree with me that Gestalt principles are

25   well-established?

1   A.  I think there's a branch of psychology called Gestalt

2   psychology that is totally unnecessary to analyze the

3   situations in this case.

4   Q.  My question, sir, is do you agree that Gestalt principles

5   are well-established in psychology?

6   A.  I think it's a branch of psychology that has gained fairly

7   widespread acceptance.

8   Q.  And it's, in fact, well-established, isn't it?

9           THE COURT:  Well, no objection was raised.

10          Are you a psychologist?

11          THE WITNESS:  No.

12          THE COURT:  All right.  The silently made objection is

13  sustained.

14          MR. HENN:  Fair enough.

15  BY MR. HENN:

16  Q.  Well, let's talk about brands.

17          You agree that strong associations to the brand in

18  memory create a brand's image?

19  A.  Yes.

20  Q.  And that the most important associations reflect attributes

21  and benefits?

22  A.  Yes.  But I'm not sure I put them on equal footing.

23  Q.  You agree that, I think you said on direct, people don't

24  buy products, they buy benefits, right?

25  A.  I did.

1   Q.  Including self-expressive benefits?

2   A.  Absolutely.

3   Q.  And that basically means if I want to feel good about

4   myself, I might buy a red sports car because I just turned 50,

5   and that makes me feel good.  That's a self-expressive benefit

6   from the car?

7   A.  Well, self-expressive benefit would be more specific.

8   Might make me feel young.

9   Q.  Fair.  But that's what you mean when you say benefit?

10  A.  That's one class of benefit, just like drilling a hole in

11  the wall is another class of benefits for Black & Decker

12  drills.

13  Q.  And you agree with Dr. Joachimsthaler that adidas and Thom

14  Browne offer their respective consumers different self-

15  expressive benefits, correct?

16  A.  Well, I think that's likely, but I think one would want

17  empirical evidence of that.

18  Q.  You think it's likely that they have different self-

19  expressive benefits?

20  A.  That would be my hypothesis.

21  Q.  Did you do any work of your own to try and determine what

22  self-expressive benefits consumers of either adidas or Thom

23  Browne may have?

24  A.  No.  But neither really did Dr. Joachimsthaler.

25  Q.  With regard to harm, you would agree that a junior user of

1   a similar mark can impair or harm the senior user's trademark?

2   A.  I will agree with that, especially since the word is "can"

3   and not "will."

4           MS. SAYOUR:  Objection, your Honor.

5   Q.  And you agree that --

6           THE COURT:  Wait a minute.  There was an objection.

7   Hold on a moment.

8           What was the ground of the objection?

9           MS. SAYOUR:  Scope.

10          THE COURT:  Overruled.

11  BY MR. HENN:

12  Q.  You also agree that one way a junior user can harm the

13  senior user's mark is that the senior user's brand awareness

14  and fall as a result of what the junior user has done?

15  A.  I think that's theoretically possible.  I think that's

16  extremely unlikely, and I've written as such.

17  Q.  You also have written that one way a junior user can harm

18  the senior user's mark is that the marketing and sale of the

19  junior user's goods renders the associations with the senior

20  user less favorable?

21  A.  That is theoretically possible from the strong favorable

22  and unique characterization of associations.  But in order to

23  determine whether or not that happens, that is why you need

24  empirical evidence.

25  Q.  Another way a junior user can harm the senior user is brand

1   associations formerly belonging to the senior user can become

2   shared between two different brands?

3   A.   Yes.  I think that, again, is theoretically possible, but

4   it didn't happen between -- in Mercedes, it did happen for

5   Infiniti.  And, again, it's another reason you need empirical

6   evidence and not hand-waving.

7   Q.   And each of those -- loss of awareness, associations being

8   less favorable, and being shared across the brands -- each of

9   those results in a loss in brand equity, correct?

10  A.   If it happens, yes.

11  Q.   In this case I think you characterized Dr. Joachimsthaler's

12  discussion of the memory networks as -- well, I forget the

13  derogative term you used.

14         You basically said you didn't like it, fair?

15  A.   I think the words I used were complicated and overly

16  complicated and speculative.

17  Q.   In this case, you didn't attempt to create any map of an

18  associative memory network for the adidas brand?

19  A.   No.  And if I were working for you, I wouldn't have either,

20  because it's a much simpler question of collecting

21  associations.  You don't need to model the network.

22  Q.   And you also didn't do any effort to create a model for

23  what Thom Browne's associative memory network might look like?

24  A.   That's right.  I didn't for the same reason.

25  Q.   With regard to surveys and empirical evidence, you did not

1   critique the methodology that Dr. Joachimsthaler employed with

2   regard to his three-stripe survey, correct?

3   A.  The one, the recognition survey?

4   Q.  Yes.

5   A.  I did not.

6   Q.  You would agree with me that the principle of spreading

7   activation or activation spreading is well-established in a

8   consumer psychology?

9   A.  I think it's a useful framework from which a lot of

10  branding theory has been derived.  Yes, I would agree.  I'm

11  sorry, I'll agree with that.

12  Q.  And you agree that when there are similar stimuli, similar

13  visual stimuli presented, there can occur spreading activation?

14  A.  It's an empirical question.  I presume it's possible, but

15  there is no evidence that any of that happened here.

16  Q.  But you didn't look at the Poret survey?

17  A.  The Poret survey was on post-sale confusion.  I don't see

18  how that has anything to do with spreading activation.

19  Q.  You weren't here for Dr. Joachimsthaler's testimony, right?

20  A.  Um, I was told I was not permitted to be.

21          THE COURT:  Yes.

22          MS. SAYOUR:  Objection, your Honor.

23          THE COURT:  The jury should understand that all

24  witnesses are excluded while other witnesses are testifying, so

25  he could not have been here even if he wanted to.

1          THE WITNESS:  And I did want to.

2          THE COURT:  Well, there is no accounting for that.

3   BY MR. HENN:

4   Q.  Dr. Steckel, the image of people in your field acknowledge

5   spreading activation, correct?

6   A.  I think that's fair.  I think the majority of people who

7   study brands use spreading activation as one of the tools that

8   they use to analyze the theory that they develop.

9   Q.  And one of the risks of shared activation is the generally

10  accepted principle that when the information presented to

11  consumers is not consistent with the inferences that aid their

12  judgment, subsequent messages from the brand might be

13  dismissed?

14  A.  Counsel, I think you need to repeat the question.  I am not

15  sure you used the terminology you wanted to.

16  Q.  Fair enough.  I'll repeat it.

17          You would agree with me, wouldn't you, that one of the

18  risks of shared activation, in other words where they are

19  sharing the connection, is the generally accepted principle

20  that when the information presented to consumers is not

21  consistent with the inferences that aid their judgment,

22  subsequent messages from the brand might be dismissed?

23  A.  Oh, I think that's a principle that is much more general

24  than the context that you're describing, that whenever people

25  in general see information that is inconsistent with their

1    prior beliefs, they will resist that information.

2    Q.  And although you didn't do --

3    A.  I --

4    Q.  I'm sorry.

5    A.  Go ahead.

6            THE COURT:  Before anything goes further, we're just

7    about at the end of today, so I think we'll have to continue

8    all this tomorrow.

9            So, ladies and gentlemen, we made great progress

10   today.  We're on schedule.  To stay on schedule, we'll start at

11   nine o'clock tomorrow.

12           So we will see you at nine o'clock.  Have a very good

13   evening.

14           MR. HENN:  Two questions.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You can step down.  We'll see you at nine.

3          THE WITNESS:  I'll be here.

4          (Witness temporarily excused)

5          THE COURT:  All right.  Please be seated.

6          I have a 4:30 other matter, but I don't see yet all

7    counsel for that matter, so we can continue a little bit with

8    the discussion.

9          The question I had asked towards the very end of the

10   last discussion was:  What's the relevance of willfulness in

11   this case?

12         MR. HENN:  Three reasons it's relevant.

13         First, it is a defense to the defense of laches.  So

14   if the jury were to say that adidas unreasonably delayed and

15   that there was evidence, sufficient evidence of material

16   prejudice, but found the infringement to be willful, laches

17   doesn't apply.  So that's the first reason.

18         THE COURT:  All right.

19         MR. HENN:  The second reason is that although the

20   *Romag Fasteners* Supreme Court said wilfulness is no longer a

21   requirement for an award of profits, the way it used to be in

22   the Second Circuit, they indicated it is still a factor that a

23   jury -- or the court will rather, since it is equitable

24   relief -- that the court may consider in determining whether to

25   make an award of profits.

1          And then the final would be adidas does have in its

2     scope of relief a claim for fees under the Lanham Act, which

3     one of the factors that the court is permitted to look at in

4     that is whether the infringement was --

5          THE COURT:  That's for the jury.

6          MR. HENN:  No, that's not for the jury.

7          But a jury finding of willfulness could advise on

8     profits and on, ultimately, a fee award post trial.

9          THE COURT:  That's very helpful.

10          Now I do see the lawyers for the next matter, so we

11    will see you all.  I think we won't ask you to come in before

12    9:00.  We will start promptly at nine o'clock tomorrow.

13          (Adjourned to January 11, 2023, at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                          Page

 RODRIGO BAZAN

Cross By Mr. Henn . . . . . . . . . . . . . . 989

Redirect By Mr. Maldonado . . . . . . . . . .1005

 ROBERT CHILDS

Direct By Mr. Maldonado . . . . . . . . . . . 618

Cross By Mr. Flemming . . . . . . . . . . . 647

 LUCAS LANGELLIER

Cross By Ms. Nelson . . . . . . . . . . . . . 693

Redirect By Ms. Sayour . . . . . . . . . . . 710

 JOANNE ARBUCKLE

Cross By Mr. Flemming . . . . . . . . . . . 757

 JOEL STECKEL

Direct By Ms. Sayour . . . . . . . . . . . . 763

Cross By Mr. Henn . . . . . . . . . . . . . . 779

PLAINTIFF EXHIBITS

Exhibit No.                            Received

 1321   . . . . . . . . . . . . . . . . . . . 991

 1322   . . . . . . . . . . . . . . . . . . . 995

 1323   . . . . . . . . . . . . . . . . . . . 996

 1324   . . . . . . . . . . . . . . . . . . . 997

 222   . . . . . . . . . . . . . . . . . . . 998

 852   . . . . . . . . . . . . . . . . . . . 999

 999   . . . . . . . . . . . . . . . . . . . .1001

1    219 . . . . . . . . . . . . . . . . . . . .1002

2    217 . . . . . . . . . . . . . . . . . . . .1003

3    218 . . . . . . . . . . . . . . . . . . . .1004

4    253 and 1314 . . . . . . . . . . . . . . . 618

5    884 . . . . . . . . . . . . . . . . . . . . 650

6    649 . . . . . . . . . . . . . . . . . . . . 703

7    837 . . . . . . . . . . . . . . . . . . . . 704

8    894 . . . . . . . . . . . . . . . . . . . . 706

9    140, 141 and 142 . . . . . . . . . . . . . 714

10   1330 . . . . . . . . . . . . . . . . . . . 758

11   826 . . . . . . . . . . . . . . . . . . . . 762

12                   DEFENDANT EXHIBITS

13   Exhibit No.                              Received

14   82, 122 through 127, 140, 141, 142, 144 . . . 618

15           through 147, 153, 375, 376,

16           and 460

17   83 . . . . . . . . . . . . . . . . . . . . 633

18   95 . . . . . . . . . . . . . . . . . . . . 677

19   470 through 492 . . . . . . . . . . . . . . 679

20   493 through 510, 511 through 526, 595 . . . . 680

21           through 616, 617 through 633,

22           735 through 746

23   97 . . . . . . . . . . . . . . . . . . . . 684

24   98 . . . . . . . . . . . . . . . . . . . . 685

25   99 . . . . . . . . . . . . . . . . . . . . 685

1    188 . . . . . . . . . . . . . . . . . . . 688

2    189 . . . . . . . . . . . . . . . . . . . 689

3    190 . . . . . . . . . . . . . . . . . . . 689

4    333 . . . . . . . . . . . . . . . . . . . 690

5    334 . . . . . . . . . . . . . . . . . . . 691

6    335 . . . . . . . . . . . . . . . . . . . 692

7    22 . . . . . . . . . . . . . . . . . . . 714

8    372 . . . . . . . . . . . . . . . . . . . 720

9    404 . . . . . . . . . . . . . . . . . . . 724

10   264 . . . . . . . . . . . . . . . . . . . 729

11   242 . . . . . . . . . . . . . . . . . . . 731

12   210 . . . . . . . . . . . . . . . . . . . 731

13   239 . . . . . . . . . . . . . . . . . . . 734

14   235 . . . . . . . . . . . . . . . . . . . 735

15   303 . . . . . . . . . . . . . . . . . . . 739

16   206 . . . . . . . . . . . . . . . . . . . 740

17   200 . . . . . . . . . . . . . . . . . . . 741

18   228 . . . . . . . . . . . . . . . . . . . 742

19   257 . . . . . . . . . . . . . . . . . . . 742

20   223 . . . . . . . . . . . . . . . . . . . 743

21   213 . . . . . . . . . . . . . . . . . . . 744

22   227 . . . . . . . . . . . . . . . . . . . 745

23   204, 269, and 266 . . . . . . . . . . . . 753

24   408 . . . . . . . . . . . . . . . . . . . 767

25