N1BsADI1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ADIDAS AMERICA, INC., an Oregon corporation;
and ADIDAS AG, a foreign entity,

                    Plaintiffs,

          v.                          21 Civ. 5615 (JSR)

THOM BROWNE, INC., a Delaware corporation,

                    Defendant.

------------------------------x

                                      New York, N.Y.
                                      January 11, 2023
                                      9:00 a.m.

Before:

                    HON. JED S. RAKOFF,

                                      District Judge
                                      -and a Jury-


                         APPEARANCES

KILPATRICK TOWNSEND & STOCKTON LLP
      Attorneys for Plaintiffs
BY:  R. CHARLES HENN, JR.
     H. FORREST FLEMMING III

WOLF GREENFIELD & SACKS, PC
      Attorneys for Defendant
BY:  ROBERT MALDONADO
     HARLEY LEWIN
     BRYAN CONLEY
     TONIA SAYOUR
     MARIE McKIERNAN


ALSO PRESENT:
NITA GRAY, adidas paralegal
MICHAEL PUSTERLA, Thom Browne paralegal

N1BsADI1

1    (Trial resumed; jury not present)

2    THE COURT:  Just before we begin, two things.

3    One is there is a request from the jury that we go

4    without a break until the conclusion at 12, or maybe even

5    earlier at the rate we're going.  That seems fine.

6    I think everyone recognizes -- but I'll hear from you

7    later if you disagree -- that laches is ultimately, the defense

8    of laches is ultimately for the court.  It's an equitable

9    defense.  And for that reason, you may recall that in the very

10   first version of the draft of the preliminary instruction that

11   I gave to you, I didn't mention laches at all.  And then

12   defense counsel said, well, we would like to have laches in

13   there.  And I thought, well, OK, we can take an advisory

14   verdict from the jury on that issue since, in any event, we're

15   going to have one trial that covers everything.

16   But in thinking about it further, I think we're

17   already imposing too much on the jury without burdening them

18   with that.  So I am inclined to tell them that laches is

19   something that will not be decided by them and, therefore,

20   we'll revise the charge accordingly.

21   Also, this is not something I thought about

22   previously, but I thought about it last night.  I'm wondering

23   whether loss profits is also a judge issue, not a jury issue,

24   in which case I would not give that to the jury either.  So

25   this, I think, would simplify things for the jury.  It would

1    just be the two substantive counts plus damages and actual

2    damages.

3            But anyone disagree with that?

4            MR. HENN:  Well, on behalf of us, you are correct that

5    laches is an equitable defense.  The court should rule on it.

6    We have no issue with you simply taking that issue, now that

7    you've heard the evidence, and making that decision.

8            Profits is a little different in the way the trademark

9    cases have dealt with it.  Yes, it is an equitable remedy.

10   However, the case law is pretty clear that in cases where there

11   is both legal and equitable relief sought from the -- well,

12   from the case, and the parties try those issues to the jury,

13   the jury goes ahead and awards both amounts.  The court can

14   then, after the verdict, adjust that as it sees fit because the

15   statute specifically says that the profits award is to be

16   subject to the principles at equity.

17           THE COURT:  Well, we'll discuss that further then.

18   The jury is obviously anxious to get going.  I am going to take

19   laches from the jury.

20           But let me hear first from defense counsel.

21           MR. MALDONADO:  So we believe as to laches that there

22   are some underlying factual issues that the jury should

23   consider and perhaps even decide, including when, as your Honor

24   had raised previously, when the defendant should have known

25   about -- the plaintiff should have known about defendant's

1    activities.

2              So we believe that we want to be able to include that

3    as part of our story, the laches defense.

4              THE COURT:  That may be, but it's not --

5              Do you disagree that laches is for the court to

6    decide?

7              MR. MALDONADO:  I do not disagree with that, your

8    Honor.

9              THE COURT:  All right.  I'm going to take it from the

10   jury.

11             All right.  Let's bring in the jury.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2            THE COURT:  Let's get the witness back on the stand.

3            Good morning, ladies and gentlemen.  Thank you, as

4    always, for your promptness.

5            You may recall from my preliminary instruction that

6    there was a reference to the issue of delay, and you may even

7    recall that legally, at some times, was called the defense of

8    laches of delay.  You've heard some evidence relating to that,

9    whether the plaintiff delayed too long in bringing this case,

10   and so forth.

11           After consultation with counsel it has been determined

12   that that is not an issue that you need to decide.  So that's

13   no longer a part of the case.  When you get my detailed

14   instructions tomorrow, you'll see that it's no longer the case.

15   So far as you're concerned, the case is simply going to be the

16   plaintiff has proven infringement and/or dilution, and if so,

17   what actual damages you need to award for that.  But delay is

18   no longer part of the case.

19           So I just wanted to alert you to that, and you'll see

20   in much more detail my instructions tomorrow.

21           So go ahead, counsel.

22   CROSS-EXAMINATION

23   BY MR. HENN:

24   Q.  Morning, Dr. Steckel.  I just want to pick up where we left

25   off yesterday and clarify a few things about what you are not

1  offering an opinion on here in court.

2          All right?

3  A.  I understand.

4  Q.  I understand you are not offering any opinion that

5  Thom Browne's use of these stripe designs does not create a

6  likelihood of confusion?

7  A.  That is correct, I am not.

8  Q.  You are not offering any opinion what Thom Browne has done

9  does not create a likelihood of dilution?

10  A.  That is correct, I am not.

11  Q.  You are not offering any opinions on the similarity of the

12  Three-Stripe Mark to the Thom Browne stripe designs?

13  A.  That is correct, I am not.

14  Q.  You're not offering any opinions concerning Mr. Poret's

15  survey or Dr. Joachimsthaler's methodology of his survey?

16  A.  That is correct, I am not.

17  Q.  You are also not offering any professional opinion in this

18  case that adidas is not a strong brand?

19  A.  That is correct, I am not.

20  Q.  And you're also not offering any opinions on whether the

21  Three-Stripe Mark is famous or not?

22  A.  Correct.

23          MR. HENN:  No further questions.

24          THE COURT:  Redirect?

25          MS. SAYOUR:  Nothing further, your Honor.

1   THE COURT:  Thank you very much.  You may step down.

2   Please call your next witness.

3   (Witness excused)

4   MR. MALDONADO:  The defense calls Basil Imburgia.

5   MR. HENN:  We need a quick sidebar on this one.

6   THE COURT:  All right.

7   (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2         THE COURT:  By the way, on the subject we were just

3    going over, I will have a much further discussion, but I have

4    not yet decided whether the facts relating to delay are still

5    something defense counsel can talk to the jury about as bearing

6    on some of the other issues in the case.

7         So I'm not ruling out that possibility.

8         MR. MALDONADO:  Thank you.

9         THE COURT:  OK.  But we'll discuss that further.

10        Yes?

11        MR. HENN:  The issue we have -- and this has just come

12   to our attention -- last week on Friday, all day there was a

13   bald man sitting in the back of the courtroom.  We have no idea

14   who he was.  As he was leaving the courtroom, we noticed that

15   on his briefcase he had the logo of FTI.  That is the company

16   that this witness works for.

17        We looked up this guy online, and it turns out he

18   works with the next witness.  We can't think of any good reason

19   why he was listening to testimony last week.

20        THE COURT:  Well, it doesn't matter unless he

21   discussed the testimony.

22        MR. HENN:  That's why I wanted to raise it.

23        THE COURT:  So is he still in the courtroom now?

24        MR. CONLEY:  No.  He was our graphics person.  He has

25   nothing to do with our knowledges expert.

1          MR. HENN:  Then I don't have a concern.

2          THE COURT:  OK.

3          (Continued on next page)

1           (In open court)

2           THE COURT:  Let's get the witness on the stand.

3    Please remain standing and raise your right hand.

4     BASIL ANTHONY IMBURGIA,

5         called as a witness by the Defendant,

6         having been duly sworn, testified as follows:

7           State your full name and spell it for the record.

8           THE WITNESS:  Yes.  My name is Basil Anthony Imburgia

9    and it is B-a-s-i-l and the last name is I-m-b-u-r-g-i-a.

10          THE COURT:  Counsel.

11          MR. CONLEY:  Before we begin the examination, your

12   Honor, we have a number of stipulated exhibits for admission.

13   I can read those into the record?

14          THE COURT:  Go ahead.

15          MR. CONLEY:  Defendant's Exhibit numbers 128, 163,

16   164, 165, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440,

17   441, 442, 899, 900, 901, 903, 805 and 897.

18          THE COURT:  Received.

19          (Defendant's Exhibits 128, 163, 164, 165, 431, 432,

20   433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 899, 900,

21   901, 903, 805 and 897. received in evidence)

22   DIRECT EXAMINATION

23   BY MR. CONLEY:

24   Q.  Good morning, Mr. Imburgia.

25          You prepared a set of slides to assist us with your

1    testimony today?

2    A.  Yes.

3    Q.  If we can have DTX 10, please.

4            Are these those slides?

5    A.  Yes.

6    Q.  Could you please introduce yourself to the jury?

7    A.  Yes.  My name is Basil Imburgia.  I am a senior managing

8    director at the firm of FTI Consulting.  FTI Consulting has

9    about 7,000 consultants, and it's a global consulting firm and

10   the North American leader of the forensic and lead services

11   segment.  I'm a certified public accountant, certified fraud

12   examiner, and certified in financial forensics.  And I have

13   over 30 years of accounting and consulting experience.

14           I was formerly a partner at PriceWaterhouseCoopers and

15   KPMG, two of the four big accounting firms.  And I've been with

16   FTI for the past 20 years or so.  And I'm a member of the

17   American Institute of Certified Public Accountants, the New

18   York State Society of Certified Public Accountants.  And I'm

19   currently on the Merger and Acquisition Disputes Task Force of

20   the AICPA.  And in 2000 and 2001, the chairman of the New York

21   State Society of CPAs Litigation Services Committee.

22   Q.  Can you please tell the jury a little bit about your

23   experience as it relates to cases like this?

24   A.  Yes.  I started my career doing a lot of financial

25   statement audits and worked with a lot of apparel, retail,

1  textile-type companies.

2          For two years I worked on the Allied Federated

3  Bankruptcy.  Many of those retail stores were acquired,

4  ultimately by Macy's, a long time ago.  There were a lot more

5  retail stores, like A&S and Johnny Wanamaker's and Stern's, and

6  a lot of those locations got acquired by Macy's.  So I worked

7  in the retail area for two years on that restructuring and

8  bankruptcy.

9          The items in green on the chart are where I've done

10  different types of profit calculations or damage calculations

11  in litigation or arbitration.  And the ones that are in yellow

12  that just popped up are audit clients I had, like Tommy

13  Hilfiger, Murjani, Jordache, and Escada.  I had to audit the

14  books and records of those companies.

15  Q.  If we can pull up DTX 897, please.

16          Mr. Imburgia, do you recognize DTS 897?

17  A.  Yes.  That's my c.v.

18  Q.  Is it accurate?

19  A.  Yes.

20  Q.  Could you tell the jury what you were asked to do in this

21  case?

22  A.  Yes.  I was asked to -- anytime you're doing some kind of

23  damage analysis, you have to assume liability.  So I assumed

24  that the accused products are infringing on the mark and those

25  kinds of things.  You have to make an assumption.  I have to

1  assume harm because that's the reason why I would go in and do

2  a damage calculation.

3        So I was asked to do a profits calculation on the

4  sales of accused products, and I was also asked to analyze

5  royalties as an alternative and review the report presented by

6  adidas' expert, Mr. Plumpe.

7  Q.  If we can go back to slide four.

8        Could you provide a high-level summary of your opinion

9  as it relates to your profits analysis?

10  A.  Yes.  My summary opinion is the profits from the sales of

11  accused products are $1,751,705, and those are profits for the

12  period 2015 through 2022 on approximately $15.6 million of

13  accused product sales.

14  Q.  Let's discuss how you arrived at that conclusion.

15        Could you please explain how you began your analysis?

16  A.  Yes.  So when you're doing a profits calculation, first

17  thing you need to do is identify sales.  So the sales for the

18  accused products from 2015 through 2022, identify the company

19  did an analysis looking at probably 128 SKUs, stock keeping

20  units that are accused in the case.  They do a drill down and

21  look at their information, their books and records, and they

22  identify those sales.

23        The second thing that has to happen is you have to

24  look at cost of goods sold.  Thom Browne in the U.S. actually

25  buys product that are manufactured for them.  So there is an

1   invoice price reflecting the purchases of those products,

2   that's the cost of goods sold, that gets deducted as an

3   expense.  Then there is certain costs that vary with sales, so

4   as sales increase, those costs increase.  Those have to be

5   identified and deducted.  And then you look at what we have

6   down here as needed controllable costs.  These are costs below

7   the variable cost line, and you have to go through and identify

8   which of those costs are needed to produce and sell accused

9   products.

10          So I went through analyzed those costs.  I analyzed

11  what costs should be included in the controllable costs and

12  which costs should be excluded, and then deducted the ones that

13  should be included because they were needed to produce and sell

14  the accused products.

15  Q.  So how did you arrive at your total profits numbers?

16  A.  So the profit number that you see here for the '15 through

17  '22 period of 1.7 million approximately, what I did is I added

18  up the cost of sales, I added up the variable expenses, and I

19  added up the controllable expenses that were needed.  And those

20  became the expenses I deducted from sales to get to profits.

21  Q.  All right.  Let's start with sales.

22          How did you identify sales of accused products from

23  2015 to 2022?

24  A.  So the company, the Thom Browne entity, their CFO and head

25  of business intelligence did an analysis based on the SKUs that

1   were alleged or the accused SKUs, and they did a drill-down

2   analysis.  So they identified sales from 2015 through 2022 by

3   different channel.

4        So you'll see this chart breaks the channels up:

5   Wholesale, retail and e-commerce.  So wholesale is if Thom

6   Browne in the U.S. is selling to Nordstrom's products.  That's

7   the wholesale sales.  The retail sales are the sales made by

8   the Thom Browne retail stores in the U.S.  And then e-commerce

9   is our sales that are made through web kind of orders.

10  Q.  Is that summary of sales reflected in DTX 899?

11  A.  Yes, it is.

12  Q.  Let's move to cost of goods sold.

13       How did you arrive at the total cost of goods sold or

14  COGS?

15  A.  So the cost of goods sold is the invoice price charged from

16  the manufacturer to the Thom Browne U.S. entity.  So I was able

17  to, from the Thom Browne U.S. financial statements, I was able

18  to pick up what the cost of goods sold was.  Mr. Plumpe deducts

19  cost of goods sold; I deduct cost of goods sold, so we agree on

20  that deduction.

21       Mr. Plumpe stops at gross profit.  I needed to go

22  further than that, and so I analyzed those other expenses that

23  I discussed.  My cost of goods sold figure was a deduction of

24  about 55 percent of sales; Mr. Plumpe's was 57.  So my number

25  was less of a deduction, so it was more conservative.

1    And then one thing that was important, this last

2    bullet point is I needed to understand the mix of sales for the

3    accused products versus the overall U.S. entity, and my next

4    chart does that.

5    Q.  If we can go to the next slide, please.

6    Tell us about the chart we see here.

7    A.  Yes.  What I wanted to be able to do is look at the overall

8    sales of U.S. products from '15 through 2021 and there is

9    approximately -- this is Thom Browne in the U.S. -- there is

10   approximately $119 million of total product sales.  And since

11   the profit-and-loss statements I had were for the total U.S.

12   company, I wanted to make sure that the sales mix of the sales

13   channels for the accused products were similar.

14   And what I found is that approximately 50 percent of

15   the accused products went through the wholesale channel, 25

16   percent roughly the retail channel, and 25 or so percent the

17   e-commerce channel.

18   The reason is because when I'm looking at total

19   expenses for the business, I need to make sure that if I'm

20   looking at a total expense, that it would be similar as an

21   expense for the accused products.  And the mix tells me that I

22   can use the overall financial statements as a good proxy for

23   calculating expenditures.

24   Q.  How did you go about determining Thom Browne's gross

25   profits on sales of the accused products?

1    A.  So the first thing you typically look for is, does Thom

2    Browne have any product line P&Ls where they are actually

3    calculating by product profit and loss, and they didn't have

4    those statements historically prepared or available.

5            So what I needed to do is obtain an understanding of

6    the historical financials.  And what I found is that from 2015

7    through 2018, the gross profit percentages were inconsistent.

8    They ranged from 22 to 66 percent.  There was some grouping

9    issues that management talked about where things were

10   inconsistently grouped in the early periods.

11           So what I ended up looking at was 2019 through 2021,

12   and I saw that the cost of goods sold and the gross profits

13   were historically consistent in those years.  And those were

14   also for 2020 and 2021.  Those were years that this entity was

15   audited by Deloitte & Touche.  After an acquisition in 2018,

16   there was an SAP system put in place for 2020 and 2021, where

17   the groupings were similar, that management felt that these

18   financials were the best and most accurate from a

19   consistency/reliability standpoint.  And as I said, audited by

20   one of the big four accounting firms.

21           So we decided, based on our discussions with

22   management, that 2020 and 2021 were the income statements for

23   Thom Browne that we should utilize to calculate profits.

24   Q.  And what did you do next in your profits analysis?

25   A.  So we went to the Thom Browne, Inc. -- that's the U.S.

1    entity -- and we saw that the Thom Browne, Inc., financial

2    statements for '19, '20 and '21 were losing money from an

3    operating standpoint.  The reason for that is many of the

4    marketing functions, the public relations, the communication

5    functions since Thom Browne started in the U.S., a lot of those

6    departments service not only the U.S. entity with customer

7    communications and marketing and things like that, they service

8    the globe.

9            So when you take those expenditures and deduct those

10   from the U.S. gross profit, it creates a negative number.  So

11   because of that and our obtaining an understanding from

12   management that the U.S. entity and those kinds of marketing

13   expenditures and things like that service the global business,

14   and many of the global expenditures actually service the global

15   business plus the U.S. business, we looked at controllable

16   expenses on a total global company basis and then allocated

17   that back to the specific accused products.

18   Q.  Tell us a little bit more about how you went about

19   deducting costs.

20   A.  So these are the categories of expenses that I previously

21   discussed.  Cost of goods sold, that the invoice price that the

22   U.S. pays for the products they are selling.  So I was able to

23   source that from a Thom Browne U.S. profit-and-loss statement.

24   The variable expenses, these are the expenses that move with

25   sales up or down that vary.  As you sell more, you're going to

1    incur more expenses.  Those available expenses I was able to

2    source from the Thom Browne U.S. profit-and-loss statement as

3    well.

4            The controllable expenses, those are the ones I used

5    the global profit-and-loss statement because of the fact that

6    the Thom Browne U.S. financial statement actually showed a

7    loss.  So this was a more conservative way to look at the

8    controllable expenses.

9            And then things like fixed rent, variable rents and

10   occupancy costs, I was able to use the Thom Browne U.S. to

11   identify those categories of expenses.

12   Q.  All right.  Let's start with cost of goods sold.

13           What did you ultimately conclude there?

14   A.  My conclusion after looking at the profit-and-loss

15   percentages from Thom Browne U.S. financial statements are that

16   the cost of goods sold in '20 and 2021 were pretty similar.

17   They were about 55 percent or so.  So that became an amount

18   that we deducted for cost of goods sold.

19   Q.  Are these percentages reflected in DTX 901?

20   A.  Yes.

21   Q.  Now, could you please explain to the jury the variable

22   expenses that you considered?

23   A.  So there are a number of variable expenses identified on

24   Thom Browne's financial statement, Thom Browne U.S.'s financial

25   statements.  There is employee commissions, so those are the

1    commissions that are paid to the retail store employees.

2           So if you go to a retail store, especially a high-end

3    retail store, you're going to get assistance from the store

4    clerks.  And many times you go to the register, they'll tell

5    you who helped you kind of thing.  Well, those individuals that

6    are helping you buy products at the retail stores are getting a

7    commission, roughly a five percent commission.  So those

8    employee commissions are a variable expense or a sales increase

9    at the retail locations.  Those commissions will increase as

10   well.

11          Concession fees are fees paid to Farfetch.  Farfetch

12   is an online system where you can buy Thom Browne products.

13   They also manage the Thom Browne website and those orders, so

14   they charge a commission of about 30 percent for sales through

15   their, in essence, e-commerce channel.  So that's a variable

16   expense because as you sell more product, you're going to pay

17   more of a commission.

18          Credit card fees are exactly that.  Those are fees for

19   credit cards that are used at the retail location, used for

20   e-commerce purchases, so those will vary with sales as well.

21          Factoring charges are if Thom Browne has some

22   wholesale clients that they sell the receivables because they

23   want cash collections quicker, or some of the retail sales they

24   go out and get what we call credit enhancement insurance.  So

25   they actually pay an insurance company to ensure collection of

1   receivables, and those are volume-driven as well based on the

2   sales volume, that insurance.

3           And then other variable expenses is very small kind of

4   catchall for other variable expenses.  I think there is a few

5   thousand dollars in that expenditure category that were

6   deducted as variable costs as well.

7   Q.  Are these expenses reflected in DTX 435 through 438?

8   A.  Yes.

9   Q.  What did you ultimately conclude with respect to variable

10  expenses?

11  A.  So the variable expenses for '20 and '21 were approximately

12  10 percent or so, and those variable expenses were deducted

13  from the sales of accused products as well.

14  Q.  Shifting gears to controllable expenses, could you please

15  explain the controllable expenses that you considered?

16  A.  So when looking at these controllable expenses, we wanted

17  to identify expenses that had a connection to production or

18  sale.  The expenses that we identified were selling expenses,

19  sample and design, advertising and marketing, compensation and

20  benefits for related selling sampling, design advertising, and

21  marketing departments, fixed costs at retail locations,

22  variable rents at retail locations, and then other occupancy

23  costs at retail locations, and then travel and entertainment

24  relating to different kinds of sales-type events.

25  Q.  Let's start with selling costs.

1    Could you tell us a little bit about those?

2   A.  So selling costs have categories of freight.  So handling

3   freight, so to get products to retail locations, to wholesale

4   locations, and things like that, there is going to be freight,

5   duty and handling, and packaging and processing and things like

6   that.  So those selling costs relate to getting products to

7   market and selling, so those were included.

8        And then brand-building exercises, like modeling

9   agencies, photo shoots were also included because those kinds

10  of things, like modeling agencies and photo shoots, are going

11  to be -- they are going to have a connection to selling product

12  as well and building the brand.

13       And then clothing displays and storage at the retail

14  locations, those are going to be related to selling as well.

15  Q.  Did you exclude any selling expenses?

16  A.  Yes.  I spent probably in total about five hours with

17  management discussing different general ledger.  Those are the

18  books and records where they record these expenses, different

19  types of expenses by line item.  And a number of the expenses

20  when we discussed them with management don't relate to the

21  accused products.  Many of them, like things like garment bags

22  and mending expenses or alterations, really relate to suits and

23  things like that, not to the accused products.  And some of the

24  selling expenses specifically relate to, like, Japan and Italy.

25  So those were, as we discussed them with management, were

1  excluded as well.

2  Q.  Tell us a little bit about sample and design costs.

3  A.  So sample and design costs are exactly what you would

4  think.  They are, you know, mostly the materials used when you

5  have a prototype product and you design those prototype

6  products.  There is people putting them together so they can go

7  out to the market and show the buyers the different types of

8  products so they can see them before the buyers are making

9  orders for them, as well as they are making those samples so

10 internally they can be reviewed and decisions can be made about

11 selling products relating to sample and design costs.  So, in

12 essence, these are exactly what you would think.  They are the

13 samples and designs and the costs relating to those.

14 Q.  Did you exclude any selling expenses?

15 A.  Yes.  Again, through our discussions and interviews with

16 management, there were certain types of prototype expenses,

17 like accessories and knit cut and sew, and special projects

18 that when we interviewed management, they didn't relate to the

19 accused products.  So those categories of expenses were not

20 deducted.

21 Q.  Tell us about advertising and marketing costs.

22 A.  So advertising and marketing, it has general marketing,

23 public relations, fashion shows, the Met Gala, Red Carpet

24 events, digital marketing, social media influencers, look books

25 went to the sales catalogs where all these products that are

1   displayed in books, and things like that.

2           So what this all is, is this the cost to get your

3   product and your brand known.  When we look at all of those

4   things, these events, they are building the Thom Browne brand.

5   And the whole purpose of advertising marketing spend is, as

6   you're building the brand for all your products, you are doing

7   it so you're influencing customers to go out and buy the

8   products.  Whether they are wholesale customers like

9   Nordstrom's and the buyers there being influenced to buy

10  products or the retail consumer going out and buying products,

11  it's all building the brand image and the brand name.

12          So because advertising and marketing has, you know, a

13  direct link to product sales, those costs were included as

14  being needed for production and sale of products.

15  Q.  Tell us about compensation and benefits, another category

16  in controllable costs.

17  A.  Yes.  So there are two categories.  There is compensation

18  and benefits, and the company had breakdowns of compensation

19  and benefits by department.  So the way I'm typically doing

20  this is, I'm looking for departments that deal with production

21  or sale.  So customer communications, design departments,

22  logistics, marketing, retail, people at the retail store, the

23  merchandising, the people that are kind of handling inventory

24  management, taking orders, things like that.  Logistics that

25  deals with shipping products.

1    Client value management is one where they actually

2  have the customer contact database and they keep a history of

3  customer purchases.  So when they analyze historical sales of

4  products and things like that, they can present that to the

5  buyers in an effort to convince them to buy certain products

6  that are selling really well, things like that.  So all of

7  these things are related to the production and sale, so those

8  compensation and benefits we include as a deductible expense.

9    I excluded what I'll call more of the general

10  administrative functions, like, finance, general, HR, the

11  intercompany, the IT, the officer salaries.  Because I look at

12  the expenditures and say, you know, the people that are working

13  on merchandising and selling products, those should be

14  deducted.

15    I always use the scenario, if the CFO took off a

16  month, I don't think that is going to affect product sales or

17  production, right.  So the administrative functions, even

18  though they are recording sales, and accounting inventory

19  management and things like that, they are further away from

20  being a connection to sales and production, so we excluded

21  those costs as a deduction.

22  Q.  Just for the record, when you referred to client value

23  management, was that the reference to CVM?

24  A.  Yes.  So ultimately compensation that we deducted was

25  58 percent; compensation we excluded was about 42 percent.

1  Q.  All right.  Let's move on to other variable rent costs.

2  A.  So when it comes to rent, since you need the retail stores

3  and you need that rent to sell products through the retail

4  channel, that becomes a cost that is associated with selling

5  product.

6         So I included the fixed retail store rent for the U.S.

7  There is two stores, one in Miami and one in California, that

8  have certain targets that the fixed rents will be higher, and

9  if you make a certain amount of sales, there will be some

10  variable rent.

11         So I included those variable rent expenses as a

12  deduction, as a cost to deduct.  And then things like the

13  corporate offices' rent, since those are more general functions

14  and they are less connected to selling and producing product,

15  I excluded those.

16  Q.  Tell us about other occupancy costs, please.

17  A.  So other occupancy costs are going to be primarily things

18  like taxes on the locations, water, electricity, heating,

19  cleaning costs, security, some postage, stationery, some

20  equipment rentals.

21         Since the entity actually had breakdowns of all of

22  these costs by the different functions, what I did is I only

23  included the other occupancy costs for the retail stores,

24  right.  You need the retail stores to sell retail products, so

25  the water and electricity, heating, real estate taxes, I

1   included those for the retail stores and excluded the other

2   occupancy costs relating to corporate offices and things like

3   that.

4   Q.  Next, could you tell us about the travel and entertainment

5   category?

6   A.  So the travel and entertainment category really is -- it

7   consists of sales kinds of activities, right.  The biannual

8   selling campaigns for fall and winter.  There is a lot of

9   travel of the sales and marketing folks from the company in the

10  U.S. to locations for things like the international fashion

11  week, which happens four times a year in London, New York,

12  Milan, and Paris. They are getting together before and after

13  those events to finalize products.  After the events they

14  actually have events where they are selling products to buyers

15  and things like that.

16         So what I did is, because I had breakdowns of the

17  expenditures -- and this is only for the U.S. -- I looked at

18  the total U.S. travel and entertainment spending, and then I

19  removed the executive and officer travel relating to that and

20  kept in those sales and marketing functional travel, because

21  they are going to be more related to sales and production of

22  product.

23  Q.  Finally, what about nonoperating expenses?

24  A.  So things like depreciation, even if they are depreciation

25  of high-end furniture in the retail stores, I excluded all

depreciation and amortization.  Here is a listing of the

different types of depreciation and amortization, you know,

software licenses and things like that, excluded these as

deductions.

Q.  Can you provide us with a summary of your excluded costs?

A.  Yes.  So things like professional fees, depreciation,

amortization, interest, license fees, permits, IT maintenance,

permit and consultants, which are a lot of the departmental

leads.  Things like garment bags, mending expenses and

alterations that don't relate to the accused products, they

relate more to suits and things like that.  And then, as I

said, certainly administrative compensation, like the

financial, HR, IT departments, officers, those were excluded.

Q.  What did you ultimately conclude with respect to

controllable costs?

A.  That approximately 24 percent roughly of excludable costs,

controllable costs, should be deducted.

Q.  What are the total profits after deducting costs of goods

sold, variable costs, and other costs related to production

sales?

A.  They were approximately 11 percent or so.  So I used 2020,

actual financial statements to develop the 10.5 percent profit

for 2020.  I applied the 11.4 percent for 2021 to the 2021

sales.  For 2022, I used the combined financials for 2020 and

2021, so I used the 11.3 and calculated the profits for 2022.

1   And because, as I said, the years prior had a number of issues

2   relating to them, I used the 11.3, the combined profit figure,

3   for 19 and prior in my calculations.

4   Q.  Is that summary reflected in DTX 901?

5   A.  Yes.

6   Q.  What is your summary amount to in terms of dollars?

7   A.  So, as I said, for the period 2015 through 2022, we had

8   about $15.6 million of accused products.  Applying the

9   different profit percentages that I just was discussing, I get

10  the $1,751,705 in profits on those accused products.

11  Q.  Just for good measure, could you provide us with a summary

12  now of your profits analysis?

13  A.  Profits, as I said, is approximately 15.6 million in sales

14  and 1.7 million in profits.

15  Q.  Do you have any other opinions in this matter?

16  A.  I also did a royalty calculation for the same period.

17          So a reasonable royalty is an alternative opinion in

18  this matter.  So if profits aren't the designated loss damage

19  calculation, as an alternative, you can use a royalty

20  calculation.  Normally I'm doing those kinds of calculations as

21  an alternative.

22          So for the period of 2015 through 2022, applying a

23  reasonable royalty rate to the 15.6 million, I get $867,225 in

24  a royalty payment.

25  Q.  Is that summary reflected in DTX 903?

1  A.  Yes.

2  Q.  And for both your profits analysis and your royalty

3  analysis, you assumed liability?

4  A.  I assume liability and harm, and then went to do my

5  calculations.

6           MR. CONLEY:  No further questions.

7           THE COURT:  Cross-examination.  Oh, before we hear

8  questions from counsel.

9           You were determining damages on the assumption that

10  the plaintiff had proven trademark infringement, right?

11           THE WITNESS:  Correct.

12           THE COURT:  You didn't do any analysis as to what

13  damages, if any, were available if the plaintiff proved

14  trademark dilution, did you?

15           THE WITNESS:  I don't believe I made any separations,

16  no.

17           THE COURT:  They wouldn't necessarily be the same,

18  would they?

19           THE WITNESS:  Possibly not.  I did a kind of

20  discouragement calculation assuming liability.  I don't think I

21  went through and did a separate -- I didn't do any separate

22  analysis.

23           THE COURT:  You just assumed infringement?

24           THE WITNESS:  I assumed infringement, that's correct.

25           THE COURT:  Very good.

1    CROSS-EXAMINATION

2    BY MR. FLEMMING:

3    Q.  Hello, Mr. Imburgia.

4    A.  Hello.

5    Q.  In your testimony you talked about expenses -- and I wrote

6    these down -- related to, connected to, or with a nexus to the

7    accused products?

8    A.  Yes.

9    Q.  So would you please tell us the exact standard that you

10   actually used to decide which expenses should be deducted from

11   net sales to reach profits?

12   A.  Yes.  So when you're looking at sales and calculating the

13   expenditures to deduct, there has to be a nexus or connection.

14   So as an accountant, the ones that are very easy are things

15   like cost of goods sold.  Cost of goods sold are the purchase

16   of the products you're selling, so you need those costs to sell

17   the product.  So costs of goods sold has a connection because

18   the purchase of the products, and we're selling those products.

19   And as I sell more products, I need to buy more products.

20           So cost of goods sold, in my view, always has a

21   connection because it's a variable-type expenditure that's

22   required to sell products, so cost of goods sold is one

23   category.  That's pretty simple.

24   Q.  So you mentioned that if there is a connection.

25           Is it a direct connection, is it a close connection,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   like what language were you thinking of what you were writing

2   your report?

3   A.   What I typically do in my mind -- because it is variable

4   costs are an accounting concept, right.  So it's easy for an

5   accountant to come up and say cost of goods sold is variable.

6   Commissions, concession fees, those kinds of costs vary as I

7   sell more.  So those things, from an accounting standpoint, you

8   always deduct those in a profits calculation because they vary,

9   so those are easy.

10          Then you get to controllable costs, which some may be

11  variable, some may be fixed.  And then I have to make an

12  assessment, after interviewing management, looking at the books

13  and records, which are the costs that need to be included

14  because they have a connection or a nexus.

15          So when I do that assessment, what I do is I look at

16  the different categories, I understand the costs, and I have to

17  make a determination.  Are these costs -- and the way I think

18  about it is, if I eliminate this cost, is it going to have an

19  effect on production and sale, and that is how I think about

20  the process.

21          So I use my example, if the CFO took a two-month

22  vacation, probably wouldn't affect my production and sale.  So

23  I look at that and say that's not really connected.  That's not

24  really a cost that I need to produce and sell product.  But

25  when it comes to things like the design function, you know,

1    that would be a cost that I need.  I need to design products to

2    show the buyers so they can buy products.

3          So that is the way I do it.  I look at those

4    categories of expenses and say which ones do I need to produce

5    and sell products.

6    Q.  So you agree with me that the jury ultimately will make the

7    decision on what expenses should be deducted, correct?

8    A.  I agree with that, yes.

9    Q.  And so you're saying that the jury should just consider

10   costs that are either related to or connected to in some way or

11   with a nexus to or -- yeah, I think you also may have had some

12   other language in there.

13         You can't give a specific language that the jury

14   should consider in deducting expenses, they just need to

15   consider that full two-minute explanation you just gave?

16         MR. CONLEY:  Objection, compound.

17         THE COURT:  Sustained.

18   Q.  Mr. Imburgia, your presentation earlier states that Thom

19   Browne, Inc., lost money from 2019 through 2021, is that

20   correct?

21   A.  Thom Browne, Inc., selling general administrative expenses,

22   were greater than the gross profit.  It created an operating

23   loss.  Then there's, like, a transfer pricing profit share

24   adjustment that takes profits from other Thom Browne global

25   entities and moves it in, really, like a tax adjustment, and

N1BsADI1                     Imburgia - Cross

1    moves it in and makes it profitable.

2           But the selling, general administrative expenses in

3    the general ledger are greater than the gross profits, so it

4    creates a loss.

5    Q.  Am I correct that your presentation stated that Thom

6    Browne, Inc., lost money from 2019 through 2021?

7    A.  On an operating basis, yes.

8    Q.  And in forming your opinions in this case, you relied on

9    the fact that Thom Browne, Inc., is majority owned by a company

10   called Ermenegildo Zegna, correct?

11   A.  Yes.

12   Q.  And Zegna -- can we call it Zegna for short?

13   A.  That's fine.

14   Q.  Zegna is a Dutch limited liability company, is that

15   correct?

16           MR. CONLEY:  Objection, relevance.

17           THE COURT:  Overruled.

18   A.  Yes.

19   Q.  And Zegna owned a 90 percent share in Thom Browne, Inc.,

20   correct?

21   A.  Correct.

22   Q.  And Mr. Browne owns just a 10 percent share in his company?

23   A.  I believe so.

24   Q.  And Zegna bought a majority share of Thom Browne, Inc., in

25   2018, is that right?

N1BsADI1                    Imburgia - Cross

1    A.   Yes.

2    Q.   So Thom Browne, Inc., still lost money in those three years

3    following its acquisition by Zegna, correct?

4    A.   Again, on an operating basis, that's correct.

5    Q.   Let's bring up your presentation and go to slide six.

6            So it's your professional opinion that since 2015,

7    Thom Browne has never made more than 11.4 percent in profits

8    from sales of the accused products?

9    A.   My opinion is this is the profits calculation that I

10   determined based on my review of the expenses to include and

11   what expenses to exclude.

12   Q.   So is it your professional opinion that Thom Browne, Inc.,

13   never made more than 11.4 percent in profits from sales of the

14   accused products?

15   A.   From sales of the accused product, that's correct.

16            MR. FLEMMING:  May I approach the witness, your Honor?

17            THE COURT:  Yes.

18   Q.   I'm going to hand you what's been marked as Plaintiff's

19   Exhibit 705, which is already in evidence.

20            You're holding a Thom Browne jacket, correct?

21            MR. CONLEY:  I'm going to object, your Honor.  It's

22   outside the scope of his report, his opinions.

23            THE COURT:  Well, I don't know yet.  All he's been

24   asked is to look at it.

25            Do you want a sidebar, though?

1          MR. CONLEY:  Please.

2          (Continued on next page)

1     (At the sidebar)

2         THE COURT:  So what are you proposing to ask him about

3  this?

4         MR. FLEMMING:  The price, which is $1,500, and

5  perspective what only 11 percent in profits would look like for

6  $1,500 jacket.

7         MR. CONLEY:  It's not what he offered opinions on.

8         THE COURT:  Pardon?

9         MR. CONLEY:  It's not what he offered opinions on.

10        He never inspected a physical product and looked at

11 the books and records of the company and did his analysis.

12        THE COURT:  Well, but he could ask him what the

13 calculation would be on any given item because it to his

14 opinion what the calculation is for all the items.

15        I'll allow it.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

N1BsADI1                    Imburgia - Cross

1    　　　　(In open court)

2    BY MR. FLEMMING:

3    Q.  Mr. Imburgia, that's a Thom Browne jacket, correct?

4    A.  Yes, that's what the tags say.

5    Q.  And it has a price tag on it.

6    　　　　Can you find that, please, and let me know when you've

7    found it?

8    A.  I found it.

9    Q.  And the price is $1,450, correct?

10   A.  That's correct.

11   Q.  So is it your professional opinion that if Thom Browne sold

12   that jacket for $1,200, Thom Browne actually would have lost

13   money on that product?

14   A.  Yeah.  That's a difficult question to answer because when

15   they are provided from Thom Browne trading a product, they mark

16   them up in a similar way.  So if you're changing the price of

17   the product and saying it's a lower price, probably they are

18   going to be paying a lower price from Thom Browne trading, the

19   Swiss company.  So I don't think it would change the

20   profitability at all.  It probably -- they would just have cost

21   of goods sold that was less because the markup -- the markup on

22   these products are the same.

23   　　　　If you want me to just assume the company is just

24   going to charge higher and then markup is not going to be

25   consistent with what they normally do, then there would be --

1  there would be another 20-something percent of cost in there

2  under that assumption.

3  Q.  Assuming that the costs stay the same, but assuming that

4  the only change is that Thom Browne sells that jacket to

5  consumers at a price of $1,200.  Under your calculations, Thom

6  Browne, Inc., would actually lose money on that sale?

7  A.  Well, if you're talking about my calculations, you have to

8  follow what the company does and how they mark up consistently.

9         What you're doing is just putting a hypothetical in

10  place and saying the company doesn't mark it up the way they

11  do.  Just assume that, so if I'm going to assume that there is

12  not as much markup, right, when you think about the fact that

13  there's 45 percent gross profit, 55 percent cost of sales, that

14  would change in my model based on what the company does.

15         If you're just saying that assume that it's not a

16  45 percent profit, it's 25 percent profit, in gross profit they

17  would lose money then, if the price is the same.

18  Q.  So you can't answer the hypothetical, if Thom Browne

19  decides to sell that product for $200 less, you have to add a

20  bunch of assumptions on top of that to not answer the

21  hypothetical?

22         MR. CONLEY:  Objection, argumentative and asked and

23  answered.

24         THE COURT:  Sustained.

25  Q.  Mr. Imburgia, you were retained in this case to offer

1    opinions on monetary remedies, correct?

2    A.   Yes.

3    Q.   And you were also retained to criticize certain aspects of

4    Mr. Plumpe's expert report?

5    A.   Correct.

6    Q.   And one of your criticisms is that Mr. Plumpe should have

7    deducted more than just cost of goods sold in calculating

8    profits, right?

9    A.   I believe there are other expenditures that I'm deducting

10   that are required to be deducted.  I don't think Mr. Plumpe

11   analyzed those because he didn't have access to management, so

12   I think he just stopped at gross profit.

13   Q.   So you decided what those extra expenditures were based on

14   private conversations with Thom Browne's management?

15             MR. CONLEY:  Objection.

16             THE COURT:  Ground?

17             MR. CONLEY:  Mischaracterization.

18             THE COURT:  Pardon?

19             MR. CONLEY:  Mischaracterization.

20             THE COURT:  Well, if it's a mischaracterization, the

21   witness will correct it.

22             Overruled.  You may answer.

23   A.   I think it's a combination of my five hours of interviews

24   with management team.  But I did read depositions of the same

25   management team, so it's a combination of both of that.

1    Q.  So those five hours of conversations, those were private

2    conversations that were not recorded?

3    A.  They weren't recorded, but we documented the discussions in

4    our 127-page report that describes all of the general ledger

5    expense categories, what they relate to, whether it should be

6    included or excluded, and why.

7    Q.  And no one was under oath in those five hours of

8    conversations, is that right?

9    A.  Nobody was under oath.

10   Q.  You spoke with Luigi Gajo, correct?

11   A.  Correct.

12   Q.  And he sat for a deposition, correct?

13   A.  Correct.

14   Q.  And you spoke with Andy Ng?

15   A.  Correct.

16   Q.  And Andy Ng did not sit for a deposition?

17   A.  I don't believe so.

18   Q.  And other than Mr. Gajo and Mr. Ng, you didn't speak with

19   anyone else at Thom Browne in forming your expert opinions?

20   A.  No.  That was the management team, the CFO and the head of

21   business intelligence, that we interviewed.

22   Q.  Mr. Gajo didn't testify at trial, did he?

23   A.  I wasn't here, so I don't know.

24         THE COURT:  I need to interrupt at this point to

25   inform the ladies and gentlemen of the jury that either side

1   has a right to take the deposition of anyone and either side

2   has the right to call any witness they think is relevant.

3            So bear that in mind in assessing the last few

4   questions and answers.  There is nothing in the law that

5   prevents an expert from having conversations with people, as

6   long as when he's here, he is prepared to reveal the substance

7   of those conversations, and also he references in his report

8   the fact that he had those conversations.

9            Go ahead, counsel.

10  BY MR. FLEMMING:

11  Q.  Mr. Imburgia, as we talked earlier, in calculating profits,

12  you deducted additional expenditures other than costs of goods

13  sold, correct?

14  A.  Correct.

15  Q.  And you deducted storage space costs, is that right?

16  A.  Yes.

17  Q.  But Thom Browne didn't rent any new storage space

18  specifically for the accused products, right?

19  A.  I think this is just storage space, really, at the retail

20  locations where they are storing not only the accused products,

21  but all products.

22  Q.  But Thom Browne didn't rent or purchase any new space

23  specifically for the accused products, correct?

24           MR. CONLEY:  Objection, asked and answered.

25  A.  I don't believe so.

1    THE COURT:  Well, I'll allow it.

2    But when there is an objection, hang on.

3    THE WITNESS:  I'm sorry.

4    THE COURT:  Go ahead.

5  Q.  You also deducted some employees salaries and benefits,

6  correct?

7  A.  Correct.

8  Q.  But Thom Browne didn't hire any new employees specifically

9  for the accused products?

10  A.  I don't believe there were additional hires specifically

11  related to accused products.

12  Q.  So even if the accused products did not exist, Thom Browne

13  would still be paying the same amount in employee salaries and

14  benefits, correct?

15  A.  It's possible.

16  Q.  You don't have any evidence otherwise?

17  A.  As I said, when you get to the expenses, the controllable

18  costs expenses, I'm not doing a fixed and variable analysis,

19  I'm doing a connection and nexus analysis.  So I'm looking at

20  the design department and saying, if I don't have that design

21  department, I'm not going to be designing these products so

22  it's going to affect sales.  It's not a variable analysis.  The

23  design department creates other products as well, but there is

24  a connection because if I'm not including those as --

25    MR. FLEMMING:  Objection, narrative and nonresponsive.

1    THE COURT:  No.  You may finish your answer.

2    A.   Just if I'm not including them, then I'm unfairly burdening

3    design department costs on the other products of the business

4    and not allocating them appropriately among the accused

5    products and the other products in the business.  So you take

6    the design department, you divide it by total sales, and then

7    you get design department as a percent of sales, and then I'm

8    applying it to the accused product.

9         It's the design department.  You need that department

10   to produce the accused products.  If the accused products

11   weren't here, what you're saying is would the design department

12   costs be the same.  Well, it's not a variable analysis.  I

13   didn't do that analysis.  What I'm doing is a connection and a

14   nexus analysis.

15   Q.   So to confirm, you have no evidence that Thom Browne's

16   salary and benefits costs would change in any way if the

17   accused products did not exist?

18   A.   That's correct.  It's not a variable analysis.  That's

19   right.

20   Q.   Let's talk about some of the other expenditures that you

21   deducted.

22        And in the selling category, that includes provision

23   for bad debt reserve, correct?

24   A.   Yes.

25   Q.   And utilization of bad debt reserve?

1    A.  Correct.

2    Q.  And laundry services?

3    A.  Yes.

4    Q.  In the compensation and benefits category, you partially

5    deducted the following categories:

6            Vacation?

7    A.  Yes.  Salaries and benefits, that's correct.

8    Q.  Ticket restaurant?

9    A.  I would have to look.

10   Q.  Travel allowance?

11   A.  I believe so.

12   Q.  Life insurance?

13   A.  I believe so.

14   Q.  And you talked about other occupancy during your testimony

15   earlier, right?

16   A.  Correct.

17   Q.  And you partially deducted these categories:

18           Gifts?

19   A.  That's correct.

20   Q.  Postage?

21   A.  That's correct.

22   Q.  Cleaning?

23   A.  All as it relates to retail stores, but yes.

24   Q.  Understood.

25           And water?

N1BsADI1                    Imburgia – Cross

1   A.  Yes.

2   Q.  And in the travel and entertainment category, you deducted

3   all of the following:

4           Rental car?

5   A.  Correct.

6   Q.  Meals?

7   A.  Yes.

8   Q.  Entertainment expenses?

9   A.  That's correct.

10  Q.  Tolls?

11  A.  Yes.

12  Q.  Parking?

13  A.  Yes.

14  Q.  And laundry again?

15  A.  That's correct.

16  Q.  You said you agree with Mr. Plumpe that costs of goods sold

17  are deductible in calculating profits, correct?

18  A.  Yes, that's correct.

19  Q.  And you generally agree with Mr. Plumpe what types of

20  expenditures fall within cost of goods sold?

21  A.  Correct.

22  Q.  Your only difference in terms of costs of goods sold with

23  Mr. Plumpe is about two percent, right?

24  A.  That's correct.

25  Q.  And, in fact, Mr. Plumpe's cost of goods sold calculation

1    is more favorable to Thom Browne than yours?

2    A.   That's correct.

3    Q.   So, in other words, if the jury accepts Mr. Plumpe's cost

4    of goods sold calculation, that would actually be more

5    favorable to Thom Browne by about two percent?

6    A.   That's correct.

7    Q.   So if the jury agrees with Mr. Plumpe that only cost of

8    goods sold are deductible here, they don't need to go through

9    all these other categories of expenses that you talked about?

10   A.   I don't believe that was Mr. Plumpe's opinion.  I think he

11   stopped at gross profit and said he didn't have the ability to

12   analyze any other expenses.  So I wouldn't say that's his

13   opinion on profits.  That's his opinion on gross profits.

14   Q.   Understood.

15        So if the jury believed that only cost of goods sold

16   were deductible and they used Mr. Plumpe's calculation, then

17   they wouldn't need to go through all the other categories of

18   expenditures that you have written about in your report?

19   A.   That's correct.

20   Q.   They would only need to look at your other expenditures if

21   they believed things like laundry and rental cars and meals are

22   attributable to the accused products?

23   A.   As some of the categories, that's correct.

24   Q.   Let's just talk about a few more of the categories and then

25   we'll move on.

1    In the advertising and marketing category, you

2 deducted all of Barcelona sales, is that right?

3 A.  I think if you look, it actually was an income item.  It

4 actually went the other way, so I actually included it because

5 it was -- it was brand-building.  But I think it was a reversal

6 of a prior expense, so it actually was an income item.

7 Q.  So Barcelona, you mean the partnership with the football

8 club, Barcelona?

9 A.  Yes.  And I think it was an income item, so we included it

10 in relation to brand building.

11 Q.  OK.  So with the clarity that it was an income item, is it

12 your professional opinion that Thom Browne's partnership with

13 FC Barcelona is directly related to sales of the accused

14 products?

15 A.  I think we left it in because it was a profit figure and it

16 was more conservative, and that's the reason we included it.

17 Q.  One more category.

18    You also deducted all expenses associated with Thom

19 Browne's fashion shows, correct?

20 A.  That's correct.

21 Q.  And you believe that all of those expenses were incurred in

22 connection with the sale or production of the accused products?

23 A.  The fashion shows are a brand-building effort.  And,

24 remember, I'm taking the fashion shows expense and dividing it

25 by the $300 million of total company sales and getting a

1    percent.  Then I'm applying that percent to the 15 million.

2              That's how I'm breaking it apart as to what applies to

3    the accused products and what applies to the other products.

4    But I did treat it as a brand-building effort that drives

5    sales.

6    Q.  Let's bring up Plaintiff's Exhibit 1314, which is already

7    in evidence, and let's start at page 59.

8              Can you zoom in at the top there, please.

9              Mr. Imburgia, do you see that this is from the Thom

10   Browne website?

11   A.  Yes.

12   Q.  Do you see men's spring/summer 2015 runway there at the top

13   left?

14   A.  Yes.

15   Q.  And 2015 is where your profits calculation started,

16   correct?

17   A.  Correct.

18   Q.  And you reviewed images of the accused products in this

19   case in forming your opinions, is that right?

20   A.  Yes.  Because I had the plaintiff's identification as a

21   starting point and they had pictures of the accused products

22   and that's how the company went in and did the drill-down

23   analysis on the sales numbers, yes.

24   Q.  And the drill-down spreadsheets that you reviewed also had

25   images of the accused products?

N1BsADI1                    Imburgia - Cross

1    A.  Yes.

2    Q.  All right.  Let's zoom out so that we can see the whole

3    page.

4           Let's scroll through these fashion shows from 2015 to

5    2023, and you stop me when you see an accused product, please.

6           You can start.

7           (Pause)

8    A.  That's pretty fast.

9           I see a couple.

10   Q.  You saw a couple?

11   A.  Yeah.  I thought I saw some sweat socks --

12   Q.  Oh.

13   A.  -- with the stripe.

14   Q.  Do you understand you have sweats?

15   A.  Not this, but the jacket with the -- I thought I saw with

16   bars.

17   Q.  OK.  So you seen one or two products so far; yes?

18   A.  Yes.

19   Q.  All right.  Let's keep going.  We're almost near the end.

20          We can go a little slower now that we're closer to the

21   end.

22          (Pause)

23          You can take that down.

24          So in about 45 pages of Thom Browne's runway shows

25   from the last eight years, you saw a couple of accused

1    products?

2    A.   Yes.

3    Q.   And you deducted all expenses from the fashion shows in

4    your profits calculation as a percentage of net sales?

5    A.   As a percentage of net sales, I took that whole category as

6    a brand-building category that is going to be related to

7    convincing customers to buy product.

8    Q.   Thank you.

9            MR. FLEMMING:  No further questions, your Honor.

10           THE COURT:  Redirect?

11           MR. CONLEY:  Very briefly.

12   REDIRECT EXAMINATION

13   BY MR. CONLEY:

14   Q.   Mr. Imburgia, to your knowledge, does Mr. Plumpe dispute

15   any of the additional costs that you deduct in your analysis?

16           MR. FLEMMING:  Objection, outside the scope.

17           THE COURT:  Sustained.

18           MR. CONLEY:  No further questions.

19           THE COURT:  All right.  Thank you very much.  You may

20   step down.

21           (Witness excused)

22           THE WITNESS:  Thank you, your Honor.

23           THE COURT:  Does plaintiff rest?

24           MR. HENN:  Plaintiffs already rested, your Honor.

25           THE COURT:  Does defense rest?

N1BsADI1                    Imburgia – Redirect

1          MR. MALDONADO:  Your Honor, we have one housekeeping

2     item.

3          THE COURT:  Go ahead.

4          MR. MALDONADO:  There are two designations that we

5     would like to move into evidence, deposition designations.

6          THE COURT:  OK.

7          MR. MALDONADO:  Defendant's Exhibit 923 and 924 from

8     yesterday.

9          MR. HENN:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibits 923 and 924 in evidence)

12          MR. MALDONADO:  Defendant rests your Honor.

13          THE COURT:  Ladies and gentlemen, both sides have

14     rested, which means you get most of the day off.

15          Lucky you.  But your work will really begin tomorrow.

16     Tomorrow starting at 9:30, you will hear first closing

17     arguments from counsel.  Each side has up to an hour and a half

18     of closing arguments, so that will take us to essentially the

19     lunch break.  Then you'll hear my instructions of law, which

20     will take about a half hour.  So around, oh, 2:15, 2:30

21     tomorrow, the case will be yours to deliberate.

22          Now you can take as little or as long as you want for

23     deliberations.  I've had juries return a verdict in five

24     minutes.  I've had juries return a verdict in ten days.  It's

25     totally in your control.  However, if tomorrow you decide that

1    you want to deliberate beyond 4:30, which is totally up to you.

2    We can stop at 4:30 or come back on Friday.  That's certainly

3    one possibility.  But sometimes juries like, once they get into

4    it, like to deliberate longer.  You have to let us know by four

5    o'clock so we can arrange, in worst-case, to have you

6    deliberate as long as seven o'clock tomorrow.  But only if you

7    give us advanced notice.

8             OK.  So until tomorrow, don't discuss the case with

9    anyone.  This is a shame it's not a great day.  I was going to

10   say you could go take a walk in Central Park, but it's probably

11   not the best day.  Do whatever you like, and we'll see you

12   tomorrow at 9:30.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury not present)

2             MR. HENN:  One piece of housekeeping on the record.

3             I understand that although Ms. Backman's deposition

4    excerpts were played in court, the reporter wasn't taking it

5    down.  So we have marked that transcript as 1325, and for the

6    record to be complete, it should be included.

7             THE COURT:  So that will be assuming both sides agree,

8    that could be sent to the jury if they ask for or they can ask

9    to see the videotape replayed.  The only difference is anything

10   that is videotaped, if they ask for it and it's not in the

11   transcript, then we would have to bring them back here into the

12   court and play it, which is not a big deal.  That's the

13   difference.

14            MR. HENN:  I just wanted to make sure for the record

15   for the appeal.

16            THE COURT:  Right.  I assume defense counsel has no

17   problem with that transcript sent to the jury as part of the

18   exhibits?

19            MR. MALDONADO:  That's correct, your Honor.

20            THE COURT:  Very good.

21            (Plaintiff's Exhibit 1325 received in evidence)

22            Please be seated.  So I assume at this point defense

23   counsel renews its motion for a directed verdict on all the

24   grounds that it previously indicated.

25            Was there any additional ground you wanted to add --

1    MR. MALDONADO:  No, your Honor.

2    THE COURT:  -- to the 47 you already had?

3    MR. MALDONADO:  That's right, your Honor.

4    THE COURT:  OK.  So let's continue the discussion.

5  Some of this will also affect the charge, obviously.  But I

6  still haven't heard, I don't believe, from plaintiff's counsel

7  a basis for not dismissing the punitive damages claim.

8    So the plaintiff's counsel says that when they did add

9  the four-stripe, the defendant didn't do any kind of search,

10  notwithstanding that the lawyers arguably suggested that they

11  do it.  At least there was some indication to that effect.  And

12  furthermore, that even after they were in 2018 told to stop,

13  they continued on.

14    All of that may go to question of bad faith, but I'm

15  not sure why it goes to punitive damages.  Because punitive

16  damages don't just exist or don't exist at all for a dispute

17  between two parties that is personal just to those two parties

18  no matter how bad it is.  It has to have a more raw, social

19  public factor involved.

20    I'm still at a loss to see any evidence of that in

21  this case.

22    MR. HENN:  Well, your Honor, it's our position that

23  the same evidence that a jury could use to find willfulness

24  can also be weighed in a way that would justify punitive

25  damages.  The reason there was a public interest in a trademark

1    case, unlike some other civil cases, is that as you're aware

2    there are really three parties in a trademark case:  The

3    plaintiff, the defendant, and the public.  And the whole

4    purpose of a Lanham Act is to protect the public from

5    confusion.

6              So in instances where a defendant takes actions --

7              THE COURT:  So your claim is that in any case in which

8    there is willful infringement, then you're automatically

9    entitled to punitive damages because in some sense there's a

10   public interest in not being confused?

11             MR. HENN:  I don't think I would agree with the way

12   you just phrased that --

13             THE COURT:  I'm glad.  That's good.

14             MR. HENN:  -- as you cross-examined me there.

15             We're not saying every single case, you are entitled

16   to punitive damages.  The issue here is whether the issue goes

17   to the jury and whether there is evidence in the record from

18   which a jury could conclude that what Thom Browne did either

19   with its failure to follow up with its counsel or otherwise

20   consider the likelihood of adding a fourth stripe would create

21   confusion, as well as the press of encouragement issues with

22   regard to the fourth stripe mark.

23             But separately, the Grosgrain products.  Remember,

24   those are products where Mr. Browne testified, That is not my

25   mark.  That was a design choice.  I chose to do it that way.  I

1   chose to run it down right where adidas always does.  And on

2   the shoes, significantly, I chose to take my design, first of

3   all which is white/blue/white/blue/red, and then conveniently

4   put it on a white shoe so you can't see any of the whites.  And

5   not just do it in the skinny version of the ribbon, widen them

6   to the exact width essentially of an adidas stripe, angle it

7   exactly as an adidas stripe, and then call a shoe, you know,

8   that is not a running shoe, a running shoe, and put it out into

9   the public with images of people on tracks and running.

10          That's egregious behavior, your Honor, that should be

11  punished, and the jury has a right to make that determination.

12          THE COURT:  So if we went down that road -- and I'm

13  glad you reminded me of that, because I was focusing more on

14  the four stripes, it would be limited then to those few -- the

15  punitive damages would be limited to those few products that

16  meet that kind of scenario you've just described.

17          MR. HENN:  If you were to limit it in that way,

18  obviously we would be bound only to describe those particular

19  products in the context of punitive damages.  My point was

20  simply that there is evidence as to several products from which

21  a jury could conclude that this behavior was sufficiently

22  egregious to require deterrence.

23          THE COURT:  Let me hear from --

24          I'm sorry.  Hold on a minute.

25          (Pause)

1          Yes.  Just to let you know, there is a short matter

2   that I have to take at 11:15 because I thought we would be on a

3   break at that point.  When we get to 11:15, we'll pause for a

4   few minutes.

5          Anyway, so what about the Grosgrain?

6          I keep calling it Grosgrain, but I take it it's

7   French?

8          MR. MALDONADO:  It's Grosgrain.  That's correct, your

9   Honor.

10          THE COURT:  We don't pronounce the S because they

11   don't pronounce anything over there.

12          So go ahead.  Anyway, what about that?

13          MR. MALDONADO:  So there's no evidence to support what

14   Mr. Henn just told the court about the Grosgrain.  The evidence

15   was that the defendant has used the Grosgrain on its clothing

16   from day one.  They've used it not only as the tab, but also as

17   a decorative design element.  And Mr. Childs testified about

18   that.  They've always used it as a design element.

19          They've used -- you've seen manuals of the collections

20   through the years.  It's been used all over the clothing, in

21   all different locations.  Here, here, everywhere, and it's

22   being used in different widths and different sizes.  There's no

23   evidence of any move to make it look more like anything adidas

24   is doing.

25          Adidas isn't doing that.  In fact, the evidence shows

1    that adidas' trademark isn't even three stripes pushed

2    together, as you see the Grosgrain is all just one continuance,

3    pattern of stripes in different colors, red, white and blue,

4    which is not colors that adidas hasn't used any red, white and

5    blue in that way.

6         So this is a device that they've always used

7    throughout the years.  It's not something that they've been

8    made to look more like adidas.  There is no evidence of that,

9    your Honor.  And there isn't anything --

10        THE COURT:  Remind me.  When Ms. Backman called Thom

11   Browne with the complaint about the three stripes, did she say

12   anything in that conversation about the Grosgrain?

13        MR. MALDONADO:  There was no evidence to that effect,

14   your Honor.  There was no mention of Grosgrain.

15        THE COURT:  She just focused on the three -- the three

16   big stripes, for lack of a better way of putting it.

17        MR. MALDONADO:  That's correct, your Honor.  Even

18   though Thom Browne was using the Grosgrain at the time and that

19   was, you know, on all of its products.  If she looked and did

20   the investigation like she said she did, she would have seen

21   that and discovered it.  There is no evidence to support any

22   kind of egregious conduct, any kind of bad faith, or any kind

23   of use of the Grosgrain in the manner that Mr. Henn described.

24        THE COURT:  All right.  I will think about this for --

25   obviously, I'm going to make all the decisions before the day

1   is out.  I'll think about this one a little bit more.

2           Now of the other grounds that were made on the motion

3   for a directed verdict for the defense, there was some were

4   directed at bad faith and willfulness.  Remind me what your

5   position is on that.

6           MR. MALDONADO:  Our position, your Honor, is that

7   there has been no evidence of bad faith here that the defendant

8   started using three bars in 2005.  It used it until it was

9   contacted by adidas in 2007.  The defendant then switched to a

10  four-bar mark, which it used prominently in its collection ever

11  since then, from 2007 through today.

12          adidas did not complain for ten years.  The defendant

13  reached out to adidas several times.  They left messages,

14  voicemail.  adidas never returned the calls.  So there is no

15  evidence of the defendant adopted its mark in bad faith.  There

16  is no evidence that they did anything in their development of

17  their business in bad faith.

18          And they was silence on the part of adidas.  They had

19  every right or every opportunity to investigate what the

20  defendant was doing.  The defendant is in a different category

21  than adidas has been and continues to be operating in a

22  different category.  There's never been any evidence of

23  confusion through the 15 years.  There is no evidence to

24  support that the defendant was trying to trade on adidas'

25  reputation.

1          And there's just simply, your Honor, no evidence of

2   bad faith or willfulness in this case, so we move for directed

3   verdict.

4          (Continued on next page)

5          THE COURT:  All right.  On that issue.

6          Let me hear from plaintiff's counsel.

7          MR. HENN:  Well, on the three points that were just

8   raised by defense counsel.

9          First, there's no contention by anyone that back in

10  2007 Thom Browne was using the Grosgrain in the way we complain

11  about now on the shoes.  So the idea that the fact that they

12  were using it as a little tab on the back of a suit coat and

13  adidas didn't know anything about it, there was no evidence

14  that adidas saw it.  The evidence of what Ms. Backman saw --

15         THE COURT:  And this goes back to our discussion a

16  minute ago on punitive damages.  Is there any other product,

17  you don't need more than one -- but is there any other product

18  that you're claiming bad faith vis-a-vis the Grosgrain thing

19  other than the shoes?

20         MR. HENN:  We also believe putting that Grosgrain down

21  the hem of pants and the sleeve of sweatpants, there is no

22  evidence in the record that they did that before.  Yes, they

23  had it as a stripe on a helmet on a fake football player, yes,

24  they've used it in lots of different ways, but when they

25  decided to put it in the exact placement where adidas's most

1    classic and recognized stripes are, that was a design choice by

2    Mr. Browne; that was arguably in bad faith because he's

3    testified he knew about the three stripes.

4         THE COURT:  Let me interrupt you on that just to get

5    the response on that to the shoes and the sweatpants.

6         MR. MALDONADO:  So, your Honor, with regards to the

7    sweatpants, you know, as you've seen in the evidence in the

8    record, there's others that use stripes on the sweatpants, and

9    the stripes that our client uses are not like adidas's.  The

10   Grosgrain is totally different than the stripes that they used,

11   and we've seen that in the evidence of the record.  There's no

12   evidence that -- the designer of the sweatpants was on the

13   stand.  There was no examination as to his intent, what he was

14   trying to do when he designed the sweatpants, was he trying to

15   mimic adidas or copy adidas.  There was no examination to that

16   regard.  There was no evidence to that regard.  So there's no

17   evidence that there was any bad faith on the part of the client

18   in using these decorative elements that it's used in all

19   positions throughout its clothing, throughout -- for more than

20   a decade now, your Honor.

21        And with respect to the shoes, again, the evidence

22   showed that this was a limited quantity item; that they've used

23   different items of shoes, different types of shoes.  You know,

24   whether it's called a running shoe or the words that are used

25   to describe the shoe is not really relevant to the question of

1    bad faith.  It's just a shoe that costs an enormous amount of

2    money.  It's sold by a luxury designer, but people don't go to

3    luxury designers to buy running shoes.  So it's just a word to

4    describe the shoe the way it looks, and it's not a functional--

5             THE COURT:  How much did the shoes cost?

6             MR. MALDONADO:  $900, your Honor.

7             Anyway, for all of those reasons, we don't think

8    there's any bad faith with regards to the shoe or the stripes

9    down the pants.

10            MR. HENN:  The one last thing I wanted to mention on

11   this because I didn't finish what I was talking about before,

12   counsel mentioned that one of the reasons he thinks a directed

13   verdict would be appropriate on these issues is because they're

14   in a different category, but that gets to the heart of one of

15   our key components of bad faith and willfulness story.  Adidas

16   objects in 2018, spring of 2018.  In 2020 the line of

17   compression products is released, the full line, the very

18   products that Mr. Poret's survey that show enormous levels of

19   confusion.

20            In a trademark case if you get over 12 percent in a

21   survey, that's enough.  He's getting numbers in the thirties or

22   twenties.  I think anyone would have known that was egregious.

23   And then to offer them as running products and performance

24   products, that is bad faith.  If after adidas'S objection they

25   had a legitimate complaint about the fact that, oh, we've been

swelling gray sweatpants for a long time, let's fight that out,

let's take it to the court.  But to expand further after the

objection -- that's the *Victorinox* case.  To expand further

after the objection is raised, that's evidence of bad faith.

You can't enter a directed verdict when evidence of that

exists.

THE COURT:  So what about the fact when the designer

of the shoes was on the stand, he was never confronted with

your accusation that he did this purposely to infringe or take

advantage of the confusion, alleged confusion over adidas.

MR. HENN:  As your Honor is well aware, and the case

law is replete with the statement that willfulness and bad

faith may be determined by the jury based on circumstantial

evidence.  There is no requirement that I ask a direct question

of a witness:  Did you ask in bad faith, because no witness

would ever say, "Yes, I did."  So the way that bad faith is

proven in a trademark case is you lay out the case.  These are

our rights.  This is what they did.  This is the timeline.

They knew of our objection, and they did it anyway.

And then the jury can look at that evidence and decide

for themselves based on the facts that have been presented, the

circumstantial evidence, whether that rises to a level of

turning a blind eye, consciously disregarding adidas's rights,

or in the case of moving directly into compression products,

trying to trade on some of the good will.

1    MR. MALDONADO:  Your Honor, three points.  One with

2    respect to the compression pants, as your Honor knows, the

3    evidence shows that the defendant Thom Browne has been selling

4    sweatpants since 2010.  The difference between compression

5    pants and sweatpants is that compression pants are tighter.

6    It's just a natural expansion of his product line.  We don't

7    believe it's anything in bad faith.

8    Second, Mr. Becker testified that when they switched

9    from three to four, that he would not have done that if he had

10    not thought that it would cause more problems with adidas.  It

11    was done in good faith.  It was not done in bad faith.

12    And, third, and I think most importantly, for the

13    question of willfulness, as your Honor mentioned yesterday,

14    there's absolutely no evidence in the record that Thom Browne

15    thought that anything he was doing was infringing.  It did not

16    have knowledge that there was infringement  It did not think

17    there was infringement  Adidas was silent.  They never said

18    anything.  It had every reason to think that there was no

19    infringement.  So, without that, your Honor, there is no basis

20    for a willfulness claim to go forward.

21    THE COURT:  All right.  Now, remind me, defense

22    counsel, of some of the other more particular grounds you gave

23    for your motion to dismiss.

24    MR. MALDONADO:  Other --

25    THE COURT:  Yes.  It's a lot less and I did not copy

N1BQadi2

1  it down.

2          MR. MALDONADO:  We had disgorgement of profits was

3  another ground, but there was no basis to disgorge profits

4  under the *Romag* case.

5          DEPUTY CLERK:  Spell it.

6          MR. MALDONADO:  R-O-M-A-G.

7          THE COURT:  Because?

8          MR. MALDONADO:  Because of the -- because of the lack

9  of willfulness, your Honor.

10          THE COURT:  Yes.  So, but that would go, at most -- as

11  many of these points do -- not to dismissing the entire claim

12  but just to narrowing it.  Okay.

13          MR. MALDONADO:  Next, we had initial interest

14  confusion, your Honor.  I don't believe there was any evidence

15  presented by plaintiff on their theory of initial interest

16  confusion, so that is a theory that we think should not go to

17  the jury.

18          THE COURT:  Let's hear plaintiff's counsel on that.

19          MR. HENN:  Shall I address the profits one and initial

20  interest?

21          THE COURT:  Yes, sure.

22          MR. HENN:  I'm not sure what counsel is referring to

23  with regard to *Romag* requiring willfulness, since the whole

24  point of *Romag* was to removal willfulness as a requirement.

25  The Second Circuit used to require willfulness for profits.

1    Supreme Court finally made unanimity across the circuits by

2    saying willfulness is not required for profits, and so, if

3    anything, *Romag* shows why the --

4            THE COURT:  Except for dilution.

5            MR. HENN:  Correct.  But as your Honor probably noted

6    in our proposed jury instructions, we are only seeking monetary

7    relief for infringement.

8            THE COURT:  That's what I did think, and that's why I

9    put in my charge --

10           MR. HENN:  And I assumed that's why you were asking

11   the question of Mr. Ibrugia --.

12           THE COURT:  Yes, I just wanted to be absolutely sure.

13   Okay.  Good.  So I'm glad we've clarified that.

14           So, but I think you're right that willfulness is no

15   longer required for infringement lost profits.

16           MR. HENN:  There was also -- he didn't mention it just

17   now, but he had also moved to exclude our reasonable royalty

18   calculation.  Do I need to address that or are you --

19           THE COURT:  Sure.

20           MR. HENN:  I mean, obviously, many trademark cases

21   have accepted reasonable royalties as a stand-in for damages,

22   but damages experts talked about how many cases they've been in

23   where they've done exactly that, including the *Payless* case

24   that I mentioned earlier.  That was a case where reasonable

25   royalties were awarded in a trademark case.

1    THE COURT:  Yes, I went back and looked at that case I

2  thought it was brilliant.

3    MR. HENN:  Thank you.  Judge King was an excellent

4  judge.

5    With regard to initial interest confusion, so counsel

6  seems to -- let me back up.

7    The way these issues get to the jury is based on

8  Polaroid factors.  Those factors don't mention initial interest

9  for post sale or point of sale.  The issues, the facts and the

10  evidence that comes in is as to how similar are the marks, how

11  similar are the products, you know, what are your channels,

12  what are your consumers, all those things.

13    Then the jury is allowed, unless a plaintiff, as we

14  have here, pulled back one of the theories -- the jury is

15  allowed to consider that evidence in all three time frames.

16  They can consider it presale, they can consider it post sale,

17  and they can consider it point of sale.  Here, no point of

18  sale, but it's not as though we need separate evidence on

19  Polaroid factors with regard to initial interest and Polaroid

20  factors with regard to post sale; it's the same evidence on

21  Polaroid factors.  They are just permitted to consider it in

22  those two contexts.  And so there are -- to the extent the jury

23  wanted to look for evidence of initial interest confusion in

24  opening and again in closing, I will point out that what we are

25  arguing with regard to initial interest confusion is that there

1    are two scenarios where that is likely.  One is social media.

2    There have been gobs of social media posts put in front of the

3    jury showing Thom Browne's products, showing celebrities

4    wearing the product, showing celebrities wearing the products

5    with adidas shoes.  So there is evidence from which a jury

6    could conclude that in the context of social media someone

7    seeing that would be confused.

8              The other one is there's been --

9              THE COURT:  An alternative theory is celebrity will

10   wear anything if you pay him enough.

11             MR. HENN:  For sure.

12             The other scenario in which we've alleged initial

13   interest confusion is likely is in the context of these retail

14   stores where they do have overlapping sales.  Both parties put

15   in a lot of evidence about the fact that these parties'

16   products appear at, say, Nordstrom.  And our argument is when

17   you're walking through Nordstrom, there is a time that initial

18   interest presale phase where the products are over there, and

19   you're walking into the store, and from a distance, just as we

20   see on this rack, a consumer could see those stripes and think,

21   oh, that's some neat adidas stuff, and walk over.  When they

22   get there, of course, they see the Thom Browne tag, and the

23   probably see the price tag and faint, but from a distance they

24   thought it was adidas.  The jury can conclude that based on the

25   evidence of -- voluminous evidence of the fact that the

N1BQadi2

1    parties' products exist in the same retail locations.

2              THE COURT:  Let me ask you something else before I

3    forget.  It's off the subject of what we are now discussing,

4    but we talked about it a little bit yesterday.

5              Willfully, is willfully still in the case just as a

6    technical matter.  It's not in the case as to laches because

7    I'm going to decide that -- if it's in the case there, I'll

8    decide it, but it's not for the jury.  It's not in the case as

9    to dilution damages because you're not claiming dilution

10   damages, just injunctive relief.

11             MR. HENN:  Right.

12             THE COURT:  But there was a third item that I think

13   you mentioned, and I just forgot.

14             MR. HENN:  It relates to this *Romag* situation.

15             So the Supreme Court said willfulness is no longer a

16   prerequisite to profits, but that it is still a factor that may

17   be considered in an award of profits.  And so it would be in

18   the case to the extent defendant wanted to make the argument

19   that --

20             THE COURT:  Well, assuming you persuade me to put in

21   under the Polaroid factors, the bad faith factor, wouldn't that

22   really be sufficient for your purposes?  I mean, do you need --

23   are you saying I have to have a separate instruction under

24   damages that in determining damages you can also look at bad

25   faith?

1    MR. HENN:  That would probably suffice in terms of the

2  bad faith interaction with the profits assessment.

3    THE COURT:  All right.  So in that regard, I'll ask my

4  law clerk just to go get a couple copies of the revised charge.

5  This is not the final charge at all, obviously, but just to

6  reflect the rulings that were made this morning.

7    MR. MALDONADO:  Your Honor, we also agreed to include

8  bad faith in Polaroid factors.

9    THE COURT:  That's good because I put it into my new

10  version.  My law clerk will go get that for you now.

11    No, what else?

12    MR. MALDONADO:  What other grounds?

13    With respect to the reasonable royalty as a proxy for

14  damages, we believe that that is limited in cases where there's

15  some sort of relationship between the parties, such as a

16  holdover licensee or franchisee, and in this case, of course,

17  there's no relationship between the parties.

18    So, getting back initial interest confusion again,

19  there's no evidence of initial interest confusion.  We don't

20  believe that the products being available in the same store is

21  enough to satisfy the evidentiary requirements for initial

22  interest confusion.  It has to be a consumer who sees Thom

23  Browne's products and are unfamiliar with Thom Browne's

24  products, sees them, and believe that they're adidas products.

25    THE COURT:  I'm sorry, what's the guy, Poirot, or

1    whatever his name was?

2              MR. HENN:  Poret.

3              THE COURT:  Poret, thank you.  His study was limited

4    to post sale?

5              MR. MALDONADO:  That's correct, your Honor.  That was

6    a post-sale environment.  They didn't put any studies related

7    to initial interest.  He said he didn't consider initial

8    interest.  And there's no expert or fact witness who testified

9    as to initial interest confusion in this case, so we believe

10   that that should not be presented to the jury.

11             THE COURT:  Here is what I think makes sense.  I am

12   going to grant the motion to dismiss the punitive damages

13   claim.  I am going to deny the motion to dismiss any of the

14   other claims.  But we will take up the specific, more narrow

15   objections you have as they come up in the charge.  I think

16   really that's the best way to handle it, so -- because, for

17   example, I no longer need to confront whether bad faith should

18   be listed as a Polaroid factor because both counsel have

19   agreed.

20             On the other hand, I'm leaning on not saying anything

21   about willfully, given that two of the respects in which it was

22   relevant are now no longer part of the jury instructions, but

23   these are more narrow questions that as we go through each, so

24   I'll give you all -- my law clerk will bring up the new version

25   in about two minutes, and I'll give you a break, and you can

N1BQadi2

1   look at that, and then we can resume.

2           MR. HENN:  I have to tell you, this is a first

3   procedurally.  I just don't want to waive anything.  I had

4   intended to move for a directed verdict JMOL on the laches

5   defense.  Now that you've taken it back, and if we did move for

6   summary judgment, I feel like I need to renew it just to

7   preserve that issue.

8           THE COURT:  If you need to renew it, you have now

9   renewed it.

10          MR. HENN:  Thank you.  I just want to make sure I'm

11  not waiving anything.

12          THE COURT:  But all the laches questions -- of course,

13  if the jury finds no liability, I don't reach it.  But assuming

14  they find liability, then what I will probably ask you both to

15  do is give me a short written summation, in effect, on laches.

16  Maybe I'll set a schedule for that after the jury brings in

17  their verdict.  I want to do it in the next, you know, week

18  while it's all fresh in my mind, but I don't think -- I think

19  it's clear that there are genuine issues of fact going both

20  ways on that, so neither side gets to remove it totally unless

21  the jury removes it by finding no liability.

22          Very good.  We'll see you all in, why don't we say,

23  ten minutes.

24          (Recess)

25          (In open court)

1       THE COURT:  Just to a elaborate a little bit further

2   on my ruling dismissing the punitive damages, I'm not sure the

3   relevant case law is summarized in a decision of the New York

4   Court of Appeals.  The punitive damages is being sought under

5   New York law at *Rocanova v. Equitable Life Assurance Society,*

6   and reported at 634 N.E. 2d 940.  And I won't go through all

7   the citations, but the Court says that punitive damages are

8   available only where there is a "high degree of moral

9   turpitude" demonstrating "such wanton dishonesty as to imply a

10  criminal indifference to civil obligations," plus the conduct

11  must be "aimed at the public generally."

12      Even if we could construe a Lanham Act violation as

13  being aimed at the public generally, which I think is much too

14  broad an interpretation of the Lanham Act or of New York Law

15  for punitive damages, there is not here, I think, any material

16  evidence of such wanton dishonesty and criminal indifference,

17  et cetera, that would warrant sending that matter to the jury.

18      Let's turn to the new revised instructions of law.

19      MR. MALDONADO:  Your Honor, before we get started, I

20  just wanted to preserve our objection in the record to the

21  deletion of the laches instruction from the jury instruction.

22      THE COURT:  The deletion of the?

23      MR. MALDONADO:  The laches instruction from the jury

24  charge.  We believe that there are subsidiary factual issues

25  that should be decided by the jury, at least at a minimum as an

1    advisory verdict for the --

2              THE COURT:  No, I think that's clearly not the law.

3              MR. MALDONADO:  I just want to say that we believe

4    there are issues for the jury in accordance with your Honor's

5    decision on our motion for summary judgment where you did hold

6    that there were issues of fact for the jury, and we believe

7    that those issues of fact as to when -- at least as to when

8    adidas knew or should have known that it had to prove an

9    infringement claim, that that should be an issue that the jury

10   at least weighs in on.

11             THE COURT:  So as I -- let me start again.

12             If an issue is for the Court, that includes, of

13   course, all relevant fact-finding by the Court, otherwise the

14   distinction between matters of law that are for the jury and

15   equitable matters that are for the judge would be meaningless

16   because there are always going to be some facts that need to be

17   found.  So it's the judge who makes the findings of fact.

18             That doesn't mean to say that the judge can't, if he

19   or she wishes, have the benefit of an advisory verdict, and

20   that was originally the route I was going, but I decided that

21   was imprudent.  It also doesn't mean that there aren't factual

22   issues that may also be part of other claims that will be

23   decided by the jury, but those decisions by the jury on those

24   other claims are not binding on the Court on the equitable

25   claims.  They are just, again, advisory, in effect, so I

1  respectfully disagree with -- and if I said anything to the

2  contrary in my summary judgment opinion, which I don't think I

3  did, but if I did, well, then shame on me, but I reject it.

4         MR. MALDONADO:  Thank you, your Honor.

5         THE COURT:  Now, with respect to the latest version of

6  the charge.  Let's deal first with general instructions 1

7  through 8.  These are basically my standard form instructions,

8  but let me hear from either side, beginning with plaintiffs,

9  whether either there is anything you object to, anything you

10  want to offer edits on, or anything you want to add to the

11  general instructions of 1 through 8.

12         MR. HENN:  Your Honor, just a stylistic thing.  I

13  don't want to show any disrespect, but given all the writing

14  we're going to be doing, do you mind if we do the charge

15  conference seated?

16         THE COURT:  No.  No.  Go ahead.  Absolutely.  Please.

17         MR. HENN:  With regard to instructions 1 through 7, I

18  think those are fine, and we have no objections to them.

19         The only objection, or suggested change, really, in

20  instruction 8 is that defendants did not call Brian Sowers, so

21  should not be listed as an expert witness.

22         THE COURT:  Okay.  Thank you very much.

23         MR. HENN:  They did call a couple of experts who

24  probably should be listed.

25         THE COURT:  Let me get the exact list.  I was doing

N1BQadi2

1    this.  So for adidas, it's Hal Poret, Erich Joachimsthaler and

2    John Plumpe, right?

3                    MR. HENN:  That's correct.

4                    THE COURT:  For defense, it was Hannah Arbuckle and--

5                    MR. LEWIN:  Your Honor.  Marie McKiernan for the

6    record.

7                    THE COURT:  I'm sorry?

8                    MS. McKIERNAN:  Marie McKiernan for Thom Browne.

9                    THE COURT:  I'm not going to list your name as an

10   expert even though I know you are.

11                   MS. McKIERNAN:  I was going to spell it for the

12   record, your Honor.  Last name is M-C-K-I-E-R-N-A-N.

13                   For Thom Browne, the experts to list would be JoAnne

14   Arbuckle, not Hannah.

15                   THE COURT:  Thank you very much.  Excellent.

16                   MS. McKIERNAN:  In addition, Joel Steckel.

17                   THE COURT:  Hold on just one second.  What was

18   Mr. Steckel's first name.

19                   MS. McKIERNAN:  Joel, J-O-E-L.

20                   THE COURT:  And Mr. --

21                   MS. McKIERNAN:  Mr. Basil Imburgia, I-M-B-U-R-G-I-A.

22                   THE COURT:  So it's JoAnne Arbuckle, Joel Steckel,

23   S-T-E-C-K-E-L.  And what was Mr. Imburgia's first name?

24                   MS. McKIERNAN:  Basil, B-A-S-I-L.

25                   THE COURT:  I-M-B-U-R-G-I-A.  Thank you very much.

1    MR. HENN:  Your Honor, with regard to that list,

2  plaintiffs object to the inclusion of Ms. Arbuckle.  Since your

3  Honor excluded her from offering any opinions, she really isn't

4  being offered and in the end did not give any expert opinion or

5  expert testimony.

6    THE COURT:  Well, that's true, but as you can see from

7  this instruction, I call these folks specialized witnesses, and

8  she was specialized.  And, indeed, we learned without objection

9  not only how she conducted her search but also that she was the

10 dean of the finest fashion institute in the world, so I'm going

11 to leave it as is.

12   All right.  Anything from defense counsel on

13 1 through 8?

14   MS. McKIERNAN:  No, your Honor.

15   THE COURT:  Thank you.

16   Now turning to numbers -- I think here we have to go

17 individually.  Number 9, any addition from plaintiff's counsel?

18   MR. HENN:  No, your Honor.

19   THE COURT:  Defense counsel?

20   MS. McKIERNAN:  No, your Honor.

21   THE COURT:  Number 10.

22   MR. HENN:  A couple of things.  Let me start with the

23 easiest.  The exhibits that are referenced in the current

24 instruction were not offered or received.  The registrations

25 were compiled in two exhibits, Exhibit 181 --

N1BQadi2

1          THE COURT:  I'm sorry, the registrations are -- go

2   ahead.

3          MR. HENN:  If you look right in the middle of the

4   instruction, it references some exhibits in the 700s.

5          THE COURT:  Right.  What's the right number?

6          MR. HENN:  The correct numbers are 181 and 183 with

7   one clarification, which I've discussed with defense counsel,

8   which is that 183 included in it two registrations at the very

9   end that are not being asserted in the case, and so when we

10  send that exhibit back, presumably as part of this or as part

11  of the record, we've agreed --

12         THE COURT:  Well, does 181 have all of them except for

13  the ones that are in 183?

14         MR. HENN:  181 has apparel and 183 has footwear.

15         THE COURT:  Okay, but all 17 are there?

16         MR. HENN:  Correct.

17         THE COURT:  And the two that are not being asserted

18  are?

19         MR. HENN:  At the very end of 183.  We'll just redact

20  that.

21         THE COURT:  That works for both sides?  Good.  Okay.

22         MR. HENN:  So our other issues with regard to the

23  proposed instruction number 10, the first relates to the second

24  sentence, the sentence that begins "For the purposes of this

25  case."

1     THE COURT:  Yes.

2     MR. HENN:  Right now, it says, "adidas' Three-Stripe

3  Mark means its use of three parallel stripes on clothing or

4  shoes in the manner described and shown in a number of federal

5  trademark registrations."

6     It's adidas's position that that should --

7     THE COURT:  It should be just described?

8     MR. HENN:  Yes.  Or, actually, what it should say is

9  "the use of three parallel stripes on clothing or shoes,

10 certain executions of which are shown in a number of

11 registrations."

12    MS. McKIERNAN:  Your Honor?

13    THE COURT:  Yes.

14    MS. McKIERNAN:  We believe that the language there

15 should remain the same, as the preceding sentences clearly

16 address the unregistered uses of the three -- or executions of

17 the Three-Stripe Mark.

18    THE COURT:  Yes, I think the description -- my

19 recollection is, for example, as to color, which is one of the

20 issues that came up.  I think the registrations on the face say

21 can be any color.

22    MR. HENN:  Correct.

23    THE COURT:  So why isn't it enough to say in the

24 manner described -- I think "shown" should maybe be replaced

25 with "exemplified" or some word like that.

N1BQadi2

1    MR. HENN:  That could work.  The issue we have is not

2    whether you use the word "shown" or "described," but rather in

3    its current proposed form, it necessarily suggests a limitation

4    on what the Three-Stripe Mark is because it says, "It's three

5    stripes in the manner described or shown in the registrations,"

6    and as the Court is well aware --

7    THE COURT:  But then the next sentence goes on to say

8    "and" et cetera.

9    MR. HENN:  Right, which is why I'm trying to avoid a

10   sentence that seems to contradict the next sentence.

11   THE COURT:  I don't think it's contradictory.  But I

12   will change "shown" to "exemplified."

13   And then the next sentence I think makes exactly the

14   point you want to make.  "it also includes any other use by

15   adidas of three parallel stripes on clothing or shoes that you

16   find gives consumers the same commercial impression as any one

17   or more of the registered uses."  I think that's more than

18   sufficient for your purposes.

19   Any other plaintiff's objection?

20   MR. HENN:  Yes.  With regard to the final sentence,

21   the language that references "differing materially" we do not

22   believe is supported in the relevant case law.  We believe that

23   after the second hyphen, it should read:  "If you find that the

24   use would be perceived to have the same commercial impression

25   by a reasonable consumer."  So you would strike the portion

that reads "does not differ materially from one or more of the

registered uses and," and you would delete "in the same way"

because in connection with assessing commercial impression, the

jury is not supposed to look at a use and look at a

registration and make an assessment on whether they as drawn

are materially different or are the same, but rather are

supposed to use the evidence presented to them to assess

whether they think consumers in the marketplace would perceive

those in the same commercial way.

THE COURT:  The last part is in here.  Just so the

record is clear, after that sentence we just read, the

following sentence is, "By this, I mean that you may find that

a particular use of three parallel stripes by adidas falls

under its Three-Stripe Mark -- even if it differs in some way

from the use of three stripes in any of the federal

registrations -- if you find that the use does not differ

materially from one or more of the registered uses and would be

perceived in the same way by a reasonable consumer."

So I think the second part of what you were asking for

is there in the second part of the clause.

But looking at the first part -- by the way, this

language is by *McCarthy* on trademark, but that's just neither

here nor there.

I think maybe it should simply say -- but I want to

hear from defense counsel on this --"By this, I mean that you

1    may find that a particular use of three parallel stripes by

2    adidas falls under its Three-Stripe Mark -- even if it differs

3    in some way from the use of three stripes in any of the federal

4    registrations -- if you find that it would be perceived in the

5    same way by a reasonable consumer."

6              MR. HENN:  That's what it should say.

7              THE COURT:  All right.  Let me see if there is any

8    objection to that from defense counsel.

9              MS. McKIERNAN:  Your Honor, we don't have an

10   objection.

11             THE COURT:  Great.  Anything from defense counsel on

12   the revised number 10.

13             MS. McKIERNAN:  No, your Honor.

14             THE COURT:  Very good.

15             On to 11.  Anything from plaintiff's counsel on 11?

16             MR. HENN:  Yes, your Honor.  A minor point.  There are

17   two plaintiffs so it probably should be plural possessive as to

18   plaintiffs' exhibits.

19             THE COURT:  I'm having trouble hearing you.

20             MR. HENN:  Sorry.  There are two plaintiffs in the

21   case, and --

22             THE COURT:  Yes.  Yes.  Yes.

23             MR. HENN:  It represents plaintiff's singular.  It's a

24   minor point, but we might as well clean it up.

25             THE COURT:  All right.

1    MR. HENN:  First paragraph.

2    THE COURT:  Don't we define earlier.  And then we did

3  in the preliminary instruction.  Maybe we should -- okay.

4    MR. HENN:  That's actually one of our suggestions,

5  your Honor.  It seems sometimes there's a reference to --

6    THE COURT:  On instruction 9, going back to that first

7  sentence "With these general instructions in mind, let me now

8  turn to the two claims in this case that the plaintiffs',

9  adidas America, Inc. and adidas AG (Hereinafter collectively

10  referred to as 'adidas')," right?  That's what you want?

11    MR. HENN:  Sure.  Well, and as to the reference to the

12  exhibits, there are several places later in the instruction

13  where the proposed instruction uses phrases like "the relevant

14  products," it might help clarify for the jury when that phrase

15  is used -- or we've in discussing it with witnesses and

16  discussing it in our openings, I believe both sets of counsel

17  referred to them as the "accused products."  That might be

18  better than "relevant products."

19    THE COURT:  Well, in the instruction 11 in the

20  third -- excuse me -- in the second sentence of the first

21  paragraph, it says, "You can review the specific Thom Browne

22  products that adidas accuses of infringement in Plaintiff's

23  Exhibits 55 and 56.

24    MR. HENN:  And so my suggestion is to then do a

25  similar defined term at that point and define them -- you can

N1BQadi2

define them as the "accused products" as we have been doing

throughout the trial, or I think in other places --

THE COURT:  Tell me the line and the specific language

you want.

MR. HENN:  Sure.  After the number 56, you have

"(hereinafter collectively referred to as the 'accused

products')."  And then we would just make sure we go through

the various places where now it either just says "products" or

"sell products" or the "relevant products" and we streamline it

to just all say "the accused products."

THE COURT:  Now, I thought you were going to mention

on the second paragraph.

MR. HENN:  I'm getting there.

THE COURT:  The third line, the sentence beginning "As

you heard," it says "adidas does not conted" whereas it should

be "contend," and I will take this up privately with my law

clerk.

MR. HENN:  As you should.

Actually, our objection in that paragraph pertains to

the first sentence --

THE COURT:  Go ahead.

MR. HENN:  -- it currently references "likelihood of

confusion as to source," which would be the products are made

and sold.  And it references "approved by," but as you're

aware, Section 43(a) extends beyond mere approval, and so that

1    sentence should say "or otherwise connected with, associated

2    with, sponsored by or approved by adidas."  And that's the

3    statutory language.

4              THE COURT:  Give me those again.

5              MR. HENN:  Sure.  "Connected with, associated with."

6              THE COURT:  What's the difference between connected

7    and associated?

8              MR. HENN:  You have to take that up with Congress,

9    your Honor.  Those are by statute.

10             THE COURT:  I'm not required to.  Congress typically

11   gives, a laundry list of, in effect, of synonyms.  My aim is to

12   make sure the jury is not confused.

13             MR. HENN:  So "connected with" is typically used if

14   there is a belief that the defendant may be operating in

15   connection --

16             THE COURT:  All right, anyway, I will -- just move

17   things along, "connected with, associated with," what's the

18   rest?

19             MR. HENN:  "Sponsored by."

20             THE COURT:  I'm sorry?

21             MR. HENN:  And then it would also just be "approved by

22   adidas."

23             THE COURT:  Or "approved by."

24             Anything else on 11 from plaintiffs?

25             MR. HENN:  Yes, just sort of grammatically.  Oh, on

1    all of 11?  Yes.  Let me look through them.

2            So in that same paragraph, after "post sale," to track

3    what was said immediately prior, I would suggest a comma and

4    the word "such" so that it tracks what you said in presale.

5            And then where it says "Thom Browne customers saw," it

6    should say "see."

7            THE COURT:  I'm sorry, what's the language you want?

8            MR. HENN:  It says "saw," which suggests in the past

9    it has occurred, and it should say "see" because this is about

10   likelihood.

11           THE COURT:  So what's the language you want?

12           MR. HENN:  Change the word "saw" to "see."

13           THE COURT:  To?

14           MR. HENN:  "See," S-E-E.

15           THE COURT:  Okay.

16           MR. HENN:  Then our next objection/suggestion is in

17   the paragraph that begins "second."

18           THE COURT:  By the way, we will get to defense counsel

19   in a minute.  But, of course, this paragraph raises the

20   question of presale versus post sale, but we'll get to that in

21   a minute.  Go ahead.

22           MR. HENN:  The next objection is in the paragraph

23   beginning "second."

24           THE COURT:  Yes.

25           MR. HENN:  So there is an inconsistency in the

N1BQadi2

1    instructions as currently presented with regard to how you're

2    going to refer to Thom Browne's designs.  Sometimes it's

3    referred to as "designs;" sometimes it's referred to as

4    "signatures."  It should be consistent.

5            THE COURT:  Which one do you want?

6            MR. HENN:  Our preference is "designs."

7            THE COURT:  Okay.  That's fine with me.

8            Now, here and with respect also to the accused

9    products, we will indeed go through and fix all of this, and I

10   will get you sometime this afternoon the final, but "subject

11   only to," things like that.

12           MR. HENN:  Our next objection in that paragraph we

13   will touch on later as well, but these instructions use

14   language that presumes we are alleging point-of-sale confusion

15   in a few places.  So, in a case involving --

16           THE COURT:  Just tell me -- I need to know -- as I

17   indicated yesterday, I want to know where you are objecting,

18   what language you are objecting to and what language you would

19   substitute.

20           MR. HENN:  It says in the paragraph beginning with the

21   word "second," it refers to "prospective purchasers."

22           THE COURT:  Okay.

23           MR. HENN:  It does it twice.

24           THE COURT:  So you would substitute?

25           MR. HENN:  "Consumers."

1           THE COURT:  Pardon?

2           MR. HENN:  "Consumers."  It could either be

3 substituted or --

4           THE COURT:  Consumers is fine.

5           MR. HENN:  The paragraph that is suggested that begins

6 with "third" should be replaced.  Competition referred to cases

7 not involving point of sale confusion is held to be not as

8 relevant.  We propose using adidas's suggested language from

9 its proposed instructions that were submitted previously.

10           THE COURT:  Which is what?

11           MR. HENN:  Which is as follows:  It would say, "Third,

12 you should consider the competitive proximity of parties'

13 products.  In other words, you should compare adidas's

14 Three-Stripe Mark products with the accused products and

15 consider how similar the products are, whether they are sold in

16 the same or similar channels, and whether they are promoted

17 through similar advertising media.  Products that are similar

18 or that are sold or advertised in similar channels are more

19 likely to be confused than those used in connection with

20 unrelated or non-proximate products."

21           THE COURT:  I'm not going to give you all of that.

22 That is endless and confusing.  But I'm not quite sure what

23 your objection is to the language I have.

24           MR. HENN:  Well, so competition is pertinent if you're

25 talking about a purchaser who is going to buy a product and

1 might accidentally pick up the wrong one because they're on the

2 same shelf.

3          In the case of initial interest and post-sale

4 confusion, it's not a competition.  It's about how proximate

5 they are in the marketplace.  Are they likely to encounter

6 these products because they're similar goods?  Are they near

7 each other in terms of advertising media?  Are they near each

8 other in terms of what stores they might be in?  So,

9 competition is overly limiting given the theory that we're

10 presenting to the jury.

11          THE COURT:  I'll think about it.  I'll put the

12 question mark for a moment.

13          MR. HENN:  In the paragraph that begins with the word

14 "fourth, we believe that it would be appropriate to add a

15 sentence indicating to the jury that survey evidence is

16 evidence of actual confusion.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    THE COURT:  No.  I don't normally, in any instruction,

2    single out any particular form of evidence.  If it's in

3    evidence, it's in evidence.

4    If there were some special instruction that would be

5    given, I would only consider it for this, but not for that.

6    That would be a different story.  That's not the case here.

7    I'm not going to make that change.

8    MR. HENN:  Our next objection is in regard to the

9    paragraph that begins sixth.  This includes and is largely

10   designed for point-of-sale confusion.  So this talks about the

11   word at the end of the first line where it says.  The care that

12   a consumer would use in purchasing.  Since we're not alleging

13   point-of-purchase confusion --

14   THE COURT:  OK.  All right.

15   MR. HENN:  -- as opposed to in purchasing, replace

16   that.

17   THE COURT:  So you want to change that to comparing?

18   MR. HENN:  When encountering.

19   THE COURT:  Pardon?

20   MR. HENN:  When encountering.

21   THE COURT:  All right.  I'll hear from your adversary

22   in a minute, but for the moment that sounds...

23   MR. HENN:  The final sentence should be deleted

24   entirely.  Again, cost and price are not relevant to claims of

25   initial interest post-sale confusion.

1    THE COURT:  Why is it not the case that people pay

2  more attention to what they are buying when they are spending a

3  million dollars as opposed to five cents?

4    MR. HENN:  It's absolutely the case when they are

5  baying.  But remember, we're not talking about confusion when

6  they are buying.

7    THE COURT:  I see.

8    MR. HENN:  But this is when they are seeing it across

9  the stores, they are not anywhere near the purchase moment yet,

10 or when they are out on the street walking by someone.

11   THE COURT:  OK.  I think that's a good point.  I will

12 at least tentatively, except to hear from your adversary,

13 strike that.

14   MR. HENN:  Those are all our objections.

15   THE COURT:  In the new paragraph I added on bad faith,

16 which is in the version you now have, but wasn't in the form I

17 gave you yesterday.  I say, or chose to turn a blind eye to the

18 possibility that consumers would be confused.

19   I think that is not the law.  I think I would change

20 that to read, or purposely chose to turn a blind eye to the

21 high likelihood that consumers would be confused.

22   MR. HENN:  We have no objection to that change.

23   THE COURT:  Pardon?

24   MR. HENN:  We have no objection to that change.

25   THE COURT:  Very good.

1    Let's turn to defense counsel on all of number 11.

2    MS. MCKIERNAN:  Your Honor, we're OK with a short --

3    defining the accused products so that it's clear.

4    THE COURT:  OK.

5    MS. MCKIERNAN:  As the scope and bounds of what is

6    being accused.

7    With regard to, we would like the word occurred to be

8    changed to occurs.

9    THE COURT:  I'm sorry.  Where are we talking about.

10   MS. MCKIERNAN:  In the second paragraph.

11   THE COURT:  You want to change.

12   MS. MCKIERNAN:  Occurred to occurs, to make it present

13   tense.

14   THE COURT:  Oh, occurs.

15   OK.  That's good.  I like that.

16   MS. MCKIERNAN:  What we would like to raise here is

17   the issue that we raised earlier.

18   THE COURT:  The big issue --

19   MS. MCKIERNAN:  Yes.

20   THE COURT:  -- in this pre-sale versus post-sale.

21   Let me just get everything else you have on 11, if

22   anything, and then we'll turn to that.

23   MS. MCKIERNAN:  We'll turn back to that.  We prefer

24   that, in terms of the bottom of the page here for second, where

25   it is beginning at the second.

1    THE COURT:  I'm sorry?

2    MS. MCKIERNAN:  So plaintiff has requested, in the

3    bottom paragraph of page 15, that the signatures be changed to

4    designs.  We would like it to remain signatures, as that is the

5    testimony heard from Thom Browne witnesses as how it is

6    referred to in the ordinary course.

7    THE COURT:  I think signatures does not in everyday

8    discourse mean what you take it to mean and, therefore, I think

9    the everyday Webster use of language would be, I think, closer

10    to design than it would be to signature.

11    I'm going to leave it at design.

12    MS. MCKIERNAN:  OK, your Honor.

13    THE COURT:  OK.  Now let's talk --

14    I'm sorry.  Was there anything else?

15    MS. MCKIERNAN:  With regard to the third paragraph, we

16    would like to leave the language there compete for the same

17    consumers.

18    THE COURT:  Well, I think we use consumers everywhere

19    else, so consumers -- and I don't think there is a meaningful

20    difference between consumers and purchasers.

21    Pardon?

22    LAW CLERK:  It's the compete for language.

23    THE COURT:  Oh, I'm sorry, on third.  I am completely

24    missing.  I was looking at second.

25    OK.  Yes.  I'm still inclined to keep that in.  I

1    agree.

2            MS. MCKIERNAN:  Your Honor, my apologies.  With regard

3    to the second paragraph and plaintiff's request to remove

4    reference to perspective purchasers, we believe that --

5            THE COURT:  No, no.  They just wanted to change

6    purchasers to consumers.  They made two changes on second.  One

7    they wanted to change signatures to design, which I agree with,

8    and then they wanted to change perspective purchasers to

9    perspective consumers, which I also agree.

10           MS. MCKIERNAN:  With regard to that, your Honor, we

11   believe the prospective purchaser language is more proper here.

12   While point-of-sale confusion is off the table, the --

13           THE COURT:  What is the difference?

14           Please explain to me what is the difference between a

15   purchaser and a consumer in the context of this case.

16           MS. MCKIERNAN:  So consumer appears -- is broader and

17   prospective purchaser is to -- what plaintiff's original

18   proposed jury instructions pointed out, that while

19   point-of-sale confusion is not at issue here, you can still

20   consider point-of-sale.  And it may just be less important in

21   assessing the *Polaroid* factors.  It was listed as their eighth,

22   the eighth point in their proposed jury instructions on this

23   point.

24           THE COURT:  Well...

25           MS. MCKIERNAN:  And the harm for a trademark owner

1    would be the prospective purchase.

2            THE COURT:  You understand the abstract point that

3    consumer is broader than purchaser, but I don't know why it is

4    different in the context of this case.  If we did that, in all

5    places you would change consumers to purchasers?

6            MS. MCKIERNAN:  Yes, your Honor.

7            THE COURT:  Let me hear plaintiffs' counsel on that

8    point.

9            Why isn't it really purchaser we're concerned about?

10           MR. HENN:  Because many of the people we're referring

11   to who are likely to be confused are not purchasers of Thom

12   Browne products.

13           THE COURT:  They are not at the time.  They are

14   prospective, but why aren't they prospective purchasers?

15           MR. HENN:  Well, they aren't prospective purchasers --

16   I think you misunderstood my suggested change.

17           The post-sale confusion context is not limited to

18   people who would then -- who would see a Thom Browne product,

19   be confused, and then go visit the Thom Browne store and spend

20   $2,000 on sweatpants.  It's broader than that.

21           This gets to the notion of protecting the public.  So

22   my proposal there was to remove both the word prospective and

23   purchasers and replace it simply with the word consumers,

24   because we are not talking about people who would necessarily

25   buy Thom Browne products.  We're talking about consumers in the

1    marketplace who encounter these things in the post-sale

2    environment.

3            MR. HENN:  It's --

4            THE COURT:  Just read me the exact language that you

5    would have in that entire sentence.

6            MR. HENN:  In particular, you should consider what

7    effect the similarity or lack thereof has on consumers and

8    whether any similarity between the parties' designs is likely

9    to cause confusion among consumers.

10           MS. MCKIERNAN:  Your Honor, if I may?

11           THE COURT:  Go ahead.

12           MS. MCKIERNAN:  This goes to the issue of the

13   confusion relating to harm here.  The survey evidence that

14   plaintiffs have put on specifically refers to post-sale

15   confusion.  It is the harm that would be from a prospective

16   purchaser. That's the exact survey evidence that Mr. Poret put

17   on the stand.

18           MR. HENN:  Our harm evidence had nothing to do with

19   purchases.  We're not alleging lost sales.  In fact, that is

20   why we are seeking a reasonable royalty.  Our harm evidence is

21   with regard --

22           THE COURT:  Yes, I think plaintiff's counsel is right.

23   I'll make both those changes.  Both the prospective purchasers

24   in both places is changed to just consumers.

25           All right.  Again, I want to discuss at length the

1   pre-sale/post-sale, but anything else from defense counsel on

2   instruction number 11?

3           MS. MCKIERNAN:  We believe that the sentence under the

4   paragraph that begins with the word sixth, in addition the

5   greater the cost of the product, the more careful the typical

6   consumer could be.

7           We believe this should remain in the instructions.

8   This is specifically requested by plaintiff.

9           THE COURT:  I think there is really no evidence to

10  support -- I'm making a factual assertion there it wasn't

11  supported by the evidence.  I'm going to strike that sentence.

12          All right.  So let's go back to the big issue here, so

13  far as number 11 is concerned, what is the evidence of pre-sale

14  confusion?

15          The survey was limited to post-sale confusion and,

16  therefore, its evidence of who was confused and so forth is so

17  limited.

18          What other evidence was there, what evidence is there

19  anywhere, of pre-sale confusion?

20          MR. HENN:  Let me start with the premise of your

21  question which is somehow that a plaintiff must submit survey

22  evidence to be able to allege the claim --

23          THE COURT:  No, no, no.  I am not asserting that at

24  all.  I'm just saying that you cannot use -- in my view, you

25  can't use that survey to show pre-sale confusion.

1            MR. HENN:  Fair enough, your Honor.

2            As you know, the survey is only evidence of one of the

3     multiple factors.

4            THE COURT:  Absolutely.

5            MR. HENN:  So the way the evidence supporting our

6     initial interest claim is evidence that the marks are similar

7     by putting in the marks themselves, evidence that the products

8     are similar because we showed we sell the same kinds of

9     products, significantly the notion that both products appear on

10    social media, which is one of the places initial interest

11    confusion can take place.

12           We also put in the record evidence of how the parties

13    made sales through social media, which means it is an initial

14    interest context.  We also have evidence from both parties that

15    these products appear at retail stores together, which allows

16    the jury to assess whether the products are sufficiently

17    competitive, in your Honor's language, or proximate in our

18    language to be confused in that context.

19           We wouldn't be relying on Mr. Poret's survey, but as

20    your instruction suggests, evidence of actual confusion is not

21    required.  But I would note that some of our evidence of actual

22    confusion is, in fact, on social media, where people were

23    seeing the social media posts of Thom Browne and responded

24    adidas.  And a juror could interpret that as either an example

25    of post-sale confusion because it is when they are out in the

1    marketplace, or because it was on advertisement published by

2    Thom Browne trying to advertise its products, it is evidence of

3    an initial interest confusion.  As they were trying to sell the

4    product, the person saw it, they thought it was adidas, they

5    didn't end up buying it.  But that's exactly what initial

6    interest confusion is.

7           And then the evidence of bad faith we have otherwise

8    is equally weighable by the jury in the context of a pre-sale

9    decision.  So there is no magic evidence that must exist to

10   allege confusion at either the initial interest stage or at the

11   post-sale stage.  The jury is permitted to weigh the evidence

12   of each of the *Polaroid* factors in each of the purchase

13   contexts, pre, at the point of purchase, and post.

14           MS. MCKIERNAN:  Your Honor.

15           THE COURT:  Yes.

16           MS. MCKIERNAN:  Your Honor, there is no evidence here

17   of any initial interest confusion.  The social media post that

18   plaintiff's counsel is pointing to were described, Mr. Poret

19   described both what would appear in images that would show

20   initial interest or post-sale environment.

21           The social media images that plaintiff's counsel is

22   pointing to are clearly, by their expert's own definition,

23   showing a post-sale environment where those purchases had

24   already been made.  And these people are posing and out in the

25   world in the walking on the street, I believe he said, or you

1    could be running in Central Park, might have been his language.

2    Exactly, but those are instances where the environment in those

3    posts are expressly referring to post-sale.

4            MR. HENN:  I think I was unclear based on what counsel

5    just said.

6            So my argument, your Honor, is not that the paragraph

7    within the post was in a store because they were obviously

8    taken outside.  My point about the social media is that because

9    they are advertisements of the product put out by Thom Browne

10   himself, consumer reactions to that are by definition initial

11   interest confusion examples, because those purchasers have not

12   bought anything.

13           They've seen the ad.  They are confused.

14           THE COURT:  Yes, I agree with plaintiff, and I think

15   it is really an exercise of the ordinary uses of circumstantial

16   evidence.  The jury can draw any reasonable inference from the

17   circumstantial evidence, and so if the evidence is post-sale

18   but the reasonable inference is it would relate equally well to

19   pre-sale, that's an inference they could draw.

20           I do think maybe we should say, on the first item

21   where I'm describing the strength, a mark strength is measured

22   by its tendency to identify the product sold under the mark as

23   associated with a particular company may depend on factors,

24   such as advertising, media coverage, products bearing the

25   marks, sales success, the longevity, and exclusively of the

1  mark's use.  Consumer studies, and I would put in here, limited

2  to post-sale --

3          MR. HENN:  Your Honor, I think that would be a

4  mistake.

5          THE COURT:  I'm sorry?

6          MR. HENN:  That would be a mistake.  This factor, the

7  first factor is talking about the strength of adidas' mark.

8          THE COURT:  All right.  But I think my point is this.

9  It may not be there that we put it in, but I think we need to

10  remind the jury that the survey was limited to post-sale.

11          MR. HENN:  You can put it in the paragraph beginning

12  fourth.  We're actually talking about actual consumers.  We had

13  suggested referencing the survey there, and if you wanted to do

14  it, that would be the place to put it.  Because the Second

15  Circuit has said survey evidence belongs in the consideration

16  of the actual confusion factor.

17          THE COURT:  Let me see if I can try something.

18          MS. MCKIERNAN:  Your Honor.

19          THE COURT:  Hold on just one second.

20          (Pause)

21          I want to hear from defense counsel more generally,

22  but while it's on my mind, on the fourth element, fourth

23  *Polaroid* factor, I would add the following:

24          Please remember that adidas is only claiming confusion

25  at the pre-sale and post-sale points and that its consumer

1    survey is limited to post-sale.

2              Any problem with that from the plaintiff's counsel?

3              MR. HENN:  No, your Honor.

4              THE COURT:  OK.  Now let me hear from defense counsel.

5              MS. MCKIERNAN:  No objection to that, your Honor.

6              THE COURT:  All right.  I think we have resolved

7    everything with respect to 11.

8              Let's go on to 12.  Now, I must admit that I'm not

9    happy about the fact that I have to give two instructions on

10   dilution, one under federal law and one under state law, when

11   the difference is pretty minor.  But the difference is there in

12   the law.

13             However, if plaintiff wanted to waive that difference

14   and just give it as a single instruction -- we'll see what

15   defense counsel would say -- I think that would be a lot easier

16   on the jury here.

17             MR. HENN:  Give me one second.

18             THE COURT:  Yes.

19             (Counsel confer)

20             MR. HENN:  Your Honor, we'll waive the state law

21   claim.

22             THE COURT:  OK.  This would now be, so instruction

23   number 12 would just be trademark dilution, and we would

24   eliminate what is currently instruction 13.

25             Any problems from plaintiffs with instruction 12?

1    MR. HENN:  The only thing we objected to was that the

2    exhibits need to be corrected to 181 and 183 in the third

3    paragraph.

4    THE COURT:  I'm sorry.

5    MR. HENN:  Sorry.  At the end --

6    THE COURT:  Line three of?

7    MR. HENN:  Third paragraph, bottom line.  We just --

8    THE COURT:  Oh, thank you so much.  That's got to be

9    fixed to be the same as previously.

10   MR. HENN:  Yes.  Otherwise, we have no objection.

11   THE COURT:  OK.  Any objection to 12 from defense

12   counsel?

13   MS. MCKIERNAN:  Your Honor, on the second page of that

14   instruction where you list the relevant factors, some of the

15   relevant factors.

16   THE COURT:  Yes.

17   MS. MCKIERNAN:  We would like to include the intent,

18   whether Thom Browne intended to create an association with

19   adidas' mark.

20   THE COURT:  Whether Thom Browne?

21   MS. MCKIERNAN:  Whether Thom Browne intended to create

22   an association with adidas' mark.  The intent factor.

23   THE COURT:  So what is the language you would

24   specifically put?

25   MS. MCKIERNAN:  Whether Thom Browne intended to create

1    an association with --

2              THE COURT:  I'm sorry.  Whether?

3              MS. MCKIERNAN:  Whether Thom Browne intended to create

4    an association with adidas' Three-Stripe Mark.

5              THE COURT:  All right.  I would think plaintiff would

6    be all for that.

7              MR. HENN:  It's a statutory factor, your Honor.  We

8    don't object.

9              THE COURT:  OK.

10             MS. MCKIERNAN:  Your Honor, we would also like to add

11   one additional statutory factor.

12             THE COURT:  Yes.

13             MS. MCKIERNAN:  The extent to which the owner of the

14   famous mark is engaging in substantially exclusive use of the

15   mark.

16             THE COURT:  I'm, for some reason, having trouble

17   hearing you.

18             MS. MCKIERNAN:  The extent to which the owner of the

19   famous mark is engaging in substantially exclusive use of the

20   mark.  It's one of the statutory factors.

21             THE COURT:  What does that mean?

22             MS. MCKIERNAN:  Whether other people are using three

23   stripes.

24             THE COURT:  Ah.

25             MS. MCKIERNAN:  There is evidence of third-party use

1   of stripes in the record.

2            THE COURT:  Yes.  Definitely we have all those

3   photographs of the incredibly heavy dresses that women had to

4   wear in the 19th century.  But there is also more recent -- not

5   much more recent stuff -- which of course is what plaintiff

6   will point out -- some more recent stuff.

7            Well, I like your second formulation.  Do you want to

8   give that again?

9            The trouble I had with your first formulation is the

10  language is kind of vague.

11           MR. HENN:  Maybe use adidas instead of the owner of

12  the famous mark.

13           THE COURT:  Whether?

14           MS. MCKIERNAN:  Whether other entities are using --

15           THE COURT:  Other.

16           MS. MCKIERNAN:  Whether third parties are using.

17           THE COURT:  Well, it's other producers of similar

18  goods or something like that, right?

19           MR. HENN:  It's really an issue of the extent to

20  which, so that is the statutory language.

21           THE COURT:  Well, I'm willing to put in something

22  along this.  I need some language, though.

23           Let's see.  We can figure it out.  Whether other.

24           MS. MCKIERNAN:  The extent to which other producers of

25  similar goods are using stripes, using...

1    Yeah.

2    THE COURT:  Are you using three stripes just lower

3    case?

4    In other words, not Three-Stripe Mark, but three

5    stripes?

6    MS. MCKIERNAN:  Yes, your Honor.

7    THE COURT:  OK.  I'll put that.

8    All right.  On to what is now instruction 14, but

9    which will be now 13, because we're eliminating 13.  But

10   anyway, for your purposes, 14 in your draft.

11   Any problems with that from plaintiff's counsel?

12   MR. HENN:  Only that it probably -- if you're going to

13   read the headers, I don't know if you are, like Roman numeral

14   III, it should say monetary remedies because we have damages

15   and profits, not just damages.

16   THE COURT:  I'm sorry?

17   MR. HENN:  At the very top of the page, I have no idea

18   if you're going to read that, where it says Roman numeral III.

19   It said Roman numeral III, damages.

20   As your Honor is aware, we're seeking damages and

21   profits.  I would suggest changing that to monetary remedies.

22   And then instead of saying damages generally at the beginning

23   of the instructions --

24   THE COURT:  Whoa, whoa, whoa.  The jury doesn't know

25   anything about the refinement on damages that is implicit in

1   your point.  They just know that damages means money.

2               MR. HENN:  It's fine.  You can leave it as damages.

3               I withdraw the objection.

4               THE COURT:  I mean, how about this in the first

5   sentence:  If you find Thom Browne liable for trademark

6   infringement, you must also determine the amount of money,

7   paren.

8               MR. HENN:  No, no.  That's fine, your Honor.  We

9   weren't objecting to -- this was literally just the titles.

10              THE COURT:  I understand the point you're making, but

11  I think for the purposes of the jury --

12              MR. HENN:  It doesn't matter.

13              THE COURT:  Yes.

14              MR. HENN:  We withdraw the objection and have no

15  objection to 14.

16              THE COURT:  OK.  Any problems with 14 from defense

17  counsel?

18              MS. MCKIERNAN:  No, your Honor.

19              THE COURT:  All right.  15, any problems from

20  plaintiff's counsel?

21              MR. HENN:  I think you should, in the very first

22  sentence after actual damages, you should say I mean instead of

23  is meant.

24              THE COURT:  What should I insert me?

25              MR. HENN:  Because otherwise it doesn't make sense.

1    Maybe you can say actual damages means instead of the by.

2              THE COURT:  OK.  That's OK.  Actual damages means.

3    That's good.  I like that.

4              MR. HENN:  No other objections.

5              THE COURT:  OK.  Anything from defense?

6              MS. MCKIERNAN:  Yes, your Honor.

7              THE COURT:  Yes.

8              MS. MCKIERNAN:  In the second paragraph, I believe

9    it's the second sentence, it says:  If you agree that adidas

10   was harmed by Thom Browne's failure to pay a reasonable

11   royalty.

12             I believe that should be changed to if you would agree

13   that adidas was harmed by the likelihood of confusion or the

14   likelihood of confusion with regard to adidas' Three-Stripe

15   Mark and should have been paid a royalty.

16             THE COURT:  No.  I think the language I have there now

17   captures, in effect, what the jury has to do, which is they

18   have to determine based on the expert testimony what a

19   reasonable royalty would have been if this had gone to a

20   licensing situation, which is, I think, the standard way this

21   is computed.  So I'm going to leave it as is.

22             MR. HENN:  I didn't notice that before, but I actually

23   think counsel is correct.  And with due respect, your Honor,

24   the standard is not whether the harm was because of failure to

25   pay a royalty, the test is simply was there evidence of harm,

1    period.

2              If there is evidence of harm --

3              THE COURT:  Oh, I see.  I missed the point.

4              Sorry.  Now I understand the point.

5              MR. HENN:  So probably we should just end after the

6    word harm.

7              THE COURT:  I don't think we need that first.  Now

8    that I understand the point you're both making, maybe it should

9    just read as follows, in the second photograph:  Adidas does

10   not claim that it lost sales as a result of any infringement by

11   Thom Browne; rather, it contends that its actual damages are

12   measured by the royalties Thom Browne would have paid had Thom

13   Browne sought to use adidas' Three-Stripe Mark and had adidas

14   been willing to license it to Thom Browne.

15             Then I would strike the first part of the next

16   sentence and simply say:  you should calculate the damages

17   award using a royalty fee, etc.

18             MR. HENN:  That would be fine with us.

19             THE COURT:  OK.  Very good.

20             All right.  Sorry for missing the point on that.

21             How about number 16?

22             MR. HENN:  Just two typos, your Honor.

23             Three-Stripe Mark is misspelled in the fourth line

24   down.

25             THE COURT:  Oh.

1          MR. HENN:  Lots of Es.

2          THE COURT:  I'm sorry.

3          MR. HENN:  Similarly, in the second to the last line

4    over on the right.

5          THE COURT:  Of the thee.

6          MR. HENN:  Of thee credible.

7          THE COURT:  This is -- I went to a Quaker college.

8    This is the Quaker pronunciation.

9          But thank you for catching both of those.

10          MR. HENN:  No other objections.

11          THE COURT:  All right.

12          I want to reraise a point that I mentioned earlier

13    today, but I want to make sure I understand the parties' --

14          I'm sorry.  First of all, anything from defense

15    counsel at 16?

16          MS. MCKIERNAN:  No, your Honor.

17          THE COURT:  OK.  So loss profits, in some sense, is

18    discouragement, and discouragement is classically an equitable

19    remedy and, therefore, not to be determined by the jury but by

20    the court.

21          Now, there is language in the statute which sort of

22    finesses this and seems to suggest that the jury can

23    determine -- they don't use those words -- subject to further

24    refinement by the court for equitable reasons or whatever.

25          I'm grateful, as I am sure you are, to congress for

1  giving us that totally ambiguous word, but I do wonder a little

2  bit whether congress should be read to have intended to make

3  discouragement, which is in every other context a purely

4  equitable remedy into something that was determined initially

5  by the jury and then is subject to equitable review, which is

6  the way the statute apparently seems to be have to have been

7  read.

8          Let me hear from plaintiff's counsel and then defense

9  counsel.

10          MR. HENN:  That is how the statute has been read

11  repeatedly by the courts.  Essentially the way this plays out

12  is the historic distinction between a damages remedy being

13  legal and profits being equitable comes into play at the

14  question of whether there is a right to a jury trial at all.

15          But once there is legal relief being sought, here

16  damages, under the Lanham Act the profits portion also is

17  decided by the jury because you've got the jury there.  And the

18  courts then treat that language where it says subject to the

19  principles of equity as a post-trial remittitur or adjustment

20  of any profits that the court deems inequitable.

21          THE COURT:  I think I'm stuck with that both from the

22  language and from the case law, although that makes no sense to

23  me in light of all the other cases on discouragement.

24          All right.  Any disagreement with any of that by

25  defense counsel?

1    MS. MCKIERNAN:  No, your Honor.

2    THE COURT:  All right.  Lastly.

3    MR. HENN:  Your Honor, just for the record, we should

4  probably state we have no objection to 17 and 18.

5    THE COURT:  OK.  Well, that's where I was going.

6    MR. HENN:  Sorry.

7    THE COURT:  Any objection to 17 or 18 from defense

8  counsel?

9    MS. MCKIERNAN:  No, your Honor.

10    THE COURT:  All right.  So here is what we will do.  I

11  have a judge's meeting from one to two.  I will put in all the

12  changes we have now agreed to, hopefully before I leave for

13  that meeting, but if not my law clerk will bring you, as

14  quickly as possible, the new version, the final version.  We

15  will then reconvene at 2:15.

16    I'll also give you a draft verdict form.  The only

17  thing I will allow at 2:15 are, in effect, nitpicks, other than

18  as to the verdict form, since that will be the first time you

19  get a chance to see the verdict form.

20    Have a good lunch.  I'll see you at 2:15.

21    MS. MCKIERNAN:  Your Honor, would we be able to get an

22  electronic copy when the new version is served?

23    THE COURT:  If you want to stay here, we'll try to get

24  it to you before one.  If you would like, we'll just e-mail it

25  to you.

1    MR. HENN:  E-mail.

2    MR. MALDONADO:  E-mail.

3    THE COURT:  We'll e-mail to both sides.

4    MS. MCKIERNAN:  Thank you.

5    THE COURT:  Thanks a lot.

6    MR. MALDONADO:  Your Honor, can we discuss briefly the

7    schedule for tomorrow?

8    THE COURT:  So tomorrow, as I already told the jury,

9    we'll start at 9:30.  The first summation therefore will be

10   over by 11.  We'll take a 15-minute break.  The second

11   summation, which will then be over by 12:45.

12   We'll give the jury an hour for lunch.  We'll bring

13   them back from lunch and give my instructions of law, and then

14   they will start their deliberations.

15   Be sure sometime tonight to put together all the

16   exhibits with an index to exchange between sides so we can send

17   that right in to the jury as soon as I finish my instructions

18   of law.

19   And then as I told them today, if they want to, they

20   can go past 4:30 tomorrow up to seven, if they want to, but

21   they have to tell us by four if that's what they want.

22   OK.

23   MR. MALDONADO:  Thank you, your Honor.

24   MR. HENN:  Thank you.

25   (Trial continued January 12, 2023 at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

Cross By Mr. Henn . . . . . . . . . . . . . .1195

 BASIL ANTHONY IMBURGIA

Direct By Mr. Conley . . . . . . . . . . . .1200

Cross By Mr. Flemming . . . . . . . . . . .1221

Redirect By Mr. Conley . . . . . . . . . . .1241

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 1325   . . . . . . . . . . . . . . . . . .1244

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 128, 163, 164, 165, 431, 432, 433, 434, . . .1200

         435, 436, 437, 438, 439, 440,

         441, 442, 899, 900, 901, 903,

         805 and 897.

[Exhibits]*[received]  . . . . . . . . . . .1242