N1CQadi1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADIDAS AMERICA, INC., an
Oregon corporation;
and ADIDAS AG, a foreign entity,

                    Plaintiffs,

          v.                              21 Civ. 5615 (JSR)

THOM BROWNE, INC., a Delaware
corporation,

                    Defendant.

------------------------------x
                                          New York, N.Y.
                                          January 12, 2023
                                          9:35 a.m.

Before:

                    HON. JED S. RAKOFF,

                                          District Judge

                                          -and a Jury-

                         APPEARANCES

KILPATRICK TOWNSEND & STOCKTON LLP
      Attorneys for Plaintiffs
BY:  R. CHARLES HENN, JR.
      H. FORREST FLEMMING III

WOLF GREENFIELD & SACKS, PC
      Attorneys for Defendant
BY:  ROBERT MALDONADO
      HARLEY LEWIN
      BRYAN CONLEY
      TONIA SAYOUR

ALSO PRESENT:
NITA GRAY, adidas paralegal
MICHAEL PUSTERLA, Thom Browne paralegal

N1CQadi1

1        (Trial continued; jury not present)

2        THE COURT:  So the record should reflect that

3    yesterday my law clerk and I emailed the verdict form to the

4    parties, and plaintiffs had no objection.  Defendants had an

5    objection for the record, as they stated, which was overruled.

6    So the verdict form will stand.

7        I understand that plaintiff has an objection to a

8    demonstrative in defendant's opening.  We'll take that up at

9    the next break.  And I think we're ready to proceed.

10       Bring in the jury.

11       (Jury present)

12       THE COURT:  Good morning, ladies and gentlemen.  You

13   are so lucky it's raining out, it's a nasty day, but you get to

14   listen to lawyers.

15       So let me remind you before we hear closing arguments

16   that nothing that counsel says is evidence.  The evidence which

17   is fully before you now came from the witnesses and the

18   exhibits and there were a few stipulations.  But it may be very

19   useful to hear what each side thinks the evidence shows.  Of

20   course, they're going to disagree but they will be able to

21   bring to your attention arguments and inferences that you may

22   not have otherwise thought about, so it's useful to hear their

23   respective views of the evidence.

24       Plaintiff has what's called the burden of proof.  I'll

25   explain that to you in my instructions later today, but the

1    result is that the plaintiff begins first, so we'll hear from

2    plaintiff's counsel.

3         MR. HENN:  Good morning.  Before we begin, I just

4    wanted to take a moment to thank all of you for the time and

5    attention that you have paid over the last ten days listening

6    to all of these witnesses, and, most of all, listening to the

7    lawyers droning on.  I know it's hard.  We know you will

8    continue to pay attention and to do your job, and both of us

9    thank you for that.  So let's get started.

10        Every trademark case, just like this one, has three

11   parties who are interested:  The plaintiff, here adidas, who

12   has spent 70 years developing a brand around three stripes; the

13   defendant, here Thom Browne, who added a stripe, or in the case

14   of the Grosgrain, took a stripe off and started selling

15   products that are basically the same; but there's a third party

16   in interest in this case that I want you to keep in mind as you

17   deliberate, and that is the public.

18        The purpose of trademark infringement, yes, it's to

19   protect adidas's trademark.  Yes, it's to stop infringers from

20   doing conduct that's unlawful, but the most important thing is

21   preventing the public from being confused out in the

22   marketplace, outside the walls of the courtroom.  Keep the

23   public in the back of your mind as you assess the evidence and

24   consider whether confusion is likely and whether Thom Browne

25   should be held liable.

N1CQadi1                    Summation – Mr. Henn

1              We're going to talk a lot this morning about confusion

2     and the likelihood of confusion.  As I explained to you at the

3     beginning during my opening statement, confusion and likelihood

4     of confusion can occur at three different points in time:  One

5     is presale or initial interest confusion and you heard some

6     testimony about that.  The next is point of sale; that's where

7     you're literally at the register buying the product and you

8     don't know what you're buying.  The third is post sale; that's

9     after someone who knew what they were buying is wearing the

10    product, and is out in the public, and is seen by a member of

11    the public who is then confused about who put out that product.

12             And as we explained at the opening, and as we will say

13    throughout this closing, adidas is not alleging that someone

14    walks into Thom Browne's boutique and spends an hour with one

15    of their customer service people and spends $3,000 on a

16    sweatsuit and walks out thinking they have adidas.  That's not

17    what we are alleging.  Our allegation is that in the real

18    world, there are circumstances presale and post sale where

19    confusion is likely.

20             I told you at the beginning the presales scenarios

21    where that can occur are where you're sitting on your couch

22    scrolling through social media and you see something that pops

23    up that has stripes on it, and you think, oh, that's a neat

24    adidas product.  And you look more closely and you realize, oh,

25    wait, that's Thom Browne.  In that moment you have experienced

N1CQadi1                     Summation - Mr. Henn

1    presale confusion.

2            The other presale scenario for you to think about is

3    if you're walking through Nordstrom, a store where both adidas

4    and Thom Browne sell product, and you're walking through the

5    aisle, and you see a rack of striped clothes like you see

6    across the courtroom, and you see it from this distance.  You

7    see those stripes, and the question is, are you likely to be

8    confused and think, oh, those might be adidas products?  We'll

9    talk more about that later.  But that's what presale likelihood

10   of confusion is.

11           Post sale likelihood of confusion is, again, a

12   situation where someone is wearing a Thom Browne outfit or,

13   more likely, is wearing one item of Thom Browne product outside

14   jogging through Central Park, walking down the street, and who

15   knows what else they have on.  They might have adidas shoes on.

16   They might not.  But the point is out in the world people have

17   become so accustomed to seeing adidas stripes that when they

18   see that, a substantial portion of the population is likely to

19   think, oh, that person is wearing adidas.  That's likelihood of

20   post sale confusion.

21           Two things for you to think about before we go through

22   the evidence:  First, adidas does not have to prove both

23   presale and post sale likelihood of confusion.  Either one

24   suffices.  So if you in your mind think the evidence shows only

25   presale confusion, Thom Browne is still liable.  If you think

N1CQadi1                        Summation — Mr. Henn

1   the evidence shows only post sale confusion or likelihood of

2   it, Thom Browne is still liable.  It does not have to be both.

3           The other thing I want you to think about is, as the

4   Judge said, he's going to instruct you on the burden of proof.

5   This is not a criminal case.  Adidas does not have to prove

6   anything beyond a reasonable doubt as you hear on *Law and*

7   *Order*.  This is a case where the burden of proof is called the

8   preponderance of the evidence, which is essentially a fancy way

9   of saying when you consider all the evidence that both sides

10  presented and you put it on a scale, does it tip towards adidas

11  or does it tip towards Thom Browne.  Any tip towards adidas,

12  that's liability.  50.1 percent is enough for liability in this

13  case.  That's preponderance of the evidence.

14          So as you are listening to the closings and you're

15  considering the evidence, I want you to think, where does the

16  scale tip?  Does it tip towards the possibility or the

17  likelihood that someone is going to be confused or does it

18  suggest, no, no one is going to be confused by this.  All

19  right?

20          So, how do you go about considering whether there's a

21  likelihood of confusion?  We talked about the factors at the

22  opening, and I've tried in my closing to organize the evidence

23  that you heard with regard to each of those factors to help you

24  process it in the way that makes sense.  A note about the

25  factors.  These factors are just things you can consider.  They

1    are things that the Judge will tell you tend to suggest whether

2    there is a likelihood of confusion or there is not, but it is

3    not a list of requirements.  It's not as though adidas has to

4    prove every single one of these factors.  You might find some

5    favor Thom Browne.  You might some favor adidas.  But your job

6    is to decide overall which way does the scale tip, all right?

7          So what are those factors?  How strong is the

8    Three-Stripe Mark?  How similar are the parties' marks to one

9    another?  Do the products compete for the same consumers?  Is

10   there any evidence of actual confusion?  Remember, this is a

11   case about likelihood of confusion so we don't have to show

12   that people were actually confused, but where there is evidence

13   of actual confusion, it's pretty good evidence that it's likely

14   since it actually occurred.

15         Next factor is quality of the products.  Are they

16   similar?  And if so, confusion is more likely.  The degree of

17   care when consumers encounter the products.  So in the presale

18   environment, how closely are people paying attention to tags,

19   prices and labels and how it was manufactured.  And in the

20   post-sale environment, how careful is someone being about what

21   they're seeing running by them on the street?  And the last is

22   bad faith.  We'll talk about bad faith.  Bad faith, I like to

23   tell my team as a plaintiff in a trademark case, it's a nice to

24   have but not a need to have.  In other words, if you find that

25   Thom Browne acted in bad faith, that tends to show confusion is

N1CQadi1                    Summation – Mr. Henn

1    likely because he was trying to do something that got closer

2    and closer to adidas, and that suggests a likelihood of

3    confusion.  But if you find that there's no bad faith, that

4    doesn't mean confusion isn't likely.  It just means he didn't

5    do it on purpose.  Still liable, all right?

6         So let's talk about these factors.  First, strength of

7    the mark.  As we said at the beginning, adidas is known for

8    three stripes.  It has been in the business of putting out

9    product with parallel stripes since the 1950s in this country,

10   and since Adi Dassler invented the idea of putting an exterior

11   brand on footwear so that people would know who put out that

12   product.  It's kind of interesting you heard Mr. Browne say

13   that the reason he wanted to put stripes on his product is that

14   he learned from Ralph Lauren that you need an exterior badge to

15   signal where your product comes from.  That's exactly what Adi

16   Dassler figured out in the 1940s, and when he began selling in

17   the United States in the 1950s, it had the Three-Stripe Mark,

18   and it's been on the products ever since.

19        The mark is covered by multiple federal trademark

20   registrations.  The United States Patent and Trademark Office

21   has considered whether the Three-Stripe Mark is protectable

22   multiple times.  You've seen on your screen one example.  Every

23   one of these registrations is depicted in black and white.  And

24   as Ms. Vanderhoff testified, when a registration is depicted in

25   black and white, it covers all color combinations.  It's not

1    just restricted to black and white.  It covers all color

2    combinations.  It's registered on footwear multiple times and

3    in multiple places.  It's registered on apparel in multiple

4    different placements covering a wide arrange of apparel,

5    jackets and sweatpants and shirts and shorts and pants and

6    track tops.

7         It is a federally registered mark.  There is no doubt

8    that adidas owns the Three-Stripe Mark.  The Three-Stripe Mark

9    is so integral to adidas and who it is and its DNA that when it

10   decided to adopt the trefoil logo in the 1970s, it says, you

11   know what, we're going to have three leaves and we're going to

12   run horizontally the Three-Stripe Mark across that trefoil and

13   it's going to be on every product we sell.

14        In the 1990s when they said, you know what, we want to

15   separate our Lifestyle product from our Performance product,

16   they said we need a new Performance logo, the Badge of Sports.

17   They took the Three-Stripe Mark, they angled it 30 degrees --

18   there's the three -- they cut the bottom off and they created

19   the Badge of Sport.

20        When they needed a corporate logo, they took the

21   Three-Stripe Mark and they ran it horizontally next to the word

22   adidas.  Three stripes permeates adidas.  It is one of the

23   strongest trademarks in the United States, particularly when it

24   comes to footwear and apparel.  Everyone knows adidas when they

25   see that mark.

1    Now you're going to be able to consider various types
2    of evidence as to whether the mark is strong in addition to the
3    fact that it is registered.  One is how long has adidas been
4    using it?  Well, the evidence is uncontested, since 1952.  No
5    challenge to that by Thom Browne.

6    Another type of evidence you can consider as to how
7    strong a mark is, is how much is this being advertised?  Well,
8    you heard testimony from Chris Murphy about television
9    advertising, print advertising, online advertising, every
10   possible type of advertising you can think of to the tune of
11   $300 million a year of advertising featuring the Three-Stripe
12   Mark.

13   Sales is another way you can decide if a mark is
14   strong because if products are selling well, that suggests the
15   branding on it is valuable to the consumers who are buying it.
16   $3 billion a year adidas sells of just apparel and footwear
17   with three stripes on it in the United States.  That is an
18   incredibly strong trademark.

19   And you might ask yourself, why is this a factor?  Why
20   does strength of the mark matter in the likelihood of confusion
21   analysis?  Well, the reason is when you have a really strong
22   trademark, when people see it and they immediately think of the
23   brand name, that means it's more likely when they see something
24   that's similar to trigger adidas in their minds because they've
25   been trained, since 1952 you've been trained when you see those

N1CQadi1                        Summation - Mr. Henn

1     three parallel stripes, you think adidas.  So when you see

2     something else, you're more likely to be confused.  That's why

3     strength is an important a factor, and it's often why it's the

4     first factor.

5           Evidence of decades of use.  Remember those old

6     categories people wearing 1970s clothes?  We went through that

7     ad nauseam at the beginning of the trial.  You probably thought

8     we would never stop showing you catalogs, but the reason we did

9     that was to show how strong the mark is and how long the mark

10    has been used and how long it has been known to consumers.  It

11    was used back in the Seventies horizontally, vertically, on

12    shoes, on apparel, and in the red, blue, white combination.

13          We presented an exhibit that walked through horizontal

14    uses and some diagonal uses over decades.  So it is not just

15    that the adidas Three-Stripe Mark exists in a vertical form.

16    It is used horizontally, vertically and diagonally, and it

17    conveys the same impression:  When people see that three

18    stripes, whether it's down the sleeve or around the sleeve or

19    diagonally on a shoe, they know it's adidas.

20          Red, blue stripe use.  You saw tons of evidence of

21    this as well.  As we went through the decades of advertising

22    and catalogs, we highlighted for you the fact that adidas has

23    consistently used that combination over a long period of time.

24    We also went through iconic shoes in history.  One of the

25    reasons the Three-Stripe Mark is so famous is because famous

N1CQadi1                        Summation - Mr. Henn

1    athletes who have done incredible things did so wearing three

2    stripes.  It dates back to the first track shoes, to cleats

3    that had screw-in -- the first soccer cleats that had screw-in

4    cleats.  Muhammad Ali wearing three stripes in his world

5    championship bouts.  Dick Fosbury, the high jumper, wearing it

6    when he jumped over the high jump.  The pro model which tons of

7    ABA athletes wore in the 1970s with the red and blue stripes,

8    Billie Jean King's shoe.  Shoes from, you know, Run-D.M.C.

9    wrote a whole song about "My Adidas" about the Superstar shoe

10   which had stripes on it.

11           As I mentioned, the evidence showed substantial sales

12   of Three-Stripe products to the tune of $31 billion over the

13   last ten years, $3.1 billion a year, tons of advertising of the

14   marketing of the three stripes and, by the way, advertising of

15   the three stripes not always in the traditional down-the-sleeve

16   pattern, but in all sorts of ways.  You remember how Chris

17   Murphy walked you through those ads that we watched, the

18   television ads and the compilations that were on video, and he

19   showed you how thoughtful they are about making sure that the

20   camera zooms in on the stripes during the ad so that you know

21   the stripes are part of adidas's DNA.

22           We also presented substantial evidence of unsolicited

23   media attention.  Reporters write articles about adidas, and

24   their editors say don't say adidas every time.  Sometimes you

25   have to refer to them as something else or change it up a

1    little bit.  So you've got references to adidas iconic three

2    stripes, the trademark Three-Stripe logo, the famous brand with

3    the three stripes.  And I'll note that none of these modify

4    three stripes by saying, the famous vertical Three-Stripe logo.

5    They don't do that.  It's three stripes no matter what the

6    orientation.  The mark is clearly very strong.  There's really

7    been no evidence to counter anything I just went through from

8    Thom Browne.  That clearly weighs in adidas favor.

9            The second factor is how similar are the marks.  And I

10   put this graphic up here because if similarity of the marks in

11   trademark infringement were simply a matter of counting

12   stripes, we wouldn't need a jury.  We would just need a

13   calculator.  We would look at it and say, oh, that's four,

14   that's three, they're not the same.  But that's not how it

15   works.  When you're considering the similarity of the marks,

16   your job is to consider how similar are they when they are

17   encountered by consumers in the marketplace.  So when someone

18   is scrolling through social media on the couch, how similar is

19   it when they're going through when you've got four versus

20   three?  When somebody runs by you in Central Park wearing some

21   of the compression tights that Thom Browne put out, how closely

22   are you counting stripes?  And the fact is four and three are

23   very similar because, as we're going to discuss in a minute,

24   there's only one more of them from a distance, moving past,

25   scrolling past, they're very similar.  You can look at these

1    images.  The registered mark is on the left.  Thom Browne's

2    product is on the right.  Yes, there's a fourth stripe, but the

3    law does not require us to show that they're identical.  The

4    Judge will tell you that similarity is the test, not identical.

5            The other thing is negative space.  Do you remember

6    when I was cross-examining Thom Browne, and I pulled the

7    sweatpants up, and I asked him about negative space, and he

8    said, yes, it's the space between the stripes.  This is one of

9    the reasons four stripes is a problem because when you add a

10   fourth stripe, you create the impression of three in between.

11   You see on your slide how that occurs.  When Mr. Maldonado

12   stands up here in a few minutes with his Thom Browne tie, take

13   a look at that tie.  Tell me do you always see four white

14   stripes or do you see three gray stripes between the white?

15   And you might be saying, oh, you're crazy, that's a stretch

16   man, that's a stretch.  But then Ms. Arbuckle got up on the

17   stand, this person from Fashion Institute of Technology who

18   knows everything about fashion, and she was presented with this

19   jacket from Celine, and counsel for Thom Browne asked her how

20   many stripes do you see?  Do you remember what she said?  I was

21   looking at it, I was waiting for her to say three, you know,

22   three stripes.  No, she looked at that, and she said, I see two

23   black stripes on a white background.  She literally gave you on

24   the stand the evidence of how negative space can influence how

25   someone sees stripes.  So think about that when you're thinking

1    about how similar these marks are.

2           The shoes are perhaps the closest example of how

3    similar what Thom Browne has done to the adidas marks.  We

4    talked about the fact that this is not Thom Browne's Grosgrain.

5    He testified that that is not his Grosgrain.  That was a design

6    choice that he made to create stripes.  And it's convenient,

7    isn't it, that they're basically the same width as adidas

8    stripes.  They are angled sideways just like adidas stripes.

9    They're in the exact position of adidas stripes on the shoe,

10   with regard to the red and blue ones.  And with regard to the

11   white ones on the back, again, he said, "That's not my 4-Bars.

12   That's a design choice.  I put the 4-Bars on the side of that

13   sneaker."  Ask yourself why?  Why do that?  If your brand is

14   the little tag on the back.  If it's the Grosgrain, white, red,

15   white, blue, white thing, why do that?  And why put it on a

16   white shoe if you want people to know that it's white, red,

17   white, blue, white?  Curious.

18          The other Grosgrain products are also incredibly

19   similar to the marks that are registered by adidas:  Same

20   placement, same impression, shorts, pants, et cetera.  So when

21   you are considering how similar the marks are, yes, one is

22   three, one is four, or one is three and one is two, but on

23   balance, in the context of presale and the context of post

24   sale, they are incredibly similar.  Hence, likely confusion.

25          So the next one is do the products compete for the

1   same consumers?  Well, there are a lot of different ways you

2   can look at this factor.  The first is, are the parties selling

3   the same products?  Well, there are different price points for

4   different products, for sure.  But ask yourself, the last time

5   you were scrolling through Instagram, how many times did you

6   see a price tag on the products before you started clicking

7   through?  Or when you were walking through the store and you

8   saw products hanging on a rack way over there, did you know

9   what the price was?  No, you just knew that that was a cardigan

10  and a suit.  So the product categories are the same, and why

11  that's relevant in this kind of case is when someone is running

12  by you in Central Park, and they're wearing 4-Bar compression

13  products, it is more likely that you will be confused if adidas

14  also sells compression products, right?  You can consider if

15  adidas didn't sell any compression products, then it would be

16  very odd for you to see that and think adidas.  But because

17  they sell exactly the same types of products, confusion is more

18  likely, and the record is very clear on this.

19          You probably are again wondering why it was taking so

20  long when we went through with Paul Bowyer, we went through

21  different categories.  There are specific exhibits, an exhibit

22  of compression and running, an exhibit of sweatpants, an

23  exhibit of shorts, an exhibit of T-shirts, an exhibit of polo

24  shirts, sweat jackets and hoodies and outerwear and puffy

25  jackets and, of course, shoes.  So the types of products that

are likely to be encountered in the marketplace are essentially
the same.

What about the other products?  Thom Browne has spent
a lot of time during this trial putting in front of you
examples of products that adidas doesn't accuse of
infringement:  Suits, the shrunken suit, cardigans, cashmere
sweaters.  When you are back making your deliberations, focus
on what is actually being accused of infringement in this case.
It is not these products.  It is the products that are exactly
the same kind that adidas sells.  And adidas was thoughtful
about that.  We did not say Thom Browne must stop all four
stripes on everything that it does.  Because we are bound by
the law that says we can only object to things that are likely
to cause confusion.  So we focused our claims on the products
in Exhibits 55 and 56.  Those are the products that adidas
alleges to infringe.  Not this other stuff.  Not the stuff on
the runways.

How else do we know that these parties are competing
for the same consumers?  One way we know is they're in the same
stores.  Lots of testimony from both sides about the fact
they're in Saks, they're in Bergdorf, they're in Nordstrom's.
If you're walking through one of those stores, you are likely
to encounter both products at some point in your shopping trip,
and that increases the likelihood of confusion.  Because if
you're walking through Nordstrom and you see stripes, do you

know if it's Thom Browne or adidas from a distance?  Probably
not.

          FARFETCH and Net-A-Porter.  Those are online sites
where they also overlap. So if you are scrolling through what
FARFETCH has to offer, you might encounter both.  Yes, once you
click through and you see at the top it says Thom Browne and
you see it's $2,000 for something, yes, yes, you realize that
that's a Thom Browne product, but that's point-of-sale
confusion.  You've already clicked through, and that is presale
confusion, and that is just as unlawful as what happens at the
register.

          **We also know that presale confusion is possible
because both parties are very active on social media.  You
heard testimony from Chris Murphy about this.  You saw plenty
of examples with Rodrigo Bazan and Thom Browne where there were
Facebook posts and Instagram posts and that is exactly how it's
possible that people will scroll past these things in their
feed.  You also heard about adidas doing paid advertising so
that even if you don't follow an adidas account, you are
exposed to those three stripes all the time.**

          How else do we know they're pursuing the same types of
consumers?  Well, we talked a lot about Leo Messi.  You didn't
know him before; you now know who he is.  He has been an adidas
athlete, as we know, for well over a decade.  And Thom Browne
did a deal with them in 2018.  We're going to talk about the

 1   suspicious timing of that in a minute when we get to the bad

 2   faith factor.  But as we think about whether we are approaching

 3   the same consumers, do you remember what Mr. Browne testified

 4   on cross about this?  His testimony was:  I did that because I

 5   wanted to reach customers that we hadn't reached before.  I

 6   wanted to reach a new type of consumer; not the niche

 7   consumer -- you remember the exhibit where they said they were

 8   a niche brand that was not known outside of their little area?

 9   Part of that effort was to go out into the world of sports and

10   try and reach new people.  Who were they trying to reach?  They

11   were trying to reach consumers like adidas who are interested

12   in Lionel Messi and other soccer players.  So, again, there was

13   lots of testimony from Chris Murphy and Paul Bowyer about how

14   focused adidas is in advertising, marketing and selling to

15   soccer fans.  And Thom Browne didn't just do a one-time deal.

16   We saw the contract:  Three-year deal with Barcelona,

17   conveniently after adidas objected to the use of the 4-Bars.

18          Basketball too.  Lebron is a fan.  Lebron wears Thom

19   Browne apparel.  They went out in 2018 four months after adidas

20   objected, or a couple of months after adidas objected, and

21   outfitted the whole Cavaliers team.  Well, why were they doing

22   that?  Again, to reach new audiences with their product.

23   Basketball, where adidas has had a long-term presence and a

24   huge focus, you heard testimony from Chris Murphy and Paul

25   Bowyer about the importance of basketball as a category, the

1      importance of dressing athletes in three stripes, and you saw

2      tons of advertising like you see here on this slide.  That's an

3      example of competing for the same consumer.

4              The next one is evidence of actual confusion.  Now,

5      actual confusion, it's another one of those nice to have, not

6      need to have.  The Judge is going to tell you that adidas has

7      no obligation to present you with evidence of actual confusion

8      because that's not the test.  It's whether confusion is likely

9      to occur, not whether it has actually occurred.  But in a case

10     where there is an actual confusion, that tells you it's likely.

11     So there are two categories of actual confusion evidence that

12     you heard in this case.  One is consumers who in that presale

13     environment scrolling through their Instagram or feeds came

14     across a Thom Browne product.  And, yes, one guy bothered to

15     literally type in "adidas" but think of all the people who saw

16     that and didn't think, oh, well, I should alert Thom Browne to

17     the fact that I think this is adidas and let me take a moment

18     and type adidas in there.  This is the tip of the iceberg,

19     someone who took the time to express their confusion in

20     writing.

21             And think about how rare it would be for someone to

22     document actual confusion in the presale or post-sale

23     environment.  You know if you're confused when you buy

24     something, you get home and you think, oh, my gosh, it's not

25     adidas.  You return it to the store, and there's a very clear

N1CQadi1                          Summation - Mr. Henn

documentation, I was confused, hence, I returned it.  But in

the presale and post-sale environment, it's very difficult to

find actual confusion.  There's not a 1-800 I was confused and

you dial in and you say, "I saw Thom Browne and I was

confused."  But here, we actually have people who took the time

to express their confusion.  In Instagram posts both with

regard to the 4-Bars and with regard to the Grosgrain, "I

thought it was adidas."  Even using @adidas, tagging the

company.

        The other evidence of actual confusion in this case is

the survey.  So you're sitting there thinking, all right, I'm a

juror, I've got to decide all of this evidence.  What is the

best evidence of what consumers think when they see these

products?  The best evidence is a study that shows the products

to consumers and asks, what do you think?  Who puts this out?

Well, Hal Poret conducted a survey of 2,400 people, men and

women across the United States, people who were likely to buy

these types of products, so the very consumers that you are

supposed to be assessing whether there's a likelihood of

confusion for.

        He asked them two key questions.  The first was what

company or brand do you believe makes or puts out this product?

Makes or puts out.  That is an assessment of are people

confused about the source of these products.  Do you think

adidas actually made this product?  He also asked do you think

N1CQadi1                      Summation - Mr. Henn

1    the product we showed you is affiliated with, sponsored or

2    approved by adidas?  And when the Judge gives you the

3    instructions later, you will see that that is important

4    evidence.  If, in fact, consumers are likely to believe that

5    the product is affiliated with, sponsored by, or approved by

6    adidas, Thom Browne is liable.  Hal Poret asked the same

7    questions that you are being asked to resolve.

8           And what were the results?  The results were

9    significant, as Mr. Poret told you.  You might look at this and

10   say, well, 26 percent of people were confused.  What about the

11   other 74 percent?  Yes, we're not saying everyone in America is

12   going to be confused.  But think about 26 percent of the

13   population and what that number looks like.  26 percent of

14   people in New York walking down the street.  26 percent of

15   people thinking that that is adidas.  And, keep in mind, that's

16   after controlling for the noise created by just these look like

17   athletic products.  The control caught that.  So we know the

18   only difference in these images is Thom Browne's use of the

19   4-Bar mark.  And 26 percent of people seeing the jacket, and

20   the compression pants were confused.  38.6 percent were

21   confused by that top.  Almost 25 percent were confused by the

22   running shorts and the jacket.  This is empirical data that you

23   have to base your decision on.  With regard to men's product,

24   35 percent were confused by the T-shirt and the gray

25   sweatpants.  31 percent by the shorts.  30 percent by the

jacket.  15 percent by the sweatpants by themselves.  And the
shoes 14 percent.

Mr. Poret gave you quantitative proven data that the
consumers at issue are confused.  What did Thom Browne give you
in response?  Nothing.  Nothing.  There is not a survey from
Thom Browne in this case.  There is no one who came and sat in
that chair and said, I did a study, and guess what?  Confusion
is not likely.  Just an empty chair.  No response to Hal
Poret's survey.

Now, they brought Dr. Steckel in.  He's a great guy,
but he didn't offer any opinions regarding Hal Poret's survey
or any other matter in the case for that matter, but he did not
respond to Hal Poret's survey.  We have no response in the
record, so when you are weighing the evidence, there is nothing
to counterbalance that in the record.

What do we have?  We have the cross-examination of
Mr. Poret.  And what did the cross-examination focus on?  It
was, well, Mr. Poret, you used pictures with a white
background.  Okay.  Let's just pause and think about that for a
minute.  First of all, he testified the reason he did that was
so that consumers would focus on the product, so they had every
opportunity to see the stripes, count the stripes without any
distractions that would actually exist in the world real.  The
second thing he said is putting a tree in the background or a
bus in the background does not reduce the level of confusion.

N1CQadi1                      Summation - Mr. Henn

 1    If anything, that would mean people are paying less attention

 2    to the clothing because they're distracted by everything else

 3    going on around them.  Confusion goes up.  The third thing he

 4    said about that criticism was perhaps important from a science

 5    standpoint, he said adidas is not alleging that trees are like

 6    likely to cause confusion.  So I would have had to put that in

 7    the background of the control as well.  So it would have netted

 8    out.  So by using the white background, he ensured the most

 9    valid result.  And overall 26.9 percent of the public is

10    confused by Thom Browne's products.  Remember, the third party

11    in interest in this case.  It's these people, the public.

12            The next factor is quality of the parties' products.

13    First of all, both parties sell perfectly high-quality goods.

14    Not only did you hear testimony from adidas from Paul Bowyer

15    about the controls at the factory and the wear testing and the

16    performance testing and all the things adidas goes through to

17    make sure its products are the highest quality and actually

18    help perform on court or on the field, but you also heard

19    testimony about these collaborations where adidas does these

20    high-end collaborations with Yohji Yamamoto and Stella

21    McCartney, Danielle Cathari and Prada and Gucci.  So to the

22    extent you had some concern about the fact that Thom Browne's

23    products are made in Italy from the finest fabrics and are

24    woven in a very special way, the quality is essentially the

25    same.

1    The other thing to think about while you're assessing

2    quality is context.  Remember, if you were buying one of these

3    things, you might pick them up and check the manufacturer, you

4    might check price, you might see how it's woven and what the

5    fabric is.  If you're in the presale context, you're too far

6    away to touch the product, to know how it's manufactured, to

7    know what it's made of.  And in the post-sale scenario, unless

8    you are a really creepy person, if you see somebody on the

9    subway, you're not going to know what the fabric feels like or

10   what it's made of because you're not going to go over and start

11   touching the person.  So you will need to assess quality in the

12   context in which you are assessing likelihood of confusion.

13   And so visually the quality is essentially the same.

14        A moment about the rack, the rack that's been sitting

15   over there for you to look at.  A couple things for you to

16   think about the rack:  First, can you tell the price of

17   anything on that rack?  Nope.  In fact, do you remember when

18   counsel took one of the products up to Thom Browne and asked

19   him what the price was, and he started looking all over for a

20   price tag and couldn't find a price tag, and said, oh, it's

21   about a thousand bucks?  He couldn't tell the price holding his

22   own product.  Ask yourself in the post-sale scenario, do you

23   know what the price of these product are?  Fabric?  This one is

24   made of cashmere, so of course it's totally different from

25   adidas and no one would know.  You can't tell that's cashmere

N1CQadi1                          Summation - Mr. Henn

from over here.  Who knows what those are made of?

How they are manufactured.  Are the stripes woven in or stitched on?  Really?  Is that what people are focused on when they're seeing people walk by them?  Or when you're looking across there, can you really tell how those are woven into the product?  You are looking at product in the exact kind of way that someone in the presale or post-sale environment would -- from a distance.  You also can't, by the way, read the little labels and see that in tiny, tiny print it says "Thom Browne."  So that's not helping anyone avoid confusion.

So what was on that rack?  This is a good example where they filled this rack with a bunch of products adidas is not alleging infringed its mark because the products are so different.  Adidas is limiting its claims to things that look like adidas products:  Sweatpants, hoodies, sweatshirts, right?  Take everything off the rack that we're not accusing, and it's a skinny, little rack.

The other thing to think about, what's not on that rack?  What did Thom Browne not want you to look at in this courtroom?  There is not one piece of their running compression apparel on that rack.  There is not a single shoe over there.  You think that was by accident?  They didn't want you to see that stuff from this kind of distance because they knew the impact would be, oh, my gosh, from over there, that looks like adidas.

N1CQadi1                    Summation - Mr. Henn

1           The other thing I want to say about quality, Thom

2      Browne clearly makes very expensive clothes, and they are --

3      you know, reminds me of the old ads of Corinthian leather, but

4      they are products made with the finest cashmere from Corgi and

5      Wales.  We are not disputing that, but, very interestingly, the

6      products we actually accuse are the products that Thom Browne

7      calls things like running shoes, and tech compression tights.

8      And when we asked, are these actual running shoes?  It might

9      have been my favorite line in the whole trial.  Thom Browne

10     said, "I would advise not running in my running shoes."  Think

11     about that for a minute.  "I would advise not running in my

12     running shoes."

13          And when asked whether they did any product testing or

14     wear testing on these purported running outfits, the answer

15     was, oh, no, no, no, no.  And when we asked about their

16     swimwear, do you remember that one?  Are these actually for

17     swimming?  The answer:  Well, you can swim in it.  Reminds me

18     of going to a wedding, getting dunked in a pool.  You can get

19     wet in these things, but they are not made for this purpose.

20          The next factor, the degree of care when you are

21     encountering the product.  I've covered this a little bit as

22     I've talked about the other factors because, again, as you

23     assess the evidence, on each of these you need to be very

24     cognizant where in that purchase journey the likelihood of

25     confusion is happening.  When you think about the degree of

1    care that consumers are exercising, be thinking about the two

2    places that adidas is alleging likelihood of confusion:

3    Presale and post sale.

4         So what is some evidence that is not relevant to your

5    consideration?  Price.  Presale.  Post sale.  Nobody knows the

6    price.  Fabric.  Presale.  Post sale.  You don't know the

7    fabric.  You don't know the manufacturing.  You don't have

8    someone giving you careful client care and sitting with you and

9    serving you tea and all of the things that happened in the

10   store.  None of that is relevant.  With regard to where we are

11   alleging likelihood of confusion and where you need to assess

12   is confusion likely, the degree of care is way less.  It's just

13   the nature of life.  When you walk from the car or the subway

14   or from your place to the court, you are not sitting there

15   touching the people that walk by and asking them what it cost

16   and where it was manufactured.  That's just not the way things

17   happen in the post-sale world.

18        Why is the degree of care such an important issue for

19   you in this case?  Well, it's because once the products leave

20   Thom Browne's store, the consumer can wear it however they

21   want.  I asked Mr. Bazan, any restrictions you put on anyone

22   once they buy these products?  Nope.  They can wear it wherever

23   and however they want.  We have evidence in the record that

24   people wear it with adidas shoes and socks.  We're not saying

25   that happens all the time, but we're giving it as an example

N1CQadi1                    Summation - Mr. Henn

1    that that is a very realistic possibility of what could happen

2    in the world.  And if you thought this stuff looked confusing

3    like adidas before they wore it with adidas shoes, you can

4    image what it might look like somebody running by you wearing

5    adidas shoes and these striped outfits.  You might think, oh,

6    they have a lot of adidas on.

7             The picture on your left, the guy with his knee up in

8    the air?  That was posted out by Thom Browne's company to the

9    public.  That was on their own social media feed, like, hey,

10   here's our stripes and wearing it with adidas socks.  We showed

11   you this ad, mostly because I thought it was a nice break in an

12   otherwise mundane day, but this is a good example of what

13   happens.  People buy Thom Browne's products, and then they can

14   do with it whatever they want and go wherever they want with

15   it.  People can end up in gyms.  Celebrities can end up in ads.

16   And, yes, it's funny.  He's obviously not working out.  He's

17   drinking milk out of a sippy cup.  Yes, it's funny, but the

18   idea is they're placing this in the context of sport, adidas's

19   core area.  And that's why in that wholesale world,

20   possibilities for confusion are much greater than at the

21   register.

22            We also know that because of how people wear clothes

23   and move about the world, the four stripes are not always going

24   to be visible.  Even on Thom Browne's own website, he's got

25   models bunching up the shorts so you can't see all four stripes

1  clearly.  I don't think it was done intentionally, but it's a

2  perfect example of how someone can be confused in the public.

3  Even if someone has four stripes, they are not always visible.

4  It's why just slapping a fourth stripe on wasn't the answer.

5           The products in the middle, remember I showed those to

6  Mr. Bazan, and I asked about the leggings on the guy.  I said,

7  he's got your leggings on there, and the shorts are covering up

8  or his hand is covering some of the stripes, so you can only

9  see a couple of them, you can only see three stripes on the

10  shorts and on the leggings.  His answer was to sort of deviate

11  and say, oh, but you see the four stripes on the top.  What's

12  to say the person wearing the tights and the shorts out in the

13  park is also wearing a Thom Browne top?  They might just be

14  wearing a black top.  They might be wearing an adidas top.  The

15  fact is you cannot ensure that consumers in the post-sale world

16  will always see all four stripes, and that's why four doesn't

17  solve the problem.

18           How else do we know that even when people are

19  presented with this, the degree of care doesn't prevent

20  confusion?  Because we have the survey results.  We talked

21  about the overall percentages, but I think equally important is

22  the verbatim responses.  When people saw these striped designs

23  and repeatedly said, "I saw three stripes, three stripes, three

24  stripes, three stripes."  Even though there's clearly four

25  white stripes there.  It begs the question, are they looking at

from the negative space like Ms. Arbuckle?  Or is this an

example of that Gestalt theory you heard Dr. Joachimsthaler

talk about where people don't sit down and count stripes, but

they get an impression based on their memory, adidas being

stripes?  It doesn't matter which one is happening.  You don't

have to resolve that psychological conundrum.  You just need to

know that the empirical data from a survey to which there was

no rebuttal proves people thought it was adidas and saw three

stripes.

          The same was true with the male products:  Three

stripes, three stripes, three stripes.  Same was true with

shoes:  Three stripes, three stripes.  And think about these

are people who are sitting down with no distractions on their

computer screen taking a survey, looking at the product for 15

seconds minimum, and then being asked immediately who puts this

out and why?  Think of the degree of care they're engaged in at

that moment versus somebody on the street.  Likely to be even

higher in those scenarios.

          The Judge asked the witness a question, which I

thought was a good one, he asked Dr. Joachimsthaler, "Well,

what if people had problems with their eyesight when they took

the survey?"  Well, two things.  Dr. Joachimsthaler explained,

yeah, and people out in the real world, they have problems with

their eyesight, so guess what?  You're going to have people who

don't see it clearly.  But Mr. Poret also explained in his

1    survey, not only were respondents required to put on their

2    contact lenses or eyeglasses but after they saw the question

3    and before they answered the question about source confusion

4    and affiliation, they had to say, "I was able to view the

5    images clearly."  There is no worry that in the survey people

6    weren't seeing what they were needing to see.

7            Another point on degree of care.  This might be my

8    second favorite quote from Thom Browne during the trial while

9    he was on the stand.  You remember when he was shown these

10   drawings offings early playing around with Three-Stripe band on

11   the sleeve?  As counsel said to him, how many stripes are on

12   that sleeve?  Mr. Browne said, "Four."

13           (Continued on next page)

1      MR. HENN:  There was sort of an awkward pause.  And

2   all of a sudden he said, Oh, oh, wait, three.

3      Now, clearly that was a mistake.  But guess what?

4   That's what happens in the real world, and you saw it here on

5   the stand from the man who drew the pictures himself.

6   Sometimes three looks like four.  Sometimes you, guess what,

7   get confused, even when you're sitting on a stand under oath

8   and paying very careful attention.  You can imagine what it's

9   like out in the world.

10      The last factor on likelihood of confusion is bad

11   faith.  Again, if there is evidence of bad faith, it tends to

12   show confusion is more likely.  But if you think, you know

13   what, Thom Browne didn't do anything wrong.  He just made a

14   mistake.  It's all right.  He's still liable because confusion

15   is likely.

16      Let's talk about the evidence of bad faith.  So we all

17   know back in 2007, adidas called and said, Hey, stop doing

18   three stripes.  And Mr. Becker said, We'll do it.  We're about

19   to go bankrupt.  We don't need to fight.  Hung up the phone.

20      We also know that Thom Browne's lawyers promptly

21   provided them with a full report, 40-something pages, of all of

22   adidas' trademark registrations and said to him, By the way,

23   that those covered mark vertically, horizontally, and

24   diagonally.  And that was in 2007 the company's CEO was on

25   notice of adidas' trademark rights.

1    So a few months later Thom Browne and his design team
2  get together and they think, All right, can't do three.  What
3  do we do?  I've got it.  We'll do four.  We'll put another
4  stripe on top.  Do they call the lawyers that just told them
5  adidas owned all these rights?  Did they ask, Hey, is four an
6  infringement?  Hey, if I put a fourth stripe on it, am I good
7  legally?  No.

8    You heard Mr. Becker.  It might have been the last
9  answer he gave on the stand.  I asked him:  Did you give an
10  opinion as to whether this was OK?  He said, We didn't get any
11  opinions from them.  So instead of checking with the lawyers,
12  Thom Browne starts slowly rolling four-stripe products out.

13    Now he's doing a lot of non-four-stripe products.  We
14  looked at a lot of fashion show pictures.  All kinds of very
15  creative, very artistic, very unusual products.  None of which
16  are accused of infringement.  He also started putting the four
17  stripes on cardigan sweaters.  Not accused of infringement.  He
18  ultimately added the four stripes to the shrunken suits.  Not
19  accused of infringement.

20    Then there was sweat pant created, but it was a tiny,
21  tiny situation.  You remember those invoices that one of the
22  last witnesses went through where my colleague Bethany asked
23  him to go through and find the highlighting somewhere in the
24  invoice?  Well, if you want to spend some quality time, you can
25  go through those invoices yourself.  We did some math for you.

1          Over a two-year period, Thom Browne told 374

2     sweatpants.  So it was a tiny thing, tiny thing back then.  And

3     then starting in 2016 the company decided, you know what, let's

4     expand this.  Let's get into sportswear bigtime.  Our key

5     growth pillars are sportswear.  Because right now we're just a

6     niche brand.  We have low awareness.  It's just customers

7     within that tight fashion circle that really like Mr. Browne.

8          So guess what?  Sportswear segment greatly expands in

9     2017, 2018.  It's a business priority to go down the path of

10    selling more of this sportswear.  Adidas calls in 2018 and

11    says, Hey, woah, we're seeing infringing product.  What are you

12    doing?  This is new stuff.  You're putting it on shoes.  You're

13    running it down the legs of pants.  You're starting to sell

14    products that look like our products.  That's not suits.  We

15    didn't have a problem with the suits.  So there was a call in

16    2018; stop doing this.

17         This is where bad faith gets really obvious.  After

18    that call that put them on notice of adidas' rights and adidas'

19    objection, after that call they do the deal with Barcelona.

20    They do the deal with the Cavs.  After that call, two years

21    later in 2020 they decide, you know what, let's release an

22    entire line of compression athletic products.  And they told

23    *Vogue* magazine, this is the first for the brand.  And

24    Mr. Browne testified, prior to this point, they hadn't sold any

25    legitimate athletic product.  Two years after adidas objects.

1    That's not good faith.  That's bad faith.

2           What else did they do that exhibits bad faith?  Well,

3    they put all these products on a new section of their website

4    called active-wear.  And you remember when the judge asked

5    about the definition of sportswear versus active-wear, and

6    Mr. Browne said active-wear, that's for athletics.  That's for

7    sports.  That's where they put these products that we accuse.

8           What else did they do?  They started calling these

9    things running shoes, tech products, ski jackets.  They started

10   using the language of sport to promote these products.  This is

11   bad faith.  When you go from a shrunken suit to a tiny handful

12   of sweatpants to full-on compression products that you promote

13   online with models wearing adidas shoes.

14          Same thing with the Grosgrain.  Adidas doesn't say

15   it's a problem to put it on the back of a business suit or tuck

16   it inside the placket or on the buttons on your sleeve.  That

17   is not going to cause confusion.  But when you turn it on an

18   angle and you blow it up and you put it on a white shoe, that

19   is bad faith.  Running that two-stripe design down the side of

20   a pant or in the classic position down a jacket, that is bad

21   faith.

22          And you might pause and think, Oh, well, but that's

23   his trademark.  He should be able to do it.  He did apply to

24   register that little flag, so he can stretch it out if he wants

25   to.  So I asked Mr. Browne.  I said, Hey, is this your

1    trademark, this stuff?  Remember what he said?  He said no,

2    that's just a design choice.  I chose to do that.  I chose to

3    do it.  Didn't have to.  That's bad faith, when someone does

4    that in the face of an objection from a trademark owner of one

5    of the most famous brands in the country.

6            And what a good deal it has been for them.  Remember

7    their damages expert putting this up on the slide?  Back in

8    2015, couple hundred thousand dollars of this stuff.  Up to

9    $4 million in 2021, last full year in this data.  He's only

10   gone through November of 2022.  It's small.  That's bad faith,

11   going at it, doing more, selling more, selling more.

12           Do you remember in the opening when Mr. Maldonado said

13   this case is about property lines, and adidas needs to stay on

14   its property.  I want you to think about that analogy when you

15   think about bad faith.  So Thom Browne sells all these things

16   that adidas doesn't accuse.  They are not active-wear.  They

17   are not sports, even though he calls them sportswear.  Use your

18   common sense on that.  These are not the things that adidas

19   objects to now or ever objected to.  We don't have an issue

20   with these.  What adidas objected to and what is bad faith is

21   when Thom Browne moved on to adidas' property with sports

22   products, athletic products, running shoes that he wouldn't

23   advise you to run in but is still calling them running shoes.

24           And you are likely to hear a bit of an emotional plea

25   from my opposing counsel about adidas is trying to stop us from

N1CsADI2                    Summation - Mr. Henn

1    doing everything.  This brand means so much to us.  Don't make

2    us stop.  I want to put in context what adidas is objecting to

3    in light of the overall Thom Browne business.  We heard they

4    are a $300 million business, globally a $300 million business.

5    You saw data from the last witness that, in the U.S. during the

6    last six years or so, they sold $120 million of product

7    totally.  The accused products, according to their expert, were

8    12 million.  So adidas is only objecting to 10 percent of what

9    Thom Browne did.

10        It's worth thinking about.  If 90 percent of your

11   product is outside of anything adidas cares about, why go on

12   their front lawn.  You're like, oh, man, get off my lawn.  Why

13   do that?  You don't need that.  And more importantly, why do it

14   with four stripes?  He sells tons of products -- it's in

15   evidence -- tons of products with no four bars on them.  If you

16   look at the exhibits that are his current website, a portion

17   has the four bars.  He very easily could have started selling

18   compression products and running shoes and running shorts

19   without any objection to adidas if he had simply done it

20   without four bars on it, which would have brought that

21   10 percent number down to essentially nil.

22        Remember, they have done no market research, despite

23   the board of directors, they didn't do market research to see

24   if there is any brand awareness of the four bars, whether

25   anyone actually buys products because of the four bars.  There

is no evidence that it does anything for their business, and
yet they went right into adidas' own court.

What else did they do that was in bad faith?  How
about this one?  Thom Browne sponsors a football game, not just
in the backyard among friends, where he's going to get them out
in his sweat suits.  He invites *Vogue* magazine to attend for a
photo op, and he puts them all in adidas shoes.  That's bad
faith, people.  That's bad faith.

I also thought it was interesting.  I asked Mr. Bazan,
who put out those shoes, and he could tell me adidas, even
though he couldn't read the word adidas.  He saw the stripes.
He knew adidas.

What else is bad faith?  How about the Facebook post
where they not only put a model on a track that's wearing
products that they suggest aren't really for running, and then
put them in adidas shoes and adidas sunglasses, and posted that
out to Facebook.  That's bad faith.

And you're not really having to answer a separate
question in the verdict form about bad faith.  The reason
you're considering bad faith is, is he doing things that are
going to make confusion more likely?  This is a good example of
that.  When you push out media that combines Thom Browne
products with adidas products, you are doing things -- you can
call it bad faith -- but really you're just doing things that
make confusion more likely.

1              Last point on bad faith I'll point out.  Thom Browne

2      is not some naive, in the woods, knows nothing about

3      intellectual property and stumbled onto adidas' front lawn.

4      You heard testimony from Mr. Bazan that Thom Browne values its

5      trademarks and has gone after Rossignol and Moncler and Tommy

6      Hilfiger and Zara.  And I didn't put the last one on because it

7      was funny.  And you also heard that the Rossignol complaint

8      they raised was particularly out to this case because Thom

9      Browne claims its Grosgrain is five stripes -- white/blue/

10     white/red/white.  He testified we went after Rossignol for

11     using three stripes.

12             They know that just taking a stripe away or adding a

13     stripe doesn't prevent confusion.  So they did all of that

14     behavior I just went through knowing full well that the simple

15     difference in the number of stripes doesn't make a difference.

16     They knew what they were doing.

17             So the Three-Stripe Mark is a very strong, famous

18     mark.  The marks are similar in the context in which you are

19     assessing likelihood of confusion.  The products clearly

20     compete for the same consumers.  There is survey evidence,

21     there is evidence of actual consumer confusion online.  The

22     products are sufficiently similar in quality.  And if anything,

23     the sports products being put out by Thom Browne are not up to

24     par when it comes to performance.  There is a very low degree

25     of care by consumers in these contexts pre-sale and post-sale,

1    and there is substantial evidence of bad faith.

2            So what do you do with that?  First question you're

3    going to be asked is:  Do you find Thom Browne liable?  We go

4    back to my shared services.  It doesn't have to be beyond a

5    reasonable doubt.  The question is, is it more likely than not,

6    just that much, is it more likely than not that people are

7    going to be confused.  A survey proves it, and the rest of this

8    evidence helps support why that is happening.  So you check

9    liable.

10           All right.  The next thing you're going to be asked is

11   what do you award?  Well, money.  The first step is to look at

12   the evidence you have in the record of how this harms adidas.

13   We spent a lot of time with the first few witnesses talking

14   about how important adidas' brand is to its business, how core

15   it is, that it is the most valuable asset of the company.  And

16   then you heard testimony from Mr. Murphy, Dr. Joachimsthaler,

17   about how confusion in the marketplace and dilution, which

18   we'll talk about in a minute, harms a brand.  And the way it

19   does is you spent all of this time creating an image, an

20   impression in people's minds of certain attributes associated

21   with your brand, but when they encounter it in a different

22   context, it undermines those efforts.  It causes the mark to be

23   less differentiated.

24           I said to Thom Browne on the stand, Are you aware of

25   any other companies using three stripes as a brand?  No.  Are

you aware of any other companies using four stripes as a brand?
No.  Well, when you add a confusing brand, one that consumers
think is three stripes, we know from the survey data that
causes that Three-Stripe Mark to lose its differentiation in
the marketplace.  It becomes less unique in the minds of
consumers.  That was the testimony from Dr. Joachimsthaler.  It
weakens those brand associations that people have that adidas
has spent all that time building.

It creates shared associations.  And we're going to
talk about that which we talk about those memory networks in a
minute.  That when those are disconnected, it hurts the brand.
It drives up the cost of marketing because you're going to have
to overcome the impact of that confusion.  Also, the testimony
from Dr. Joachimsthaler that it reduces consumer loyalty.

Now, Dr. Joachimsthaler admitted and, in fact, no one
contests that these things are very difficult to measure, that
is why you're being asked to consider a royalty as a proxy for
a quantified measurement.  The reason is, as Dr. Joachimsthaler
explained, these are things that happen in the minds of
consumers.  Once someone has been confused, these things happen
in their mind.  And it's not like you can then follow that
person around and see what they buy in the future.  You know
that these have occurred, and the way you quantify it in a
trademark case is by saying, OK, we're going to measure that
harm as what would be the value of a license if Thom Browne had

1   bothered to come to adidas and say, Hey, let me move into your

2   yard, and I'll pay you a royalty for it.

3         So the damages in this case, that's the royalty fee.

4   The parties agree, you heard both Mr. Plumpe and Mr. Imburgia

5   say, that if you're going to award damages, that's the amount:

6   867,225.

7         There's also a profits calculation.  Mr. Plumpe gave

8   you a very straightforward calculation.  They sold

9   $15.6 million worth of products.  Deductible costs are

10  8.6 million.  That results in net profits of 7 million.  That's

11  the award.

12        Now, Mr. Imburgia suggests, no, no, that profit is

13  much lower.  Thom Browne's losing money constantly.  Selling

14  $4,000 sweat suits and yet can't make a dime.  To get there, he

15  proposes the nexus theory where he says pretty much everything

16  that the company does should be deducted from the revenue line,

17  so you can get to a very, very small profit line.  The Met Gala

18  becomes an expenses that is related to the products that we're

19  accusing.  Laundry services are being deducted.  Gifts, lavish

20  trips to Paris.  There is thousands and thousands and thousands

21  of dollars of just taxi expenses for Thom Browne that are

22  deducted from that number.  And I mean the person, not the

23  company.

24        Remember when my colleague showed him the sweatshirt

25  and was, like, a $1,400 sweatshirt.  You're saying he only

makes 11 percent profit on this.  He sells this for 1200, he's

losing money.  There was a lot of fight about, Oh, I can't

possibly answer that hypothetical.  You're allowed to use your

common sense.  Does it make common sense to you if they sold

this for 1200 bucks, they would lose money on this product?

All right.  So what do we do with the verdict form?

We fill out the monitor remedies.  You're going to be asked

what the damages should be.  That's where you write in 867,225.

You will also be asked what profits to award.  That's the

7 million number there.

You're separately going to be asked about dilution,

and as the judge is going to tell you, we're only seeking the

monetary relief for the infringement claims, so what we've just

been through.  But there is a separate claim for trademark

dilution.  It's very similar to infringement.  And as you'll

see in a minute, a lot of the factors are essentially the same.

I'm not going to repeat everything I just went

through, I assure you, but here are some of the factors.  Well,

let me start by saying, two prevail on dilution, adidas needs

to show that its Three-Stripe Mark is famous, and that what

Thom Browne is doing is likely to dilute the distinctiveness of

that trademark.  It's a lot of what we've already been talking

about.

As we went over before when I was talking about

strength of the mark, it is clearly famous.  It has clearly

N1CsADI2                    Summation - Mr. Henn

been famous for a long, long time.  No one denies that the

Three-Stripe Mark is famous and is known widely by the general

public.  There is really no evidence put in by Thom Browne on

the other side.

So the question on dilution for you is, really, are

these products likely to dilute the distinctive character of

the Three-Stripe Mark.  And this is where you see some overlap

in the factors, so how similar are the marks.  Well, we already

talked about similarity of the marks.  OK.  It's that notion of

people see it.  And they think adidas, people see it and they

think three, and the context in which they are encountering

them.

How strong is the Three-Stripe Mark?  We've talked

about that already.  How widely recognized is the Three-Stripe

Mark.  Again, we've already discussed that.  Intent.  In other

words, did Thom Browne do things intentionally to move into

adidas' area.  We've been through that, so I'm not going to

repeat that.  Those you should find essentially the same, for

infringement or dilution.

Now one of the factors is the extent of third-party

use of stripes.  Ms. Arbuckle came to talk to you about third-

party use of stripes, and she showed you some very interesting

stripes from the 1800s, 200 years before the United States

Patent Trademark office granted adidas' trademark registration.

That is it not making the mark weak.  Those antebellum outfits

N1CsADI2                          Summation - Mr. Henn

1   and military uniforms do not somehow dilute the Three-Stripe

2   Mark in 2023.

3          The other factor is has there been evidence of actual

4   association.  Now, similar to confusion and infringement, the

5   test is a likelihood of dilution, not actual dilution.  OK.

6   So in the context of confusion, I said we don't have to show

7   actual confusion.  But where it exists, pretty obvious that it

8   is likely.  With regard to dilution, the same kind of analysis

9   applies.  The test is likely dilution.  But where there is

10  evidence of actual association, dilution is very likely.

11         So what is the evidence of actual association?  Well,

12  again, we've got social media posts in the record where people

13  saw these products and thought adidas.  Now this person writes

14  "mock adidas."  So this person was not confused, right.  They

15  didn't think it was adidas.  They are pointing out that it

16  looks like adidas.  That's the difference between infringement

17  and dilution.  Infringement is about are they confused.

18         Dilution is are they associating these two designs in

19  their mind, and if they are, that's what dilution is.  Because

20  when you associate them, you start blurring the lines between

21  what is adidas and what is not.  So this person clearly

22  associated it with adidas.  This person also associated it with

23  adidas.  Probably not somebody who was confused, right.  They

24  say "adidas" and they've got little laughing emojis.  They

25  figured out it wasn't adidas, but adidas came to mind when they

1    saw these, and it could be because of how the stripes are.

2              Adidas and the survey, remember, it asked those

3    questions about do you think this is affiliated with,

4    connected, sponsored by adidas?  And you had overwhelming

5    levels.  Everyone who said adidas in response to Hal Poret's

6    survey necessarily thought adidas because they couldn't have

7    figured out how to type it out if they didn't think of it.  The

8    survey is also evidence of association.

9              Then we had a long testimony about how the brain

10   works, and I don't want to bore you with all of that again.

11   Suffice it to say, we were trying to explain through

12   Dr. Joachimsthaler how dilution happens because it's kind of a

13   fuzzy concept.  You're like, wait a minute, how is this a

14   problem?  Dr. Joachimsthaler explained that we have these

15   memory networks in our head because of exposure to brands, and

16   then he relied on tons of empirical research, a study from 2005

17   that showed that, unprompted, just think of adidas in your

18   mind, what do you think of?  Three stripes, 65 percent.  Almost

19   as much as Nike.  Remember in the study, 70 percent said the

20   swoosh.

21             He did his own survey where 52 percent associated

22   three stripes with adidas and he relied on studies that adidas'

23   outside market research companies had done where three stripes

24   was at the center of what respondents in their survey said when

25   they asked about adidas.  So this is based on hard science.

1    We went through tons of market research decks.  You

2    were probably wondering, why am I looking at all these spider

3    graphs?  The reason was because Dr. Joachimsthaler used those

4    spider graphs in order to fill out his model of how an example

5    of an adidas memory might be.  Yours might be different.  Mine

6    might be different.  Everyone in this courtroom might have a

7    slightly different memory network.  This is representative.

8    The idea is that stripes are closely associated as are

9    things like authenticity and sport credibility.  And then he

10   went about trying to come up one for Thom Browne.  They don't

11   do any market research, so he is basing this on what testimony

12   he was able to read and what documents he was able to review.

13   Then he said, OK.  How do we know whether there is actual

14   association?  How do we know that one of these memory networks

15   gets triggered by the other.  You know what, let me look at the

16   data.

17   And he went back to Hal Poret's survey and he looked

18   at those verbatims.  And he said, Oh, we have hard data that

19   these memories are getting blurred, because people saw the Thom

20   Browne products and they thought adidas, and they saw three

21   stripes.  With women's products, with men's products, and with

22   the shoes.  Again, empirical proof for what Dr. Joachimsthaler

23   told you.

24   And so then he says, What happens based on decades of

25   consumer psychology research?  What happens?  Spreading

activation or activation spreading.  The idea is when you see

the four stripes of the Grosgrain and you think of adidas,

those things get connected.  And it sounds kind of crazy.  But

guess what?  The two Ph.D. doctors that came in both agreed

that this is sound science.  Dr. Joachimsthaler described it,

and I asked Dr. Steckel, you agree with me that spreading

activation is well-settled in this area.  And he said it's

basically the foundation of a lot of market research.  We know

this is how this happens.  And so based on the data in the

case, you have a lot to rely on.

        And what was Thom Browne's evidence on this?  Nothing.

Remember I asked Dr. Steckel, are you offering an opinion that

this doesn't happen?  Oh, no, no, no.  I'm not offering that

opinion.  Are you offering an opinion that the market is not

famous?  Oh, no, no, not offering that.  Are you offering any

opinion that dilution is not likely?  Nope.  Nope, not offering

that opinion.

        So there is no response in the record.  So the mark is

famous.  It has been for decades.  The products are clearly

likely to dilute the distinctiveness of the Three-Stripe Mark,

and there is no counter evidence for you to put on the other

side of the scale there.  So when you're asked about dilution,

you should find Thom Browne liable.

        I'm going to finish where I began, and that is you

might like adidas.  You might not like them.  You might like

1    Thom Browne.  You might not like him.  But really what you're

2    here to do is to protect the public from confusion.  That's

3    your job.  If you think that the evidence was more in favor of

4    a likelihood of confusion, you have to find Thom Browne liable,

5    and you have to do that on behalf of the consuming public.  The

6    same public, 27 percent of whom were confused by what they were

7    shown in the Poret survey.

8            Thanks for your attention.

9            THE COURT:  Thank you very much.

10            All right, ladies and gentlemen, we'll take a

11    15-minute break.

12            (Jury not present)

13            There was an objection.

14            MR. HENN:  Yes, your Honor.

15            We obviously do not object, as I just did as to

16    referring to testimony, but several of the slides in

17    defendant's decks have actual transcript pages which is, I

18    believe, improper to show a jury since the transcripts are not

19    evidence and they are supposed to be deciding on the collective

20    memory of the witnesses that occurred on the stand.

21            THE COURT:  No, no.  I think someone put up on the

22    screen an example of one of these demonstratives.

23            I'm going to see where the reference is to page

24    numbers.

25            MR. HENN:  It's at the lower right corner.

1          THE COURT:  Oh, I see.  First of all, I don't see any
2     objection.
3          Second, I think it's mainly an eye test for our
4     jurors.
5          But no, that objection is overruled.
6          MR. HENN:  Thank you, your Honor.
7          THE COURT:  Very good.  See you all in 15 minutes.
8          (Recess)
9          Please get the jury.
10         All right.  We're ready to hear from defense counsel.
11         MR. MALDONADO:  Thank you, your Honor.
12         Ladies and gentlemen of the jury, adidas does not own
13    stripes.  Remember that as you consider the evidence, as you
14    consider your verdict.  Adidas does not own stripes.  And
15    that's what this case is about.  It's not about competition.
16    These parties do not compete.  It's not about diluting the
17    adidas brand.  You haven't seen any evidence of dilution of
18    adidas' brand.  This question is about does adidas own stripes,
19    and adidas does not own stripes.
20         Now before we get into the summary of the evidence --
21    and I'm going to be the last lawyer to speak to you; we're
22    almost at the end here -- thank you.  I want to thank you all
23    for your time that you devoted to this and for listening to the
24    evidence, for your patience.  We've seen each other every day
25    for the past two weeks, and it's almost at the end.  I want to

N1CsADI2                         Summation - Mr. Henn

1    thank you for staying engaged even when it was difficult, even

2    when you heard witness after witness get on the stand and talk

3    about things that don't matter.

4          But remember, as I told you during my opening

5    statement, the facts in this case are simple.  And hopefully,

6    by now, you've heard all the evidence and you agree that the

7    facts in this case are really quite simple.  Now, you've made a

8    sacrifice of your time.  Thank you for being here.  Many if not

9    all of you did not know Mr. Thom Browne when this case started.

10   But now you do.  He's been here in court every day.  He's here.

11   He's testified.  He's told you his story.  And it's a very

12   different story than what you've heard from Mr. Henn.  He's

13   here because he cares a lot about this case.  For himself.  For

14   his employees.

15         The defendant Thom Browne, Inc., the company that he

16   founded, he poured his heart, his soul, and every penny he

17   earned into his company.  He devoted himself to his company

18   100 percent.  He's worked to build a reputation and a brand,

19   and he succeeded, and that is why he's here today.  He's

20   recognized as a game changer.  An icon in the fashion industry.

21   This case is important to him, and he's here for that reason.

22         Quite frankly, ladies and gentlemen, the notion that

23   Mr. Thom Browne wants to trade on the reputation of adidas and

24   build his brand on adidas, a performance sports company, that

25   offends him.  Nothing against adidas.  They are a great

company.  They are successful at what they do.  But Mr. Browne
is not adidas.

Now, ladies and gentlemen, Mr. Browne took the stand
and told you under oath his story, and I know that you listened
to it.  You didn't hear any mention of adidas in that story,
aside from the dispute that arose in 2007 and then laid dormant
and quiet for more than ten years until 2018.  You didn't hear
any testimony from him, or from anyone else at his company,
including his director of design, about adidas.  They never
talked about adidas.  They never considered adidas.  They
didn't have any interest in imitating adidas.

And why not?  Because Mr. Thom Browne is a luxury
designer.  And as I told you in my opening, and as the evidence
has shown, Thom Browne and adidas are worlds apart.  Why on
earth would a high-end luxury brand like Thom Browne want to be
associated with a performance active-wear company like adidas?
There is no reason for that.  You didn't hear any reason from
Thom Browne's witnesses, and you didn't hear any reason from
adidas' witnesses.  There simply is no reason.

And it's my hope as you sit here and you listen to the
evidence and you got to know Mr. Thom Browne as a person, as a
designer, and as an icon in the fashion industry, you got a
sense for his company, from the rack of clothing that we
brought into this courtroom and you got to see.  This is Thom
Browne.  This is the clothing that he sells.  And on that rack,

yes, there is sweatpants that are accused of infringement.
There is a sweatshirt accused of infringement. But this is how
he displays his goods. This is how he sells his goods. This
is who he is, and that's what we wanted you to see.

Now, Mr. Henn would like you to take those sweatpants
off the rack and throw them on a chair and pretend that that is
Thom Browne. But that's not Thom Browne. And you saw him in
his presentation earlier, when he was examining witnesses, you
saw him take the clothes off the rack and throw them on the
chair. He wants to create a different Thom Browne that is not
Thom Browne. It's not a Thom Browne that exists in this world.

Now, the court will instruct you on the law, but as
the court told you, you're not going to be asked to decide
whether adidas' claims are too late and should be barred
because adidas unreasonably delayed in complaining about what
Thom Browne was doing. The judge will decide that issue.

Instead, you'll decide whether there is trademark
infringement and whether there is dilution. There isn't.
There is no trademark infringement. There is no dilution. In
deciding those issues, the long history of this dispute, and in
particular the silence by adidas over ten years as Thom Browne
grew his business and built his brand, will still be relevant
to your consideration of whether Thom Browne in any way acted
in bad faith. He did not act in bad faith. Every decision he
has made, every step of the way, has been made in good faith

1  and in full respect of adidas' asserted rights to three

2  stripes.  They told him to stop, and he did.

3          As I said to you before, adidas does not own stripes.

4  And I ask you to keep in mind, as you evaluate the evidence and

5  reach your verdict, the fundamental facts that I pointed out to

6  you during my opening.  You may recall that adidas' rights in

7  the Three-Stripe Mark are limited.  That Thom Browne uses four

8  horizontal bars on the left side, not three vertical stripes.

9  There is no evidence of confusion in this case in the 10,

10 15 years that Thom Browne has been selling sweatpants.  He's

11 been using the four bars.  He's been using the Grosgrain.  No

12 evidence of confusion at all.  And fourth, the parties are

13 worlds apart and they do not compete.

14         So let's take a look now at the evidence.  As Mr. Henn

15 told you, we're going to look at the likelihood of confusion

16 factors in deciding whether there's confusion between these

17 products.  And, first of all, we're going to look at the

18 registered trademarks.  And you've seen these during the

19 presentation of evidence.  Adidas owns registrations for

20 clothing, and that's shown on this slide.  Each item of

21 clothing, you see three stripes, vertical stripes on both

22 sides.

23         In all the registrations, the last one is what we call

24 a quadrilateral registration, which we'll talk about

25 separately.  On this slide, we see footwear.  adidas owns and

1    asserts in this action these registrations on footwear.  In

2    each one you see three diagonal stripes.  Again, we have the

3    quadrilateral registration at the end.  That applies to the

4    apparel and the clothing.  No horizontal stripes in neither of

5    these slides.

6           Finally, here is the headwear.  These are the

7    registrations asserted in this case that adidas owns and is

8    asserting, even though as you've seen through the lists of

9    accused products, there is no hats that are accused of

10   infringement in this case.  And you see over there on the rack

11   that we brought into court, you see a hat.  And that hat has

12   four vertical bands down the front.  adidas owns a registration

13   for a hat with three horizontal lines around the rim.  That hat

14   is not accused of infringement.  Those vertical stripes or

15   bands do not infringe those horizontal bands.  Keep that in

16   mind as you consider the evidence.

17          Also, as you look through the trademark registrations

18   owned by adidas, you'll see since these are design

19   registrations.  Each registration also includes a description

20   of what the trademark is.  You'll have a chance to look at all

21   these and read those for yourself.  They are all described in

22   words.  It's not just pictures.  And in this case for this

23   963 registration, you see the mark consists of three parallel

24   bands positioned along the length of each sleeve of a jacket,

25   and it tells you that this image that accompanies the

1    registration is intended to show the position of the mark.

2    It's not covering a trademark in any other location or any

3    other number of stripes.

4            Is there a likelihood of confusion?  Decide for

5    yourselves.  Look at these registrations, three stripes down

6    the sleeve.  Look at these accused shorts.  We've got four

7    parallel bands on the left side only.  Nothing alike.  No

8    confusion.  Now, to be sure, adidas does own a registration for

9    shorts.  But, again, it's three vertical stripes down the

10   sleeves of the shorts.

11           Let's talk a little bit about this registration.  This

12   is what we call the quadrilateral registration.  Now, in this

13   case, adidas has a trademark registration for this design, and

14   it's described as you see in the registration certificate as

15   three diagonal quadrilaterals positioned parallel to each other

16   upon a contrasting background.  And you look at the items

17   accused of infringement, the items sold by Thom Browne.  You're

18   not going to see any parallel diagonal quadrilaterals as shown

19   in this trademark registration.  Is there a likelihood of

20   confusion?

21           Here's an example.  Here is the registration we just

22   discussed.  Here is a polo shirt accused of infringement.  It's

23   got the Grosgrain down the sleeve on the side there.  That is

24   nothing like the quadrilateral registration on the left there.

25   Those are not diagonal lines.

1        So what is the Three-Stripe Mark?  That's the big

2   question of the day.  What is this Three-Stripe Mark that

3   adidas asserts?

4        We've heard testimony from various adidas' witnesses,

5   and there's someone mystery about what this Three-Stripe Mark

6   is.  So we look here at the testimony of Chris Murphy, and he's

7   the senior vice president of brand marketing at adidas.  Now,

8   he was asked about adidas' trademarks, you know, and he says,

9   is adidas known for two stripes?  It's not known for two

10  stripes, is that right?  He said correct.  adidas is not known

11  for five stripes or six stripes?  That's true.  adidas is not

12  known for four stripes?  That's true.  In fact, adidas doesn't

13  use two stripes?  We do not.  adidas doesn't use four stripes?

14  No.  Or five stripes?  Or six stripes?  No, no, no.  It's

15  always three?  Correct.  And adidas is not known as a

16  four-stripe brand?  We are not.  Or a brand with four stripes?

17  No, we are not.  Is adidas a brand with horizontal stripes?

18  No, we are not.  And it isn't known for any number of stripes

19  other than three?  Correct.

20        Yet you then hear testimony from Ms. Dana Kabela, and

21  she is a director of trademark counsel for adidas.  Now adidas

22  is known for a number of stripes, doesn't own rights in any

23  other number of stripes.  Yet when you ask, Does adidas claim

24  rights in two stripes?  Well, we are not claiming rights on two

25  stripes, but two stripes can infringe the Three-Stripe Mark.

1    Oh, really.  How about four stripes?  Yes, that can infringe,

2    too.  Oh, so what about one stripe?  Yes, that can infringe,

3    too.  OK.  How about five stripes?  Yes, that can infringe,

4    too.  Can six stripes infringe?  Yes, six stripes can infringe,

5    too.

6         So any number of stripes can infringe the Three-Stripe

7    Mark.  adidas believes it owns stripes, but it doesn't.

8         We heard testimony from Ms. Vanessa Backman.  I'm sure

9    you won't forget that testimony.  Let's hear a snippet from

10   her.  She was the in-house counsel at adidas when this dispute

11   first arose in 2007.  She reached out to Thom Browne.  She made

12   him change, she made him drop his three bars.  And let's see

13   what she thinks of Three-Stripe Mark is.

14        (Video played)

15        That's the definition of the Three-Stripe Mark.  It's

16   the Three-Stripe Mark.  What does that mean?  Nobody knows.

17        And so the witnesses have different ideas, different

18   answers to this.  If we look here at the next slide.  We talked

19   about what was referred to as smushed stripes.  These are

20   stripes that are smushed together.  There is no space between

21   the stripes.  And we had Mr. Chris Murphy, the senior vice

22   president of brand marketing at adidas, testifying about the

23   Gucci stripes on this article of clothing, this collaboration

24   article of clothing here shown on slide 18.

25        And the question was, It's your testimony that the

1  green/red/green -- that's the three stripes no spaces in

2  between -- is that adidas' Three-Stripe Mark?  He answers, I

3  didn't create the product.  It certainly could be.  But can we

4  agree that's not adidas' stripe mark, the green/red/green?

5  Well, it could.  Then he says, We use three stripes in a number

6  of ways.  Sometimes smushing the stripes together, sometimes in

7  different patterns.  I'm sure we've used green/red/green in the

8  past.

9       Ladies and gentlemen, I don't think you've seen any

10  examples of adidas stripes smushed together.  And yet adidas

11  thinks it owns stripes smushed together.  Or does it?  When we

12  asked Ms. Sara Vanderhoff about stripes smushed together, the

13  question was:  If three stripes or stripes are together,

14  squished together with no space in between, would that be a

15  version of the Three-Stripe Mark?  Ms. Vanderhoff said, I would

16  have to see it, but typically we do have a space between the

17  stripes.

18       We asked her about the Gucci trademark where the

19  stripes are squished together.  She said, That is Gucci's

20  trademark, that's not Three-Stripe Mark.  So according to one

21  adidas witness, the Gucci stripe is the three-stripe trademark

22  and another witness says it is not.  It's a complete lack of

23  clarity.

24       Now let's talk about orientation, because as I've told

25  you and as you've seen in the registrations that adidas owns,

adidas' three stripes are vertical.  They are down the side of

at pant, down the side of a sleeve.  In this case, they are

asserting them against Thom Browne's four bars, which as you

see are horizontal.

What rights does adidas own?  So let's look here at

the testimony of Chris Murphy.  Now, Mr. Murphy was asked what

the Three-Stripe Mark is, and he says it's three parallel

stripes.  Does it matter how big or small they are?  Nope, it

doesn't matter.  We've gone through all the products.  They are

shown in a variety of width, variety of colors, and a variety

of placements.

He's asked, Is the horizontal use of three stripes

different from the vertical use of the three stripes?  His

answer, It's not.  We're the brand with three stripes.  Just to

be clear, how many Three-Stripe Marks does adidas own?  Only

one.

So adidas believes that it's one Three-Stripe Mark is

not only vertical, but it's horizontal.  It's any number of

stripes together, separated.  Doesn't matter.  But then again,

it depends on who you ask.

Now, Mr. Murphy showed us a collection that he made of

exemplary ads.  These are ads of adidas goods, and he put

together this whole collection of ads, Plaintiff's Exhibit 22.

Look through all that.  You'll get the evidence at the end of

this.  You can go through the exhibits yourselves.  If you want

1    to take a look at Exhibit 22, look at all the examples of

2    adidas' use of stripes.  As you go through this exhibit, you're

3    not going to see any use of horizontal stripes.  You're going

4    to see vertical stripes, and that is what adidas is known for.

5           Mr. Paul Bowyer, you may remember him, the VP of

6    originals, partner brands and basketball at adidas.  He was

7    asked about horizontal stripes, and he presented this Exhibit

8    84, which you'll see the first page of here on the screen.  And

9    he told you, well, this is a compilation that adidas put

10   together, and this was done after his deposition when he was

11   asked, how long has adidas been using horizontal stripes?  He

12   said, Well, I don't know.  So after his deposition he did some

13   research.  And adidas said, let's go through all our archives

14   in Germany, wherever they keep them, and let's see how long

15   have we been using horizontal stripes.  They put together this

16   wonderful exhibit here at the convenience of all of you, so you

17   can see indeed how long has adidas been using horizontal

18   stripes.

19          And he says, you know, the first use that he was able

20   to find goes back to 1979, and he shows horizontally on the

21   sleeves of polo shirts.  But you'll see that this collection is

22   not just horizontal stripes.  It also includes various other

23   stripes -- I'm sorry.  One second.

24          You'll see also that this exhibit here, you'll see how

25   many items.  We asked him, How many items have you sold in the

past that have horizontal stripes?  And he says, I couldn't

tell you exactly how many horizontal, vertical, or diagonal.

They don't classify that in their systems.  They don't track

that in their systems.

Yet, he did testify and told you that each year, or

each season, adidas makes 40,000 original styles.  40,000 per

season.  That's 80,000 original items, styles per year.  Now

this exhibit that we just looked at collected examples of

horizontal stripes over the past 50 years.  This is 50 years of

adidas products, collection of their use of horizontal stripes.

That's 50 times 70.  We're talking, like, one and a half

million styles over that time period.  And out of those, adidas

presented us with just 163 pages showing horizontal use of

stripes.  Over 50 years, 160 pages.  That's a very minute

percentage.  He was asked and he agreed, a very minute

percentage.

Ladies and gentlemen, adidas is not known for

horizontal stripes.  Whatever minimal use they may have made

over the last 50 years, that's not what they are known for.

These are other examples that are in the same book

that we just looked at.  And as you look through the evidence,

ask yourself as you see things like this, is this really

adidas?  I mean, these are various uses of stripes.  You see

V stripes on these various jackets.  These are adidas products,

but this is not what adidas is known for.

1    You heard some testimony and saw some evidence about

2    the Neuclassics, adidas' Neuclassics collection.  When was that

3    launched?  This was launched just last year.  This is a new

4    collection launched just last year where adidas decided to use

5    three horizontal stripes only on the left sleeve, as you see

6    here in this image.  Just last year they made that decision.

7    And this is the adidas Adicolor Neuclassics hoodie, as

8    you see here on the screen in front of you, and adidas tells

9    you in its own description.  This is its own add-on his web

10   page where it advertises this product.  And if you look at this

11   here, it tells you that the stripes are not where you usually

12   see them.  This is not a usual branding that adidas has used.

13   Adidas has decided, for this collection released just last

14   year, that it is only going to wrap its stripes around one

15   sleeve, on the left sleeve of the top.  That's just a decision

16   that they made last year.

17   Now, we've talked about this says it's not where you

18   usually see the adidas stripes.  So one of adidas' witnesses

19   testified, Where do you usually see the adidas stripes?  This

20   is what adidas refers to as the classic positions.  And this is

21   Dana Kabela, the director of trademark counsel for adidas.  She

22   was asked, And what are the classic positions of the

23   Three-Stripe Mark?  She tells us the classic positions are, for

24   example, on the sleeves, running from the neck to down the side

25   of the sleeve.  On both sides, left and right?  Yes.  And

1    what are other classic positions?  On the pants, on the sides

2    of the pants in a vertical position.

3           Ladies and gentlemen, that is what adidas is known

4    for.  Those are the classic positions.  Now, adidas has

5    internal branding guidelines.  Adidas, as you know, is a huge

6    company, worldwide company based in Germany.  They have

7    designers all over the world designing their products.  They

8    have to provide some guidelines for their designers, how can

9    you use stripes when you're designing adidas products.  They

10   want to make sure people aren't doing things they shouldn't do.

11          Why?  Because they want brand consistency.  They want

12   you to know, when you see stripes on a product, that it is

13   adidas.  They want to make sure they are using their brand in a

14   consistent way.  And they say in this branding guideline, here

15   on slide 28, consistent use of branding means that we can

16   maintain exclusive ownership for our trademark and broadens the

17   scope of the protection that we have for them.

18          Let's see what the branding guidelines say about

19   stripes.  So there is this guideline here on the angling of

20   stripes.  As I told you, adidas is known for vertical stripes,

21   and so sometimes designers may want to tilt the stripes.  So

22   you can tilt them, but only to 20 degrees.  So it can be

23   vertical or tilted to 20 degrees.  That's it.  No further.

24          It even says at the bottom here, do not use

25   horizontally.  These are in adidas' branding guidelines, do not

1    use stripes horizontally.  These branding guidelines include

2    examples of what is not permitted.  These are three stripes

3    violations.  These are things that are not permitted by adidas'

4    own internal branding guidelines.  And here you'll see example

5    after example of horizontal stripes used on polo shirts.  Not

6    allowed.  Those are violations.  In fact, it says here at the

7    bottom, as you can see hopefully on your screen, vertical only.

8    Do not use horizontally.

9            Let's talk about shoes for a minute.  Adidas has

10   guidelines about shoes and how you apply stripes to shoes, and

11   one of their guidelines says that you cannot apply the stripe

12   on the same color background, because then you won't see it.

13   You can't use a white stripe on a white background because then

14   you won't see it.  They give this example in their materials,

15   and they claim that this is a violation of their guidelines.

16   This particular shoe -- white stripe, white background --

17   violates adidas' guidelines.

18           Yet, curiously enough, if we look at this Thom Browne

19   product on the right accused of infringement, the middle white

20   stripe is on a white shoe, a white background, and adidas

21   accuses that of infringement.  Something their own designers

22   can't even do with their shoes, Thom Browne does it, it's an

23   infringement.  Ask yourself, does that make sense?

24           Another example here on your screen, product branding

25   guidelines.  Here you see jogging pants, jogging pants with

three bands around one leg.  Again, assymetrical use of three
stripes, horizontal stripes, three horizontal stripes on only
one side of the sweatpants.  Adidas says you can't do that.
Adidas identifies this as recent executions that undermine our
trademark rights.  These are things that adidas tells its
designers you cannot do.

So as you review all of this evidence, you ask
yourselves:  How is anyone supposed to know what this
three-stripe trademark is?  If you're a designer, an industry
out there making clothes, making products for all of you to
wear, how are you going to know what you can and can't do with
all these different and inconsistent messages coming from
adidas?

Now, you did hear testimony from Ms. Joanne Arbuckle,
former dean at FIT, and she went through the history of
stripes, the history of the use of stripes on clothing.
Mr. Henn put up some images she found from the 1800s on the
screen.  But she also found a lot of very current references of
how other people are using stripes, and those are summarized
here.  These are some of them.  There is others as well.  This
is what we can fit on this particular screen of examples that
she found of the use of stripes on clothing.  You can see it
here used on jackets.  You can see it used on peacoats.  You
can see it used on sweaters.  You can see it used on
sweatshirts.  You can see it used on jogging pants.

1        By various designers, including high-end luxury
2   designers, Givenchy, we have Karl Lagerfeld, we have Celine.
3   These are all high-end luxury designers using stripes on
4   clothing.  Stripes on clothing are not new.  You can look in
5   your closet, look at all the clothes you have.  I'm sure you'll
6   see stripes in there.  Go in the subway, walk around, you'll
7   see stripes all over the place.  People always use stripes on
8   clothing.  They always have and they always will.

9        Now, adidas focuses its infringement claims in this
10  case only on selected products.  Now, adidas sells a lot of
11  products, some of which are here on the rack in front of you
12  that are not accused of infringement but do bear the four-bar
13  designs.  Somehow adidas has decided that some products
14  infringe and some don't.

15       I showed you during testimony a cashmere sweater
16  without a hood.  That's not accused of infringement.  And
17  another cashmere sweater right next to it, it has a hood, it is
18  accused of infringement.  adidas doesn't necessarily own rights
19  in hoods, but one product is accused and one is not.  Their
20  infringement allegations are random.

21            (Continued on next page)

1             MR. MALDONADO:   (Continued)

2         Now, Thom Browne, there are over 130 products in this

3     case accused of infringement.  And that's just a small subset

4     of the products that Thom Browne sells, but all of these

5     products do fit within Thom Browne's collection.  He makes a

6     collection of clothes, and he fits these items into his

7     collection so that people can buy jackets.  They could buy

8     sweats.  They could buy shirts.  They could buy ties that meet

9     all their needs through his collection, and that's what he

10    tries to do as a designer.

11        So, in sum, if you look at the registrations that are

12    owned and asserted by adidas on the left here.  If you look at

13    unregistered uses which are shown on the bottom, some which

14    adidas calls violations but nonetheless are executions of

15    adidas, and you compare those to what's infringed in this case,

16    or what's accused in this case, rather, you see the sweatshirt

17    with the red, white and blue Grosgrain down the sleeve.

18    Another sweatshirt with four bars down the sleeves.  Ladies and

19    gentlemen, these are not at all similar to what adidas owns or

20    claims it owns.  There's no difference here.  There's no

21    confusion.

22        So we talked about the differences in the marks.  We

23    talked about the strength of Three-Stripe Mark that's asserted

24    in this case.  Both of those factors weigh against the finding

25    of confusion.

1          Let's talk now about competition.  Competition for the

2     same consumers.  As you know, and as you've heard throughout

3     this trial, the parties' products are vastly different price

4     points.  As this slide shows, an adidas pair of sweatpants $40.

5     Thom Browne pair of sweatpants a thousand dollars.  Now you

6     have the sweatpants here that I showed you during testimony,

7     and those are right here, and you've had a chance to feel them

8     and touch them and see them up close.  You can tell the

9     difference in quality.  It's not the same.  You had a designer

10    of Thom Browne sweatpants here on the stand to testify.  His

11    sweatpants are tailored.  They're expensive.  They're not to

12    wear to the gym.  They're to wear out to look good.  And they

13    are often worn, as you see in this image right here, with a

14    button-down white shirt.  They're worn with more formal

15    clothing as you see here.  They're not the same products.

16    They're not even competitive products.

17          Mr. Thom Browne was asked about these items of

18    clothing:  What's the retail price of this item that was shown

19    here on the screen?

20          And he says around a thousand dollars, $1,200.  And he

21    says, you know, this combined suit, the top and bottom of this

22    track suit would cost several thousand dollars?  Yes.  That's

23    how much it costs.

24          Now we talk to Chris Murphy.  He's a senior VP of

25    brand marketing at adidas.  Now, Mr. Murphy was asked about

adidas's goods and where they're sold.  And we showed him a

document which was a marketing update and we showed him some

images from that document that you see here on the screen.

Mr. Murphy talked about shop-in-shop spaces.  This is where

adidas has a shop within a department store, example.  If you

go here -- in this example, if you go into Dicks, there's a

section in Dicks where you'll find adidas goods, and that's

called a shop-in-shop.  So adidas has a shop-in-shop in Dicks

Sporting Goods that's dedicated to its products.  Adidas also

has a shop-in-shop at Foot Locker, and that shop-in-shop at

Foot Locker, again, dedicated to adidas products.

          Now, then we asked Mr. Murphy, well, do you think that

when someone -- do you believe that when someone says does

adidas sell or is adidas known for high-end luxury, that most

people wrote say yes?  And he said, "I think a good number of

people would say yes, especially based on some collaboration

they've been doing.

          "Do you believe most people would say yes?

          "A lot of people would say yes.

          "Now that's true even though adidas sells its products

at Dicks Sporting Goods?

          "Correct."

          So he believes that even products sold at Dicks

Sporting Goods are luxury products, even though high-end luxury

products are sold at stores like Bergdorf Goodman, Saks Fifth

Avenue, and other chains we've heard about during this trial.

Now, Thom Browne, you've heard about his clothing, his style, his aesthetic.  You've heard from Lucas Langellier, the VP of retail at Thom Browne.  And part of Thom Browne -- part of what Thom Browne is, is not only the tailored clothing that he designs and sells, but also really a tailored customer service experience.  And Mr. Langellier explained this to you in his testimony; that when you go to a Thom Browne store, you get attention.  You get personalized attention.  Someone will come up to you.  They'll talk to you.  They'll ask you questions.  They'll get to know you.  They want to know what you want.  They want to show you what you might want, what you might need.  It's a very different experience from shopping in other stores.  What they're trying to do in this sense in their stores, in their retail stores is to build relationships with customers, so that the customers become loyal to the brand.  They'll come back.  They'll purchase more.  They'll be loyal to the product.  And that's how they build their brand loyalty.  Again, as we said, Thom Browne's products are sold at major department stores at Barneys, at Bergdorf, at Nieman Marcus, at Nordstrom's, at Saks Fifth Avenue.

So, in sum, Thom Browne and adidas, they're, again, on different levels and different worlds, and they do not compete for the same consumers.  The consumers of Thom Browne's goods, they pay a lot of attention to what they're doing.  When they

N1CQadi3                        Summation - Mr. Maldonado

go into his store and they in to buy a pair of sweatpants for a
thousand dollars, they're thinking about.  They are paying
attention.  They pay a lot of attention to detail, and they're
not likely to be confused.

            Let's talk about the so-called evidence of actual
confusion.  First, as I mentioned, and as you know, from the
time that Thom Browne started using four bars and Grosgrain,
through 2018, at least through that whole period, and I would
say even through today, there's no evidence that anyone was
ever confused.  No one ever confused Thom Browne for adidas.
And a lot of witnesses were asked about that on the stand.
We'll go through their testimony.  You'll recall witness after
witness after witness said have you known of any confusion?
No.  No.  No.  No.  No confusion.  Adidas knows this, and they
put up a survey, a flawed survey.  And I want to point out, and
the Judge will instruct you, that adidas bears the burden of
proof here.  Thom Browne doesn't need to do a survey.  Thom
Browne doesn't need to show that there was no confusion.  If
adidas's survey is flawed, Thom Browne can decide how am I
going to respond?  Am I not going to respond?  There are things
that don't need responding to.  So you shouldn't think just
because Thom Browne didn't run a survey, that adidas's survey
should be the end word on the matter.  We'll talk about that
survey and what the problems are.

            Adidas also presented Instagram comments, anonymous

1   Instagram comments.  I think like five Instagram comments.  And
2   they said, wow, that's confusion.  People are really confused.
3   You can draw your own conclusions there, but let's take a look
4   here.  Now, adidas talked about three times of confusion:
5   Initial interest confusion, point-of-sale confusion, post-sale
6   confusion.  Now, most cases we looked first at point of sale
7   because that's where the harm is done.  If someone is going
8   into a store, they're looking at your sweatpants.  They're
9   looking at the other guy's sweatpants, deciding which one to
10  by.  That's where harm really occurs, when someone else buys
11  someone else's product thinking it's yours.  That's called
12  point of sale.
13          Curiously, adidas did not do a point-of-sale confusion
14  survey because adidas knows that there's no confusion at the
15  point of sale.  So, instead, adidas looked at initial interest
16  confusion, which there's no evidence of initial interest
17  confusion.  There's no evidence of anyone going into a store or
18  flipping through their phone and saying, oh my God, Thom
19  Browne.  I mean, that looks like adidas.  Oh, Thom Browne, I'll
20  buy that instead.  I'll buy the thousand dollar sweatpants
21  because I thought they were adidas.  There's no evidence that
22  that has ever happened or that it ever will happen.  Then they
23  looked at post sale, and that's Mr. Poret's survey, which we'll
24  talk about in a minute.
25          Actually, we'll talk about it now.  So Mr. Poret, this

1    is adidas's consultant and survey artist.  He did a survey,

2    which he calls a post-sale survey.  But you'll remember his

3    testimony, and you'll remember the images that he used in his

4    survey, and those were not images taken in the real world.  So

5    post-sale confusion is supposed to test confusion in a real

6    world environment.  When you see pants on the street, when you

7    see them in the store, when you see them wherever, wherever

8    people are in life, that's what post-sale confusion is supposed

9    to test.  Yet in his survey, he didn't use post-sale confusion

10   photos.  He didn't use photos in the real world.  He used

11   photos in an art studio.  Photos in a photographer studio of

12   models with white backgrounds.  Mr. Henn said he didn't want

13   you to be confused by trees and butterflies and things in the

14   background because then you wouldn't really focus on the

15   stripes.  But that's the whole point.  The whole point is what

16   do you see out on the street in the real world.  What do you

17   pay attention to?  What do you focus on?

18          Here we see the testimony of Mr. Poret, and he agrees,

19   we're comparing here, if you recall, on the left is adidas's

20   website, and on the right is an image that was used in

21   Mr. Poret's survey.  By the way, the images in Mr. Poret's

22   survey came from adidas.  Adidas provided the images.  And it's

23   kind of funny how much they look like adidas images.  You see

24   the similarities here.  Mr. Poret testified, you know, I agree

25   they both have white backgrounds.  It's a pretty standard

1    background for a clothing website, but, yes, they're both

2    essentially white.

3            Now, would you agree, he was asked, that adidas has

4    point-of-sale photos because photos on the website are

5    point-of-sale photos, that's where you make a purchase on the

6    website.  He says, would you agree that adidas has

7    point-of-sale photos that look like post-sale photos.  And he

8    says, yes, he admits there's similarities, and you could see

9    that for yourself.  It's evidence.

10           Now, this is the testimony he had showing his

11   relationship with adidas.  This isn't the first case that he's

12   testified in favor of adidas.  There's been many, many cases

13   which Mr. Poret has design surveys for adidas.

14           This is the testimony where Mr. Poret says that he

15   admits he wasn't the photographer.  He didn't take the photos.

16   And that he got the photos from adidas.  And, again, if you

17   look at these photos and think about it and think about images

18   that you've seen of adidas, it's obvious to anyone that these

19   photos and these models were make to look like adidas, as close

20   to adidas as they could get.  You don't see any models here as

21   is displayed on Thom Browne's website in a white button-down

22   shirt with sweatpants.  You don't see that here.  What do you

23   see?  You see people in sports clothes.  They mix and match

24   some of Thom Browne's clothes with other sports clothes and

25   T-shirts.  They have athletic poses.  You have the model

1    holding her arm like this to turn the horizontal stripes

2    vertical; you see that in the first image.  So you have all

3    these images that were purposely taken and made to look as

4    close to adidas as they could.  And that, ladies and gentlemen,

5    is a serious, serious flaw to this survey.

6          Again, this is a very good example.  I mean, the other

7    ones were studio pictures of clothing that were taken by

8    adidas.  This is actual image from Thom Browne's website.

9    Think about that.  That's an image from Thom Browne's website.

10   That is point of sale.  Thom Browne's website is where you go

11   to buy Thom Browne's products.  They take the image from the

12   point of sale and they put it into their post-sale confusion

13   survey.  You know why they do that?  So that you can't see the

14   price.  You can't see that it's on Thom Browne's website.  You

15   can't see all the things that you would see in a normal

16   purchasing environment.  It's stripped all that away, they take

17   the image and they put it in front of someone and they ask

18   questions.  That, ladies and gentlemen, is not a post-sale

19   survey.

20         Another interesting thing.  You saw images -- I mean,

21   Mr. Henn was really upset about some of the images that he put

22   on the screen that showed the Grosgrain on clothing down the

23   sleeve and down the leg, you might remember that?  Funny thing

24   is Mr. Poret didn't test any of that clothing.  Not a single

25   piece of clothing with Grosgrain was tested in the survey.  The

1    only Grosgrain product that Mr. Poret tested was a sneaker.  So

2    the clothing that is so outrageous and so close to adidas

3    wasn't even tested.  Think about that.

4         As I mentioned to you earlier, it's been over a decade

5    of coexistence with no actual confusion.  And you'll see here

6    on the screen the very first runway show Thom Browne in 2009

7    where the sweatpants with the four bars were debuted, right

8    here on the screen, 2009.  We go through all these years, from

9    2009 through 2018, no confusion.  People aren't confused.  And

10   yet now adidas wants you to believe that there's a high

11   likelihood of confusion.  There's no actual confusion.  But

12   there's a high likelihood that people are now all of a sudden

13   going to start to be confused.  They're not.

14        Social media.  So we have Instagram posts, Instagram

15   comments that Mr. Henn put on the screen.  Think about that

16   again.  How many did he put up?  How many are in evidence?  How

17   many were shown to you?  Just five.  Five over 15 years.  Just

18   five Instagram posts which allegedly show confusion.  We don't

19   think they show confusion at all.  Someone says adidas, does

20   that mean they're confused?  No.  What would adidas say?

21   That's not confusion.  I mean, Who are these people anyway?  We

22   don't know who they are.  Many of you probably have Instagram,

23   and you look at posts, you don't know who says what, who these

24   people are, what they're saying, what they mean.  We can't find

25   these people.  Try to ask Instagram who that user is, they're

not going to tell you.  Try to get a court order, that's is

going to be hard to get on its own.  We don't know who the

people are.  We don't know What they mean by what they say.

And, most importantly, this evidence is so minimal, so de

minimus that it does not prove actual confusion in no way,

shape or form.

     Thom Browne's CEO, Mr. Bazan, testified about Thom

Browne's Instagram followers and Facebook follow years.  And

Thom Browne has 190,000 Facebook followers, and has 1.3 million

Instagram followers.  Lots of followers on Thom Browne's site.

No confusion.  Mr. Bazan was asked he's been CEO since 2016.

"have you been aware of any reports of confusion between Thom

Browne and adidas?

     "A.  No."

     Lucas Langellier, the VP of retail for Thom Browne, he

was also asked about confusion.  He's in the store all the

time.  He runs all the retail stores.  He's in charge of them.

     "Has anyone ever told you that your 4-Bar signature

product looked just like adidas?

     "No.  Nobody's ever said to me that it's confused Thom

Browne 4-Bar stripe with adidas."  He's been in this company

for a long time.  Ten years, more.  No confusion.

     "Has anyone told you that Grosgrain signature looks

like adidas's trademark?

     "No.

1          "Has anyone confused the product?

2          "No."  No reports of confusion for Mr. Langellier.

3          When adidas's witnesses were asked the same question,

4    we get the same responses.  This is Chris Murphy again, VP of

5    brand marketing at adidas.

6          "At the time of your deposition, you testified that

7    you weren't aware of any customer complaints or reviews that

8    mentioned Thom Browne."

9          He said no.

10         "You had not seen any reviews or complaints where a

11   consumer had indicated to adidas that he or she was confused

12   between adidas and Thom Browne?

13         "No."

14         He doesn't no anything about confusion either.  He's

15   been in that position a very long time.

16         Paul Bowyer, also testified, the VP of Originals,

17   asked similar questions.  He's been at adidas since 2012, ten

18   years now, over a decade.

19         "During that time have you seen any quantitative or

20   qualitative data of confusion, any actual confusion?

21         "A.  No."

22         No confusion.  No evidence of confusion.  Poret's

23   survey, not valid; flawed; does not show confusion.

24         Five Instagram posts.  No.  That doesn't do it.

25   There's no evidence of confusion.

1       Let's talk about the quality of the product.  Now,

2   Mr. Henn told you the quality of the products are similar.  One

3   thing funny is how many products did adidas bring into the

4   courtroom for this case?  Zero.  You haven't seen a single

5   adidas product in this case.  Yet he wants you to believe that

6   the quality is similar.

7       Now, you have heard from Thom Browne's witnesses that

8   his products are undeniably high in quality, and you see here

9   the sweatpants here, you've seen here the sweatpants in front

10  of you, talked about the intarsia, how the stripes are woven

11  into the material, and, I mean, Mr. Henn suggested you can't

12  see that from far away.  I think you can.  I think if you look

13  over there at those products on the rack, you can see that

14  those are not sewn-on stripes.  You can see that they're woven

15  into the fabric.

16      The other thing you can see, ladies and gentlemen,

17  from here, from across the room looking at the rack, those

18  clothes are expensive.  That's an expensive rack of clothes.

19  You can tell that from across the room just looking at that

20  rack.  You don't need to go up to the clothes.  You don't need

21  to feel them.

22      Mr. Browne told you that Thom Browne has always aimed

23  for the highest quality in the clothing that he designs.  He

24  wanted his clothing to have that true, American sensibility,

25  handmade clothing of the best quality.

Mr. Bazan also agreed about the quality of the
clothing.  He talked about the highest raw materials, highest
quality fabric, about the attention to detail.  Thom Browne's
products are of a superior quality.

Let's talk a little about bad faith.  The Judge will
instruct you on bad faith.  You heard about the inspiration for
Thom Browne's designs.  He was inspired by the varsity sweater
as you see on the slide.  And you've seen other images of
varsity sweaters during this litigation.  Undeniably, varsity
sweaters, stripes on the left sleeve.  Thom Browne bands on the
left sleeve.  That was his inspiration.  You're not going to
see anything from adidas that looks like that from this time
period.  From last year you might see something, but not in
this time period.

November 2006, Mr. Browne opens his store in Tribeca.
We've all seen this article.  We've heard a lot of testimony
about this.  This was his first retail store in New York,
opened in 2006.  At that time when this article came out,
Vanessa Backman got a copy of the article.  She sends it to
Mr. Henn.  This is on November 15, 2006, her outside counsel.
She sends him this article about Thom Browne and the store in
Tribeca.  One week later, November 21, she sends it again to
Mr. Henn.  She sends him the article again.  This time the
picture of the sports coat with the three bars is circled.  You
see the circling there and the arrow.

Now, Mr. Thomas Becker was the CEO of Thom Browne in 2007 when the dispute between adidas and Thom Browne first started.  He was there at the company, and he testified that the change from three to four stripes was made because of adidas.  We all know that.  That's the only reason that Thom Browne stopped using the three stripes was because of adidas. In good faith, to avoid a dispute, Thom Browne stopped his three bars, changed to four bars, to avoid an IP dispute.

The images, the emails, this is email correspondence that you've seen between Thom Browne and his factory.  You saw this email from Sam Lothrop to Lisa Wood at the Corgi factory where they manufacture their knitwear.  Mr. Lopthrop says in this email, "We're changing our stripe layout for the left sleeve before adidas sues our short pants off."

Ladies and gentlemen, there's no question that Thom Browne made this change because of adidas.  He did so in good faith.  There is no bad faith.  No evidence of bad faith here.

Mr. Becker also told you that he tried to follow up with Ms. Backman.  He tried to call her.  He wanted to tell her that they're changing to four bars.  He wasn't able to reach her.  He couldn't get in touch with her, but he tried, and that was his undisputed testimony.  She never returned his calls. They never spoke, but he did try.  They acted in good faith at all times.

Robert Childs, again, he told you will about the

1    designer sweatpants.

2            Now, adidas complains about compression pants.  I'm

3    not sure if they're really complaining about the sweatpants,

4    although the charge was infringement, but what was in Thom

5    Browne, the company, what was in their mind when they were

6    coming out with sweatpants?  Mr. Childs told you about that.

7    He said they wanted to design something that the customers

8    could wear to work.  They could wear on the weekends when

9    they're lounging.  It's just a natural progression of the

10   development of their line of clothing.  That's what the

11   sweatpants were.  They wanted something that the customers

12   could wear on weekends.

13           And so we see through this period of time –– and again

14   this goes to Thom Browne's good faith –– you see evidence.  You

15   see lots of images from fashion shows from 2008 through 2018.

16   I will go through some of these, and you will see throughout

17   the years, throughout all these years Thom Browne has been

18   selling items of clothing, including sweaters and casual wear

19   with four bars and with the Grosgrain signature.  You'll see it

20   throughout this collection.

21           Mr. Henn tried to create some kind of timeline like

22   Thom Browne just started using Grosgrain in a decorative way or

23   they're changing the way that they're using their signatures.

24   Interestingly enough, his timeline doesn't have any dates on

25   it.  So you don't know when any of this actually happened.  The

1    truth is that it all happened a long time ago; that Thom Browne

2    has been using Grosgrain decoratively in his clothing,

3    Mr. Childs testified, since the beginning, since he started

4    there in 2007.  It's not something new.  It's not some

5    progression to change the look of Thom Browne's clothing to

6    look more like adidas.  That's not happening.

7         Now, we heard testimony from Ms. Vanderhoff.  You

8    know, we're trying to figure out what was the delay.  We had

9    Ms. Backman testify that she knew about Thom Browne in 2007.

10   We know she reached out.  Then there was nothing until 2018.

11   What happened in the interim?  Ms. Vanderhoff testified she

12   didn't know about Thom Browne, and yet, we also heard testimony

13   from her that before she joined adidas, she worked with

14   Mr. Henn at Kilpatrick.  And she worked mostly on adidas

15   matters.  This was back in 2005.  She said that she didn't know

16   about Thom Browne until 2018, but then there was a privilege

17   log, there was an entry, and you saw the testimony about this,

18   that in 2006, Ms. Vanderhoff, who back then was known as Sara

19   Maurer, she sent an email to Charlie Henn.  In 2006 she sent an

20   email to Charlie Henn.  What's the subject?  Potential claims

21   against Thom Browne.  Ms. Vanderhoff was working on Thom Browne

22   matters when she was an associate at Kilpatrick in 2006.  She

23   was working on the very matter that was the predecessor to this

24   lawsuit.  Yet, she told you she didn't even know about Thom

25   Browne until 2018.  Ladies and gentlemen, that affects her

1    credibility, as you consider her testimony and all the matters

2    that she testified about at this trial.

3            Let's look at this slide.  That's one of the images

4    that adidas loves.  They love that image on the right of the

5    model on the track in her compression wear.  Ladies and

6    gentlemen, it's a stretch to think that this image means that

7    Thom Browne changed his whole business, everything he's built

8    over his whole career to look like adidas.  That's what they

9    want you to believe, because of that one image on Facebook.

10           We also saw the Dan Levy video, and you all enjoyed

11   that, I'm sure.  Dan Levy is there in his Thom Browne sweat

12   suit.  He's not stretching.  He's not exercising.  He's

13   drinking a milkshake or maybe it's a pina colada, who knows,

14   but he is certainly not exercising in his Thom Browne clothes.

15   This whole idea that Thom Browne wants to be a sportswear

16   athletic company is just not true.

17           Now you saw corporate board meeting minutes that went

18   on the board talking about sportswear, how they're going to

19   grow the sportswear business.  Yet, keep in mind as the

20   witnesses testified, as the documents show, what do they mean

21   by that?  Sportswear within the Thom Browne company means

22   anything that's not tailored.  So they're trying to grow the

23   non-tailored portion of their business:  The knits, the polo

24   shirts, various items Mr. Bazan talked about in his emails.

25   They weren't talking about performance athletic wear.  There

N1CQadi3                         Summation - Mr. Maldonado

1    was one email that talked about expanding compression wear into

2    bags and shoes.  You heard testimony that never happened.

3    There's been no expansion into adidas's realm.

4           So, ladies and gentlemen, that's the last fact that

5    you need to consider when you're deciding likelihood of

6    confusion.  As you go through all of these factors, you should

7    come to the conclusion that there is no likelihood of confusion

8    here.  Again, this case isn't about confusion.  It isn't about

9    competition.  It's about whether adidas can own all stripes.

10          Now, there's another claim in case for dilution that

11   the Judge will instruct you about.  And one of the questions

12   that you need to decide is whether the Three-Stripe Mark is

13   famous.  Now, as the Judge will instruct you, you need to

14   decide the Three-Stripe Mark was famous at the time that Thom

15   Browne adopted his Grosgrain and at the time that Thom Browne

16   adopted the four bars.  Those are the two signatures that are

17   accused of infringement here.  And you see here on the left,

18   you've see in this trademark registration.  Thom Browne owns

19   the trademark registration for his Grosgrain, for clothing.

20   You see that here on the left.  It cites a date of first use in

21   2004.  So we know that Thom Browne has been using the Grosgrain

22   since at least 2004.  Adidas has to prove that its Three-Stripe

23   Mark was famous at least as of 204 with respect to dilution

24   claim against the Grosgrain.  With respect to its dilution

25   claim against the four bars, adidas has to show that its

1    Three-Stripe Mark, however that is defined, was famous as of

2    2008.  Those are the critical dates for dilution.

3            What's the evidence?  There is none.  First of all,

4    there's no evidence about fame of three horizontal stripes.  So

5    any alleged evidence that adidas will rely on regarding fame

6    would be as to its trademark registrations perhaps or as to

7    vertical stripes.  You're not going to see any evidence

8    relating to fame of horizontal stripes.  As I told you earlier

9    and as you saw the evidence, there is very scant evidence that

10   adidas has even used horizontal stripes.

11           You have here testimony from Tom Kahl, the senior

12   manager of finance at adidas.  He talked about the data that he

13   considered, the sales data that he considered, or that are

14   presented in his sales report, rather.  He says there was no

15   sales presented prior to 2012.  No sales data prior to 2012.

16   Dilution has to be as of 2002, 2004 or 2008.  They have no

17   sales data prior to those periods.  Because the systems don't

18   have that data.  So the sales data, as you'll see in this

19   slide, is from 2012 forward.  There's no pre-2012 sales data.

20   No data to support fame for purposes of dilution.

21           Now if we talk about advertising and marketing data.

22   You'll see here in this slide, if you look at Plaintiff's

23   Exhibit 72, which they rely upon, it doesn't have any data

24   prior to 2010.  Marketing advertising spends no data prior to

25   2012.  So, again, here, if we use 2012 as the date for

1  marketing and sales data, that's supposedly is going to show

2  that the Three-Stripe Mark is famous, nothing prior to 2008.

3  There is no data that's going to support their claim of

4  dilution.

5       Catalogs.  Adidas has relied on many catalogs, but

6  catalogs are not evidence of fame.  Catalogs are sent to

7  wholesale buyers.  They are not sent to consumers.  They're

8  sent to buyers of stores.  They can't rely on catalogs to show

9  fame.

10       So, ladies and gentlemen, there is no evidence in this

11  record that the Three-Stripe Mark was famous prior to 2008.

12  That alone is reason enough for you to deny the dilution claim.

13       Interestingly enough, adidas survey artist, Hal Poret,

14  he didn't conduct a survey on fame.  Survey experts often will

15  conduct surveys to support claims of dilution.  In this case,

16  there's no survey by Mr. Poret.  Mr. Joachimsthaler, who you

17  heard from, he conducted a survey, but it wasn't a fame survey.

18  He says it was a recognition survey.  We asked him, did you do

19  a fame survey? He said no.  It's definitely not a fame survey.

20  No survey evidence of fame.

21       Ladies and gentlemen, one of the things you should

22  think about throughout your evaluation of the testimony and as

23  you come to your conclusion is how has adidas been harmed by

24  any of this?  And you will see, there is no harm.  There's been

25  no harm.  There's no evidence of harm.  There's no evidence

that adidas has been harmed by anything that Thom Browne has
done.

        We talked about confusion.  They had their confusion
survey.  As we mention, there is initial interest, there is
post sale.  We put those around the side there because really
the important thing about confusion is the middle there, the
point of sale.  Adidas's evidence misses the mark.

        Now the only evidence that they tried to put in on
harm is Dr. Joachimsthaler.  Now I'm sure you were all
scintillated by his testimony about your brain and the little
nodules in your brain, and you probably didn't know there was a
compartment in your brain where adidas sits.  They have all
these theories about the brain and what's going on in the brain
to try to manufacture a theory of harm.  But it's all
theoretical.  There's no empirical evidence.  He didn't do any
studies.  He didn't put anything in front of you that shows
adidas was harmed.  He just comes up with theoretical
possibilities that he knows as a scholar because he's very
intelligent in these matters, and so he tells you what scholars
think about what's going on in your brain, but no real evidence
of harm.  Just think as a practical matter, is adidas being
harmed by Thom Browne?  You can even answer that at that level,
ladies and gentlemen.

        As you know here, he says, he talks about different
lifestyles, and he admits that Thom Browne is luxury.  Adidas

 1    is for everyone.  He knows about the difference.  He knows

 2    they're not competitors.  Adidas and Thom Browne don't compete

 3    for the same business.

 4              Remember that chart at the bottom there?  That

 5    confusing chart with all the circles and the overlapping

 6    circles, and I don't know what that means, but he put that

 7    chart up on the screen and he said this is harm.  This shows

 8    harm.  The little circles, adidas and Thom Browne, I don't

 9    know, somehow that's harm.

10              Mr. Steckel came up.  He is a professor of marketing

11    at NYU.  He testified and told you, he's an expert, he is a

12    specialized witness, and he told you, my overall conclusion is

13    that his opinions, Dr. Joachimsthaler's opinions lack

14    scientific basis.  They're not grounded -- they are grounded on

15    baseless and incorrect assumptions and a lot of speculation.

16    To put it simply, his report was a lot of complicated

17    hand-waving as opposed to scientific investigations.

18              No harm here, ladies and gentlemen.  No damages.

19    Adidas is going to ask you to find Thom Browne liable and to

20    award them, I don't know, 7 million plus dollars in damages?

21    Ladies and gentlemen, in order to award damages, you need to

22    find that adidas was harmed.  Adidas was not harmed.  The

23    damages, if there is liability, and we don't think that there

24    is, and we hope that you agree with us -- zero.

25              Ladies and gentlemen, at the conclusion of this case,

1    and we're just about over.  Five minutes left.  Can you

2    imagine?  At the conclusion of this case, we're going to take a

3    break.  The Judge will instruct you on the law.  Then you are

4    going to go back to deliberate, and the Judge will hand you

5    this verdict form.  The verdict form will ask you on the claim

6    of trademark infringement, we, the jury, find the defendant

7    Thom Browne -- you should check the right box -- not liable for

8    trademark infringement.  If you check that box, you don't have

9    to answer 2 or 3.  You don't have to put in any dollar amounts

10   in those two questions.

11          Then you skip to the fourth question.  Again the

12   question is:  On adidas's claim for trademark dilution, we, the

13   jury, find the defendant Thom Browne, not liable.  And that's

14   it.  And then your work is done.  You can go home.  You can go

15   back to your lives, back to your families, back to your jobs.

16   and we're done.

17          So thank you all for your time, for your patience, for

18   your attention, and, please, vote as you should:  That Thom

19   Browne is not liable.  Thank you.

20          THE COURT:  Thank you very much.

21          All right, ladies and gentlemen.  We will take our

22   lunch break now.  So we will resume at 1:30.

23          (Jury not present)

24          THE COURT:  Please be seated.  It's going to sound

25   like a broken record, but I continue to be very impressed by

1    the quality of lawyering in this case, and I want to express my

2    great thanks to all the counsel for their really excellent

3    work.  It's a case that has many interesting facets that now

4    will be for the jury as soon as I give them instructions of

5    law.

6            Now I couldn't help but think when we were hearing

7    about various marks of what undoubtedly are the most famous

8    marks; namely the Marx brothers.  And so my trivia question for

9    counsel is:  How many Marx brothers were there?

10           You're saying four?  Can you name them?

11           MR. LEWIN:  Harpo, Groucho.  I'm forgetting the order

12   on the last two --

13           THE COURT:  My courtroom deputy --

14           DEPUTY CLERK:  Chico, Zeppo.

15           THE COURT:  Technically, you could make an argument

16   that there were four.  There were actually five.  But one of

17   them named Gummo only appeared on stage and never appeared in

18   the movies.  But you knew that, of course.

19           So, whether it's three stripes, four stripes in the

20   case of the Marx brothers, it was five strikes.  And, by the

21   way, their stock in trade was confusion.  See you in an hour.

22           THE COURT:  I'm sorry, are the exhibits all ready?

23           MR. HENN:  There's an issue that we just need to put

24   something on the record at the court reporter's request, but

25   they are ready.

1    THE COURT:  We'll do that once we come back.

2    (Luncheon recess)

3                    AFTERNOON SESSION

4                        1:30 p.m.

5    (Jury not present)

6    THE COURT:  There was something plaintiff's counsel

7    wanted to put on about exhibits.

8    MR. HENN:  Yes, your Honor.

9    In finalizing the exhibits, we realized there was a

10   handful where there was no objection, it was presented to the

11   witness and the jury, but your Honor didn't say the magic words

12   received.

13   THE COURT:  But that's because I said it earlier, and

14   I don't know if you found this, that where the parties had

15   stipulated, in effect, to the admission, they were

16   automatically received.  So those were received, in fact, even

17   though I didn't say it at that time.

18   MR. HENN:  Thank you.

19   Do you mind if I just read them for clarity sake?

20   THE COURT:  Go ahead.

21   MR. HENN:  The exhibits referring to, these are all

22   plaintiff's exhibits, 50, 80, 81, 82, 86, 196, 1008, 1030,

23   1307, and 1309.

24   (Plaintiff's Exhibits 50, 80, 81, 82, 86, 196, 1008,

25   1030, 1307, and 1309 received in evidence)

1           THE COURT:  OK.  And now so that they can go into the

2    jury room as soon as we finish with the instructions, where are

3    the exhibits?

4           They are in those various boxes on both sides?

5           So did you bring the crane?

6           Now we know what needs to be brought in and now the

7    CSO officer can help with that.

8           Yes.

9           MR. MALDONADO:  Your Honor, we want to read a couple

10   of transcript corrections into the record.

11          THE COURT:  Go ahead.

12          MR. MALDONADO:  At page 401, line 12, 0820 should be

13   0082 and 0120 should be 0102.  And then at page 401, line 20,

14   39 should be 139.

15          THE COURT:  Very good.

16          MR. MALDONADO:  Thank you, your Honor.

17          THE COURT:  All right.

18          (Jury present)

19          Ladies and gentlemen, you each have a copy now of my

20   instructions of law.  I'm going to read them together now.

21   You'll be able to take them with you into the jury room as well

22   to refer to them during your deliberations.

23          If you look at the table of contents on the second

24   page, you'll see that first there are some general

25   instructions.  These are instructions that apply basically to

all civil cases.

          Then there's instructions under the heading liability.
These are about the two claims in this case:  Infringement and
dilution.

          Then if you find liability on infringement, then you
need to determine damages, which is just the lawyer's word for
money, so there is some instructions there in the third section
about that.

          Finally, there is some concluding instructions about
how you fill out your verdict form and things like that sort.

          So let's begin on page three with instruction number
one.

          We are now approaching the most important part of this
case, your deliberations.  You have heard all of the evidence
in the case, as well as the final arguments of the lawyers for
the parties.  Before you retire to deliberate, it is my duty to
instruct you as to the law that will govern your deliberations.
These are the final and binding instructions, which entirely
replace the preliminary instruction I gave you at the start of
the case, which you should now discard.

          Regardless of any opinion that you may have as to what
the law may be or ought to be, it is your sworn duty to follow
the law as I give it to you.  Also, if any attorney or other
person has stated a legal principle different from any that I
state to you in my instructions, it is my instructions that you

must follow.

        Because my instructions cover many points, I have
provided each of you with a copy of them, not only so that you
can follow them as I read them to you now, but also so that you
can have them with you for the reference throughout your
deliberations.  In listening to them now and reviewing them
later, you should not single out any particular instruction as
alone stating the law, but you should instead consider my
instructions as a whole.

        Your duty is to decide the fact issues in the case and
arrive, if you can, at a verdict.  You, the members of the
jury, are the sole and exclusive judges of the facts.  You pass
upon the weight of the evidence; you determine the credibility
of the witnesses; you resolve such conflicts as there may be in
the testimony; and you draw whatever reasonable inferences you
decide to draw from the facts as you determine them.

        In determining the facts, you must rely upon your own
recollection of the evidence.  To aid your recollection, we
will send you the exhibits at the start of your deliberations,
together with an index to help you find what you want.  If you
need to review particular items of testimony, we can also
arrange to provide them to you in transcript or read-back form.

        Please remember that none of what the lawyers have
said in their opening statements, in their closing arguments,
in their objections, or in their questions is evidence.  Nor is

anything I may have said evidence.  The evidence before you,

consists of just three things:  The testimony given by

witnesses that was received in evidence, the exhibits that were

received in evidence, and any stipulations of the parties as to

matters in evidence.

Testimony consists of the answers that were given by

the witnesses to the questions that were permitted to be asked

here in court.  Please remember that questions, although they

may provide the context for the answers, are not themselves

evidence, only answers are evidence, and you should therefore

disregard any question to which I sustained an objection.

Also, you may not consider any answer that I directed you to

disregard or that I directed be stricken from the record.

Likewise, you may not consider anything you heard about the

contents of any exhibit that was not received in evidence.

More generally, you should be careful not to speculate

about matters not in evidence.  Your focus should be solely on

the evidence that was presented here in court.

It is the duty of the attorney for each side of a case

to object when the other side offers testimony or other

evidence that the attorney believes is not properly admissible.

Counsel also have the right and duty to ask the court to make

rulings of law and to request conferences out of the hearing of

the jury.  All such questions of law must be decided by me.

You should not show any prejudice against any attorney or party

because the attorney objected to the admissibility of evidence,
asked for a conference out of the hearing of the jury, or asked
me for a ruling on the law.

I also ask you to draw no inference from my rulings or
from the fact that on occasion I asked questions of certain
witnesses.  My rulings were no more than applications of the
law and my questions were only intended for clarification or to
expedite matters.  You should understand this, I have no
opinion as to the verdict you should render in this case.

You are to perform your duty of finding the facts
without bias or prejudice or sympathy or hostility as to any
party, for all parties are equal under the law.  You are to
perform your final duty in an attitude of complete fairness and
impartiality.  You are not to be swayed by rhetoric or
emotional appeals.  It must be clear to you that if you were to
let extraneous considerations interfere with your thinking,
there would be a risk that you would not arrive at a true and
just verdict.  So do not be guided by anything except clear
thinking and calm analysis of the evidence.

As you know, this is a civil case.  In a civil case, a
party who is making a claim against another party has what we
call the burden of proof, which is the burden of establishing
each of the essential elements of that claim.  Here, adidas has
asserted claims of trademark infringement and dilution against
Thom Browne, and therefore has the burden of proof as to those

claims.

I will describe the essential elements of adidas' claims shortly, but for now, keep in mind that adidas must prove each of the essential elements of each of its claims by a preponderance of the credible evidence.  Credible evidence means such evidence that you find worthy of belief.  To establish an element of a claim by a preponderance of the credible evidence means to prove that that element is more likely true than not true.

When assessing whether a party has met its burden of proof or failed to do so, the question is not which party called the greater number of witnesses or how much time one party or another spent during the trial.  The focus must always be on the quality of the evidence:  Its persuasiveness in convincing you of its truth.

In deciding whether a party meets its burden of proof, you may consider both direct evidence and circumstantial evidence.

Direct evidence is evidence that proves a fact directly.  For example, where a witness testifies to what he or she saw, heard, or observed, that is called direct evidence.

Circumstantial evidence is evidence that tends to prove a fact by proof of other facts.  To give a simple example, suppose that when you came into the courthouse today the sun was shining and it was a nice day, but the courtroom

blinds were drawn and you could not look outside.  Later, as
you were sitting here, someone walked in with a dripping wet
umbrella, and soon after somebody else walked in with a
dripping wet raincoat.  Now, on our assume facts, you cannot
look outside the courtroom and you cannot see whether it is
raining, so you have no direct evidence of that fact.  But on
the combination of the facts about the umbrella and the
raincoat, it would be reasonable for you to infer that it had
begun raining.

          That is all there is to circumstantial evidence.
Using your reason and experience, you infer from established
facts the existence or nonexistence of some other fact.  Please
note, however, that it is not a matter of speculation or guess;
it is a matter of logical inference.

          The law makes no distinction between direct and
circumstantial evidence.  Circumstantial evidence is of no less
value than direct evidence, and you may consider either/or
both, and may give them such weight as you conclude is
warranted.

          It must be clear to you by now that counsel for the
opposing parties are asking you to draw very different
conclusions about various factual issues in the case.  An
important part of that decision will involve making judgments
about the testimony of the witnesses you have listened to and
observed.  In making these judgments, you should carefully

N1CsADI4                    Jury Charge

scrutinize all of the testimony of each witness, the

circumstances under which each witness testified, and any other

matter in evidence that may help you to decide the truth and

the importance of each witness's testimony.

         Your decision to believe or to not believe a witness

may depend on how that witness impressed you.  How did that

witness appear to you?  Was the witness candid, frank, and

forthright, or did the witness seem to be evasive or suspect in

some way?  How did the way the witness testified on direct

examination compare with how the witness testified on

cross-examination?  Was the witness consistent or

contradictory?  Did the witness appear to know what he or she

was talking about?  Did the witness strike you as someone who

was trying to report his or her knowledge accurately?  These

are examples of the kinds of common-sense questions you should

ask yourselves in deciding whether a witness is or is not

truthful.

         How much you choose to believe a witness may also be

influenced by the witness's bias.  Does the witness have a

relationship with any of the parties that may affect how he or

she testified?  Does the witness have some interest, incentive,

loyalty, or motive that might cause him or her to shade the

truth?  Does the witness have some bias, prejudice, or

hostility that may cause the witness to give you something

other than a completely accurate account of the facts he or she

1    testified to?

2            You should also consider whether the witness had an

3    opportunity to observe the facts he or she testified about, and

4    whether the witness's recollection of the facts stands up in

5    light of the other evidence in the case.

6            In other words, what you must try to do in deciding

7    credibility is to size up a person just as you would in any

8    important matter where you are trying to decide if a person is

9    truthful, straightforward, and accurate in his or her

10   recollection.

11           Some of the testimony before you is in the form of

12   excerpts from the depositions that were received in evidence.

13   A deposition is simply a procedure whereby prior to trial the

14   attorneys may question a witness or a party under oath before a

15   court stenographer.  You should consider the deposition

16   received for trial according to the same standards you would

17   use to evaluate the testimony of a witness given live in court.

18           The law permits parties to offer testimony from

19   witnesses who were not involved in the underlying events in the

20   case, but who by education or experience profess to expertise

21   in a specialized area of knowledge.  In this case, the expert

22   witnesses who testified were Hal Poret, Erich Joachimsthaler,

23   and John Plumpe called by adidas, and Joanne Arbuckle, Joel

24   Steckel, and Basil Imburgia called by Thom Browne.  Specialized

25   testimony is presented to you on the theory that someone who is

N1CsADI4                          Jury Charge

learned in the field may be able to assist you in understanding

specialized aspects of the evidence.

However, your role in judging credibility and

assessing weight applies just as much to these witnesses as to

other witnesses.  When you consider the specialized opinions

that were received in evidence in this case, you may give them

as much or as little weight as you think they deserve.  For

example, a specialized witness necessarily bases his or her

opinions, in part or in whole, on what that witness learned

from others, and you may conclude that the weight given the

witness's opinions may be affected by how accurate or

inaccurate an underlying information is.  More generally, if

you find that the opinions of a specialized witness were not

based on sufficient data, education, or experience, or if you

should conclude that the trustworthiness or credibility of such

a witness is questionable, or if the opinion of the witness is

outweighed, in your judgment, by other evidence in the case,

then you may, if you wish, disregard the opinions of that

witness entirely or in part.  On the other hand, if you find

that a specialized witness is credible, and that witness's

opinions are based on sufficient data, education, and

experience, and that the other evidence does not give you

reason to doubt the witness's conclusions, you may, if you

wish, rely on that witness's opinions and give them whatever

weight you deem appropriate.

1          With these general instructions in mind, let me now

2     turn to the two claims in this case that the plaintiffs, adidas

3     America Inc., and adidas A.G. (collectively referred to as

4     adidas) bring against Thom Browne, Inc.:  A claim of trademark

5     infringement and a claim of trademark dilution.

6          I will shortly instruct you on each of the essential

7     elements that adidas must prove, by a preponderance of the

8     evidence, to prevail on a given claim.  This is known as

9     establishing liability.  If adidas has failed to prove any

10    essential element of a particular claim by a preponderance of

11    the evidence, you must find Thom Browne not liable on that

12    claim.  By contrast, if you find that adidas has proven by a

13    preponderance of the evidence every essential element of a

14    particular claim, then you should fine Thom Browne liable on

15    that claim.

16         Before we turn to adidas' claims, a word about the

17    trademark at issue.  A trademark can be a word, name, symbol,

18    or design that indicates to consumers the company associated

19    with a product.  Here, adidas asserts infringement and dilution

20    of what it calls the Three-Stripe Mark.  For purposes of this

21    case, adidas' Three-Stripe Mark means its use of three parallel

22    stripes on clothing or shoes in the manner described and

23    exemplified in a number of federal trademark registrations that

24    you can review at Plaintiff's Exhibit 181 and 183.  It also

25    includes any other use by adidas of three parallel stripes on

1   clothing or shoes that you find gives consumers the same

2   commercial impression as any one or more of the registered

3   uses.  By this, I mean that you may find that a particular use

4   of three parallel stripes by adidas falls under its

5   Three-Stripe Mark -- even if it differs in some way from the

6   use of three stripes in any of the federal registrations -- if

7   you find that the use would be perceived in the same way by a

8   reasonable consumer.

9        Adidas asserts that Thom Browne has infringed adidas'

10  Three-Stripe Mark through Thom Browne's use of two branding

11  designs called the Four Bar and Grosgrain designs on specific

12  Thom Browne products.  You can review the specific Thom Browne

13  products that adidas accuses of infringement at Plaintiff's

14  Exhibits 55 and 56 (collectively referred to as the accused

15  products).

16       Adidas contends that Thom Browne's use of the Four Bar

17  and Grosgrain designs on the accused products is likely to

18  confuse consumers into thinking that the products are made and

19  sold or otherwise connected with, associated with, sponsored

20  by, or approved by adidas.  As you heard, adidas does not

21  contend that this confusion occurs at the point-of-sale of Thom

22  Browne products, but rather either presale (such as when

23  consumers first see a product in stores, online, or on social

24  media), or post-sale (as when consumers other than the Thom

25  Browne customers see these customers wearing the accused

1    products).

2           In determining whether consumers, at either of these

3    points in time, are likely to be confused, you may draw on your

4    own common experience.  You should also take into consideration

5    the following factors:

6           First, the strength of adidas' Three-Stripe Mark.  A

7    mark's strength is measured by its tendency to identify the

8    products sold under the mark as associated with a particular

9    company and may depend on factors, such as advertising, media

10   coverage of products bearing the mark, sales success, the

11   longevity and exclusivity of the mark's use, consumer studies

12   linking the mark to the company, and any other factor in

13   evidence that you find bears on the strength of the mark.  The

14   stronger the mark, the more likely that similar uses by other

15   parties will cause confusion.

16          Second, the degree of similarity between adidas'

17   Three-Stripe Mark and Thom Browne's use of the Four Bar and/or

18   Grosgrain designs on the accused products.  In particular, you

19   should consider what effect the similarity or lack thereof has

20   on consumers and whether any similarity between the parties'

21   designs is likely to cause confusion among consumers.

22          Third, whether the accused products and adidas

23   products compete for the same consumers.

24          Fourth, whether or not there is evidence that

25   consumers are actually confused about which company offers the

1   accused products.  While proof of actual confusion is not

2   necessary to prove trademark infringement, and it is enough for

3   plaintiffs to show likelihood of confusion, evidence of actual

4   confusion can weigh in favor of there being a likelihood of

5   confusion.  Conversely, the absence of evidence of actual

6   confusion can be evidence that confusion is unlikely.  Please

7   remember that adidas is only claiming confusion at the pre-sale

8   and post-sale points, and that its survey is limited to

9   post-sale.

10          Fifth, the quality of the accused products relative to

11   adidas' products bearing the Three-Stripe Mark.  If the

12   products are of similar quality, confusion may be more likely,

13   whereas if they are different quality, confusion is less

14   likely.

15          Sixth, the degree of care and attention that an

16   ordinary consumer would use when encountering adidas' and Thom

17   Browne's respective products.  Generally, the more

18   sophisticated and careful the average consumer of a product is,

19   the less likely that that consumer will be confused about the

20   company behind the product.

21          Seventh, whether adidas has shown that Thom Browne

22   acted in bad faith.  In this context, bad faith goes to whether

23   Thom Browne used the Four Bar and Grosgrain designs on the

24   accused products within with the intention that consumers would

25   associate their products with adidas' Three-Stripe Mark so as

1  to profit from adidas' reputation, or whether Thom Browne chose

2  to purposely turn a blind eye to the high likelihood that

3  consumers would be confused.

4       In considering the factors I just described to you,

5  please keep in mind that no one factor or consideration is

6  conclusive, but each of these factors, as well as any other

7  factors you find relevant, should be weighed in light of the

8  total evidence presented at the trial to determine whether, on

9  balance, a likelihood of confusion exists.  If adidas has

10  proved that a likelihood of confusion exists, it has then

11  carried its burden of proof on its infringement claim.

12       Adidas also asserts a claim for trademark dilution

13  under federal law.  This claim does not require showing that

14  consumers are likely to be confused about the source of the

15  accused products.  Instead, they require showing that Thom

16  Browne's designs on the accused products are likely to dilute

17  the distinctiveness of adidas' Three-Stripe Mark by eroding its

18  distinctiveness in the mind of the public.

19       To prove dilution under federal law, adidas must show

20  by a preponderance of the credible evidence that:

21       One, adidas' Three-Stripe Mark is famous;

22       Two, adidas' Three-Stripe Mark became famous before

23  Thom Browne first sold any of the accused products; and

24       Three, Thom Browne's use of its Four Bar and Grosgrain

25  designs on the accused products is likely to dilute the

1    distinctiveness of adidas' mark.

2              The Three-Stripe Mark is famous if it is widely

3    recognized by the general consuming public as designating

4    adidas as the source of goods bearing the mark.  In measuring

5    fame, you may consider your own experience, as well as the

6    extent, history, and geographic reach of advertising and

7    publicity of the mark (both by adidas or third parties), the

8    amount, volume, and geographic reach of sales of products

9    bearing the mark, the extent to which members of the public

10   actually recognize the mark, and whether the mark was federally

11   registered.  Here, as described above, the Three-Stripe Mark

12   consists of several specific federal registrations that you can

13   review at Plaintiff's Exhibits 181 and 183, as well as any uses

14   you find to create the same commercial impression.

15             If you determine adidas' Three-Stripe Mark is famous

16   and has been famous since before Thom Browne began selling the

17   accused products, you must consider whether Thom Browne's use

18   of the Four Bar and Grosgrain designs on the accused products

19   is likely to dilute the distinctiveness of the Three-Stripe

20   Mark.  In determining whether such dilution is likely to occur,

21   you may consider all relevant factors, including, for example:

22             The degree to which Thom Browne's use of the Four Bar

23   and/or Grosgrain designs on the accused products is similar to

24   adidas' use of the Three-Stripe Mark;

25             The strength of adidas' Three-Stripe Mark, which you

should evaluate as described in Instruction 11;

The degree to which adidas' Three-Stripe Mark is widely recognized;

Whether Thom Browne intended to create an association with adidas' Three-Stripe Mark;

The extent to which other producers of similar goods are using three stripes;

Any actual association by consumers of Thom Browne's Four Bar and/or Grosgrain designs with adidas' Three-Stripe Mark.

You may also consider any other relevant factors, and you should remember that no one of these factors is conclusive. Your task is to consider whether, after considering these factors and any others that you find relevant, Thom Browne's use of its Four Bar and/or Grosgrain designs on the accused products is more likely than not to dilute the distinctiveness of adidas' Three-Stripe Mark.

If you find Thom Browne liable for trademark infringement, you must also determine the amount of money to award to adidas.  There are two possible components of such an award:

One, any actual damages suffered by adidas, and

Two, the profits Thom Browne earned by selling any of the accused products you determine infringed adidas' Three-Stripe Mark.

1          Please note that this does not apply to dilution

2     (where no monetary damages are claimed), but only to

3     infringement.

4          Actual damages means the amount of money necessary to

5     compensate adidas for harm directly caused by any infringement

6     by Thom Browne.  You may decline to award any actual damages if

7     you find adidas was not harmed by any infringement by Thom

8     Browne.

9          Adidas does not claim that it lost sales as a result

10    of any infringement by Thom Browne; rather, it contends that if

11    Thom Browne had wanted to use its designs without infringing on

12    adidas' Three-Stripe Mark, it would have had to enter into a

13    licensing agreement with adidas.  Accordingly, adidas contends

14    that its actual damages are measured by the royalties that

15    Thom Browne would have paid to adidas under such a licensing

16    agreement.  The parties are agreed that you should calculate

17    such damages using a royalty fee equal to 8 percent of

18    wholesale sales and 3.1 percent of retail and e-commerce sales

19    of any of the accused products you find have infringed adidas'

20    Three-Stripe Mark.

21         If you find Thom Browne liable for trademark

22    infringement, you may also award adidas the profits you

23    determine Thom Browne earned as a result of its infringement.

24    You should measure such profits as the difference between Thom

25    Browne's total sales of any accused products you determine to

N1CsADI4                         Jury Charge

have infringed adidas' Three-Stripe Mark and the expenses

Thom Browne incurred in order to make those sales.  The burden

is on adidas to show by the preponderance of the credible

evidence the amount Thom Browne received from selling the

accused products, while the burden is on Thom Browne to show by

the preponderance of the credible evidence the expenses it

incurred in order to sell the accused products.

          You will shortly retire to the jury room to begin your

deliberations.  As soon as you get to the jury room, please

select one of your number as the foreperson to preside over

your deliberations and to serve as your spokesperson if you

need to communicate with the court.

          You will be bringing with you into the jury room a

copy of my instructions of law and a verdict form on which to

record your verdict.

          Let me pause just there and show you the verdict form.

You saw this during closing arguments with counsel.  Let me

show you again.  It's a simple one-page document.  The first

question is whether on infringement you find Thom Browne liable

or not liable.  If you find not liable, then you skip down to

question four.  If you find liable, you answer two and three,

which are the amount of damages -- both actual damages and

profits, the two components of damages -- putting the amount

there.  And then you go on to the final question, question

four, which is whether you find Thom Browne liable or not

N1CsADI4                      Jury Charge

1   liable for dilution.

2          After you have reached your verdict and your

3   foreperson has signed and dated the verdict form, the

4   foreperson will fold it and seal it in this envelope very

5   cleverly marked verdict, and that will be brought to me here in

6   court.  And I will not open it until all eight of you are back

7   here in the courtroom, and then we will open it and we will ask

8   each of you individually, after reading the verdict, whether

9   that is, in fact, your verdict.  The reason we go through that

10  is to be absolutely sure we have your verdict as you have

11  decided.

12         So back to the instructions.

13         In addition, we will send into the jury room all of

14  the documentary and physical exhibits that were admitted into

15  evidence, along with an index so you can locate what you want.

16  If you want any of the testimony, that can also be provided in

17  either transcript or read-back form.  But please remember that

18  it is not always easy to locate what you might want, so be as

19  specific as you possibly can be in requesting portions of

20  testimony.  Also, if you want any of the videotapes replayed,

21  please let us know, and we will bring you back into court to

22  see the relevant videotape.

23         Any of your questions, in fact any communication with

24  the court, should be made to me in writing, signed by your

25  foreperson, and given to the marshal, who will be available

1   outside the jury room throughout your deliberations.  After

2   consulting with counsel, I will respond to any question or

3   request you have as promptly as possible, either in writing or

4   by having you return to the courtroom so that I can speak with

5   you in person.

6          You should not however tell me or anyone else how the

7   jury stands on any issue until you have reached your verdict

8   and recorded it on the verdict form.

9          Each of you must decide the case for yourself, after

10   consideration with your fellow jurors of the evidence in the

11   case, and your verdict must be unanimous.  In deliberating,

12   bearing in mind that while each juror is entitled to his or her

13   opinion, you should exchange views with your fellow jurors.

14   That is the very purpose of jury deliberation –– to discuss and

15   consider the evidence, to listen to the arguments of fellow

16   jurors, to present your individual views, and to consult with

17   one other and reach a verdict based solely and wholly on the

18   evidence.

19          If after carefully listening and after carefully

20   considering all the evidence and the arguments of your fellow

21   jurors, you entertain a conscientious view that differs from

22   the others, you are not to yield your view simply because you

23   are outnumbered.  On the other hand, you should not hesitate to

24   change or modify an earlier view that, after discussions with

25   your fellow jurors, now appears to you erroneous.

N1CsADI4                    Jury Charge

1            In short, your verdict must reflect your individual

2     views and it must also be unanimous.

3            This completes my instructions on the law.

4            Now, all previous objections to the instructions are

5     deemed to have been made again at this time and are preserved.

6            Is there any reason counsel needs to approach the

7     sidebar?

8            MR. HENN:  No, your Honor.

9            MR. MALDONADO:  Yes, your Honor.

10           May we approach?

11           THE COURT:  OK.

12           (At the sidebar)

13           MR. MALDONADO:  I just wanted to put my early

14    objection on the record, I didn't say what it was.  I want it

15    to be on the record to the verdict form.

16           THE COURT:  What's your objection?

17           MR. MALDONADO:  My objection was that the defendant

18    believes that the verdict form should include separate verdict

19    questions as to each of the accused products.

20           THE COURT:  OK.  That objection is overruled.

21           MR. MALDONADO:  Thank you.

22           (In open court)

23           THE COURT:  Ladies and gentlemen, we're going to swear

24    in the marshal who will guard you throughout your

25    deliberations.

 1              If you haven't reached a verdict by 4:30, unless you

 2     want to stay later, you should just go home and come back at

 3     9:30 tomorrow, and your foreperson will be in charge that you

 4     don't start your deliberations again until all eight of you are

 5     back.

 6              If you decide you want to stay later, you need to let

 7     us know by four o'clock today, a half hour before 4:30, and we

 8     can arrange for you to stay as late at seven o'clock, if you

 9     wish.

10              I remind you that there is no magic to how long you

11     need to take.  You can take five minutes for your verdict.  You

12     can take five days for your verdict.  But it all is up to you.

13              So we will swear in the marshal.

14              (Marshal sworn)

15              THE DEPUTY CLERK:  Jurors, please follow the marshal

16     back into our jury room.

17              (Jury not present)

18              THE COURT:  As soon as you can, my courtroom deputy

19     will take the exhibits into the jury room.  She hasn't done any

20     other weightlifting today, so this will be a good opportunity.

21              In terms of counsel.  While the jury is deliberating,

22     there always has to be at least one counsel from each side

23     present on this floor.  You don't have to be in this room, but

24     you have to be on the 14th floor, and someone who can answer

25     any notes we receive.  So that if we get a note, we can

N1CsADI6

1   promptly respond, we don't have to go searching for counsel

2   somewhere else.

3           Unless they ask to stay later, you can just

4   automatically leave at 4:30 and come back at 9:30 tomorrow.  I

5   will let them know tomorrow, if they are still deliberating,

6   that you can take lunch from one to two, but otherwise you need

7   to be on this floor.

8           Anything else any counsel needs to raise with the

9   court?

10          MR. HENN:  Not from the plaintiffs.

11          MR. MALDONADO:  Nothing, your Honor.

12          Do you have other matters this afternoon?

13          Do you need us to clear out of the courtroom?

14          THE COURT:  Pardon?

15          MR. MALDONADO:  Do you have other matters?

16          Do you need us to clear out of the courtroom?

17          THE COURT:  I have something.  I don't think it's four

18   o'clock.  Let me just check.

19          It's not until 4:30, so you can stay here.  You can

20   admire the now no longer existing rack, or you can consider, as

21   my law clerk did, who is the sixth Marx Brothers, and the

22   answer was Karl Marx.

23          See you shortly.

24          (Recess pending verdict)

25          (Jury not present)

N1CsADI6

1          THE COURT:  We have a verdict.

2          Let's bring in the jury.

3          THE DEPUTY CLERK:  Marshal, please bring in the jury.

4          (Jury present).

5          Would the foreperson please rise?

6          THE COURT:  I'm sorry.  Everyone can be seated first.

7          Actually, you can be seated, too, because when I open

8  the verdict form in a minute, I will not comment on it because

9  the determination of the verdict is your job, not mine.

10          But I did want to take a moment, before I open it, to

11  compliment this jury.  I thought you were a terrific jury.  I

12  saw you very carefully observing the witnesses, taking notes.

13  I have another trademark case beginning January 30.  If you

14  wouldn't mind ...

15          Anyway, in all seriousness, you are now excused for

16  four years for your service.

17          OK.  Now the foreperson will rise and I will open the

18  verdict.

19          All right.  The verdict is in proper form.

20          Mr. Foreperson, on adidas' claim for trademark

21  infringement, does the jury find the defendant Thom Browne;

22  liable or not liable?

23          THE JURY:  Not liable.

24          THE COURT:  On adidas' claim for trademark dilution,

25  does the jury find the defendant Thom Browne; liable or not

N1CsADI6

1    liable?

2              THE JURY:  Not liable.

3              THE COURT:  Very good.  Please hand it back.

4              Excuse me.  I don't want any talking.

5              Please hand the verdict form to my courtroom deputy.

6              So, Juror No. 1, is that your verdict?

7              JUROR NO. 1:  Yes.

8              THE COURT:  Juror No. 2, is that your verdict?

9              JUROR NO. 2:  Yes.

10             THE COURT:  Juror No. 3, is that your verdict?

11             JUROR NO. 3:  Yes.

12             THE COURT:  Juror No. 4, is that your verdict?

13             JUROR NO. 4:  Yes.

14             THE COURT:  Juror No. 5, is that your verdict?

15             JUROR NO. 5:  Yes.

16             THE COURT:  Juror No. 6, is that your verdict?

17             JUROR NO. 6:  Yes.

18             THE COURT:  Juror No. 7, is that your verdict?

19             JUROR NO. 7:  Yes.

20             THE COURT:  Juror No. 8, is that your verdict?

21             JUROR NO. 8:  Yes.

22             THE COURT:  Juror No. 9, is that your verdict?

23             JUROR NO. 9:  Yes.

24             THE COURT:  Juror No. 10, is that your verdict?

25             JUROR NO. 10:  Yes.

N1CsADI6

1          THE COURT:  Juror No. 11, is that your verdict?

2          JUROR NO. 11:  Yes.

3          THE COURT:  Juror No. 12, is that your verdict?

4          JUROR NO. 12:  Yes.

5          THE COURT:  Juror polled.  Jury unanimous.

6          Again, thank you so much for your excellent jury

7   service, and you are now excused.

8          Have a good weekend.

9          (Jury discharged)

10          All right.  So this also obviates the need for the

11   court to deal with the issue of laches.  The judgment will be

12   entered probably tomorrow.

13          Anything else we need to take up at this time?

14          Anything from plaintiff?

15          MR. FLEMMING:  I don't believe so, your Honor.

16          THE COURT:  Anything from defendant?

17          MR. MALDONADO:  No, your Honor.

18          THE COURT:  Very good.  Thanks very much.

19          That concludes this proceeding.

20          (Adjourned)

21

22

23

24

25