**KILPATRICK TOWNSEND & STOCKTON LLP**
R. Charles Henn Jr.
H. Forrest Flemming, III
The Grace Building
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADIDAS AMERICA, INC., an Oregon corporation; and ADIDAS AG, a foreign entity,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>THOM BROWNE INC., a Delaware corporation,<br><br>　　　　　　　　　Defendant. | No. 1:21-cv-05615-JSR |

**ADIDAS'S MEMORANDUM IN SUPPORT OF ITS**
**RULE 60(B) MOTION FOR A NEW TRIAL**

## <u>TABLE OF CONTENTS</u>

**PAGE**

I.    Introduction ................................................................................................... 1

II.   Factual Background ....................................................................................... 3

    A.   Thom Browne Intentionally Withheld the Bad-Faith Emails During Discovery .............. 3

    B.   Thom Browne's FC Barcelona Collaboration Is Central to The Parties' Dispute.............. 4

    C.   adidas's Document Requests Covered the Bad Faith Emails Several Times Over ........... 5

    D.   Thom Browne's ESI Searches Covered the Bad Faith Emails ........................................... 7

    E.   Thom Browne's Misconduct Prevented adidas From Taking Complete Depositions........ 8

    F.   Thom Browne's Misconduct Deprived adidas of Critical Trial Evidence ....................... 10

        1.   Opening Statements .......................................................................... 10

        2.   Witness Testimony........................................................................... 11

        3.   Thom Browne's Motions for Judgment as a Matter of Law..................................... 13

        4.   Closing Arguments ........................................................................... 13

III.  The Court's Jurisdiction............................................................................... 14

IV.   The Court Should Grant adidas a New Trial Under Rule 60(b)(2)....................................... 15

    A.   The Bad Faith Emails Are Newly Discovered and Existed Before Trial ......................... 15

    B.   The Bad Faith Emails Are Admissible and Likely Would Have Changed the Outcome of Trial ... 15

        1.   The Emails Contain Admissions on the "Ultimate Question" in the Case .............. 16

        2.   The Emails Are Highly Probative of Several *Polaroid* Factors................................ 17

    C.   The Bad Faith Emails Are Neither Cumulative Nor "Merely Impeachment"................. 20

    D.   adidas Has Been Diligent................................................................................ 20

V.    The Court Should Grant adidas a New Trial Under Rule 60(b)(3)....................................... 21

    A.   Thom Browne Engaged in "Misconduct"........................................................ 21

B.   Thom Browne's Misconduct Substantially Interfered With adidas's Ability to Fully and Fairly Present its Case .......................................................................................................... 22

C.   Justice Requires a New Trial ............................................................................................ 25

VI.   Conclusion ................................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Cryovac, Inc.*,
862 F.2d 910 (1st Cir. 1988) .................................................................................21

*In re Blue Cross Blue Shield Antitrust Litig.*,
No. 2:13-cv-20000-RDP, 2018 WL 11425554 (N.D. Ala. Oct. 24, 2018) ...........................23

*Catskill Dev., L.L.C. v. Park Place Ent. Corp.*,
286 F. Supp. 2d 309 (S.D.N.Y. 2003) ................................................21, 24, 25

*Classic Liquor Imps., Ltd. v. Spirits Int'l B.V.*,
201 F. Supp. 3d 428 (S.D.N.Y. 2016) (Rakoff, J.) ..............................16

*Colon-Torres v. Negrón-Fernández*,
997 F.3d 63 (1st Cir. 2021) ....................................................................24

*DiPirro v. United States*,
189 F.R.D. 60 (W.D.N.Y. 1999) .............................................................21

*E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*,
90 F. Supp. 2d 277 (S.D.N.Y. 2000) .....................................................18

*Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*,
104 F. Supp. 3d 371 (S.D.N.Y. 2015) ..........................................16, 17, 18

*Frankel v. C.N.P., Inc.*,
No. 85 Civ. 2667 (BN), 1987 WL 10386 (S.D.N.Y. Apr. 30, 1987) .................25

*George v. Celotex Corp.*,
914 F.2d 26 (2d Cir. 1990) .....................................................................16

*Gross v. Bare Escentuals Beauty, Inc.*,
641 F. Supp. 2d 175 (S.D.N.Y. 2008) ..............................................16, 17

*Gucci Am., Inc. v. Guess
?, Inc.*, 843 F. Supp. 2d 412, 425 (S.D.N.Y. 2012) ..............................18

*Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*,
609 F.3d 122 (2d Cir. 2010) ...................................................................15

*Kos Pharms., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004) ...................................................................19

*M'Otto Enters., Inc. v. Redsand, Inc.*,
 831 F. Supp. 1491 (W.D. Wash. 1993)................................................................19

*Madere v. Compass Bank*,
 No. A-10-CV-812 AWA, 2012 WL 5208538 (W.D. Tex. Oct. 22, 2012) ............................25

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
 818 F.2d 254 (2d Cir. 1987)................................................................17

*Monaghan v. SZS 33 Assocs., L.P.*,
 No. 89 Civ. 4900 (RWS), 1992 WL 135821 (S.D.N.Y. June 1, 1992) ................................22

*Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*,
 No. 14 C 7424, 2015 WL 3633987 (N.D. Ill. June 10, 2015) ................................17

*Nikon Inc. v. Ikon Corp.*,
 987 F.2d 91 (2d Cir. 1993)................................................................19

*ODS Cap. LLC v. JA Solar Holdings Co., Ltd.*,
 No. 18-CV-12083 (ALC), 2021 WL 9349939 (S.D.N.Y. Oct. 15, 2021),
 *remanded by Altimeo Asset Mgmt. v. JA Solar Holdings Co.*, No. 20-4268,
 2021 WL 9349956 (2d Cir. Oct. 21, 2021)................................................................14

*Rozier v. Ford Motor Co.*,
 573 F.2d 1332 (5th Cir. 1978) ................................................................22

*Schultz v. Butcher*,
 24 F.3d 626 (4th Cir. 1994) ................................................................21, 24, 25

*Sports Auth., Inc. v. Prime Hosp. Corp.*,
 89 F.3d 955 (2d Cir. 1996)................................................................18, 19

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
 736 F.3d 198 (2d Cir. 2013)................................................................20

*Talisker Corp. v. Prime W. Jordanelle, LLC*,
 No. 2:06-CV-1034 TC, 2008 WL 4279642, at *8 (D. Utah Sept. 12, 2008)................................19

*Thomas v. City of New York*,
 293 F.R.D. 498 (S.D.N.Y. 2013), *aff'd*, 691 F. App'x 671 (2d Cir. 2017) .................... *passim*

*Timex Corp. v. Stoller*,
 961 F. Supp. 374 (D. Conn. 1997)................................................................16, 17

*West v. Bell Helicopter Textron, Inc.*,
 803 F.3d 56 (1st Cir. 2015)................................................................21

*Whimsicality, Inc. v. Rubie's Costume Co., Inc.*,
    836 F. Supp. 112 (E.D.N.Y. 1993) .................................................................15

**Other Authorities**

Fed. R. App. P. 12.1(b) ...................................................................................14

Fed. R. Civ. P. 60(b)(2)....................................................................2, 15, 21, 23

Fed. R. Civ. P. 60(b)(2) and 60(b)(3) ................................................... *passim*

Fed. R. Civ. P. 60(c)(1) ..................................................................................14

Fed. R. Civ. P. 62.1(a) ...............................................................................3, 14

Fed. R. Civ. P. 62.1(a)(3)................................................................................14

Fed. R. Civ. P. 62.1(a), (a)(3) ........................................................................14

FRE 801(d)(2)..................................................................................................15

## I.   INTRODUCTION

adidas is entitled to a new trial under Federal Rules of Civil Procedure 60(b)(2) and 60(b)(3) because it recently learned that Thom Browne improperly withheld several email chains in which Thom Browne employees admit to the ultimate liability issue in this case—a likelihood of confusion between the company's "Four Bar" design and adidas's Three-Stripe Mark:

On Tue, Aug 6, 2019 at 9:06 AM Thom Browne <thom@thombrowne.com> wrote:

dear thi…
good morning…
i thought tomaso has already said that we shouldn't use the four bar because of adidas…
please confirm with matt and then we can proceed…
maybe it would be safer to just make the rwb stripes bigger and proceed...
thank you…
thom.

Dear Thom,
I hope you are well. I wanted to hear your thoughts on the usage of 4bar for FCB dressing for players. I wanted to raise a flag now from me before other teams start bombarding you with this concern. As Adidas has such a big presence in the sporting world, it is inevitable that our 4bar in white be read as adidas stripes, especially on accessories. Or would you also consider RWB?

Dear Thom,
I hope you are doing well. I'm reaching out to see which range below you prefer for the players to have for the new season. There is a 4bar range and RWB range in case you feel that 4bar is too loud and 'adidas' in the football context. Please note they are all on black deerskin.

Dear Thom,
I'm sorry for the confusion. We have mixed old and new comments from FCB.
1. They are not comfortable with any four bars, which in their view is too much in the spirit of Adidas

1.  We try to avoid rows of 4 bar armband on the racks so as to not look like Adidas. We've therefore removed some styles from your original orders.

Henn Decl. Exs. 1-4 (the "**Bad Faith Emails**").

Thom Browne withheld the Bad Faith Emails, all dated between 2016 and 2019 and involving New York-based employees,[1] until months after trial, when it disclosed them in a trademark lawsuit with adidas in the United Kingdom. Thom Browne's concealment of these highly relevant—and highly damaging—emails denied adidas a fair trial. adidas is therefore entitled to relief under Federal Rule of Civil Procedure 60(b)(2), which provides for relief when a party uncovers evidence that likely would have changed the outcome of trial.

adidas is also independently entitled to relief under the much more lenient standard of Rule 60(b)(3), which provides for a new trial when a party withholds evidence during discovery that "could well have been probative on an important issue" or served as "a potentially fruitful avenue of direct or cross examination." *See Thomas v. City of New York*, 293 F.R.D. 498, 504 (S.D.N.Y. 2013) (citation omitted), *aff'd*, 691 F. App'x 671 (2d Cir. 2017). Significantly, Rule 60(b)(3) applies even where the concealment is "accidental or inadvertent." *Id.*

Each *one* of the Bad Faith Emails would be outcome determinative under Rule 60(b)(2), as each constitutes an admission on the ultimate issue in trademark cases: likelihood of confusion. Each *one* of the Bad Faith Emails is also "probative on an important issue" and presents a "potentially fruitful avenue" for cross-examination under Rule 60(b)(3). *Id.* (citation omitted). In *combination*, though, the four Bad Faith Emails undeniably would have changed the outcome of the trial and would have been overwhelmingly probative on critical issues the jury was asked to decide.

---

[1] The New York-based Thom Browne employees involved in the Bad Faith Emails held the following titles: (1) Thom Browne, Owner; (2) Rodrigo Bazan, CEO; (3) Jay Sternstein, Vice President of Sales; (4) Thi Wan, Head of Menswear; (5) Kelly Connor, Director of Brand Relations; and (6) Emily Maturo, Senior Men's Account Manager.

Accordingly, pursuant to Federal Rule of Civil Procedure 62.1(a), the Court should issue an "Indicative Ruling" stating that "it would grant [adidas's] motion" for relief from judgment and for a new trial so that the Second Circuit can then remand the case.

## II.   FACTUAL BACKGROUND

### A.   Thom Browne Intentionally Withheld the Bad-Faith Emails During Discovery

Thom Browne's lawyers intentionally withheld the Bad Faith Emails during discovery in this action. At the outset of fact discovery, Thom Browne agreed to search for the word "adidas" among the files of several custodians, including Mr. Browne, Rodrigo Bazan, and Jay Sternstein (each of whom possessed at least one of the Bad Faith Emails). Declaration of R. Charles Henn Jr. ("Henn Decl.") ¶ 13, Exs. 7-8. And because each of the emails contains the word "adidas," it is indisputable that Thom Browne's counsel intentionally pulled the Bad Faith Emails out of its document production, despite—as discussed further below—their plain relevance and responsiveness to adidas's discovery demands.

adidas did not discover Thom Browne's misconduct until August of 2023, seven months after trial, when Thom Browne's lawyers in the U.K. produced the Bad Faith Emails in a separate trademark dispute with adidas in that jurisdiction involving the same marks and many of the same products. Declaration of Emily Sharkey ("Sharkey Decl.") ¶ 6. Because Thom Browne designated the emails as "Confidential" in the U.K. action, adidas's U.K. counsel asked Thom Browne to allow adidas's U.S. counsel to see them. *Id.* ¶ 7. Thom Browne refused, forcing adidas to file an emergency application in the U.K. action. *Id.* ¶¶ 7-8. But on October 5, Thom Browne's U.S. counsel finally produced the emails to adidas's U.S. counsel. Henn Decl. ¶ 5.

Counsel for Thom Browne recently confirmed that the Bad Faith Emails "were collected between January and March of 2022" but were not produced to adidas in discovery. Henn Decl. ¶

21, Ex. 12. Yet, Thom Browne has not offered any explanation regarding *why* they were not produced to adidas despite being collected (and presumably reviewed by counsel). *Id.*

**B.      Thom Browne's FC Barcelona Collaboration Is Central to The Parties' Dispute**

Several of the Bad Faith Emails concern Thom Browne's collaboration with FC Barcelona and its then-captain, Lionel Messi. That collaboration has been a key issue in this litigation[2] since long before the Complaint was filed, making Thom Browne's failure to produce the emails especially egregious. Indeed, this dispute began in December 2019, when adidas's counsel wrote to Thom Browne's counsel that "recent TB products" were "very troubling" and "will create significant trademark concerns." Henn Decl. ¶ 19, Ex. 10. adidas's counsel expressed concern that many of these products were promoted worldwide as part of Thom Browne's "major campaign" with FC Barcelona. *Id.*; *see also* ECF 99-42 at 3.

In its June 2021 Complaint, adidas cited Thom Browne's collaboration with FC Barcelona as an example of "Thom Browne's encroachment into adidas's core market category." ECF 1 ¶ 40. Later, in ruling on Thom Browne's motion to dismiss adidas's Complaint, Magistrate Judge Lehrburger discussed adidas's allegations about FC Barcelona, as well as a *GQ Style* article referencing the Thom Browne/FC Barcelona collaboration and calling Thom Browne "the ***other*** Three Stripes." ECF 41 at 4 (emphasis in original).

Thom Browne later admitted in its Answer that it had collaborated with FC Barcelona, but alleged that: "Thom Browne and adidas operate in entirely separate markets" and "are not competitors"; "Thom Browne's use of the Four [Bars] . . . is very different from the manner in which adidas uses" the Three-Stripe Mark; "[t]here has been no actual confusion between Thom Browne's goods and adidas' goods"; "[c]onsumers are not likely to be confused between Thom

---

[2] On just the second day of trial, the Court joked that the jury had heard about Mr. Messi "about 14 times" already. Tr. Day 2 at 315:2-4.

Browne's clothing and adidas' clothing"; and Thom Browne's "sportswear collections" are "entirely unlikely to be confused with adidas' performance activewear and performance wear." ECF 51 ¶ 40; *id.* at 12, 15, 17.

At trial, even Thom Browne's expert described the company's collaboration with FC Barcelona as a good example of "brand building" (Tr. Day 7 at 1237:1-10), opining that it qualified as "Advertising & Marketing" and had a "[s]ufficient nexus to [the] production and/or sale of accused products" to factor into a profits award. Henn Decl. Ex. 11.

## C.    adidas's Document Requests Covered the Bad Faith Emails Several Times Over

On the very first day of discovery, October 7, 2021, adidas served requests for production ("RFPs") that cover the Bad Faith Emails several times over:

RFP 94: Thom Browne's Communications, including Thom Browne's internal Communications, referring to adidas's Three-Stripe Mark or adidas's use of stripes on apparel or footwear.

RFP 26: Documents concerning Thom Browne's decision to begin offering for sale Activewear bearing a Stripe Design.

RFP 63: Thom Browne's internal Communications regarding third parties' use of Stripe Designs.

RFP 71: Documents concerning consumers' awareness or understanding of the marks, including trade dress, in connection with which Thom Browne has offered for sale the Accused Products.

RFP 84: Documents concerning any instance of which Thom Browne is aware in which any consumer, in connection with any Stripe Design . . . expressed or displayed confusion or mistake—including through making an inquiry—as to the affiliation, connection, or association of Thom Browne and adidas.

RFP 87: Documents sufficient to show the steps Thom Browne has taken to reduce or eliminate any actual or likely confusion or mistake as to the source or origin or sponsor or approval of Thom Browne's goods vis-à-vis adidas.

RFP 95: Documents concerning Thom Browne's trademark clearance efforts in connection with any Stripe Design . . . .

Henn Decl. Ex. 5. Thom Browne agreed to comply with each of these RFPs and promised it would produce responsive documents "from 2005-2021." Henn Decl. Ex. 6.

Each of the Bad Faith Emails involves U.S. employees and U.S. matters, and each is responsive to multiple RFPs. TB00530150 (Henn Decl. Ex. 1, "**Email 1**") includes a December 2016 email from Thom Browne's New York-based Senior Men's Account Manager Emily Maturo. In letter-briefing, Thom Browne dismissively describes this email as correspondence with "a supplier in Switzerland." ECF 217 at 3. But in her email, Ms. Maturo states—on behalf of the company Thom Browne—"**We** try to avoid rows of 4 bar armband on the racks so as to not look like Adidas." Henn Decl. Ex. 1 at 1 (emphasis added). Ms. Maturo's email is responsive to RFP 94 because it concerns "adidas's Three-Stripe Mark or adidas's use of stripes." The email is also responsive to RFPs 26, 71, 84, and 87.

TB00530154 (Henn Decl. Ex. 2, "**Email 2**") includes a November 2018 email from Thom Browne's New York-based Head of Menswear Thi Wan to Mr. Thom Browne (also based in New York) stating that, "[a]s Adidas has such a big presence in the sporting world, it is inevitable that our 4bar in white be read as adidas stripes . . . ." Thom Browne claims in letter-briefing that Mr. Wan's email is about "accessories" (ECF 217 at 3), but Mr. Wan refers to "dressing" FC Barcelona players in "4bar," and explains that "it is inevitable that our 4bar in white be read as adidas stripes, *especially* on accessories." Email 2 (emphasis added). Thus, on its face, Mr. Wan's admission is not at all limited to "accessories." In any event, the email is responsive to RFP 94 because it refers to adidas's mark. It is also responsive to RFPs 63, 71, 84, 87, and 95.

TB00530155 (Henn Decl. Ex. 3, "**Email 3**") includes December 2018 emails between Thom Browne's Vice President of Marketing, Tomaso Galli, and Mr. Browne concerning the FC

Barcelona promotional campaign. In letter-briefing, Thom Browne contends that the chain concerns only "accessories." ECF 217 at 4. But Mr. Galli clarifies that FC Barcelona is "not comfortable with _**any**_ four bars, which in their view is too much in the spirit of Adidas." Email 3 at 1 (emphasis added). Regardless, the email is responsive to RFP 94 because it concerns "adidas's Three-Stripe Mark or adidas's use of stripes." It is also responsive to RFPs 63, 71, 84, 87, and 95.

Finally, TB00530157 (Henn Decl. Ex. 4, "**Email 4**") includes August 2019 emails in which Mr. Wan states, "There is a 4bar range and RWB range in case you feel that 4bar is too loud and 'adidas' in the football context," and Mr. Browne responds, "i thought tomaso[3] has already said that _we shouldn't use the four bar because of adidas_ . . . maybe it would be safer to just make the rwb stripes bigger and proceed." _Id._ (emphasis added). These emails are responsive to RFP 94 because they concern adidas's mark. They are also responsive to RFPs 63, 71, 87, and 95.

### D.    Thom Browne's ESI Searches Covered the Bad Faith Emails

Early in discovery, and pursuant to a stipulated ESI Order (ECF 34), the parties conferred extensively regarding the custodians and search strings they would use for collecting and reviewing ESI. Among the custodians Thom Browne offered to search were Mr. Browne, Rodrigo Bazan, and Jay Sternstein. Henn Decl. Ex. 7. Mr. Bazan and Mr. Sternstein would have had copies of Email 1 in their email inboxes, and Mr. Browne would have had copies of Emails 2, 3, and 4 in both his inbox and "sent" mailbox.

Thom Browne initially offered to search its custodians' files for the word "adidas," and later agreed to expand the search term to "adidas*," which would encompass any variation,

---

[3] "Tomaso" refers to Tomaso Galli, Thom Browne's Senior Vice President of Marketing.

capitalization, or punctuation of the word. *Id.* ¶¶ 12-13, Exs. 7-8. Each of the Bad Faith Emails contains the word "adidas," so Thom Browne's attorneys undoubtedly collected them. The only explanation for why they were not produced to adidas is that Thom Browne's attorneys deliberately pulled them from the document production. With the Bad Faith Emails removed, Thom Browne's document production included just a few dozen emails mentioning "adidas," nearly all of which were third-party news alerts, settlement communications with adidas, or discussions about this lawsuit's press coverage. Henn Decl. ¶ 21.

Significantly, Thom Browne produced the bottom two emails in the Email 3 chain during discovery, and listed Mr. Browne as the "custodian." Henn Decl. ¶ 15, Ex. 9. There can be no question, then, that the Bad Faith Emails were intentionally withheld from adidas.[4]

### E.    Thom Browne's Misconduct Prevented adidas From Taking Complete Depositions

Thom Browne's withholding of the Bad Faith Emails significantly prejudiced adidas's ability to conduct useful depositions. To start, Thom Browne never disclosed Ms. Maturo as a witness with relevant knowledge, despite her admission that Thom Browne "tr[ies] to avoid rows of 4 bar armband on the racks so as to not look like Adidas" (Email 1), meaning Thom Browne denied adidas the opportunity to assess whether she was worth deposing. Henn Decl. ¶ 18. The same is true of Ms. Kelly Connor, who was never disclosed despite her role as Director of Brand Relations and her knowledge that FC Barcelona had given "feedback" that the Four Bar design was "too much in the spirit of Adidas" (Email 3). *Id.* Both of these New York-based Thom Browne employees had extensive knowledge about the collaboration with FC Barcelona, which has been a key issue throughout this case.

---

[4] The Bad Faith Emails do not appear on Thom Browne's privilege log. Henn Decl. ¶ 14.

The most egregious example, however, is Thom Browne's concealment of Mr. Wan. As shown in the Bad Faith Emails, Mr. Wan told Mr. Browne himself that because "Adidas has such a big presence in the sporting world, *it is inevitable* that our 4bar in white be read as adidas stripes." Email 2 (emphasis added). Mr. Wan also expressed concern to Mr. Browne that the Four Bar design would be "too loud and 'adidas' in the football context." *Id.* Thom Browne therefore denied adidas the opportunity to depose a critical witness who had made multiple highly damaging admissions.

Thom Browne's misconduct also infected several of the depositions adidas was able to take. For example, Thom Browne's withholding of Email 1 prevented adidas from asking Mr. Sternstein during his deposition about Ms. Maturo's statement—copying him—that "rows of 4 bar armband on the racks" can "look like Adidas."

Thom Browne's withholding of Email 4, in which Mr. Browne recounts that "tomaso has already said that we shouldn't use the four bar because of adidas," deprived adidas of the opportunity to question Tomaso Galli about that statement during his deposition. adidas's counsel *did* question Mr. Galli about TB00404533—which, as noted above, consists of the bottom two emails in Email 3. Henn Decl. ¶ 15. But because Thom Browne withheld the top email in the chain, it denied adidas the opportunity to question Mr. Galli about his statement that FC Barcelona viewed the Four Bar design as "too much in the spirit of Adidas."

The deposition of Mr. Browne, perhaps the most critical witness in the case, was severely prejudiced by Thom Browne's withholding of each of the Bad Faith Emails—all but one of which were sent by or to Mr. Browne. For example, Mr. Browne was asked about the factors that went into in his decision-making when designing products for FC Barcelona, and he made no mention of the concerns raised by FC Barcelona regarding the 4 Bars being "in the spirit of

Adidas." Email 3. He made no mention of Mr. Galli's statement that "***we shouldn't use the four bar because of adidas***." Email 4 (emphasis added). And he made no mention of Mr. Wan's concerns "that 4bar is too loud and 'adidas' in the football context" (Email 4) and that "***it is inevitable*** that our 4bar in white be read as adidas stripes[.]" Email 2 (emphasis added). Thus, Thom Browne's misconduct denied adidas a fair opportunity to cross-examine Thom Browne's most important witness.

**F.     Thom Browne's Misconduct Deprived adidas of Critical Trial Evidence**

The January 2023 trial in this action centered on whether Thom Browne's encroachment into the activewear space with its Four Bar design was likely to cause confusion with adidas's Three-Stripe Mark. But at every turn, Thom Browne's improper withholding of the Bad Faith Emails unjustly hamstrung adidas's efforts to prove a likelihood of confusion.

**1.     Opening Statements**

In his opening statement, adidas's counsel discussed evidence showing the strength of adidas's Three-Stripe Mark under the first *Polaroid* factor (Tr. Day 1 at 32:3-33:15), but Thom Browne prevented him from citing Mr. Wan's admission that the "adidas stripes" have "a big presence in the sporting world." Thom Browne also prevented adidas's counsel from citing, in connection with the second *Polaroid* factor, Thom Browne's admission that "it is *inevitable* that our 4bar in white *be read as adidas stripes*" (Email 2, emphasis added). *Id.* at 33:16-34:8.

adidas's counsel next discussed the third *Polaroid* factor, the proximity of the parties' products as measured in the initial-interest and post-sale context by their similarity and likelihood to be encountered together, and cited Thom Browne's "deal with [FC] Barcelona" featuring adidas athlete Lionel Messi in support. *Id.* at 34:9-11, 36:16-24. But Thom Browne's misconduct prevented counsel from raising FC Barcelona's and Thom Browne employees' admissions that the Four Bar would look like adidas's Three-Stripe Mark in the sports context.

10

adidas's counsel focused heavily on the "bad faith" *Polaroid* factor, citing "Thom Browne's movement . . . into sportswear . . . with full knowledge of adidas's rights" as evidence of bad faith. *Id.* at 38:9-13. Because of Thom Browne's misconduct, the jury was oblivious to the Bad Faith Emails' admissions that Thom Browne moved into sportswear *fully aware that the Four Bar design was likely to cause confusion*.

adidas's counsel next discussed adidas's dilution claim, which concerns whether consumers, "when they see a Thom Browne product because of the stripes, . . . they think of adidas." Tr. Day 1 at 41:19-22. But the jury was deprived of Thom Browne employees' admissions that it was "inevitable" that the Four Bar design would "read as adidas stripes" and would be perceived as "too . . . 'adidas' in the football context." Email 2.

Thom Browne's counsel used his opening statement to make assertions that could not be undermined later in trial by the Bad Faith Emails, which had been concealed from adidas. Defense counsel stated: "[N]othing that Thom Browne has done in this case has anything to do with adidas." Tr. Day 1 at 48:20-21. And after asking "Why has there been no confusion?", counsel explained it is because the parties' marks "are not similar. They are very distinct. They are very different and convey different things. Three stripes is not the same as four horizontal bars . . . ." *Id.* at 61:17-25. The Bad Faith Emails directly contradict each of those statements.

### 2.    Witness Testimony

Thom Browne's concealment of the Bad Faith Emails and failure to disclose Ms. Maturo, Mr. Wan, and Ms. Connor at all prevented adidas from making a knowledgeable assessment of whether it should call Mr. Galli, Mr. Sternstein, Ms. Maturo, Mr. Wan, or Ms. Connor as trial witnesses. In addition, Thom Browne's misconduct significantly prejudiced adidas's questioning of several witnesses who did appear at trial. For example, Thom Browne deprived adidas of the

opportunity to show Dr. Erich Joachimsthaler Ms. Maturo's admission that Thom Browne "tr[ies] to avoid rows of 4 bar armbands on the racks so as to not look like Adidas" (Email 1) after the Court challenged him about why consumers "who actually saw four stripes" might then "report[] that they saw three." Tr. Day 4 at 669:24-671:2.

For Mr. Browne's testimony, offered during adidas's case-in-chief, Thom Browne brought in a physical rack of Four Bar clothing into the courtroom as a demonstrative. Thom Browne's counsel then had Mr. Browne testify to the jury: "The goods on the rack show a good, I guess, representation of my collection . . . in regards to the usage of the 4-Bars on the pieces of clothing." Tr. Day 5 at 421:1-7. Thom Browne denied adidas the chance to cross Mr. Browne using Ms. Maturo's admission that "We try to avoid rows of 4bar armband on the racks so as to not look like Adidas" (Email 1). Thom Browne also deprived adidas of the opportunity to cross Mr. Browne—the key witness for the defense—about his multiple discussions with Mr. Wan about the "inevitable" confusion between the Four Bar design and adidas and Mr. Galli's recommendation to him that "we shouldn't use the four bar because of adidas" (Email 4).

Mr. Bazan—who also testified during adidas's case-in-chief—gave a definitive "No" to the question: "Since you've been with Thom Browne, have you been aware of any reports of confusion between any products of Thom Browne and any product of adidas?" Tr. Day 5 at 520:11-14. Mr. Bazan was in possession of Ms. Maturo's email (Email 1), but Thom Browne denied adidas the chance to use it on cross. And when Mr. Bazan forcefully testified that "Thom Browne's 4-Bar design" and "adidas's three stripes" are "completely different" and "visually" give "a completely different effect," *id.* at 519:15-24, Thom Browne ensured that the employee admissions of confusing similarity in the Bad Faith Emails could not be used against him.

12

### 3.     Thom Browne's Motions for Judgment as a Matter of Law

Following Mr. Browne's and Mr. Bazan's testimony at the close of adidas's case-in-chief, Thom Browne made several motions for judgment as a matter of law ("JMOL"), including on the issues of willfulness and punitive damages. In support of its motion, Thom Browne's counsel stated: "[T]here's absolutely no evidence in the record that Thom Browne thought that anything he was doing was infringing." Tr. Day 7 at 1254:12-20. Addressing adidas's counsel, the Court explained that the evidence of bad faith was insufficient, and that there was limited evidence that "the average consumer would perceive [the Four Bar design] as anything other than four stripes." Tr. Day 6 at 747:5-9. The Court also explained that there was no evidence that Thom Browne "clearly knew they were infringing." *Id.* at 748:20-23. Yet the Bad Faith Emails are exactly such evidence.

Thom Browne's concealment of the Bad Faith Emails unjustly prevented the Court from considering highly relevant evidence in ruling on Thom Browne's JMOL motions.

### 4.     Closing Arguments

During closing arguments, Thom Browne took great advantage of its concealment of the Bad Faith Emails. Despite Ms. Maturo's admission of likely confusion arising from Four Bar armbands on "racks" (Email 1), Thom Browne's counsel referred to the "rack" of carefully-chosen Four Bar clothing in the courtroom no fewer than *ten times*. Pointing to the rack, counsel stated: "This is Thom Browne. . . . [T]his is how he displays his goods. This is how he sells his goods. This is who he is, and that's what we wanted you to see." Tr. Day 8 at 1356:20-1358:4.

Recounting the trial testimony from Mr. Browne and others, Thom Browne's counsel stated: "You didn't hear any testimony from him, or from anyone else at his company . . . about adidas. **They never talked about adidas**. **They never considered adidas**." Tr. Day 8 at 1357:7-

13

10 (emphasis added). He also claimed that even though "a lot of witnesses were asked about" actual confusion—not including Mr. Wan, Ms. Maturo, Mr. Sternstein, Mr. Galli, or Ms. Connor, of course—"there's no evidence that anyone was ever confused." *Id.* at 1377:5-15.

Thom Browne's counsel would not have dared make these arguments if the jury had been permitted to see the Bad Faith Emails.

### III.   THE COURT'S JURISDICTION

The appeal of the Court's final judgment in this action is currently before the Second Circuit.[5] adidas's motion is therefore subject to Federal Rule of Civil Procedure 62.1(a), which provides: "If a timely motion is made for relief that the court lacks authority to grant because of an appeal," the court may defer ruling, deny the motion, or "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a), (a)(3). "If the district court states that it would grant the motion or that the motion raises a substantial issue, the court of appeals may remand . . . ." Fed. R. App. P. 12.1(b).

adidas's motion is "timely" under Rule 62.1(a) because it was brought "no more than a year after the entry of the judgment." Fed. R. Civ. P. 60(c)(1). And as discussed below, the motion is meritorious or at least raises "a substantial issue." Fed. R. Civ. P. 62.1(a)(3). Accordingly, the Court should issue an "indicative ruling" that it would grant adidas's motion on remand. *See Thomas*, 293 F.R.D. at 503 n.4; *see also ODS Cap. LLC v. JA Solar Holdings Co., Ltd.*, No. 18-CV-12083 (ALC), 2021 WL 9349939, at *1 (S.D.N.Y. Oct. 15, 2021) (issuing "indicative ruling" in connection with Rule 60(b)(2)), *remanded by Altimeo Asset Mgmt. v. JA Solar Holdings Co.*, No. 20-4268, 2021 WL 9349956 (2d Cir. Oct. 21, 2021). adidas will

---

[5] Oral argument has not yet been scheduled.

"promptly notify" the Second Circuit, which can then avoid spending its resources deciding an appeal that may ultimately be mooted.

## IV.   THE COURT SHOULD GRANT ADIDAS A NEW TRIAL UNDER RULE 60(B)(2)

Rule 60(b)(2) permits relief from final judgment where the movant raises "newly discovered evidence . . . that is relevant to the merits of the litigation." *Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*, 609 F.3d 122, 130-31 (2d Cir. 2010) (citation omitted). To prevail on a Rule 60(b)(2) motion, the movant must present: "(1) newly discovered evidence of facts existing at the time of trial (2) admissible and likely to change the former ruling (3) not merely cumulative or impeaching of evidence already in the record, and (4) of which the moving party was excusably ignorant at the time of trial despite due diligence." *Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 836 F. Supp. 112, 117 (E.D.N.Y. 1993). Each of these elements is satisfied here.

### A.   The Bad Faith Emails Are Newly Discovered and Existed Before Trial

The Bad Faith Emails are dated between 2016 and 2019, meaning they "exist[ed] at the time of trial." *Whimsicality, Inc.*, 836 F. Supp. at 117. And they are "newly discovered" because they were in the sole possession of Thom Browne, who withheld them until nine months after trial.

### B.   The Bad Faith Emails Are Admissible and Likely Would Have Changed the Outcome of Trial

The Bad Faith Emails are admissible because they are relevant and non-hearsay. FRE 801(d)(2).[6] And as admissions of likely confusion, their introduction "likely" would have changed the outcome of trial.

---

[6] Mr. Galli's statement in Email 3 that FC Barcelona is "not comfortable with any four bars, which in their view is too much in the spirit of Adidas" is admissible because his statement is a party admission, and FC Barcelona's statement is admissible under the state-of-mind exception

1.      **The Emails Contain Admissions on the "Ultimate Question" in the Case**

Courts in the Second Circuit use the eight *Polaroid* factors to assess whether a defendant's conduct is likely to cause confusion. *See Classic Liquor Imps., Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 442 (S.D.N.Y. 2016) (Rakoff, J.). The Bad Faith Emails transcend those factors, however, because they speak *directly* to "the ultimate question of whether consumers are likely to be confused." *Id.* (citation omitted).

Rarely has a trademark defendant made an admission on the "ultimate question" of likely confusion, but in nearly every such instance, the trademark owner has won judgment *as a matter of law*. For example, in *Gross v. Bare Escentuals Beauty, Inc.*, the court granted summary judgment to the trademark owner when the infringer admitted in an email: "The similarity in the brand name often causes confusion." 641 F. Supp. 2d 175, 192 (S.D.N.Y. 2008) (citation omitted). In *Timex Corp. v. Stoller*, the court granted summary judgment to the plaintiff when the defendant wrote in an administrative filing that its mark was "likely to cause confusion or mistake in the minds of the public." 961 F. Supp. 374, 381 (D. Conn. 1997) (citation omitted). And in *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, the court granted summary judgment to the plaintiff when the defendant "admitted in sworn testimony" that "his company name could cause confusion with Plaintiff." 104 F. Supp. 3d 371, 381 (S.D.N.Y. 2015).

Here, Thom Browne's employees admitted that they "shouldn't use the four bar because of adidas," that "it is *inevitable* that our 4bar in white be read as adidas stripes," that "rows of 4 bar armband on the racks" could "look like Adidas," and that "4bar" may be "too loud and

_____

*or* need not be offered for its truth. Instead, the statement can be offered for the notice it provided to Thom Browne of a likelihood of confusion. *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

'adidas' in the football context." If the defendants' admissions in *Bare Escentuals Beauty*, *Timex Corp.*, and *Flat Rate Movers* could support *summary judgment* on the issue of infringement, then the Bad Faith Emails "likely" would have changed the outcome of trial here.

### 2.      The Emails Are Highly Probative of Several *Polaroid* Factors

The Bad Faith Emails are also highly probative of at least half of the *Polaroid* factors; thus, putting aside their status as admissions on the ultimate liability question, the emails still likely would be outcome determinative. Beginning with the first *Polaroid* factor, the strength of adidas's mark, Email 2 contains an admission from Mr. Wan that the "adidas stripes" have "a big presence in the sporting world." *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987) ("Mobil's **ubiquitous presence** throughout the petroleum industry further increases the likelihood that a consumer will confuse [the parties]." (emphasis added)).

With regard to the second *Polaroid* factor, the similarity of the parties' marks, the Bad Faith Emails contain several admissions that the Four Bar design is visually similar to the Three-Stripe Mark—including Mr. Wan's admission that "it is inevitable that our 4bar in white be *read as adidas stripes*" (Email 2 (emphasis added)) and Ms. Maturo's admission that Thom Browne tries "to avoid rows of 4 bar armband on the racks so as not to look like adidas" (Email 1). *See Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d at 192 (granting summary judgment in owner's favor where infringer "admitted that the two marks are so similar as to cause consumer confusion"); *see also Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *4, *10 (N.D. Ill. June 10, 2015) (finding plaintiff was "highly likely to succeed" where defendant's "own employees commented on the logos' similarity" in internal emails).

As to the third *Polaroid* factor, the proximity of the parties' products, the Bad Faith Emails contain admissions that styles containing the "4 bar armband" would "look like Adidas," and that use of the Four Bar design "in the football context" will be "too loud and 'adidas.'"

Finally, and most significantly, the Bad Faith Emails are powerful evidence of Thom Browne's bad faith, the fifth *Polaroid* factor. The Second Circuit has repeatedly held that the question of bad faith "is best left in the hands of the trier of fact," *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996), but Thom Browne's concealment of the Bad Faith Emails deprived the jury of the opportunity to assess that crucial factor. And because courts are in agreement that the "bad faith" *Polaroid* factor is often of critical importance, the Bad Faith Emails are likely outcome determinative. *E.g.*, *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 425 (S.D.N.Y. 2012) ("Bad faith also gives rise to a rebuttable presumption of actual confusion . . . ."); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 295 (S.D.N.Y. 2000) ("But perhaps the most important of the *Polaroid* factors is Tashey's manifest bad faith.").

As the Court explained to the jury, "bad faith goes to whether Thom Browne used the Four Bar and Grosgrain designs on the accused products with the intention that consumers would associate their products with adidas's Three-Stripe Mark so as to profit from adidas's reputation, **or whether Thom Browne chose to purposely turn a blind eye to the high likelihood that consumers would be confused**." Tr. Day 8 at 1412:21-1413:3 (emphasis added). Each of the Bad Faith Emails shows that Thom Browne knew of "the high likelihood that consumers would be confused," but "chose to purposely turn a blind eye."

For example, Thom Browne sold Four Bar products despite its knowledge that its mark can "look like Adidas" when displayed on "racks" of clothing. *See Flat Rate Movers, Ltd.*, 104

F. Supp. 3d at 381 (finding bad faith where "[d]efendants continued using the 'FLAT RATE' name even after acknowledging that it would confuse customers and after commencement of this lawsuit"). This conduct, coupled with Thom Browne's concealment of Email 1, is especially egregious given that Thom Browne brought a physical "rack of [Four-Bar] clothing" into the courtroom and told the jury during closing arguments: "[T]his is how [Thom Browne] displays his goods. This is how he sells his goods. This is who he is, and that's what we wanted you to see." Tr. Day 8 at 1357:20–1358:4.

Thom Browne's continued use of the Four Bars despite warnings of confusion from its Head of Menswear and from FC Barcelona also demonstrates bad faith. The Second Circuit has held that a defendant's persistence despite being "warned" of potential "confusion" is "evidence of bad faith." *See Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 97 (2d Cir. 1993) (warning from counsel); *see also Sports Auth.*, 89 F.3d at 964 (finding evidence of bad faith where defendant "continued to expand" its use after "receiving notice" of plaintiff's mark). This is no surprise, as the "adequacy and care with which a defendant investigates and evaluates . . . allegations of potential confusion" are "highly relevant" to the bad faith analysis. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 721 (3d Cir. 2004).[7]

---

[7] *See also Talisker Corp. v. Prime W. Jordanelle, LLC*, No. 2:06-CV-1034 TC, 2008 WL 4279642, at *8 (D. Utah Sept. 12, 2008) ("That Prime West kept the Talisman name in the face of Ms. Moon's and Mr. Lewis' warnings is revealing. . . . [T]he record clearly supports the inference that, despite their protestations otherwise, Prime West intended to benefit from the Talisker Trademarks."); *M'Otto Enters., Inc. v. Redsand, Inc.*, 831 F. Supp. 1491, 1503 (W.D. Wash. 1993) ("In considering intent, the Court considers it appropriate and relevant to note that . . . M'Otto sailed past several clear warning flags which should have indicated to M'Otto that it might be infringing on Redsand's already existing marks." (citation omitted)).

In short, the Bad Faith Emails "likely" would have changed the trial outcome because they are (1) admissions on the ultimate question of likelihood of confusion, and (2) highly probative of at least four *Polaroid* factors, including the critically important "bad faith" factor.[8]

## C.   The Bad Faith Emails Are Neither Cumulative Nor "Merely Impeachment"

The Bad Faith Emails are not cumulative of evidence already in the record. *See* ECF 115 at 30 (describing summary judgment bad faith evidence); Tr. Day 8 at 1337:10-1345:1 (describing trial bad faith evidence). In fact, defense counsel repeatedly stated during closing arguments that there was "no evidence" of bad faith in the record, and that Thom Browne's employees "**never talked about adidas**. **They never considered adidas**." Tr. Day 8 at 1357:7-10 (emphasis added).

The emails also are not "merely" impeachment evidence. Rather, they are *affirmative* evidence of a likelihood of confusion, the strength of the Three-Stripe Mark, the similarity of the parties' marks, the proximity of the parties' products, and Thom Browne's bad faith.

## D.   adidas Has Been Diligent

adidas could not have discovered the Bad Faith Emails earlier because they were in the sole possession of Thom Browne and fell within the scope of adidas's document requests (and the ESI search protocols to which the parties agreed). adidas also deposed several witnesses copied on the emails, including Messrs. Browne, Bazan, Galli, and Sternstein—none of whom even hinted at the emails' existence or substance.

---

[8] adidas also brought a federal claim for dilution by blurring, for which the ultimate question is whether Thom Browne's conduct is likely to create an "association . . . that impairs the distinctiveness" of adidas's mark. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 207 (2d Cir. 2013) (citation omitted). As with infringement, the "degree of similarity between the marks" is "an integral element in the definition of 'blurring,'" and "intent to create an association" will also "favor[] a finding of a likelihood of dilution." *Id.* at 207-12. Thus, the Bad Faith Emails likely would have changed the outcome on adidas's dilution claim as to the Four Bar design.

Thus, all four Rule 60(b)(2) requirements are satisfied, and a new trial is proper.

## V.    THE COURT SHOULD GRANT ADIDAS A NEW TRIAL UNDER RULE 60(B)(3)

adidas is also *independently* entitled to a new trial under Rule 60(b)(3). Unlike Rule 60(b)(2), Rule 60(b)(3) does not require a showing "that the outcome would have been different." *Thomas*, 293 F.R.D. at 504. "The standard under 60(b)(3) is 'more lenient than its Rule 60(b)(2) counterpart, and properly so as the 'newly discovered evidence' provision of Rule 60(b)(2) is aimed at correcting erroneous judgments stemming from the unobtainability of evidence . . . while Rule 60(b)(3) focuses not on erroneous judgments as such, but on judgments which were unfairly procured.'" *Id.* at 506 (alterations in original) (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988)).

To prevail under Rule 60(b)(3), adidas must show that (1) Thom Browne engaged in "misconduct" that (2) "substantially interfer[ed] with [adidas's] ability to fully and fairly present its case." *Id.* at 503. The Court, in exercising its discretion, must then "weigh [adidas's] need for substantial justice against the value of preserving the finality of judgments." *See Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 286 F. Supp. 2d 309, 312 (S.D.N.Y. 2003).

### A.    Thom Browne Engaged in "Misconduct"

The law is clear that "even an accidental failure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of Rule 60(b)(3)." *Catskill Dev., LLC*, 286 F. Supp. 2d at 314; *see also West v. Bell Helicopter Textron, Inc.*, 803 F.3d 56, 67-68 (1st Cir. 2015) ("[A] party's 'failure to disclose or produce materials requested in discovery can constitute "misconduct" within the purview of' Rule 60(b)(3)."); *DiPirro v. United States*, 189 F.R.D. 60, 65 (W.D.N.Y. 1999) ("The rule applies to both intentional and unintentional misrepresentations."); *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) ("[A]n adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent

requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3).").

The Bad Faith Emails fall squarely within adidas's document requests. Thom Browne has waived any argument to the contrary by selectively producing *some* of the emails within the Bad Faith Emails, while withholding the most damaging ones. In any event, should Thom Browne quibble with the wording of any particular document request, "[s]uch semantic niceties have no place in federal discovery matters. The documents were arguably within the scope of the request and definitely relevant to the subject matter involved." *Monaghan v. SZS 33 Assocs., L.P.*, No. 89 Civ. 4900 (RWS), 1992 WL 135821, at *4 (S.D.N.Y. June 1, 1992); *see also Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1341 (5th Cir. 1978) (refusing to analyze "[w]hether the document in question technically is or is not a cost/benefit analysis" in Rule 60(b)(3) context and taking a broad view of responsiveness). Thom Browne is therefore totally without excuse.

**B.     Thom Browne's Misconduct Substantially Interfered With adidas's Ability to Fully and Fairly Present its Case**

If Thom Browne's misconduct was "intentional," then adidas "is entitled to a *presumption* that the misconduct substantially interfered with [adidas's] preparation of its case," which "may only be overcome by clear and convincing evidence to the contrary." *Thomas*, 293 F.R.D. at 504 (emphasis added) (citation omitted). For at least three reasons, the record shows that Thom Browne's misconduct was intentional.

*First*, Thom Browne was in possession of each of the Bad Faith Emails during discovery in this case in 2021 and 2022, as evidenced by the dates of the documents (2016 to 2019) and the fact that they were produced in the UK Action. *Second*, Thom Browne agreed to search the emails of Mr. Bazan, Mr. Browne, and Mr. Sternstein for the word "adidas" with any capitalization, punctuation, or suffix, meaning Thom Browne's U.S. attorneys necessarily

reviewed the Bad Faith Emails during discovery. *Third*, Thom Browne produced the first two emails in the Email 3 chain but withheld the document containing the most recent (and highly damaging) email. Because Email 3 is the most fully "inclusive" email in the chain, Thom Browne's ESI software—through email threading[9]—would have favored review and production of that email in particular. This is critically important because it means Thom Browne's counsel made a conscious decision to produce the lesser inclusive emails in the chain, purposefully withholding the most damning of them.[10]

Regardless of the presumption, the record amply demonstrates why Thom Browne's improper withholding of the Bad Faith Emails substantially interfered with adidas's ability to present its case. To satisfy Rule 60(b)(3), adidas need only show either that (1) the emails "could well have been *probative* on an important issue" or (2) would have presented "*a potentially fruitful avenue* of direct or cross examination." *Thomas*, 293 F.R.D. at 504 (emphasis added). Thus, unlike Rule 60(b)(2), a new trial is proper under Rule 60(b)(3) even where the evidence at issue would merely be for impeachment. *Id.* at 506 ("If Marrow were impeached with the Agreement, the jury may well have thought differently of her and rejected her passionate testimony as nothing more than crocodile tears.").

Above, adidas showed that the Bad Faith Emails likely would have changed the outcome of trial, which is more than enough to meet the "substantial interference" standard of Rule

---

[9] *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000-RDP, 2018 WL 11425554, at *4 n.6 (N.D. Ala. Oct. 24, 2018) ("[I]n the production of emails, multiple individual emails are produced that, when communicated originally, were part of a chain or 'thread' of emails. A threading application links the related emails together to reconstruct the email 'thread,' or the back-and-forth communication made up of the individual emails, so that a cohesive thread is produced rather than separate multiple copies of related emails.").

[10] adidas's RFPs incorporated Local Rule 26.3(c)(2): "[A] non-identical copy is a separate document within the meaning of [the] term ['document']." Henn Decl. Ex. 5 at 5-6..

60(b)(3). But that standard is also *independently* met because Thom Browne's misconduct deprived adidas of meaningful opportunities for discovery and impeachment. For example, Thom Browne denied adidas the ability to make a knowledgeable assessment of whether to depose Ms. Maturo, Ms. Connor, or Mr. Wan, or to call them (or Messrs. Galli and Sternstein) as trial witnesses. *See Schultz*, 24 F.3d at 630 (remanding because author of report "could have been called to testify by Spirit Cruises, and the information contained in [it] may well have led the defense attorneys to additional evidence that supported the report's findings and conclusions . . . .").

Thom Browne also denied adidas the ability to conduct effective cross-examinations of Mr. Browne, Mr. Bazan, Mr. Sternstein, and Mr. Galli. *See Thomas*, 293 F.R.D. at 506 (granting new trial where movant was unable to use a document to challenge "credibility" of "key witness"); *Catskill Dev., L.L.C.*, 286 F. Supp. 2d at 319 ("Had plaintiffs' counsel possessed the tapes, they would have been fodder for cross examining the participants in the conversations, and other witnesses as well."). Indeed, adidas's counsel questioned Mr. Galli during his deposition regarding the first two emails in Email 3, on which he was copied, but Thom Browne deprived counsel of the ability to question Mr. Galli regarding the unproduced email in the same chain in which he stated that the "four bars" are "too much in the spirit of Adidas."[11] Thom Browne also deprived adidas's counsel of the ability to question Mr. Galli and Mr. Browne regarding Mr. Galli's statement that Thom Browne "shouldn't use the four bar because of adidas." Email 4.

---

[11] On remand, adidas intends to seek limited discovery necessitated by Thom Browne's misconduct. *See Colon-Torres v. Negrón-Fernández*, 997 F.3d 63, 75 (1st Cir. 2021) (suggesting that a district court lacks jurisdiction to reopen discovery during appeal). Depending on the full scope of that misconduct, adidas reserves the right to seek sanctions.

Accordingly, adidas has more than established substantial interference, regardless of the presumption.

## C.      Justice Requires a New Trial

Rule 60(b) is discretionary and "seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the 'incessant command of the court's conscience that justice be done in light of all the facts.'" *Frankel v. C.N.P., Inc.*, No. 85 Civ. 2667 (BN) (CBM), 1987 WL 10386, at *4 (S.D.N.Y. Apr. 30, 1987) (citation omitted). A new trial is required, however, "[w]hen wrongful secretion of discovery material makes it inequitable for the withholder to retain the benefit of the verdict." *Schultz*, 24 F.3d at 631.

Here, the public's interest in the finality of judgments is lower because the Second Circuit has not heard oral argument on the appeal. *Catskill Dev., L.L.C.*, 286 F. Supp. 2d at 320-21 ("Here, the judgment's finality does not weigh as heavily," partly because "the Court of Appeals has not yet ruled on plaintiffs' appeal; indeed, it has not heard oral arguments.").

In any event, the need for substantial justice here dramatically outweighs any judicial preference for finality. Thom Browne deliberately impeded adidas's pursuit of justice first by depriving adidas of numerous meaningful avenues of discovery, and then by depriving adidas of outcome-determinative documents at trial. While the Court may be reluctant to "set aside a jury's hard work and deliberate decision, Rule 60(b)(3) exists to protect the integrity of the trial process and that integrity was undermined here." *See Madere v. Compass Bank*, No. A-10-CV-812 AWA, 2012 WL 5208538, at *5 (W.D. Tex. Oct. 22, 2012).

## VI.      CONCLUSION

For the reasons stated above, the Court should issue an indicative ruling that it would grant adidas's motion under both Rules 60(b)(2) and 60(b)(3).

DATED:  October 19, 2023

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: */s/ R. Charles Henn Jr.*
R. Charles Henn Jr.
H. Forrest Flemming III
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone:  (212) 775-8845
chenn@kilpatricktownsend.com
fflemming@kilpatricktownsend.com
*Attorneys for Plaintiffs*