UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ADIDAS AMERICA, INC., and
ADIDAS AG,

         Plaintiffs,

    -v-

THOM BROWNE, INC.,

         Defendant.

---

21-cv-5615 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.

This is a trademark action brought by Adidas America, Inc. and Adidas AG (collectively "Adidas") against Thom Browne, Inc. ("Thom Browne"). Adidas alleged that Thom Browne's use of its four bar and grosgrain designs on certain of Thom Browne's activewear infringed Adidas's trademarked three-stripe design. The case went to trial in January 2023, and the jury returned a verdict of not liable in favor of Thom Browne. Adidas appealed and the Second Circuit affirmed in May 2024.

While its appeal was pending, Adidas filed the instant motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(2) and 60(b)(3), based upon the intervening discovery of four emails that Thom Browne failed to produce in this case. According to Adidas, these emails show that Thom Browne employees, including Mr. Thom Browne himself, knew that there was

a likelihood Thom Browne's four-bar design could be confused with Adidas's three stripes.

On May 3, 2024, the Court issued a "bottom-line" Order denying Adidas's motion. This Opinion sets forth the reasons for that ruling. As explained in more detail below, the Court finds that Adidas has failed to show either that the four emails probably would have changed the outcome of trial as required to obtain relief pursuant to Rule 60(b)(2) or that Thom Browne engaged in "misconduct" in failing to produce the emails as required to obtain relief pursuant to rule 60(b)(3).

I.   Background

  A. Underlying Litigation & Trial

The Court assumes familiarity with the background of this long-running litigation and sets forth only those facts necessary to understand the instant motion.[1] In brief, Adidas is a major player in the market for activewear, known for its signature "Three-Stripe Mark," which generally consists of three parallel lines of roughly the same width placed in close proximity. In 2021, Adidas brought this action against defendant Thom Browne,

---

[1]    For additional detail regarding the plaintiff's claims, see the Court's summary judgment Opinion, Dkt. 159, and Magistrate Judge Lehrburger's Report and Recommendation concerning defendant's motion to dismiss, Dkt. 41, which was adopted by the Court, Dkt. 47.

asserting claims for trademark infringement, trademark dilution, and unfair competition. Adidas claimed that Thom Browne's use of its "Four-Bar Signature" design -- generally, four parallel bars -- and Thom Browne's "Grosgrain" design -- a pattern of red, white and blue stripes -- on certain pieces of Thom Browne's activewear infringed upon and diluted Adidas's Three-Stripe Mark.

The products Adidas accused of infringement (the "accused products") consisted of certain specified pieces of Thom Browne activewear, notably certain sweatpants, hoodies, and running shoes. Adidas expressly disclaimed any allegation that Thom Browne's other products for which it was more well known, such as Thom Browne's formalwear, were infringing. *See* Dkt. 225-17 (depicting accused products). While the precise definition of Adidas's Three-Stripe Mark was a disputed issue throughout the case, it was ultimately defined by the Court in its jury instructions as follows:

> adidas' Three Stripe Mark means its use of three parallel stripes on clothing or shoes in the manner described and exemplified in a number of federal trademark registrations that you can review at Plaintiffs' Exhibits 181 and 183. It also includes any other use by adidas of three parallel stripes on clothing or shoes that you find gives consumers the same commercial impression as any one or more of the registered uses. By this, I mean that you may find that a particular use of three parallel stripes by adidas falls under its Three Stripe Mark - even if it differs in some way from the use of three stripes in any of the federal registrations -- if you find that the use would be perceived in the same way by a reasonable consumer.

Jury Instructions (Dkt. 190) at 14.

A jury trial on Adidas's claims was held on January 3,2023. During the eight-day trial, the jury heard the testimony of sixteen witnesses and saw the introduction into evidence of over 400 exhibits. After the conclusion of the evidence, the jury deliberated for approximately two hours before returning a verdict on January 12,2023 of not liable on all counts in favor of Thom Browne. *See* Dkt. 188. Adidas then timely filed a notice of appeal. *See* Dkt. 212. On May 31, 2024, the Second Circuit ruled in favor of Thom Browne and affirmed the jury's verdict. *See* Dkt. 256.

B. Adidas's Motion for New Trial

While Adidas's appeal was pending, Adidas's U.S. counsel was contacted by Adidas's U.K. counsel about certain emails that had been produced by Thom Browne in a somewhat parallel U.K. action, but, as it later became apparent, had not been produced during discovery in the instant case. *See* Henn Decl. (Dkt. 222) ¶ 1. After some back-and-forth with Thom Browne's U.S. counsel, Thom Browne produced to Adidas's U.S. counsel in October 2023 copies of various emails, four of which are the basis for the instant motion and are described below. *See id.* ¶ 5.

**Email 1 (Dkt. 222-1)** is a December 2016 email exchange between Emily Maturo, a Senior Men's Account Manager at Thom Browne and Incorp S.a.L., a distributor in Switzerland that purchased product from Thom Browne for retail stores in Asia. Bazan Decl. (Dkt. 227)

¶¶ 3-5. Discussing the display of Thom Browne's clothes, Maturo states: "We try to avoid rows of 4 bar armband on the racks so as to not look like Adidas. We've therefore removed some styles from your original orders." (Dkt. 222-1)

**Email 2 (Dkts. 222-2, 230-4)** is a November 2018 email exchange between Thi Wan, then Thom Browne's Head of Menswear, and Mr. Thom Browne himself. In the exchange, the two discuss design choices for formalwear and accessories that Thom Browne was creating for FC Barcelona ("FCB"), the Spanish soccer (football) club. In the initial email, Wan states: "I wanted to hear your thoughts on the usage of 4bar for FCB dressing for players. I wanted to raise a flag now from me before other teams start bombarding you with this concern. As Adidas has such a big presence in the sporting world, it is inevitable that our 4bar in white be read as adidas stripes, especially on accessories. Or would you also consider RWB? [*i.e.,* a mark built around Mr. Browne's initials]." Dkt. 230-4 (alteration added). Below this, Wan included in his email pictures of various Thom Browne handbags and formalwear under consideration. *See id.* In response, Mr. Browne thanks Wan for the message and says, "Let's discuss." Dkt. 222-2. None of the products depicted in this email includes any of the accused products in the U.S. lawsuit and none was ever ultimately provided to FCB. Bazan Decl. (Dkt. 227) ¶¶ 7-8.

**Email 3 (Dkt. 222-3)** is a December 2019 email exchange among Kelly Connor, Director of Brand Relations at Thom Browne, Tomaso Galli, Vice President of Marketing and Communication at Thom Browne, and Mr. Thom Browne. The discussion concerns the same formalwear and accessories for FCB that were being discussed in Email 2. In the final email in the chain, Galli states, "They [FCB] are not comfortable with any four bars, which in their view is too much in the spirit of Adidas." Dkt. 222-3.[2]

**Email 4 (Dkt. 222-4)** is an August 2019 email exchange between Wan and Browne. The discussion concerns design choices for accessories that Thom Browne was designing for FCB. In his initial email, Wan states: "There is a 4bar range and RWB range in case you feel that 4bar is too loud and 'adidas' in the football context." Dkt. 222-4. In response, Browne states: "[I] thought [T]omaso [Galli] has already said that we shouldn't use the four bar because of adidas… please confirm with matt and then we can proceed… maybe it would be safer to just make the rwb stripes bigger and proceed..." *Id.* Finally, Wan replies back, "You're right on the 4bar. We should and will focus on the RWB." *Id.*

\*      \*      \*      \*      \*

---

[2]     The first few emails in this chain were produced in discovery in the U.S. action, but the version with the final emails -- refering to Adidas -- was not. *See* Maldanado Decl. (Dkt. 230) ¶¶ 27-28 & Ex. 5; Henn Decl. (Dkt. 222) ¶ 15 & Ex. 9.

Based upon the non-production of these four email exchanges, Adidas timely moved on October 19, 2023 for a new trial pursuant to Federal Rule of Civil Procedure 60(b)(2) and 60(b)(3).[3] In its moving papers, Adidas argued -- among other things -- that the non-production of the four emails must have been the product of intentional, bad faith conduct on the part of Thom Browne, and that even if the non-production was purely accidental, it still constituted "misconduct" justifying relief pursuant to Rule 60(b)(3). *See* Adidas Mot. (Dkt. 221) at 3-10, 21-22. In opposing this portion of Adidas's motion, Thom Browne argued that some intentional misconduct was necessary for Rule 60(b)(3) to apply, and that Adidas had failed to show that that the non-production of these emails was intentional. TB Opp. (Dtk. 224) at 9-10, 22-23.

After giving notice to the parties, the Court held an evidentiary hearing on December 21, 2023 to determine the reason why the four emails were not produced. During the hearing, the Court heard testimony from an e-discovery specialist employed by counsel of Adidas, and from two paralegals who worked for Thom Browne's counsel, the firm of Wolf Greenfield, during the relevant period. *See* Nov. 21, 2023 Minute Entry; Dec. 21, 2023 Hearing Tr.

---

[3]    Because Adidas's appeal with the Second Circuit was still pending at the time of its initial motion, the relief Adidas sought was technically an "indicative ruling" pursuant to Federal Rule of Civil Procedure Rule 62.1.

(Dkt. 240). At the conclusion of this hearing, the Court granted Adidas permission to take the deposition of two associates who worked at Wolf Greenfield on the Adidas matter, and the deposition of a representative of Thom Browne's e-discovery vendor, Consilio. *See* Dec. 21, 2023 Hearing Tr. (Dkt. 240), at 97-99.[4]

Following the conclusion of this additional discovery, the Court ordered supplemental briefing on two questions:

1. Can even an innocent failure to produce documents during discovery constitute "misconduct" within the meaning Federal Rule of Civil Procedure 60(b)(3), or must the moving party demonstrate some greater degree of culpability, such as negligence, gross negligence, or recklessness?

2. In light of the additional discovery that the parties have received, why were the four emails that form the basis of Adidas's motion not produced during discovery, to what degree was Thom Browne (or its counsel) culpable for the failure to produce the emails and does that degree of culpability satisfy the aforementioned "misconduct" standard under Rule 60(b)(3)?

---

[4]    Following the hearing, with the Court's permission Thom Browne also activated its e-discovery database and conducted additional searches to confirm that no other documents went un-produced. The parties have not brought any such documents to the Court's attention beyond the four emails.

Dkt. 245.

C. Non-Production of the Four Emails

Based on the evidentiary hearing and the parties' written submissions, the Court makes the following findings of fact regarding the non-production of the four emails:

During the course of discovery in the U.S., the parties entered into a stipulated order governing the discovery of electronically stored information ("ESI"). *See* Dkt. 34. The ESI Order set forth procedures, whereby the parties would negotiate and agree upon a set of document custodians and search terms that the responding party would use to identify responsive documents. *See id.* ¶¶ 4-5. Prior to production, the ESI Order permitted the responding party to review and withhold documents that it believed to be privileged. *See id.* ¶¶ 4-6.

Consistent with this procedure, the parties agreed that Thom Browne would search the ESI of nine of its custodians. Maldenado Decl. (Dkt. 230) ¶¶ 4-7. With the help of its e-discovery vendor (Consilio), Thom Browne's counsel (Wolf Greenfield), collected over 1.4 million documents from these custodians spanning the years 2005 to 2021. *Id.* ¶ 9. The parties agreed upon a set of search terms and Consilio ran those search terms across the documents that were collected. Wolf Greenfield then oversaw a review of the resulting set of presumptively responsive documents for privilege. *Id.* ¶ 11.

Wolf Greenfield's privilege review began with the creation of a list of search terms intended to identify potentially privileged documents, which would then be run across the potentially responsive documents. The plan was that all documents that hit on these terms would then be subjected to a manual review by Wolf Greenfield's attorneys before being either produced or listed on Thom Browne's privilege log and withheld. Among the terms that Wolf Greenfield used in identifying potentially privileged documents was the term "adidas," because of Thom Browne's long-running legal disputes with the company. *See* Hearing Tr. (Dkt. 240) at 70.

To carry out the privilege review, Wolf Greenfield began by creating a so-called "saved search" of all documents that "hit" on these privilege search terms. As part of that process, a Wolf Greenfield paralegal named Virginia Weeks sent an email to Consilio, instructing them to create "a saved search for ALL potentially privileged documents that have not already been produced by Thom Browne so that we will have one search to work with when we go to do our privilege review." Dkt. 244-4, at TB00530219. Joseph Juneau, the lead project manager from Consilio, responded that he had created a saved search titled "All Potentially Privileged" by running the privilege search terms -- provided by Ms. Weeks -- across all documents "that are not produced, not coded for responsiveness and not coded for

privilege." *Id.* at TB00530218; Kerr Dep. (Dkt. 244-3) at 51-54.
Wolf Greenfield and Consilio then used this "All Potentially
Privileged" saved search to conduct their privilege review, with
reviewers going through each document and either tagging it for
production or listing it on the privilege log to be withheld.

The non-production of the four emails apparently resulted
from a misunderstanding between Wolf Greenfield and Consilio in
the creation of this "All Potentially Privileged" saved search.
Unbeknownst to Consilio, approximately a week earlier Ms. Weeks
had carried out a mass edit on some subset of documents that hit
on the search term "adidas" -- including the four emails here at
issue -- changing the responsiveness, privilege and
confidentiality fields to "needs further review." Hearing Tr.
(Dkt. 240) at 70, 75-76. Some or all of the documents Ms. Weeks
tagged in this manner were not included in the "All Potentially
Privileged" saved search because, in creating that search,
Consilio included only documents "not produced, not coded for
responsiveness and not coded for privilege," and yet Ms. Weeks *had*
in effect coded (*i.e.* tagged) these documents for privilege and
responsiveness although also indicating they needed to be reviewed
further. Dkt. 244-4, at TB00530218; *see* Kerr Dep. (Dkt. 244-3) at
51-55; Hearing Tr. (Dkt. 240) at 87-88. Because the four emails
were not included in the saved search used for the privilege
review, they were never reviewed for privilege or otherwise, but

nonetheless were withheld from production because they hit on a privilege term. Then, in November 2022, Consilio was instructed to move all non-produced documents to storage. Hearing Tr. (Dkt. 240) at 80-81.

## II.  Discussion

### A. Federal Rule of Civil Procedure 60(b)(2)

Federal Rule of Civil Procedure 60(b)(2) permits a court to relieve a party of a final judgment upon a finding of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). To obtain relief under this rule, "[t]he movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001) (quotation omitted).

Here, the first and second requirements of Rule 60(b)(2) are satisfied. The four emails are evidence that was in existence at the time of the trial that should have been disclosed during the course of discovery but, through no fault of Adidas, were not.

While Thom Browne argues Adidas was "not diligent in pursuing discovery" in connection with the emails, Thom Browne Opp. (Dkt. 224) at 15, this argument is without merit. The fact that Adidas could have questioned Thom Browne's witnesses further about the subject matter of these emails, and perhaps discovered their existence that way, is beside the point, because Adidas was under no obligation to do so. Thom Browne does not meaningfully dispute that the four emails fell within the scope of Adidas's discovery requests.[5] When the emails were not produced by Thom Browne, Adidas could reasonably rely on Thom Browne's discovery response and assume that the emails did not exist. The extent to which Thom Browne is to blame for failing to produce the emails is a matter of dispute, but Adidas is certainly not to blame.[6]

---

[5]    In a footnote, Thom Browne suggests that these emails were not responsive to Adidas's discovery requests because those requests were limited to the United States. TB Opp. (Dkt. 224) at 23 n.19. But Thom Browne's witnesses testified that it was their practice to produce all documents that hit on the responsiveness search terms that were not potentially privileged, without regard to such a limitation, and as Adidas persuasively argues, the FCB deal plainly had a sufficient nexus with the U.S. to make the emails discoverable.

[6]    In this regard, the Court also finds unpersuasive Thom Browne's assertion of the defense of unclean hands. *See* Thom Browne Sur-Reply (Dkt. 235). To be applicable, the doctrine of unclean hands requires some direct connection between the inequitable conduct and the relief being sought. *See In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 484 (S.D.N.Y. 2013) (courts of equity "requir[e] clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation")(quoting *Keystone Driller Co. v. General Excavator*

Though a closer call, the fourth requirement, that the emails "not be merely cumulative or impeaching," is also satisfied. *Int'l Bhd. of Teamsters*, 247 F.3d at 392.

Importantly, since there were no other documents introduced at trial containing similar statements by Thom Browne employees, this would, at a minimum, have provided useful impeachment of those Thom Browne employees who authorized the statements and testified at trial (notably Mr. Thom Browne himself) or who might have been called by plaintiffs as adverse witnesses if plaintiffs had known of these emails.

Resolution of the instant motion therefor turns on the third requirement: that the evidence "be admissible and of such importance that it probably would have changed the outcome." *Id.* The four email exchanges, plainly contain, at least in part, admissible evidence.[7] However, as explained below, the Court finds

---

*Co.*, 290 U.S. 240, 245 (1933)). Here, the only even arguably inequitable conduct by Adidas was the purported violation of the U.K. protective order that occurred when Adidas learned about the four emails. Whether that order was breached is a matter for the U.K. courts to decide, but it has little if any connection to the underlying non-disclosure of the emails that Adidas seeks to remedy through the instant motion.

[7]    Thom Browne argues the four emails are inadmissible hearsay and are "not . . . party admission[s] because adidas has not shown that th[e] statement[s] relates to the Accused Products." TB Opp. (Dkt. 224) at 19. But all four statements were made by Thom Browne employees "on a matter within the scope of [the employment] relationship and while it existed," and so are not hearsay. Fed. R. Evid. 801(d)(2)(D). The fact that these statements are not "admissions" is irrelevant. See Wright & Miller, Federal Practice

that Adidas has not shown the emails are of such importance that they probably would have changed the outcome of trial.

A key question at trial was whether the accused products created a reasonable likelihood of confusion with Adidas's Three-Stripe Mark. This is ultimately an objective standard, which can be informed by the jurors' actual experience and observation. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). However, the Court instructed the jurors that they should consider the so-called *Polaroid* factors. Jury Instructions (Dkt. 190) at 15. To this end, the instructions listed these *Polaroid* factors relevant in this case as follows:

> *First*, the strength of adidas' Three Stripe Mark. . . . *Second*, the degree of similarity between adidas' Three Stripe Mark and Thom Browne's use of the Four Bar and/or Grosgrain designs on the Accused Products. . . . *Third*, whether the Accused Products and adidas products compete for the same consumers. *Fourth*, whether or not there is evidence that consumers are actually confused about which company offers the Accused Products. . . . *Fifth*, the quality of the Accused Products relative to adidas' products bearing the Three Stripe Mark. . . . *Sixth*, the degree of care and attention that an ordinary consumer would use when encountering adidas' and Thom Browne's respective products. . . . *Seventh*, whether adidas has shown that Thom Browne acted in bad faith.

---

& Procedure § 6772 ("There is no requirement that statements admitted through Rule 801(d)(2) constitute 'admissions.'"). To the extent certain emails contain a second layer of hearsay -- namely, the views of FCB representatives -- they are admissible as going to the declarant's state of mind. And while not directly addressed to the accused products, they still relate to Thom Browne's understanding of the possibility for confusion of the relevant marks.

Jury Instructions (Dkt. 190) at 15-16.

None of the four emails bears directly on any of these factors. Nonetheless, Adidas argues that the four emails constitute admissions of liability as to the "ultimate question of whether consumers are likely to be confused." Adidas Mot. (Dkt. 221) at 16-17. Adidas also argues that the four emails are "highly probative" of several of the *Polaroid* factors, including the strength of Adidas's mark, the degree of similarity between Adidas's mark and Thom Browne's design, the proximity of the parties' products, and "most significantly . . . Thom Browne's bad faith." *Id.* at 17-19. But these arguments are highly exaggerated.

Email 1 contains the off-hand suggestion by a senior account manager at Thom Brown, Emily Maturo, that, "[w]e try to avoid rows of 4 bar armband on the racks so as to not look like Adidas." Dkt. 222-1. To try to "not look like Adidas" hardly conveys an opinion that the repeating bars are confusing, let alone a confession of same. Moreover, there is no evidence that this email was referring to the accused products, and in fact the purchaser with whom Ms. Maturo was corresponding was located in Switzerland and purchasing products for Asia, so her remarks concerned an entirely distinct market. To the extent the reference to what "[w]e try" to do can be understood as a suggestion that Maturo was describing a general policy of the company, that inference is rebutted by the absence of any other evidence produced in discovery that such a policy

exists. Further, even Adidas admitted that there is no risk of confusion when it comes to Thom Browne's formalwear, having only alleged infringement with respect to a subset of Thom Browne's activewear, so the suggestion that "we try to avoid rows of 4 bar armband[s]," without any limitation to Thom Browne's activewear, hardly constitutes an admission of necessary confusion.

Email 3 reflects the views not of Thom Browne employees, but of an FCB employee, Tomasso Galli. The email describes the view of an unnamed individual at FCB that "any four bars . . . is too much in the spirit of Adidas." Dkt. 222-3. The designs being discussed are for formalwear and accessories, which Adidas does not contend constitute infringement. The fact someone at FCB believed that the design is "too much in the spirit of Adidas" may be well be relevant, but it far from an admission that Thom Browne agreed. Further, there is an obvious distinction between a likelihood of confusion and being "too much in the spirit of Adidas." In Email 4, Thom Browne suggests that he "thought [T]omaso [Galli] has already said that we shouldn't use the four bars because of adidas." Dkt. 222-4. This simply summarizes Browne's view of the import of Galli's views expressed in Email 3 and is of doubtful relevance, let alone an alleged admission.

Of the emails, perhaps the only one of more than marginal import is Email 2, in which Thi Wan, then Thom Browne's Head of Menswear, states, "As Adidas has such a big presence in the

sporting world, it is inevitable that our 4bar in white be read as adidas stripes, especially on accessories." Dkt. 222-1. Even this is not an admission, because, as already noted, the issue is not Mr. Wan's belief, but what is the objective likelihood of confusion. In any case, Mr. Wan was not discussing any of the accused products, but was instead referring to formalwear and accessories (i.e. handbags). Again, Adidas admits that these products did not infringe on its trademark.

As noted, what the jury had to decide was whether, as an objective matter, there was a reasonable likelihood or confusion between Adidas's distinctive arrangement of three stripes and Thom Browne's distinctive arrangement of four bars. Aside from the jurors' visual assessment of the similarity and dissimilarity of the two designs, the central focus at trial was, as one would expect such a case, on the competing testimony of the parties' competing experts. These experts testified about the history of the brands, the historical use of stripes and bars in a wide variety of settings (e.g., on the sleeves of army sergeants), consumers perceptions of various stripe designs, etc. There was also a considerable focus on the vastly differing price points of Adidas's and Thom Browne's products and the very different channels through which they are sold. The four email exchanges here at issue would have had little relevance to these central foci. It is true that Adidas also produced evidence of Thom Browne's alleged bad

faith, but contrary to Adidas's own assertion, it is doubtful that the four emails would have played a material role in the jury's assessment of that issue.

Indeed, it was essentially undisputed at trial that Thom Browne was aware from early on that Adidas had concerns about anyone else's use of any combination of stripes (even if labeled "bars"), that Adidas had a history of taking highly aggressive actions against any other company that used stripes in their products, and that Thom Browne sought to minimize the risk of a confrontation with Adidas but ultimately concluded that their four-bar design could be defended. *See, e.g.*, Trial Tr., at 471:21-23; 472:1-16; 473:21-474:4. The four emails here at issue are consistent with that largely undisputed evidence at trial.

In sum, the four emails, while not irrelevant, hardly seem material to the central issues in this case as they actually played out at trial. It is also worth noting that the jury, by their verdict, plainly indicated that they were not persuaded by the much more directly relevant evidence that Adidas presented. For example, Adidas presented the results of a consumer's survey that Adidas contended showed evidence of actual consumer confusion between Adidas's stripes and Thom Browne's bars. *See* Trial Tr. (Dkt. 198) at 379-405. The survey polled 2,400 consumers in the U.S. and purportedly showed that somewhere between 14% and 38.6% were confused, depending on the product type. *Id.* at 403-404. The

four emails now at issue, even when viewed most favorably to
Adidas, express the view of a few individuals at Thom Browne and
FCB that there was a risk of confusion. By contrast, this survey
purported to show that hundreds of consumers were in fact confused.
If the jury was willing to believe that there was a risk of
confusion between the two marks, the views of these actual
consumers would presumably have been far more powerful than the
views expressed in the four emails.

Furthermore, the essence of Thom Browne's defense in this
case was simply that Adidas's claims amounted to a contention that
they owned all stripe designs and that this was a masked attempted
to monopolized the sportswear market. In his closing statement,
Thom Browne's counsel summarized this argument by declaring "this
case isn't about confusion. It isn't about competition. It's about
whether adidas can own all stripes." Trial Tr. (Dkt. 208) at 1391.
Indeed, the Court's perception of the jury "body language" suggests
that it was this argument that most likely influenced the jury in
Thom Browne's favor. The four emails now at issue say nothing about
this argument.

The same is true with respect to the other arguments
emphasized by Thom Browne's counsel, such as that Thom Browne's
products did not compete with those of Adidas because they had
such widely differing price points. *Id.* at 1374-77, 1385-86. Thom
Browne also stressed the substantial difference in quality between

the two companies' products, and the fact that Thom Browne's activewear is not really meant for sports. Mr. Browne testified that he "would advise not running in [his] running shoes." Trial Tr. (Dkt. 202) at 499. To be sure, Adidas disagreed, claiming that the quality and price-point of the clothes would not have been apparent in the pre-sale and post-sale contexts, which were the only circumstances where Adidas alleged that confusion occurred. But the point for present purposes is that the four emails, if they had been introduced at the trial, would have had little or no bearing on the central dispute in this case as they actually played out at trial. More generally, even though the trial lasted eight days and included the testimony of sixteen witnesses and the introduction of over 400 exhibits, the jury returned a verdict for Thom Browne in approximately two hours. This swift verdict shows that the jury was totally unpersuaded by virtually any of the proof or argument Adidas presented at trial, and it is frankly impossible to conclude under these circumstances that these four emails here at issue would have probably tipped the scales in favor.

B. <u>Federal Rule of Civil Procedure 60(b)(3)</u>

Federal Rule of Civil Procedure 60(b)(3) permits a Court to relieve a party of a final judgment in the case of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). To be entitled to relief under this provision, Adidas must show that (1)

Thom Browne engaged in "misconduct," (2) the misconduct "substantially interfer[ed] with [Adidas's] ability to fully and fairly present its case," and (3) the "need for substantial justice" outweighs "the value of preserving the finality of judgments" such that a new trial is warranted. *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 286 F. Supp. 2d 309, 312, 316 (S.D.N.Y. 2003).

Unlike the Rule 60(b)(2) standard discussed above, which requires a showing that the evidence probably would have changed the outcome of trial, the second element of the test under Rule 60(b)(3) is satisfied where "the concealment precluded inquiry into a plausible theory of liability, denied [the movant] access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." *TAL Properties of Pomona, LLC v. Vill. of Pomona*, 2019 WL 3287983, at *9 (S.D.N.Y. July 22, 2019) (quotation omitted). Arguably, the four emails satisfy this second element; but the court does not reach that question because the Court finds that Adidas has failed to satisfy the first element, concerning whether Thom Browne has engaged in misconduct.[8]

---

[8]    Because, as explained below, the Court finds Adidas has not shown that Thom Browne engaged in misconduct, it follows that Adidas has also failed to satisfy the third element, *i.e.*, that the "need for substantial justice" warrants a new trial. *Catskill*, 286 F. Supp. 2d at 312.

1. <u>Legal Standard</u>

While the Second Circuit has never addressed the precise meaning of "misconduct" as used in Rule 60(b)(3), it has held that the moving party, to be entitled to relief, must prove the opposing party's misconduct by "clear and convincing evidence." *Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir. 1989).

Adidas argues that "even an innocent failure to produce documents during discovery may constitute 'misconduct' under Rule 60(b)(3)." Adidas Supp. Br. (Dkt. 248) at 1. Though on its face, this seems inconsistent with the common meaning of "misconduct," Adidas's position is arguably suggested by at least *dicta* in some

cases from other Circuits,[9] and several courts in this District have adopted a similar view. [10]

In response, Thom Browne claims that the First Circuit's decision in *West v. Bell Helicopter Textron*, 803 F.3d 56 (1st Cir. 2015), "affirms that 'misconduct' requires intentional or conscious behavior." Thom Browne Supp. Br. (Dkt. 250) at 5-6. Thom Browne's reading of *West* is incorrect. *West* repeatedly cited and

---

[9]    *See Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988) (stating "misconduct" "can cover even accidental omissions"); *West v. Bell Helicopter Textron, Inc.*, 803 F.3d 56, 67 (1st Cir. 2015) (quoting this portion of *Anderson* with approval); *Schultz v. Butcher*, 24 F.3d 626, 630-31 (4th Cir. 1994) ("We hold that an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)."); *Morgan v. Tincher*, 90 F.4th 172, 180 (4th Cir. 2024) (finding "failure to disclose evidence" constituted "misconduct" "irrespective whether that failure was inadvertent or intentional"); *Bros. Inc. v. W.E. Grace Mfg. Co.*, 351 F.2d 208, 211 (5th Cir. 1965) (suggesting Rule 60(b)(3) analysis is "the same whether there was evil, innocent, or careless, purpose."); *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 879 (9th Cir. 1990) (stating "misconduct" may be "either knowing or accidental"); *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1328 (Fed. Cir. 2016) (applying Eleventh Circuit law and stating that "'misconduct' does not demand proof of nefarious intent or purpose as a prerequisite to redress.").

[10]    *See Thomas*, 293 F.R.D. at 503-04 (suggesting "misconduct" may be "accidental or inadvertent"); *Catskill*, 286 F. Supp. 2d at 314 ("[A]ccidental failure to disclose or produce materials requested in discovery can constitute "misconduct" within the purview of Rule 60(b)(3)."); *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, 1996 WL 524339, at *2 (S.D.N.Y. Sept. 13, 1996) ("[Plaintiff] correctly asserts that an adverse party's inadvertent failure to produce requested discovery material in its possession may constitute misconduct under Rule 60(b)(3).").

quoted *Anderson* with approval, including those portions indicating proof of intentional misconduct is not required. *See West*, 803 F.3d at 67 ("[Misconduct] is an expansive concept, as misconduct 'does not demand proof of nefarious intent or purpose as a prerequisite to redress,' and the term 'can cover even accidental omissions.'" (quoting *Anderson*, 862 F.2d at 922-23).[11]

However, in *Jordan v. Paccar, Inc.*, the Sixth Circuit disagreed with this view and held that Rule 60(b)(3) "require[s] the moving party to demonstrate that the non-moving party engaged in deliberate or reckless misbehavior." 1996 WL 528950, at *8 (6th Cir. 1996).[12] The *Jordan* court believed that "[f]raud cannot be unintentional, and the use of the prefix 'mis' in both 'misrepresentation' and 'misconduct' also suggests that the moving party under the rule must show that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding in question." *Id.* at *6. *Jordan* found the

_____

[11]    While the *West* court did fault the district court for failing to determining the degree of defendants' culpability, it did so only because that culpability was relevant as to whether "substantial interference" could be presumed or must instead be proven by plaintiff. *See id.* at 71-73. It did not require intentional misconduct for Rule 60(b)(3) to apply.

[12]    Adidas mischaracterizes this case as requiring only a showing that the non-disclosure resulted from "accidents that should have been avoided." Adidas Supp. Br. (Dkt. 248) at 3 (quoting *Jordan*, 1996 WL 528950, at *6). While that language does appear in *Jordan*, elsewhere in the *Jordan* opinion the court clearly specified that the standard it espoused requires proof the non-disclosure was the product of deliberate or reckless conduct. *See Jordan*, 1996 WL 528950, at *7-8.

applicable canon of statutory interpretation to be *noscitur a sociis* -- the rule that "a word is known by the company it keeps" -- which suggests that "misconduct," when read with "fraud" and "misrepresentation" requires "some odious behavior on the part of the non-moving party." *Id.* at *7.

Having considered the relevant authorities, none of which is binding on this Court, the Court finds that a middle approach is appropriate here. In the context of the non-production of electronically stored information, the moving party must show the non-production was at least the product of negligence on the part of the non-producing party for it to constitute "misconduct" within the meaning of Rule 60(b)(3).

In this Court's view, this conclusion follows from the term "misconduct" itself. The term plainly connotes some form of malfeasance or inappropriate behavior. *See Misconduct*, Black's Law Dictionary (11th ed. 2019) (defining "misconduct" as "[a] dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust"); *see Anderson*, 862 F.2d at 924 n.10 ("In contrast [to Rule 60(b)(2)], Rule 60(b)(3) focuses not on erroneous judgments as such, but on judgments which were unfairly procured.").

Federal Rule of Civil Procedure 34 permits a party to "serve on any other party a request within the scope of Rule 26(b)" to produce "any designated documents or electronically stored

information." Fed. R. Civ. P. 34. Rule 26(b), in turn, permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). Among the key considerations in evaluating whether the requested discovery is proportional is "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

It follows from this fundamental limitation -- that all discovery must be proportional -- that courts do not demand perfection in responding to discovery requests, particularly when it comes to the production of electronically stored information. *See Williams v. NYC Bd. of Elections*, 2024 WL 2125435, at *6 (S.D.N.Y. May 13, 2024) ("Perfection is not the rule, especially with multiple sources of ESI, the tendency for there to be multiple copies of the same email or near-dupes the production of which has no incremental value to the case but exponentially increases the costs of discovery."); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 461 (S.D.N.Y. 2010) ("In an era where vast amounts of electronic information is available for review . . . [c]ourts cannot and do not expect that any party can meet a standard of perfection."), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012); *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 2014 WL 584300, at *2 (S.D.N.Y. Feb. 14, 2014) ("[N]o one

could or should expect perfection from [the electronic discovery] process."). Courts only require, for example, that a party conduct a "reasonable search" for documents in response to a request, not that they boil the ocean to ensure every potentially responsive item is produced. *Raine Grp. LLC v. Reign Cap., LLC*, 2022 WL 538336, at *1 (S.D.N.Y. Feb. 22, 2022).

The strict liability rule demanded by Adidas is inconsistent with this principle of proportionality. Unlike Rule 60(b)(2), which requires a showing that the non-produced material probably would have changed the outcome at trial, Rule 60(b)(3) may be satisfied where "the concealment precluded inquiry into a plausible theory of liability, denied [the opposing party] access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." *TAL Properties*, 2019 WL 3287983, at *9. The scope of documents potentially encompassed by this rule is comparatively vast, and it is entirely plausible that even a thorough and diligent search will fail to identify items that satisfy the test. If the innocent non-production of such documents were in every case sufficient to void the results of a trial, the balance of economy and thoroughness struck by the discovery rules would be shattered, as parties would be incentivized to go to inordinate lengths to ensure all conceivably significant material is produced. And while most cases do not go to trial, every party

must assume that a trial might take place and conduct their discovery accordingly. Thus, an overly expansive interpretation of Rule 60(b)(3) will have the perverse effect of incentivizing inordinate levels of care in a large proportion of cases, for fear that any trial win may be no win at all. This result cannot be correct.

In a similar vein, where a party "fail[s] to timely produce [certain] evidence," but this failure is discovered before trial, courts may not impose sanctions unless the failure was the product of "a culpable state of mind." *Valentini v. Citigroup, Inc.*, 2013 WL 4407065, at *2 (S.D.N.Y. Aug. 16, 2013). "The 'culpable state of mind' element is satisfied by a showing that 'a party has breached a discovery obligation . . . through bad faith or gross negligence [or] ordinary negligence.'" *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 113 (2d Cir. 2002)).

Just as a party must show at least negligence to obtain sanctions, it makes sense to require a similar showing of at least negligence to demonstrate "misconduct" within the meaning of Rule 60(b)(3). Not only does this align the standards of conduct throughout the various portions of the Rules of Civil Procedure, but also without such a showing, the moving party arguably has not demonstrated that the non-moving party even breached its discovery

obligations at all, and, hence, that any misconduct has occurred.[13] By contrast, the strict liability rule advocated by Adidas would create the anomalous result that a party may obtain a new trial based on a showing that would not even entitle them to sanctions during the normal course of litigation, a result fundamentally at odds with the principle that "final judgments should not be lightly reopened." *Catskill*, 286 F. Supp. 2d at 320 (quoting *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)(internal quotation marks omitted)).

The Court acknowledges the non-binding authority cited above that runs arguably contrary to this holding, but notes that the suggestion that even innocent non-disclosures may constitute misconduct was dicta in many of those cases, where some degree of purposeful culpability was clearly apparent.[14] In the other cases

---

[13] One might argue that the standard to obtain sanctions does not actually define a party's underlying discovery obligations, or in other words that there is a divergence between the conduct rule and the decision rule. *See Meir Dan-Cohen, Decision Rules and Conduct Rules: On Acoustic Separation in Criminal Law,* 97 Harv. L. Rev. 625, 627-28 (1984) (explaining distinction between "conduct rules" intended to guide the public's conduct and "decision rules" addressed to officials applying the law). But even if Rule 37's culpability requirement defines only when sanctions may be obtained (*i.e.* defines a decision rule), the Court sees no reason why a similar decision rule should not apply in the Rule 60(b)(3) context.

[14] *See, e.g., Anderson*, 862 F.2d at 927-28 ("Appellee's knowledge of the Report, before trial and in ample time to make disclosure, cannot be gainsaid."); *Jones*, 921 F.2d at 878-79 (remanding for district court to make findings about existence of misconduct in first instance); *Morgan*, 90 F.4th at 180 (finding

where a Rule 60(b)(3) motion was granted without an explicit finding of culpability, there were nevertheless suggestions in the record that the party engaging in misconduct was aware of the non-produced information or that they likely had acted with at least negligence in failing to produce it, and so the facts of these cases are consistent with this Court's holding, even if their reasoning diverges from it somewhat.[15] And, perhaps most significantly, none of the other cases involved a failure to produce electronically stored information as part of a substantial discovery review process and thus none of the cases implicate the proportionality concerns present in that context.

On the other hand, the Court is equally convinced that a showing of no more than negligence is appropriate. Limiting "misconduct" to "intentional[] or conscious" bad acts, as Thom

---

defendant engaged in misconduct by failing to update discovery response seeking information about other cases where the defendant had been sued); *Thomas*, 293 F.R.D. at 505-06 (concluding misconduct was intentional).

[15]    *See, e.g., Rembrandt Vision Techs., L.P.*, 818 F.3d at 1328 (suggesting argument that party was unaware of test results "strains credulity, given that it provided" its product to the expert who conducted the testing); *Schultz*, 24 F.3d at 629 (suggesting non-producing party was "in possession of" extremely harmful report it failed to disclose); *Bros Inc.*, 351 F.2d at 211 (concluding there was insufficient evidence to find party had engaged in "purposeful misconduct" by submitting and relying on false affidavit but granting Rule 60(b) relief regardless); *Catskill*, 286 F. Supp. 2d at 314 (non-producing party admitted to being aware of evidence, but failed to disclose it based on erroneous interpretation of agreement regarding scope of discovery).

Browne requests, TB Supp. Br. (Dkt. 250) at 2, ignores the critical role that attorneys play in our discovery system. "Discovery is run largely by attorneys, and the court and the judicial process depend upon honesty and fair dealing among attorneys." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007). "If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." 1983 Advisory Comm. Note to Rule 26(g). Demanding a party affirmatively use reasonable care in complying with its discovery obligations is therefore appropriate for the proper functioning of our civil justice system. *Cf. Residential Funds Corp.* 306 F.3d at 108 ("The inference is adverse to the destroyer [of documents] not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991)).

If only intentional misconduct were penalized, a party's incentive would be to do the bare minimum in complying with its obligations, in the hope that its lackluster performance would go unnoticed until a wrongful trial result was obtained and it is too late to correct. *See Anderson* 862 F.2d at 923 ("[I]t takes scant imagination to conjure up discovery responses which, though made in good faith, are so ineptly researched or lackadaisical that

they deny the opposing party a fair trial."). And the problem is compounded by difficulties of proving an adversary's bad intent after the fact.[16]

Furthermore, permitting Rule 60(b)(3) relief based on a showing of negligence preserves the independent force of the term "misconduct."

2. <u>Application</u>

It follows that for Adidas to establish Thom Browne's non-production of the emails constituted "misconduct" within the meaning of Rule 60(b)(3), Adidas must show by clear and convincing evidence that Thom Browne was obligated to produce the emails and negligently failed to do so. The court finds that Adidas has not satisfied this burden.

As explained *supra* Section I.C., the non-production of the four emails was the product of a miscommunication between Thom Browne's counsel and its e-discovery vendor. Wolf Greenfield paralegal Viriginia Weeks sent an email to Thom Browne's e-discovery vendor, Consilio, instructing them to create "a saved search for ALL potentially privileged documents that have not already been produced by Thom Browne so that we will have one

_____

[16]    True, a party still might be able to obtain relief under Rule 60(b)(2) if the non-disclosed evidence is sufficiently probative, but rarely will a court be able to say with confidence that a given piece of evidence "probably would have change the outcome" of a trial.

search to work with when we go to do our privilege review." Dkt.
244-4, at TB00530219. Consilio then created a saved search titled
"All Potentially Privileged" by running privilege search terms
across all documents "that are not produced, not coded for
responsiveness and not coded for privilege." *Id.* at TB00530218;
Kerr Dep. (Dkt. 244-3) at 51-54. The four emails were not included
in this "All Potentially Privileged" saved search because
unbeknownst to Consilio, Ms. Weeks had previously tagged all (or
some) documents hitting on the search term "adidas" as "needs
further review." Hearing Tr. at 70, 75-76, 87-88; *see* Kerr Dep.
(Dkt. 244-3) at 51-55. Because the four emails were not included
in this saved search, they were never reviewed for privilege and
so were never produced.

    As an initial matter, there is no evidence in the record that
suggests the non-production of the four emails was intentional or
knowing. Each of Thom Browne's witnesses credibly denied any
recollection of seeing the four emails or having ever been
instructed to withhold responsive, non-privileged documents. This
is confirmed by the Relativity document histories for the four
emails. These histories reflect all instances when the four emails
were viewed or modified. The histories for Emails 2 through 4,
show that the only time a representative from Wolf Greenfield had
any interaction with them was when Ms. Weeks carried out a "Mass
Edit" on these documents (and presumably others) changing the

responsiveness, confidentiality, and privilege coding to "Needs Further Review." *See* Dkts. 242-5, 242-6, 242-8, 242-9, 242-11, 242-12, 242-16, 242-17.[17]

The document history for Email 1 is somewhat more complicated. *See* Dkts. 242-2, 242-3. Email 1 was ultimately subject to the same mass edit by Ms. Weeks as the other three emails. However, prior to that edit another Wolf Greenfield paralegal, Cindy Babbit, viewed the document several times, made several mass edits to its responsiveness, privilege, and confidentiality coding, and made one non-mass edit, changing its privilege coding to "Needs Further Review." Ms. Weeks apparently also viewed this document before making her aforementioned mass edit. It is not clear why Ms. Babbit made these edits, why Ms. Babbit or Ms. Weeks viewed this document, or how long they viewed it for. At an evidentiary hearing, Ms. Babbit had no recollection of making these changes or viewing the document. Ms. Weeks testified she was instructed by a Wolf Greenfield associate to make the aforementioned mass tag of documents that hit on the Adidas search terms, but she also did not recall viewing the document.

Adidas nonetheless argues that these document histories demonstrate that Ms. Weeks and Ms. Babbit had knowledge of the

---

[17]   According to the e-discovery principal employed by Adidas's own counsel, "[a] mass edit is when you apply tags or categories to a document without actually looking at [the documents]." Hearing Tr. (Dkt. 240) at 17:19-24.

contents of at least Email 1. *See* Adidas Supp. Br. (Dkt. 248) at 5-7. But even assuming these individuals in fact had knowledge of Email 1 -- something both of them denied having any recollection of -- that would not establish any culpable conduct. As paralegals, they cannot reasonably be apprised of all documents produced and in play in the case. And even assuming, *arguendo*, that it might be reasonable to expect them to understand the significance of Email 1, the most they can be expected to do is flag the document for further review by an attorney, which is precisely what happened. Having done so, neither paralegal had any reason to believe the emails would not have been reviewed and produced.

Adidas argues that, even if not knowing, the non-production of the four emails was the product of negligence. In particular, Adidas points out that, in response to Ms. Weeks's request to create the saved search for the privilege review, Consilio told her it had included only documents "not coded for responsiveness and not coded for privilege," and so Weeks and other Wolf Greenfield attorneys cc'd on the email were on notice that the four emails -- which Weeks had previously coded -- were not included in the search. *See* Adidas Supp. Reply. (Dkt. 254) at 4-5.

The Court is not convinced this demonstrates negligence. Weeks' instruction that the saved search should include "ALL potentially privileged documents" was quite clear and it was

reasonable for her to assume that this would encompass documents that had been tagged as "needs further review." By contrast, the suggestion that only documents "not coded for responsiveness and not coded for privilege" were included is rather vague, and documents "not coded for privilege" could easily be understood as encompassing only documents that had already been determined were in fact privileged. With the benefit of hindsight, this disconnect in understandings is readily apparent, but in the moment, while an extensive discovery review was ongoing, it is not clearly negligent for Weeks to have assumed her unambiguous instruction was understood. An inadvertent but understandable mix-up is not the same as negligence, at least not here.

Furthermore, Adidas has failed to prove by clear and convincing evidence that this further check was conducted in a negligent manner. Claire Schuster, a Wolf Greenfield associate, testified that she was tasked not only with reviewing the "All Potentially Privilege" saved searches created by Consilio, but also with conducting additional independent searches to ensure no other documents fell through the cracks. *See* Schuster Dep. (Dkt. 244-2) at 21-31. This included searching for any documents that were tagged as "needs further review." *See id.* at 40 (testifying that she "endeavored to be careful and review every document that was tagged 'further review.'"); *see also id.* at 57-58 (testifying that "it was [Schuster's] intent, when [she] was completing the

privilege log exercise, to review every document that was tagged 'needs further review'" and that she "believe[s] [her] actions matched [her] intent").

While Schuster's quality check ultimately did not identify the four emails, *see id.* at 50-52, the very fact that such a check was conducted negates the high burden placed on Adidas to prove negligence with clear and convincing evidence.

III. <u>Conclusion</u>

For the forgoing reasons, the Court reconfirms its "bottom-line" order of May 3, 2024, denying Adidas's motion for a new trial.

SO ORDERED.

Dated:    New York, NY
          July 29, 2024                    JED S. RAKOFF, U.S.D.J.